Counsel listed on signature pages]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LIDODERM ANTITRUST LITIGATION | Case No. 14-md-02521-WHO |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' COMPLAINTS<br><br>Date:          November 5, 2014<br>Time:          2:00 p.m.<br>Courtroom:  2, 17th Floor<br>Before:       Hon. William H. Orrick |

## TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................... 1

II.  FACTS ........................................................................................................................ 2

    A.  Watson's ANDA ............................................................................................. 2

    B.  Endo and Teikoku's Patent Litigation Against Watson ................................. 3

    C.  The Challenged Reverse-Payment Agreement ................................................ 4

        1.  Payment #1:  Free Product ($96 million) ......................................... 4

        2.  Payment #2:  No Authorized Generic for 7½ Months ($150-198 million) ....... 4

    D.  FDA Approval for Watson's Generic Lidoderm ANDA ................................. 5

III.  ARGUMENT ............................................................................................................. 6

    A.  Applicable Legal Standards ............................................................................ 6

        1.  Motions to Dismiss ............................................................................ 6

        2.  Application of the Rule of Reason in a "Pay for Delay" Case ......................... 6

    B.  Plaintiffs Have Met Their Pleading Burden Under the Rule of Reason and *Twombly* ........................................................................................................ 7

    C.  Defendants May Not Obtain Dismissal by Asserting Procompetitive Justifications ................................................................................................... 8

    D.  Antitrust Scrutiny Under Actavis is Not Limited to Cash Payments ........................ 12

        1.  The Free Branded Lidoderm Was a $96 Million Payment to Watson ............ 14

        2.  The No-AG Promise Was a $150-198 Million Payment to Watson ............... 16

    E.  The No-AG Promise Can and Should Be Given Per Se Treatment in Claim II .......... 19

    F.  Plaintiffs Have More Than Adequately Alleged Antitrust Injury and Causation ....... 21

    G.  Plaintiffs' Attempted Monopolization and Monopolization Claims Are Cognizable Against Endo and Teikoku; Alternatively, They are Cognizable Against Endo ................................................................................................. 24

    H.  The End-Payor Plaintiffs Have Standing to Pursue Their State Law Claims ............ 27

        1.  The EPPs Have Article III Standing and Therefore May Pursue The Claims Of Absent Class Members In Other States ......................................... 28

        2.  The Law of the State of Purchase Governs the Standing Inquiry .................. 30

    I.  End-Payor Plaintiffs And GEHA Are Not Barred From Pursuing State Law Claims In Illinois, Massachusetts, Puerto Rico, And Rhode Island ........................... 31

1        1.   Illinois ..........................................................................................................31

2        2.   Massachusetts .............................................................................................32

3        3.   Puerto Rico ..................................................................................................34

4        4.   Rhode Islands ..............................................................................................35

5    J.   End-Payor Plaintiffs and GEHA Sufficiently State Claims for Unjust
         Enrichment ............................................................................................................36

6

7        1.   Unjust Enrichment Can Be Pleaded in the Alternative ...............................36

8        2.   Plaintiffs Adequately Allege Unjust Enrichment Claims .............................37

9        3.   *Illinois Brick* Does Not Bar Plaintiffs' Unjust Enrichment Claims ...............38

10       4.   Receipt of Lidoderm Does Not Bar Plaintiffs' Unjust Enrichment Claims ....39

11       5.   Plaintiffs' Lidoderm Purchases Conferred a Direct Benefit on
              Defendants ...................................................................................................40

12       6.   California Recognizes an Independent Cause of Action for Unjust
              Enrichment ..................................................................................................41

13   IV.   CONCLUSION ...................................................................................................................42

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## FEDERAL CASES

*Am. Ad Mgmt., Inc. v. GTE*,
  92 F.3d 781 (9th Cir. 1996) ........................................................................... 7, 12

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010) ..................................................................................... 14, 18

*Andrx Pharm. Inc. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001) .......................................................................... 23

*Apple iPod iTunes Antitrust Litig. v. Apple, Inc.*,
  2010 WL 2629907 (N.D. Cal. June 29, 2010) ..................................................... 9

*Armstrong v. U.S.*,
  756 F.2d 1407 (9th Cir.1985) ............................................................................ 22

*Asahi Glass Co. v. Pentech Pharms., Inc.*,
  289 F. Supp. 2d 986 (N.D. Ill. 2003) ........................................................... 15, 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................ 6

*B. Braun Med., Inc. v. Abbott Labs.*,
  124 F.3d 1419 (Fed. Cir. 1997) ......................................................................... 18

*Barnett v. Strom*,
  265 F. Supp. 2d 946 (N.D. Ill. 2003) ................................................................. 17

*Bates v. United Parcel Serv., Inc.*,
  511 F.3d 974 (9th Cir. 2007) ....................................................................... 28, 29

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................. 6, 7, 13

*Benefit Trust Life Ins. Co. v. Union Nat'l Bank*,
  776 F.2d 1174 (3d Cir. 1985) ............................................................................ 41

*Berger v. Home Depot USA, Inc.*,
  741 F.3d 1061 (9th Cir. 2014) ........................................................................... 41

*Betaseed, Inc. v. U & I, Inc.*,
  681 F.2d 1203 (9th Cir. 1982) ........................................................................... 11

*Bhan v. NME Hosps., Inc.*,
  929 F.2d 1404 (9th Cir. 1991) ................................................................. 7, 11, 12

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
   182 F.3d 1096 (9th Cir. 1999) ................................................................................. 12

*Biovail Corp. Int'l. v. Hoechst*,
   49 F. Supp. 2d 750 (D.N.J. 1999)............................................................................ 23

*Blue Cross & Blue Shield v. AstraZeneca Pharms. LP (In re Pharm. Indus. Average
   Wholesale Price Litig.)*,
   582 F.3d 156 (1st Cir. 2009) ................................................................................... 34

*Brennan v. Concord EFS, Inc.*,
   369 F. Supp. 2d 1127 (N.D. Cal. 2005).....................................................................9

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979) ..................................................................................................... 18

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) ................................................................................................. 14

*California v. ARC Am. Corp.*,
   490 U.S. 93, 102-103 (1989) ................................................................................... 38

*Carter v. Variflex, Inc.*,
   101 F. Supp. 2d 1261 (C.D. Cal. 2000) ................................................................... 18

*Chicago Prof'l Sports Ltd. P'Ship v. NBA*,
   95 F.3d 593 (7th Cir. 1996) ..................................................................................... 26

*Chipanno v. Champion Int'l Corp.*,
   702 F.2d 827 (9th Cir. 1983) ................................................................................... 22

*Ciardi v. F. Hoffman-La Roche Ltd*.,
   762 N.E.2d 303 (Mass. 2002) .................................................................................. 33

*Clancy v. The Bromley Tea Co.*,
   No. 12-cv-3003, 2013 WL 4081632 (N.D. Cal. Aug. 9, 2013)................................ 29

*Cohlmia v. St. John Med. Ctr.*,
   693 F.3d 1269 (10th Cir. 2012) ............................................................................... 25

*Cont'l Ins. Co. v. Bahman*,
   216 F.3d 150 (1st Cir. 2000) ................................................................................... 33

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
   433 U.S. 36 (1977) ................................................................................................... 14

*Desiano v. Warner-Lambert, Co.*,
   326 F.3d 339 (2d Cir. 2003) .................................................................................... 41

*Earth Elements, Inc. v. Nat'l Am. Ins. Co.*,
   41 Cal. App. 4th 110 (Cal. Ct. App. 1995)........................................................13

*Easter v. American West Financial*,
   381 F.3d 948 (9th Cir. 2004) ........................................................................29

*Eastman Kodak Co. v. Image Tech. Serv.*,
   504 U.S. 451 (1992) ........................................................................11, 14

*Ellsworth v. U.S. Bank, N.A.*,
   908 F. Supp. 2d 1063 (N.D. Cal. 2012)........................................................9

*Engine Spec., Inc. v. Bombardier, Ltd.*,
   605 F.2d 1 (1st Cir. 1979) ........................................................................21

*Exxon Co., USA v. Sofec, Inc.*,
   517 U.S. 830 (1996) ........................................................................22

*Federal Deposit Ins. Corp. v. Dintino*,
   167 Cal. App. 4th 333 (Cal. Ct. App. 2008)........................................................41

*Ferrell v. Wyeth-Ayerst, Labs., Inc.*,
   No. 01-447, 2004 U.S. Dist. LEXIS 15127 (S.D. Ohio June 30, 2004), at *13....................30

*Frullo v. Landenberger*,
   814 N.E.2d 1105 (Mass. App. Ct. 2004) ........................................................33

*FTC v. Actavis, Inc.*,
   133 S. Ct. 2223 (2013) ........................................................................passim

*Genentech, Inc. v. Eli Lilly & Co.*,
   998 F.2d 931 (Fed. Cir. 1993) ........................................................................19

*Ghirardo v. Antonioli*,
   924 P.2d 996 (Cal. 1996)........................................................41

*Gladstone, Realtors v. Village of Bellwood*,
   441 U.S. 91 (1979) ........................................................................30

*Gonzalez-Maldonado v. MMM Health., Inc.*,
   693 F.3d 244 (1st Cir. 2012) ........................................................................25

*Hairston v. Pac. 10 Conf.*,
   101 F.3d 1315 (9th Cir. 1996)........................................................12

*Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*,
   850 F.2d 477 (9th Cir. 1988) ........................................................................26

*Image Tech. Serv. v. Eastman Kodak Co.*,
   903 F.2d 612 (9th Cir. 1990) ........................................................................11

*In re Auto. Parts Antitrust Litig.*,
Civ. No. 12-md-2311, 2014 WL 2993742 (E.D. Mich. July 3, 2014) ................................. 40

*In re Bextra & Celebrex Mktg. Sales Prac. & Liab. Litig.*,
495 F. Supp. 2d 1027 (N.D. Cal. 2007) ................................................................... 33

*In re Cardizem CD Antitrust Litig.*,
332 F.3d 896 (6th Cir. 2003) ................................................................................ 23

*In re Cardizem CD Antitrust Litig.*,
105 F. Supp. 2d 618 669 (E.D. Mich. 2000) ...................................................... 39, 41

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
MDL 1917, 2014 WL 1088256 (N.D. Cal. Mar. 13, 2014) ................................... 34

*In re Checking Account Overdraft Litig.*,
281 F.R.D. 667 (S.D. Fla. 2012) ........................................................................... 37

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
261 F. Supp. 2d 188, 205 (E.D.N.Y. 2003). ......................................................... 24

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D. N.Y. 2012) ................................................................. 41

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ............................................................................... 29

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011) .................................................................. 35

*In re Ditropan XL Antitrust Litig.*,
529 F. Supp. 2d 1098 (N.D. Cal. 2007) ............................................................... 30

*In re Flonase Antitrust Litig.*,
692 F. Supp. 2d 524 (E.D. Pa. 2010) ......................................................... 30, 37, 41

*In re G-fees Antitrust Litig.*,
584 F. Supp. 2d 26 (D.D.C. 2008) ................................................................. 37, 39

*In re Graphics Processing Units Antitrust Litigation*
527 F.Supp.2d 1011, 1026-27 (N.D. Cal. 2007) ................................................... 29

*In re High-Tech Empl. Antitrust Litig.*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...................................................... 8, 10, 16

*In re K-Dur Antitrust Litig.*,
338 F. Supp. 2d 517 (D.N.J. 2004) .......................................................... 22, 23, 39, 41

*In re K-Dur Antitrust Litig.*,
686 F.3d 197 (3d Cir. 2012) ................................................................................ 24

*In re K-Dur Antitrust Litig.*,
   MDL 1419, 2008 WL 2660783 (D.N.J. March 19, 2008)......................................................31

*In re Lamictal Direct Purchaser Antitrust Litig.*,
   2014 WL 1745072 (3d. Cir. Apr. 28, 2014). ............................................................13

*In re Lipitor Antitrust Litig.*,
   2013 WL 4780496 (D.N.J. Sept. 5, 2013)................................................13, 22, 23

*In re Loestrin 24 Fe MDL Antitrust Litig.*,
   2014 WL 4368924 (D.R.I. Sept. 4, 2014) ................................................13, 14

*In re Mercedes-Benz TeleAid Litig.*,
   257 F.R.D. 46 (D.N.J. 2009) ............................................................37

*In re NCAA Student-Athlete Name & Like. Lic. Litig.*,
   2014 WL 1410451 (N.D. Cal. Apr. 11, 2014)...........................................................7

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   968 F. Supp. 2d 367 (D. Mass. 2013)................................................13, 16, 23

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   No. 12-md-2409, slip op. (D. Mass. Oct. 23, 2013), Dkt. No. 448 ........................................36

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   2014 WL 4370333 (D. Mass. Sept. 4, 2014) ................................................13, 18

*In re Niaspan Antitrust Litig.*,
   No. 2:13-md-2460 (E.D. Pa. Sept. 8, 2014) ............................................................13

*In re Processed Egg Prods. Antitrust Litig.*,
   851 F. Supp. 2d 867....................................................................37, 39

*In re Relafen Antitrust Litig.*,
   221 F.R.D. 260 (D. Mass. 2004) ............................................................30, 31

*In re Rezulin Prods. Liab. Litig.*,
   392 F. Supp. 2d 597 (S.D.N.Y. 2005) ............................................................31

*In re Static Random Access Memory (SRAM) Antitrust Litigation*,
   2010 WL 5094289 (N.D. Cal. Dec. 8, 2010) ............................................................35

*In re Terazosin Hydrochloride Antitrust Litig.*,
   220 F.R.D. 672 (S.D. Fla. 2004) ............................................................37, 38

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   599 F. Supp. 2d 1179 (N.D. Cal. 2009)............................................................35

*In re TFT-LCD (Flat Panel) Antitrust Litigation,*
    2011 WL 4345435 (N.D. Cal. Sept. 5, 2011) ................................................................ 41, 42

*In re TJX Cos. Retail Sec. Breach Litig.,*
    564 F.3d 489 (1st Cir. 2009) ................................................................................................ 33

*In re Wellbutrin XL Antitrust Litig.,*
    260 F.R.D. 143 (E.D. Pa. 2009) ...................................................................................... 30, 31

*In re Wellbutrin XL Antitrust Litig.,*
    2009 WL 678631 (E.D. Pa. Mar. 13, 2009) ..................................................................... 27

*In re Wellbutrin XL Antitrust Litig.,*
    No. 08-2431, ECF No. 534 (E.D. Pa. Jan. 17, 2014) ................................................ 13, 16, 27

*Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co.,*
    817 F.2d 639 (10th Cir. 1987) .......................................................................................... 18

*King Drug Co. of Flor., Inc. v. Cephalon, Inc.,*
    702 F. Supp. 2d 514 (E.D. Pa. 2010) ................................................................... 22, 37, 39

*King Drug Co. of Florence v. Smithkline Beecham Corp.,*
    No. 14-1243 (3d Cir. filed Jan. 30, 2014) ........................................................................ 13

*Kohen v. Pacific Investment Management Co.,*
    571 F.3d 672 (7th Cir. 2009) ............................................................................................ 28

*Krehl v. Baskin-Robbins Ice Cream Co.,*
    664 F.2d 1348 (9th Cir. 1982) .......................................................................................... 18

*L.A. Mem'l Coliseum Comm. v. NFL,*
    726 F.2d 1381 (9th Cir. 1984) .......................................................................................... 12

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n,*
    884 F.2d 504 (9th Cir. 1989) ....................................................................................... 7, 12

*Mannington Mills, Inc. v. Congoleum Indus., Inc.,*
    610 F.2d 1059 (3d Cir. 1979) ..................................................................................... 18, 21

*Metro Indus. v. Sammi Corp.,*
    82 F.3d 839 (9th Cir. 1996) ................................................................................................. 7

*Moraine Prod. v. ICI America, Inc.,*
    538 F.2d 134 (7th Cir. 1976) ............................................................................................ 18

*Mozart Co. v. Mercedes-Benz of N. Am., Inc.,*
    833 F.2d 1342 (9th Cir. 1987) ............................................................................................ 9

*N. Pac. Ry. Co. v. United States,*
    356 U.S. 1 (1958) .............................................................................................................. 21

*Nationwide R.A.C. Sales v. Ford Motor Co.*,
   1997 WL 88399 (N.D. Cal. Feb. 19, 1997) ............................................................... 8

*NCAA v. Bd. of Reg. of Univ. of Okla.*,
   468 U.S. 85 (1984) .................................................................................................... 9

*Nordberg v. Trilegiant Corp.*,
   445 F. Supp. 2d 1082 (N.D. Cal. 2006) .................................................................. 41

*Oltz v. St. Peter's Cmty. Hosp.*,
   861 F.2d 1440 (9th Cir. 1988) .................................................................................. 7

*Paladin Assocs. v. Montana Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) ............................................................................ 7, 27

*Palmer v. BRG of Ga., Inc.*,
   498 U.S. 46 (1990) ...................................................................................... 18, 20, 21

*Pareto v. F.D.I.C.*,
   139 F.3d 696 (9th Cir. 1998) .................................................................................... 6

*Piechur v. Redbox Automated Retail, LLC*,
   2010 WL 706047 (S.D. Ill. Feb. 24, 2010) ........................................................... 32

*Powers v. Lycoming Engines*,
   245 F.R.D. 226 (E.D. Pa. 2007) ............................................................................ 37

*R.C. Dick Geo. Corp. v. Thermo., Inc.*,
   890 F.2d 139 (9th Cir. 1989) (*en banc*) ............................................................... 21

*Rebel Oil Co. v. Atl. Rich. Co.*,
   51 F.3d 1421 (9th Cir. 1995) ............................................................................... 7, 26

*Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*,
   259 F. Supp. 2d 992 (N.D. Cal. 2003) ..................................................................... 8

*Rite-Hite Corp. v. Kelley Co., Inc.*,
   56 F.3d 1538 (Fed. Cir. 1995) ............................................................................... 17

*Rivera-Muniz v. Horizon Lines Inc.*,
   737 F. Supp. 2d 57 (D.P.R. 2010) .................................................................... 34, 35

*Roller Bearing Co. v. United States*,
   341 U.S. 593 (1951) ............................................................................................... 18

*Rome Amb. Surg. Ctr. v. Rome Mem'l Hosp.*,
   349 F. Supp. 2d 389 (N.D.N.Y. 2004) .................................................................. 10

*Scott v. Kuhlmann*,
   746 F.2d 1377 (9th Cir. 1984) .................................................................................. 9

*Shady Grove Orth. Assoc. v. Allstate Ins. Co.*,
      559 U.S. 393 (2010) ............................................................................................... 32

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
      263 F.R.D. 205 (E.D. Pa. 2009) ...................................................................... 30, 31

*Simpson v. Union Oil Co. of Cal.*,
      377 U.S. 13 (1964) ................................................................................................. 19

*Singer v. AT&T Corp.*,
      185 F.R.D. 681 (S.D. Fla. 1998) ........................................................................... 37

*Sosna v. Iowa*,
      419 U.S. 393 (1975) ................................................................................................ 29

*Standfacts Credit Servs., Inc. v. Experian Info Sol., Inc.*,
      405 F. Supp. 2d 1141 (C.D. Cal. 2005) ................................................................ 26

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
      2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) ....................................................... 25

*Stearns v. Ticketmaster Corp.*,
      655 F.3d 1013 (9th Cir. 2011) ............................................................................... 29

*Steel Co. v. Citizens for a Better Env't*,
      523 U.S. 83 (1998) ................................................................................................. 30

*Sun Dun Inc. of Wash. v. The Coca-Cola Co.*,
      740 F. Supp. 381 (D. Md. 1990) ............................................................................ 26

*Tanaka v. U.S.C*,
      252 F.3d 1059 (9th Cir. 2001) ........................................................................... 7, 11

*Texaco, Inc. v. Dagher*,
      547 U.S. 1 (2006) ................................................................................................... 26

*Thurman Ind., Inc. v. Pay 'N Pak Stores, Inc.*,
      875 F.2d 1369 (9th Cir. 1989) ............................................................................... 12

*Tucker v. Apple Comp., Inc.*,
      493 F. Supp. 2d 1090 (N.D. Cal. 2006) .................................................................. 9

*United States v. Bayer Co.*,
      135 F. Supp. 65 (S.D.N.Y. 1955) ..................................................................... 18, 20

*United States v. Brown*,
      936 F.2d 1042 (9th Cir. 1991) ............................................................................... 21

*United States v. Concentrated Phosphate Export Ass'n*,
      393 U.S. 199 (1968) ............................................................................................... 14

*United States v. Crown Zellerbach Corp.*,
    141 F. Supp. 118 (N.D. Ill. 1956)................................................................21

*United States v. Gen. Elec. Co.*,
    272 U.S. 476 (1926) ........................................................................................19

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) ........................................................................................21

*United States v. Westinghouse Elec. Corp.*
    648 F.2d 642 (9th Cir. 1981) ........................................................................19

*Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)........................................................................................24

**STATE CASES**

*Pearline Peart v. D.C. Hous. Auth.*,
    972 A.2d 810 (D.C. 2009) ............................................................................40

*Pion v. Bess Eaton Donuts Flour Co.*,
    637 A.2d 367 (R.I. 1994)................................................................................36

*Pressure Vessels of P.R., Inc. v. Empire Gas de P.R.*,
    137 P.R. Dec. 497 (1994) ..............................................................................35

*Ransom v. Marrese*,
    122 Ill. 2d 518 (1988) ....................................................................................32

**FEDERAL STATUTES**

740 ILCS 10/7 ......................................................................................................31, 32

10 L.P.R.A. § 268 ..........................................................................................................34

Clayton Act § 4 ..................................................................................................35, 39

Sherman Act § §1, 2 ................................................................................................*passim*

**FEDERAL RULES**

Federal Rule of Civil Procedure 8 ........................................................................37

Federal Rule of Civil Procedure 23 ..................................................28, 29, 32

**STATE STATUTES**

Mass. Gen. Laws ch. 93A, § 1(b) ......................................................32, 33, 34

R.I. Gen. Laws § 6-36-7 ..................................................................................................35

**SECONDARY AUTHORITIES**

1 William B. Rubinstein et al., Newburg on Class Actions § 2:6 (5th ed. 2011)..........................29

2A Sutherland Statutes and Statutory Construction, at § 47:8 (7th ed. 2014) .............................32

7AA Alan Wright et al., Federal Practice and Procedure § 1785.1 (3d ed. 2010) ......................29

Aaron Edlin, Scott Hemphill, Herbert Hovenkamp & Carl Shapiro, *Activating Actavis*
    28 ANTITRUST 16, 20 (Fall 2013) ........................................................................................10

Black's Law Dictionary (9th ed. 2009) ........................................................................................13

Brief of Federal Trade Commission, *In re Lamictal Direct Purchaser Antitrust Litig.*,
    2014 WL 1745072, *1 (3d. Cir. Apr. 28, 2014) ......................................................................13

C. Scott Hemphill, *An Aggregate Approach to Antitrust: Using New Data and Rulemaking
    to Preserve Drug Competition*, 109 COLUM. L. REV. 629, 665-66 (2009).............................14

ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES §2.5, (3d ed. 2006) ...28

*Medium of Payment* § 26 60 Am. Jur. 2d (2014) .........................................................................13

P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 2046(b)(3) (2014) ...........................................18

RESTATEMENT OF RESTITUTION § 1 and Comments (a) & (b)........................................................38

William O. Kerr & Cleve B. Tyler, *Measuring Reverse Payments in the Wake of Actavis*
    28 ANTITRUST 29, 34-35 (2013) ...........................................................................................16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.   INTRODUCTION

Plaintiffs' complaints[1] describe how defendants Endo and Teikoku paid their generic competitor, Watson,[2] hundreds of millions of dollars in return for Watson's agreement to delay for more than a year launching its less expensive, generic version of Lidoderm.  Such a "pay-for-delay" agreement is actionable under the antitrust "rule of reason."  *See FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013).  Endo and Teikoku paid Watson with (a) $96 million worth of free Lidoderm that Watson then turned around and sold at full price, and (b) a promise not to market their own authorized generic version of Lidoderm for 7½ months after Watson's delayed launch, which was worth at least another $150 million to Watson, because it gave Watson all generic sales during those 7½ months and freed it from having to compete on price against Endo and Teikoku's authorized generic.  DC ¶¶ 95-102, 110-16; EC ¶¶ 106, 113-17; GC ¶¶ 98-105.

Endo and Teikoku made these payments to Watson in exchange for Watson's agreement not to compete against branded Lidoderm for more than a year.  DC ¶¶ 94-95; EC ¶¶ 104-05, 124; GC ¶¶ 97-98.  As agreed, despite obtaining FDA approval to launch lower-priced generic Lidoderm on August 23, 2012, Watson instead took the payments and kept generic Lidoderm off the market until September 15, 2013.  DC ¶¶ 2, 75; EC ¶¶ 2, 80, 120; GC ¶¶ 75, 96.

Absent the payments, two lower-priced generic versions of Lidoderm (Watson's generic and Endo/Teikoku's authorized generic) would have been available as early as August 23, 2012, and Plaintiffs and the classes of purchasers they represent would have begun buying the less expensive generic as early as then, instead of 13 months later.  DC ¶¶ 142-49; EC ¶¶ 3, 124; GC ¶¶ 2, 75, 99, 112.  On a billion-dollar-a-year drug like Lidoderm, the savings would have been substantial.  Plaintiffs have sued to recover these overcharges.  DC ¶ 152; EC ¶ 153; GC ¶ 3.

---

[1] Direct Purchaser Pls.' Consol. Am. Class Action Compl. ("DC"), ECF No. 70; End-Payor Pls.' Consol. Am. Compl. ("EC"), ECF No. 72; Gov't Employees Health Ass'n First Am. Compl. ("GC"), ECF No. 71.  The Direct Purchaser and End-Payor Plaintiffs will be referred to collectively as "Plaintiffs."

[2] "Endo" is defendant Endo Pharmaceuticals, Inc.  "Teikoku" are defendants Teikoku Pharma USA and Teikoku Seiyaku Co.  "Watson" are defendants Watson Laboratories, Inc. and Watson Pharmaceuticals, Inc., now known as Actavis plc.  Collectively, they are "Defendants."

1    Defendants make arguments not properly addressed on a motion to dismiss.  Instead of

2    accepting as true Plaintiffs' allegations that Endo and Teikoku paid Watson to delay launching

3    generic Lidoderm, Defendants complain that Plaintiffs are "wrong" (Def. Br. at 1) and argue their

4    version of the facts.  Instead of adhering to the antitrust rule of reason's well-established burden-

5    shifting procedure, Defendants ask the Court to blindly accept their justifications for the

6    payments, even though purported procompetitive justifications are affirmative defenses for which

7    Defendants bear the burden of proof.  Defendants then invite the Court to rule as a matter of law,

8    bypassing the jury's role in balancing the anticompetitive harm from delayed generic competition

9    against any procompetitive justifications Defendants might later try to prove.

10    In *Actavis*, the Supreme Court reversed the dismissal of an antitrust complaint challenging

11    a reverse-payment settlement because "the antitrust laws are likely to forbid" a pay-for-delay

12    agreement if "the basic reason [for the reverse payments] is a desire to maintain and to share

13    patent-generated monopoly profits[.]"  133 S. Ct. at 2237.  The Court held that the defendants

14    may seek to prove that the payments were justified, but that mere "possibility" did not justify

15    dismissing the complaint before discovery.  *Id.* at 2236.  Plaintiffs' claims and Defendants'

16    purported justifications here likewise must be tested in fact and expert discovery and weighed by

17    the finder of fact.  The motion should be denied.

## II.    FACTS

### A.    Watson's ANDA

20    FDA approved Hind Healthcare Inc.'s New Drug Application ("NDA") for Lidoderm in

21    1999.  DC ¶ 56; EC ¶¶ 64-65; GC ¶ 54.  Hind granted Endo exclusive U.S. rights to market

22    Lidoderm, and assigned its NDA for Lidoderm to Teikoku.  DC ¶ 57; EC ¶ 65; GC ¶¶ 55-56.

23    Endo launched Lidoderm in 1999.  *Id.*  Lidoderm lacked generic competition for over 10 years.

24    In November 2009, Watson filed the first Abbreviated New Drug Application ("ANDA")

25    seeking approval to market a generic version of Lidoderm.  DC ¶ 71; EC ¶ 77; GC ¶¶ 7, 70.

26    Generic drugs are copies of brand drugs, but are less expensive.  DC ¶ 42; EC ¶ 51; GC ¶ 5.  With

27    its ANDA, Watson submitted a so-called Paragraph IV certification, stating that U.S. Patent No.

28    5,827,529 (the "'529 patent"), which Teikoku and Endo had listed in FDA's "Orange Book," was

1    not valid or would not be infringed by its generic version.  DC ¶¶ 72, 60; EC ¶¶ 68, 77; GC ¶ 71.

2    In response, Endo and Teikoku sued Watson for infringement on February 19, 2010 (the "'529

3    litigation"), which triggered certain provisions of the Hatch-Waxman Act that stayed FDA

4    approval of Watson's ANDA for 30 months (until mid-July 2012), or until the district court ruled

5    for Watson, whichever came first.  DC ¶ 76; EC ¶ 81; GC ¶ 76.

6    **B.**      **Endo and Teikoku's Patent Litigation Against Watson**

7              The '529 litigation went poorly for Endo and Teikoku.  The court ruled that the '529

8    patent covered a formulation with only one water-soluble high-molecular weight substance and

9    only one water-retaining agent.  DC ¶¶ 79, 84-88; EC ¶¶ 84, 91-95; GC ¶¶ 79, 84-86.  Yet,

10   Watson's generic contained more than one of each.  DC ¶ 88; EC ¶ 95; GC ¶ 88.  This claim

11   construction ruling ensured that Watson's generic would not infringe the '529 patent.  *Id.*

12             Two days after that critical ruling, Endo scrambled to sue Watson on three other patents

13   Endo had purchased (the "Rolf patents").  DC ¶ 78; EC ¶ 82; GC ¶ 78.  Revealing their view of

14   the utility of those patents to block generic Lidoderm competition, Endo and Teikoku had not

15   bothered to timely list them in FDA's Orange Book, and so the Rolf patent suit could not stay

16   FDA's approval of Watson's ANDA.  DC ¶¶ 78, 70; EC ¶¶ 82; GC ¶¶ 66, 78.

17             A bench trial was held in February 2012.  DC ¶ 79; EC ¶ 85; GC ¶ 79.  In addition to

18   noninfringement, Watson presented evidence that Teikoku's own prior art showed the '529 patent

19   to be invalid and inequitably obtained:  Teikoku had hidden its own patch inventions from the

20   Patent and Trademark Office when seeking the '529 patent.  DC ¶¶ 79-83; EC ¶¶ 82, 87-90; GC

21   ¶¶ 79-83.  Watson's confidence in winning the patent litigation was so great that its CEO told

22   Wall Street analysts in 2011 and 2012 that Watson was increasing its capacity for manufacturing

23   generic Lidoderm, and that it would be "ready to go at the earliest possible time to launch the

24   product."  DC ¶ 124; EC ¶ 125; GC ¶¶ 35, 39.  The "earliest possible time" — fast approaching

25   — would be at the end of the 30-month stay in July 2012, or sooner.  Watson fully expected FDA

26   approval of its ANDA.  DC ¶ 124; EC ¶ 125; GC ¶¶ 35, 39.  FDA approval issued on August 23,

27   2012.  DC ¶ 75; EC ¶ 80; GC ¶ 75.

28

1    **C.      The Challenged Reverse-Payment Agreement**

2              On May 28, 2012, with the end of Watson's 30-month stay hanging over Endo and

3    Teikoku's heads, Defendants entered the pay-for-delay agreement challenged here (the

4    "Agreement").  DC ¶ 93; EC ¶ 103; GC ¶ 96.  Watson promised to delay launching generic

5    Lidoderm until September 15, 2013.  DC ¶ 94; EC ¶ 104; GC ¶ 97.  In exchange, "Endo/

6    Teikoku" (as they called themselves in the Agreement) promised to make two large payments to

7    Watson: (1) $96 million worth of free branded Lidoderm product, and (2) a promise not to

8    compete against Watson with an authorized generic version of Lidoderm for 7½ months after

9    Watson's delayed launch of generic Lidoderm.  DC ¶¶ 95-99; EC ¶¶ 105-11; GC ¶¶ 98-102.

10             **1.      Payment #1:  Free Product ($96 million)**

11             The $96 million of free branded product, measured at full "WAC" price,[3] was payable to

12   Watson in eight monthly installments of $12 million each, between January and August of 2013.

13   DC ¶ 95; EC ¶ 106; GC ¶ 98.  In selling this free product, Watson was required to honor Endo's

14   existing pricing for its existing accounts.  DC ¶¶ 95, 98; EC ¶ 109; GC ¶ 98.  Watson sold this

15   product at full WAC price, generating nearly $96 million in revenue.  DC ¶ 98; EC ¶ 109; GC ¶

16   98.  This was no different than if Endo had made those sales itself, and simply handed the

17   resulting money to Watson.  DC ¶ 95; EC ¶ 106; GC ¶ 98.  Contrary to Defendants' account now

18   (Def. Br. at 9), this payment was not then described as a response to perceived risk that FDA

19   would not approve Watson's ANDA; rather, Defendants said it was to resolve "the claims at issue

20   in the Litigation."  DC ¶ 97; EC ¶ 108; GC ¶ 100.

21             **2.      Payment #2:  No Authorized Generic for 7½ Months ($150-198 million)**

22             The second payment came in the form of Endo and Teikoku's promise not to sell an

23   authorized generic ("AG") in competition with Watson for the first 7½ months that Watson's

24   generic product was on the market (the "no-AG promise").  DC ¶ 101; EC ¶ 111; GC ¶ 104.

25   Dating back to at least 2007, Endo and Teikoku had planned for Endo to sell an AG version of

26

27   ───────────────

28   [3] WAC, or Wholesale Acquisition Cost, is an undiscounted list price to wholesalers.  *See* DC
     ¶ 95; EC ¶¶ 106, 109; GC ¶ 98.

1    Lidoderm upon launch of a generic version of Lidoderm.  DC ¶¶ 99, 100; EC ¶¶ 112; GC ¶ 103.[4]

2    Instead, because Watson kept its promise to delay generic competition, Endo and Teikoku kept

3    their promise to delay their AG:  only after Watson's generic was on the market for 7½ months

4    did Endo and Teikoku launch their AG.  DC ¶ 104; EC ¶¶ 112; GC ¶ 107.[5]

5           Had Endo and Teikoku launched their AG simultaneously with Watson's generic launch

6    as planned, the AG would have taken half of Watson's sales and forced down generic prices;

7    Watson would have earned only $100 million from selling generic Lidoderm for the first 7½

8    months.  But spared competition from the AG, Watson earned $270 million — a gain of more

9    than $150 million.  See DC ¶¶ 110-12; EC ¶¶ 114-15; GC ¶ 109.  It is little different than if Endo

10   and Teikoku had launched an AG without delay and just handed all the money they made during

11   the first 7½ months to Watson.  DC ¶ 102; EC ¶¶ 113; GC ¶ 105.  Endo and Teikoku's sacrifice

12   of profits by delaying their AG made economic sense only if it was used to pay Watson to delay

13   generic Lidoderm entry until September 15, 2013.  DC ¶ 108; EC ¶¶ 114; GC ¶ 106.

14   **D.    FDA Approval for Watson's Generic Lidoderm ANDA**

15          As Watson expected, just three months after the Agreement was struck, on August 23,

16   2012, FDA approved Watson's ANDA.  DC ¶¶ 75, 124; EC ¶¶ 80, 125; GC ¶¶ 75, 99.  Despite

17   having final approval, Watson did not launch its generic Lidoderm; rather, it kept its promise to

18   stay off the market until September 15, 2013 in exchange for Endo/Teikoku's payments.  Absent

19   the payments, Watson would have entered the market as early as August 23, 2012, either (a) "at

20   risk" (*i.e.*, before the patent litigation was over) or (b) under a less restrictive settlement

21   agreement without large reverse payments for delay.  DC ¶¶ 122-25; EC ¶¶ 119, 126-27; GC ¶¶ 2,

22   75, 122.  Either way, less-expensive generic Lidoderm would have been available far earlier than

23   September 15, 2013.  DC ¶¶ 122, 125-26; EC ¶¶ 119, 128; GC ¶¶ 14, 112.  As a result of this pay-

24   for-delay agreement, Plaintiffs paid substantially higher prices for lidocaine patch 5%, both

25

26          [4] Brand companies launch AGs of their own brand to recapture sales they would otherwise
     lose to generic competitors.  DC ¶¶ 47-48; EC ¶¶ 56-57; GC ¶¶ 41, 95.

27          [5] The National Library of Medicine lists the marketing start date of Endo and Teikoku's AG
     as May 2, 2014.  *See* http://dailymed.nlm.nih.gov/dailymed/ lookup.cfm?setid=2ce8a4fe-8aa6-
28   4dc5-ad0f-3984ae68c4bc (last accessed Aug. 26, 2014).

1  during the period of paid-for delay and after:  generic Lidoderm entry was delayed for up to a

2  year or more, and even after that delay ended, authorized generic Lidoderm was delayed for 7½

3  months.  DC ¶¶ 3, 126; EC ¶¶ 3, 127-28; GC ¶¶ 11, 104-05.

4  <center>III.      ARGUMENT</center>

5  **A.      Applicable Legal Standards**

6       **1.      Motions to Dismiss**

7       On a motion to dismiss, the court must accept as true and construe in the light most

8  favorable to the plaintiff all "allegations of material facts set forth in the complaint . . . together

9  with all reasonable inferences therefrom."  *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).

10  The motion must be denied where, as here, the complaint "contain[s] sufficient factual matter,

11  accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S.

12  662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  However, there

13  is no "probability requirement at the pleading stage"; rather, there must simply be "enough facts

14  to raise a reasonable expectation that discovery will reveal evidence of the necessary element."

15  *Twombly*, 550 U.S. at 556.

16       **2.      Application of the Rule of Reason in a "Pay for Delay" Case**

17       In *Actavis*, the Supreme Court held that reverse-payment settlements can violate the

18  antitrust laws, and so the "rule of reason" must apply to them.  133 S. Ct. at 2227.[6]  As

19  Defendants note, the same rule of reason applicable to other antitrust cases applies to a reverse-

20  payment case such as this one.[7]  The elements of a rule of reason case under Section 1 of the

21  Sherman Act are well established:  (1) an agreement or conspiracy, (2) with the intent to harm or

22

23

---

24      [6] The Court justified its holding on a number of bases.  One was that "Hatch-Waxman's
unique regulatory framework . . . ha[s] created special incentives for collusion[.]"  *Id.* at 2235

25  (citation omitted).  Another was that it is "unusual" and "concern[ing]" when a patentee "agree[s]
to pay the [infringers] many millions of dollars to stay out of its market, even though the

26  [infringers] did not have any claim that the [patentee] was liable to them for damages."  *Id.* at
2231.  A third was that brand and generic companies can settle patent litigation without reverse

27  payments.  *Id.* at 2237.

    [7] Def. Br. at 13 ("A party challenging a so-called reverse payment 'must prove its case as in

28  other rule-of reason cases.'") (quoting *Actavis*, 133 S. Ct. at 2237-38).

restrain competition, (3) that does harm or restrain competition.[8]  Equally well established is the

three-part burden-shifting framework for the rule of reason, under which plaintiff and defendant

bear shifting burdens of production and persuasion:  plaintiff has the burden to show the

challenged restraint produces "significant anticompetitive effects" within a "relevant market";

defendant then bears the burden to show procompetitive effects resulting from the restraint;

plaintiffs may then prevail either by proving any procompetitive effects could have been achieved

in a substantially less restrictive manner or that the anticompetitive effects outweigh any

procompetitive effects.[9]  It is for the finder of fact (here, the jury) to decide whether, after

weighing any cognizable, non-pretextual procompetitive justifications Defendants can prove to

justify the harm to competition, the challenged agreement violates the rule of reason.[10]

**B.**      **Plaintiffs Have Met Their Pleading Burden Under the Rule of Reason and *Twombly***

Plaintiffs' initial burden under the rule of reason is to allege injury to competition.[11]  "In

order successfully to allege injury to competition, a section one claimant . . .  must, at a minimum,

sketch the outline of the antitrust violation with allegations of supporting factual detail." *Les

Shockley Racing, Inc.*, 884 F.2d at 507-08.  Cognizable harm to competition includes higher

prices, lower output, diminished product quality, or reduced consumer choice.[12]

---

[8] *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir. 1989) (reviewing grant of motion to dismiss) (quotation omitted).  The challenged Agreement satisfies the element of conspiracy here.  *See, e.g.*, *Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1153 (9th Cir. 2003) (signed agreement was "direct evidence of concerted activity").

[9] *Tanaka v. U.S.C*, 252 F.3d 1059, 1063 (9th Cir. 2001).  *See also Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991) ("Should the plaintiff satisfy his initial burden, the defendant must offer evidence of pro-competitive effects."); *In re NCAA Student-Athlete Name & Like. Lic. Litig.*, 2014 WL 1410451, *3 (N.D. Cal. Apr. 11, 2014) (same).

[10] *See Am. Ad Mgmt., Inc. v. GTE*, 92 F.3d 781, 791 (9th Cir. 1996) ("The law clearly envisions that the [rule of reason] balancing test is normally reserved for the jury") (reversing grant of summary judgment).

[11] *Tanaka*, 252 F.3d at 1063 (in rule of reason cases, the "plaintiff bears the initial burden of showing that the restraint produces 'significant anticompetitive effects' within a 'relevant market.'").

[12] *See Am. Ad Mgmt.*, 92 F.3d at 791 ("it is difficult to image a more typical example of anti-competitive effect than higher prices"); *Metro Indus. v. Sammi Corp.*, 82 F.3d 839, 848 (9th Cir. 1996) ("reduced output or increased prices . . . [is] direct evidence of injury to competition . . . when responding to a motion for summary judgment"); *Rebel Oil Co. v. Atl. Rich. Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (anticompetitive effects are those that "raise[] the prices of goods above competitive levels or diminish[] their quality"); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d

Plaintiffs meet these requirements.  The complaints extensively allege how Watson — in exchange for payments from Endo/Teikoku — agreed to delay launching its generic lidocaine patch 5% until September of 2013, and absent those payments would have come to market earlier, saving consumers and purchasers hundreds of millions of dollars.  DC ¶¶ 94-103, 120-26; EC ¶¶ 104-13, 122-28; GC ¶¶ 16, 97-106.  The complaints allege the challenged Agreement harmed competition by reducing output of lidocaine patch 5%, keeping prices at high branded levels, preventing those prices from falling to the levels that generic competition would have produced, and depriving consumers of a choice between a generic and a brand product.  DC ¶¶ 146-52, 98, 101, 121, 151, 162; EC ¶¶ 109, 113, 122-23; GC ¶¶ 101, 104, 156.  This is the exact harm resulting from reverse-payment agreements identified in *Actavis*:  the "maint[enance of] supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market[.]"  133 S. Ct. at 2236.  This alleged harm to competition satisfies Plaintiffs' pleading obligation in a rule of reason case.[13]

## C.   Defendants May Not Obtain Dismissal by Asserting Procompetitive Justifications

Defendants ask the Court to rule that the challenged agreement was "reasonable as a matter of law" because it was purportedly "procompetitive."  Def. Br. at 18-20.  This invites error for several reasons.  As the Court held in *Actavis*:  the "possibility" that defendants "may have provided for a reverse payment without having sought or brought about the anticompetitive

---

1440, 1448 (9th Cir. 1988) (jury finding of injury to competition supported by evidence that "patients and surgeons who preferred the services of [plaintiff] were hindered from obtaining them" and "the price of anesthesia services . . . rose dramatically because of the challenged restraint").

[13] *See, e.g.*, *In re High-Tech Empl. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122-23 (N.D. Cal. 2012) (allegations of how defendants' collusive elimination of cold-calling would reduce employees' compensation and mobility sufficient to meet initial pleading burden of showing anticompetitive harm from challenged conduct); *Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*, 259 F. Supp. 2d 992, 1001 (N.D. Cal. 2003) ("by alleging that Defendants' agreement on uniform interchange fees has the purpose and effect of reducing competition between acquiring banks and raising the merchant discounts, Plaintiffs have stated a claim under section 1 of the Sherman Act"); *Nationwide R.A.C. Sales v. Ford Motor Co.*, 1997 WL 88399, *6 (N.D. Cal. Feb. 19, 1997) ("Under the rule of reason, plaintiffs' initial burden to show an unreasonable restraint of trade is minimal.  Plaintiffs' complaint must allege sufficient facts to show that defendant's actions had an anti-competitive effect within the relevant market.  Plaintiffs' allegation that defendant's actions excluded plaintiffs from the rental market and caused a similar loss of business for other brokers, artificially restraining the entire market of repurchased vehicles, meets this burden.") (citations omitted).

consequences we mentioned above" does not "justify dismissing the [plaintiff's] complaint[.]" 133 S. Ct. at 2236.  As is the case with affirmative defenses generally,[14] procompetitive justifications cannot be raised on a motion to dismiss.[15]

Moreover, when the time comes to test them, Defendants' purported justifications will fail as a matter of fact and law.  Defendants say that Endo and Teikoku's payments to Watson, and Watson's consequent promise to delay its generic (the terms of the Agreement challenged by Plaintiffs), were somehow procompetitive because the agreement containing those two mutual terms also removed purported litigation risk that Watson would have faced from the pending '529 and Rolf patent lawsuits and "enabled Watson to market Lidoderm in competition with Endo" despite purported "regulatory obstacles" from a pending FDA petition and lack of FDA approval for Watson's ANDA.  Def. Br. at 19-20.  But these purported justifications suffer from serious logical and legal defects.

*First*, they conflict with *Actavis*.  The generic companies there also faced litigation risk; defendants emphasized that the settlement allowed the generics to enter the market years before

_____

[14] *See Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (motion to dismiss cannot be granted based on affirmative defense unless that "defense raises no disputed issues of fact"); *Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) ("Ordinarily, an affirmative defense may not be raised on a motion to dismiss.").  The Supreme Court and the Ninth Circuit treat procompetitive justifications for challenged concerted action as affirmative defenses on which defendants bear the burdens of production and persuasion.  *See NCAA v. Bd. of Reg. of Univ. of Okla.*, 468 U.S. 85, 113 (1984) (defendants bear "a heavy burden of establishing an *affirmative defense* which competitively justifies this apparent deviation from the operations of a free market") (emphasis added); *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1349, 1350 n.7 (9th Cir. 1987) ("The defendant bears the burden of showing that the case falls within the contours of this *affirmative defense*."; approving jury instruction stating that "[t]he burden is on the defendant to demonstrate the existence of a business justification") (emphasis added).  *See also Actavis*, 133 S. Ct. at 2236 ("An antitrust *defendant* may show in the antitrust proceeding that legitimate justifications are present, thereby explaining the presence of the challenged term and showing the lawfulness of that term under the rule of reason.") (emphasis added).

[15] *See Apple iPod iTunes Antitrust Litig. v. Apple, Inc.*, 2010 WL 2629907, *7 (N.D. Cal. June 29, 2010) ("the validity of a claimed business justification is a question of fact") (denying motion to dismiss in case under § 2); *Tucker v. Apple Comp., Inc.*, 493 F. Supp. 2d 1090, 1101 (N.D. Cal. 2006) ("the existence of valid business reasons in antitrust cases is generally a question of fact not appropriate for resolution at the motion to dismiss stage"); *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1133 (N.D. Cal. 2005) ("[w]hatever [the] merits of these [procompetitive] arguments, they are intrinsically factual . . . and inappropriate for resolution at the motion to dismiss stage").

1    the brand patent expired.  But because the plaintiff alleged that generic entry would have occurred

2    still earlier absent the reverse payments, dismissal of the complaint was error.[16]

3            *Second*, the existence of litigation risk, even if *bona fide*, cannot logically explain, much

4    less justify, a payment *from* the patentee *to* the accused infringer.  After all, Watson had no claim

5    for damages against Endo or Teikoku.  *See* DC ¶¶ 77, 89; EC ¶¶ 83, 96.  If anything, such a

6    payment suggests that any infringement risk was nonexistent, because Watson instead required

7    payments to delay its entry.[17]  Likewise, purported "regulatory obstacles" have no logical

8    connection to patent litigation or its settlement, nor with any infringement risk, nor with

9    Endo/Teikoku's promise not to compete against Watson with an AG for 7½ months, nor with

10   Watson's promise to delay its launch.  "The logical disconnect in defendants' argument is

11   sufficient to raise a question of fact as to its justification."[18]

12           *Third,* these justifications are implausible.  The patent litigations here posed no risk to

13   Watson.  Watson had secured a favorable *Markman* ruling in the '529 litigation; a Watson victory

14   was virtually inevitable.  DC ¶¶ 80-88; EC ¶¶ 84-95; GC ¶¶ 80-88.  The Rolf litigation boded

---

16   [16] *See Actavis*, 133 S. Ct. at 2229 ("Under the terms of the settlement Actavis agreed that it
     would not bring its generic to market until August 31, 2015, 65 months before Solvay's patent
17   expired"); *id.* at 2230 ("But we do not agree that that fact, or characterization, can immunize the
     agreement from antitrust attack.").  Defendants thus cannot be heard to argue "that even a small
18   risk of [patent] invalidity justifies a large payment." *Id.* at 2236.  "[B]e that as it may," the Court
     said in rejecting this defense, "the payment (if otherwise unexplained) likely seeks to prevent the
19   risk of competition.  And, as we have said, *that consequence constitutes the relevant
     anticompetitive harm*." *Id.* (emphasis added).  *See also* Aaron Edlin, Scott Hemphill, Herbert
20   Hovenkamp & Carl Shapiro, *Activating Actavis*, 28 ANTITRUST 16, 20 (Fall 2013) ("The Court
     says that payments to avoid even a small risk of competition are antitrust violations.  That is
21   reason enough to deny a risk-aversion defense. …These arguments suggest rejecting the risk-
     aversion argument.").

22   [17] *See Actavis*, 133 S. Ct. at 2236-37 ("In a word, the size of the unexplained reverse payment
23   can provide a workable surrogate for a patent's *weakness*, all without forcing a court to conduct a
     detailed exploration of the validity of the patent itself.") (emphasis added); *id.* at 2236 ("[a]n
24   unexplained large reverse payment itself would normally suggest that the patentee has serious
     doubts about the patent's survival.  And that fact, in turn, suggests that the payment's objective is
25   to maintain supracompetitive prices to be shared among the patentee and the challenger rather
     than face what might have been a competitive market — the very anticompetitive consequences
26   that underlies the claim of antitrust unlawfulness.").  Logically, a brand will not pay a generic
     more than what the brand would save in litigation costs, *unless* the brand is buying more delay in
27   generic competition than it expects to result from the litigation.  If it were otherwise, the brand
     would logically prefer to pay its own lawyers rather than its generic competition.

28   [18] *Rome Amb. Surg. Ctr. v. Rome Mem'l Hosp.*, 349 F. Supp. 2d 389, 411 (N.D.N.Y. 2004).

equally well for Watson.  DC ¶¶ 89-92; EC ¶¶ 96-100; GC ¶¶ 89-92.[19]  As to "regulatory

obstacles," Watson's own public statements belie any fear of "obstacles," as they show that

Watson expected approval in 2012 and was preparing for launch upon approval.  DC ¶ 124; EC ¶

125.  Finally, the justification that the Agreement was procompetitive because it enabled Watson

to market branded Lidoderm in "competition" with Endo/Teikoku is implausible, because it did

not actually create competition at all.  Watson sold the free Lidoderm it got at the same

supracompetitive prices at which Endo/Teikoku's Lidoderm was being sold, and under the same

label.  DC ¶¶ 95, 98; EC ¶¶ 106, 109-10; GC ¶¶ 98, 101.  At the appropriate procedural juncture,

Plaintiffs will show that each of Defendants' offered justifications is pretextual.[20]

       Finally, even if Defendants ultimately can meet their burden to show one or more

cognizable non-pretextual procompetitive justifications for the reverse payments, that does not

end the case.  Plaintiffs may offer evidence showing that Defendants could have settled the patent

litigations in a substantially less restrictive manner, without a reverse payment and the delay it

purchased.[21]  Here, Plaintiffs alleged that settlement could have been achieved by means that

were substantially less restrictive.  DC ¶¶ 125, 118, 122; EC ¶¶ 119, 127; GC ¶¶ 11, 110.

---

[19] The slow pace of the Rolf litigation makes Defendants' suggestion that Watson would not
have launched generic Lidoderm prior to resolution implausible.  Watson's interest was to
maximize its opportunity to sell generic Lidoderm "at the earliest possible time," including by
beating others to the market.  Instead, the plausible inference is that Watson did not view the Rolf
litigation as an impediment to launch; otherwise, it would have expedited it.

[20] Plaintiffs' arguments that Defendants' justifications for the reverse payments are pretextual
independently preclude dismissal.  *See Eastman Kodak Co. v. Image Tech. Serv.*, 504 U.S. 451,
483-86 (1992) (existence of factual questions concerning pretextual nature of defendant's
procompetitive justifications precluded summary judgment); *Image Tech. Serv. v. Eastman Kodak
Co.*, 903 F.2d 612, 618-19 (9th Cir. 1990) (summary judgment reversed because reasonable jury
could find defendants' procompetitive justifications were pretexts).

[21] *Actavis*, 133 S. Ct. at 2237 ("the fact that a large, unjustified reverse payment risks antitrust
liability does not prevent litigating parties from settling their lawsuit.  They may, as in other
industries, settle in other ways, for example, by allowing the generic manufacturer to enter the
patentee's market prior to the patent's expiration, *without* the patentee paying the challenger to
stay out prior to that point.") (emphasis added).  *See also Tanaka*, 252 F.3d at 1063 (if defendant
produces evidence of procompetitive justifications, plaintiff can "show that any legitimate
objectives can be achieved in a substantially less restrictive manner.") (citation omitted); *Bhan*,
929 F.2d at 1410 n.4 ("are there other and better ways — so-called less restrictive alternatives —
by which the collaborators can achieve their legitimate objectives with fewer harms to
competition?") (quotation omitted); *Betaseed, Inc. v. U & I, Inc.*, 681 F.2d 1203, 1230 (9th Cir.
1982) ("Given the factual issues with respect to . . . whether [defendant] had available to it a

1    Ultimately, it is for the finder of fact to balance the harm to competition against any

2    procompetitive justifications.[22]  Defendants' request to have their reverse-payment agreement

3    simply declared on its face to be "reasonable" and "procompetitive" must be rejected.

4    **D.      Antitrust Scrutiny Under Actavis is Not Limited to Cash Payments**

5    Impermissibly contradicting Plaintiffs' allegations, Defendants argue that Endo and

6    Teikoku did not pay Watson to delay launching generic Lidoderm.  Def. Br. at 16.  Defendants

7    ignore the many paragraphs of the complaints showing how the promise not to compete for 7½

8    months with an AG transferred at least $150 million in revenues from Endo/Teikoku to Watson.

9    DC ¶¶ 109-15; EC ¶¶ 113, 117; GC ¶¶ 105-10.  As to the $96 million in product Endo/Teikoku

10   gave to Watson, Defendants initially say they will show this was not a payment, but then argue an

11   entirely different and procedurally inapt point:  that the supply of free product was allegedly

12   procompetitive.  Def. Br. at 17.  Finally, Defendants invent a rule that a reverse payment exists

13   when "the payment to the generic is made whether or not the generic challenger sells the product

14   in competition with the brand before the patent expires," but does not exist when "the value to the

15   generic comes from its sales of a competing product, and the competition benefits consumers."

16   Def. Br. at 16.  Defendants do not — and cannot — cite any authority supporting their proposed

17   rule, which offers a confusing and unhelpful jumble of payment, delay in competition, and

18   procompetitive justification, each of which is analytically distinct under the rule of reason and

19   which the Court kept as such in *Actavis*.

20   The free goods and no-AG promises Watson received are both payments to Watson.

21   Otherwise, *Actavis* was an empty gesture:  drug manufacturers could circumvent the decision

22
23   method of accomplishing its objective that was less restrictive to competition, summary judgment
     on the rule of reason claim must be reversed.").

24   [22] *Am. Ad Mgmt.*, 92 F.3d at 791 ("The law clearly envisions that the balancing test is
     normally reserved for the jury.") (reversing summary judgment, because court usurped jury's role
     to balance harm against justifications proven by defendant).  This is because "[t]he
25   reasonableness of a restraint is a 'paradigm fact question[.]'" *L.A. Mem'l Coliseum Comm. v.
     NFL*, 726 F.2d 1381, 1401 (9th Cir. 1984) (citation omitted).  *See also Big Bear Lodging Ass'n v.
26   Snow Summit, Inc.*, 182 F.3d 1096, 1101 (9th Cir. 1999) (rule of reason analysis "is a case-by-
     case study in which the fact finder weighs all of the circumstances of a case"); *Hairston v. Pac.
27   10 Conf.*, 101 F.3d 1315, 1319 (9th Cir. 1996) (same); *Bhan*, 929 F.2d at 1413 (same); *Les
     Shockley Racing*, 884 F.2d at 507 (same); *Thurman Ind., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d
28   1369, 1373 (9th Cir. 1989) (same).

simply by making reverse payments in kind rather than in cash.  The Supreme Court could not

have meant to issue such a meaningless decision.  It is therefore unsurprising that the FTC has

characterized both free goods and no-AG promises as common forms of reverse payments.[23]

Most courts to consider the question agree that "nothing in *Actavis* strictly requires that the

payment be in the form of money."[24]  Following this analysis, the court in *In re Niaspan Antitrust*

*Litig.*, No. 2:13-md-2460 (E.D. Pa. Sept. 8, 2014), ruled that a "No AG" promise can qualify as

---

[23] *See* Brief of Federal Trade Commission, *In re Lamictal Direct Purchaser Antitrust Litig.*, Appeal No. 14-1243, 2014 WL 1745072, *1 (3d. Cir. Apr. 28, 2014) ("Originally, reverse payments often took the form of outright cash transfers.  Today, after years of antitrust scrutiny, a branded-drug company may sometimes induce a generic company to stay out of the market by offering it payments in kind rather than in cash."); *id.* at *17 ("whether [the sharing of monopoly profits] takes the form of gold bullion, stocks, *free goods*, real estate . . . the potential for harm to consumers is present"); *id.* at *26-27 ("In a no-AG deal, the branded-drug company enables the generic to earn these *added* revenues by giving up its unqualified right to market an AG product, and thereby transfers economic value to the generic as surely as if it had written a check.").

[24] *In re Lipitor Antitrust Litig.*, No. 3:12-cv-2389, 2013 WL 4780496, at *6 (D.N.J. Sept. 5, 2013) (judgment forgiveness); *see also In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 392 (D. Mass. 2013) ("Nowhere in *Actavis* did the Supreme Court explicitly require some sort of monetary transaction to take place for an agreement between a brand and generic manufacturer to constitute a reverse payment.") (no-AG promise);  *In re Nexium (Esomeprazole) Antitrust Litig.*,No. 12-md-02409, 2014 WL 4370333, *23 (D. Mass. Sept. 4, 2014) ("SJ Order") ("As this Court held in denying the Defendants' motion to dismiss, unlawful reverse payments are not limited to monetary payments.") (summary judgment denied); *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, ECF No. 534 (E.D. Pa. Jan. 17, 2014) ("The Court is not prepared at this point to accept [the] argument that only a large cash payment . . . is subject to antitrust analysis under *Actavis*.").  *See also Earth Elements, Inc. v. Nat'l Am. Ins. Co.*, 41 Cal. App. 4th 110, 116 (Cal. Ct. App. 1995) ("There is no analytical distinction between surrendering money in exchange for a settlement and exchanging any other item of value. While the value of money is apparent on its face, an intangible item is equally capable of being evaluated."); Black's Law Dictionary (9th ed. 2009) (defining "payment" as the "[p]erformance of an obligation by the delivery of money *or some other valuable thing* accepted in partial or full discharge of the obligation") (emphasis added); 60 Am. Jur. 2d *Payment* § 26 (2014) ("A payment can refer to a transfer of something of value *other than money*[.]") (emphasis added).  One outlier, the *Lamictal* case that Defendants cite is on appeal to the Third Circuit.  *See King Drug Co. of Florence v. Smithkline Beecham Corp.*, No. 14-1243 (3d Cir. filed Jan. 30, 2014).  The other outlier is *In re Loestrin 24 Fe MDL Antitrust Litig.*, 2014 WL 4368924 (D.R.I. Sept. 4, 2014), where the court found that plaintiffs "adequately pled the existence of a Sherman Act § 1 violation under *Twombly*" (*id.* at *12) and also reasoned that "it is of relatively little import whether a payment for delay is made in the form of cash or some other form of consideration" (*id.*), but ultimately relied on *Lamictal*'s "cash only" holding.  In *Loestrin*, the court also stated that the plaintiffs had not adequately quantified the dollar value of the reverse payments.  *Id.* at *11.  Whatever the merit of that statement, it has no application here.  Moreover, in *Loestrin* the generic (Watson) received from the brand company the very same type of payment-for-promotion agreement as Watson received in *Actavis*, bringing the two cases into conflict.  *Compare Actavis*, 133 S. Ct. at 2255 ("agreeing to promote AndroGel to doctors in exchange for millions of dollars") *with Loestrin*, 2014 WL 4368924, *4 ("agreed to pay Watson annual fees and a percentage of net sales in connection with the co-promotion of a separate Warner Chilcott drug called Femring").

an unlawful reverse payment, rejecting the "cash only" rulings of *Lamictal and Loestrin*.  *See In re Niaspan*, ECF No. 112 at 18-22.  *Actavis* itself cites several Supreme Court cases involving patent licensing agreements where no cash was paid.[25]  Antitrust scholars, including two cited by the Court in *Actavis*, concur that cognizable reverse payments need not be in cash.[26]  After all, the same core danger — a collusive agreement not to compete and to divide the consequent monopoly profits — occurs regardless of the form of payment to the would-be generic, and the Court has repeatedly warned that distinctions of form should not govern antitrust analysis.[27]  The inquiry is, instead, "one of competitive reality."[28]  Here, the economic reality of the free goods and the no-AG promise is that they were payments from Endo and Teikoku to Watson.

### 1.    The Free Branded Lidoderm Was a $96 Million Payment to Watson

Free goods, like other in-kind payments, are a recognized form of payment in reverse payment agreements according to the FTC and scholars cited by the Supreme Court in *Actavis*,[29] and according to logic and common sense.  Plaintiffs allege that Endo/Teikoku gave Watson $96 million worth of branded Lidoderm (spread over eight months), for which Watson paid *zero* and

---

[25] *See Actavis*, 133 S. Ct. at 2232-35 (citing *United States v. Line Material Co.*, 333 U.S. 287 (1948), *United States v. Singer Mfg. Co.*, 374 U.S. 174 (1963), *United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948); *United States v. New Wrinkle, Inc.,* 342 U.S. 371 (1952); and *Standard Oil Co. v. United States*, 283 U.S. 163, 175 (1931)).

[26] *E.g.*, *Activating* Actavis, *supra* note 16, at 18 (reverse payment "may take forms other than cash").

[27] *See Eastman Kodak Co.*, 504 U.S. at 466-67 ("formalistic distinctions" are "generally disfavored in antitrust law"); *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58-59 (1977) (antitrust analysis must "be based upon demonstrable economic effect rather than . . . upon formalistic line drawing.").  The *Loestrin* and *Lamictal* courts apparently lost sight of this.

[28]*Am. Needle, Inc. v. NFL,* 560 U.S. 183, 196 (2010); *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 780-81 (1999) ("What is required, rather, is an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint."); *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 208 (1968) ("In interpreting the antitrust laws, . . . [w]e must look at the economic reality of the relevant transactions.").

[29] *See* Brief of FTC, *supra* note 23.  *See also* C. Scott Hemphill, *An Aggregate Approach to Antitrust: Using New Data and Rulemaking to Preserve Drug Competition*, 109 COLUM. L. REV. 629, 665-66 (2009) (describing as an effort to disguise a reverse payment a situation where "[t]he brand-name firm supplies the product to the generic firm at a discount, which the generic firm then resells under its own label at a profitable price.  The compensation is buried in the discounted price offered by the brand-name firm.").  Here, instead of a discount, Watson received the brand Lidoderm for free and sold it as required under Endo/Teikoku's label. DC ¶¶ 95, 98; EC ¶¶ 106, 109-10; GC ¶¶ 98, 101.

1    then sold for $96 million at prevailing brand prices, pocketing all the money.  The economic

2    reality is that this was a $96 million payment by Endo/Teikoku to Watson.

3            In arguing that the free goods were not a payment, Defendants offer the *non sequitur* that

4    supplying Watson with free goods was procompetitive.  Those are two different questions.  *Was* a

5    payment made is one question; was the payment procompetitive, is another, different question.

6    The complaints allege the payment; Defendants' defense of it as allegedly procompetitive is not

7    properly asserted on a motion to dismiss and will be Defendants' burden to prove.[30]  And,

8    Defendants' "procompetitive" argument impermissibly contradicts Plaintiffs' complaints.[31]

9            Defendants also cite *Asahi Glass Co. v. Pentech Pharms., Inc*., 289 F. Supp. 2d 986 (N.D.

10   Ill. 2003), a pre-*Actavis* decision.  In *Asahi Glass*, the court recognized that the provision of free

11   product was, as it is here, a payment that induced the generic to stay out of the market.  *Id.* at 994.

12   However, the court in *Asahi Glass* declined to submit that settlement to antitrust scrutiny because

13   it applied the so-called "scope of the patent test" and emphasized the "presumption of validity

14   that attaches to an issued patent" (*id.* at 992-93) — two tenets rejected by *Actavis*.  Any doubts

15

16

17

18   [30] Defendants will not be able to meet their burden.  Watson sold the branded Lidoderm at the
     full WAC price at which it was initially valued.  DC ¶ 98; EC ¶¶ 106, 109; GC ¶ 101.  Even if
19   Watson had been inclined to compete on price against Endo with these limited amounts of
     Lidoderm, Defendants concede that Watson could not interfere with pricing on Endo's existing
20   contracts.  Def. Br. at 10 n.7.  It is implausible that Watson would have been inclined to compete
     on price against Endo:  Watson only had a set amount of Lidoderm, and so had no plausible
21   incentive to sell Lidoderm at a lower price to increase sales volume.  Moreover, as alleged in the
     complaints, price competition in the pharmaceutical industry comes *not* from additional sellers of
22   brand product, but from AB-rated generic substitutes.  *See* DC ¶¶ 42-46; EC ¶¶ 51-55; GC ¶¶ 43-
     45 (describing price competition that derives from generic substitution, not brand substitution);
23   DC ¶¶ 131-32; EC ¶ 136; GC ¶¶ 115-16 (only AB-rated generic competition causes positive cross
     elasticity of demand as to a brand product, such as Lidoderm).  Finally, Defendants' suggestion
24   that the free goods were really just an insurance policy against Watson's purportedly-feared
     inability to obtain final FDA approval is belied not only by the fact that Watson was not required
25   to pay fair value — or any value — for them, but also by the fact that they were supplied
     beginning in January of 2013, when Watson's agreed entry date in the Agreement was not until
26   September 15, 2013, 9 months later.

27   [31] Plaintiffs allege that Watson's sale of branded Lidoderm "did not increase output, reduce
     price, or increase consumer choice," and instead resulted only in Endo/Teikoku sharing monopoly
28   profits with Watson as compensation for its agreement to refrain from marketing a less-expensive
     generic for longer than it otherwise would have.  DC ¶ 98; EC ¶ 110; GC ¶ 101.

1    that the *Asahi Glass* court had about applying antitrust scrutiny to reverse payment cases, have

2    been resolved by *Actavis*.[32]

3         **2.    The No-AG Promise Was a $150-198 Million Payment to Watson**

4         No-AG promises are another recognized form of payment used to buy unlawful generic

5    delay in reverse-payment agreements.[33]  Here, Plaintiffs allege that Endo/Teikoku's agreement

6    not to sell a competing AG version of Lidoderm transferred a large sum — between $150 million

7    and $198 million — from Endo and Teikoku to Watson, for which Watson agreed to delay

8    entering the market with generic Lidoderm.  DC ¶¶ 102-15; EC ¶¶ 111-17; GC ¶ 109.  Endo and

9    Teikoku were otherwise ready, willing, and able to launch an AG simultaneously with Watson's

10   entry.  DC ¶ 100; EC ¶ 112; GC ¶¶ 15, 112.

11

12

---

13   [32] *See also In re Nexium*, 968 F. Supp. 2d at 392 (declining to follow *Asahi Glass* after
     *Actavis*).  *Asahi Glass* is also distinguishable because there the generic manufacturer sold the
14   product it received as a competing generic version of the branded drug and could "undersell [the
     brand manufacturer]." 289 F. Supp. 2d at 993.  Here, as expected by the parties, Watson sold
15   branded product, at the high brand price.  DC ¶ 98; EC ¶ 109; GC ¶ 101.

     [33] *See* Brief of FTC, *supra* note 23.  *See also In re Nexium*, 968 F. Supp. 2d at 391 ("[T]aking
16   all intendments in the light most favorable to the Direct Purchasers, then, the no-authorized
     generic agreement between AstraZeneca and Ranbaxy . . . sufficiently implicate adverse
17   anticompetitive consequences to allow the Direct Purchasers' claims to proceed.") (motion to
     dismiss denied); *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, ECF No. 534 (E.D. Pa. Jan.
18   17, 2014) (refusing to dismiss reverse-payment case based on no-AG promise); *Activating*
     Actavis, *supra* note 16, at 18 (the "payment prong" in *Actavis* involves "valuing any
19   consideration flowing from the patentee to the claimed infringer; which may be made over time
     and may take forms other than cash," such as when "the patentee may agree not to market its own
20   unbranded product."); Federal Trade Comm'n, Authorized Generic Drugs: Short-Term
     Effects And Long-Term Impact vii (2011) ("[A]s a consequence of an authorized generic's
21   significant negative impact on a generic's revenues, some brand-name companies have used
     agreements not to launch an authorized generic as a way to compensate an independent generic in
22   exchange for the generic's agreement to delay its entry. The frequency of this practice and its
     profitability may make it an attractive way to structure a pay-for-delay settlement, a practice that
23   causes substantial consumer harm.") (available at
     http://www.ftc.gov/sites/default/files/documents/ reports/authorized-generic-drugs-short-term-
24   effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-
     term-effects-and-long-term-impact-report-federal-trade-commission.pdf); William O. Kerr &
25   Cleve B. Tyler, *Measuring Reverse Payments in the Wake of Actavis*, 28 Antitrust 29, 34-35
     (2013) ("When a branded producer provides compensation in the form of an agreement not to
26   introduce an [authorized generic], the potential anticompetitive effect of the settlement may be
     larger than in a similar deal in which compensation is paid in cash.  This is because when a
27   branded producer pays cash it bears the entire burden of the payment.  However, by refraining
     from introducing an [authorized generic], the firm pushes some of the costs of a deal onto
28   consumers by decreasing competition").

---

Endo/Teikoku's no-AG pledge was little different than if they had launched their AG and simply handed the resulting cash to Watson.  DC ¶ 102; EC ¶¶ 113-17; GC ¶¶ 108-10.  An AG takes about half of the generic sales, and so Endo and Teikoku's no-AG promise allowed Watson to *double* its generic Lidoderm unit sales and charge higher prices to boot.  DC ¶¶ 48-54; EC ¶¶ 56-62, 111-17; GC ¶¶ 104-08.  This latter effect exposes a no-AG promise as an especially pernicious form of payment-for-delay, because it harms consumers twice.  First, the no-AG promise, as a payment for Watson's delay, transformed the period from August 23, 2012 until September 15, 2013 from what would have been a three-supplier-rivalry (branded Lidoderm, Watson's generic, and Endo/Teikoku's AG) into a period where only high-priced branded Lidoderm was available.  Second, while Endo/Teikoku were making good on the no-AG promise for the 7½ months from Watson's delayed entry (September 15, 2013) until May 2, 2014, what would have been a three-supplier rivalry (branded Lidoderm, Watson's generic, and Endo/Teikoku's AG) was instead just a duopoly (branded Lidoderm and Watson's generic only), free of the price-constraining effect of the AG.  DC ¶¶ 103, 118; EC ¶ 4; GC ¶ 16.

Defendants do not, and cannot, challenge the averments of the complaints setting forth how the no-AG promise transferred $150-198 million from Endo and Teikoku to Watson.  Instead, Defendants argue that because they called the no-AG promise an "exclusive license," it cannot be subject to antitrust liability.  Defendants are wrong.  *First,* the no-AG promise is *not* an exclusive license.  An exclusive license is one where the patent holder turns over its patent rights to another, and the other, having stepped into the shoes of the patent holder, alone practices the patented invention, and receives rights to enforce the patent.[34]  Here, by contrast, during the entire period the no-AG promise was in effect, Endo/Teikoku continued to sell lidocaine patch 5% as

---

[34] *E.g.*, *Barnett v. Strom*, 265 F. Supp. 2d 946, 949 (N.D. Ill. 2003) ("one of the most basic fundamentals of patent law and practice [is that w]hen a patentee has granted an *exclusive* license, even the patentee is prohibited from practicing the art disclosed by the patent") (footnote omitted); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1553 (Fed. Cir. 1995) (licensees were not exclusive licensees because they "had no right under the agreements to exclude anyone from making, using, or selling the claimed invention").

1    branded Lidoderm and at § 2(g) of the Agreement expressly deprived Watson of enforcement

2    rights.  Nor is the no-AG promise a "field of use" license.[35]

3        Second, even if the no-AG promise could be construed as an exclusive or "field of use"

4    license, such licenses are *not* immune from antitrust scrutiny.[36]  Rather, they are subject at the

5    very least to the antitrust rule of reason.[37]  *Actavis* itself noted that "both within the settlement

_____

[35] There is no separate "field of use" of generic Lidoderm and no separate set of direct
purchaser-customers to which Watson was given "exclusive" rights.  A generic drug is "identical
— or bioequivalent — to a brand name drug in dosage form, safety, strength, route of
administration, quality, performance characteristics and intended use" but is "typically sold at
substantial discounts from the branded price." http://www.fda.gov/Drugs/ResourcesForYou/
Consumers/BuyingUsingMedicineSafely/UnderstandingGenericDrugs/ucm144456.htm (last
visited Sept. 7, 2014).

[36] *See* P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 2046(b)(3) (2014) ("the Patent Act
expressly permits exclusive licenses, but this fact alone does not render them immune from
antitrust scrutiny"); *Moraine Prod. v. ICI America, Inc.*, 538 F.2d 134, 143 (7th Cir. 1976) ("we
are not aware of any language specifically creating a theory of unswerving supremacy of patent
law over antitrust law nor establishing in a patent licensing situation an absolute immunity from
antitrust law. . . . The bare language of § 261 does allow a patentee or his assignee to grant an
exclusive license to make, use, or sell the patented invention. But the statutory language must be
construed in connection with antitrust law"); *In re Nexium*, 2014 WL 4370333, at *25 ("The
Defendants cannot shield themselves with the argument that patent licenses are common and
authorized, if such licenses disguise unlawful reverse payments.  In view of this consideration, the
Court rules that AstraZeneca's agreement to refrain from marketing [authorized] generic Nexium
during Ranbaxy's exclusivity period may be considered part of an illegal reverse payment.").

[37] *See Am. Needle*, 560 U.S. at 203 (rule of reason applied to exclusive trademark license);
*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 47, 50 (1990) (*per se* liability applied to exclusive
copyright and trademark license); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 7,
10, 15-16, 19, 24 (1979) (rule of reason applied to blanket copyright license); *Roller Bearing Co.
v. United States*, 341 U.S. 593, 598 (1951) (allocation of territories incidental to trademark
licensing contracts was subject to antitrust scrutiny); *B. Braun Med., Inc. v. Abbott Labs.*, 124
F.3d 1419, 1426 (Fed. Cir. 1997) ("[F]ield of use restrictions . . . and any anticompetitive effects
they may cause are reviewed in accordance with the rule of reason"); *Instructional Sys. Dev.
Corp. v. Aetna Cas. & Sur. Co.*, 817 F.2d 639, 644-45 (10th Cir. 1987) (rule of reason applied to
to exclusive trademark license, because "[e]ven constitutionally protected property rights such as
patents may not be used as levers for obtaining objectives proscribed by the antitrust laws")
(citation omitted); *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1355 (9th Cir. 1982)
(rule of reason applied to exclusive trademark licensing scheme because "licenses were merely
facades to mask an allocation of markets by pre-existing competitors") (citations omitted);
*Mannington Mills, Inc. v. Congoleum Indus., Inc.*, 610 F.2d 1059, 1071-73 (3d Cir. 1979)
(exclusive patent license subject to antitrust scrutiny because "[t]he patent statute is not seriously
encumbered by prohibiting the misuse of a patent as a cosmetic to cover a cartel"); *Carter v.
Variflex, Inc.*, 101 F. Supp. 2d 1261, 1265-66 (C.D. Cal. 2000) (exclusive "field of use" license
in patent settlement agreement judged under rule of reason) (citation omitted); *United States v.
Bayer Co.*, 135 F. Supp. 65, 70-71 (S.D.N.Y. 1955) (*per se* antitrust liability applied to trademark
settlement agreement with exclusive licenses). *See also In re Niaspan*, ECF No. 112 at 21
(rejecting "exclusive license" argument, "a no-AG provision works exactly as would a payment
of cash.").

context and without, the Court has struck down overly restrictive patent licensing agreements —
irrespective of whether those agreements produced supra-patent-permitted revenues." 133 S .Ct.
at 2232. Defendants' cases, most of which stand for the uncontroversial proposition that
exclusive licenses may be procompetitive, do not suggest otherwise.[38] And none even remotely
involves the facts here: a licensee *agreeing to delay competing with the patentee* in exchange for
the so-called "exclusivity" in the license. Nothing Defendants argue changes the economic
reality that the no-AG promise paid Watson to delay generic competition.

A "cash only" requirement presupposes that non-cash settlements are immune from
antitrust scrutiny, but (1) no case so holds; and (2) *Actavis* did not merely "carve out" an
exception to the "scope of the patent test" that in some circuits had immunized reverse payments,
it rejected it. Lower courts may not reinstate it.

**E.      The No-AG Promise Can and Should Be Given Per Se Treatment in Claim II**

The no-AG promise here also should be subject to *per se* antitrust liability, not merely
because it is a large reverse payment under *Actavis* (it is that), but because it *also* can be seen as a
naked agreement not to compete for 7½ months, a type of agreement long held *per se* unlawful.
Prior to Watson's belated September 15, 2013 launch, the no-AG promise was serving as a large
reverse payment, inducing Watson to delay launching until that date and so is actionable under
*Actavis*. But from that date forward, until May 2, 2014 (7½ months later), the no-AG promise
was a naked agreement by Endo/Teikoku to not compete with Watson. Critically, as of
September 15, 2013, Watson had entered — the delay of generic Lidoderm was finally over —
but Endo/Teikoku then withheld their competing AG, and did so for 7½ months. DC ¶¶ 160-67;

---

[38] Def. Br. at 15, 18. For example, *United States v. Westinghouse Elec. Corp.* 648 F.2d 642
(9th Cir. 1981) dealt with the inapposite question of whether the fact that Westinghouse licensed
some patents to a rival obligated Westinghouse to license all of its patents. *Simpson v. Union Oil
Co. of Cal.*, 377 U.S. 13 (1964) and *United States v. Gen. Elec. Co.*, 272 U.S. 476 (1926), the
latter cited by *Actavis*, both involved the inapposite issue of resale price maintenance. *Genentech,
Inc. v. Eli Lilly & Co.*, 998 F.2d 931 (Fed. Cir. 1993), too, is inapposite. Genentech did not hold,
as Defendants suggest, that an exclusive license is necessarily lawful under the antitrust laws.
Genentech's antitrust complaint simply alleged that the University of California licensed drug
patent rights to drug maker Eli Lilly, nothing more. The Genentech complaint was dismissed
because it failed to allege sufficient facts of a conspiracy in restraint of trade. *Id.* at 949.
Defendants characterize the *Lamictal* case as immunizing an exclusive license (Def. Br. at 18),
but a review of that opinion reveals no discussion of exclusive licenses whatsoever.

EC ¶¶ 113-14, 123; GC ¶¶ 98, 101, 102. *That* period of time reflects a naked — and hence *per se*

unlawful — agreement not to compete (as set forth in Claim II).[39]

The Supreme Court held that reverse-payment settlements should be judged under the rule

of reason (rather than condemned *per se*) because the Court held that determining whether

a payment is anticompetitive depends on such factual matters as the payment's size (*i.e.*, was it

greater than the payor's saved litigation costs) and cognizable justifications offered by

defendants.[40]  However, here, as in *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46 (1990) and *United

States v. Bayer Co.,* 135 F. Supp. 65 (S.D.N.Y. 1955),[41] it is facially obvious that the no-AG

promise suppressed competition between two generics.  This is not a situation where Watson had

a patent to exclude Endo/Teikoku's AG, and the parties agreed to a compromise date that enabled

Endo/Teikoku's AG to enter the market earlier.  DC ¶ 164; EC ¶ 112; GC ¶ 106.  Indeed, there

was *nothing* — no case, law, or patent — that could have stopped Endo/Teikoku from launching

their AG; nothing except their own, voluntary and naked agreement not to compete for a 7½

month period.  DC ¶¶ 160-67; EC ¶ 112; GC ¶¶ 101, 103, 110, 112.  During this period, prices for

generic Lidoderm were higher than they would have been had Endo and Teikoku not withheld

their AG.  DC ¶¶ 142-52; EC ¶¶ 113, 124; GC ¶¶ 106, 122-24.

Certain agreements or practices "because of their pernicious effect on competition and

lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal

without elaborate inquiry as to the precise harm they have caused or the business excuse for their

use." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958).  Horizontal output restrictions and

---

[39] *See Activating* Actavis*, supra* note 16, at 18 n.25 (a no-AG agreement "can also be directly
analyzed as an illegal non-compete agreement, in which the patentee agrees to pull its competitive
punches in exchange for the claimed infringer delaying its entry.").

[40] *See Actavis*, 133 S. Ct. at 2237 ("The existence and degree of any anticompetitive
consequence may also vary as among industries. These complexities lead us to conclude that the
FTC must prove its case as in other rule-of-reason cases.").

[41] In *Palmer*, HBJ licensed its trade name to BRG, which sold competing bar review courses.
In the license, the parties agreed "that HBJ would not compete with BRG in Georgia and that
BRG would not compete with HBJ outside of Georgia." 498 U.S. at 47.  The Court held that this
agreement was *per se* unlawful.  *Id.* at 50.  In *Bayer*, the parties agreed to divide up the world
market for certain pharmaceuticals in an agreement that facially was a trademark dispute
settlement.  The court held that the agreement was *per se* unlawful, despite the use of a
"licensing" pretext such as Defendants attempt here.  135 F. Supp. at 70.

naked market allocations are two such practices.[42]  Courts have long recognized the severe harms

presented by market division.[43]  The no-AG promise is just such an unlawful market division.

        Defendants' sole response is that the AG was withheld because of an exclusive license,

and so the rule of reason should apply.  Def. Br. at 14-15.  But as reviewed above, the agreement

here cannot be characterized or defended as an "exclusive license."[44]  Even if it could, substantial

precedent holds that exclusive license provisions do not prevent the imposition of *per se*

liability.[45]  Substantial precedent also holds that license provisions that benefit the licensee rather

than the patentee — and the no-AG promise here clearly benefited Watson and represented a

sacrifice of profits for Endo/Teikoku, *see* DC ¶¶ 48, 108, 115; EC ¶¶ 113-14; GC ¶¶ 103, 105,

106 — "cannot be justified as a subsidy for the patentee's inventive activity," and thus are for that

additional reason susceptible to review under the *per se* standard.[46]

**F.      Plaintiffs Have More Than Adequately Alleged Antitrust Injury and Causation**

        Defendants urge dismissal because they say "Plaintiffs have failed to plausibly allege that

the Lidoderm settlement caused injury."  Def. Br. at 21.  Defendants' argument overlooks

Plaintiffs' clear averments of two judicially-accepted ways in which earlier generic competition

---

[42] "Horizontal output restrictions constitute per se violations of section 1 of the Sherman Act." *R.C. Dick Geo. Corp. v. Thermo., Inc.*, 890 F.2d 139, 154 (9th Cir. 1989) (*en banc*).  "A market allocation agreement between two companies at the same market level is a classic per se antitrust violation."  *United States v. Brown*, 936 F.2d 1042, 1044-45 (9th Cir. 1991).

[43] *See, e.g., United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (condemning "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition"); *Engine Spec., Inc. v. Bombardier, Ltd.*, 605 F.2d 1, 11 (1st Cir. 1979) (agreement is unlawful market allocation where "Bombardier is free of Agrati's competition in both sales and manufacturing in North America and Agrati is free of Bombardier's competition in manufacturing outside North America").

[44] *See supra* notes 34-35 & accompanying text.

[45] *E.g., Palmer*, 498 U.S. at 47, 50 ("agreement that gave BRG an exclusive license" to copyrighted materials and trademarks, such that "HBJ would not compete with BRG in Georgia and that BRG would not compete with HBJ outside of Georgia," was "unlawful on its face").

[46] *Mannington Mills*, 610 F.2d at 1071 (citations omitted); *id.* at 1073 ("On this scant record, we express no view on whether this case should be judged by the rule of reason or by a Per se rule.  That determination should await fuller development of the evidence on remand."); *United States v. Crown Zellerbach Corp.*, 141 F. Supp. 118, 127 (N.D. Ill. 1956) ("restrictions imposed upon the patentee by the licensing agreement must be viewed in a different light.  Restraints upon competition for the benefit of the licensee are to be measured not by the standards of the patent laws, but by the general rules governing the validity of competitive restrictions").

would have occurred but-for the challenged terms of the Agreement.  These are (a) at-risk launch and (b) an agreement without large payments to Watson and consequently an earlier licensed entry date.  DC ¶¶ 118, 122; EC ¶¶ 119, 124-27; GC ¶¶ 2, 110, 112.  Defendants' argument also overlooks that not a single motion to dismiss in a pay-for-delay case has ever been granted on the grounds that Plaintiffs had inadequately alleged antitrust injury.[47]

      Defendants first argue that Plaintiffs' allegations are "premised on the speculation that Watson would have received FDA approval of its ANDA on August 23, 2012, *and* that Watson would have prevailed in the '529 lawsuit and Rolf lawsuit (or that Watson would have launched "at-risk" of patent damages for infringement)."  Def. Br. at 22-23.  This argument is fundamentally flawed.  First, it is not speculation that Watson would have gained FDA approval of its ANDA on August 23, 2012.  That is what happened.  DC ¶ 75; EC ¶ 80; GC ¶¶ 75, 99.[48] Second, and contrary to Defendants' mischaracterization, Plaintiffs' claims are *not* premised, or required to be premised, on the theory that "Watson would have prevailed in the '529 lawsuit and Rolf Lawsuit."  This is not a theory of harm upon which Plaintiffs do, or need to, rely.[49]

---

[47] *E.g.*, *In re Lipitor Antitrust Litig.*, 2013 WL 4780496, at *24 ("causation is generally a factual issue, and particularly here where [d]efendants contest the allegation that generic competition would have and could have entered the market sooner but for [d]efendants' conduct"); *King Drug Co. of Flor., Inc. v. Cephalon, Inc.*, 702 F. Supp. 2d 514, 537 (E.D. Pa. 2010) (rejecting defense argument that it was too speculative for plaintiffs to allege that absent pay-for-delay agreement generic company would have entered the market sooner); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 535 (D.N.J. 2004) ("[a]ccepting the facts alleged by Plaintiffs as true and drawing all reasonable inferences in the light most favorable to Plaintiffs, this Court finds that a reasonable trier of fact could conclude that but for the allegedly anti-competitive agreements, generic drugs may have entered the market sooner" and dismissing, as "conjecture," defendants' assertion that no generic manufacturer would have entered the market "at risk").  In general, "[t]he issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review."  *Exxon Co., USA v. Sofec, Inc.*, 517 U.S. 830, 840-41 (1996); *Armstrong v. U.S.*, 756 F.2d 1407, 1409 (9th Cir.1985); *Chipanno v. Champion Int'l Corp.*, 702 F.2d 827, 832 (9th Cir. 1983) ("The causation alleged is not so inherently speculative as to justify denying plaintiffs an opportunity to prove it.").

[48] Defendants, citing nothing, argue that "it is far from clear that, absent the Lidoderm settlement, FDA would have resolved Endo's Citizen Petition — and simultaneously approved Watson's ANDA — as quickly as August 23, 2012."  Def. Br. at 22.  If anyone is engaged in speculation, it is Defendants.

[49] Even if it were, *Actavis* held that "the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness, all without forcing a court to conduct a detailed exploration of the validity of the patent itself."  *Actavis*, 133 S. Ct. at 2236-37.  And, "a court, by examining the size of the payment, may well be able to assess its likely anticompetitive effects

Instead, Plaintiffs allege, as one theory of harm, that absent the Agreement, Watson would have entered the market "at-risk" (*i.e.*, while the patent litigations were pending) once it received final FDA approval.  DC ¶¶ 118, 122; EC ¶ 119, 123-26; GC ¶¶ 110, 112.  Plaintiffs even explain *why* Watson would have entered at risk.[50]  These allegations are not only "plausible," but are consistent with Defendants' admission that, in the first quarter of 2012, Watson "had increased capacity and procured raw materials to be in a position to launch generic Lidoderm."  Def. Br. at 23.  It is Defendants' argument that Watson was *not* preparing for an at-risk launch that is implausible.  Such an argument ignores that during the first quarter of 2012 Watson (1) knew Endo/Teikoku's patent position was weak; (2) increased production capacity for a launch of generic Lidoderm; and (3) procured the raw materials for such a launch.  DC ¶¶ 79-92, 124; EC ¶¶ 81-100, 125; GC ¶¶ 79-92.  Moreover, federal courts in pay-for-delay cases across the country agree that a complaint's allegations of an at-risk launch are not only plausible, but also establish antitrust injury-in-fact on a motion to dismiss.[51]

---

along with its potential justifications *without litigating the validity of the patent*." *Id.* at 2237. (emphasis added).

[50] Plaintiffs allege that Watson was confident that its generic Lidoderm did not infringe any valid and enforceable claim of patents covering Lidoderm.  DC ¶¶ 79-92; EC ¶¶ 81-100; GC ¶¶ 79-92. Defendants focus on the statement by Watson's CEO about a "trial decision."  Def. Br. at 22-23 (emphasis added).  But Mr. Bisaro's statement is more than plausibly read to describe an intent to launch upon FDA approval, which would be, as he said, "at the earliest *possible* time." DC ¶ 124; EC ¶ 125.  Moreover, Mr. Bisaro made no reference to the Rolf patent litigation (he referenced "a" trial decision, not two), which (together with Watson's allowing that litigation to languish) plausibly reflects Watson's lack of concern about that litigation.  *See also supra* note 19 (implausible that, given its behavior, Watson was concerned about Rolf litigation).

[51] *E.g.*, *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 911 (6th Cir. 2003) (finding antitrust injury because "a trier of fact may well find that the [brand's] $89 million payment renders incredible the defendants' claim that [the generic] would have refrained from marketing [during the patent litigation] simply because of its fear of infringement damages"); *Andrx Pharm. Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 813 (D.C. Cir. 2001) (reversing dismissal based on antitrust injury because a reasonable juror could conclude that but for the brand's $10 million quarterly payments, the generic would have entered the market); *In re Nexium*, 968 F. Supp. 2d at 390 (denying motion to dismiss in reverse payment action including at-risk launch theory of antitrust injury); *In re Lipitor Antitrust Litig.*, 2013 WL 4780496, at *23-24 (same); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d at 534-35 (rejecting as "conjecture" defendants' assertion that generic manufacturer would not have entered at risk, a conjecture that the court found to be "not [its] concern" on a motion to dismiss"); *Biovail Corp. Int'l. v. Hoechst*, 49 F. Supp. 2d 750, 767-68 (D.N.J. 1999) (allegations of injury were not too "speculative," despite defendants' argument that the generic would not have launched at risk). *In re Niaspan*, ECF No. 112 at 29-30 (allegations showing generics plan to launch "at the very first opportunity" sufficient to plead antitrust injury). Defendants cite *Ciprofloxacin* as contrary authority, but there the complaints

1    Finally, Defendants all but ignore Plaintiffs' allegations that absent the unlawful reverse

2    payment, the parties would have entered a settlement with an earlier date of generic entry.  DC ¶¶

3    118, 122, 114; EC ¶ 119.  Defendants cite *Verizon Comm'ns Inc. v. Law Offices of Curtis V.*

4    *Trinko, LLP*, 540 U.S. 398 (2004) for the proposition that "courts cannot condemn an otherwise

5    procompetitive agreement 'whenever some other approach might yield greater competition.'"

6    Def. Br. at 19 (citing *Trinko*).  This is an inapt dictum.  Plaintiffs allege that absent

7    Endo/Teikoku's large reverse payments, Watson would have insisted upon, and Endo/Teikoku

8    would have agreed to, earlier entry than the September 15, 2013 date that Endo/Teikoku bought

9    with their reverse payment.  This theory of harm was specifically endorsed by *Actavis*.[52]

10   Moreover, the question whether Defendants' reverse payments were the least restrictive means of

11   settling the patent litigation is *necessarily* a part of Plaintiffs' rebuttal case under the rule of

12   reason.[53]  In light of the specific allegations outlined above, Defendants' argument at best

13   concerns a disputed issue of fact for the jury, and is not a basis for dismissal.

14   **G.    Plaintiffs' Attempted Monopolization and Monopolization Claims Are Cognizable Against Endo and Teikoku; Alternatively, They are Cognizable Against Endo**

15           Defendants argue that Plaintiffs' monopoly-based claims against Endo and Teikoku must

16   be dismissed because both are named as monopolists.  *See* Def. Br. at 24-26.  Defendants

17   mischaracterize Plaintiffs' complaints as alleging a "shared monopoly."  Plaintiffs do not allege a

18   "shared monopoly," but allege that Endo and Teikoku, *acting as a single entity*, attempted to and

19

20   also had allegations that "undermine[d]" the at-risk launch theory, and since there was no express
     allegation of the likelihood of an at risk launch, the allegations were insufficient.  *In re Ciprofloxacin*
21   *Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 205 (E.D.N.Y. 2003).

22       [52] *Actavis* explicitly states — as the fifth enumerated basis for its holding — that
     pharmaceutical patent litigants could have settled their litigation "by allowing the generic
23   manufacturer to enter the patentee's market, without the patentee paying the challenger to stay out
     prior to that point."  *Id.* at 2237.  *See also In re K-Dur Antitrust Litig.*, 686 F.3d 197, 218 (3d Cir.
24   2012) ("it is logical to conclude that the quid pro quo for the payment was an agreement by the
     generic to defer entry beyond the date that represents an otherwise reasonable litigation
25   compromise") (citation omitted), *abrogated on other grounds*, *Actavis*, 133 S. Ct. 2223.  Even
     the *Ciprofloxacin* decision, cited by Defendants, endorses such a theory.  261 F. Supp. 2d at 209-
26   10.

     [53] *See supra* note 21 and accompanying text (citing *Tanaka*, *Bhan*, and *Betaseed*).
27   Defendants' citation to *Trinko* is thus misplaced, especially so given that *Actavis* itself cites
     *Trinko* — albeit for quite a different proposition:  that collusion, of which the Court gives a
28   reverse-payment settlement as an example, is the "supreme evil of antitrust."  133 S. Ct. at 2233.

did monopolize the relevant market by controlling prices, preventing prices from falling, and

excluding competitors through the Agreement.  DC ¶¶ 130-41, 177-83; EC ¶¶ 135-45; GC

¶¶ 114-21.  Plaintiffs' allegations are more than sufficient to state a claim for monopolization and

attempted monopolization at the very least against Endo (which sold Lidoderm to direct and

indirect purchasers in the United States), but should lie against Endo's completely-involved co-

conspirator, Teikoku, as well.  After all, in the Agreement challenged in this case, Endo and

Teikoku expressly refer to themselves as one entity:  "Endo/Teikoku," and co-equally make the

payments to purchase Watson's delay thereunder.[54]

As Defendants acknowledge, monopolization claims may exist where, as here, there is

complete domination of a market by a "single entity."  *See* Def. Br. at 24.[55]  In this case, Plaintiffs

allege that two enterprises, Endo and Teikoku, acting as a *single economic entity*, attempted to,

and did, monopolize the market for lidocaine patch 5% by assuring that only one product,

Lidoderm, would be sold.  DC ¶¶ 168-83; EC ¶¶ 171-83; GC ¶¶ 132, 141-51.[56]

Defendants ignore these allegations, and instead seek to transform the Sherman Act and

state laws' requirement of monopolization by a "single entity" into a requirement of

monopolization by a single *defendant*.  Defendants' incorrect view is that a plaintiff must allege

---

[54] *See* DC ¶ 101, EC ¶ 111, GC ¶ 104 ("Subject to the terms and conditions of this Agreement, Endo/Teikoku hereby grant to Watson"); *id.* ("The license granted pursuant to Section 2(a) shall be partially exclusive for a period of time in that Endo/Teikoku and their respective Affiliates shall not market or sell a Generic Product, or authorize or license a Third Party to market or sell and [sic] AG Product").  *See also* DC ¶ 95, EC ¶ 106, GC ¶ 98 ("Endo/Teikoku shall provide, at no cost, to Watson's Wholesaler Affiliate Brand Product").

[55] *See also Gonzalez-Maldonado v. MMM Health., Inc.*, 693 F.3d 244, 250 (1st Cir. 2012) ("Of course, a company *or any other single economic unit* can violate section 2 of the Sherman Act, which prohibits attempts to monopolize and monopolization.") (emphasis added); *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1280 (10th Cir. 2012) ("Section 2 can be violated by a single economic unit"); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3521979, *25 (E.D. Cal. Sept. 3, 2010) ("Section 2 of the Sherman Act prohibits antitrust activity of a single entity").

[56] *See also* DC ¶ 21 ("Endo, Teikoku Pharma, and Teikoku Seiyaku at all relevant times acted as a single entity with respect to the material provisions and performance of the Reverse Payment Agreement, which refers to Endo, Teikoku Pharma and Teikoku Seiyaku collectively in provisions relating to the grant of patent licenses to Watson, the agreement not to launch a competing authorized generic for 7½ months, and the obligation to deliver free brand Lidoderm product to pay Watson."); EC ¶ 27 (same).  Plaintiffs also allege that Endo, Teikoku Pharma, and Teikoku Seiyaku are "involved in a marketing enterprise that covers the distribution and marketing of Lidoderm in the United States."  DC ¶ 21; EC ¶ 27.

1    that monopoly power is housed in only one corporate entity, and that no other corporate entity,

2    even if part of the same economic unit, can be liable for a monopolization claim.

3           Section 2 provides that a "person" may be found liable for monopolization, attempted

4    monopolization, or conspiracy to monopolize. The term "person" has not been limited to a single

5    corporate entity under the Sherman Act. For example, the Supreme Court has explained that

6    when "persons" combine to "'pool their capital and share the risks of loss as well as the

7    opportunities for profit . . . such joint ventures [are] regarded as a single firm competing with

8    other sellers in the market.'"[57]

9           Defendants cite cases addressing the irrelevant question whether competitors in a product

10   market may be joined together as a duopoly or oligopoly for purposes of pleading a Section 2

11   claim.[58] By contrast, here Plaintiffs allege that Endo and Teikoku formed a single economic

12   entity that, acting as a unit, entered into a reverse payment agreement with Watson, made the

13   payments under that agreement, and extracted Watson's agreement to delay generic entry until

14   September 2013. Plaintiffs do *not* premise their claims on combining Endo's and Teikoku's

15   separate market shares from selling Lidoderm in the United States (since only Endo, not Teikoku,

16   made such sales).

17          Even under the reasoning of *In re Wellbutrin*, the Court should permit the claims to

18   proceed against Endo.[59] The *Wellbutrin* court held that the "gist of th[e] complaint [was] that [the

19

20          [57] *Texaco, Inc. v. Dagher*, 547 U.S. 1, 6 (2006) (quoting *Ariz. v. Maricopa County Med. Soc'y*, 457 U.S. 332, 356 (1982)). Similarly, the Seventh Circuit has held that a sports league
21   composed of multiple teams may be treated as a single entity under Section 1. *See Chicago Prof'l Sports Ltd. P'Ship v. NBA*, 95 F.3d 593 (7th Cir. 1996). Because multiple corporate
22   entities may be treated as a single firm or single entity for purposes of Section 1 of the Sherman Act, they necessarily may be treated as a single firm or single entity for purposes of Section 2.

            [58] *See, e.g., Sun Dun Inc. of Wash. v. The Coca-Cola Co.*, 740 F. Supp. 381, 390 (D. Md.
24   1990) (plaintiff's "conclusory allegations to the effect that defendants as a group possessed monopoly power or dominant market power do not meet the requirements" of § 2); *Rebel Oil Co.*,
25   51 F.3d at 1443 (rejecting claim of shared monopoly by oligopolists selling multiple competing products); *Standfacts Credit Servs., Inc. v. Experian Info Sol., Inc.*, 405 F. Supp. 2d 1141, 1152
26   (C.D. Cal. 2005) (same). The Ninth Circuit has not definitively ruled out the possibility that a shared monopoly or oligopoly theory may state a viable claim under Section 2. *See Harkins
27   Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 490 (9th Cir. 1988).

            [59] *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, 2009 WL 678631, at *6-8 (E.D. Pa. Mar.
28   13, 2009).

1    distributor] had a monopoly" on the sale of the drug in question, and dismissed the

2    monopolization claims only against the producer.  *Id.* at *8.  Similarly, the complaints here allege

3    that Endo markets and sells Lidoderm in the United States, and Teikoku manufactures Lidoderm

4    in Japan for sale in the United States.  DC ¶¶ 13-14; EC ¶¶ 19-20; GC ¶ 56.  Even under

5    Defendants' logic, Plaintiffs have stated cognizable monopolization and attempted

6    monopolization claims against Endo.

7           Finally, Plaintiffs state a valid claim for conspiracy to monopolize against Endo and

8    Teikoku regardless of whether the Court finds that Plaintiffs have alleged valid monopolization

9    and attempted monopolization claims against both Endo and Teikoku or only as to Endo.  "To

10   prove a conspiracy to monopolize in violation of § 2, [a plaintiff] must show four elements: (1)

11   the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the

12   conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury."[60]  Plaintiffs'

13   conspiracy to monopolize claim alleges that Endo, Teikoku, and Watson all conspired; it is

14   actionable no matter whether the single unit of Endo/Teikoku or, alternatively just Endo,

15   possesses the monopoly power that was maintained by the acts in furtherance of the conspiracy.

16   DC ¶¶ 170-71; EC ¶¶ 174-76; GC ¶¶ 142-43.  Plaintiffs state a claim for conspiracy to

17   monopolize, with all three Defendants as co-conspirators, regardless of whether the Court finds

18   that Endo/Teikoku acted as a single unit or as separate entities.  Defendants' cases are about

19   shared monopolies, and are not to the contrary.

20   **H.     The End-Payor Plaintiffs Have Standing to Pursue Their State Law Claims[61]**

21          The End-Payor Plaintiffs (EPPs) purchased or received reimbursement for Lidoderm or its

22   generic equivalent in 30 states.[62]  Defendants do not challenge this allegation, nor could they.

23   Plaintiffs' allegations must be taken as true and, in any case, they have already disclosed their

24

25   _____

      [60] *Paladin Assocs.*, 328 F.3d at 1158.

26    [61] The End-Payor Plaintiffs note that regardless of how this Court rules on Defendants'
      arguments under federal antitrust law, the End-Payor Plaintiffs' claims should survive the motion
27    to dismiss.

28    [62] *See* EC ¶¶ 9-18.

purchasing and reimbursement data to defendants.[63]  Instead, Defendants move to dismiss some

of the claims in the CAC based on an incorrect legal argument: that Plaintiffs may pursue claims

only under the laws of the states in which they *reside or have places of business*.  That argument

defies Ninth Circuit authority, fundamentally confusing two separate legal concepts: Article III

standing and the Rule 23's class certification requirements.

### 1. The EPPs Have Article III Standing and Therefore May Pursue The Claims Of Absent Class Members In Other States

In a class action, "standing is satisfied if at least one named plaintiff meets the

requirements."[64]  Article III merely requires a "case or controversy."  As long as one member of a

proposed class has standing, such a case or controversy exists.[65]  A federal court then has the

power "to adjudicate a *case*."[66]  It is a separate issue what the scope of the case should be,

including whether the court should certify a class.[67]  The Ninth Circuit has thus determined

standing by "key[ing] in] on the representative party, not all of the class members, and has done so

for many years."[68]  In fact, the Ninth Circuit has been recognized – along with the Third, Seventh

and arguably the Tenth – for its exclusive focus on named plaintiffs in its standing inquiry.[69]

Therefore, at this point in the litigation, the named EPPs need merely establish that

they have Article III standing to assert their own claims.  Whether they can adequately represent

---

[63] *See* the Parties' Joint Case Management Statement (ECF No. 27) and this Court's Order Following Case Management Hearing (ECF No. 53).

[64] *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).  *See also Kohen v. Pacific Investment Management Co.*, 571 F.3d 672, 676 (7th Cir. 2009) (Posner, J.) (citing *United States Parole Commission v. Geraghty,* 445 U.S. 388, 404 (1980) *and Wiesmueller v. Kosobucki,* 513 F.3d 784, 785–86 (7th Cir. 2008)).

[65] *Kohen*, 571 F.3d at 676-77.

[66] ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES §2.5, at 63 (3d ed. 2006) (emphasis added).

[67] *Kohen*, 571 F.3d at 676-77.

[68] *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020-21 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 1970 (2012).

[69] *See In re Deepwater Horizon*, 739 F.3d 790, 800 (5th Cir. 2014) (stating that the above-cited Circuits' approach to Article III standing looks "exclusively [into] the . . . standing of the 'named plaintiffs' or 'class representatives.'  This test requires courts to ignore the absent class members entirely.").

absent class members is then determined at the class certification stage, solely under Rule 23's requirements.[70]

Here, each of the named EPPs purchased or provided reimbursement for Lidoderm or its generic equivalent during the class period. Moreover, the CAC alleges that as a result of defendants' unlawful conduct, each of the named EPPs paid more than they otherwise would have in the form of overcharges.[71] Accordingly, each satisfies the threshold inquiry required for Article III standing, namely, showing that they "personally suffered some actual or threatened injury as a result of putatively illegal conduct of the defendant."[72] No more is required to

---

[70] *See Sosna v. Iowa*, 419 U.S. 393, 403 (1975) (once the named plaintiff establishes that he has suffered an injury that is "real and immediate," not "conjectural" or "hypothetical," it "shift[s] the focus of examination for the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interests of the class'") (citation omitted). *See also Clancy v. The Bromley Tea Co.*, No. 12-cv-3003, 2013 WL 4081632, at *6 (N.D. Cal. Aug. 9, 2013) ("applying the concept of standing to dismiss proposed class action allegations is a category mistake"); *id.* at *5 ("Transmogrifying typicality or commonality into an issue of standing would undermine the well-established principles that '[i]n a class action, standing is satisfied if at least one named plaintiff meets the requirements," and that '[t]he class action is an 'exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" (quoting *Bates*, 511 F.3d at 985; *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011)). The governing principle is straightforward: "[W]hen a class plaintiff shows individual standing, the court should proceed to Rule 23 criteria to determine whether, and to what extent, the plaintiff may serve in a representative capacity on behalf of the class." 1 William B. Rubinstein et al., Newburg on Class Actions § 2:6 (5th ed. 2011); *see also* 7AA Alan Wright et al., Federal Practice and Procedure § 1785.1 (3d ed. 2010) (once named plaintiff establishes his own standing, "whether he will be able to represent the putative class . . . depends solely on whether he is able to meet the additional criteria encompassed in Rule 23").

The cases Defendants cite do not hold to the contrary. *See, e.g.*, Def. Br. at 28 & n. 16. The Ninth Circuit in *Easter* held that it was proper to address the standing of *the named plaintiffs* before class certification, not of absent class members. *See Easter v. American West Financial*, 381 F.3d 948, 961-62 (9th Cir. 2004) ("As to those trusts which have never held a *named plaintiff's* loan, Borrowers cannot allege a traceable injury and lack standing.") (emphasis added). Plaintiffs here are not arguing against the Court addressing at this stage the standing of *the named plaintiffs*. But the named plaintiffs clearly do have standing. What is premature is an assessment of which absent class members the named plaintiffs may represent as part of a class. The court in *In re Graphics Processing Units Antitrust Litigation* confused these two issues, misreading the holding of *Easter*—that the standing of the *named plaintiffs* may be addressed before class certification—with the separate issue of whether the standing of absent class members may be addressed on a motion to dismiss. 527 F.Supp.2d 1011, 1026-27 (N.D. Cal. 2007). Requiring standing of *absent* class members would be inconsistent with the Ninth Circuit's opinions in *Bates* and *Stearns*, as this Court recently explained in its opinion in *Clancy*. 2013 WL 4081632, at *5-*6.

[71] *See, e.g.*, EC at ¶¶ 9-18, 154-155, 161, 169, 182, 191, 196.

[72] *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979).

establish Article III standing to pursue the EPPs' claims in this case.[73]  Because the EPPs have

established Article III standing to assert their own claims, no separate standing inquiry is

necessary.

2.        **The Law of the State of Purchase Governs the Standing Inquiry**

Further, what governs the actionability of state law claims is not the place of a plaintiff's

residence or business under federal law, but *purchase location*.  The courts have taken a near-

unanimous view that, because state antitrust and consumer protection statutes are designed to

protect consumers, "[t]he location of consumers' purchases . . . assumes special significance,"[74]

and plaintiffs "suffer[] injury and have standing in states where they purchased a drug or

reimbursed their members for purchases of a drug."[75]  Likewise, "[s]tates have a strong interest in

protecting consumers with respect to sales within their borders."[76]  Accordingly, the EPPs can

pursue claims under the laws of each of "the various states in which consumers' purchases were

---

[73] *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998).

[74] *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 278 (D. Mass. 2004).

[75] *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010).  *See also In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 156-57 (E.D. Pa. 2009) ("The elements of a standing analysis of the plaintiffs' claims have clear connection to the states where the plaintiffs themselves are located and the states where their members made purchases of Wellbutrin XL. Therefore, plaintiffs have standing to assert claims in those states."); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 263 F.R.D. 205, 213 (E.D. Pa. 2009) ("a plan's claim arises where the overcharge occurs" and "each [third party payor] plan may have a cause of action in multiple states"); *Ferrell v. Wyeth-Ayerst, Labs., Inc.*, No. 01-447, 2004 U.S. Dist. LEXIS 15127, at *13 (S.D. Ohio June 30, 2004), at *13 ("The Court rejects Wyeth's argument that [health plans] lack standing to prosecute claims anywhere but in their 'home' states, because the **purchase** of Premarin – the critical event causing the alleged antitrust injury – did not take place only in Illinois or Minnesota.").  Defendants cite *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098 (N.D. Cal. 2007), in support of their argument that the place of residence or business governs the standing inquiry, but that case is inapposite because, unlike in that case, *each* of the named plaintiffs here allegedly purchased and/or reimbursed its members' claims for Lidoderm or the generic equivalent in various of the 30 states listed, each plaintiff allegedly suffered overcharges because Defendants unlawfully delayed market entry of generic Lidoderm, and the relief sought will compensate them for their injuries and ensure that Defendants' unlawful conduct ceases.  *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 611 n.85 (S.D.N.Y. 2005), also cited by Defendants, is likewise inapposite because, unlike in that case, the EPPs *have* in fact alleged that they have reimbursed their members in the states listed. Further, *Rezulin* does not explain its conclusion that health plans are not injured in the states in which they pay or reimburse their members' purchases.  *See also In re K-Dur Antitrust Litig.*, MDL 1419, 2008 WL 2660783 (D.N.J. March 19, 2008) (special master's recommendation).

[76] *Relafen*, 221 F.R.D. at 278.

1   made. . . ."[77]  Thus, Defendants' assertion that Plaintiffs may assert state law claims only where

2   they reside or have places of business is incorrect as a matter of law.[78]  Each of the named

3   Plaintiffs purchased or received reimbursement for Lidoderm or its generic equivalent in a state

4   whose laws Plaintiffs invoke.[79]  No more is required.

5   **I.    End-Payor Plaintiffs And GEHA Are Not Barred From Pursuing State Law Claims
        In Illinois, Massachusetts, Puerto Rico, And Rhode Island**[80]

6          **1.    Illinois**

7          Defendants contend that only the Illinois Attorney General may bring a class action on

8   behalf of indirect purchasers, and the EPPs' Illinois Antitrust Act claims should be dismissed.

9   Def. Br. at 33-34.  But the Illinois Antitrust Act could not be clearer that "[n]o provision of th[e]

10  Act shall deny any person who is an indirect purchaser the right to sue for damages."[81]  The

11  statute does provide that "no person shall be authorized to maintain a class action in *any court of*

12  *this State* for indirect purchasers asserting claims under this Act."[82]  Under a plain reading of this

13  provision, indirect purchaser actions are only prohibited from bringing class actions in Illinois

14  *state* courts, the only courts "of" the State of Illinois.[83]  The U.S. Supreme Court has held under

15

16  ─────────────────────

17       [77] *Id.*

         [78] The cases Defendants cite that purportedly require more detailed allegations in fact support
18  the level of detail provided by the EPPs in the CAC, and, further, support the EPPs' position that
    reimbursements constitute injuries sufficient to establish standing.  *See* Def. Mem. at 29 n.20;
19  *Compare* EC ¶¶ 9-18 *with Sheet Metal Workers*, 263 F.R.D. at 213 (where plaintiffs only
    identified specific states to which they sent reimbursement checks in their briefing responding to
20  defendants' motion to dismiss rather than in the complaint itself, the court dismissed state law
    claims as to those belatedly-identified states) and *Wellbutrin XL*, 260 F.R.D. at 156
21  ("Reimbursement for the purchase of drugs, the price of which is allegedly inflated through
    anticompetitive or otherwise illegal means, constitutes a monetary injury to the plaintiffs.").

22       [79] *See* EC ¶¶ 9-18, 168, 181, 186, 201.

23       [80] EPPs voluntarily withdraw their antitrust claims under Florida law.

         [81] 740 ILCS 10/7.
24
         [82] *Id.* (emphasis added).
25
         [83] *See, e.g.*, *Ransom v. Marrese*, 122 Ill. 2d 518, 527 (1988) ("A court *in* the State of Illinois .
26  . . is not transformed into a court *of* [another] State [] simply because it applies [the] substantive
    law [of that State].") (emphasis added); *Piechur v. Redbox Automated Retail, LLC*, No. 09-cv-
27  984, 2010 WL 706047, at *4 (S.D. Ill. Feb. 24, 2010) ("while [a federal court] may sit *in* the state
    of Illinois, [it] is not a court *of* the state of Illinois") (citation omitted).  Principles of statutory
28  construction confirm this reading.  Indeed courts generally "construe provisos consistent with
    legislative intent."  2A Sutherland Statutes and Statutory Construction, at § 47:8 (7th ed. 2014).

1   these circumstances a federal court should certify a class if plaintiffs satisfy Rule 23.[84]

2   Defendants' arguments to the contrary cannot withstand scrutiny.

3         **2.**      **Massachusetts**

4         Defendants argue that EPPs and GEHA lack standing to pursue their claims under the

5   Massachusetts Consumer Protection Act, Mass. Gen. L. Ch. 93A §§ 1-11 ("Massachusetts

6   CPA"),[85] because all business entities can only bring claims under Section 11 of the Act, and

7   claims under Section 11 by indirect purchasers are barred by *Illinois Brick*.  Def. Br. at 37.

8         The Massachusetts CPA protects against unfair or deceptive acts or practices in the

9   conduct of any trade or commerce "directly or indirectly affecting the people of this

10  commonwealth."  G.L. c. 93A, § 1.  The statute distinguishes between "business" claims

11  actionable under Section 11 and all other claims actionable under Section 9.[86]  Defendants assert

12  that EPPs and GEHA cannot assert Section 9 claims, because Section 9 "is reserved for individual

13  consumers."  Def. Br. at 37.  Defendants ignore Plaintiffs' well-pleaded facts and legal precedent.

14        EPPs are employee health and welfare funds under the Taft-Hartley Act (hereafter, "the

15  Funds"), a municipality and two individuals.  EC ¶¶ 9-18.  GEHA is a not-for-profit corporation

16  providing health and dental plans to federal employees and their families.  GC ¶ 21.  None of

17  ────────────────

Any doubts are "strictly resolved" such that "only those subjects *expressly exempted*" are "freed
18  from a statute's operation."  *Id.* (emphasis added).  Because the statute only excepts from suit
indirect purchaser class claims brought in *state* courts, those claims remain actionable in federal
19  courts.

20     [84] *Shady Grove Orth. Assoc. v. Allstate Ins. Co.,* 559 U.S. 393, 408 (2010) (holding federal
court must apply Rule 23, even if in state court plaintiffs could not seek certification of a class).

21     [85] EC at ¶¶ 168(j); 181(j); GC at ¶¶ 130(h); 138(h); 150(i); 158(i); 179.

22     [86] Section 9 of Mass. G.L. c. 93A provides a cause of action for "[a]ny person, other than a
person entitled to bring action under section eleven of this chapter, who has been injured by
23  another person's use or employment of any method, act or practice declared to be unlawful . . .."
(emphasis added).

24     Section 11 of Mass. G.L. c. 93A provides a cause of action for "[a]ny person who engages in
the conduct of any trade or commerce and who suffers any loss of money or property, real or
25  personal, as a result of the use or employment by another person who engages in any trade or
commerce of an unfair method of competition or an unfair or deceptive act or practice declared
26  unlawful…." (emphasis added).

   Section 11 further provides that the court "be guided in its interpretation of unfair methods of
27  competition by those provisions of chapter ninety-three known as the Massachusetts Antitrust
Act." G.L. c. 93A, § 11.
28

1   these entities "engage" in "trade or commerce" within the meaning of Section 11.[87] EPPs and

2   GEHA are not involved in "trade or commerce," because they purchase Lidoderm products for

3   the personal use of their consumer insureds.[88] Thus, Plaintiffs have standing to bring claims

4   under Section 9 of the Massachusetts CPA.[89]

5           Defendants further argue that entities may only pursue claims under Section 11 of the

6   Massachusetts CPA and that "Section 11…has not been extended to indirect purchasers," citing

7   two First Circuit decisions—*Cont'l Ins. Co. v. Bahman*, 216 F.3d 150, 156 (1st Cir. 2000); *In re*

8   *TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489, 495 (1st Cir. 2009)—and *Ciardi*. Def. Br. at

9   37. But following these decisions, the First Circuit has explicitly concluded that third party

10  payers need not be in privity with a defendant drug manufacturer to proceed against it for claims

11  of interference with "trade or commerce" under Section 11.[90] Defendants' argument, therefore,

12  that a direct purchaser relationship must exist between a TPP and a pharmaceutical manufacturer

13  is misplaced.

14          Defendants rely on *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL 1917, 2014 WL

15  1088256 (N.D. Cal. Mar. 13, 2014), but that case in fact supports Plaintiffs' argument. In *CRT*,

16  the court understood the involved/not involved in trade or commerce distinction, and found that

17

18

19

20      87 As used in chapter 93A, "trade or commerce" includes "the offering for sale, rent or lease
        [and] the sale, rent, lease or distribution of any ... property." Mass. Gen. Laws ch. 93A, § 1(b).
21      Plaintiffs are not involved in "trade or commerce," because they purchase Lidoderm products for
        the personal use of their consumer insureds.

22      88 *See In re Bextra & Celebrex Mktg. Sales Prac. & Liab. Litig.*, 495 F. Supp. 2d 1027, 1032
23      (N.D. Cal. 2007) (finding "no serious dispute" that the plan purchased prescription drugs for the
        personal use of its members); *see also Frullo v. Landenberger*, 814 N.E.2d 1105, 1112 (Mass.
24      App. Ct. 2004) ("[t]he dividing line between a consumer claim and a business claim for purposes
        of G.L.c.93A §§ 9 and 11, is not always clear," and cases attempting to define it appear to turn on
25      the purpose of the purchase; collecting cases).

26      89 *See Ciardi v. F. Hoffman-La Roche Ltd.*, 762 N.E.2d 303 (Mass. 2002) (holding that
        indirect purchasers can assert claims for antitrust violations under Section 9).

27      90 *Blue Cross & Blue Shield v. AstraZeneca Pharms. LP (In re Pharm. Indus. Average*
28      *Wholesale Price Litig.)*, 582 F.3d 156, 193 (1st Cir. 2009).

1    Tweeter, a company that purchased CRT products for resale, was a corporation that was involved

2    in trade or commerce, and thus was outside the definition of a plaintiff under Section 9.[91]

3         **3.    Puerto Rico**

4         Defendants also seek dismissal of EPPs' claim under the Puerto Rico Antitrust Act

5    ("PRAA"), arguing that the claim is barred by *Illinois Brick*.  Def. Br. at 32.  The PRAA,

6    however, does not distinguish between direct and indirect purchasers but provides that "*[a]ny*

7    *person*" injured by acts prohibited by the statute may sue and recover threefold damages, costs

8    and reasonable attorney's fees.[92]   The PRAA is liberally construed and has been held to permit

9    indirect purchasers to bring antitrust claims for damages:

10             PRAA is modeled after federal antitrust statutes.  Although federal
               jurisprudence has implied special standing requirements into private
11             antitrust actions . . . , Puerto Rico explicitly rejects any such
               limitations  .  .  .  .  Because Puerto Rico liberally construes its
12             standing requirements in private antitrust cases, it is immaterial
               whether Plaintiffs are direct or indirect purchasers of cabotage
13             services.[93]

14

15         Ten days after issuing its decision in Rivera-Muniz, the District of Puerto Rico refused to

16    certify for appeal the question of whether indirect purchasers have standing under the PRAA,

17    determining that the question was well-settled and that certification "is not a vehicle to force the

18    high court to revisit settled matters of Puerto Rico law."[94]   The District of Puerto Rico reasoned

19    as follows:

20             The Puerto Rico legislature enacted PRAA in 1964. Since then,
               federal precedents have limited standing in private antitrust actions
21             under federal law to direct purchasers. Without citing *Illinois Brick*
               explicitly, the Puerto Rico Supreme Court rejected such limitations
22

23

24         [91] *Id*. at *3 ("Section 9 applies to persons (individual consumers **or corporations**) not
       involved in trade or commerce.") (emphasis added).

25         [92] PRAA, 10 L.P.R.A. § 268 (emphasis added).

26         [93] *Rivera-Muniz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 61 (D.P.R. 2010) (internal
       citations omitted).

27         [94] *Rivera-Muniz v. Horizon Lines Inc.*, Civ. No. 09-2081, 2010 WL 3703737, at *1 (D.P.R.
28     Sept. 13, 2010).

1    on standing for the purpose of private antitrust actions under
     PRAA.[95]

2    Defendants cite solely to *In re Static Random Access Memory (SRAM) Antitrust*

3    *Litigation*, No. 07-md-01819, 2010 WL 5094289 (N.D. Cal. Dec. 8, 2010). In SRAM, which was

4    briefed before the *Rivera-Muniz* decision was issued, the Court noted that "Plaintiffs point to no

5    authority that suggests that *Illinois Brick's* interpretation of federal antitrust law would not be

6    applied to Puerto Rico law."[96]  *SRAM* does not analyze *Rivera-Muniz*, which, together with

7    *Pressure Vessels*, *do* constitute case law interpreting the PRAA to allow for indirect purchaser

8    claims.

9        **4.**    **Rhode Islands**

10       The EPPs and GEHA assert antitrust claims under the Rhode Island Antitrust Act

11   ("RIAA"). EC ¶¶ 168(w); 181(w); GC ¶¶ 130(u), 138(u), 150(w), 158(v). Defendants argue for

12   dismissal of these claims because the statute's Illinois Brick Repealer provision, R.I. Gen. Laws §

13   6-36-7, was only enacted on July 15, 2013.[97] Def. Br. at 32-33. But under Rhode Island law

14   "remedial and procedural statutes, which do not impair or increase substantive rights but rather

15   prescribe methods for enforcing such rights, may be construed to operate retroactively."[98] The

16   amendment simply prescribes who has standing to enforce existing substantive rights and thus

---

19   [95] *Id.* (internal citations omitted). *See also Pressure Vessels of P.R., Inc. v. Empire Gas de
20   P.R.*, 137 P.R. Dec. 497, 519 (1994) (noting that at the time of the PRAA's enactment in 1964 the
     Supreme Court "had expressed itself on behalf of a liberal standing theory under Clayton Act sec.
     4" and the law should be applied "'in accordance with its plain language and its broad remedial
21   and deterrent objectives'" (citing *Blue Shield of Va. v.McCread* , 457 U.S. 465, 473 (1982)).

22   [96] *Id.*, at *4. Similarly, in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 599 F. Supp. 2d
23   1179, 1185-86, 1188 (N.D. Cal. 2009), a case not cited by Defendants, the court pointed to
     defendants' argument that "there are no antitrust cases in . . . Puerto Rico permitting indirect
24   purchasers to bring suit under the state antitrust laws" and concluded that it was "reluctant to find
     standing in the absence of an explicit Illinois Brick repealer, either by statute or *case law*."
     (emphasis added). Likewise, in *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390
25   (S.D.N.Y. 2011), the court concluded that "any state that has not expressly passed *Illinois Brick*
     repealer legislation *or interpreted its law in such a way as to override the rule of Illinois Brick* is
26   presumed to have decided to follow federal law." *Id.* at 413 (emphasis added).

27   [97] Even without retroactive application, EPPs and GEHA would have standing to assert RIAA
     claims for purchases after July 15, 2013.

28   [98] *Pion v. Bess Eaton Donuts Flour Co.*, 637 A.2d 367, 371 (R.I. 1994).

1    should apply retroactively.[99]

2    **J.      End-Payor Plaintiffs and GEHA Sufficiently State Claims for Unjust Enrichment**

3            Defendants seek dismissal of EPPs and GEHA's unjust enrichment claims on two general

4    grounds.  *See* Def. Br. at 41-46.  First, Defendants argue that unjust enrichment claims must rise

5    or fall on the strength of the statutory claims.  Next, they argue that the elements of unjust

6    enrichment are not properly pled in certain states.  Both arguments are wrong: unjust enrichment

7    may be plead in the alternative to statutory claims and the elements, which are materially the

8    same throughout the United States, are adequately plead here.

9            **1.      Unjust Enrichment Can Be Pleaded in the Alternative**

10           Defendants argue that Plaintiffs "cannot use an unjust enrichment claim to circumvent

11   state antitrust and consumer protection laws."[100]  Def. Br. at 41; *id.* at 31 (same argument with

12   respect to GEHA's unjust enrichment claim under Missouri common law)).  But Defendants

13   everywhere else deny that Plaintiffs have legitimate antitrust and consumer protection claims.

14   Plaintiffs have specifically pleaded their unjust enrichment cause of action in the alternative, *see,*

15   *e.g.*, GC ¶ 206, as permitted by Federal Rule of Civil Procedure Rule 8.[101]  Defendants' own

16

17

18           [99] *See In re Nexium*, No. 12-md-2409, slip op. at 3-4 (D. Mass. Oct. 23, 2013), Dkt. No. 448
19   (holding that the RIAA applies retroactively).

20           [100] Notably, in the following states GEHA asserts only unjust enrichment claims: Alabama,
     Connecticut, Delaware, Georgia, Kentucky, Maryland, New Jersey, Oklahoma, and Washington.
21   EPPs assert only unjust enrichment claims in the following states: Alabama, Alaska, Arkansas,
     Colorado, Connecticut, Delaware, Georgia, Idaho, Kentucky, Louisiana, Maryland, Missouri,
22   Montana, New Jersey, Oklahoma, Pennsylvania, South Carolina, Virginia, Washington, and
     Wyoming.

23           [101] *See In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 917-18; *King Drug
     Co. of Florence, Inc. v. Cephalon, Inc.*, 702 F. Supp. 2d 514, 540 (E.D. Pa. 2010) ("it has long
24   been recognized that plaintiffs are allowed to plead alternative causes of action and unjust
     enrichment is commonly recognized as one (1) of those permissible alternative causes of action").
25   *See also In re G-fees Antitrust Litig.*, 584 F. Supp. 2d 26, 46 (D.D.C. 2008) ("Rule 8, however,
     expressly permits pleading in the alternative of the sort employed by plaintiffs here, even where
26   they appear to have an adequate remedy at law…. 'It is not generally a ground for dismissal of a
     complaint asserting equitable claims that the plaintiff has an adequate remedy at law.'") (quoting
27   1 MOORE'S FED. PRAC. § 2.03[2] (Matthew Bender 3d ed.)); FED. R. CIV. P. 8(d)(2) & (3) (a party
     may plead claims in the alternative, and "may state as many claims or defenses as it has,
28   regardless of consistency").

1    authorities attest that dismissal of unjust enrichment claims at this stage would be improper.[102]

2         **2.    Plaintiffs Adequately Allege Unjust Enrichment Claims**

3              In arguing that Plaintiffs fail to differentiate between autonomous and parasitic claims

4    among each state's unjust enrichment laws, Defendants attempt to create distinctions that do not

5    exist.  See Def. Br. at 41-42.  State law claims of unjust enrichment are "universally recognized

6    causes of action that are materially the same throughout the United States."[103]    Defendants do

7    not—and cannot—offer a single example of a meaningful difference among various states' unjust

8    enrichment laws, because there is none:

9                      Although there are numerous permutations of the elements of the
                     [unjust enrichment] cause of action in the various states, there are
10                   few real differences.  . . .  At the core of each state's law are two
                     fundamental elements—the defendant received a benefit from the
11                   plaintiff and it would be inequitable for the defendant to retain that
                     benefit without compensating the plaintiff.  The focus of the inquiry
12                   is the same in each state.  . . .  In other words, regardless of which
                     state's unjust enrichment elements are applied, the result is the
13                   same.[104]

14             To state an unjust enrichment claim, a plaintiff must allege: (1) the unjust act; (2)

15   retention of; (3) a benefit received; (4) at the expense of another.[105]    Plaintiffs have sufficiently

16

17        _____

18        [102] *See In re Flonase Antitrust Litig.*, 692 F. Supp. 2d at 543 (refusing "to dismiss an unjust
     enrichment claim at the motion to dismiss stage because Plaintiffs at this stage may plead
     alternate remedies").

19        [103] *Singer v. AT&T Corp.*, 185 F.R.D. 681, 692 (S.D. Fla. 1998).

20        [104] *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007), *rev'd on other
     grounds*, 328 Fed. Appx. 121 (3d Cir. 2009).  *See also In re Checking Account Overdraft Litig.*,
21   281 F.R.D. 667, 681 (S.D. Fla. 2012) ("[C]ourts often certify unjust enrichment claims because
     'common questions predominate' and are 'all eaasily resolved class wide.'" (internal citation
22   omitted)); *In re Mercedes-Benz TeleAid Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009) ("At the core of
     each state's law are two fundamental elements—the defendant received a benefit from the
23   plaintiff and it would be inequitable for the defendant to retain that benefit without compensating
     the plaintiff.") (internal quotation omitted); *In re Terazosin Hydrochloride Antitrust Litig.*, 220
24   F.R.D. 672, 697 n.40 (S.D. Fla. 2004) ("The standards for evaluating each of the various states
     classes' unjust enrichment claims are virtually identical.  Courts have recognized that state claims
25   of unjust enrichment are universally recognized causes of action that are materially the same
     throughout the United States.").

26        [105]  *See* RESTATEMENT OF RESTITUTION § 1 and Comments (a) & (b) thereto.  *See also In re
     Terazosin*, 220 F.R.D. at 697 n.40 (finding the law to be the same in 17 states: Alabama,
27   California, Florida, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Nevada, New
     Mexico, New York, North Carolina, North Dakota, South Dakota, West Virginia, and
28   Wisconsin.)  To the extent necessary, Plaintiffs have pleaded the "appreciation" element.  EC ¶

pleaded these elements.  Plaintiffs plead (1) they purchased a significant amount of branded

Lidoderm at monopoly prices (EC ¶¶ 9-18; GC ¶ 22); (2) they conferred an economic benefit

upon the Defendants in the nature of revenue resulting from payments made during the pendency

of the antitrust conspiracy (EC ¶ 196; GC ¶¶ 209); (3) overpayments for Lidoderm have been

shared by Defendants pursuant to the Reverse Payment Agreements (EC ¶¶ 194-195; GC ¶ 208);

and (4) it would be inequitable to allow Defendants to retain these ill-gotten gains (EC ¶ 201; GC

¶ 213).  The claims are properly pled.

### 3. *Illinois Brick* Does Not Bar Plaintiffs' Unjust Enrichment Claims

Defendants argue that Plaintiffs' unjust enrichment claims in 23 states and Puerto Rico[106]

contravene *Illinois Brick*.  Def. Br. at 42-43.  The Supreme Court expressly limited the effects of

*Illinois Brick* to claims under Section 4 of the Clayton Act[107], and other courts have properly

rejected Defendants' argument.[108]

---

202 ("Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Class); GC ¶ 215 (same).

[106] These jurisdictions are:  Alaska, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Montana, New Jersey, Oklahoma, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Texas, Virginia, Washington, and Wyoming.

Puerto Rico: GEHA voluntarily withdraws its antitrust claims under the Puerto Rico law.  *See* GEHA Br. at n.2.  EPPs have earlier shown that Puerto Rico recognizes indirect purchaser antitrust actions.  See, supra, Section III.I.3.

Florida: EPPs have voluntarily withdrawn their antitrust claims under Florida law.  *See, supra*, Section III.I.  EPPs and GEHA's claims for purchases in Florida are asserted under Florida's Deceptive and Unfair Trade Practices Act, and thus do not contravene Illinois Brick. *See* GEHA Br. at Section I.B.1.

Illinois: EPPs have also earlier shown that Illinois's class action ban does not survive Shady Grove, *See, supra*, Section III.I.1. Defendants' arguments with regard to GEHA are misplaced; GEHA does not assert class claims under Illinois law.  *See* GEHA Br. at Section I.B.3.

Massachusetts: Plaintiffs' claims for its Massachusetts purchases, which are asserted under the Massachusetts Consumer Protection Act, do not contravene Illinois Brick.  *See, supra*, Section III.I.2.

Rhode Island: Plaintiffs have earlier shown that Rhode Island is an Illinois Brick Repealer State.  *See, supra*, Section III.I.4.

The remaining 19 states are not Illinois Brick Repealer States, and therefore Plaintiffs do not bring claims under those states' antitrust statutes.

[107] *California v. ARC Am. Corp.*, 490 U.S. 93, 102-103 (1989).

[108] *See, e.g., King Drug*, 702 F. Supp. 2d at 539-40 ("Defendants also argue that the endpayer Plaintiffs' unjust enrichment claim should be dismissed as an "end-run" around statutory

1    **4.      Receipt of Lidoderm Does Not Bar Plaintiffs' Unjust Enrichment Claims**

2         Defendants argue that Plaintiffs' unjust enrichment claims in 22 jurisdictions[109] fail

3    because they "obtained the product [they] expected at the price [they] agreed to pay—i.e., the

4    benefit of [the] bargain."  Def. Br. at 44.  Relatedly, Defendants assert that unjust enrichment

5    claims in 11 states[110] fail because "defendant has provided consideration for the benefit it

6    received."  *Id.*  But, "Plaintiffs' receipt of valuable medicine for their payments does not, as

7    Defendants contend, bar an unjust enrichment claim."[111]  An unjust enrichment claim is based

8    upon a *defendant's* gain—not a plaintiff's losses.[112]  The Eastern District of Michigan recently

9    addressed a similar "benefit of the bargain" argument and sustained unjust enrichment claims in

10

11

12

---

13   limitations on remedies.  Several courts, however, have found just the opposite.  The courts also
14   explained that unjust enrichment claims are viable regardless of the applicable state antitrust
     laws.") (citations omitted).  *See also In re G-Fees*, 584 F. Supp. 2d at 46 ("No reason or logic
15   supports a conclusion that a state's adherence to the rule of Illinois Brick dispossesses a person
     not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same
16   person of his right to pursue a common law equitable remedy."*); In re Cardizem CD Antitrust
     Litig.*, 105 F. Supp. 2d 618 669 (E.D. Mich. 2000) (denying defendants' motion to dismiss unjust
17   enrichment claims because the defendant "confuses Plaintiffs' right to recover an equitable
     remedy under a common law claim based upon principles of unjust enrichment with its right to
     recover a remedy at law for an alleged violation of a state's antitrust laws").

18        Even if Defendants are correct—and they are not—their blanket listing of 24 jurisdictions
     does not meet their burden on this motion—a state-by-state analysis is required.  *See, e.g., In re
19   Processed Egg*, 851 F. Supp. 2d at 914-36 ("The cases upon which Defendants rely in no way
     indicate how Utah law treats the interplay between its statutory and common law schemes, and
20   when common law might be precluded by statute (and statutory interpretation).").

21        [109] These jurisdictions are: Arizona, Arkansas, California, the District of Columbia, Florida,
     Illinois, Iowa, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New
22   Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island,
     South Carolina, and Utah.

23        [110] These states are:  Florida, Kansas, Massachusetts, Missouri, Nevada, New Hampshire,
     South Dakota, Tennessee, Utah, Vermont, and Wisconsin.

24        [111] *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 545 (D.N.J. 2004); *see also id.* (rejecting
25   the notion  that "'any consideration' given for a benefit conferred necessarily defeats unjust
     enrichment claims").

26        [112] *See, e.g., Pearline Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 820 (D.C. 2009) ("restitution
27   [] is typically measured by reference to the defendant's gain rather than the plaintiff's loss")
     (citing DAN B. DOBBS, DOBBS LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION § 3.1, at 280
28   (2d ed. 1993) ("Restitution [] begins with the aim of preventing unjust enrichment to the
     defendant . . . . To measure restitution, courts look at the defendant's gain or benefit.")).

21 of the 22 jurisdictions at issue here.[113] Notably, that court analyzed—state-by-state— a

majority of the cases cited by Defendants here (Def. Br. at Appendix 5), and concluded that:

> In sum, the Court has reviewed the case law upon which
> Defendants rely and in large measure finds it distinguishable.  In
> contrast to the relationships involved in the case law cited by
> Defendants, here the parties were not in a direct bargaining
> relationship. Instead, [End Payor Plaintiffs'] unjust enrichment
> claims arise out of the alleged antitrust violations that resulted in
> payment of overcharges by [End Payor Plaintiffs]. For the most
> part, the state cases cited by Defendants did not involve indirect
> purchasers of price-fixed products.[114]

The same conclusion should be reached here.

### 5. Plaintiffs' Lidoderm Purchases Conferred a Direct Benefit on Defendants

Defendants argue that Plaintiffs are too far removed from Defendants in the distribution

chain to assert unjust enrichment claims in 20 states.[115]  Def. Br. at 45.  However, Plaintiffs plead

the close economic relationship between Defendants and the class, a result of the unique U.S.

prescription drug pricing system, as the prices they pay for Lidoderm are formulaically-based

upon the manufacturer's list price, called "Wholesale Acquisition Cost."  *See* EC ¶¶ 51-62; GC

¶¶ 46-53.  The direct relationship between the illegal acts of drug manufacturers and the effects

suffered by Plaintiffs has long been recognized.[116]  Thus, that Plaintiffs did not pay Defendants

directly is immaterial.  Regardless, several courts have rejected Defendants' "direct benefit"

---

[113] *See In re Auto. Parts Antitrust Litig.*, Civ. No. 12-md-2311, 2014 WL 2993742, at *26-42 (E.D. Mich. July 3, 2014).  The court also dismissed a claim for unjust enrichment under California law.  *Id*. at *29.  Plaintiffs address this point *infra* at Section III.J.6.

[114] *Id*. at *42.  The cases analyzed in In re Auto. Parts are precisely those relied on by Defendants in 10 jurisdictions (Arizona, Arkansas, District of Columbia, Florida, Illinois, Minnesota, Mississippi, New Hampshire, New Mexico, and North Carolina), and some of those relied on in 6 states (Iowa, Michigan Missouri, New York, Oregon, and Utah).  Compare, Def. Br. at Appendix 5 and In re Auto. Parts, 2014 WL 2993742, at *26-42 (distinguishing cases, inter alia, that had a contractual relationship between the parties or because the facts could not be applied to a price fixing antitrust case).

[115] These jurisdictions are Alabama, Arizona, the District of Columbia, Florida, Georgia, Idaho, Kansas, Maine, Maryland, Michigan, Missouri, New Jersey, New York, North Carolina, North Dakota, Pennsylvania, Rhode Island, South Carolina, Texas, and Utah.

[116] *See Desiano v. Warner-Lambert, Co.,* 326 F.3d 339, 349-50 (2d Cir. 2003).

1   argument in similar pay-for-delay actions.[117]

2   ### 6.   California Recognizes an Independent Cause of Action for Unjust Enrichment

3
4   Defendants argue that "California does not recognize a cause of action for unjust

5   enrichment." Def. Br. at 45.[118]   Though California courts are split on the "essentially semantic"

6   question of whether unjust enrichment exists as an independent claim or is merely an equitable

7   remedy, courts in the Ninth Circuit routinely uphold unjust enrichment claims.[119]   The Ninth

8   Circuit recently explained that under California law "the elements of unjust enrichment are

9   receipt of a benefit and unjust retention of the benefit at the expense of another."[120]   As explained

10  above, Plaintiffs allege just that:  that defendants were unjustly enriched at the expense of

11  Plaintiffs who purchased Lidoderm at supracompetitive prices, and that defendants accepted and

12  retained benefits conferred by plaintiffs as a result of defendants' wrongful conduct.  EC ¶¶ 196,

13

14      [117] *See In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 234 (S.D. N.Y. 2012) ("despite not having direct dealings (contractual or otherwise) with Defendants, Plaintiffs
15  plausibly conferred some benefit on Defendants"); *Cardizem CD*, 105 F. Supp. 2d at 671
16  ("Whether or not the benefit is directly conferred on the defendant is not the critical inquiry; rather, the plaintiff must show that his detriment and the defendant's benefit are related and flow
17  from the challenged conduct.") (citation omitted).  *See also In re K-Dur*, 338 F. Supp. 2d at 545; *Benefit Trust Life Ins. Co. v. Union Nat'l Bank*, 776 F.2d 1174, 1177 (3d Cir. 1985), ("the essence
18  of the doctrine of unjust enrichment is that there is no direct relationship between the parties.") (citation omitted); *In re Flonase*, 692 F. Supp. 2d at 544 ("as a general matter, unjust enrichment
19  does not require that the benefit conferred be done so directly").

20      [118] Defendants fail to cite a Supreme Court of California decision in support.  *See* Def. Br. at 45-46.  But, several California cases—including the Supreme Court of California—recognize
21  stand-alone unjust enrichment claims.  *See Ghirardo v. Antonioli*, 924 P.2d 996, 998, 1003 (Cal. 1996) (recognizing that although plaintiff did not have a statutory claim for relief, he "was,
22  however, entitled to seek relief under traditional equitable principles of unjust enrichment" and articulating the legal standard for such a claim as one where "an individual may be required to
23  make restitution if he is unjustly enriched at the expense of another"); *Federal Deposit Ins. Corp. v. Dintino,* 167 Cal. App. 4th 333, 346 (Cal. Ct. App. 2008) ("[U]njust enrichment is a common
24  law obligation implied by law based on the equities of a particular case and not on any contractual obligation.").

25      [119] *See, e.g., Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1100 (N.D. Cal. 2006) (upholding unjust enrichment claim and observing that the argument that California does not
26  allow an unjust enrichment cause of action is "essentially semantic"); *In re TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827, 2011 WL 4345435, at *3 (N.D. Cal. Sept. 5, 2011)
27  (acknowledging split of California courts but denying motion to dismiss unjust enrichment claim).

28      [120] *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1070 (9th Cir. 2014) (citation omitted).

1   199-200; GC ¶¶ 22, 208-09.  Plaintiffs have thus "invoked a valid theory of recovery"—

2   "regardless of the precise label assigned to the cause of action"—and have stated a claim.[121]

3                                    IV.     CONCLUSION

4         For the above reasons, Plaintiffs respectfully request that the Court deny Defendants'

5   motion.  If the Court is inclined to grant Defendants' motion in any respect, Plaintiffs respectfully

6   request leave to replead.

7

8   DATED:  September 8, 2014

9   Respectfully submitted,

10

11  /s/ Peter R. Kohn                        /s/ Daniel C. Girard
    Peter R. Kohn                            Daniel C. Girard (SBN 114826)
12  Joseph T. Lukens                         Dena C. Sharp (SBN 245869)
    **FARUQI & FARUQI LLP**                  **GIRARD GIBBS LLP**
13  101 Greenwood Avenue                     601 California Street, 14th Floor
    Suite 600                                San Francisco, CA 94108
14  Jenkintown, PA 19046                     Telephone: (415) 981-4800
    Telephone:  (215) 277-5770               Facsimile:  (415) 981-4846
15  Facsimile:  (215) 277-5771               Email: dcg@girardgibbs.com
    Email: pkohn@faruqilaw.com               Email: chc@girardgibbs.com
16

17  /s/ Thomas M. Sobol                      /s/ Renae D. Steiner
    Thomas M. Sobol                          Renae D. Steiner
18  David S. Nalven                          **HEINS MILLS & OLSON, P.L.C.**
    **HAGENS BERMAN SOBOL SHAPIRO**          310 Clifton Avenue
19  **LLP**                                  Minneapolis, MN 55403
    55 Cambridge Parkway, Suite 301          Telephone:  (612) 338-4605
20  Cambridge, MA 02142                      Facsimile:  (612) 338-4692
    Telephone:  (617) 482-3700               Email: rsteiner@heinsmills.com
21  Email: tom@hbsslaw.com
    Email: davidn@hbsslaw.com                /s/ J. Douglas Richards
22                                           J. Douglas Richards
23                                           Sharon K. Robertson
    /s/ Bruce E. Gerstein                    **COHEN MILSTEIN SELLERS &**
24  Bruce E. Gerstein                        **TOLL PLLC**
    Joseph Opper                             88 Pine Street, 14th Floor
25  Ephraim R. Gerstein                      New York, New York 10005
    **GARWIN GERSTEIN & FISHER LLP**         Telephone:  (212) 758-3042
26  88 Pine Street, 10th Floor               Facsimile:  (212) 838-7745
    New York, NY 10005
27

28  ───────────────
    [121] *TFT-LCD*, 2011 WL 4345435, at *4.

Telephone:  (212) 398-0055
Facsimile:   (212) 764-6620
Email: bgerstein@garwingerstein.com
Email: jopper@garwingerstein.com
Email: egerstein@garwingerstein.com


*Interim Co-Lead Counsel for the proposed Direct Purchaser Class*

*Interim Co-Lead Counsel for the proposed End-Payor Class*

/s/ *Todd A. Seaver*
Joseph J. Tabacco, Jr.
Todd A. Seaver
Sarah Khorasanee Mcgrath
**BERMAN DEVALERIO**
One California Street
Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

Barbara Hart
Peter D. St. Phillip
Uriel Rabinovitz
Noelle Ruggiero
**LOWEY DANNENBERG
COHEN & HART, P.C.**
White Plains Plaza
One North Broadway
Fifth Floor
White Plains, NY, 10601
Telephone: 914-997-0500
Facsimile: 914-997-0035

Mark D. Fischer
Robert Griffith
**RAWLINGS & ASSOCIATES
PLLC**
1 Eden Parkway
La Grange, KY 40031
Telephone:  502-587-1279
Facsimile: 502-584-8580

*Attorneys for Government
Employees Health Association*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2014, I electronically filed the foregoing document using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.


_____/s/ David S. Nalven_____
DAVID S. NALVEN