1  STEVEN C. SUNSHINE (admitted *pro hac vice*)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  1440 New York Avenue, N.W.
   Washington, DC 20005-2111
3  Telephone: (202) 371-7000
   Facsimile: (202) 393-5760
4  Email: steven.sunshine@skadden.com

5  KAREN HOFFMAN LENT (admitted *pro hac vice*)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  Four Times Square
   New York, New York 10036
7  Telephone: (212) 735-3000
   Facsimile: (917) 777-3000
8  Email: karen.lent@skadden.com

9  JAMES P. SCHAEFER (Bar No. 250417)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
10 525 University Avenue, Suite 1400
   Palo Alto, California 94301
11 Telephone: (650) 470-4500
   Facsimile: (650) 470-4570
12 Email: james.schaefer@skadden.com

13 Attorneys for Defendants:
   WATSON PHARMACEUTICALS, INC.,
14 WATSON LABORATORIES, INC.,
   ACTAVIS PLC
15 [Additional Counsel Listed on Signature Page]

16                  **UNITED STATES DISTRICT COURT**

17                **NORTHERN DISTRICT OF CALIFORNIA**

18                    **SAN FRANCISCO DIVISION**

19  IN RE LIDODERM ANTITRUST                  MDL Docket No. 14-md-02521-WHO
    LITIGATION
20
                                              **REPLY MEMORANDUM IN SUPPORT**
21  This Document Relates to All Cases        **OF JOINT MOTION TO DISMISS**
                                              **PLAINTIFFS' COMPLAINTS**
22
                                              Hearing Date:        November 5, 2014
23                                            Time:                  2:00 p.m.
                                              Courtroom:           2, 17th Floor
24                                            Before:              Hon. William H. Orrick
25

26

27

28

---

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                    **CASE NO. 14-MD-02521**

1

2

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT ......................................................................................................................2

    I.      PLAINTIFFS' CLAIMS SHOULD BE DISMISSED AS A MATTER OF
            LAW BECAUSE DEFENDANTS' CONDUCT WAS NOT
            ANTICOMPETITIVE ................................................................................2

            A.     The Lidoderm Settlement Is Not a "Reverse Payment" Under *Actavis*.......2

            B.     Failure to Substantiate Alleged Payments Also Dooms Plaintiffs'
                    Claims ........................................................................................5

            C.     The Lidoderm Settlement Is Reasonable As a Matter Of Law...................7

    II.     PLAINTIFFS HAVE FAILED TO PLAUSIBLY ALLEGE THAT THE
            LIDODERM SETTLEMENT CAUSED ANTITRUST INJURY ........................8

    III.    PLAINTIFFS HAVE FAILED TO STATE A *PER SE* CLAIM...........................10

    IV.    PLAINTIFFS' "SINGLE ECONOMIC ENTITY" THEORY DOES NOT
            SAVE THEIR SECTION 2 MONOPOLIZATION CLAIMS. ............................13

    V.     VARIOUS STATE LAW CLAIMS ALLEGED BY INDIRECT
            PURCHASERS MUST BE DISMISSED ..............................................16

            A.     End-Payor Plaintiffs Lack Article III Standing to Bring Claims
                    Under the Laws of the States Where They Have Not Adequately
                    Alleged Injury. ........................................................................16

             B.     Plaintiffs Fail to State a Claim Under Illinois, Rhode Island, Puerto
                    Rico, and Massachusetts Statutes. ............................................21

             C.     Plaintiffs' Unjust Enrichment Claims Should Be Dismissed. ...................26

CONCLUSION....................................................................................................30

1

# TABLE OF AUTHORITIES

2 **Cases**

3 *American Needle, Inc. v. National Football League*,
4     560 U.S. 183 (2009)........................................................................................ 14

*In re Automotive Parts Antitrust Litigation*,
5     12-md-02311, 2013 WL 2456612 (E.D. Mich. June 6, 2013)............................ 26

6 *In re Automotive Parts Antitrust Litigation*,
7     12-md-02311, 2014 WL 2993742 (E.D. Mich. July 3, 2014) ...................... 22, 29

*Bates v. United Parcel Service, Inc.*,
8     511 F.3d 974 (9th Cir. 2007) ........................................................................ 18

9 *Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................ 4
10

*Broadcast Music, Inc. v. Columbia Broadcasting Systems, Inc.*,
11     441 U.S. 1 (1979)........................................................................................ 11

12 *In re Cardizem Antitrust Litigation*,
    105 F. Supp. 2d 618 (E.D. Mich. 2000)..................................................... 27, 30
13

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
14     No. C-07-5944 SC, 2014 WL 1088256 (N.D. Cal. Mar. 13, 2014)................... 26

15 *Chicago Professional Sports Ltd. Partnership v. NBA*,
    95 F.3d 593 (7th Cir. 1996) .......................................................................... 14
16

*Clancy v. Bromley Tea Co.*,
17     No. 12-cv-03003-JST, 2013 WL 4081632 (N.D. Cal. Aug. 9, 2013)................. 18

18 *Cohlmia v. St. John Medical Center*,
    693 F.3d 1269 (10th Cir. 2012) .................................................................... 14
19

*Davis v. Federal Election Commission*,
20     554 U.S. 724 (2008)..................................................................................... 17

21 *In re DDAVP Indirect Purchaser Antitrust Litigation*,
    903 F. Supp. 2d 198 (S.D.N.Y. 2012)....................................................... 27, 29
22

*In re Deepwater Horizon*,
23     739 F.3d 790 (5th Cir. 2014) ........................................................................ 18

24 *In re Digital Music Antitrust Litigation*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011)................................................. 22, 24, 27
25

*In re Ditropan XL Antitrust Litigation*,
26     529 F. Supp. 2d 1098 (N.D. Cal. 2007) ...................................................... 17, 21

27 *In re Effexor XR Antitrust Litigation*,
    No. 11-cv-05479, 2014 WL 4988410 (D.N.J. Oct. 6, 2014) .......................... 5, 6
28

**REPLY IN SUPPORT OF JOINT MOTION
TO DISMISS PLAINTIFFS' COMPLAINTS**        **CASE NO. 14-MD-02521**

*Ferrell v. Wyeth-Ayerst Laboratories, Inc.*,
   No. 01-447, 2004 WL 6073010 (S.D. Ohio June 30, 2004) ................................................ 21

*In re Flonase Antitrust Litigation*,
   692 F. Supp. 2d 524 (E.D. Pa 2010) ................................................ 21, 27, 28, 30

*Fraley v. Facebook, Inc.*,
   830 F. Supp. 2d 785 (N.D. Cal. 2011) ................................................ 30

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................ 17

*FTC v. Actavis, Inc.*,
   133 S. Ct. 2223 (2013) ................................................*passim*

*Genentech, Inc. v. Eli Lilly & Co.*,
   998 F.2d 931 (Fed. Cir. 1993), *abrogated on other grounds by Wilton v. Seven Falls
   Co.*, 515 U.S. 277 (1995) ................................................ 11

*In re G-Fees Antitrust Litigation*,
   584 F. Supp. 2d 26 (D.D.C. 2008) ................................................ 27, 28

*Ghirardo v. Antonioli*,
   14 Cal. 4th 39 (1996) ................................................ 30

*In re Graphics Processing Units Antitrust Litigation (GPU I)*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................ 16, 17, 18

*Griffin v. Dugger*,
   823 F.2d 1476 (11th Cir. 1987) ................................................ 18

*Gonzáles-Maldonado v. MMM Health, Inc.*,
   693 F.3d 244 (1st Cir. 2012) ................................................ 14

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
   896 F.2d 1542 (9th Cir. 1990) ................................................ 20

*Hill v. Roll International Corp.*,
   195 Cal. App. 4th 1295 (2011) ................................................ 30

*In re iPhone Application Litigation*,
   844 F. Supp. 2d 1040 (N.D. Cal. 2012) ................................................ 30

*Kaveny v. Town of Cumberland Zoning Board of Review*,
   875 A.2d 1 (R.I. 2005) ................................................ 23

*In re K-Dur Antitrust Litigation*,
   338 F. Supp. 2d 517 (D.N.J. 2004) ................................................ 30

*In re K-Dur Antitrust Litigation*,
   No. 01-1652 (JAG), 2008 WL 2660780 (D.N.J. Feb. 28, 2008) ................................................ 21, 27

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
   702 F. Supp. 2d 514 (E.D. Pa. 2010) ................................................ 27-28

*Kohen v. Pacific Investment Management Co. LLC*,
    571 F.3d 672 (7th Cir. 2009) ............................................................................. 18

*In re Lamictal Direct Purchaser Antitrust Litigation*,
    No. 12-cv-995 (WHW), 2014 WL 282755 (D.N.J. Jan. 24, 2014) ................................... 4, 5

*Lawrence v. Anheuser-Busch, Inc.*,
    523 A.2d 864 (R.I. 1987) .................................................................................. 23

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ....................................................................................... 12

*Levine v. Blue Shield of Cal.*,
    189 Cal. App. 4th 1117 (2010) .......................................................................... 30

*Lewis v. Casey*,
    518 U.S. 343 (1996) ....................................................................................... 17

*In re Lipitor Antitrust Litigation*,
    No. 3:12-cv-02389 (PGS), 2014 WL 4543502 (D.N.J. Sept. 12, 2014) ........................... 6, 9

*In re Loestrin 24 FE Antitrust Litigation*,
    MDL No. 13-2472-S-PAS, 2014 WL 4368924 (D.R.I. Sept. 4, 2014) ............................. 4, 5

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
    No. 13-cv-01180-BLF, 2014 WL 4774611 (N.D. Cal. Sept. 22, 2014) ....................... 17, 18

*Mannington Mills, Inc. v. Congoleum Industries, Inc.*,
    610 F.2d 1059 (3d Cir. 1979) ............................................................................ 13

*Melchior v. New Line Productions, Inc.*,
    106 Cal. App. 4th 779 (2003) ............................................................................ 30

*Midwest Gas Services, Inc. v. Indiana Gas Co.*,
    317 F.3d 703 (7th Cir. 2003) ........................................................................... 2, 14

*Natural Resources Council of Maine v. International Paper Co.*,
    424 F. Supp. 2d 235 (D. Me. 2006) ...................................................................... 9

*New Motor Vehicles Canadian Export Antitrust Litigation*,
    350 F. Supp. 2d 160 (D. Me. 2004) ..................................................................... 27

*In re Nexium (Esomeprazole) Antitrust Litigation*,
    968 F. Supp. 2d 367 (D. Mass. 2013) ............................................................... 22, 25

*In re Nexium (Esomeprazole) Antitrust Litigation*,
    No. 12-md-02409-WGY, 2014 WL 4370333 (D. Mass. Sept. 4, 2014) ........................... 10

*In re Niaspan Antitrust Litigation*,
    No. 13-md-2460, 2014 WL 4403848 (E.D. Pa., Sept. 5, 2014) ................................... 28

*In re Packaged Ice Antitrust Litigation*,
    779 F. Supp. 2d 642 (E.D. Mich. 2011) ............................................................... 28

*Palmer v. BRG of Georgia, Inc.,*
    498 U.S. 46 (1990) ........................................................................................................ 12

*Pharmaceutical Industry Average Wholesale Price Litigation,*
    582 F.3d 156 (1st Cir. 2009) .......................................................................................25-26

*Pion v. Bess Eaton Donuts Flour Co.,*
    637 A.2d 367 (R.I. 1994) .............................................................................................. 23

*PNY Technologies, Inc. v. SanDisk Corp.,*
    No. 11-cv-04689, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) .......................................... 9

*Pressure Vessels of Puerto Rico v. Empire Gas de Puerto Rico,*
    137 D.P.R. 497 (1994) .................................................................................................. 24

*In re Processed Egg Products Antitrust Litigation,*
    851 F. Supp. 2d 867 (E.D. Pa. 2012) ............................................................................. 28

*In re Relafen Antitrust Litigation,*
    221 F.R.D. 260 (D. Mass. 2004) .................................................................................... 20

*In re Relafen Antitrust Litigation,*
    225 F.R.D. 14 (D. Mass. 2004) ...................................................................................... 23

*In re Rezulin Products Liability Litigation,*
    392 F. Supp. 2d 597 (S.D.N.Y. 2005) ............................................................................ 21

*Rhode Island Mobile Sportfishermen, Inc. v. Nope's Island Conservation Ass'n, Inc.,*
    59 A.3d 112 (R.I. 2013) ................................................................................................ 23

*Rivera-Muñiz v. Horizon Lines Inc.,*
    737 F. Supp. 2d 57 (D.P.R. 2010) ...............................................................................24-25

*Schneider v. California Department of Corrections,*
    151 F.3d 1194 (9th Cir. 1998) ....................................................................................... 15

*Shady Grove Orthopedic Associates v. Allstate Insurance Co.,*
    559 U.S. 393 (2010) ................................................................................................ 21, 22

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,*
    263 F.R.D. 205 (E.D. Pa. 2009) .................................................................................... 21

*In re Skelaxin (Metaxalone) Antitrust Litigation,*
    299 F.R.D. 555 (E.D. Tenn. 2014) ................................................................................. 20

*Sosna v. Iowa,*
    419 U.S. 393 (1975) ...................................................................................................... 18

*Sprewell v. Golden State Warriors,*
    266 F.3d 979 (9th Cir. 2001), *opinion amended on denial of reh'g*, 275 F.3d 1187
    (9th Cir. 2001) .............................................................................................................. 7

*Standfacts Credit Services, Inc. v. Experian Information Solutions, Inc.,*
    405 F. Supp. 2d 1141 (C.D. Cal. 2005), *aff'd in part*, 294 F. App'x 271
    (9th Cir. 2008) .................................................................................................. 14, 15, 16

*Stanisulaus Food Products Co. v. USS-POSCO Industies*,
 No. CV F-09-0560 LJO SMS, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) ...................... 14

*State v. Briggs*,
 58 A.3d 164 (R.I. 2013) .......................................................................................................... 23

*State v. Lead Industries Association, Inc.*,
 No. 99-5226, 2001 WL 345830 (Super. Ct. R.I. Apr. 2, 2001) ........................................... 23

*In re Static Random Access Memory (SRAM) Antitrust Litigation*,
 No. 07-md-1819, 2010 WL 5094289 (N.D. Cal. Dec. 8, 2010) ........................................... 24

*Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*,
 171 F.3d 912 (3d Cir. 1999) .................................................................................................. 27

*Stearns v. Ticketmaster Corp.*,
 655 F.3d 1013 (9th Cir. 2011) .............................................................................................. 18

*Sun Dun of Washington v. Coca Cola Co.*,
 740 F. Supp. 381 (D. Md. 1990) ...................................................................................... 14, 15

*In re Terazosin Hydrochloride Antitrust Litigation*,
 160 F. Supp. 2d 1365 (S.D. Fla. 2001) .......................................................................... 27, 29

*In re Terazosin Hydrochloride Antitrust Litigation*,
 220 F.R.D. 672 (S.D. Fla. 2004) .................................................................................... 21, 29

*Texaco Inc. v. Dagher*,
 547 U.S. 1 (2006) .................................................................................................................. 14

*In re TFT-LCD (Flat Panel) Antitrust Litigation (TFT II)*,
 599 F. Supp. 2d 1179 (N.D. Cal. 2009) ......................................................................... 24, 27

*United States v. Bayer Co.*,
 135 F. Supp. 65 (S.D.N.Y. 1955) ................................................................................... 12, 13

*United States v. Crown Zellerbach Corp.*,
 141 F. Supp. 118 (N.D. Ill. 1956) ........................................................................................ 13

*United States v. Westinghouse Electric Corp.*,
 648 F.2d 642 (9th Cir. 1981) ................................................................................................ 11

*Wayland Health Center v. Lowe*,
 475 A.2d 1037 (R.I. 1984) .................................................................................................... 23

*In re Wellbutrin XL Antitrust Litigation*,
 No. 08-2431, 2009 WL 678631 (E.D. Pa. March 13, 2009).......................................... 14, 15

*In re Wellbutrin XL Antitrust Litigation*,
 260 F.R.D. 143 (E.D. Pa. 2009)............................................................................................ 21

*In re Wellbutrin XL Antitrust Litigation*,
 756 F. Supp. 2d 670 (E.D. Pa. 2010) .................................................................................... 22

**REPLY IN SUPPORT OF JOINT MOTION
TO DISMISS PLAINTIFFS' COMPLAINTS**   **CASE NO. 14-MD-02521**

**Statutes**

740 Ill. Comp. Stat. Ann. § 10/7(2) ................................................ 21

Mass. Gen. Laws Ann. ch. 93A, § 1 ................................................ 25

P.R. Laws Ann. tit. 10, §§ 257-76 ................................................ 24

R.I. Gen. Laws § 6-36-7(d) ................................................ 22

**Rules**

Fed. R. Civ. P. Rule 8 ................................................ 28

Fed. R. Civ. P. Rule 9(b) ................................................ 26

Fed. R. Civ. P. Rule 12 ................................................ 6, 15, 26

Fed. R. Civ. P. Rule 23 ................................................ 21, 22, 29

### *INTRODUCTION*

The Supreme Court's decision in *Actavis* leaves no room for doubt that the only circumstance in which a Hatch-Waxman settlement even arguably raises antitrust concerns is when it contains a large, unexplained payment to the generic in exchange for the generic's agreement to stay off the market.  *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237-38 (2013).  In their motion to dismiss, Defendants established that Plaintiffs' allegations do not satisfy *Actavis'* threshold requirement of a large payment that is unexplained by traditional settlement considerations.  Plaintiffs' claims that Endo's provision of brand product to Watson, and the exclusivity of Watson's early-entry license for a period of time, constitute a reverse payment are not plausible because the only way Watson could benefit from either term of the Lidoderm Settlement was by entering the market – not "staying out" of it – and selling Lidoderm when it was otherwise prevented from doing so.  This is precisely the kind of settlement that the Supreme Court sought to shield from unnecessary scrutiny when it devised the *Actavis* rule.

There is also no question that the *Actavis* Court explicitly rejected a rule of presumptive illegality for reverse payment settlements.  Plaintiffs' attempt to avoid the *Actavis* rule by characterizing the Lidoderm Settlement as a *per se* illegal "market allocation" agreement should thus be rejected.  Indeed, far from delaying or injuring competition, the Lidoderm Settlement enhanced competition by guaranteeing earlier entry than the contemporaneous regulatory obstacles and litigation risks would otherwise suggest was possible or even plausible.  Nor have Plaintiffs adequately alleged injury sufficient to give rise to an antitrust claim.  The two scenarios which they posit allegedly would have occurred in the absence of the Lidoderm Settlement are highly speculative and rely on an implausible view of the regulatory obstacles and litigations risks faced by the parties at the time the settlement was entered.

In addition, Plaintiffs' Section 2 monopolization claims (Counts III-V of the DPP CAC, Count II of the EPP CAC, and Counts II and III of the GEHA FAC) fail, not only for the reasons summarized above, but also because they plead a shared monopoly between Endo and Teikoku rather than monopolization by a *single* entity.  Plaintiffs have failed to cite any authority finding that Section 2 monopolization claims can be based on a shared monopoly between a producer and a

1

1  licensee.  To the contrary, as the cases cited by Defendants in their motion to dismiss make clear,

2  "a § 2 claim can only accuse one firm of being a monopolist." *Midwest Gas Servs., Inc. v. Ind. Gas*

3  *Co.,* 317 F.3d 703, 713 (7th Cir. 2003).

4        Finally, while End-Payor Plaintiffs' and GEHA's various state law claims should be

5  dismissed for the same reasons the Sherman Act claims fail, many of Plaintiffs' state law claims

6  are also defective for lack of standing and for other reasons particular to those state laws.

7                        ***ARGUMENT***[1]

8  **I.      PLAINTIFFS' CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW**

9       **BECAUSE DEFENDANTS' CONDUCT WAS NOT ANTICOMPETITIVE**

10        *Actavis* established the standard for evaluating patent settlements that allegedly involve

11  reverse payments.  *Actavis*, 133 S. Ct. at 2237-38.  The Supreme Court explicitly rejected a rule of

12  presumptive illegality for such settlements, and instead adopted the rule that the settlements must

13  be evaluated under the rule of reason.  *Id*. at 2237.  Further, *Actavis* makes clear that the only

14  settlements subject to rule-of-reason review are those involving a large and unjustified payment

15  from the innovator to the alleged infringer in return for the infringer's promise to "stay[] out" of

16  the market before the patent expires.  *Id*. at 2234.  *Actavis* thus requires as a threshold matter that

17  the patent settlement at issue include a specific type of payment – a large and unjustified payment

18  from the patent holder to the alleged patent infringer – before even proceeding to a rule-of-reason

19  inquiry regarding the competitive merits of the settlement.  *Id*. at 2237-38.  A party challenging a

20  so-called reverse payment under the *Actavis* rule must then "prove its case as in other rule-of-

21  reason cases," meaning that plaintiffs must meet their burden of proving "the presence of

22  significant unjustified anticompetitive consequences."  *Id*.

23       **A.      The Lidoderm Settlement Is Not a "Reverse Payment" Under *Actavis***

24        In their opposition, Plaintiffs claim that Defendants' motion to dismiss is based on an

25  improper fact-based argument that the Lidoderm Settlement is justified under the rule of reason and

26  therefore not anticompetitive.  (Pls.' Consol. Opp. at 2.)[1]  But Defendants did not argue about their

27  _____

28  [1] "Pls.' Consol. Opp." refers to Plaintiffs' Consolidated Opposition to Defendants' Joint Motion to Dismiss Plaintiffs' Complaints, *In re: Lidoderm Antitrust Litigation*, 3:14-md-02521-WHO, Dkt.

*(cont'd)*

2

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                                    **CASE NO. 14-MD-02521**

agreement's procompetitive justifications.  Rather, Defendants made clear that because Plaintiffs have not plausibly alleged a "pay-for-delay" agreement at all, no rule of reason analysis is necessary to find that the Lidoderm Settlement survives antitrust scrutiny.  Indeed, the Lidoderm Settlement is precisely the kind of settlement that the Supreme Court sought to shield from unnecessary scrutiny when it adopted the *Actavis* rule.

The *Actavis* Court held that it is lawful to settle Hatch-Waxman infringement litigation with an agreement on the generic's entry date.  *Actavis*, 133 S. Ct. at 2237 ("[Parties] may, as in other industries, settle in other ways, for example, by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point.").  As demonstrated in the complaints, this is precisely what the Lidoderm Settlement involved.  In the Lidoderm Settlement, the parties agreed Watson would be permitted to launch a generic by September 15, 2013, more than two years earlier than the expiration of the latest-expiring patent covering Lidoderm.  (DPP CAC ¶¶ 60, 94; EPP CAC ¶¶ 68, 104; GEHA FAC ¶¶ 59, 97.)  At the time of the settlement, however, Watson did not have FDA approval to sell its generic, and a Citizen Petition had been pending for years and very possibly would continue to delay FDA approval of *any* generic version of Lidoderm.  (Defs.' Mot. to Dismiss at 9.)  Thus, the Settlement also obligated Endo to provide Watson's wholesaler affiliate with branded Lidoderm beginning in January 2013, which allowed Watson to enter even earlier by ensuring that Watson had approved Lidoderm product to sell.

Defendants' motion explains that the provision of branded Lidoderm, which Plaintiffs allege to be a reverse payment for delay, cannot be logically characterized as a payment to "stay out" of the market, *Actavis*, 133 S. Ct. at 2237, because the provision of branded Lidoderm to

---

*(cont'd from previous page)*
103 (N.D. Cal. Sept. 8, 2014).  "Defs.' Mot. to Dismiss" will refer to Defendants' Notice of Joint Motion, Joint Motion and Memorandum of Points and Authorities in Support of Joint Motion to Dismiss Plaintiffs' Complaints, *In re: Lidoderm Antitrust Litigation*, 3:14-md-02521-WHO, Dkt. 95 (N.D. Cal. July 28, 2014).  "DPP CAC," "EPP CAC" and "GEHA FAC" will refer respectively to Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint, *In re: Lidoderm Antitrust Litigation*, 3:14-md-02521-WHO, Dkt. 70 (N.D. Cal. June 13, 2014); End-Payor Plaintiffs' Consolidated Amended Complaint, *In re: Lidoderm Antitrust Litigation*, 3:14-md-02521-WHO, Dkt. 72 (N.D. Cal. June 13, 2014); and First Amended Complaint, *In re: Lidoderm Antitrust Litigation*, 3:14-md-02521-WHO, Dkt. 71 (N.D. Cal. June 13, 2014).

3

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                           **CASE NO. 14-MD-02521**

1   Watson is what actually enabled Watson to *enter* the market to start selling Lidoderm, and only

2   provided value to Watson if it in fact entered the market.  (Defs.' Mot. to Dismiss at 17-18.)

3   Defendants' motion also explains that the commitment by Endo and Teikoku to refrain from

4   launching an authorized generic for a limited period of time cannot possibly qualify as a payment

5   to "stay out" of the market that is actionable under *Actavis*, 133 S. Ct. at 2237, because it is a kind

6   of exclusive license (from Endo and Teikoku to Watson), which held no value whatsoever to

7   Watson unless and until Watson actually sold generic Lidoderm.  (Defs.' Mot. to Dismiss at 18.)

8   Neither term is cognizable as a payment under *Actavis*, since both were designed to facilitate early

9   entry in the face of regulatory impediments, rather than to secure a promise by Watson to "stay

10  out" of the market.  *Actavis*, 133 S. Ct. at 2237.

11          Without any plausible basis for concluding that the Lidoderm Settlement is a "reverse

12  payment", Plaintiffs' complaint is reduced to merely labeling the settlement a "reverse payment" or

13  a "pay-for-delay" agreement, and summarily concluding that the rule of reason applies.  Such

14  conclusory assertions are insufficient to satisfy the threshold inquiry under *Actavis*.  *See Bell Atl.*

15  *Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that a "plaintiff's obligation to provide the

16  'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions) (alteration in

17  original).  Where, as here, Plaintiffs have not plausibly pleaded a "reverse payment" – let alone one

18  that is large and unjustified – the rule of reason analysis simply does not come into play.  *In re*

19  *Lamictal Direct Purchaser Antitrust Litig.*, No. 12-cv-995 (WHW), 2014 WL 282755, at *5

20  (D.N.J. Jan. 24, 2014) (holding that a rule of reason analysis should only be undertaken if plaintiffs

21  satisfy two preliminary questions:  "In Step One, a district court must ask, is there a reverse

22  payment? . . . In Step Two, a district court must ask, is that reverse payment large and

23  unjustified?"); *see also In re Loestrin 24 FE Antitrust Litig.*, MDL No. 13-2472-S-PAS, 2014 WL

24  4368924, at *12 (D.R.I. Sept. 4, 2014) (acknowledging that, under *Actavis*, there are some "reverse

25  payment contexts where rule of reason scrutiny is not applicable").  Because the alleged payments

26  do not even qualify as actionable reverse payments, there is no reason to proceed to step 2 (whether

27  the alleged reverse payment is "large and unjustified"), or application of the rule of reason

28  (whether, despite a "large and unjustified" payment, the settlement at issue is nonetheless

4

**REPLY IN SUPPORT OF JOINT MOTION
TO DISMISS PLAINTIFFS' COMPLAINTS**                          **CASE NO. 14-MD-02521**

1  procompetitive).  Plaintiffs' opposition does not acknowledge or address these threshold issues,

2  and instead improperly skips directly to the rule of reason analysis.  Under the framework set forth

3  in *Actavis*, however, Plaintiffs' claims should never even reach a rule of reason analysis.

**B.    Failure to Substantiate Alleged Payments Also Dooms Plaintiffs' Claims**

5          As Plaintiffs acknowledge, two district courts, each in a different circuit, have gone even

6  further, and held that *Actavis* is limited to reverse payment settlements in which the branded

7  company pays *cash* to the generic company.  (Pls.' Consol. Opp. at 13 n.24.)  In *Lamictal* and more

8  recently in *Loestrin*, courts have dismissed antitrust cases for failure to state a claim where, as here,

9  the alleged reverse payment was not a cash payment at all.  *In re Lamictal*, 2014 WL 282755, at

10  *7-9 (granting motion to dismiss where alleged reverse payment did not involve monetary

11  compensation); *In re Loestrin*, 2014 WL 4368924, at *12-13 (dismissing complaints because

12  plaintiffs did not plead facts suggesting that a cash payment was made).  The *Loestrin* court

13  explained why *Actavis* is best read as limited to cash-only reverse-payment settlements:

> It is more than merely the choice of words describing the
> consideration, however, that suggests that the majority in *Actavis*
> intended for it to apply only to cash settlements. . . .  Ostensibly to
> assist the lower courts, *Actavis* set forth five "considerations" to
> guide the inquiry as to whether a settlement payment satisfies the
> rule of reason. . . .  Critically, each of these five factors requires, on
> the part of the plaintiff, and ultimately the reviewing court (or the
> jury), an ability to assess or calculate the **true value** of the payment
> made by the patentee to the generic competitor. . . .  All of these five
> factors can be reasonably measured when the reverse payment is a
> cash payment; a non-cash settlement, particularly one that is
> multifaceted and complex (like the arrangement here), is almost
> impossible to measure against these five factors.

21  *In re Loestrin*, 2014 WL 4368924 at *8-9 (emphasis added).  Under the *Loestrin* and *Lamictal*

22  courts' interpretations of *Actavis*, Plaintiffs' allegations of non-cash reverse payments provide

23  ample independent grounds on which to dismiss their claims for failure to state a claim.

24          But this Court need not decide that *Actavis* is limited to cash payments to dismiss Plaintiffs'

25  claims.  Under *Actavis*, Plaintiffs' allegations still fail as a matter of law, as the complaints do not

26  plausibly set forth a reliable estimate of the value of the alleged payment.  In applying *Actavis*,

27  courts have held that any alleged "non-monetary payment must be converted to a reliable estimate

28  of its monetary value so that it may be analyzed against the *Actavis* factors."  *In re Effexor XR*

**REPLY IN SUPPORT OF JOINT MOTION
TO DISMISS PLAINTIFFS' COMPLAINTS**                    **CASE NO. 14-MD-02521**

1  *Antitrust Litig.*, No. 11-cv-05479, 2014 WL 4988410, at *21 (D.N.J. Oct. 6, 2014) (dismissing

2  plaintiffs' claims because "[s]imply alleging some sort of value of a no-authorized generic

3  agreement, absent a reliable foundation supporting that value, does not establish the plausibility

4  required by Rule 12(b)(6)"); *see also In re Lipitor Antitrust Litig.*, No. 3:12-cv-02389 (PGS), 2014

5  WL 4543502, at *20 (D.N.J. Sept. 12, 2014) (dismissing allegations based on non-monetary

6  settlement terms as "not plausible because they do not provide a reliable foundation or

7  methodology to estimate the monetary value" of the alleged payment).  To meet the plausibility

8  standard required under *Twombly*, the *Effexor* court emphasized that plaintiffs must not only value

9  consideration flowing from the patentee to the claimed infringer, but also deduct from this alleged

10  payment any avoided litigation costs and other consideration flowing from the claimed infringer to

11  the patentee.  *In re Effexor*, 2014 WL 4988410, at *22.

12      Plaintiffs' claims are deficient in two important respects.  *First*, Plaintiffs fail to plead facts

13  that plausibly allege an appropriate method of calculating the value of Endo's agreement not to

14  launch an authorized generic for a limited period of time.  In fact, each of the three complaints

15  suggests a different value for the authorized generic agreement, without providing any support for

16  their conclusory and conflicting valuations. (Pls.' Consol. Opp. at 12 (citing DPP CAC ¶¶ 109-115,

17  GEHA FAC ¶¶ 105-110, EPP CAC ¶ 113).)  Plaintiffs merely state that the no-authorized generic

18  agreement amounted to a "large sum," and fail to value the supposed payment with any greater

19  precision than somewhere "between $150 million and $198 million," or provide any explanation of

20  the basis for this amount.  (*Id.* at 16.)

21      *Second*, Plaintiffs make no effort *at all* to value avoided litigation costs or the consideration

22  flowing from Watson to Endo and/or Teikoku under the royalty provisions of the Lidoderm

23  Agreement, pursuant to which Watson paid Endo a 25% royalty on sales of Watson's generic

24  Lidoderm during the initial exclusivity period.  (RJN Ex. A § 3(a).)  Under *Effexor*, any such

25  payments must be subtracted from the value of the authorized generic agreement to determine

26  whether there has been a "net payment" that is "large" within the meaning of *Actavis*.  *In re*

27  *Effexor*, 2014 WL 4988410, at *23.  Plaintiffs' complaints disregard the avoided litigation costs

28  and royalty payments entirely, and thus fail to sufficiently allege a basis for substantiating the

6

**REPLY IN SUPPORT OF JOINT MOTION
TO DISMISS PLAINTIFFS' COMPLAINTS**                    **CASE NO. 14-MD-02521**

1    "large" payment they claim has been made under the settlement.  Plaintiffs simply cannot contend

2    their valuations are based on "a reliable foundation" when they provide no methodology for how to

3    value the supposed net payment, as they must do to state a claim under *Actavis*.

4          **C.**     <u>**The Lidoderm Settlement Is Reasonable As a Matter Of Law**</u>

5          Plaintiffs' antitrust challenge to the Lidoderm Settlement should be dismissed for the

6    separate and independent reason that no reasonable finder of fact could conclude that it is an

7    unreasonable restraint of trade.  Plaintiffs do not dispute that, when considering the reasonableness

8    of a patent settlement (*i.e.*, applying the rule of reason), the decision maker must assess the

9    situation as it existed *at the time of the settlement*.  (Defs.' Mot. to Dismiss at 18-19.)  Here, the

10   relevant considerations at the time of the settlement in May 2012 – as alleged by the Plaintiffs –

11   included patents extending to 2015, unresolved litigation on multiple fronts (with one case still in

12   its infancy), a Citizen Petition that had been pending for six years, *and* no FDA approval for

13   Watson's ANDA, which Plaintiffs acknowledge was unlikely to occur until the FDA decided the

14   Citizen Petition.  (Defs.' Mot. to Dismiss at 20.)  Entry on January 1, 2013 was far earlier than

15   Plaintiffs can plausibly allege that Watson would have expected to achieve when it entered the

16   settlement agreement in May 2012, absent that agreement.  The regulatory and litigation obstacles

17   were simply too great to suggest otherwise.

18          Viewed in their proper context, Plaintiffs' bald assertions that Watson would either have

19   launched at risk, or achieved a more favorable entry date, are thus conclusory and need not be

20   accepted by the court.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 ("The court need not

21   . . . accept as true allegations that contradict matters properly subject to judicial notice or by

22   exhibit. . . . Nor is the court required to accept as true allegations that are merely conclusory,

23   unwarranted deductions of fact, or unreasonable inferences."), *opinion amended on denial of reh'g*,

24   275 F.3d 1187 (9th Cir. 2001).  Accordingly, it is simply not plausible that the Lidoderm

25   Settlement led to "significant unjustified anticompetitive consequences" as required under the rule-

26   of-reason analysis set forth in *Actavis*, 133 S. Ct. at 2238.  The Lidoderm Settlement was not

27   merely reasonable in light of the circumstances, it was *procompetitive*.  The Lidoderm Settlement

28   introduced competition earlier than would otherwise have occurred, and nothing in the agreement

7

**REPLY IN SUPPORT OF JOINT MOTION**                            
**TO DISMISS PLAINTIFFS' COMPLAINTS**                  **CASE NO. 14-MD-02521**

1  prevented Endo and Watson from competing on price, irrespective of the respective status of their

2  products as branded or generic Lidoderm.

3  **II.   PLAINTIFFS HAVE FAILED TO PLAUSIBLY ALLEGE THAT THE LIDODERM SETTLEMENT CAUSED ANTITRUST INJURY**

4

5          As Defendants explained in their motion, Plaintiffs do not – and cannot – plausibly allege

6  that the Lidoderm Settlement caused them any injury, and on this basis alone the complaints should

7  be dismissed irrespective of Plaintiffs' failure to meet the *Actavis* standard.  (Defs.' Mot. to

8  Dismiss at 21-24.)  Plaintiffs' oppositions confirm that they are relying on two highly speculative

9  allegations to establish injury in fact: (i) that Watson would have prevailed in the pending lawsuits

10  by the time it received FDA approval on August 23, 2012, or (ii) that Watson would otherwise

11  have launched at risk.

12          *First*, Plaintiffs cannot possibly show antitrust injury from the Lidoderm Settlement unless

13  they can plausibly allege that Watson would have prevailed in both the '529 and Rolf Lawsuits,

14  and further that Watson would have prevailed in both suits *before* the FDA ultimately approved

15  Watson's ANDA on August 23, 2012.  As Defendants explained in their motion, any such

16  allegations are implausible; as Plaintiffs concede, the Rolf Lawsuit had "barely proceeded past the

17  pleading stage," (DPP CAC ¶ 89; EPP CAC ¶ 96; GEHA FAC ¶ 89), and thus certainly would not

18  have been resolved by August 23, 2012.  (Defs.' Mot. to Dismiss at 20, 23.)

19          *Second*, because Plaintiffs cannot plausibly allege that Watson would have prevailed in the

20  underlying patent litigations, Plaintiffs speculate that but for the Lidoderm Settlement, Watson

21  would have launched at risk.  This allegation is completely unsupported and implausible because

22  (1) it assumes that Watson would act contrary to its business interests by launching at risk, and (2)

23  the opportunity to launch at risk would not even arise until *after* the FDA approved Watson's

24  ANDA and resolved the Citizen Petition.  Both the ANDA and Citizen Petition had been pending

25  for years at the time of the Lidoderm Settlement and Plaintiffs have not alleged a basis on which

26  Defendants could have known at the time of the settlement when they would be resolved.

27          Plaintiffs base their contention that Watson would have launched at risk on certain

28  statements made by Watson's CEO on earnings calls in 2011 and 2012.  Because Plaintiffs have

8

1  taken these statements out of context, Defendants asserted that the transcripts, in their entirety,

2  should be considered incorporated by reference in the Complaints, or alternatively, the Court

3  should take judicial notice of the actual earnings call transcripts.  (Defs.' Mot. to Dismiss at 23

4  n.11.)  Plaintiffs oppose this request,[2] but continue to rely on the selectively-quoted snippets from

5  the transcripts as the sole support for their allegation that Watson would have launched at risk.

6  Plaintiffs cannot have it both ways.  If, as Plaintiffs argue, the Court cannot consider the transcript

7  on the motion to dismiss, Plaintiffs' allegations about Watson's statements to Wall Street analysts

8  must be disregarded entirely.  *See Natural Res. Council of Maine v. Int'l Paper Co.*, 424 F. Supp.

9  2d 235 (D. Me. 2006) (concluding a plaintiff cannot "selectively cite a portion of a document to its

10  benefit in framing the allegations in its complaint" while simultaneously "forbid[ing] a defendant

11  from having the court consider the document as a whole."); *see also Lipitor*, 2014 WL 4543502 at

12  *40 (concluding that plaintiffs' reliance on a single statement by defendant's CEO did not meet the

13  plausibility standard, stating "[i]n the Court's view, it is difficult to rely upon five lines from a

14  book, or its context, without analyzing the gist of the entire book.  As a result, the quote, on its

15  own, cannot be the sole basis of a cause of action.").

16          Alternatively, if as Defendants argue, the Court were to consider the transcripts in their

17  entirety, the allegations of an at-risk launch by Watson are exposed as implausible.  Indeed, in the

18  very same earnings call quoted by Plaintiffs in their complaints (DPP CAC ¶ 124; EPP CAC ¶

19  125), Watson's CEO stated that they were waiting for a court decision to launch – that means,

20  precisely, that Watson would *not* launch at risk.  (RJN Ex. D, Q1 2012 Earnings Call Transcript

21  (". . . we're waiting for a trial decision . . .").)  Plaintiffs latch onto the statement by Watson that

22  "we are doing everything we can to be ready to go at the earliest possible time," and try to claim

23  that this is akin to a statement that the company would launch at risk.  However, that interpretation

24  _____

25  [2] The Court should not consider Plaintiffs' Opposition to the Request for Judicial Notice.  Any objections to evidentiary materials should have been presented in their opposition brief.  *See PNY*

26  *Technologies, Inc. v. SanDisk Corp.*, No. 11-cv-04689, 2014 WL 1677521 at *2 n.4 ("[An] objection and reply to [a] RJN do not comply with Civil Local Rules 7–3(a) and 7–3(c), which

27  require objections to evidence to be incorporated in the parties' opposition or reply brief. Accordingly, they are STRUCK.").

28

**REPLY IN SUPPORT OF JOINT MOTION
TO DISMISS PLAINTIFFS' COMPLAINTS**                    **CASE NO. 14-MD-02521**

1   is directly at odds with the unequivocal statement that Watson was not just waiting for FDA

2   approval, but also "for a trial decision."

3          Finally, Plaintiffs argue that courts in other reverse-payment cases have refused to dismiss

4   other complaints for insufficient pleading of antitrust injury. This is a non sequitur. Every

5   complaint must stand on its own. It does not matter that other plaintiffs in other cases have

6   sufficiently pled antitrust injury; these Plaintiffs have not. Notwithstanding Plaintiffs' argument, at

7   least one court in a reverse payment case has rejected a theory of antitrust liability predicated on

8   unsupported speculation regarding FDA approval, the possibility of earlier settlement dates, and

9   whether the generic would or would not have launched at risk. *In re Nexium (Esomeprazole)*

10  *Antitrust Litig.*, No. 12-md-02409-WGY, 2014 WL 4370333 (D. Mass. Sept. 4, 2014). In *Nexium*,

11  as here, antitrust injury depended upon establishing that the generic would have launched at risk,

12  "in spite of the possibility of losing its pending patent infringement case." *Id.* at *32. Plaintiffs in

13  *Nexium* similarly relied on internal projections and the "'financial incentives'" of an at-risk launch.

14  *Id.* at *33 (citation omitted). The *Nexium* court found plaintiffs' assertions unpersuasive,

15  dismissing them as "conclusory" and "unsupported," and holding that where the purported causal

16  link between an alleged reverse payment and the alleged harm "layers hypothetical scenario upon

17  hypothetical scenario," plaintiffs fail to establish antitrust injury. *Id.* at *33, *35, *55.

18  **III.    PLAINTIFFS HAVE FAILED TO STATE A *PER SE* CLAIM**

19         In their opposition, Plaintiffs incorrectly attempt to portray the exclusive generic license to

20  Watson both as an integral component of the settlement, and therefore as a reverse payment, *and* as

21  an entirely separate "naked agreement not to compete" subject to *per se* analysis. (Pls.' Consol.

22  Opp. at 16, 19.) Neither characterization can survive this motion to dismiss. If the exclusive

23  license represents a component of the settlement, then the license is plainly not a "naked

24  agreement," but rather is ancillary to the settlement and, pursuant to *Actavis*, must be evaluated

25  under the rule of reason. *Actavis*, 133 S. Ct. 2223, 2237. If instead Plaintiffs wish to portray the

26  license as separate and apart from the settlement in an attempt to characterize it as a "naked"

27  restraint, then Plaintiffs cannot claim it as a reverse payment, and the license must be evaluated

28  consistent with the long-established rule that exclusive licenses are lawful.

**REPLY IN SUPPORT OF JOINT MOTION
TO DISMISS PLAINTIFFS' COMPLAINTS**                    **CASE NO. 14-MD-02521**

1       Defendants' opening brief explained that *Actavis* plainly compels rejection of a *per se*

2 analysis in this case, and Plaintiffs concede that the *Actavis* Court held that the rule of reason

3 "must" apply to reverse payment settlements.  (Pls.' Consol. Opp. at 6.)  Nevertheless, Plaintiffs

4 erroneously argue that Watson's license under the Lidoderm Settlement should be condemned as

5 *per se* unlawful because the so-called "no-AG promise" in the Lidoderm Settlement allegedly

6 constituted a "naked agreement not to compete for 7½ months." (Pls.' Consol. Opp. at 19.)  As an

7 initial matter, the "no-AG promise" was *not* a promise not to compete.  Plaintiffs allege that the

8 relevant market consists of both generic Lidoderm and branded Lidoderm (DPP CAC ¶ 139, EPP

9 CAC ¶143, GEHA FAC ¶120), and Endo of course maintained at all times its right to sell branded

10 Lidoderm in competition with any Watson generic product.  In any event, Plaintiffs fail to explain

11 how the *per se* standard, adopted by courts only in situations where the conduct is considered

12 unreasonably anticompetitive every time it arises, *see Broad. Music, Inc. v. Columbia Broad. Sys.,*

13 *Inc.*, 441 U.S. 1, 19-20 (1979), can be reconciled with the *Actavis* Court's rejection of any

14 presumption of illegality for "reverse payment" settlements.  *Actavis*, 133 S. Ct. 2223, 2237.

15       Nor do Plaintiffs explain why the Court should not follow the well-established principle

16 that exclusive licenses are generally regarded as lawful.  *See, e.g., United States v. Westinghouse*

17 *Elec. Corp.*, 648 F.2d 642, 647 (9th Cir. 1981) ("The right to license [a] patent, exclusively or

18 otherwise, or to refuse to license at all, is 'the untrammeled right' of the patentee." (citation

19 omitted)); *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 949 (Fed. Cir. 1993) (affirming

20 dismissal of a Section 1 claim and acknowledging "the grant of an exclusive license is a lawful

21 incident of the right to exclude provided by the Patent Act"), *abrogated on other grounds by*

22 *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995).  In fact, branded pharmaceutical companies

23 regularly grant licenses that are exclusive as to generic versions of their products, and nothing in

24 *Actavis* – or any other case Plaintiffs cite as support for their position – suggests that the existence

25 of such a license within a settlement that is otherwise subject to rule of reason scrutiny

26 automatically transforms it into a presumptively unlawful agreement.  Presuming that this

27 provision in the parties' license agreement is unlawful runs counter to the Supreme Court's

28 instruction that "the *per se* rule is appropriate only after courts have had considerable experience

11

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                              **CASE NO. 14-MD-02521**

1   with the type of restraint at issue, and only if courts can predict with confidence that it would be

2   invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods.,*

3   *Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007) (citations and quotations omitted).

4         Plaintiffs' only response to defendants' motion to dismiss was to cite two trademark cases

5   that involve geographic market allocations.  (Pls.' Consol. Opp. at 20.)  Both cases are readily

6   distinguishable on the ground that – unlike Watsons's 7½ month exclusive license, which never

7   eliminated competition between Endo's branded product and Watson's generic product – the

8   challenged agreements eliminated all competition between competitors in defined geographic

9   areas.  *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) and *United States v. Bayer Co.*,

10  135 F. Supp. 65, 69-70 (S.D.N.Y. 1955).

11        Plaintiffs' cases are also distinguishable because it was the agreement to divide geographic

12  areas that triggered *per se* treatment in those cases, not the licenses themselves.  In *Palmer*, the

13  Defendant BRG and a competitor (HBJ) were both in the business of providing bar review

14  materials and lecture services.  *Id.* at 46-47.  BRG and HBJ entered into an agreement in which

15  BRG received an exclusive license to market HBJ's material and use its trade name in Georgia.  *Id.*

16  at 47.  BRG and HBJ further agreed to divide the U.S. market for bar review materials and lecture

17  services so that only BRG would serve Georgia, and only HBJ would serve the rest of the United

18  States.  *Id.* ("The parties agreed that HBJ would not compete with BRG in Georgia and that BRG

19  would not compete with HBJ outside of Georgia.").  That geographic market division by horizontal

20  competitors is what amounted to a *per se* violation of the antitrust laws, but the exclusive license

21  was not found to be anticompetitive.  *Id.* at 49-50 (footnote omitted).

22        Similarly, *Bayer* did not concern a patent holder's exercise of rights inherent to the patent.

23  Rather, like in *Palmer*, the agreement of concern was a geographic market division by horizontal

24  competitors:

25          In sum the agreements, which have been described as the 'usual form
        of international cartel arrangement' provide for a world wide

26          territorial division of the pharmaceutical market. The division is as
        complete as words can express. . . . The allocation of the world

27          markets of the defined pharmaceutical products . . . is so all
        pervasive as to constitute a per se violation of § 1 of the Sherman

28          Act . . . ."

12

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                    **CASE NO. 14-MD-02521**

135 F. Supp. at 69-70 (footnote omitted).  Although the agreements also provided for an exchange

of trademarks, incident to the geographic market allocation, the trademark exchange was not the

ground for the antitrust violation.  Plaintiffs characterize these cases as "substantial precedent" for

their contention that exclusive licenses are subject to *per se* liability, yet neither of these cases held

that the licenses themselves were anticompetitive.[3]  Accordingly, these cases cannot overcome the

Supreme Court's clear rejection in *Actavis* of the application of a *per se* standard to alleged reverse

payment settlement agreements.

## IV.   PLAINTIFFS' "SINGLE ECONOMIC ENTITY" THEORY DOES NOT SAVE THEIR SECTION 2 MONOPOLIZATION CLAIMS

Plaintiffs acknowledge in their opposition that their Section 2 monopolization claims are

premised on a purported monopoly held by *two* separate enterprises – Endo and Teikoku.  (Pls.'

Consol. Opp. at 25.)  But they claim they can do so because these two enterprises allegedly acted

as a "single economic entity."  (*Id*. at 24-27.)  While the opposition argues that Endo and Teikoku

*acted* as a single economic entity, it does not argue – nor could it – that Endo and Teikoku *formed*

a single entity, via a joint venture or any other vehicle.  To the contrary, rather than a joint venture,

the amended complaints allege that Endo, Teikoku Seiyaku, and Teikoku Pharma are separate

entities and that pursuant to a Manufacturing and Supply Agreement, Teikoku Seiyaku

manufactures Lidoderm in Japan for sale in the United States by Endo and that Endo pays Teikoku

Seiyaku royalties.  (DPP CAC ¶¶ 13-15; EPP CAC ¶¶ 19-21; *see also* GEHA FAC ¶¶ 23-25.)

---

[3] Plaintiffs further contend there is "substantial precedent" that licenses benefitting the licensee are subject to *per se* review.  (Pls.' Consol. Opp. at 21 n.46 (citing *Mannington Mills, Inc. v. Congoleum Indust., Inc.*, 610 F.2d 1059 (3d Cir. 1979) and *United States v. Crown Zellerbach Corp.*, 141 F. Supp. 118, 126 (N.D. Ill. 1956)).)  Plaintiffs' reliance on these cases is misplaced.  In *Mannington Mills*, the defendant granted plaintiff a non-exclusive license but later conspired to revoke plaintiff's license in response to threats from other licensees.  The antitrust concern arose not from the underlying patent license, but rather from the patentee's later conspiratorial agreement with a different licensee to terminate plaintiff's license.  *Mannington Mills, Inc. v. Congoleum Indust., Inc.*, 610 F.2d 1059,1073 (3d Cir. 1979) ("[W]e think that a patentee's termination of a licensee, in concert with competing licensees, is not entitled to an antitrust exemption.").  *Crown Zellerbach* involved allegations regarding a multitude of anticompetitive agreements between the defendants, which included tying arrangements, and the court emphasized that it was not considering "the possible legality of each of the agreements and practices standing alone."  *United States v. Crown Zellerbach Corp.*, 141 F. Supp. 118, 126 (N.D. Ill. 1956).

13

**REPLY IN SUPPORT OF JOINT MOTION
TO DISMISS PLAINTIFFS' COMPLAINTS**                                   **CASE NO. 14-MD-02521**

1    Plaintiffs in *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, 2009 WL 678631 (E.D. Pa.

2  March 13, 2009) also asserted a monopolization claim against two entities – a producer (Biovail)

3  and its distributor (GSK) – and similarly argued that "Biovail and GSK acted as a single economic

4  entity." *Id.* at *7.  The *Wellbutrin* court rejected plaintiffs' "single economic entity" theory as

5  being insufficient to state a Section 2 monopolization claim against *both* Biovail and GSK.  *Id.* at

6  *8.  First, the *Wellbutrin* court found that plaintiffs' "single economic entity" did not mean that the

7  parties had formed a joint venture.  To the contrary, the court found that "GSK is a licensee of

8  Biovail rather than a joint venturer."  *Id.* at *7.  For that reason, the *Wellbutrin* court rejected

9  plaintiffs' reliance on *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) – the same case relied upon by

10  Plaintiffs (Pls.' Consol. Opp. at 26 n.57) – because *Texaco* involved an actual joint venture.  *Id.*[4]

11    The *Wellbutrin* court also found that *Sun Dun of Washington v. Coca Cola Co.*, 740 F.

12  Supp. 381 (D. Md. 1990) undermined plaintiffs' "single economic entity" argument because "'[t]he

13  idea that a monopoly is composed of a single economic entity is . . . reflected in the requirement in

14  an actual monopolization claim that the requisite market power be held *by a single defendant.*'"

15  2009 WL 678631, at *7 (quoting *Sun Dun*, 740 F. Supp. at 391).  Likewise, in *Midwest Gas*,

16  confronted with a Section 2 claim alleging a monopoly by both a gas supplier and a separate joint

17  venture formed by the gas supplier and another supplier, the Seventh Circuit found that "a § 2

18  claim can only accuse one firm of being a monopolist."  317 F.3d at 713;[5] *see also Standfacts*

19  *Credit Servs., Inc. v. Experian Info. Solutions, Inc.*, 405 F. Supp. 2d 1141, 1152 (C.D. Cal. 2005)

20
21  [4] Likewise, none of Plaintiffs' other cases (Pls.' Consol. Opp. at 25 n.55) involved Section 2
   monopolization claims based on two entities purportedly operating as a "single economic entity."
22  *See, e.g.*, *González-Maldonado v. MMM Health., Inc.*, 693 F.3d 244, 250 (1st Cir. 2012) (Section 1
   claim against parent and wholly-owned subsidiaries); *Cohlmia v. St. John Med. Ctr.*, 693 F.3d
23  1269, 1284 (10th Cir. 2012) (alleged Section 2 monopolist was a single defendant); *Stanisulaus
   Food Prods. Co. v. USS-POSCO Indus.*, No. CV F-09-0560 LJO SMS, 2010 WL 3521979 (E.D.
   Cal. Sept. 3, 2010) (challenging creation of joint venture that allegedly held monopoly power).

24
25  [5] In light of the Seventh Circuit's decision in *Midwest Gas*, Plaintiffs' reliance on *Chicago Prof'l
   Sports Ltd. P'Ship v. NBA*, 95 F.3d 593 (7th Cir. 1996) is misplaced.  (Pls.' Consol. Opp. at 26
26  n.57.)  First, *Chicago Prof'l Sports Ltd.* was a Section 1 claim, not a Section 2 claim, and the
   Seventh Circuit only left open the possibility that the NBA may qualify for single entity status.  95
   F.3d at 599-600.  Regardless, the continuing viability of the analysis in *Chicago Prof'l Sports Ltd.*
27  is questionable in light of the Supreme Court's subsequent decision in *American Needle, Inc. v.
   National Football League*, 560 U.S. 183 (2009), which reversed the Seventh Circuit's finding that
28  the NFL qualified as a single entity immune from Section 1 scrutiny.

14

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                          **CASE NO. 14-MD-02521**

1   (finding that "because Plaintiffs have not alleged . . . that any *single* Defendant will achieve

2   monopoly power in the retail market, the Court finds that Plaintiffs have failed to state a claim for

3   attempted monopolization under section 2 of the Sherman Act" (emphasis added)), *aff'd in part,*

4   294 F. App'x 271 (9th Cir. 2008).

5          Recognizing that *Wellbutrin* is fatal to their Section 2 claims, Plaintiffs argue that even

6   under the reasoning in *Wellbutrin,* their monopolization claims should go forward against Endo.

7   (Pls. Consol. Opp. at 26-27.)  While the *Wellbutrin* court allowed the Section 2 monopolization

8   claim to go forward against GSK (but not against Biovail), plaintiffs in that case asserted that

9   "'GSK was able to maintain 100% control of the U.S. market for extended release bupropion.'"

10  2009 WL 678631, at *7 (citation omitted).  Here, Plaintiffs have not alleged that either Endo or

11  Teikoku separately held market power.  To the contrary, Plaintiffs consistently alleged that

12  "Endo/Teikoku possessed substantial market power (*i.e.,* monopoly power) in the relevant market."

13  (DPP CAC ¶ 179; EPP CAC ¶ 173; GEHA FAC ¶¶ 126, 142.)  Plaintiffs cannot now use their

14  opposition to amend their complaint to assert that Endo alone had market power.  *See Schneider v.*

15  *Cal. Dep't of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety

16  of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving

17  papers, such as a memorandum in opposition to a defendant's motion to dismiss.").

18         Finally, Plaintiffs argue that because "Endo, Teikoku, and Watson all conspired," a

19  conspiracy to monopolize claim is actionable regardless of whether "the single unit of

20  Endo/Teikoku or, alternatively just Endo, possesses the monopoly power" maintained by the

21  alleged conspiracy.  (Pls.' Consol. Opp. at 27.)  Plaintiffs fail to address the authority cited by

22  Defendants which holds that an alleged "conspiracy to create a shared monopoly does not plead a

23  claim of conspiracy under section 2."  *Standfacts*, 405 F. Supp. 2d at 1152; (*see also* Defs.' Mot. to

24  Dismiss at 26.)  Plaintiffs' conspiracy to monopolize claim fails because the conspiracy must

25  "allege a specific intent by Defendants to empower *one of them* with monopoly power."

26  *Standfacts*, 405 F. Supp. 2d at 1152 (emphasis added); *see also Sun Dun*, 740 F. Supp. at 391-92

27  (noting "the possibility of a group of firms conspiring to monopolize, if the aim of the conspiracy is

28  to form a *single entity* to possess the illegal market power" (emphasis added)).

15

1    Like their monopolization claim, Plaintiffs' conspiracy to monopolize claim asserts a

2  conspiracy "to maintain and enhance Endo/Teikoku's monopoly power" and "specifically intended

3  that [the Agreement] would maintain Endo/Teikoku's monopoly power." (EPP CAC ¶¶ 176-7;

4  GEHA FAC ¶¶ 146-7.)  Plaintiffs have not alleged that Endo (or any single Defendant) had

5  monopoly power or entered into a conspiracy with the specific intent of maintaining that monopoly

6  power.  Plaintiffs' conspiracy to monopolize claims must therefore fail as to both Endo and

7  Teikoku.  *See Standfacts*, 405 F. Supp. 2d at 1153.  Accordingly, because each of Plaintiffs'

8  Section 2 monopolization claims is based on allegations of a shared monopoly between Endo and

9  Teikoku, they must be dismissed.

10  **V.    VARIOUS STATE LAW CLAIMS ALLEGED BY INDIRECT PURCHASERS
    MUST BE DISMISSED[6]**

11

12    Plaintiffs' state law claims fail for the same reasons that the federal law claims fail.  (*See*

13  Defs.' Mot. to Dismiss at 26-27); *see also In re Graphics Processing Units Antitrust Litig. (GPU*

14  *I)*, 527 F. Supp. 2d 1011, 1025 (N.D. Cal. 2007).  Plaintiffs' opposition cites no authority to the

15  contrary, nor does it show why the same bases for dismissal of the federal claims do not apply to

16  their state law claims.  Even if the federal claims are not dismissed, however, many of Plaintiffs'

17  state law claims must be dismissed for lack of standing and other deficiencies identified in

18  Defendants' initial brief and discussed below.

19    **A.    End-Payor Plaintiffs Lack Article III Standing to Bring Claims Under the
        Laws of the States Where They Have Not Adequately Alleged Injury**

20

21    End-Payor Plaintiffs, despite residing in or having a principal place of business in only

22  eight states,[7] seek to maintain state law claims under the common law and statutes of fifty separate

23  jurisdictions.  Defendants' initial brief showed End-Payor Plaintiffs' claims must be dismissed for

24  _____

25  [6] In response to Defendants' motion to dismiss, Plaintiffs filed a consolidated opposition, and
    GEHA filed a separate opposition to address arguments specific to GEHA.  Defendants are
26  addressing the issues specific to GEHA in a separate brief.  *See* Stipulation and Order dated
    September 8, 2014 (Dkt. No. 101).
27

28  [7] California, Illinois, Massachusetts, Minnesota, New York, Pennsylvania, Rhode Island, and West
    Virginia.  (*See* EPP CAC ¶¶ 9-18.)

16

1   lack of Article III standing:  (i) in twenty states where they allege no connection at all, and (ii) in

2   twenty-two additional states where their cursory allegations have not established that they engaged

3   in a transaction for Lidoderm or generic Lidoderm in that specific state.  (*See* Defs.' Mot. to

4   Dismiss at 27-30.)

5                   1.      At Minimum, End-Payor Plaintiffs State Law Claims Must Be Dismissed In
                            The Twenty States Where They Allege No Connection to a Purchase At All
6

7           End-Payor Plaintiffs acknowledge that named plaintiffs' standing is a threshold matter on a

8   motion to dismiss and must be established for them to proceed.  (*See* Pls.' Consol. Opp. at 29 n.70

9   ("Plaintiffs here are not arguing against the Court addressing at this stage the standing of *the named*

10  *plaintiffs*.") (emphasis in original).)  Before a plaintiff may assert a cause of action under a specific

11  state's laws, that plaintiff must have standing to bring that claim.[8]  Yet as to twenty states,[9] End-

12  Payor Plaintiffs can claim no connection *whatsoever*:  they do not reside there, they do not allege

13  that they engaged in a transaction in those states, and they do not allege that their members

14  acquired Lidoderm or generic Lidoderm in those states.  These claims must be dismissed.[10]

15          In an effort to sidestep this fundamental requirement, Plaintiffs broadly assert that once

16  standing has been established for a named plaintiff—apparently under **any** state's law as to **any**

17  claim—the named plaintiff may then proceed to assert claims on behalf of "absent class members

18  **in other states**" as to other claims with the standing of such absent class members "determined at

19  _____

20  [8] *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (("[A] plaintiff must demonstrate
    standing for each claim he seeks to press and for each form of relief that is sought.") (quoting

21  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (internal quotation marks omitted)); *see
    also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000);

22  *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross").

23  [9] Alaska, District of Columbia, Hawaii, Idaho, Iowa, Louisiana, Maryland, Michigan, Mississippi,
    Montana, Nebraska, New Mexico, Oklahoma, Oregon, Puerto Rico, Utah, Vermont, Virginia,

24  Washington, and Wyoming.  (*See* Defs.' Mot. to Dismiss at 30 n.21.)

25  [10] *See Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, No. 13-cv-01180-BLF, 2014
    WL 4774611, at *4 (N.D. Cal. Sept. 22, 2014); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d

26  1098, 1107 (N.D. Cal. 2007) ("dismiss[ing] for lack of standing the claims based on the antitrust
    law of . . . twenty-four states" where "none of the named plaintiffs reside in or are alleged to have

27  personally purchased Ditropan XL in any of these twenty-four states"); *In re Graphics Processing
    Units Antitrust Litig. (GPU I)*, 527 F. Supp. 2d 1011, 1026-27 (N.D. Cal. 2007) (dismissing

28  indirect purchaser claims for lack of standing in states where none of the named plaintiffs resided).

                                                17
**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                          **CASE NO. 14-MD-02521**

1   the class certification stage." (Pls.' Consol. Opp. at 28-29 (emphasis added).) As Defendants

2   explained in their initial brief, this argument has been rejected repeatedly by courts in this circuit.[11]

3   Most recently, in *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, Judge Freeman of

4   the Northern District evaluated on a motion to dismiss the Article III standing of indirect purchaser

5   plaintiffs to bring claims under the laws of 32 states, despite the named plaintiffs being residents of

6   only seven, and dismissed their claims for lack of standing in states where the named plaintiffs

7   neither resided nor alleged they made purchases of the product at issue. *See* 2014 WL 4774611, at

8   *2, *4. The Court considered and rejected plaintiffs' contention that once a named plaintiff had

9   established standing as to some claims, class certification was "logically antecedent" to resolution

10  of Article III concerns with respect to other claims. *Id.* at *2. As Judge Freeman explained: "'If a

11  complaint includes multiple claims, at least one named class representative must have Article III

12  standing to raise *each* claim.'" *Id.* at *4 (emphasis added) (quoting 5 J. Moore et al., *Moore's*

13  *Federal Practice* § 26.63[1][b], at 23-304 (3d. 2014)).[12] Plaintiffs concede as much in their

14

---

15  [11] (*See* Defs.' Mot. to Dismiss at 28 n.16 (citing cases).); *see also Los Gatos*, 2014 WL 4774611, at
16  *3 (discussing cases).

17  [12] *See also Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("[I]t is not enough that a
    named plaintiff can establish a case or controversy between himself and the defendant by virtue of
18  having standing as to just one of many claims he wishes to assert."); *GPU I*, 527 F. Supp. 2d at
    1026 ("Each claim under each state statute must be analyzed separately. A class cannot assert a
19  claim on behalf of an individual that they cannot represent.").

20  Plaintiffs cite a number of cases that support the undisputed proposition that plaintiffs may pursue
    on behalf of absent class members any claim for which a named plaintiff *itself* has established
21  standing. *None* of Plaintiffs' cases holds that a named plaintiff may assert claims under a state's
    laws for which the named plaintiff itself lacks standing at the outset to assert that claim. *See Sosna*
22  *v. Iowa*, 419 U.S. 393, 403 (1975) (assessing whether named plaintiff's class challenge to Iowa
    statute was moot where named plaintiff did satisfy standing criteria under same Iowa statute); *In re*
23  *Deepwater Horizon*, 739 F.3d 790, 800 (5th Cir. 2014) (finding named plaintiffs had standing,
    regardless of whether court considered standing of absent class members); *Stearns v. Ticketmaster*
24  *Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011) (rejecting argument that class lacked standing under
    California's Unfair Competition Law (UCL) where it was undisputed named representative did
25  have standing); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 987-88 (9th Cir. 2007) (holding
    that class had standing even though named plaintiff's claim had become moot, given class had
26  already been certified and it was undisputed that named plaintiff did have standing initially); *Kohen*
    *v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009) (noting "*[b]efore* a class is certified,
27  it is true, the named plaintiff must have standing, because at that stage no one else has a legally
    protected interest in maintaining the suit" in finding at least one named class representative did
28  have standing (emphasis in original)); *Clancy v. Bromley Tea Co.*, No. 12-cv-03003-JST, 2013 WL
    4081632, at *5 (N.D. Cal. Aug. 9, 2013) (holding named plaintiff had standing to assert claims

*(cont'd)*

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                    **CASE NO. 14-MD-02521**

1   opposition, averring that "the state of purchase" is what "governs the actionability of state law

2   claims." (*See* Pls.' Consol. Opp. at 30.)  Therefore, claims under the laws of the twenty states

3   where End-Payor Plaintiffs do not reside and allege no connection to a purchase must be dismissed.

          2.     <u>End-Payor Plaintiffs Fail To Adequately Allege Injury Sufficient to Confer</u>

4                      <u>Standing In Any State Outside Their State of Residence or Place of Business</u>

5

6   In an additional twenty-two states,[13] End-Payor Plaintiffs claim only an attenuated

7   connection.  Plaintiffs acknowledge that they do not reside in these states, but they vaguely allege

8   that they "indirectly purchased, paid and/or provided reimbursement for Lidoderm and/or the

9   generic version of Lidoderm once it became available, other than for resale" in those states.  (*See*

10   EPP CAC at ¶¶ 9-16.)  End-Payor Plaintiffs incorrectly assert that "Defendants do not challenge

11   thia allegation" that they "purchased or received reimbursement for Lidoderm or its generic

12   equivalent" in these states.  (Pls.' Consol. Opp. at 27.)[14]  To the contrary, this general allegation is

13   far from sufficient, given the complex and varied ways in which health plans may provide

14   pharmacy benefits to their members.

15   The End-Payor Plaintiffs include six employee health and welfare benefit plans, and the

16   City of Providence, Rhode Island, which is a municipal corporation.  (EPP CAC ¶¶ 10-16.)[15]  As

17   Defendants explained in their initial brief, while the End-Payor Plaintiffs assert they ***"indirectly"***

18   purchased, paid or reimbursed for Lidoderm or its generic version in the twenty-two states outside

19   the eight in which they reside or have places of business, (*see* Defs.' Mot. to Dismiss at 29 (citing

20   EPP CAC at ¶¶ 9-16)), their complaint is devoid of any allegations that the End-Payor Plaintiffs

21   _____

*(cont'd from previous page)*

22   under various California statutes where named plaintiff itself had standing, noting "a plaintiff
23   cannot create standing where it does not exist by seeking to certify a class.").

24   [13] Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Kansas,
Kentucky, Maine, Missouri, Nevada, New Hampshire, New Jersey, North Carolina, North Dakota,
25   South Carolina, South Dakota, Tennessee, Texas and Wisconsin.  (*See* EPP CAC at ¶¶ 9-16.)

26   [14] The significance of Plaintiffs' claim to have "received" reimbursement for Lidoderm is unclear.
A party that received reimbursement (as opposed to providing it) would have suffered no injury
27   whatsoever.

28   [15] Two individuals are also End-Payor Plaintiffs, but they do not allege that they purchased
Lidoderm or generic Lidoderm in states other than their states of residence.  (EPP CAC ¶¶ 17-18.)

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**         **CASE NO. 14-MD-02521**

1   *themselves* engaged in a purchase transaction for Lidoderm or its generic version in any of these

2   states or sent a reimbursement for such purchases into any state.[16]  The lack of allegations linking

3   health plan purchases to transactions in specific states is unsurprising given the complicated nature

4   of health insurance and how entities such as the End-Payor Plaintiffs here contract to provide

5   pharmacy benefits to their members rather than reimbursing pharmacies directly for dispensing

6   prescription drugs to their members.  As one court noted, "plan sponsors" such as the health and

7   welfare plans who are plaintiffs here, "contract with commercial insurers or [Pharmacy Benefits

8   Managers ("PBMs")] for benefits, including prescription drug insurance."  *In re Skelaxin*

9   *(Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 565 (E.D. Tenn. 2014).  The commercial insurers or

10  PBMs frequently "engage in [administrative services only] agreements whereby they are paid [by

11  plan sponsors, such as health and welfare benefit plans] an agreed price for each prescription."  *Id.*

12  at 566.  Accordingly, any injury suffered by a health and welfare plan occurs not in the state where

13  plan members acquired the product, but rather in the health and welfare plan's place of business

14  where reimbursement payments take place.

15         End-Payor Plaintiffs ignore this distinction when they cite *In re Relafen Antitrust Litig.*, 221

16  F.R.D. 260 (D. Mass. 2004), for the proposition that the "location of consumers' purchases . . .

17  assumes special significance," and arguing that state antitrust and consumer protection statutes are

18  designed to protect consumers.  (Pls.' Consol. Opp. at 30.)  The test for a health plan's standing is

19  based on the location of *its* purchases or payments, not the location of the purchase by its members.

20  As one court explained:

21             [N]either the residence of [plan] participants nor the location of their
22             purchases is determinative of the law governing the claims asserted
             by a [plan] on its own behalf.  On the contrary . . . the state with the
23             greatest interest in a [plan's] claims brought on its own behalf is the
             state where the [plan] has its principal place of business and from
24             which it presumably paid the allegedly supracompetitive prices.

25  ───────────────────────

26  [16] Though End-Payor Plaintiffs state that they have "already disclosed their purchasing and
    reimbursement data", (Pls.' Consol. Opp. at 27-28), it is well-settled that a district court may not
27  consider any material outside the pleadings or submitted as part of the complaint in ruling on a
    12(b)(6) motion.  *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1554
    n.19 (9th Cir. 1990).  In any event, to the extent End-Payor Plaintiffs intend to suggest that this
28  data establishes that they have standing in more than their home states, Defendants disagree.

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                    **CASE NO. 14-MD-02521**

1   *In re K-Dur Antitrust Litig.*, No. 01-1652 (JAG), 2008 WL 2660783 at *5 (D.N.J. Mar. 19, 2008).[17]

2   Accordingly, End-Payor Plaintiffs' claims in states outside of their home states should be

3   dismissed.

**B.     Plaintiffs Fail to State a Claim Under Illinois, Rhode Island, Puerto Rico, and Massachusetts Statutes**

4

5           1.     End-Payor Claims Under Illinois Antitrust Law Fail Because Only the Illinois Attorney General May Bring Indirect Purchaser Class Suits

6

7           End-Payor Plaintiffs do not dispute that under the terms of the Illinois Antitrust Act, only

8   the Illinois Attorney General may bring a class action on behalf of indirect purchasers. *See* 740 Ill.

9   Comp. Stat. Ann. § 10/7(2). Instead, plaintiffs rely on *Shady Grove Orthopedic Assocs. v. Allstate*

10  *Ins. Co.*, 559 U.S. 393 (2010), for the proposition that the Illinois statute's reservation of indirect

11  purchaser claims to the Illinois attorney general is preempted by Rule 23.

12          In *Shady Grove*, the Court determined that Rule 23 permitted class actions in federal court

13  for violations of New York state laws that impose a "penalty," even though a New York statute

14  ───────────────

15  [17] The court in *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597 (S.D.N.Y. 2005), reached the same conclusion, finding that though "Rezulin was dispensed to [plaintiff plan's] members in a

16  number of states" the only injury – the "loss [plaintiff plan] allegedly suffered when it overpaid for diabetes drugs" – occurred in the state where the plan was based. *Id.* at 611 n.85. *In re Ditropan*

17  *XL Antitrust Litig.*, 529 F. Supp. 2d 1098 (N.D. Cal. 2007), is also directly on point. In *Ditropan XL*, union health and welfare fund named plaintiffs sought to bring a putative indirect purchaser

18  class action under the laws of 28 different states premised on the same alleged injury as End-Payor Plaintiffs here – alleged overcharge injury based on an alleged anticompetitive delay in generic

19  drug entry – and the Northern District dismissed the health and welfare funds' claims in all states outside their home states due to lack of standing. *Id.* at 1107.

20

21  The cases cited by Plaintiffs in which courts permitted health plans to bring claims in states outside their home states at minimum required allegations the plans ***themselves*** had made purchases in

22  those states or sent actual reimbursements into those states, which Plaintiffs' vague allegations do not establish. *See In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 532 (E.D. Pa. 2010) ("They

23  have experienced an injury . . . in states where they are located, in states where *they* purchased Flonase and in states where *they reimbursed* members for purchases of Flonase." (emphasis

24  added)); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 263 F.R.D. 205, 213 (E.D. Pa. 2009) (dismissing claims in states where plans had not specifically

25  alleged they "sent a reimbursement into a particular state."); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 156 (E.D. Pa. 2009) (standing was proper in states where plans specifically alleged

26  injury "through the act of reimbursing their members . . ."); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 681 (S.D. Fla. 2004) (dismissing health plan claims in state where

27  plan failed to establish it "reimbursed any claims in that state"); *Ferrell v. Wyeth-Ayerst, Labs., Inc.*, No. 01-447, 2004 WL 6073010, at *4 (S.D. Ohio June 30, 2004) (finding plans did allege

28  sufficient facts to establish standing in states where they specifically alleged they paid or co-paid for drug purchases for plan members in those states).

21

**REPLY IN SUPPORT OF JOINT MOTION
TO DISMISS PLAINTIFFS' COMPLAINTS**                          **CASE NO. 14-MD-02521**

1   precluded such suits from proceeding as class actions.  Justice Stevens' concurring opinion (which

2   is the controlling opinion)[18] explained that this result occurred because the New York statute was

3   procedural in nature.  559 U.S. at 423.  Justice Stevens distinguished the purely procedural nature

4   of the New York statute from instances where the procedural nature of the state law "is so

5   intertwined with a state right or remedy that it functions to define the scope of the state-created

6   right."  *Id.*

7         Several courts since *Shady Grove* have concluded that the Illinois provision, which is

8   contained within the Illinois Antitrust Act, is substantive and precludes the application of Rule 23.

9   *See, e.g.*, *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 415-16 (S.D.N.Y. 2011)

10   (holding that Illinois law is substantive and provides the rule of decision); *In re Wellbutrin XL*

11   *Antitrust Litig.*, 756 F. Supp. 2d 670, 676-77 (E.D. Pa. 2010) (distinguishing Illinois Antitrust Act

12   class restriction from the New York provisions addressed in *Shady Grove*); *see also In re Auto.*

13   *Parts Antitrust Litig.*, 12-md-02311, 2014 WL 2993742, at *18-19 (E.D. Mich. July 3, 2014); *In re*

14   *Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 409 (D. Mass. 2013).  End-Payor

15   Plaintiffs do not cite any post-*Shady Grove* authority in which a court has found the attorney

16   general provision in the Illinois Antitrust Act to be merely procedural in nature.  Accordingly, End-

17   Payor Plaintiffs' Illinois claims must be dismissed.

18         2.    End-Payor and GEHA Claims Under the Antitrust Laws of Rhode Island and
                 Puerto Rico Are Barred by the Principles Set Forth in *Illinois Brick*.[19]

19

20         (a)    Rhode Island

21         Plaintiffs' Rhode Island antitrust claims must be dismissed because the state statute giving

22   indirect purchasers standing does not apply retroactively.  Rhode Island's *Illinois Brick*-repealer

23   statute was enacted on July 15, 2013.  2013 Rhode Island Laws Ch. 13-365, eff. July 15, 2013,

24   codified at R.I. Gen. Laws § 6-36-7(d).  Statutes and their amendments are presumed to apply

25   ――――――――――――――

26   [18] *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d at 415; *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d at 675.

27   [19] End-Payor plaintiffs have voluntarily withdrawn their antitrust claims under Florida law.  (*See*
28   Pls.' Consol. Opp. at 31 n.80.)  Accordingly, Defendants' motion to dismiss should be granted
     without leave to amend as to that claim.

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                      **CASE NO. 14-MD-02521**

1  prospectively, (*see* Defs.' Mot. to Dismiss at 33), and there is no suggestion in Rhode Island's

2  repealer statute that the legislature intended it to apply retroactively.  To the contrary, § 2 of the act

3  provides that the "act shall take effect upon passage."  Under Rhode Island law, therefore, the

4  statute "must be applied prospectively."  *Rhode Island Mobile Sportfishermen, Inc. v. Nope's*

5  *Island Conservation Ass'n, Inc.*, 59 A.3d 112, 118-19 (R.I. 2013) (citation omitted); *Kaveny v.*

6  *Town of Cumberland Zoning Bd. of Review*, 875 A.2d 1, 4 (R.I. 2005).

7         Plaintiffs cite *Pion v. Bess Eaton Donuts Flour Co.*, 637 A.2d 367, 371 (R.I. 1994), arguing

8  that remedial and procedural statutes may be construed to operate retroactively.[20]  But as the Rhode

9  Island Supreme Court has explained, the "clear enunciation of a legislative choice overrides any

10 constructional preference for prospective or retroactive application that might otherwise obtain."

11 *Lawrence v. Anheuser-Busch, Inc.*, 523 A.2d 864, 869 (R.I. 1987) (citing *Raymond v. Jenard*, 390

12 A.2d 358, 359 (R.I. 1978)); *see also Wayland Health Ctr. v. Lowe*, 475 A.2d 1037, 1041 (R.I.

13 1984) (noting that "remedial and procedural statutes may be applied retroactively *absent a*

14 *legislative intent to the contrary*") (emphasis added).  In this case, because the legislature's intent is

15 clear that the act "shall take effect upon passage," this Court need not address the question whether

16 the statute is substantive or procedural.[21]  *Lawrence*, 523 A.2d 864 at 869.  Because Defendants

17 entered into the challenged agreement in May 2012, when Plaintiffs had no claim under the Rhode

18 Island Antitrust Act, the Court should dismiss Plaintiffs' Rhode Island Antitrust Act claims.  *See*

19 *State v. Lead Ind. Assn., Inc.*, No. 99-5226, 2001 WL 345830, at *10 (Super. Ct. R.I.  Apr. 2, 2001)

20

21 ─────────────

22 [20] In support of this position, plaintiffs cite *In re Nexium Antitrust Litig.*, No. 12-md-2409, slip op. at 3-4 (D. Mass. Oct. 23, 2013), Dkt. No. 448.  But the *Nexium* court merely held that plaintiffs

23 were permitted to amend their complaint to add a claim under the Rhode Island statute; the order does not address whether the statute applies retroactively.

24 In *In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 19-28 (D. Mass. 2004), meanwhile, Judge Young evaluated whether certain *Illinois Brick* repealer statutes in other states applied retroactively,

25 holding that they did not.  Relying on "'[e]lementary considerations of fairness,'" Judge Young followed the "traditional presumption" and declined to apply repeal statutes to conduct that

26 occurred prior to enactment.  *Id.* at 26 (citation omitted).

27 [21] In any event, the act is substantive.  *See State v. Briggs*, 58 A.3d 164, 170 (R.I. 2013) (holding that statute was substantive because it created new substantive rights by "expand[ing] the universe

28 of people are afforded the right" prescribed in the statute.).

23

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                          **CASE NO. 14-MD-02521**

1   (holding that Attorney General could not assert claim based on "pre-amendment conduct which

2   causes post-amendment damages" where statute applied prospectively).

3                              (b)      Puerto Rico[22]

4          Puerto Rico interprets its state laws in harmony with federal antitrust law, and it has not

5   enacted an *Illinois Brick* repealer.  P.R. Laws Ann. tit. 10, §§ 257-76.  A majority of federal courts,

6   including in this district, have held that indirect purchaser claims under Puerto Rico law are

7   foreclosed in accordance with *Illinois Brick*.  *In re Static Random Access Memory (SRAM)*

8   *Antitrust Litig.*, No. 07-md-1819, 2010 WL 5094289, at *4 (N.D. Cal. Dec. 8, 2010); *In re TFT-*

9   *LCD (Flat Panel) Antitrust Litig. (TFT II)*, 599 F. Supp. 2d 1179, 1187-88 (N.D. Cal. 2009).[23]  As

10  Plaintiffs note, the court in *TFT II* was "reluctant to find standing in the absence of an ***explicit***

11  *Illinois Brick* repealer, either by statute or case law."  *TFT II*, 599 F. Supp. 2d at 1188 (emphasis

12  added).  Likewise, in *In re Digital Music Antitrust Litig.*, the court concluded that "***any state*** that

13  has not ***expressly*** passed *Illinois Brick* repealer legislation or interpreted its law in such a way as to

14  override the rule of *Illinois Brick* is presumed to have decided to follow federal law."  812 F. Supp.

15  2d at 413 (emphasis added).

16         Puerto Rico has not overruled *Illinois Brick* by statute, and no Puerto Rico court has

17  expressly held that indirect purchasers have standing to bring suit under Puerto Rico law.

18  Plaintiffs' reliance on *Pressure Vessels of Puerto Rico v. Empire Gas de Puerto Rico*, 137 D.P.R.

19  497 (1994) in opposition to Defendants' motion is misplaced.  That case involved exclusive

20  dealing arrangements and had nothing to do with indirect purchasers.  Indeed, the court's holding

21  merely addressed whether plaintiff's injury bore a sufficient relationship to the exclusive dealing

22  arrangement to permit plaintiff to sue.  *See id.* at 520.  Plaintiffs also cite a subsequent decision

23  from the District of Puerto Rico, but that decision relies solely on *Pressure Vessels* and addresses

24  the issue of indirect purchaser standing in conclusory fashion.  *Rivera-Muñiz v. Horizon Lines Inc.*,

25  _____

26  [22] GEHA has voluntarily withdrawn its claim under the Puerto Rico Antitrust Act.  (*See* GEHA
    Opp. at 1 n.2.)  Because *Illinois Brick* forecloses GEHA's claim under Puerto Rico law, this Court
27  should dismiss the claim with prejudice.

28  [23] Plaintiffs incorrectly state that defendants did not cite *TFT II* in their motion to dismiss.

24

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                          **CASE NO. 14-MD-02521**

737 F. Supp. 2d 57, 61 (D.P.R. 2010).  No federal court has relied upon *Rivera-Muñiz* for the notion that Puerto Rico permits indirect purchaser damages suits.  *Cf. In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d at 410 (citing *Rivera-Muñiz* but nonetheless dismissing claims under Puerto Rico law).  In the absence of specific guidance from the Puerto Rico authorities to the contrary, this Court should follow the other courts in this district and elsewhere and hold that *Illinois Brick* forecloses plaintiffs' claims under Puerto Rico law.

> 3.    End Payor and GEHA Claims Under Massachusetts Consumer Protection Act Must Be Dismissed

Both End-Payors and GEHA purport to bring claims under the Massachusetts Consumer Protection Act ("Massachusetts CPA").  (*See* Pls.' Consol. Opp. at 32.)  Defendants' initial brief showed that these plaintiffs cannot state a claim under the Massachusetts CPA because plaintiffs are engaged in "trade or commerce" to provide health insurance,[24] and thus they cannot bring claims under Massachusetts CPA § 9, the only section that permits indirect claims.  (*See* Defs.' Mot. to Dismiss at 37.)  Plaintiffs first argue that they are not engaged in "trade or commerce" because they are in the business of providing health insurance.  (Pls.' Consol. Opp. at 33.)  None of the cases Plaintiffs cites hold that providing health insurance is not "trade or commerce" under the Massachusetts CPA, and Plaintiffs' selective quoting of the statute similarly provides no support for their argument.  (*See id.*)  Plaintiffs allegedly paid for or reimbursed for Lidoderm or generic Lidoderm in connection with their provision of health insurance services to their members.[25]  At minimum, Plaintiffs' complaints do not provide sufficient, non-conclusory allegations to establish that they are engaged in a consumer transaction and not "trade" or "commerce."

Second, Plaintiffs attempt to argue that their indirect claims are permitted under section 11 of the Massachusetts CPA, citing *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d

---

[24] Neither of the individuals who are plaintiffs in the End-Payor action allege that they purchased Lidoderm or generic Lidoderm in Massachusetts.  Thus, those plaintiffs could not have standing to bring a claim under the Massachusetts CPA, and Plaintiffs do not argue to the contrary in their opposition to Defendants' arguments for dismissal of the Massachusetts claim.

[25] *See* Mass. Gen. Laws Ann. ch. 93A, § 1 ("'Trade' and 'commerce' shall include . . . the *sale*, rent, lease or *distribution of any services* . . . .") (emphasis added).

25

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                    **CASE NO. 14-MD-02521**

1    156, 193 (1st Cir. 2009).  But that case is inapposite because the court's decision turned on the fact

2    that the alleged fraud and deception was directed to the plaintiffs in that case and the plaintiffs had

3    detrimentally relied on those misrepresentations.  *Id.* at 193-94.  In contrast with recent cases

4    holding that Section 11 claims are barred by *Illinois Brick*,[26] the court did not address the

5    application of *Illinois Brick* to claims under Section 11 or purport to overturn decisions limiting

6    Section 11 overcharge claims to direct purchasers.  As discussed in Defendants' initial brief, (*see*

7    Defs.' Mot. to Dismiss at 38-39), and in Defendants' separate reply brief addressing GEHA's

8    consumer protection claims, Plaintiffs' complaints do not adequately allege fraud and deception

9    under Rule 9(b) or Rule 12, and Plaintiffs' opposition points to no provisions in their complaints

10   that any alleged fraud or deception by Defendants was directed toward Plaintiffs.

11   **C.   Plaintiffs' Unjust Enrichment Claims Should Be Dismissed**

12          Plaintiffs have alleged unjust enrichment claims with respect to 50 jurisdictions (every state

13   except Ohio and Indiana, along with the District of Columbia and Puerto Rico).  (EPP CAC ¶¶

14   193-205; GEHA FAC ¶¶ 205-218.)  In opposition to Defendants' motion, Plaintiffs assert that

15   *Illinois Brick* does not bar their unjust enrichment claim because they are entitled to plead in the

16   alternative.  (Pls.' Consol. Opp. at 36:10-37:1, 38:9-12.)  Plaintiffs further assert that they have

17   adequately pled unjust enrichment claims.  (*Id.* at 37:3-38:7, 39:2-42:2.)  Neither argument has

18   merit.  First, Plaintiffs cannot attempt to assert an antitrust or consumer protection violation

19   through an unjust enrichment claim when there is no basis for an antitrust or consumer protection

20   claim.  (Defs.' Mot. to Dismiss at 41-43, Appx. 4.)  Second, several states require specific elements

21   for unjust enrichment claims that Plaintiffs have failed to plead.  (*Id.* at 43-46, Appx. 5-7.)

22          1.   Plaintiffs Cannot Attempt An End-Run Around *Illinois Brick* By Asserting
             Unjust Enrichment
23

24          If a state's consumer protection or antitrust law does not provide a cause of action to

25   indirect purchasers claiming injury from an allegedly anticompetitive agreement, then neither does

26   _____

27   [26] *In re Cathode Ray Tube (CRT Antitrust Litig.*, No. C-07-5944 SC, 2014 WL 1088256, at *3
     (N.D. Cal. Mar. 13, 2014) ("[A] corporation engaged in commerce whose suit is based on indirect
     purchases will not have standing under Section 11."); *In re Auto. Parts Antitrust Litig.*, 12-md-
28   02311, 2013 WL 2456612 at *29 (E.D. Mich. June 6, 2013) (dismissing dealer claims under CPA).

26

the state's common law of "unjust enrichment."  The overwhelming majority of courts have found that *Illinois Brick* bars unjust enrichment claims where no other viable claim remains.  (Defs.' Mot. to Dismiss at 42-43 and Appx. 4); *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d at 412 ("[I]t is beyond peradventure that indirect purchasers may not employ unjust enrichment to skirt the limitation on recovery imposed by *Illinois Brick*").[27]  Consequently, if no claim in this case arises under a state's consumer protection or antitrust statute, unjust enrichment law does not magically create a cause of action out of thin air.  *See, e.g., In re Flonase*, 692 F. Supp. 2d at 542; *Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*, 171 F.3d 912, 937 (3d Cir. 1999) ("[N]o justification [exists] for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that the District Court properly dismissed the traditional tort claims.").  Plaintiffs admit that 19 states have not repealed *Illinois Brick*, and thus the unjust enrichment claims must be rejected as to those states.[28]  (Pls.' Consol. Opp. at 38 n.106.)

Plaintiffs seek to rely on the rare case that ignores this substantial precedent, such as *In re Cardizem Antitrust Litig.*, 105 F. Supp. 2d 618, 669-71 (E.D. Mich. 2000).  But *In re Cardizem* provides no discussion or analysis of the interplay between *Illinois Brick* and unjust enrichment claims.  The other authority cited by Plaintiffs, *In re G-Fees* and *King Drug Co. of Florence* merely rely on *In re Cardizem* without any substantive analysis.  *See In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 46 (D.D.C. 2008); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 702 F. Supp. 2d

---

[27] *See also In re Flonase*, 692 F. Supp. 2d at 542 ("Allowing indirect purchasers to recover and recoup a benefit from the defendant under an unjust enrichment theory would circumvent the policy choice of *Illinois Brick*"); *In re K–Dur Antitrust Litig.*, No. 01-1652 (JAG), 2008 WL 2660780, at *5 (D.N.J. Feb. 28, 2008) ("[W]here the applicable state law bars antitrust actions for damages by indirect purchasers . . . a plaintiff cannot circumvent the statutory framework by recasting an antitrust claim as one for unjust enrichment"); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1380 (S.D. Fla. 2001) ("State legislatures and courts that adopted the *Illinois Brick* rule against indirect purchaser antitrust suits did not intend to work an end run around the policies allowing only direct purchasers to recover" (internal quotations omitted)); *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1191 (N.D. Cal. 2009) (recognizing that "a number of cases . . . stand for th[e] general proposition" that indirect purchasers "may not circumvent the restrictions on antitrust claims under [certain states] law by reframing those claims as unjust enrichment actions"); *In re DDAVP*, 903 F. Supp. 2d at 232 (states are "presumed to have decided to follow federal law, including the *Illinois Brick* limitation on indirect purchaser claims"); *In re New Motor Vehicles Can. Ex. Antitrust Litig.*, 350 F. Supp. 2d 160, 211-12 (D. Me. 2004).

[28] The remaining four states and Puerto Rico also should be dismissed for the reasons set forth in Defendants' moving papers.  (*See* Defs' Mot. to Dismiss at 42-43, Appx. 4.)

**REPLY IN SUPPORT OF JOINT MOTION
TO DISMISS PLAINTIFFS' COMPLAINTS**                    **CASE NO. 14-MD-02521**

1   514, 539-40 (E.D. Penn. 2010).  In addition, the *G-Fees* court held that *Illinois Brick's* prohibition

2   on indirect damages suits under the Sherman Act did not preclude plaintiffs' claim because the

3   "control" exception to *Illinois Brick* applied to plaintiffs' claims in that case.  584 F. Supp. 2d at

4   33-34.  The "control" exception is not applicable here, so *G-Fees* is inapposite.  Finally, the recent

5   *Niaspan* opinion described *G-Fees* as an "outlier" and rejected its conclusion.  *In re Niaspan*

6   *Antitrust Litig.*, No. 13-md-2460, 2014 WL 4403848, at *21 n.26 (E.D. Pa., Sept. 5, 2014).

7          Plaintiffs also seek to avoid dismissal by arguing that Federal Rule of Civil Procedure 8

8   allows them to plead in the alternative.  But Rule 8 cannot save a claim barred as a matter of state

9   law or not properly pleaded.  As set forth in detail in Defendants' initial brief, the unjust

10  enrichment claims must fail for the same reasons that the underlying antitrust and consumer

11  protection claims fail.  (Defs.' Mot. to Dismiss at 41-42); *see also In re Flonase*, 692 F. Supp. 2d at

12  542 n.13 ("[A]llowing [restitution based on conduct that is blameless under federal and state

13  antitrust statutes] would undermine state legislative policies and an entire body of substantive

14  law.").  Moreover, the handful of cases Plaintiffs cite regarding Rule 8 do not support their

15  position.  Indeed, Plaintiffs cite *In re Flonase Antitrust Litig.*, which rejected unjust enrichment

16  claims "where recovery under state antitrust and consumer protection statutes is specifically

17  prohibited."  692 F. Supp. 2d at 542 n.13.[29]

18         2.    <u>Plaintiffs Have Not Adequately Pleaded Unjust Enrichment</u>

19         While Plaintiffs argue that they have adequately pled the elements of unjust enrichment,

20  they focus on the general elements without addressing whether their complaints adequately plead

21  the necessary elements for each of the individual states at issue.  Plaintiffs' approach is wrong

22  because elements for unjust enrichment vary by state.  *See, e.g.*, *In re Processed Egg Products*

23  *Antitrust Litig.*, 851 F. Supp. 2d 867, 912 (E.D. Pa. 2012) ("[I]t is well-accepted that the 'elements

24  necessary to allege unjust enrichment vary state by state.'" (citation omitted)); *In re Packaged Ice*

25  *Antitrust Litig.*, 779 F. Supp. 2d 642, 667 (E.D. Mich. 2011) ("[s]tate law requirements under

26  _____

27  [29] *See also In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 915-18 (E.D. Pa. 2012) (only discussing Rule 8 in the context of whether plaintiffs sufficiently pled an absence of an

28  adequate remedy at law); *In re G-Fees*, 584 F. Supp. 2d at 46 (dismissing unjust enrichment claims where plaintiffs lacked standing).

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                                        **CASE NO. 14-MD-02521**

1   unjust enrichment law vary widely" (citing cases)).  Plaintiffs ignore this authority and only cite *In*

2   *re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697 n.40 (S.D. Fla. 2004) to support

3   their position.  However, this opinion evaluated class certification, and was addressing whether the

4   unjust enrichment claims were subject to generalized proof under Rule 23(b).  *Id.* at 697-98.  It did

5   not address what elements were necessary to adequately plead unjust enrichment.  *Id.*  At the

6   motion to dismiss stage, the *Terazosin* court held that unjust enrichment claims must be dismissed

7   where indirect purchasers only alleged generically that the defendants "were unjustly enriched."

8   *See In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1379-80 (S.D. Fla.

9   2001).  In multiple respects, Plaintiffs have failed to plead elements required by state law.

10        **Plaintiffs fail to establish that they did not receive the benefit of their bargain or**

11   **consideration.**  Defendants' initial brief identified numerous states that imposed a "benefit of the

12   bargain" or a "consideration" requirement for an unjust enrichment claims.  (*See* Defs.' Mot. to

13   Dismiss at Appx. 5, 6.)  Rather than address the substance of Defendants' argument, Plaintiffs

14   primarily cite to *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2014 WL 2993742 (E.D.

15   Mich., Jul. 3, 2014).  However, the court in *In re Auto. Parts* neither addresses all of the states at

16   issue in Defendants' motion nor the majority of the authority cited by Defendants in support of

17   their motion.  *Cf.* Mot. at Appx. 5, 6 to *In re Auto. Parts*, 2014 WL 2993742, at *28-42.  Indeed,

18   Plaintiffs offer no response whatsoever to the substantial authority cited by Defendants.  Plaintiffs'

19   claims should be dismissed in the twenty-two states that reject unjust enrichment claims where the

20   parties received the benefit of the bargain and in the eleven states that reject such claims where the

21   defendant has provided consideration for the benefit received.

22        **Plaintiffs have not plead a direct benefit.**  End-Payor Plaintiffs and GEHA have failed to

23   allege that they conferred a direct benefit on defendants as required by twenty states to plead unjust

24   enrichment.  (Defs.' Mot. to Dismiss at 45.) Plaintiffs' sole argument in response is that there was,

25   in fact, a sufficiently close relationship.  (Pls.' Consol. Opp. at 40-41.)  However, none of the cases

26   cited by Plaintiffs are persuasive – they either did not address the state-specific authority at issue or

27   they *granted* dismissals as to claims under certain states.  *See*, *e.g.*, *In re DDAVP Indirect*

28   *Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 234-5 (S.D.N.Y. 2012) (granting dismissals as to

                                                            29
**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                        **CASE NO. 14-MD-02521**

1    Idaho and North Dakota for failing to allege a direct benefit); *In re Flonase Antitrust Litig.*, 692 F.

2    Supp. 2d at 544, 545-46 (held that Florida and North Carolina imposed a direct benefit

3    requirement); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544-46 (D.N.J. 2004) (failing to

4    address any state-specific authority); *In re Cardizem*, 105 F. Supp. 2d at 669-71 (same). Therefore,

5    Plaintiffs' claims under the twenty states that require a direct benefit to pursue an unjust

6    enrichment claim should be dismissed. (*See* Defs.' Mot. to Dismiss at Appx. 7.)

7        **California does not recognize unjust enrichment as a cause of action.** The majority of

8    courts have concluded that California law does not recognize unjust enrichment as a cause of

9    action, but rather a general principle underlying legal doctrines and remedies. *See, e.g.*, *Melchior*

10    *v. New Line Prods., Inc*., 106 Cal. App. 4th 779, 793 (2003); *In re iPhone Application Litig*., 844 F.

11    Supp. 2d 1040, 1075 (N.D. Cal. 2012); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 814 (N.D.

12    Cal. 2011). While Plaintiffs assert that *Ghirardo* recognizes unjust enrichment as a separate cause

13    of action, the California Supreme Court only discusses unjust enrichment as a common law remedy

14    and an "unjust enrichment recovery" in connection with a common count "for payment of money."

15    14 Cal. 4th at 53-54. *Ghirardo* does not state that unjust enrichment is a separate cause of action,

16    and subsequent cases have expressly concluded that no such cause of action exists in California.

17    *See Levine v. Blue Shield of Cal*., 189 Cal. App. 4th 1117, 1138 (2010) ("[T]here is no cause of

18    action in California for unjust enrichment" (citation omitted)); *Hill v. Roll Int'l Corp*., 195 Cal.

19    App. 4th 1295, 1307 (2011) ("Unjust enrichment is not a cause of action, just a restitution claim").

20    Accordingly, Plaintiffs' unjust enrichment claim under California law should be dismissed.

21                         <u>**CONCLUSION**</u>

22        For the foregoing reasons and those set out in Defendants' Joint Motion to Dismiss,

23    Defendants respectfully request that the Court dismiss Plaintiffs' claims with prejudice.

24

       DATED: October 14, 2014

25

26

27

28

**REPLY IN SUPPORT OF JOINT MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINTS**                   **CASE NO. 14-MD-02521**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:      /s/ Steven C. Sunshine
                Steven C. Sunshine
                Karen Hoffman Lent
                James P. Schaefer
           Attorneys for Defendants
        WATSON PHARMACEUTICALS, INC.,
         WATSON LABORATORIES, INC. and
                   ACTAVIS, PLC

ARNOLD & PORTER LLP                    SQUIRE PATTON BOGGS (US) LLP

By:      /s/ Daniel B. Asimow          By:      /s/ David S. Elkins
        Jonathan L. Stern                       David S. Elkins
        Ryan Z. Watts                           Nathan Lane III
        Daniel B. Asimow                        Noriyuki Shimoda
     Attorneys for Defendant                    Joseph A. Meckes
   ENDO PHARMACEUTICALS, INC.               Attorneys for Defendants
                                         TEIKOKU SEIYAKU CO., LTD. and
                                          TEIKOKU PHARMA USA, INC.

**FILER'S ATTESTATION**

I, Steven C. Sunshine, am the ECF user whose identification and password are being used to file this REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' COMPLAINTS.  In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

/s/ Steven C. Sunshine

31

**REPLY IN SUPPORT OF JOINT MOTION
TO DISMISS PLAINTIFFS' COMPLAINTS**                    **CASE NO. 14-MD-02521**

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on October 14, 2014, I electronically filed the foregoing document

3

with the Clerk of the Court using the CM/ECF system which will send notification to the e-mail

4

addresses registered.

5

/s/ Steven C. Sunshine

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**REPLY IN SUPPORT OF JOINT MOTION
TO DISMISS PLAINTIFFS' COMPLAINTS**                    **CASE NO. 14-MD-02521**