UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1776 & PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> TEIKOKU PHARMA USA, INC., et al., <br><br> Defendants. | Case No.  14-md-02521-WHO <br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** <br><br> Re: Dkt. No. 95 |

## INTRODUCTION

In this multidistrict antitrust litigation, plaintiffs challenge in their consolidated complaints a settlement between Endo Pharmaceuticals Inc. ("Endo"), a distributor of the brand-name drug Lidoderm, Teikoku Seiyaku Co., its manufacturer, and Watson Pharmaceuticals, Inc. ("Watson") a generic drug manufacturer. Plaintiffs allege that when Endo and Teikoku agreed to drop their ongoing patent litigation against Watson, they offered consideration of $96 million in free product and deferred competition with Watson's generic product worth $170 million in exchange for Watson's agreement to delay introduction of its generic drug. As a result of this settlement, plaintiffs were allegedly unable to purchase the cheaper generic version of Lidoderm.

The central issue in defendants' consolidated motion to dismiss is whether plaintiffs have plausibly pleaded that the settlement involved large and unjustified reverse payments that caused antitrust injury under the rule of reason analysis described in *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223 (2013). For pleading purposes, plaintiffs have sufficiently alleged a violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Plaintiffs assert a myriad of other violations of federal and state antitrust and consumer protection laws. Many of these claims require an amended

pleading because of questions concerning standing or other potentially amendable defects.   I am

dismissing some state claims now with prejudice either because indirect purchaser antitrust claims

are not available under *Illinois Brick Co. v Illinois*, 431 U.S. 720 (1977) and the state at issue did

not pass an *Illinois Brick* repealer, or for reasons specific to the law of a particular state.

## I.   PARTIES AND CLAIMS

### A.   Defendants

Endo is a Delaware corporation that markets and sells Lidoderm throughout the United

States.[1]   Direct Purchaser Plaintiffs' Consolidated Amended Complaint ("DPP Compl.") [Dkt. No.

70] ¶ 13; End-Payor Plaintiffs' Consolidated Amended Complaint ("EPP Compl.") [Dkt. No. 72 ]

¶ 19; Government Employees Health Association First Amended Complaint ("GEHA Compl.")

[Dkt. No. 71] ¶ 23.   Teikoku Seiyaku Co. is a Japanese company that manufactures Lidoderm for

Endo pursuant to a Manufacturing and Supply Agreement.   DPP Compl. ¶ 14; EPP Compl. ¶ 20;

GEHA Compl. ¶ 24.   It owns one of the patents for Lidoderm that Watson allegedly infringed.   *Id.*

Teikoku Pharma USA is a California corporation that is wholly owned by Teikoku Seiyaku Co.,

and is the holder of the New Drug Application for Lidoderm.   DPP Compl. ¶ 15; EPP Compl. ¶

21; GEHA Compl. ¶ 25.   (Endo, Teikoku Seiyaku Co., and Teikoku Pharma USA will be

collectively referred to as "Endo/Teikoku").

Watson Pharmaceuticals, Inc. was a Nevada corporation that marketed, produced, and

distributed generic pharmaceutical products, including Lidoderm, starting in September 15, 2013.[2]

DPP Compl. ¶¶ 2, 19; EPP Compl. ¶¶ 23-24; GEHA Compl. ¶¶ 27-28.

### B.   Plaintiffs

The plaintiffs allegedly purchased generic and brand-name Lidoderm at supracompetitive

prices.   They are grouped into three categories based on their claims and relationship to the

defendants; the direct purchaser plaintiffs ("DPPs"), entities that purchased Lidoderm directly

---

[1] Lidoderm is the brand name for an adhesive patch that contains the drug lidocaine.  DPP Compl. ¶ 1; EPP Compl. ¶ 1; GEHA Compl. ¶ 1.

[2] Watson acquired Actavis, Inc. in January, 2013.  DPP Compl. ¶ 17; EPP Compl. ¶ 22; GEHA Compl. ¶ 27.  During this acquisition process, Watson changed its name to Actavis, Inc.  *Id.*

United States District Court
Northern District of California

from the defendants;[3] the end-purchaser plaintiffs ("EPPs"), employee health and welfare benefit plans, municipal corporations, employee unions, and two individuals who purchased Lidoderm from third parties;[4] and the Government Employees Health Association ("GEHA"), a not-for-profit corporation that provides health and dental plans to federal employees and retirees and their families that, like the EPPs, purchased Lidoderm from third parties.

The DPPs bring two claims for violations of Section 1 and three claims for violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. *See* DPP Compl. ¶¶ 153-189.[5] The EPPs and GEHA assert a total of ten claims for violations of state antitrust laws, state consumer protection laws, and common law unjust enrichment. *See* EPP Compl. ¶¶ 162-205[6]; GEHA

---

[3] The DPPs are: (i) Droguería Betances, Inc.; (ii) Rochester Drug Co-Operative, Inc.; and (iii) American Sales Company, LLC; and (iv) Cesar Castillo, Inc. DPP Compl. ¶¶ 9-12.

[4] The EPPs are: (i) Allied Services Division Welfare Fund; (ii) City of Providence; (iii) International Union of Operating Engineers Local 49 Health and Welfare Fund; (iv) International Union of Operating Engineers Local 132 Health and Welfare Fund; (v) Iron Workers District Council of New England Welfare Fund; (vi) NECA-IBEW Welfare Trust Fund; (vii) United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund; (viii) Welfare Plan of the International Union of Operating Engineers Locals 137, 137A, 137B, 137C, 137R; (ix) Irene Kampanis; and (x) Steven Roller. EPP Compl. ¶¶ 9-18.

[5] The DPPs claim that defendants violated the Sherman Act because they: (i) foreclosed the market by agreeing to delay the release date for Watson's generic lidocaine patch by 13 months, DPP Compl. ¶¶ 153-159; (ii) foreclosed the market by agreeing to delay the release date for Endo's authorized-generic lidocaine patch by seven and one half months, DPP Compl. ¶¶ 160-167; and (iii) conspired to maintain Endo/Teikoku's monopoly in the United States market for lidocaine patch 5 percent. DPP Compl. ¶¶ 168-176. Additionally, they claim that Endo/Teikoku violated the Sherman Act because they: (iv) monopolized the market for lidocaine patch 5 percent, DPP Compl. ¶¶ 177-183; and (v) attempted to monopolize the market for lidocaine patch 5 percent. DPP Compl. ¶¶ 184-189.

[6] The EPPs claim that, by entering into the agreement with Watson, Endo/Teikoku violated state laws because they: (i) entered into a contract, combination, and conspiracy that restrained trade, EPP Compl. ¶¶ 162-170; (ii) conspired to monopolize the market for Lidoderm, EPP Compl. ¶¶ 171-183; (iii) violated California's Unfair Competition Law because they engaged in unfair and unlawful practices, EPP Compl. ¶¶ 184-192; and (iv) were unjustly enriched. EPP Compl. ¶¶ 193-205.

United States District Court
Northern District of California

3

1    Compl. ¶¶ 125-218.[7]

2    **II.  REGULATORY BACKGROUND**

3           The Food and Drug Administration ("FDA") must approve all new drugs before a

4    company can begin sales in the United States.  Hatch-Waxman Act, 21 U.S.C. § 355(a).  To obtain

5    FDA approval, the company must file a New Drug Application ("NDA"), which contains

6    information about the safety and efficacy of the drug, the components of the drug, and any patents

7    issued on the composition of the drug or methods for its use.[8]  § 355(b)(1).  The FDA publishes

8    this information in the directory of *Approved Drug Products with Therapeutic Equivalence*

9    *Evaluations,* commonly known as the "Orange Book."  Filing a NDA is a long, expensive, and

10   complicated process.  *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2228 (2013).

11          Generic drugs offer significant cost-savings, so Congress passed the Hatch-Waxman Act in

12   order to provide an additional streamlined FDA approval process.  DPP Compl. ¶ 44; EPP Compl.

13   ¶ 38; GEHA Compl. ¶ 33; *see* Pub.L. No. 98–417, 98 Stat. 1585 (1984).[9]  Under the Hatch–

14   Waxman Act, a generic manufacturer can file an Abbreviated New Drug Application ("ANDA"),

15   and show that the generic drug is biologically and pharmaceutically equivalent to an FDA-

16   approved brand-name drug.  21 U.S.C. § 355(j)(2)(A).  The generic manufacturer does not need to

17

18   ────────────────────

     [7]   GEHA claims that, by entering into the settlement with Watson, Endo/Teikoku violated state
19   laws because they:  (i) monopolized the market for Lidoderm, GEHA Compl. ¶¶ 125-132; and (ii)
     attempted to monopolize the same market, GEHA Compl. ¶¶ 133-140.  It also claims that
20   defendants violated state laws because they:  (iii) conspired to monopolize the same market,
     GEHA Compl. ¶¶ 141-151; (iv) conspired to restrain trade, GEHA Compl. ¶¶ 152-162; (v)
21   engaged in unfair and deceptive practices, GEHA Compl. ¶¶ 163-204; and (vi) were unjustly
22   enriched.  GEHA Compl. ¶¶ 205-218.

23   [8] Brand-name drug manufacturers are responsible for including in their FDA applications the
     patent numbers for any patents which (i) claim the approved drug or its approved uses; and (ii) for
24   which "a claim of patent infringement could reasonable be asserted if a person not licensed by the
     owner engaged in the manufacture, use, or sale of the drug."  21 U.S.C. § 355(b)(1), (g)(7)(A)(iii).

25   [9] A generic can be substituted for the brand-name drug by a pharmacist, and many states require
26   pharmacists to do so.  DPP Compl. ¶ 43; EPP Compl. ¶ 52; GEHA Compl. ¶ 44.  According to
     plaintiffs, generic drugs typically capture 90% of sales upon their release, and are priced 85%
27   lower than the brand-name drug.  DPP Compl. ¶ 44; EPP Compl. ¶ 51; GEHA Compl. ¶ 44.
     Therefore, the presence of a generic in the market greatly benefits consumers; however it also
28   reduces the brand-name's manufacturer's revenue.

conduct time-consuming and costly trials anew, but can rely on the scientific findings of safety and effectiveness included in the brand-name drug's NDA. *Actavis*, 133 S. Ct. at 2228.

In order to protect the brand-name drug manufacturer's patent rights, the generic manufacturer must make one of four "paragraph" certifications: (i) that no patent for the brand-name drug has been filed with the FDA (paragraph I); (ii) that the patent for the brand-name drug has expired (paragraph II); (iii) that the patent for the brand-name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (paragraph III); or (iv) that the patent for the brand-name drug is invalid or will not be infringed by the generic manufacturer's proposed product (paragraph IV). 21 U.S.C. § 355(g)(2)(A)(vii).[10]

After filing an ANDA with a paragraph IV certification, the generic manufacturer must send notice to the patent holder. § 355(j)(2)(B). This notice is treated as actual infringement, and triggers a forty-five day period during which the patent holder may file a patent infringement lawsuit before the generic reaches the market. § 355(j)(5)(B)(iii). If the patentee files suit, the FDA stays the ANDA for the lesser of thirty months or entry of final judgment of non-infringement or invalidity. § 355(j)(5)(B)(iiii). During this stay, the FDA can grant tentative approval. § 355(j)(5)(B)(iv)(II)(dd).

The first party to file a paragraph IV ANDA receives a special benefit, a period of 180 days where the FDA will not grant any competing ANDA. § 355(j)(5)(B)(iv). This exclusivity period can be "worth several hundred million dollars" to the generic drug manufacturer, who typically earns most of the profits on the generic drug during this time. *Actavis*, 133 S. Ct. at 2229. However, this only excludes other generic manufacturers, not the brand-name drug manufacturer who can always release a generic. § 355(j)(5)(B)(iv)(I). Generic drugs that are released by the brand-name drug manufacturer are called "authorized generics," and they allow the brand-name drug manufacturer to recover some of the sales and profits it would otherwise lose when an ANDA applicant begins to sell the generic drug.

---

[10] Watson's ANDA included a paragraph IV certification. DPP Compl. ¶ 72; EPP Compl. ¶ 77; GEHA Compl. ¶ 71.

United States District Court
Northern District of California

United States District Court
Northern District of California

### III. FACTUAL BACKGROUND

Lidoderm is the brand-name for an adhesive patch that contains the drug lidocaine, which is used to treat pain associated with post-herpetic neuralgia.  DPP Compl. ¶ 1; EPP Compl. ¶ 1; GEHA Compl. ¶ 1.  In 1998, Hind Health Care, Inc. ("Hind") developed Lidoderm, submitted an NDA to the FDA, granted Endo an exclusive marketing and distribution license, and transferred full ownership of and responsibility for Lidoderm to Teikoku Seiyaku Co. or its wholly-owned subsidiary Teikoku Pharma USA.  DPP Compl. ¶¶ 14, 15, 56, 57; EPP Compl. ¶¶ 64, 65, 67; GEHA Compl. ¶¶ 55, 56, 58.  Lidoderm became a "blockbuster" drug that had no bioequivalent generic version until Watson released one in September 2013.  DPP Compl. ¶ 3.  Endo's United States sales revenue for Lidoderm was $825 million in 2011 and $947 million in 2012.  DPP Compl. ¶¶ 3, 133; GEHA Compl. ¶ 4.

#### A.  Endo Protects Lidoderm with Patents and a Citizen Petition

Initially, Hind identified two patents in the Lidoderm NDA:  U.S. Patent Nos. 5,411,738 ("the '738 patent") and 5,601,838 ("the '838 patent").  DPP Compl. ¶ 59; EPP Compl. ¶ 67; GEHA Compl. ¶ 58.  Both the '738 and '838 patents ("the Hind Patents") expired on May, 2, 2012.  *Id.*  After acquiring Lidoderm, Teikoku amended the NDA by identifying an additional patent, U.S. Patent No. 5,827,529 ("the '529 patent"), to be listed in the Orange Book for Lidoderm.  DPP Compl. ¶¶ 60-64; EPP Compl. ¶¶ 68, 69; GEHA Compl. ¶¶ 59-63.  The '529 patent will expire on October 17, 2015.  *Id.*

In July, 2008, Endo was sued by LecTek Co. for infringing two patents; U.S. Patent Nos. 5,741,510 ("the '510 patent") and 5,536,263 ("the '263 patent").  Endo settled this litigation in 2009, paying $23 million in exchange for exclusive licenses to use the '263' and '510 patents.  DPP Compl. ¶ 66; EPP Compl. ¶¶ 72-75; GEHA Compl. ¶¶ 64, 65.  One year later, Endo granted Teikoku a sublicense to use the '510 patent, who then submitted it for listing in the Orange Book for Lidoderm.[11]  DPP Compl. ¶ 68; EPP Compl. ¶ 74; GEHA Compl. ¶ 66.  In May, 2011, Endo purchased full title to the '510, '263, and two additional patents from LecTec Co. ("the Rolf

---

[11] The '510 Patent was not listed in the Orange Book when Watson filed its ANDA in September 2009.  DPP Compl. ¶ 70; EPP Compl. ¶ 77; GEHA Compl. ¶ 74.

1   Patents").[12]  DPP Compl. ¶¶ 70, 74; EPP Compl. ¶ 76; GEHA Compl. ¶ 69.

2           In addition, Endo filed and maintained an ongoing Citizen Petition with the FDA.[13]  In its

3   petition, Endo requested that the FDA require purported generic manufacturers to conduct clinical

4   trials to demonstrate bioequivalence with Lidoderm.[14]  Motion to Dismiss ("MTD") 7 [Dkt. 95]

5   (citing Endo Pharm. Inc., Citizen Petition at 1-2 FDA Dkt. No. 2006P-0522 (Dec. 18, 2006),

6   *available at* http://www.fda.gov/ohrms/dockets/dockets/06p0522/06p-0522-cp00001-01-vol1.pdf).

7   **B.  Watson Files an ANDA to Sell a Generic Version of Lidoderm**

8           On November 13, 2009, Watson sought to market a generic version of Lidoderm and

9   submitted an ANDA.  DPP Compl. ¶¶ 72, 73; EPP Compl. ¶ 77; GEHA Compl. ¶ 70.  Pursuant to

10  a paragraph IV certification, Watson claimed that their generic drug would not infringe the '529

11  patent, and/or that the '529 patent was invalid and/or unenforceable.  DPP Compl. ¶ 71; EPP

12  Compl. ¶ 77; GEHA Compl. ¶ 71.  Watson did not claim noninfringement of the Hind patents,

13  indicating that it would begin marketing generic Lidoderm after those patents expired in May

14  2012.  DPP Compl. ¶ 73; EPP Compl. ¶ 78; GEHA Compl. ¶ 73.  Similarly, Watson did not

15

16  _____

17  [12] Other than the '510 patent, none of the Rolf patents were ever listed in the Orange Book with
    respect to Lidoderm.  DPP Compl. 70; EPP Compl. ¶ 76; GEHA Compl. ¶ 69.

18  [13] A Citizen Petition is a request that the FDA change a policy or take specific action in order to
    address public safety issues regarding a specific ANDA.  21 U.S.C. § 355(q).  The FDA typically
19  addresses active Citizen Petitions before approving the related ANDA. *Id.*, § 355(q)(1)(A).

20  [14] Defendants request that I take judicial notice of the Citizen Petition and two amendments to that
    petition because they are public documents that are posted on the FDA website and not reasonably
21  subject to dispute.  Defendant's Consolidated Request for Judicial Notice In Support of Joint
    Motion to Dismiss Plaintiffs' Complaints [Dkt. No. 92].  Defendants also argue the petition and its
22  amendments are appropriately reviewed under the doctrine of incorporation, as the plaintiffs'
    complaints rely on the Citizen Petition. *Id.*  Plaintiffs object to this request on the grounds that the
23  contents of the petition are subject to dispute and because the Citizen Petition is not central to the
    claims plaintiffs assert, and therefore, not appropriate for incorporation by reference.  Dkt. No.
24  104.  The Federal Rules of Evidence allow courts to take judicial notice of a fact if it is "not
    subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort
25  to sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b).  Defendants
    here cite to the Citizen Petition to establish the fact that it was pending with the FDA –not for the
26  truth of the matters asserted therein.  I GRANT the Request for Judicial Notice for the Citizen
    Petition and its amendments on this limited basis.  *See W. Sugar Co-op. v. Archer-Daniels-*
27  *Midland Co.*, Case No. 11-cv-3473, 2011 WL 11741501, at *3 (C.D. Cal. Oct. 21, 2011).

28

address the Rolf '510 Patent because Teikoku did not list it in the Orange Book until November, 2010.  DPP Compl. ¶ 74; EPP Compl. ¶ 79; GEHA Compl. ¶ 74.

**C.  Endo Sues Watson for Infringing the '529 Patent**

Shortly after Watson filed the ANDA, Endo/Teikoku sued Watson for infringing the '529 Patent.  *Endo Pharm. Inc., et al., v. Watson Labs., Inc. et al.*, Case No. 10-cv-00138 (D. Del. Feb. 19, 2010).  This triggered the 30-month automatic stay, which was set to expire in mid-July of 2012 or when a final judgment was entered in the litigation.  DPP Compl. ¶ 76; EPP Compl. ¶ 81; GEHA Compl. ¶ 76.

In June 2011, Endo filed a second suit against Watson.  *Endo Pharm. Inc. v. Watson Labs., Inc.*, Case No. 10-cv-00575 (D. Del. June 29, 2011).  This suit alleged that Watson's generic Lidoderm would infringe three of the four Rolf patents, specifically, the '510, '333, and '334 Patents, none of which had been listed in the Orange Book when Watson filed the ANDA.[15]  DPP Compl. ¶¶ 78, 79; EPP Compl. ¶ 82; GEHA Compl. ¶ 78.  Around the same time, Endo amended its Citizen Petition to request that the FDA require a more complicated method to ensure that a generic was bioequivalent with Lidoderm before approving ANDAs.  EPP Compl. ¶¶ 46-50; GEHA Compl. ¶ 6.

In early 2012, Judge Sleet of the District of Delaware conducted a bench trial in the first suit where, plaintiffs allege, "the evidence at trial was overwhelmingly in favor of Watson, exposing the '529 Patent to a determination that it was invalid or unenforceable and that the patent did not cover either the brand[ name] product or Watson's generic product."  DPP Compl. ¶ 79; EPP Compl. ¶ 85; GEHA Compl. ¶ 79.  At trial, Watson argued that the '529 Patent was invalid because:  (i) Teikoku knew of prior art patents that disclosed a "hydrogel transdermal patch formulation substantially similar to that claimed in the '529 patent," (DPP Compl. ¶¶ 80, 81); and (ii) the PTO had rejected the '529 patent four times for a variety of reasons.  DPP Compl. ¶ 82.  Additionally, Watson argued that its generic did not infringe the '529 Patent because Judge Sleet had constructed the patent claims so the patent only covered products containing "one and only

---

[15] The second suit did not trigger another automatic stay.

8

one of the listed alternatives" and  Watson's generic Lidoderm contained three or four of the listed alternatives.  DPP Compl. ¶¶ 84-88; EPP Compl. ¶¶ 87-95; GEHA Compl. ¶¶ 80-88.

### D. Watson and Endo Settle

On May 28, 2012 – after the bench trial but before Judge Sleet issued his decision – Watson and Endo/Teikoku settled.  DPP Compl. ¶ 93; EPP Compl. ¶ 103; GEHA Compl. ¶ 96. The settlement contained four key terms.  First, Watson agreed to delay launching its generic Lidoderm until September 15, 2013; about a year after the FDA's 30-month stay expired, and about one year before the '510 patent was due to expire and two years before the '529 patent was due to expire.  DPP Compl. ¶ 94; EPP Compl. ¶ 104; GEHA Compl. ¶ 97.  Second, Endo/Teikoku agreed to drop the pending lawsuits and not further amend the Citizen Petition.  Third, Endo/Teikoku agreed to give Watson $96 million worth of brand-name Lidoderm patches to distribute or sell, with the condition that Watson honor Endo/Teikoku's existing price-related contracts.  DPP Compl. ¶¶ 95-99; EPP Compl. ¶ 106; GEHA Compl. ¶ 98.  Fourth, Endo/Teikoku agreed not to release their authorized generic Lidoderm until seven and one half months after Watson began selling its generic version.  DPP Compl. ¶ 99; EPP Compl. ¶ 111; GEHA Compl. ¶ 102.  During this exclusivity period, Watson agreed to pay Endo/Teikoku a twenty-five percent royalty on the Gross Profit for sales of the generic Lidoderm.  DPP Compl. ¶¶ 99-105; EPP Compl. ¶ 115; GEHA Compl. ¶ 11.  Plaintiffs estimate that this term amounted to a payment of $170 million or more.  DPP Compl. ¶¶ 107-115; EPP Compl. ¶ 113; GEHA Compl. ¶ 103.

Although the FDA approved Watson's ANDA on August 23, 2012, Watson did not begin selling generic Lidoderm until September 15, 2013, pursuant to the parties' agreement.  DPP Compl. ¶ 142; EPP Compl. ¶ 80; GEHA Compl. ¶ 112.  Endo/Teikoku was legally allowed to sell its authorized generic Lidoderm at any time; however it waited until May 2014, seven and one half months after Watson began selling its own.  DPP Compl. ¶ 104; EPP Compl. ¶ 112; GEHA Compl. ¶ 105.

### LEGAL STANDARD

### I.  MOTION TO DISMISS

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the

1    pleadings fail to state a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6).  A

2    complaint may be dismissed if it does not allege "enough facts to state a claim to relief that is

3    plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial

4    plausibility when the pleaded factual content allows the court to draw the reasonable inference that

5    the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

6    However, "a complaint [does not] suffice if it tenders naked assertions devoid of further factual

7    enhancement." *Id.* (quotation marks and brackets omitted).  "Threadbare recitals of the elements

8    of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  If a motion to

9    dismiss is granted, a court should normally grant leave to amend unless it determines that the

10   pleading could not possibly be cured by allegations of other facts. *Cook, Perkiss & Liehe v. N.*

11   *Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990).

12   **II.  SHERMAN ACT § 1: LEGAL STANDARD**

13            Section 1 of the Sherman Antitrust Act provides that "[e]very contract, combination in the

14   form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

15   States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  Interpreted literally, this

16   would forbid every contract, so the antitrust laws are primarily applied to agreements that have

17   "genuine adverse effects on competition." *Actavis,* 133 S. Ct. at 2234.

18            Before *Actavis*, circuits were split regarding what test to apply for reverse payment

19   settlement agreements between brand-name and generic drug manufacturers.  Some circuits

20   applied the "scope-of-the-patent" test, which dismissed antitrust claims if the anticompetitive

21   effects of the settlement fell "within the scope of the exclusionary potential of the patent." *See,*

22   *e.g.*, *FTC v. Watson Pharms.*, 677 F.3d 1298 (11th Cir. 2012) *cert. granted*, 133 S. Ct. 787 (2012)

23   and *rev'd and remanded sub nom F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223 (2013).  Other courts

24   used the "quick look test," which placed the burden on defendants to show procompetitive benefits

25   of the reverse payment settlement agreement. *See, e.g.*, *In re K–Dur Antitrust Litigation*, 686 F.3d

26   197 (3d Cir. 2012) *cert. granted*, 133 S. Ct. 2849 (2013) and *vacated and remanded sub nom*

27   *Upsher-Smith Labs., Inc. v. Louisiana Wholesale Drug Co.*, 133 S. Ct. 2849 (2013).

28            In *Actavis*, the Court rejected both alternatives and instead chose the "rule of reason" test

United States District Court
Northern District of California

10

in order to strike a balance "between the lawful restraint on trade of the patent monopoly and the illegal restraint prohibited broadly by the Sherman Act." *Actavis*, 133 S. Ct. at 2231. Under the traditional rule-of-reason test, the plaintiff must prove that there was: (i) an agreement between two or more persons who intend to harm or restrain competition; (ii) an actual injury to competition; and (iii) the harm or restraint is unreasonable as determined by balancing the injury against any justifications or pro-competitive effects of the restraint. *California Dental Ass'n v. F.T.C.*, 224 F.3d 942, 947 (9th Cir. 2000). The defendant has the burden to assert any justifications for or pro-competitive effects of the agreement. *Id*.

In *Actavis*, the Court held that, for a term to raise antitrust concerns: (i) the term must be a "payment"; (ii) the payment must be "reverse"; (iii) the reverse payment must be "large"; and (iv) the large reverse payment must be "unexplained." *Actavis*, 133 S. Ct. at 2237. The Supreme Court identified five considerations that support the conclusion that large and unexplained reverse payments violate the Sherman Act. *Id*.

First, such payments have the "potential for genuine adverse effects on competition." *Id.* at 2234. The brand-name manufacturer can use them to purchase the exclusive right to sell the patented product, a right it purportedly already possesses. *Id.* If a generic manufacturer abandons a viable claim in exchange for a portion of the brand-name manufacturer's monopoly profits, then the brand-name manufacturer is able to retain the monopoly profits that "would otherwise be lost in the competitive market." *Id.* at 2235. Without this payment, the generic competitor would enter the market and vigorously compete. The benefits of this lost competition "would flow in large part to consumers in the form of lower prices." *Id.* at 2234. The Court noted that this harm to competition does not occur in a "settlement on terms permitting the patent challenger to enter the market before the patent expires." *Id.*

Second, a payment can be justified if it reflects "a rough approximation of the litigation expenses saved through the settlement" or "compensation for other services that the generic has promised to perform." *Id.* at 2235–36. A settlement term that is justified by "traditional settlement considerations" does not harm competition. *Id.* at 2236. Thus, an "antitrust defendant may show in the antitrust proceeding that legitimate justifications are present." *Id.*

United States District Court
Northern District of California

11

1    Third, large payments that potentially "work unjustified anticompetitive harm"

2    independently demonstrate that the patentee has the market power to "charge prices higher than

3    the competitive level." *Id.* Stated another way, if a brand-name manufacturer does not have the

4    power to charge supracompetitive prices, it is unlikely "to pay large sums to induce others to stay

5    out of its market." *Id.* (citations omitted).

6    Fourth, "it is normally not necessary to litigate patent validity to answer the antitrust

7    question," because an "unexplained large reverse payment itself would normally suggest that the

8    patentee has serious doubts about the patent's survival." *Id.* If the patentee has such doubts, that

9    suggest that the intent behind the payment "is to maintain supracompetitive prices to be shared

10   among the patentee and the challenger rather than face what might have been a competitive

11   market—the very anticompetitive consequence that underlies the claim of antitrust unlawfulness."

12   *Id.* "In a word, the size of the unexplained reverse payment can provide a workable surrogate for a

13   patent's weakness." *Id.* at 2236–37.

14   Fifth, the Court reiterated that it was not concerned with all patent infringement

15   settlements. *Id.* For example, parties may settle by allowing "the generic manufacturer to enter

16   the patentee's market prior to the patent's expiration, without the patentee paying the challenger to

17   stay out prior to that point." *Id.* at 2237. However, if the basic reason the parties prefer a reverse

18   payment is "a desire to maintain and to share patent-generated monopoly profits, then, in the

19   absence of some other justification, the antitrust laws are likely to forbid the arrangement." *Id.*

20   With this guidance, the Supreme Court stated that lower courts should structure the rule of

21   reason analysis "so as to avoid, on the one hand, the use of antitrust theories too abbreviated to

22   permit proper analysis, and, on the other, consideration of every possible fact or theory

23   irrespective of the minimal light it may shed on the basic question—that of the presence of

24   significant unjustified anticompetitive consequences." *Id.* at 2237. Most district courts read

25   *Actavis* to hold that it is the "large and unjustified reverse payment" that creates the

26   anticompetitive concerns, and only after finding such a payment in the settlement may courts

27   engage in the traditional rule of reason analysis. *See, e.g.*, *In re Loestrin 24 Fe Antitrust Litig.*,

28   Case No. 13-mdl-2472, 2014 WL 4368924, at *7 (D.R.I. Sept. 4, 2014) ("*Actavis* appears to

United States District Court
Northern District of California

12

1    impose a three-part inquiry" where plaintiffs must show a reverse payment, that is large and

2    unjustified, and that violates the rule of reason); *see also In re Effexor XR Antitrust Litig.*, Case

3    No. 11-mdl-5479, 2014 WL 4988410, at *19 (D.N.J Oct. 6, 2014) (the term was not a large and

4    unjustified reverse payment, so the court did not apply the rule of reason); *In re Lipitor Antitrust*

5    *Litig.*, Case No. 12-cv-02389, 2014 WL 4543502, at *22 (D.N.J. Sept. 12, 2014) (same).

6         Finally, to demonstrate standing under the Sherman Act, a private plaintiff must prove that

7    he or she suffered damages from the antitrust violation, which requires showing that there is a

8    causal connection between the illegal practice and the private plaintiff's antitrust injury. *Rebel Oil*

9    *Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1445 (9th Cir. 1995). The Sherman Act's concern is

10   consumer welfare, therefore "antitrust injury occurs only when the claimed injury flows from acts

11   harmful to consumers." *Id.*

12                                   **DISCUSSION**

13   **I.   SHERMAN ACT § 1: REVERSE PAYMENT SETTLEMENT AGREEMENT**

14        **A.  Step One:  Was There a Reverse Payment?**

15        A reverse payment has the "potential for genuine adverse effects on competition." *Actavis*,

16   133 S. Ct. 2234. Plaintiffs allege that the settlement contained two terms that were payments for

17   Watson's agreement not to introduce its generic for until September 15, 2013 (13 months after the

18   FDA approved Watson's ANDA): (i) Endo/Teikoku's agreement to give Watson $96 million

19   worth of brand-name product; and (ii) Endo/Teikoku's agreement not to introduce an authorized

20   generic for seven and one half months. DPP Compl. ¶¶ 95, 99. The parties do not contest that

21   these terms were reverse because they flowed from the patentee (Endo/Teikoku) to the alleged

22   infringer (Watson). Defendants instead argue that these two terms were not payments under

23   *Actavis* for two reasons:  (i) antitrust scrutiny of patent settlements is warranted only when the

24   patent holder pays a generic challenger to stay out of the market, and the settlement here allowed

25   Watson to enter the market more than a year before the expiration of Endo/Teikoku's patents,

26   (Mot. 16); and (ii) *Actavis* is limited to cash-only payments. Reply in Support of Joint Motion to

27   Dismiss Plaintiffs' Complaints ("Reply") 5 [Dkt. 108].

28

United States District Court
Northern District of California

**1.  Is every settlement term that allows early entry protected from antitrust scrutiny?**

The defendants argue that the two terms are protected from antitrust scrutiny because they allowed Watson to enter the market before it otherwise would have been able to.  Mot. 16.  As the Supreme Court noted, a patent infringement settlement does not raise antitrust concerns if it allows "the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point."  *Actavis*, 133 S. Ct. at 2234.  In other words, while the right to sell a generic drug on the market before a patent expires is valuable, it is not itself a payment because it benefits consumers.  *Id.*  Defendants argue that each of the two terms falls within this exception and is not an impermissible payment under *Actavis* because each allowed Watson to enter the market before the expiration of the '510, '333, '334, and '529 patents, before the patent litigation and appeals were resolved in court, and, for the term that provided brand-name Lidoderm, before the resolution of the ANDA.  Mot. 16 -18.

Defendants' argument mistakenly distinguishes between early-entry settlements, where the value to the generic manufacturer comes *solely* from the ability to enter the market with a competing product, and a reverse-payment term, where the value to the generic manufacturer comes from compensation from the patentee.  *Id.*  Defendants argue that the Court's exception includes all terms that allow early-entry because they create competition that benefits customers, while the reverse payments do not.  *Id.*  Defendants argue that both terms in the challenged settlement were akin to early-entry settlements because they only provided value to Watson if it entered the market and sold $96 million worth of brand-name Lidoderm and then its own generic Lidoderm.  *Id.*

The distinction between early-entry and reverse-payment settlements is not relevant, plaintiffs argue, because it rests on the argument that the two terms are procompetitive, which is an affirmative defense to an antitrust claim that may not be raised in a motion to dismiss.  Plaintiffs' Consolidated Opposition to Defendants' Joint Motion to Dismiss ("Oppo.") 9 [Dkt. No.

103].[16]  Additionally, plaintiffs argue that the Supreme Court only carved out an exception for "one kind of settlement [that] may be free from antitrust scrutiny: one consisting *solely* of an early entry provision."  *See In re Lamictal*, Case No. 12-cv-995, 2014 WL 282755, at *7 (D.N.J. Jan. 24, 2014).

Even though some terms that allow early-entry are procompetitive and not subject to antitrust scrutiny as a matter of law, as defendants argue, here plaintiffs plausibly allege that the provision of brand-name product was not procompetitive because it did not "increase output, reduce price, or increase consumer choice."  DPP Compl. ¶ 98.  The settlement prohibited Watson from directly competing with Endo because Watson agreed to honor Endo's price-related contracts.  DPP Compl. ¶¶ 95, 98.  Moreover, plaintiffs specifically and plausibly allege that Watson in fact sold the brand-name Lidoderm at the same supracompetitive prices as Endo.  DPP Compl. ¶ 98.[17]  Plaintiffs also allege that the payment had an anticompetitive effect because Watson would have released its generic Lidoderm before September 15, 2013 if Endo/Teikoku had not paid $96 million worth of brand product.  DPP Compl. ¶ 142.

Defendants rely on *Asahi Glass Co. v. Pentech Pharm, Inc.*, 289 F. Supp. 2d 986 (N.D. Ill. 2003), for the proposition that an agreement to supply free product to a generic competitor is not a reverse payment because it requires an additional party to enter the market, thus increasing competition.  Mot. 17.  This case is not persuasive.  It was decided ten years before *Actavis*, and

---

[16] *See Apple iPod iTunes Antitrust Litig. v. Apple, Inc.*, Nos. C 05–00037 JW, C 07–06507 JW, 2010 WL 2629907, *7 (N.D. Cal. June 29, 2010) ("the validity of a claimed business justification is a question of fact") (denying motion to dismiss in case under § 2); *Tucker v. Apple Comp., Inc.*, 493 F. Supp. 2d 1090, 1101 (N.D. Cal. 2006) ("the existence of valid business reasons in antitrust cases is generally a question of fact not appropriate for resolution at the motion to dismiss stage"); *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1133 (N.D. Cal. 2005) ("[w]hatever [the] merits of these [procompetitive] arguments, they are intrinsically factual . . . and inappropriate for resolution at the motion to dismiss stage").

[17] At oral argument, defendants argued that the fact that Watson maintained the supracompetitive price was irrelevant because antitrust analysis focuses on the number of competitors in a market. However, plaintiffs make a different point.  Plaintiffs allege that the provision of $96 million of brand product was a large and unjustified payment made in order to keep Watson's own, lower cost generic, out of the market until September 15, 2013.  Regardless, both of plaintiffs' theories – delayed entry of generic lidocaine patches and Watson's sale of brand name product at supracompetitive prices – plausibly allege that the provision of brand product was harmful to competition.

United States District Court
Northern District of California

no longer applies current antitrust law. *Asahi*, 289 F. Supp. 2d at 992 (applying the scope-of-the patent test; "there is no doubt that the patent *may well* be valid, so that Glaxo cannot be faulted for trying to enforce it.").  Moreover, it is factually inapposite here because plaintiffs plausibly allege that Watson's sales of Lidoderm did not increase competition and were sold at the same supracompetitive prices. *But see id.* at 993 (the competitor could use the provided product to undersell the brand manufacturer).[18]

Plaintiffs have not cited, and I have not found any case where brand product is used as payment for the delay in a post-*Actavis* case.  But here, plaintiffs have plausibly alleged that this term was not within the category of settlements that the Supreme Court declared was beneficial to consumers and exempt from antitrust scrutiny.[19]

With respect to the no-authorized-generic term, plaintiffs plausibly allege that it not only failed to provide a procompetitive benefit, it caused actual harm and is the basis for several

---

[18] At oral argument, defendants argued that the settlement required Endo/Teikoku to give Watson free Lidoderm in 2013, and then to continue giving brand product in 2014 and 2015 or until the FDA approved Watson's ANDA.  *See* Request for Judicial Notice Ex. A at 10.  They assert this demonstrates that Endo/Teikoku's intent was to allow Watson to enter the market before FDA approval (even if the FDA delayed approval of Watson's generic through 2015) rather than to compensate Watson for delaying release of its generic until September 15, 2013.  I do not find this argument persuasive for three reasons.  First, the 2013 term is different than the 2014 and 2015 terms because it is not contingent on FDA approval of Watson's ANDA.  Second, the size of the payment suggests that this justification is not plausible.   Third, the settlement states that the parties intent regarding the "Brand Product provided by Endo/Teikoku to Watson's Wholesaler Affiliate hereunder is a good-faith bargained-for resolution of the claims at issue in the Litigation," not to allow Watson to enter the market despite FDA approval.  DPP Compl. ¶ 97.

[19] This conclusion is in accordance with the FTC, which has taken the position that free brand product, when given in exchange for an agreement to delay a generic, can allow a brand-name manufacturer to share its monopoly profits.  *See In re Lamictal*, Case No. 14-1243 (3rd Cir. April 28, 2014), 2014 WL 1745072, at *17-18 (quoting Brief of F.T.C. as Amicus Curaie[sic] in support of Plaintiffs-Appellants, "whether such sharing takes the form of gold bullion, stocks, free goods, real estate, or--as here--additional agreement not to compete, the potential for harm to consumers is present.  In any event, a settlement with a No-AG commitment can violate the antitrust laws whether it is characterized as a reverse payment (in kind rather than in cash) or instead as a reciprocal agreement not to compete.").

16

claims.[20]  *See* DPP Compl. ¶¶ 160-167; EPP Compl. ¶¶ 171-181; GEHA Compl. ¶¶ 144, 153(b).

Plaintiffs assert that the price of a generic drug is 90% of the brand-name's when there is a single

generic manufacturer; however the price drops to 52% of the brand-name's when a second generic

manufacturer enters the market.  DPP Compl. ¶¶ 110(c), 111(a) (citing Generic Competition and

Drug Prices,

http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm

129385.htm).  If Endo/Teikoku and Watson had concurrently entered the generic market, as they

were legally allowed to do as of August 2012, then plaintiffs allege that but for the agreement, an

authorized generic version of Lidoderm would have been available on the market simultaneously

with the launch of Watson's generic, and consumers would have paid far less for generic

Lidoderm.  DPP Compl. ¶¶ 143, 144.

On this motion to dismiss, plaintiffs have plausibly pled that the no-authorized-generic and

provision of brand-name Lidoderm terms were not beneficial to consumers *despite* the fact that

Watson was allowed to enter the market before patent expiry.  Thus they are not akin to the early-

entry settlements that *Actavis* held were not subject to antitrust scrutiny.

### 2.  Are non-monetary terms "payments" in the *Actavis* framework?

Defendants argue that *Actavis* is "limited to reverse payment settlements in which the

branded company pays *cash* to the generic company."  Reply 5 (emphasis in original).  Two

district courts have granted motions to dismiss in post-*Actavis* cases on the grounds that the non-

monetary settlement terms are not "payments."  *See In re Loestrin*, 2014 WL 4368924, at *10

("*Actavis* should be applied only to cash settlements, or to their very close analogues."); *see also*

*In re Lamictal*, 2014 WL 282755, at *9 (granting motion to dismiss antitrust claims because a

---

[20] At least one court has found that a six month no-authorized-generic agreement was not
anticompetitive under the rule of reason test.  *See, e.g., In re Lamictal*, 2014 WL 282755, at *10
("six months of early entry, that there was no payment of money[,] and that the duration of the
No–AG Agreement was a relatively brief six months all serve to persuade this Court that the
settlement was reasonable and not anticompetitive as forbidden by *Actavis*.").  Even though the
agreement in that case was not found to be anticompetitive, the court did not hold that it had
procompetitive benefits, as defendants argue, and as a pure early-entry settlement would.

United States District Court
Northern District of California

1    reverse payment must be monetary).  These cases are not persuasive because both turn on the

2    court's concern that the value of "a non-cash settlement, particularly one that is multifaceted and

3    complex (like the arrangement here), is almost impossible to measure."  *Id.* at *9.

4         I agree that in order to determine if a term is a large and unjustified payment, as *Actavis*

5    requires, courts must be able to calculate its value.  *See In re Effexor XR*, 2014 WL 4988410, at

6    *22.  However, not all non-monetary payments are impossible to value. [21]  There are many

7    plausible methods by which plaintiffs may calculate the value of non-monetary terms.  I agree

8    with the bulk of the recent decisions holding that courts need not restrict the definition of

9    "payments" under *Actavis* to cash.  *See, e.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F.

10   Supp. 2d 367, 382 (D. Mass. 2013) (rejecting a motion to dismiss because a no-authorized-generic

11   term could be a payment for the delay because a broader definition of payment "serves the purpose

12   of aligning the law with modern-day realities.").[22]

13        Here, the parties' own settlement states that the patentee (Endo/Teikoku) shall give the

14   infringer (Watson) "Brand Product of value totaling <u>twelve million dollars ($12,000,000) per

15   month</u> . . . on the first business day of each month beginning January 1, 2013 and ending August

16

17   [21] At oral argument, defendants urged me to follow Judge Sheridan's analysis in *In re Lipitor*.  In
18   that case, the alleged non-monetary payments were "(i) the forfeiture of Pfizer's claim for damages
     in the *Accupril* II litigation in exchange for Ranbaxy's payment of $1 million; and (ii) foreign
19   patent litigation settlements permitting Ranbaxy to launch generic Lipitor in at least eleven non-
     U.S. markets prior to patent expiration."  *In re Lipitor*, 2014 WL 4543502, at *19.  On the motion
20   to dismiss, the court concluded that the focus of *Actavis* is "on the antitrust intent of the settling
     parties rather than the manner of payment," and so rejected defendants' argument that reverse
21   payments must be cash.  However, the judge dismissed the complaints because they failed to meet
     the *Twombly* standard and allege facts sufficient to establish the value of the forfeited claims for
22   damages.  *Id.* at *19, *21; *see also In re Effexor XR*, 2014 WL 4988410, at *22 (granting motion
     to dismiss because plaintiffs failed to allege sufficient facts to value the no-authorized-generic).
23   Here, plaintiffs have adequately and plausibly alleged the value of both the no-authorized-generic
     agreement and the $96 million worth of brand-name Lidoderm.

24   [22] *See also Time Ins. Co. v. Astrazeneca AB*, Case No. 14-4149, 2014 WL 4933025 (E.D. Pa. Oct.
25   1, 2014) ("reverse payments deemed anti-competitive pursuant to *Actavis* may take forms other
     than cash payments" when considering a no-authorized-generic agreement); *In re Niaspan
26   Antitrust Litig.*, Case No. 13-2460, 2014 WL 4403848 (E.D. Pa. Sept. 5, 2014) (denying motion to
     dismiss where settlement contained non-monetary payments, including a no-authorized-generic
27   agreement); *In re Lipitor*, 2013 WL 4780496, at *27 (granting leave to amend to include no-
     authorized-generic agreement would not be futile because "nothing in *Actavis* strictly requires that
28   the payment be in the form of money.").

18

1, 2013 <u>(for a total of eight (8) months)</u>."  DPP Compl. ¶ 95 (emphasis in original).  Watson

expected this term to generate close to $96 million from these sales, and plaintiffs allege that it

did.  *Id.* at ¶ 98.  This term is not a complex, multifaceted payment; rather it is a simple transfer of

a fungible product.  Calculating its value is straightforward, and plaintiffs have plausibly alleged

facts sufficient to support their calculations.  *Id.*  This payment is also reverse because it flowed

from the patentee to the alleged infringer.  DPP Compl. ¶ 97.

Endo/Teikoku's agreement not to release an authorized generic that could compete with

Watson during the 180-day exclusivity period is more complex.  Defendants categorize this term

as a partially exclusive license and argue that it is within the "right to exclude provided by the

Patent Act."  Mot. 18.  Then, they argue that plaintiffs failed to plausibly allege "an appropriate

method of calculating the value of Endo's agreement not to launch an authorized generic."  Reply

to DPP 6.  Plaintiffs rebut the argument that the no-authorized-generic agreement was an exclusive

license because it was not "one where the patent holder turns over its patent rights to another,

[who], having stepped into the shoes of the patent holder, alone practices the patented invention."

Oppo. 17 (citing *Barnett v. Strom*, 265 F. Supp. 2d 946, 949 (N.D. Ill. 2003) ("One of the most

basic fundamentals of patent law and practice [is that w]hen a patentee has granted an *exclusive*

license, even the patentee is prohibited from practicing the art disclosed by the patent.")).

Regardless, they argue, licenses are still subject to antitrust scrutiny, especially when "a licensee

[is] agreeing to delay competing with the patentee in exchange for" the license.  *Id.* at 19.

I agree with the courts who have held that a no-authorized-generic term can constitute a

payment.  *See In re Niaspan*, 2014 WL 4403848, at *11 ("the Court rejects defendants' argument

that a no-AG provision has the same economic effect as the grant of an exclusive license to enter

the market prior to the expiration of a patent.").  Defendants have not cited, and I have not found,

any cases holding that an agreement not to release an authorized generic cannot be a "payment"

1    under the *Actavis* framework because it is a partially-exclusive license.[23]  If the no-authorized-

2    generic term has any value – which defendants concede it does – then it plausibly incentivized

3    Watson to accept an entry date later than it otherwise would have.  This is precisely the harm that

4    *Actavis* sought to prevent.

5         Plaintiffs estimate the value of the no-authorized-generic agreement by calculating the

6    difference between Watson's projected revenues with the agreement and Watson's projected

7    revenues had it competed with Endo/Teikoku's authorized generic from the start.  DPP Compl. ¶

8    109.  Plaintiffs rely on a study conducted by the FDA to allege that it "is common in the

9    pharmaceutical industry" for the first generic drug entering the market without competition to

10   capture 80% of the brand-name's, and set the price at 90% of the brand-name's.  DPP Compl. ¶¶

11   110, 111 (citing Generic Competition and Drug Prices,

12   http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm

13   129385.htm).  In contrast, a generic drug entering the market with an authorized generic

14   competitor will only take 40% of the market, and the resulting competition will drive the price

15   down to 52% of the brand-name's.  *Id.*  Applying these percentages to Endo's publicly available

16   sales information, Watson's projected revenues for the seven and one half month period would be

17   $278,437,500 with the agreement, but only $107,250,000 without the agreement.  DPP Compl. ¶

18   112.  These calculations are not overly complicated, and they are plausible.[24]

19   **B.  Step Two:  Were the Reverse Payments Large and Unjustified?**

20        Defendants argue that the complaints fail to establish that the free brand product and no-

21   authorized-generic payments were large and unjustified because they didn't plead the value of the

22

23   _____

24   [23] *In re Lamictal*, the only post-*Actavis* case defendants cite on this point, does not analyze
     whether a license can be a payment.  Rather, it reiterates the fact that *Actavis* only mentions

25   "monetary payments," and categorically declines to "extend the holding of *Actavis* to the non-
     monetary facts before it."  *In re Lamictal*, 2014 WL 282755, at *9.  I do not find this case

26   persuasive for the reasons discussed above.

27   [24] The specific and plausible valuations provided in the complaints distinguishes this case from *In
     re Effexor*, where the district court agreed that non-cash payments could constitute reverse

28   payments under *Actavis* but held that the pleadings in that case did not provide sufficient,
     plausible allegations to make those valuations.  *In re Effexor XR.*, 2014 WL 4988410, at *23.

litigation costs that were avoided by the settlement of the patent infringement cases.  Reply 6.
Defendants also allege that plaintiffs do not properly evaluate the no-authorized-generic
agreement because they do not account for the 25% royalty that Watson was required to pay Endo
for the sales on Watson's generic during that period of exclusivity.  Reply to DPP 6.  The latter
argument is incorrect, as plaintiffs' valuations explicitly account for the 25% royalty.  DPP
Compl. ¶ 107.

In *Actavis*, the Court did not define "large."  At one extreme, a "large" payment could be
"a sum even larger than what the generic would gain in profits if it won the paragraph IV litigation
and entered the market."  *Actavis*, 133 S. Ct. at 2235.  At the other extreme, perhaps a "large"
payment is anything more than the value of the avoided litigation costs plus any other services
provided from the generic to the brand manufacturer.  *See In re Effexor XR.*, 2014 WL 4988410, at
*23.

The Supreme Court gave more guidance for "unjustified," holding that a payment is
justified when it reflects "traditional settlement considerations, such as avoided litigation costs or
fair value for services."  *Actavis*, 133 S. Ct. at 2236.  Such terms do not raise the "concern that a
patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of
noninfringement."  *Id.*  The burden is on the defendant to "show in the antitrust proceeding that
legitimate justifications are present, thereby explaining the presence of the challenged term and
showing the lawfulness of that term under the rule of reason."  *Actavis*, 133 S. Ct. at 2236.

Here, Plaintiffs do not provide an estimate of the avoided litigation costs; instead they
argue that the payments at issue are so large – $266 million – that they have "no rational
connection to, and far exceed, any approximation of the costs of continuing the patent litigation."
DPP Compl. ¶¶ 117, 117.  Because this is a motion to dismiss, defendants are unable to show that
their expected litigation costs or other services justified the alleged value of the terms.  However,
given the status of the underlying patent litigation – the first case was tried and submitted for a
bench decision and the second case had proceeded past the pleading stage – the plaintiffs'
allegations that the payments were large and unjustified are plausible.

**C. Step Three: Rule of Reason**

The defendants argue that the settlement does not pass the rule of reason test because it was procompetitive as a matter of law, essentially rehashing their initial arguments that I rejected above. Mot. 7. Additionally, they contend that the outcome of the litigation and Watson's ANDA was far from certain when Watson and Endo/Teikoku entered into the settlement. *Id.* They allege that the settlement allowed Watson to enter the market earlier than it would have if defendants had not settled because the pending litigation and regulatory obstacles, including the pending Citizen Petition, were too great to suggest otherwise. *Id.* They conclude that liability cannot be established without proof that the alleged payment caused Watson's generic to enter later than it would have absent the payment. *Id.*

As discussed above, I have found that plaintiffs have plausibly pled the existence of large and unjustified reverse payments. As the Court stated, "the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness, all without forcing the court to conduct a detailed exploration of the validity of the patent itself." *Actavis*, 133 S. Ct. at 2236-37. Here, Endo/Teikoku was willing to give Watson $96 million worth of brand product, abstain from selling an authorized generic for seven and one half months, while sacrificing more than one to two years of patent protection in order to resolve the lawsuits and delay the entry of Watson's generic until September 15, 2013. On this record – and taking plaintiffs' plausible factual assertions as true – plaintiffs have alleged that the outcome of the patent litigation was reasonably certain to favor Watson.[25] The size of the payments supports these allegations. I do not need to analyze the validity of the patents in the settled litigation in order to find the allegations adequate to meet the rule of reason.

Plaintiffs have plausibly alleged that the settlement was an agreement between two or more

---

[25] Plaintiffs allege that Judge Sleet had "rejected Endo's claim construction position, strengthening Watson's defense to Endo/Teikoku's infringement claims," and that the "evidence at trial was overwhelmingly in favor of Watson." DPP Compl. ¶ 79. Specifically, they allege that Judge Sleet had indicated that the '529 patent only covered products containing "one and only one" substance from two different categories, while "Watson's generic Lidoderm product contained at least *four* water-soluble high-molecular-weight substances, and *three* water-retaining agents." *Id.* at ¶¶ 87-88 (emphasis in original).

22

1    persons who intended to harm or restrain competition; that the agreement caused an actual injury

2    to competition; and that the injury was unreasonable.

3        **D.   Step Four:  Did the Settlement Cause Antitrust Injury?**

4            Defendants argue that Watson would not have been able to enter the market before

5    September 15, 2013, therefore the settlement did not cause an antitrust injury.  Mot. 21.  Plaintiffs

6    respond with two theories of injury:  (i) Watson was able and willing to launch "at-risk" (as soon

7    as it obtained FDA approval, but before the patent litigation was finally resolved); and (ii) the

8    settlement would have allowed generic Lidoderm to enter the market even earlier if Endo/Teikoku

9    had not purchased a delay with the two payments.  DPP Compl. ¶ 122. [26]

10           Plaintiffs assert that Watson would have been able to launch at-risk as soon as it received

11   FDA approval, which occurred on August 23, 2012.  DPP Compl. ¶ 75, EPP Compl. ¶ 80, GEHA

12   Compl. ¶ 75.  At oral argument, defendants countered that this entry date is speculative, because

13   the settlement affected the FDA's decision to deny Endo's Citizen Petition and approve Watson's

14   ANDA.  Defendants' argument relies on matters outside of the pleadings – namely what the

15   FDA's practice is when a patentee with a pending Citizen Petition settles with a generic

16   manufacturer who has a pending ANDA.  On a motion to dismiss, the Court reviews only

17   plausible allegations in the complaints and matters subject to judicial notice.  Plaintiffs' assertion

18   that Watson was able to enter the market on August 23, 2012 after it received FDA approval is

19   plausible.

20           To demonstrate Watson's willingness to enter the market at-risk, both parties cite to

21   _____

22   [26] At oral argument, defendants contended that the timeline demonstrated that Watson would not
     have entered the market before September 15, 2013 without the settlement.  Their presentation

23   focused on three distinct hurdles:  the patents, the patent litigation, and the FDA proceedings.  The
     first-expiring patent expired in 2014, and the last expired more than two years later.  DPP Compl.

24   ¶ 94.  The litigation could have continued for many years because Endo/Teikoku could have
     appealed any decision, and the second case had just begun.  Similarly, the Citizen Petition had

25   been pending for six years.  Plaintiffs respond that they are not relying as a theory of injury on the
     argument that Watson would have prevailed in the patent litigation and entered the market without

26   encumbrance before September 15, 2013.  Thus defendants' arguments that plaintiffs must prove
     that Watson would have prevailed in the litigation or surmounted all three hurdles are inapposite.

27   Reply 8.  The three barriers identified by defendants do not undermine the theories of injury
     asserted by plaintiffs for the reasons discussed below.

28

United States District Court
Northern District of California

1   comments that Watson representatives made during an earning call.  Oppo. 23, Mot. 23.  Plaintiffs

2   note that Watson was planning to launch at "the earliest possible time."[27]  DPP Compl. ¶ 124.

3   Defendants dispute plaintiffs' characterization of the Watson earnings calls, and argue that Watson

4   was not willing to launch at-risk because they expressed concern about the ongoing Citizen

5   Petition.  *See* Mot. at 23 (citing RJN Ex. D at 7 "there is still the Citizen Petition overhang, which

6   sits out there and of course, we're waiting for a trial decision.  But we are doing everything we can

7   to be ready to go at the earliest possible time.").[28]  Defendants also rely on *In re Nexium*, a case

8   where the generic manufacturer moved for summary judgment, and offered unrebutted evidence

9   "that an at risk launch was 'unlikely' and 'extremely risky.'"  *In re Nexium (Esomeprazole)*

10   *Antitrust Litig.*, Case No. 12-mdl-02409, 2014 WL 4370333, at *33 (D. Mass. Sept. 4, 2014).

11   This, however, is a motion to dismiss and defendants cite to no comparable evidence that is

12   properly before the Court at this juncture.

13           Whether a generic manufacturer is willing to risk treble damages from a patent

14   infringement suit by selling a generic drug at risk is a generally a factual issue.  *In re Lipitor*, 2013

20   [27] Defendants request that I take judicial notice of three Watson earnings calls because they are
     public documents and were incorporated by reference in the complaints.  Defendants' Request for
21   Judicial Notice [Dkt. 92].  Plaintiffs object to this request on the grounds that the contents of the
     earning calls are not central to their claim.  Plaintiffs' Opposition to Defendants' Request for
22   Judicial Notice [Dkt. 104].  The "incorporation by reference" doctrine applies to situations in
     which the plaintiff's claim depends on the contents of a document.  *Knievel v. ESPN*, 393 F.3d
23   1068, 1076 (9th Cir. 2005).  Despite plaintiff's arguments to the contrary, Watson's willingness to
     launch immediately after the FDA approved the ANDA, regardless of the ongoing litigation, is a
24   crucial factor in one of the plaintiff's primary theories of injury and in support, plaintiffs rely on
     the contents of the calls.  For this purpose, the request is GRANTED.
25

26   [28] Watson's concerns about the Citizen Petition are not relevant when considering whether Watson
     would have launched at-risk because an at-risk launch cannot occur until the regulatory hurdles are
27   cleared.  As discussed above, plaintiffs have plausibly alleged that the regulatory hurdles
     (including the Citizen Petition and the ANDA) would have been and were cleared on August 23,
28   2012.

United States District Court
Northern District of California

WL 4780496, at *24.[29]  Here, Watson representatives stated in the Q3 2011 earnings call that it believed that the patents were invalid.  RJN Ex. B 7 ("We like our case, we like where our case sits. We think we've, the District Court has been certainly in the Markman hearing was, we think was favorable to us and we're pretty excited about where that product opportunity presents itself."); RJN Ex C. 16 ("There's a possibility that the judge would rule from the bench or shortly thereafter.").

Also supporting the position that Watson was willing to launch at-risk is the fact that Watson had increased production capacity and procured the raw materials in preparation for a launch in 2012.  DPP Compl. ¶ 124.  Finally, the size of the payment Watson was able to obtain from Endo/Teikoku (over $200 million) also demonstrates Endo/Teikoku's fear that Watson would have cleared the regulatory hurdles and launched its generic before September 15, 2013. *See Actavis*, 133 S. Ct. at 2236.  The allegations that Watson was expanding its facilities, preparing for an imminent launch, and stating that it was confident about both its chances of success on the patent litigation are plausible and support plaintiffs' theory of at-risk entry.

As an alternative theory of injury, plaintiffs allege that Endo/Teikoku used the two payments to purchase part or all of Watson's 13 month delay (from August 2012 through September 2013).  DPP Compl. ¶ 118.  Thus, if the parties had entered into a hypothetical settlement without payments for the delay, plaintiffs would have paid less for Lidoderm because generic Lidoderm would have entered the market before September 15, 2013.  Plaintiffs argue that this theory of injury was ratified by *Actavis*, which held that a "payment in return for staying out

---

[29] *See, e.g.*, *In re Nexium*, 968 F. Supp. 2d at 390 (denying motion to dismiss in reverse payment action where plaintiffs' theory of injury depended on generic's at-risk launch); *In re Lipitor*, 2013 WL 4780496, at *23-24 (same); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d at 534-35 (rejecting as "conjecture" defendants' assertion that generic manufacturer would not have entered at-risk); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 911 (6th Cir. 2003) (finding antitrust injury because "a trier of fact may well find that the [brand's] $89 million payment renders incredible the defendants' claim that [the generic] would have refrained from marketing [at-risk] simply because of its fear of infringement damages"); *Andrx Pharm. Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 809 (D.C. Cir. 2001) (reversing dismissal based on lack of antitrust injury because a reasonable juror could conclude that generic would have entered the market at-risk); *Biovail Corp. Int'l. v. Hoechst*, 49 F. Supp. 2d 750, 767- 68 (D.N.J. 1999) (injury based on at-risk launch was not too speculative).

United States District Court
Northern District of California

1    of the market – simply keeps prices at the patentee-set levels, potentially producing the full patent-

2    related $500 million monopoly return while dividing that return between the challenged patentee

3    and the patent challenger.  The patentee and the challenger gain; the consumer loses."  *Actavis*,

4    133 S. Ct. at 2234-35.  Defendants argue that this theory of injury "is tantamount to a preference

5    for a different settlement, one that provided for even earlier entry."  Mot. 19 (citing *Verizon*

6    *Commc'ns Inc. v. Law Offices of Curtiz v. Trinko*, 540 U.S. 398, 415-16 (2004)).

7            In *Actavis*, the Supreme Court held that settlements with large unjustified reverse payments

8    can violate the Sherman Act, even though the settlement allowed some early-entry.  *Actavis*, 133

9    U.S. 2237.  A settlement that only allows early-entry does not harm consumers; however a

10   settlement that allows early entry in conjunction large and unjustified reverse payments can. *Id.*

11   (parties may "settle in other ways, for example, by allowing the generic manufacturer to enter the

12   patentee's market prior to the patent's expiration without the patentee paying the challenger to stay

13   out prior to that point.")

14           As discussed above, plaintiffs have plausibly alleged that the terms were large and

15   unjustified reverse payments, which is sufficient to support plaintiffs' theories of injury at this

16   juncture.  Defendants have not demonstrated procompetitive effects sufficient to offset the alleged

17   injury to competition under the rule of reason analysis.

18           Defendants' motion to dismiss the Section 1 claims is DENIED.

19   **II.  SHERMAN ACT § 1: *PER SE* TREATMENT OF THE NO-AUTHORIZED-GENERIC**

20           Plaintiffs also argue that the no-authorized-generic term is an independent agreement not to

21   compete that is *per se* illegal under Section 1.  Oppo. 19.  Defendants respond that the agreement

22   is not *per se* illegal because it is not a naked agreement not to compete, and therefore must be

23   evaluated under the rule of reason standard.  Reply 10.

24           The *per se* standard was created to streamline antitrust claims in situations where the

25   agreement has "such a predictable and pernicious anticompetitive effect, and such limited

26   potential for procompetitive benefit" that courts may predict with confidence that the conduct is

27   unreasonably anticompetitive every time it arises.  *Northern Pacific Ry. Co. v. United States,* 356

28   U.S. 1, 5 (1958); *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20

United States District Court
Northern District of California

(1979).  Until *Actavis*, courts held that "the right to license [a] patent, exclusively or otherwise, or to refuse to license at all, is 'the untrammeled right' of the patentee." *Westinghouse Elec. Corp.*, 648 F.2d at 647.  *Actavis* fundamentally altered the landscape and directed district courts to apply the rule of reason analysis to patent settlements.  *Actavis*, 133 S. Ct. at 2237.  Plaintiffs have not cited, and I have not found, any case where a no-authorized generic agreement was analyzed under the *per se* test.  Instead, district courts have considered no-authorized generic agreements under the rule of reason approach as set forth by the Court in *Actavis* and discussed above.[30]  The motion to dismiss the *per se* Section 1 claim is GRANTED.

## III.  SHERMAN ACT § 2

### A.  Legal standard

Section 2 of the Sherman Antitrust Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony."  15 U.S.C. § 2.  A claim of monopoly has two elements:  (i) monopoly power; and (ii) unlawful acts.  *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).

A plaintiff alleging attempted monopoly under Section 2 must demonstrate four elements: (i) specific intent to control prices or destroy competition; (ii) predatory or anticompetitive conduct directed at accomplishing that purpose; (iii) a dangerous probability of achieving "monopoly power"; and (iv) causal antitrust injury.  *Rebel Oil Co.*, 51 F.3d at 1433.  Similarly, a plaintiff alleging a conspiracy to monopolize in violation of Section 2 must show four elements: (i) the existence of a combination or conspiracy to monopolize; (ii) an overt act in furtherance of the conspiracy; (iii) the specific intent to monopolize; and (iv) causal antitrust injury.  *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

---

[30] *See, e.g.*, *In re Effexor XR*, 2014 WL 4988410, at *21; *In re Lipitor*, 2014 WL 4543502, at *2; *In re Loestrin*, 2014 WL 4368924, at *11; *In re Nexium*, 2014 WL 4370333, at *22; *Time Ins. Co. v. Astrazeneca AB*, 2014 WL 4933025, at *1; *In re Niaspan*, 2014 WL 4403848, at *10; *In re Lamictal*, 2014 WL 282755, at *2.

United States District Court
Northern District of California

1

**B. Shared Monopoly**

2          Defendants argue that all three Section 2 claims fail because, as a matter of law, they

3  require plaintiffs to plead that a single entity possesses monopoly power. Mot. 24.[31]  The

4  complaints refer to "Endo/Teikoku," and do not allege that either Endo or Teikoku individually

5  possessed, threatened to possess, or conspired to possess monopoly power. *Id.*  Plaintiffs respond

6  that Endo and Teikoku acted as a single economic entity that monopolized the market for

7  lidocaine patch 5%, and therefore should be treated as a single entity under Section 2.  Oppo. 25.

8  Alternatively, they request that I treat the complaints as if they had alleged that Endo alone

9  possessed monopoly power.  Oppo. 27.  Finally, they request that I grant them leave to amend

10 their complaints.

11          Plaintiffs do not cite any case where a court held a manufacturer and its distributor jointly

12 liable for violating Section 2.  A monopoly, by definition, consists of a single firm, and both

13 monopolization and attempted monopolization are single-firm violations.  *See Rebel*, 51 F.3d  at

14 1443 (holding that "[t]o pose a threat to monopolization, one firm *alone* must have the power to

15 control market output and exclude competition."); *see also, Terminalift LLC v. International*

16 *Longshore and Warehouse Union Local 29*, Case No. 11-cv-1999, 2013 WL 2154793, at *3 (S.D.

17 Cal. 2013) ("The very phrase 'shared monopoly' is paradoxical.").[32]  Here, the complaints do not

18 distinguish whether Endo or Teikoku possessed monopoly power.  Plaintiffs could have alleged

19 that either party possessed market power because, for example, Teikoku owned the '529 patent for

20

---

21 [31] Plaintiffs assert three claims under Section 2:  conspiracy to monopolize, (DPP Compl. ¶¶ 168-176); monopolization, (DPP Compl. ¶¶ 177-183); and attempted monopolization.  (DPP Compl. ¶¶ 184-189).

22

23 [32] *See also American Institute of Intradermal Cosmetics, Inc. v. Society of Permanent Cosmetic Professionals*, Case No. 12-cv-06887, 2013 WL 1685558 (C.D. Cal. 2013) (dismissing complaint because to pose a threat of monopolization, one firm alone must have monopoly power);

24 *Standfacts Credit Services, Inc. v. Experian Information Solutions, Inc.*, 405 F. Supp. 2d 1141, 1152 (C.D. Cal. 2005), *aff'd in part*, 294 Fed. Appx. 271 (9th Cir. 2008) ("Since Section 2

25 prohibits only monopolization by a single entity, as opposed to shared monopolization, … an allegation of conspiracy to create a shared monopoly does not plead a claim of conspiracy under

26 Section 2."); *Sun Dun of Washington v. The Coca Cola Co.*, 740 F. Supp. 381, 391 (D. Md. 1990) ("[t]he idea that a monopoly is composed of a single economic entity is also reflected in the

27 requirement in an actual monopolization claim that the requisite market power be held *by a single*

28 *defendant."*).

28

1    Lidoderm, while Endo owned the '510 patent.  DPP Compl. ¶¶ 58, 67.

2            In some situations, two companies can "pool their capital and share the risks of loss as well

3    as the opportunities for profit . . . such joint ventures [are] regarded as a single firm competing

4    with other sellers in the market."  *Texaco, Inc. v. Dagher*, 547 U.S. 1, 6 (2006).  However such

5    joint ventures typically involve the creation of a new integrated company that is run by

6    representatives from both companies.  *Id.*  Plaintiffs cite no authority where an exclusive

7    distribution agreement, like the one between Endo and Teikoku, has sufficed to establish a joint

8    venture and liability for a monopolization claim.

9            The most analogous case is *In re Wellbutrin XL Antitrust Litigation*, where the plaintiffs

10   brought a monopoly claim against the producers and distributors of a brand-name drug.  Case No.

11   08-mdl-2431, 2009 WL 678631, at *6-8 (E.D. Pa. Mar. 13, 2009).  In that case, the distributor

12   licensed the drug from the producer, and while the producer profited as a "recipient of royalties on

13   [the distributor]'s profits . . . [it] did not participate in the U.S. market directly."  *Id.* at *7-8.  The

14   court dismissed the claims against the producer and allowed the monopolization claims to proceed

15   against the distributor because the complaint specifically alleged that the distributor alone "was

16   able to maintain 100% control of the U.S. market for" the drug.  *Id.* at *7.

17          Here a monopolization or attempted monopolization claim cannot stand against both Endo

18   and Teikoku.  Plaintiffs allege that Endo markets and sells Lidoderm in the United States, while

19   Teikoku manufacturers Lidoderm in Japan.  DPP Compl. ¶¶ 13-14.  However, unlike *Wellbutrin*

20   *XL*, plaintiffs do not allege that either Endo or Teikoku individually has market power in the

21   United States over Lidoderm, instead referring to Endo/Teikoku.  *See, e.g.*, DPP Compl. ¶ 130-

22   141.

23          Defendants argue that the conspiracy to monopolize claim must fail for the same reason, as

24   the conspiracy must "allege specific intent by Defendants to empower one of them with monopoly

25   power."  *Standfacts Credit Servs.*, 405 F. Supp. 2d at 1152.  Again, the complaints do not allege

26   that the parties conspired to endow either Endo *or* Teikoku with market power.

27           It is plausible that plaintiffs could allege either that Endo possessed market power within

28   the United States, as it was the sole distributor of Lidoderm in the United States, or that Teikoku

United States District Court
Northern District of California

29

1    possessed market power within the United States because it controlled the production and the

2    primary patents.  DPP Compl. ¶ 57.  Plaintiffs may also be able to allege specifically that Endo

3    and Teikoku conspired to give one or the other monopoly power, but those allegations are missing

4    from the existing complaints.

5            The motion to dismiss the three monopoly claims is GRANTED with LEAVE TO

6    AMEND.

7    **IV. STATE LAW CLAIMS**

8            Defendants move to dismiss the state law claims asserted by GEHA and the EPPs arguing

9    first that because the federal law claims of the DPPs fail, so must the derivative claims of GEHA

10   and the other EPPs.  However, as discussed above, I find that the federal claims – except for the

11   *per se* claim under Section 1 and the monopolization claims – have been adequately pleaded and

12   survive.  With respect to the state law claims for monopolization, I find the allegations in the EPP

13   and GEHA complaints are no different than those in the DPP complaint that have been dismissed

14   with leave to amend.  Therefore, the EPP and GEHA claims regarding monopoly are likewise

15   DISMISSED with leave to amend.

16           I will address the defendants' remaining challenges to the state law claims in turn.

17       **A.  Article III Standing**

18           Defendants argue that the claims of GEHA and the EPPs arising under the common law of

19   each state must be dismissed because the plaintiffs fail to plead adequate factual allegations to

20   establish their standing to assert each state's laws.  At its core, defendants' argument is that GEHA

21   cannot bring claims under any law other than Missouri – where it resides – and the EPPs can bring

22   claims under only the laws of the eight states where an EPP resides.  As discussed below, I agree

23   the issue should be resolved at this juncture, reject defendants unduly narrow concept of standing,

24   find that GEHA has alleged standing only for its claims under Missouri law, and agree that the

25   EPPs fail to allege sufficient facts to support standing for specific states where no EPP was

26   injured.

27           **1.  Whether Standing to Pursue State Law Claim Claims Should be Decided Now**

28           Standing is a "necessary element of federal-court jurisdiction under Article III" and a

United States District Court
Northern District of California

1   "threshold question in every federal case." *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009)

2   (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Defendants contend that in order to have

3   Article III standing, plaintiffs must allege that they were injured in a particular state in order to

4   bring claims under that state's laws.  Numerous district court cases, many arising under state

5   antitrust laws, have agreed.  *See, e.g.*, *Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours &*

6   *Co.*, Case No. 13-1180 BLF, 2014 WL 4774611, at *4 (N.D. Cal. Sept. 22, 2014) (dismissing

7   indirect purchaser claims for states where no named plaintiff purchased or was injured by a

8   product, because "'[i]f a complaint includes multiple claims, at least one named class

9   representative must have Article III standing to raise each claim.'" (quoting 5 J. Moore et al.,

10  Moore's Federal Practice § 26.63[1][b] at 23–304 (3rd Ed. 2014)); *Pardini v. Unilever United*

11  *States, Inc.*, Case No. 13-1675 SC, 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013) (granting motion

12  to dismiss state law claims based on laws of states where no named plaintiff resided or was

13  injured); *In re Optical Disk Drive Antitrust Litig.*, Case No. 10–2143 RS, 2011 WL 3894376, at

14  *13 (N.D. Cal. Aug. 3, 2011) ("Defendants have adequately shown that dismissal of state law

15  claims is appropriate with respect to those jurisdictions in which none of the named class

16  representatives reside, notwithstanding plaintiffs' arguments that it would not contravene standing

17  requirements to allow those claims to proceed.");  *In re Flash Memory Antitrust Litig.*, Case No.

18  07-0086 SBA, 643 F. Supp. 2d 1133, 1164 (N.D. Cal. 2009) ("Where, as here, a representative

19  plaintiff is lacking for a particular state, all claims based on *that* state's laws are subject to

20  dismissal."); *In re Apple & AT & TM Antitrust Litig.*, Case No. 07-05152 JW, 596 F. Supp. 2d

21  1288, 1309 (N.D. Cal. 2008) (same); *In re Ditropan XL Antitrust Litig.*, Case No. 06-1761 JSW,

22  529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (dismissing for lack of standing claims based on the

23  antitrust law of the states where no named plaintiff was injured); *In re Graphics Processing Units*

24  *Antitrust Litig.*, Case No. 06-07417 WHA, 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007)

25  (dismissing state-law antitrust claims under the laws of states where no named plaintiff resides);

26  *see also In re Niaspan*, 2014 WL 4403848, at *16 ("Because standing must be resolved on a

27  claim-by-claim basis, the Court agrees with defendants that the named plaintiffs lack standing to

28  assert claims under the laws of the states in which they do not reside or in which they suffered no

United States District Court
Northern District of California

1   injury."); *In re Wellbutrin XL*, 260 F.R.D. 143, 152-55 (E.D. Pa. 2009) (analyzing standing to sue

2   in a class action on a claim by claim basis, and concluding that a state law claim cannot be

3   asserted on behalf of a class unless at least one plaintiff has suffered injury under that state's law).

4          Plaintiffs argue that only the standing of the named plaintiff needs to be shown at this

5   juncture, and that the standing of absent class members is irrelevant.  Oppo. 29.[33]  Plaintiffs are

6   correct, but miss the point.  The cases plaintiffs rely on simply hold that as long as one member of

7   the class has standing, a case or controversy exits and standing is satisfied.  Oppo. at 28.

8   However, in each of those cases at least one named plaintiff had standing to pursue claims under

9   *each* of laws allegedly violated.  *See, e.g., Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021

10  (9th Cir. 2011); *Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007); *Kohen v. Pac. Inv. Mgmt. Co.*

11  *LLC & PIMCO Funds*, 571 F.3d 672, 676 (7th Cir. 2009); *see also Clancy v. The Bromley Tea*

12  *Co.*, Case No. 12-cv-03003 JST, 2013 WL 4081632, at *6 (N.D. Cal. Aug. 9, 2013) (denying

13  motion to dismiss in product mislabeling case where named plaintiff has standing to assert claims

14  relative to the products he purchased).  Those cases do not address the issue of standing where no

15  named plaintiff has been injured under some of the laws asserted, as is the case here.  The issue is

16  not standing of absent class members.  It is standing of the named plaintiffs to bring claims for

17  harms they have not suffered arising under state laws to which they are strangers.

18         The Ninth Circuit has confirmed that district courts can address "the issue of standing

19  before it addresse[s] the issue of class certification."  *Easter v. Am. W. Fin.*, 381 F.3d 948, 962

20  (9th Cir. 2004) (dismissing plaintiffs' claims against defendants who had not caused the named

21  plaintiffs any harm).  I find that the weight of the persuasive authority allows me to determine

22  _____

23  [33] At least one court in this district and one in the Southern District have reached opposite
    conclusions.  *See In re Actimmune Mktg. Litig.*, Case No. 08–02376 MHP, 614 F.Supp.2d 1037,
24  1053–54 (N.D. Cal. 2009) ("the court agrees with plaintiffs that the class-certification issue is
    logically antecedent to Article III standing, where the standing concerns would not exist but for
25  the class-action certification") (internal quotation marks and citation omitted); *In re Hydroxycut*
    *Marketing and Sales Practices Litig.*, 801 F. Supp. 2d 993 (S.D. Cal. 2011).  *Hydroxycut* has
26  subsequently been criticized for ignoring controlling precedent and the weight of authority is to
    the contrary.  *See Morales v. Unilever U.S., Inc.*, 2014 WL 1389613, *5 n.5 (E.D. Cal. Apr. 9,
27  2014) ("*Hydroxycut'* s suggestion that courts should defer questions of standing for class
    certification is inconsistent with controlling Ninth Circuit precedent.").
28

1   standing at this juncture, and that efficiency considerations militate against waiting until class

2   certification to determine the scope of this case.

3       **2.   EPPs Standing**

4           Defendants do not dispute that the EPPs have standing to pursue claims under the laws of

5   eight states where the EPPs reside or have a principal place of business.[34]  Instead they challenge

6   the EPPs standing to assert claims as to twenty states to which the EPPs have no alleged

7   connection,[35] and the twenty-two states where they claim only an "attenuated" connection.[36]

8           With respect to the twenty states that the EPPs do not assert any connection to, I GRANT

9   the motion to dismiss with leave to amend as to the claims under the following states' laws:

10  Alaska, District of Columbia, Hawaii, Idaho, Iowa, Louisiana, Maryland, Michigan, Mississippi,

11  Montana, Nebraska, New Mexico, Oklahoma, Oregon, Puerto Rico, Utah, Vermont, Virginia,

12  Washington, and Wyoming.  If the EPPs have facts to allege to show their named plaintiffs have a

13  sufficient connection to any of these states, they may include those facts in an amended pleading.

14          With respect to the twenty-two states with only an "attenuated" connection to the EPPs, I

15  find that the EPPs have alleged adequate facts to demonstrate standing.   As an initial matter, I

16  reject defendants test – whether the EPPs reside in a particular state – as unduly narrow. The EPPs

17  do not need to reside in a particular state to have standing to assert claims under that state's laws.

18  The question is whether the EPP was *harmed* in a particular state by either its own purchase of a

19  Lidoderm or generic patch or by its reimbursement of a purchase of a Lidoderm or generic patch

20  in that state.

21          As noted above, the EPPs include health and welfare benefits plans who allege that they

22

23  ───────────────

24  [34]   These states are: California, Illinois, Massachusetts, Minnesota, New York, Pennsylvania, Rhode Island and West Virginia.  Mot. 29 n. 17.

25  [35]   The twenty states are: Alaska, District of Columbia, Hawaii, Idaho, Iowa, Louisiana, Maryland,
26  Michigan, Mississippi, Montana, Nebraska, New Mexico, Oklahoma, Oregon, Puerto Rico, Utah, Vermont, Virginia, Washington, and Wyoming.

27  [36]   The twenty-two states are: Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Kansas, Kentucky, Maine, Missouri, Nevada, New Hampshire, New Jersey,
28  North Carolina, North Dakota, South Carolina, South Dakota, Tennessee, Texas and Wisconsin.

have "indirectly purchased, paid and/or provided reimbursement for Lidoderm and/or the generic version of Lidoderm" in the following thirty states:  Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Kansas, Kentucky, Maine, Massachusetts, Minnesota,  Missouri, Nevada, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, West Virginia and Wisconsin.  EPP Compl. ¶¶ 9-16.  These allegations of purchase or reimbursement in those states are adequate to demonstrate standing.  *See, e.g., In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010) (plaintiff health and welfare plans had "standing to bring a claim under the laws of the states where they are located, and where they purchased Flonase or reimbursed their members for Flonase purchases."); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 151 (E.D. Pa. 2009) ("the plaintiff benefit funds may bring claims under the laws of the states in which they are located and in which their members, for whom they have reimbursed purchases of Wellbutrin XL, reside."); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 263 F.R.D. 205, 213 (E.D. Pa. 2009) ("a plan's claim arises where the overcharge occurs, and recognize that each plan may have a cause of action in multiple states.").

Defendants argue the "vague" allegation that the Plans indirectly purchased or provided reimbursement for Lidoderm and the generic in these states "is far from sufficient, given the complex and varied ways in which health plans may provide pharmacy benefits to their members." Reply 19-20.  I disagree.  This is not a motion to dismiss under Rule 9(b) that would require a heightened pleading standard, but instead a case governed by Rule 8's plain, plausible statement. The EPPs have adequately pled their injury and standing to pursue these claims.  Challenges based on the "complexities" of health plans' provision and reimbursements of benefits are more

1    appropriately dealt with after discovery on class certification or at summary judgment.[37]

2           Therefore, defendants' motion to dismiss the EPPs' claims under the laws of is Alabama,

3    Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Kansas, Kentucky, Maine,

4    Missouri, Nevada, New Hampshire, New Jersey, North Carolina, North Dakota, South Carolina,

5    South Dakota, Tennessee, Texas and Wisconsin is DENIED.

6        **3.  GEHA Standing**

7           **a.  GEHA's Claims in States Other than Missouri**

8           Defendants assert that GEHA's complaint must be dismissed in its entirety because GEHA

9    resides and has its principal place of business in Missouri and has failed to adequately allege that it

10   purchased or reimbursed any of its covered participants in any particular state.  Mot. 30.  In its

11   Amended Complaint, GEHA alleges that it "provid[es] benefits to nearly 1.5 million covered lives

12   with federal employee members residing in all 50 states as well as the District of Columbia and

13   Puerto Rico."  GEHA Compl. ¶ 21.  GEHA then alleges that it "purchased a significant amount of

14   branded Lidoderm at monopoly prices during the relevant time period," but does not indicate in

15   which states or territories it made those purchases.  *Id.* ¶ 22; *see also* ¶ 122 ("GEHA has spent a

16   significant amount on purchases of Lidoderm therapy during the relevant time period.").  Later on

17   in its Amended Complaint, GEHA asserts claims for monopolization under the laws of 25 states

18   (*id.* ¶ 130); claims for attempted monopolization under the laws of 25 states (*id.* ¶ 138); claims for

19   _____

20   [37]  *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 565 (E.D. Tenn. 2014), relied on
     by defendants in reply, is a class certification decision that addressed the apparent difficulties of

21   creating damage models based upon the complex operations of the health plan plaintiffs.  That
     decision is not relevant to the specificity required for standing at the pleading stage.  The

22   defendants other cases are likewise inapposite.  In *In re K-Dur*, 2008 WL 2660783, at *5 the court
     was not addressing standing, but choice of law.  The court concluded for that distinct analysis, the

23   "state with the greatest interest in a TPP's claims brought on its own behalf is the state where the
     TPP has its principal place of business and from which it presumably paid the allegedly

24   supracompetitive prices."); *see also In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 611

25   (S.D.N.Y. 2005) (choice of law).  Finally, *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098
     (N.D. Cal. 2007) is not to the contrary.  There, defendants moved to dismiss arguing that IPPs

26   lacked standing because they failed to allege that they *either* resided in or purchased product in 24
     states.  The plaintiffs opposed based only on the argument that standing should be determined at

27   class certification.  The district court disagreed and dismissed state law claims as a result.  *Id.* at

28   1106-07.

     United States District Court
     Northern District of California

1    conspiracy to monopolize under the laws of 28 states (*id*. ¶ 150); and claims for conspiracy and

2    combination in restraint of trade under the laws of 28 states (*id*. ¶ 158).

3         Similar to the conclusion with respect to the EPPs, I agree that where a health plan alleges

4    that it purchased or reimbursed purchases for allegedly over-priced drugs in specific states, a

5    health care plan has standing to assert claims in each of those states.  *See, e.g., In re Flonase*, 815

6    F. Supp. 2d 867, 875 (E.D. Pa. 2011)  ("Plans could have standing to assert claims under the laws

7    of states in which Plan Members made Flonase purchases, where those purchases were reimbursed

8    by the Plans.").  I disagree with defendants that, at the pleading stage, more specificity is required.

9    These sorts of allegations are plausible and sufficient.

10        However, reviewing GEHA's Amended Complaint, there is no direct allegation that

11   GEHA purchased and/or reimbursed its members for purchase of Lidoderm or its generic in any

12   specific states.  Its claims under the laws of states – other than Missouri – are DISMISSED with

13   leave to amend.[38]

14        **b.  GEHA's Missouri Claims**

15        Defendants also move to dismiss GEHA's consumer protection and unjust enrichment

16   claims under Missouri law.  Mot. 31.[39]  Missouri's consumer protection law covers purchases

17   made for personal, family or household use.  Mo. Rev. Stat. § 407.025.  At least one court in this

18   district dismissed a similar claim by GEHA brought in an off-label use case.  *In re Actimmune*

19   *Mktg. Litig*., Case No. 08-02376 MHP, 2010 WL 3463491, at *12 (N.D. Cal. Sept. 1, 2010) *aff'd*,

20   464 F. App'x 651 (9th Cir. 2011) ("Although the term 'person' explicitly includes corporations

21   like GEHA, the statute has been interpreted as requiring that a person purchase the property for

22   his, her or its *own* 'personal, family or household purposes.' Accordingly, the claims of health care

23

24   _____

     [38] GEHA has also voluntarily withdrawn the following claims:  (i) antitrust, monopolization and

25   unjust enrichment claims under the laws of Puerto Rico; and (ii) consumer protection claims under
     the laws of Hawaii and Kansas.  Government Employees Health Association's Memorandum of

26   Law in Opposition to Defendants' Join t Motion to Dismiss the Complaint at 1, n. 2, 3.  These
     claims are DISMISSED as to GEHA.

27
     [39]  Defendants contend that GEHA cannot bring antitrust claims under Missouri law; an argument

28   GEHA does not dispute.  Mot. 31.

United States District Court
Northern District of California

1    plans and third-party payors have been dismissed for lack of standing." (emphasis in original)).[40]

2         GEHA does not address *In re Actimmune*.  Moreover, each of its arguments miss the point.

3    It accurately states that corporations are included as persons under the statute, but does not link the

4    corporation's purchase to its own personal, family or household use.  It cites inapposite cases

5    recognizing that a direct contractual transaction between a plaintiff and defendant is not required

6    and that, under the broad language of the statute, indirect purchasers can sue upstream

7    manufacturers.  *Gibbons v. J. Nuckolls, Inc*., 216 S.W.3d 667, 670 (Mo. 2007).  Again, that is not

8    in dispute here.

9         Finally, GEHA relies on *Sheet Metal Workers Local 441 Health & Welfare Plan v.*

10   *GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380 (E.D. Pa. 2010), where the court held that the

11   "expansive scope" of the MMPA encompassed a health plan's claims against a drug manufacturer.

12   *Id*. at 415-17.  However, that case addressed only the standing of indirect purchasers, allegations

13   of intrastate conduct, and whether misrepresentations at issue were covered acts under the statute.

14   *Id*.  The court did not address whether a health plan could assert claims under the MMPA for

15

16

17

18

19

20

21

22

23

24

25   _____

26   [40] The *In re Actimmune Mktg. Litig*. court relied on *In re Express Scripts, Inc., Pharmacy Ben.*
     *Mgmt. Litig*., Case No. 1672, 2006 WL 2632328, at *10 (E.D.Mo. Sept.13, 2006) (dismissing

27   claim of health benefit plan against prescription drug administrator because the pharmaceuticals
     purchased by the plan were not "for the Plan's personal, family, or household purposes. Instead,

28   they were purchased for a business purpose: to serve the Plan's clients.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    "personal, family or household purposes" covered by the statute.[41]

2           In the absence of any on-point authority from GEHA, the court will follow *In re*

3    *Actimmune,* but only with respect to Missouri's consumer protection statute.  GEHA's consumer

4    protection claim under Missouri law is DISMISSED with prejudice.[42]  GEHA did not address its

5    unjust enrichment claim under Missouri law in its Opposition.  For the reasons discussed in

6    Section IV.C.2 below, it is also DISMISSED with prejudice.

7    **B.  Failure to State a Claim under Certain State Antitrust Laws**

8           Defendants raise specific challenges to the EPPs' ability to state claims under four state's

9    laws.[43]

10          **1.  Illinois**

11          Defendants argue that under the Illinois Antitrust Act only the Illinois Attorney General

12   may bring a class action asserting indirect purchaser antitrust claims.  *See* 740  Ill. Comp. Stat.

13   Ann. § 10/7(2).  Defendants note that courts have dismissed indirect purchaser class action claims

14

15   _____

16   [41]  GEHA also relies generally on a case from this District interpreting the Michigan consumer protection statute that – unlike Missouri's – does not contain language that "require[s] a transaction between the plaintiff and the defendant that involves the sale of goods primarily for personal, family or household purposes; rather, it requires only that the plaintiff's damages arise from defendant's provision of such goods. In other words, the statute does not require the plaintiff to be the consumer who purchased the goods primarily for personal purposes."  *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig*., Case No. 05-1699 CRB, 495 F. Supp. 2d 1027, 1033 (N.D. Cal. 2007); *see also* MCLS § 445.902(g) ("'Trade or commerce' means the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes.").  The *Bextra* case, therefore, is inapposite.  In *Pa. Emple. Benefit Trust Fund v. Zeneca, Inc*., 710 F. Supp. 2d 458 (D. Del. 2010), the court also interpreted the Michigan consumer protection statute.  The court explained that with respect to a third party payor health plan (like GEHA), the question under Michigan law was whether the "role as a third party payor ('TPP') rendered it a 'mere conduit or intermediary' for its participants' use of Nexium or whether it purchased Nexium principally to engage in its own commercial enterprise."  Because the complaint lacked sufficient facts to explain how the TPP operated, the court could not make that determination and dismissed the Michigan consumer protection claim.  *Id*. at 484.

   [42]  Because the claims have been dismissed with leave to amend, I need not reach whether GEHA has stated claims under the consumer protection statutes of other states' laws.  *See* Mot. 34-41.

   [43]  Defendants also challenged the EPPs antitrust claims under Florida law, but the EPPs voluntarily withdrew their Florida antitrust claims in their Opposition.  Oppo. 31, n.80.  It is DISMISSED with prejudice.

1  asserted in federal court under Illinois law for this reason. *See, e.g., In re Wellbutrin XL Antitrust*

2  *Litig.*, 756 F. Supp. 2d 670, 676 (E.D. Pa. 2010) (applying the attorney general restriction to bar an

3  indirect purchaser class action in federal court); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d at

4  539 ("In this case, Plaintiffs' are prohibited from asserting claims under the Illinois Antitrust Act,

5  because the Act does not provide relief to indirect purchasers through class actions.").

6          The EPPs do not address the adverse cases, but instead rely on an argument those courts

7  rejected; that the prohibition of non-Attorney General indirect purchaser class actions applies only

8  to actions brought in the state courts of Illinois and to import that prohibition into an action

9  pending in federal court would violate Rule 23 and is contrary to the Rules Enabling Act. Oppo.

10  31-32; *see also* 740 Ill. Comp. Stat. Ann. § 10/7 ("no person shall be authorized to maintain a

11  class action **in any court of this State** for indirect purchasers asserting claims under this Act, with

12  the sole exception of this State's Attorney General, who may maintain an action parens patriae as

13  provided in this subsection." (emphasis added)); *Shady Grove Orthopedic Associates, P.A. v.*

14  *Allstate Ins. Co.*, 559 U.S. 393 (2010).

15          The EPPs contend that the Supreme Court decision in S*hady Grove Orthopedic Assocs.,*

16  *P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 396 (2010), holding that a New York law prohibiting class

17  actions in suits seeking penalties or statutory minimum damages did not prevent a federal district

18  court sitting in diversity from entertaining a class action under Rule 23, allows the Illinois claim

19  here. Oppo. 31-32. The *In re Wellbutrin XL Antitrust Litig.* court, in a very detailed analysis,

20  rejected that very argument explaining: "The Illinois restrictions on indirect purchaser actions are

21  intertwined with Illinois substantive rights and remedies because (1) the restrictions apply only to

22  the IAA, (2) they are incorporated in the same statutory provision as the underlying right, not a

23  separate procedural rule, and (3) the restrictions appear to reflect a policy judgment about

24  managing the danger of duplicative recoveries. Because the indirect purchaser restrictions of the

25  IAA are 'intertwined' with the underlying substantive right, application of Rule 23 would

26  'abridge, enlarge or modify' Illinois' substantive rights, and therefore Illinois' restrictions on

27  indirect purchaser actions must be applied in federal court." *In re Wellbutrin XL Antitrust Litig.*,

28  756 F. Supp. 2d at 677. I agree with Judge McLaughlin's analysis, especially as the no indirect

United States District Court
Northern District of California

1    purchaser class action rule was expressly adopted as an integral part of the Illinois Antitrust Act's

2    repeal of *Illinois Brick*.   As such, I conclude that the Illinois antitrust claims must be DISMISSED

3    with prejudice.[44]

4        ### 2.  Massachusetts

5        Defendants argue that Massachusetts has not repealed *Illinois Brick Co. v Illinois*, 431 U.S.

6    720 (1977) and, therefore, no indirect purchaser antitrust claims can be brought under that state's

7    laws.[45] With respect to Massachusetts law specifically, defendants argue the EPPs (and GEHA)

8    lack standing to pursue claims under the Massachusetts Consumer Protection Act, Mass. Gen. L.

9    Ch. 93A §§ 1-11, because businesses must sue under Section 11 of the Act, and Section 11 bars

10   indirect purchaser antitrust claims.

11       The EPPs respond that as employee health and welfare plans, a municipality and two

12   individuals, they are not entities engaged in "trade or commerce" within the meaning of Section

13   11.  However, under the allegations in the EPPs Complaint, the only relevant plaintiffs are the City

14   of Providence and the Iron Workers District Council of New England Welfare Fund ("Iron

15   Workers"), which both alleged they purchased and/or reimbursed purchases in Massachusetts.

16

17   _____

18   [44]  For this reason, I decline to follow *In re Lithium Ion Batteries Antitrust Litig*., No. 13-MD-2420
     YGR, 2014 WL 4955377, at *21 (N.D. Cal. Oct. 2, 2014) which relied on *Freund v. Nycomed*

19   *Amersham*, 347 F.3d 752, 761–62 (9th Cir. 2003).  The provision at issue in *Freund* was the
     conflict between Fed. R. Civ. Proc. 50 (requiring parties to make a Rule 50(a) motion pre-verdict

20   to preserve the right to argue a Rule 50(b) motion post-trial) and a California rule providing that
     the appealability of punitive damage awards is not waivable.  The Ninth Circuit held that the

21   district court erred in allowing California law to trump Rule 50, because "the federal rule must be
     applied if it does not 'abridge, enlarge, or modify any substantive right' in violation of the Rules

22   Enabling Act," and the California non-waiver provision was a procedural rule, "not a substantive
     rule that would be modified by the application of the federal rule."  *Id*. at 761.  As discussed

23   above, I consider the no non-Attorney General class action rule enacted as part of the Illinois
     Antitrust Act to be substantive and intertwined with the creation of the substantive right of indirect

24   purchasers to sue.

25   [45] In *Illinois Brick*, the Supreme Court held that indirect purchasers of goods produced by firms
     engaged in anticompetitive conduct were too remote from that conduct to be regarded as injured

26   within the meaning of the Clayton Act. 431 U.S. at 746–48.  A number of states have passed state
     laws known as *Illinois Brick*-repealers which specifically grant end-payors the right to sue for

27   antitrust violations, the validity of which was upheld by Supreme Court in *California v. ARC*
     *America Corp*., 490 U.S. 93 (1989).

28

United States District Court
Northern District of California

United States District Court
Northern District of California

EPP Compl. ¶¶ 10, 13.  The question, therefore, is whether Providence or the Iron Workers – as entities that purchased the products for their employees and plan participants – were engaged in trade and commerce under Section 11.  The EPPs rely first on a decision from this District interpreting Michigan's consumer protection statute, which held in declining to dismiss indirect purchaser claims that "[t]here is no serious dispute that the transactions that gave rise to the TTP plaintiffs' alleged damages – purchasing Celebrex and Bextra – were primarily for personal purposes, that is, the personal use of the patients."  *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig*., Case No. 05-mdl-1699 CRB, 495 F. Supp. 2d 1027, 1034 (N.D. Cal. 2007). However, under Michigan's statute, "trade or commerce" focuses on the conduct of the defendant, not the consumer/plaintiff.  The statute focuses on "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes."  MCLS § 445.902(g).

The Massachusetts statute at issue focuses on the plaintiff:  "Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice" may sue under the statute.  ALM GL ch. 93A, § 11.  Plaintiffs note that Massachusetts' courts have struggled with identifying the line between "a consumer claim and a business claim for purposes of G. L. c. 93A, §§ 9 and 11."  *Frullo v. Landenberger*, 61 Mass. App. Ct. 814, 821 (2004). As the *Frullo* Court explained:

> Ultimately, the choice appears to turn on whether a given party has undertaken the transaction in question for business reasons, or has engaged in it for purely personal reasons (such as the purchase of an item for personal use). While the character of the transaction will not always be easy to identify, the distinction is consistent with the language of the respective statutory sections. Whereas a defendant must be engaged in trade or commerce, i.e., acting in a business context, to be liable under either § 9 or § 11, a plaintiff who acts in a business context has a cause of action exclusively under § 11. Thus, any transaction in which the plaintiff is motivated by business considerations gives rise to claims only under the statute's business section. That a transaction may be an isolated one not in the normal course of business does not insulate it from the reach of G. L. c. 93A, § 11.

*Id*. at 821.  Here, according to their own complaint, the EPPs did not purchase the products (and/or

provide reimbursement for those products) for *their* personal use, but for the use of their members. The Plan and the City appear to be engaged in the "trade or commerce" of providing health and welfare benefits.  I conclude that the City and Iron Workers were engaged in trade or commerce and are covered by Section 11.[46]

The EPPs argue that even under Section 11, indirect purchaser claims are not barred.  The EPPs rely on *Blue Cross & Blue Shield v. AstraZeneca Pharms. LP (In re Pharm. Indus. Average Wholesale Price Litig.)*, 582 F.3d 156 (1st Cir. 2009).  There, the First Circuit held that third-party-payors (like Providence and the Iron Workers) could bring fraud and misrepresentation claims against AstraZeneca for publishing inflated average wholesale drug prices under Section 11, despite a lack of privity between plaintiffs and defendants.  *Id.* at 193-94.  That case, however, did not address antitrust standing and did not address or overrule the First Circuit decisions finding that indirect purchaser claims cannot be asserted under Section 11.  *See, e.g., Ciardi v. F. Hoffmann La Roche, Ltd.*, 436 Mass. 53, 62-63 (2002) (noting that for actions brought under § 11, "the court shall be guided in its interpretation of unfair methods of competition by the provisions of the Antitrust Act" but that § 9 had no such requirement); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, Case No. C 07-5944 SC, 2014 WL 1088256, at *3 (N.D. Cal. Mar. 13, 2014) ("while corporations engaged in commerce can bring suits under Section 11 and potentially win them, a corporation engaged in commerce whose suit is based on indirect purchases will not have standing under Section 11."); *In re Auto. Parts Antitrust Litig.*, Case No. 12-mdl-02311, 2013 WL 2456612, at *29 (E.D. Mich. June 6, 2013) ("this Court is bound to enforce the bar prohibiting an indirect purchaser business plaintiff from proceeding.").

Because the EPPs at issue – the City of Providence and the Iron Workers – were acting in trade or commerce when they indirectly purchased or reimbursed their employee or members, they cannot state a claim under § 9 of the Massachusetts consumer protection statute for antitrust injury.  As the indirect purchaser claim is barred under § 11, the EPPs' Massachusetts consumer

---

[46] The EPPs argue that indirect purchasers can bring antitrust under § 9. *Ciardi v. F. Hoffmann La Roche, Ltd.*, 436 Mass. 53, 55 (2002).  That may be, but Providence and the Iron Workers are engaged in trade and commerce and covered by § 11.

United States District Court
Northern District of California

1   protection act claim must be DISMISSED with prejudice.[47]

2       **3. Puerto Rico**

3       Defendants assert that Puerto Rico has not repealed *Illinois Brick* by statute, and therefore,

4   the indirect purchaser antitrust claims under Puerto Rico law must be dismissed. Plaintiffs respond

5   that Puerto Rico's Antitrust Act (PRAA) does not distinguish between direct and indirect

6   purchasers but provides that "[a]ny person" injured by antitrust violations may sue.  10 L.P.R.A. §

7   268.  Plaintiffs also rely on *Rivera-Muniz v. Horizon Lines Inc*., 737 F. Supp. 57, 61 (D.P.R.

8   2010), which rejected a motion to dismiss indirect purchaser claims under the PRAA, "[b]ecause

9   Puerto Rico liberally construes its standing requirements in private antitrust cases . . . it is

10  immaterial whether Plaintiffs are direct or indirect purchasers of cabotage services."[48]

11      Defendants rely on two decisions from this District.  In the first, *In re TFT-LCD Antitrust*

12  *Litig*., Case No. 07-mdl-1827 SI, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) the court dismissed the

13  claims under Puerto Rico law because it was "reluctant to find standing in the absence of an

14  explicit *Illinois Brick* repealer, either by statute or case law."  *Id*. at 1188.   Plaintiffs argue that

15  *Rivera-Muniz*, although a district court case in Puerto Rico, does exactly that.  In the second, *In re*

16  *Static Random Access Memory (SRAM) Antitrust Litig*., Case No. 07-mdl-01819 CW, 2010 WL

17  5094289, at \*4 (N.D. Cal. Dec. 8, 2010), the court dismissed the indirect purchaser claims because

18  "IP Plaintiffs point to no authority that suggests that *Illinois Brick's* interpretation of federal

19  antitrust law would not be applied to Puerto Rico law" and because of the ruling in *In re TFT-LCD*

20  *Antitrust Litig*.  *Id*. at \*4.

21      Finally, in the most recent decision, a district court considered all three cases – *In re TFT-*

22  *LCD*, *SRAM* and *Rivera-Muniz* – and held that "in light of the fact that Puerto Rico antitrust law

23  _____

24  [47] Defendants also argue that plaintiffs' complaint failed to allege fraud and deception under § 11.
    *See* Reply 26.  However, there is no fraud or deception claim alleged in the EPPs Complaint,
25  therefore, the Court need not reach this argument.

26  [48] The same district court rejected a request to certify the question of whether indirect purchasers
    have standing to the Puerto Rico Supreme Court, finding that because "the Puerto Rico Supreme
27  Court has unequivocally rejected limitations to private antitrust standing under PRAA, this court
    must deny Defendants' motion for certification."  *Rivera-Muniz v. Horizon Lines Inc.*, Case No.
28  09-CV-2081, 2010 WL 3703737, at \*1 (D.P.R. Sept. 13, 2010).

United States District Court
Northern District of California

1    has been interpreted in accordance with federal antitrust law, which does not allow claims from

2    indirect purchasers following *Illinois Brick*, and in the absence of evidence showing that Puerto

3    Rico has repealed *Illinois Brick*—this Court dismisses the claims arising under the Puerto Rico

4    law." *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 410 (D. Mass. 2013).

5           I realize that the court in *Rivera-Muniz* first noted that the "PRAA is modeled after federal

6    antitrust statutes" and then relied solely on *Pressure Vessels of P.R., Inc. v. Empire Gas de P.R.*,

7    137 P.R. Dec. 497, 509-18 (1994) as authority that Puerto Rico nevertheless "explicitly rejects"

8    the indirect purchaser standing limitations imposed under the federal statutes.  *Id.* at 737 F. Supp.

9    2d at 61.  However, the *Pressure Vehicles* court did not address the standing of indirect purchasers

10   under the PRAA and did not discuss *Illinois Brick* or whether it had been repealed by Puerto Rico.

11   Instead, the *Pressure Vehicles* court relied on cases recognizing the "liberal standing theory under

12   Clayton Act sec. 4" and concluded that "plaintiff need not establish anything beyond a factual

13   causal relation between the injury and the violation to meet the" pleading requirements under the

14   PRAA; "it suffices that the plaintiff has been injured as a result of the statutory violation."

15   *Pressure Vessels P.R. v. Empire Gas P.R.*, No. RE-90-78, 1994 WL 909547 (P.R. Nov. 23, 1994).

16          Because neither *Rivera-Muniz* nor *Pressure Vehicles* addressed *Illinois Brick*, I agree with

17   the weight of authority and find that the claims under Puerto Rico's statute must be DISMISSED

18   with prejudice.

19          **4.   Rhode Island**

20          Defendants assert that while Rhode Island passed an *Illinois Brick* repealer statute in 2013,

21   the statute is not retroactive and, therefore, the indirect purchaser antitrust claims under Rhode

22   Island law must also be dismissed. Mot. 33; R.I. Gen. Laws § 6-36-7(d); *Hydro-Mfg. v. Kayser-*

23   *Roth Corp.*, 640 A.2d 950, 954-55 (R.I. 1994) ("It is well established, however, that statutes and

24   their amendments are presumed to apply prospectively. . . .  Only when 'it appears by clear, strong

25   language or by necessary implication that the Legislature intended' a statute to have retroactive

26   application will the courts apply it retrospectively." (quoting *VanMarter v. Royal Indemnity Co.*,

27   556 A.2d 41, 44 (R.I. 1989)).  Here, the statute provided that it shall "take effect on passage."

28   2013 R.I. Pub. Laws 365, § 2.

1    Plaintiffs respond that the repealer statute is simply a procedural statute – conferring

2    standing on residents to sue for indirect antitrust violations – which can be applied retroactively.

3    *See Pion v. Bess Eaton Donuts Flour Co.*, 637 A.2d 367, 371 (R.I. 1994) ("Substantive statutes,

4    which create, define, or regulate substantive legal rights, must be applied prospectively. . . In

5    contrast, remedial and procedural statutes, which do not impair or increase substantive rights but

6    rather prescribe methods for enforcing such rights, may be construed to operate retroactively.").

7    Plaintiffs rely on the fact that the court in *In re Nexium Antitrust Litigation*, Case No. 12-mdl-

8    2409, slip op. (D. Mass. Oct. 23, 2013) Dkt. No. 448, allowed plaintiffs leave to amend indirect

9    antitrust claims. Oppo. 36. However, that case did not analyze whether the Rhode Island repealer

10   statute was substantive or procedural. That court simply allowed plaintiffs to plead antitrust

11   claims under Rhode Island law because those claims were similar to the existing federal claims

12   and no prejudice would result to defendants. *In re Nexium Antitrust Litigation*, slip op. at 4.

13   In absence of any authority that is to the contrary, I find that the Rhode Island statute

14   conveyed substantive rights; allowing indirect purchasers to sue on claims they had no standing to

15   before. The conclusion that the statute does not apply retroactively is supported by the language

16   of the law itself; that "it shall take effect upon passage." Finally, plaintiffs argue that claims

17   arising after July 15, 2013 are still viable. However, the conduct at issue – the allegedly

18   anticompetitive settlement agreement – was entered into in May 2012. The fact that damages may

19   have continued to occur from that conduct after the enactment of the repealer law, does not make

20   the conduct itself actionable. *See, e.g., State v. Lead Ind. Assn., Inc.*, Case No. 99-5226, 2001 WL

21   345830, at *10 (R.I. Super. Apr. 2, 2001) (rejecting Attorney General's contentions that "pre-

22   amendment conduct which causes post-amendment damages" is within the purview of a

23   prospectively applied statute).

24   Therefore, the EPPs antitrust claims under Rhode Island are DISMISSED with prejudice.

25   **C. EPPs' Unjust Enrichment Claims**

26   Defendants argue that to the extent the EPP's unjust enrichment claims are based or wholly

27   tethered to their state law antitrust claims, they must be dismissed for the same reasons as the

28   underlying antitrust claims. Reply 41-42.

United States District Court
Northern District of California

45

### 1. Standing

As an initial matter, while the EPPs assert unjust enrichment claims based on the laws of 48 states (all except Indiana and Ohio) and the District of Columbia and Puerto Rico, as discussed above the EPPs do not have standing to pursue any claims under the laws of jurisdictions where they do not reside or allege purchase or reimbursement.  Therefore, the EPPs claims for unjust enrichment under the following 20 jurisdictions' laws are DISMISSED with leave to amend: Alaska, District of Columbia, Hawaii, Idaho, Iowa, Louisiana, Maryland, Michigan, Mississippi, Montana, Nebraska, New Mexico, Oklahoma, Oregon, Puerto Rico, Utah, Vermont, Virginia, Washington, and Wyoming.

### 2. *Illinois Brick* End Run

Defendants argue that the EPPs cannot use unjust enrichment to circumvent the *Illinois Brick* ban on indirect purchaser claims in states where there has been no *Illinois Brick* repealer, and therefore the unjust enrichment claims under those specific jurisdictions must be dismissed.

The EPPs rely on three cases to argue that courts have rejected so strict an interpretation of *Illinois Brick* and have allowed unjust enrichment cases despite the lack of an *Illinois Brick* repealer.  *See, e.g., King Drug Co. of Florence v. Cephalon, Inc*., 702 F. Supp. 2d 514, 540 (E.D. Pa. 2010) (denying motion to dismiss unjust enrichment claims that were alleged to be an end run around statutory limitations on remedies); *In re G-fees Antitrust Litig*., 584 F. Supp. 2d 26, 46 (D.D.C. 2008) ("No reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy."); *In re Cardizem CD Antitrust Litig*., 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000) (declining to dismiss unjust enrichment claims as "courts often award equitable remedies under common law claims for unjust enrichment in circumstances where claims based upon contract or other state law violations prove unsuccessful.").

Defendants respond these three cases are outliers; that the lead case, *In re Cardizem*, did not discuss *Illinois Brick*, and the other two cases simply rely on *In re Cardizem*.  Defendants contend that the "overwhelming majority" of courts have found that *Illinois Brick* bars unjust

enrichment claims absent repealer, including a decision from this District.  *See, e.g., In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179, 1192 (N.D. Cal. 2009) (declining to follow *In re Cardizem* and dismissing unjust enrichment claims that "would allow plaintiffs to circumvent limitations of state antitrust laws" where "plaintiffs have not cited any authority from Arkansas, Virginia, Montana or Puerto Rico holding that an indirect purchaser plaintiff may bring an unjust enrichment claim when that same claim would be barred under state antitrust law."); *see also In re Niaspan*, 2014 WL 4403848, at *21 (joining "majority of courts" and dismissing "the end-payor plaintiffs' unjust-enrichment claims brought under the laws of any state in which indirect purchasers may not bring an antitrust or a consumer-protection claim, absent authority that courts of that state would likely allow such a common-law claim to proceed."); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 412 (S.D.N.Y. 2011) ("As to parasitic claims premised on a violation of federal law, it is beyond peradventure that indirect purchasers may not employ unjust enrichment to skirt the limitation on recovery imposed by *Illinois Brick*." (citation omitted)); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 542 (E.D. Pa. 2010) ("Allowing indirect purchasers to recover and recoup a benefit from the defendant under an unjust enrichment theory would circumvent the policy choice of *Illinois Brick*."); *In re K-Dur*, 2008 WL 2660780 (dismissing claims "where the applicable state law bars antitrust actions for damages by indirect purchasers, or simply does not recognize a private cause of action for antitrust violations, a plaintiff cannot circumvent the statutory framework by recasting an antitrust claim as one for unjust enrichment."); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 211 (D. Me. 2004) (concluding "it would subvert the statutory scheme to allow these same indirect purchasers to secure, for the statutory violation, restitutionary relief at common law (or in equity).").

I agree with the majority of courts who have directly addressed this issue and find that the EPPs cannot circumvent the *Illinois Brick* prohibition absent authority from the courts of those

United States District Court
Northern District of California

states that would allow unjust enrichment claims to proceed.[49]  Therefore, the unjust enrichment

claims are dismissed for the following jurisdictions:  Alaska, Colorado, Connecticut, Delaware,

Florida, Georgia, Idaho, Illinois, Kentucky, Louisiana, Maryland, Massachusetts, Missouri,

Montana, New Jersey, Oklahoma, Pennsylvania, Puerto Rico, Rhode Island, South Carolina,

Texas, Virginia, Washington, and Wyoming.

### 3.  Challenges to Sufficiency of Unjust Enrichment Claims

For the unjust enrichment claims that are not barred by *Illinois Brick*, defendants argue the

EPPs fail to state claims under specific state laws because: (i) the EPPs received the benefit of

their bargain;[50] (ii) unjust enrichment claims cannot be asserted where the defendant provided

consideration for the benefit the EPPs received, namely the drug patches;[51] and (iii) the EPPs fail

to allege a relationship with defendants leading to a direct benefit.[52]  Defendants do not present

their arguments on a state-by-state basis in their Motion or Reply, presumably because they ran

---

[49]  Plaintiffs also rely on *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 914-36 (E.D. Pa. 2012) to argue that even if defendants' argument is well-taken, defendants had to prove on a state-by-state basis that each of the 24 jurisdictions would preclude an unjust enrichment claim.  Oppo. 38-39, n.108.  The court in *In re Processed Egg Prods.*, in the twenty page discussion cited by the EPPs, addressed the *sufficiency* of claims under various state unjust enrichment common law standards.  The only discussion of *Illinois Brick* and unjust enrichment focused on one state, Utah.  Moreover, the EPPs provide *no authority* from any of the 24 specifically identified jurisdictions showing that any of them would allow unjust enrichment claims stemming from indirect antitrust injury when plaintiffs are precluded from bringing indirect claims.

[50]  Defendants challenge the unjust enrichment claims for following "benefit of the bargain" jurisdictions:  Arizona, Arkansas, California, the District of Columbia, Florida, Illinois, Iowa, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, and Utah.  Defendants argue that courts in these jurisdictions "reject unjust enrichment claims when 'parties voluntarily have negotiated, entered into and fully performed their bargain.'"  Mot. 43 (quoting *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d at 210).

[51]  Defendants challenge the unjust enrichment claims for the following "consideration" states: Florida, Kansas, Massachusetts, Missouri, Nevada, New Hampshire, South Dakota, Tennessee, Utah, Vermont, and Wisconsin.

[52]  Defendants challenge the unjust enrichment claims for the following "direct benefit" jurisdictions: Alabama, Arizona, the District of Columbia, Florida, Georgia, Idaho, Kansas, Maine, Maryland, Michigan, Missouri, New Jersey, New York, North Carolina, North Dakota, Pennsylvania, Rhode Island, South Carolina, Texas, and Utah.

United States District Court
Northern District of California

1  out of space to argue these issues.  Instead, they refer the Court to three appendices where

2  defendants lay out cases that purportedly support their positions.  Docket Nos. 95-5, 95-6, 95-7.

3  The EPPs similarly do not address what needs to be pled under each state's unjust enrichment case

4  law.  Instead, in response to defendants' first two arguments, the EPPs rely on a recent district

5  court case where the court analyzed on a state-by-state basis many, but not all, of the authorities

6  defendants' rely on in their appendices and rejected the motion to dismiss the unjust enrichment

7  claims.  Oppo. 39-40 (relying on *In re Auto. Parts Antitrust Litig.*, Case. No. 12-mdl-02311, 2014

8  WL 2993742 (E.D. Mich. July 3, 2014)).

9          I find that defendants – in omitting substantive state-by-state analysis from their briefing

10  and asking the Court instead to conduct that analysis by reviewing a list of cases provided in

11  appendices – have not properly raised their arguments.  They may try again.   Defendants' motion

12  to dismiss the unjust enrichment claims based on the substantive elements of each relevant

13  jurisdiction's law is DENIED without prejudice to being raised in a subsequent motion.

14          **4.  Unjust Enrichment under California Law**

15          Finally, defendants move to dismiss the EPPs' unjust enrichment claim under California

16  law.  The EPPs recognize that courts are split on the question and characterize it as a "semantic"

17  issue of whether unjust enrichment can exist as a stand-alone claim or is merely an equitable

18  remedy.  Plaintiffs rely on *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Case No. 10-5625 SI, 2011

19  WL 4345435, at *4 (N.D. Cal. Sept. 15, 2011) where the court recognized the split of authority,

20  and held that since "plaintiffs have invoked a valid theory of recovery" the unjust enrichment

21  claim would be allowed to proceed "regardless of the precise label assigned to the cause of

22  action." *Id*. at 4.  However, following the decision by the California Court of Appeal in *Hill v. Roll*

23  *Int'l Co*rp., 195 Cal. App. 4th 1295, 1307 (2011), this Court and others in the Northern District

24  have expressly held that unjust enrichment is not an independent cause of action.  *See, e.g.*, *Ham v.*

25  *Hain Celestial Group, Inc*., Case No. 14-02044 WHO, 2014 U.S. Dist. LEXIS 141157, at *14

26  (N.D. Cal. Oct. 3, 2014) ("Unjust enrichment and quasi-contract are not independent causes of

27  action."); *World Surveillance Group Inc. v. La Jolla Cove Investors, Inc*., Case No. 13-03455

28  WHO, 2014 U.S. Dist. LEXIS 51464, at *4-5 (N.D. Cal. Apr. 11, 2014); *see also In re iPhone*

1  *Application Litig.*, Case No. 11-2250 LHK, 844 F. Supp. 2d 1040, 1075 (N.D. Cal. 2012)

2  ("Plaintiffs' unjust enrichment claim does not properly state an independent cause of action and

3  must be dismissed.").

4    The EPP claim for unjust enrichment under California law is DISMISSED with prejudice.

5                                    **CONCLUSION**

6    Defendants' motion to dismiss the DPPs' Section 1 Sherman Act claims is DENIED as to

7  Claim One (rule of reason) and GRANTED with prejudice as to Claim Two (*per se*).  The motion

8  to dismiss the DPPs' Section 2 Sherman Act claims (monopoly, attempt, and conspiracy to

9  monopolize) is GRANTED with leave to amend.

10    Defendants' motion to dismiss the EPP and GEHA claims regarding monopoly are

11  DISMISSED with leave to amend.  Defendants' motion to dismiss the EPP state law claims for

12  states where they have not alleged a sufficient connection (Alaska, District of Columbia, Hawaii,

13  Idaho, Iowa, Louisiana, Maryland, Michigan, Mississippi, Montana, Nebraska, New Mexico,

14  Oklahoma, Oregon, Puerto Rico, Utah, Vermont, Virginia, Washington, and Wyoming) is

15  GRANTED with leave to amend.  The EPP state law antitrust claims under the laws of Florida,

16  Illinois, Massachusetts, Puerto Rico, and Rhode Island are DISMISSED with prejudice.

17  Defendants' motion to dismiss the EPP state law antitrust claims based on insufficient allegations

18  is DENIED.

19    Defendants' motion to dismiss the EPP unjust enrichment claims under Alaska, California,

20  Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Kentucky, Louisiana,

21  Maryland, Massachusetts, Missouri, Montana, New Jersey, Oklahoma, Pennsylvania, Puerto Rico,

22  Rhode Island, South Carolina, Texas, Virginia, Washington, and Wyoming is GRANTED and

23  those claims are DISMISSED with prejudice.

24    The motion to dismiss the EPP unjust enrichment claims for the remaining states is

25  DENIED without prejudice.

26    The motion to dismiss GEHA's claims as to states other than Missouri is GRANTED with

27  leave to amend.  GEHA's consumer protection and unjust enrichment claims under Missouri law

28  are DISMISSED with prejudice.

United States District Court
Northern District of California

1         In the Order Following Case Management Hearing (Dkt. No. 47) I required the parties to

2    complete the Rule 26(f) conference within 14 days of issuing this ruling, and to file an updated

3    discovery plan and proposed case management order governing further proceedings within

4    fourteen days of the Rule 26(f) conference.  A further Case Management Conference is set for

5    3:30 p.m. on January 6, 2015 in Courtroom 2.

6

7         **IT IS SO ORDERED**.

8    Dated: November 17, 2014

9



10   _____

WILLIAM H. ORRICK
United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California