1

2

3
[Counsel listed on signature pages]

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| **In re LIDODERM ANTITRUST LITIGATION** | Case No. 14-md-02521-WHO |
| THIS DOCUMENT RELATES TO: <br><br> ALL DIRECT PURCHASER ACTIONS | **DIRECT PURCHASER PLAINTIFFS' SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Droguería Betances, Inc. ("Betances"), Rochester Drug Co-Operative, Inc. ("RDC"), American Sales Company, LLC ("ASC"), and Cesar Castillo, Inc. ("Castillo") (collectively, "Plaintiffs"), bring this class action on behalf of themselves and all others similarly situated against defendants Endo Pharmaceuticals Inc. ("Endo"), Teikoku Pharma USA ("Teikoku Pharma"), Teikoku Seiyaku Co. ("Teikoku Seiyaku") (collectively "Teikoku"), Watson Pharmaceuticals, Inc., and Actavis, plc, formerly known as Watson Pharmaceuticals, Inc., and Watson Laboratories, Inc. (collectively, "Watson") (together with Endo and Teikoku, the "Defendants") and allege as follows based on: (a) personal knowledge; (b) the investigation of their counsel; and (c) information and belief.

## I.     NATURE OF THE ACTION

1. This is a civil antitrust action brought by Plaintiffs on behalf of a class of direct purchasers of lidocaine patch 5%, sold by Endo under the brand name Lidoderm.  Lidoderm is a lidocaine-containing patch for the treatment of pain associated with post-herpetic neuralgia.  Plaintiffs seek overcharge damages arising out of Endo and Teikoku's unlawful agreement with Watson not to compete in the market for lidocaine patch 5%.

2. On May 28, 2012, Endo and Teikoku entered into an unlawful non-competition agreement with Watson.  Under the agreement (the "Reverse Payment Agreement" or "Agreement"), Watson agreed to delay marketing its less-expensive generic version of Lidoderm for almost 13 months, until September 15, 2013.  In exchange, Endo and Teikoku agreed to pay Watson — and did, in fact, pay Watson — (a) at least $96 million in the form of branded Lidoderm at no cost to Watson, which Watson could then resell (and did, in fact, resell) at that price; and (b) by forebearing from launching an authorized generic to compete with Watson's generic Lidoderm until 7½ months after Watson's generic belatedly entered the market, effectuating a

- 1 -

payment of hundreds of millions of dollars from Endo and Teikoku to Watson.  In compliance with the Agreement, even though Watson was granted final FDA approval to launch its less-expensive generic Lidoderm patch on August 23, 2012, Watson did not come to market until September 15, 2013, thirteen (13) months later.

3. But for Defendants' unlawful Reverse Payment Agreement, one or more generic versions of Lidoderm would have entered the market as early as August 23, 2012.  Thus, absent Defendants' unlawful Reverse Payment Agreement, Plaintiffs and the members of the class would have been able to satisfy their lidocaine patch 5% requirements at significantly lower prices substantially earlier than they did, rather than being forced to pay for brand and generic Lidoderm at higher prices because of the unlawful agreement.  Endo stated in its annual report that revenue from sales of Lidoderm was $825 million in 2011 and $947 million in 2012.

4. Defendants' unlawful Reverse Payment Agreement was designed to and did in fact: (i) delay and/or preclude the entry of less-expensive generic versions of lidocaine patch 5%; (ii) delay the introduction of an authorized generic lidocaine patch 5%, which otherwise would have appeared on the market at a significantly earlier time and lowered prices further; (iii) fix, raise, maintain or stabilize the prices of lidocaine patch 5% products; (iv) permit Endo to maintain a monopoly for lidocaine patch 5%; (v) allocate 100% of the lidocaine patch 5% market in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Endo for up to 13 months; and (vi) allocate 100% of generic lidocaine patch 5% sales in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Watson for 7½ months.

5. Defendants thus violated §§ 1 and 2 of the Sherman Act through their anticompetitive Reverse Payment Agreement, which unreasonably restrained competition in the market for lidocaine patch 5% and improperly maintained and

- 2 -

extended Endo's market and monopoly power by foreclosing or delaying competition from lower-priced generic versions of lidocaine patch 5%.

## II. JURISDICTION AND VENUE

6. This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover threefold damages, costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiffs and members of the class (defined below) resulting from Defendants' unlawful restraint of trade and maintenance of market and monopoly power in the market for lidocaine patch 5% in the United States, including its territories, possessions and the Commonwealth of Puerto Rico. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 15.

7. Defendants transact business within this district, and they carry out interstate trade and commerce in substantial part in this district and/or have an agent and/or can be found in this district. Defendant Teikoku Pharma has a principal place of business in this district. Venue is therefore appropriate within this district under section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) and (c).

## III. INTRADISTRICT ASSIGNMENT

8. Assignment to this division in this District is proper because the interstate trade and commerce involved and affected by the violations of the antitrust laws was and is carried out within this division, and this action has been transferred to this division by the Judicial Panel on Multi-District Litigation.

## IV. PARTIES

### A. Plaintiffs

9. Betances is a corporation organized under the laws of the Commonwealth of Puerto Rico and located at Ave. Luis Munoz Marin Esq. El Troche Final, Caguas, Puerto Rico 00725. During the Class period (defined below), Betances purchased

- 3 -

branded Lidoderm directly from Endo, and purchased generic Lidoderm directly from Watson, and was injured as a result of Defendants' unlawful conduct.

10.    RDC is a stock corporation duly formed and existing under the New York Cooperative Corporations Law, with its principal place of business located at 50 Jet View Drive, Rochester, New York 14624.  During the Class period, RDC purchased branded Lidoderm directly from Endo, and purchased generic Lidoderm directly from Watson, and was injured as a result of Defendants' unlawful conduct.

11.    ASC is a Delaware limited liability company with its principal place of business in Lancaster, Erie County, New York.  ASC brings this action on its own behalf and as an assignee of McKesson Corporation.  During the Class period, ASC purchased (a) branded Lidoderm directly from Anda Pharmaceuticals, Inc., a wholly-owned subsidiary of Watson; (b) branded Lidoderm from McKesson Corporation, which purchased directly from Endo; and (c) generic Lidoderm directly from Watson.  ASC was injured as a result of Defendants' unlawful conduct.

12.    Castillo is a corporation organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business located at Bo. Quebradas Arena, Rd. #1 Km. 26.0, Río Piedras, Puerto Rico, 00926.  During the Class period, Castillo purchased branded Lidoderm directly from Endo and was injured as a result of Defendants' unlawful conduct.

**B. Defendants**

13.    Endo is a Delaware corporation, having its principal place of business at 1400 Atwater Drive, Malvern, Pennsylvania, 19355.  Endo markets and sells Lidoderm throughout the United States.

14.    Teikoku Seiyaku is a company organized and existing under the laws of Japan, having its principal place of business in Higashikagawa, Kagawa, Japan. Teikoku Seiyaku is the owner, assignee or licensee of U.S. Patent No. 5,827,529 (the

- 4 -

"'529 patent") over which Endo and Teikoku sued Watson.  Teikoku Seiyaku manufactures Lidoderm in Japan for commercial sale in the United States by Endo under a Manufacturing and Supply Agreement with Endo.  Endo pays Teikoku Seiyaku royalties under that agreement.  Teikoku Seiyaku does not sell Lidoderm to purchasers in the United States.

15.     Teikoku Pharma is a California corporation, having its principal place of business at 1718 Ringwood Avenue, San Jose, California, 95131.  Teikoku Pharma is a wholly-owned subsidiary of Teikoku Seiyaku, and is the holder of the New Drug Application for Lidoderm.  Under the Manufacturing and Supply Agreement, Teikoku Pharma supplies Endo with the Lidoderm manufactured by Teikoku Seiyaku for commercial sale by Endo in the United States.  Endo shared its monopoly profits with Teikoku Pharma by paying it royalties and certain per-unit acquisition costs under that agreement, as amended.  Teikoku Pharma does not sell Lidoderm to purchasers in the United States.

16.     Actavis, plc is incorporated under the laws of Ireland, having its principal place of business at 1 Grand Canal Square, Docklands Dublin 2, Ireland.  Actavis, plc also has a place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey, 07054.

17.     Defendant Watson Pharmaceuticals, Inc. was a Nevada corporation, having its principal place of business at 311 Bonnie Circle, Corona, California, 92880.  As a result of Watson Pharmaceuticals, Inc.'s acquisition of Actavis Group in or around October 2012, effective on or about January 24, 2013, Watson Pharmaceuticals, Inc. changed its name to Actavis, Inc.  Actavis, Inc. changed its name to Actavis, plc on or about October 1, 2013.

18.     Defendant Watson Laboratories, Inc. is a Nevada corporation, having its principal place of business at Morris Corporate Center III, 400 Interpace Parkway,

- 5 -

Parsippany, New Jersey 07054.  Defendant Watson Laboratories, Inc. was a wholly-owned subsidiary of Watson Pharmaceuticals, Inc. and is now a subsidiary of Actavis, plc.

19.    Watson was and is engaged in marketing, production and distribution of generic pharmaceutical products, including through its wholly-owned wholesaler affiliates including Anda, Inc., Anda Pharmaceuticals, Inc., and Valmed Pharmaceuticals, Inc.

20.    All of Defendants' actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

21.    With respect to all of the conduct complained of below, at all relevant times Endo acted in concert with Teikoku Pharma and Teikoku Seiyaku.  Moreover, Endo, Teikoku Pharma, and Teikoku Seiyaku each signed the Reverse Payment Agreement with Watson.  Furthermore, Endo, Teikoku Pharma, and Teikoku Seiyaku at all relevant times acted in concert with respect to the material provisions and performance of the Reverse Payment Agreement, which refers to Endo, Teikoku Pharma, and Teikoku Seiyaku collectively in provisions relating to the grant of patent licenses to Watson, the agreement not to launch a competing authorized generic for 7½ months, and the obligation to deliver free brand Lidoderm product to pay Watson.  On information and belief, Endo, Teikoku Pharma, and Teikoku Seiyaku are involved in a marketing enterprise that covers the distribution and marketing of Lidoderm in the United States.

- 6 -

## V.    CLASS ACTION ALLEGATIONS

22.    Plaintiffs bring this action on behalf of themselves and, under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, as representatives of a Class defined as follows:

> All persons or entities in the United States, including its territories, possessions, and the Commowealth of Puerto Rico, who purchased brand or generic Lidoderm directly from any of the Defendants at any time during the period August 23, 2012 through the date on which the anticompetitive effects of Defendants' challenged conduct cease (the "Class").

Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities.

23.    Joinder of the members of the Class is impracticable.  Plaintiffs believe the Class members are numerous and widely dispersed throughout the United States and its territories, possessions and the Commonwealth of Puerto Rico.  Further, the Class is readily identifiable from information and records in the possession of Defendants.  Direct notice to the members of the Class can be made upon obtaining the relevant information and records in the possession of Defendants.

24.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, they paid artificially inflated prices for lidocaine patch 5% and were deprived of the benefits of competition from less-expensive generic versions of Lidoderm as a result of Defendants' wrongful conduct.

25.    Plaintiffs will fairly and adequately protect and represent the interests of the Class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

26.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, and have particular experience with class action antitrust litigation in the pharmaceutical industry.

27.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

28.     Questions of law and fact common to the Class include:

a.      Whether the pay-for-delay conduct alleged herein constitutes a violation of the antitrust laws;

b.      whether Defendants conspired to suppress generic competition to Lidoderm;

c.      whether, pursuant to the Agreement, Watson agreed to, and did, delay its entry into the market with generic Lidoderm;

d.      whether, pursuant to the Agreement, Endo and Teikoku made payments to Watson, and the amounts of each payment;

e.      whether payments Endo and Teikoku made to Watson were for a purpose other than delaying Watson's entry into the market for lidocaine patch 5%;

f.      whether there are legitimate procompetitive justifications explaining Endo andTeikoku's payments to Watson, such as being merely for avoided litigation costs or for services Watson was to perform for Endo and Teikoku;

g.      whether Defendants' Agreement suppressed generic competition to Lidoderm;

- 8 -

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

h.  whether Defendants' Agreement harmed competition in the lidocaine patch 5% market;

i.  whether Defendants conspired or attempted to maintain Endo's market and/or monopoly power in the lidocaine patch 5% market;

j.  whether Endo possessed market and/or monopoly power in the market for lidocaine patch 5%;

k.  to the extent a relevant market or markets must be defined, what that definition is or those definitions are;

l.  whether the activities of Defendants as alleged herein have substantially affected interstate commerce;

m.  whether, and to what extent, Defendants' challenged conduct caused antitrust injury to the business or property of Plaintiffs and the members of the Class in the nature of overcharges; and

n.  the quantum of overcharges paid by the Class in the aggregate.

29.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy because, in addition to other benefits, such treatment will permit a large number of similarly situated persons to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining overcharge damages for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

30.  Plaintiffs know of no difficulty to be encountered in the maintenance of this action as a class action that would preclude its maintenance as a class action.

- 9 -

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

## VI.   REGULATORY BACKGROUND

### A.   The Regulatory Structure for Approval of Generic Drugs

31.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), a manufacturer who creates a new drug must obtain the approval of FDA to sell the new drug by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include submission of specific data concerning the safety and effectiveness of the drug, as well as information on applicable patents. 21 U.S.C. §§ 355(a), (b).

32.     When FDA approves a brand manufacturer's NDA, the brand manufacturer may list in the FDA's book of Approved Drug Products with Therapeutic Equivalence Evaluations (called the "Orange Book") any patent that claims either the approved drug or approved methods of use of the drug and could reasonably be asserted against a generic manufacturer who makes, uses, or sells a generic version of the brand drug prior to the expiration of the listed patent(s). Patents issued after NDA approval may be listed in the Orange Book within 30 days of issuance. 21 U.S.C. §§ 355(b)(1) & (c)(2).

33.     FDA relies completely on the brand manufacturer's truthfulness about patent validity and applicability, as it does not have the resources or authority to verify the manufacturer's patents for accuracy or trustworthiness. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

#### 1.   The Hatch-Waxman Amendments

34.     The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's NDA, and must show that the

- 10 -

generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug — that is, that the generic drug is both pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. *See generally* 21 U.S.C. §355(j) *et seq.*

35.     The FDCA and Hatch-Waxman Amendments operate on the principle that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another.  Bioequivalence demonstrates that the active ingredient of the proposed generic drug is absorbed at the site of drug action to the same extent and for the same amount of time as the brand counterpart.  21 U.S.C. § 355(j)(8)(B).  Thus, a generic drug is identical to a brand name drug in dosage form, safety, strength, route of administration, and intended use.

36.     Generic drugs that are therapeutically equivalent to their brand counterparts are given an "AB" rating by FDA, allowing their substitution for the brand when a prescription for the brand is presented at the pharmacy.

37.     Congress enacted the Hatch-Waxman Amendments to expedite the entry of generic competitors, thereby reducing healthcare expenses nationwide.  Congress also sought to protect pharmaceutical companies' financial incentives to create new and innovative products.

38.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic revenues for brand name pharmaceutical companies.  In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, prescription drug revenue for

- 11 -

brand and generic drugs totaled $21.6 billion, with generic drugs accounting for 18.6% of total prescriptions.  By 2013, total prescription drug revenue had climbed to more than $329.2 billion, with generic drugs accounting for 84% of prescriptions.  *See* IMS INSTITUTE FOR HEALTHCARE INFORMATICS, MEDICINE USE AND SHIFTING COSTS OF HEALTHCARE, at 30, 51 (Apr. 2014), *available at* http://www.imshealth.com/cds/imshealth/Global/Content/ Corporate/IMS%20Health%20Institute/Reports/Secure/IIHI_US_Use_of_Meds_for_2 013.pdf (last accessed June 2, 2014).

### 2.     Paragraph IV Certifications

39.     To obtain FDA approval of an ANDA, a generic manufacturer must certify that the generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book as claimed by the brand drug.  Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

a.     that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

b.     that the patent for the brand drug has expired (a "Paragraph II certification");

c.     that the patent for the brand drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III certification"); or

d.     that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

40.     If a generic manufacturer files a Paragraph IV certification that the listed patent is invalid or will not be infringed, it must promptly give notice to the brand manufacturer.  The filing of an ANDA with a Paragraph IV certification gives rise to a cause of action for patent infringement regardless of the merits of such an action.  If

the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), FDA will not grant final approval to the ANDA until the earlier of (a) the passage of thirty months (the "30-month stay"), or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.  Until one of those conditions occurs, FDA may grant "tentative approval," but cannot grant final approval to authorize the generic manufacturer to go to market with its product.  Accordingly, the timely filing of an infringement action provides the patent owner with the equivalent of an automatic preliminary injunction preventing final FDA approval of the challenged ANDA for up to 30 months, even if there is no merit to the infringement action.

41.    As an incentive to spur generic companies to seek approval of generic alternatives to brand drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV certification typically gets a period of protection from competition from other generic versions of the drug.  The first generic applicant often receives 180 days of market exclusivity, meaning that FDA will not approve any other ANDA for that same generic drug for at least six months.  This allows the first filer to be free from competition from other generic companies for at least six months.  However, the brand company is free to (and often does) launch its own "authorized generic" during the 180 day exclusivity period.

**B.    Generic Versions of Brand Drugs are Significantly Less Expensive than Their Corresponding Brand Versions.**

42.    Typically, AB-rated generics are priced significantly below their brand counterparts.  "Although generic drugs are chemically identical to their branded counterparts, they are typically sold at substantial discounts from the branded price.  According to the Congressional Budget Office, generic drugs save consumers an

- 13 -

estimated $8 to $10 billion a year at retail pharmacies.  Even more billions are saved when hospitals use generics.'"  *See* http://www.fda.gov/Drugs/ ResourcesForYou/Consumers/BuyingUsingMedicineSafely/UnderstandingGenericDr ugs/ucm144456.htm.

    **1.    Generic Versions of Brand Drugs Quickly and Predictably Take Sales from Their Corresponding Brand Versions**

43.    In every state, pharmacists are permitted (and in some states, required) to substitute a generically-equivalent product for the brand product prescribed, unless the doctor has indicated that the prescription for the brand product must be "dispensed as written."  Because of the significant savings they allow and other institutional features of the pharmaceutical industry, generic versions are substituted by pharmacists who are presented with a prescription for the brand counterpart immediately upon launch of the generic.

44.    As more generic sellers enter the market, prices for generic versions of a drug predictably decrease even further because of competition among the generic sellers.  Pharmacy substitution, and thus the loss of sales volume by the brand drug to the corresponding generic, thereby accelerates.  According to a recent FTC staff study, within one year of generic entry, 90% of prescriptions are filled with the brand's generic substitute, and at prices that "are, on average, 85% lower than the pre-entry branded drug price."  "*Pay for Delay: How Drug Company Pay-Offs Cost Consumers Billions*," FTC Staff, January 2010 at 8.

45.    Generic competition enables all members of the proposed Class to: (a) purchase generic versions of the drug at substantially lower prices; or (b) purchase the brand drug at a reduced price.

46.    Until a generic manufacturer enters the market, there is no generic drug to substitute for and otherwise compete with the brand drug, thereby allowing the brand manufacturer to continue to charge supracompetitive prices profitably, without losing

- 14 -

a substantial portion of its brand sales.  Consequently, brand manufacturers have a strong incentive to delay the introduction of generic competition into the market, including paying generic companies to delay launching their generic products, such as in this case.  For Endo and Teikoku, that incentive was particularly strong:  in 2012, Lidoderm accounted for 31% of Endo's revenues and resulted in payments of approximately $235 million from Endo to Teikoku.

### 2. No-Authorized-Generic Promises Are a Means By Which Brand Companies Pay Generic Companies to Delay Generic Competition

47.     One mechanism employed by brand companies to thwart generic competition is to make a payment to a first-filing generic company in the form of the brand company's promise not to launch an "authorized generic" version of the brand drug during the first 180 days of generic marketing (and sometimes longer).  An authorized generic is the brand drug, manufactured just like the brand product, but sold as a generic product under the same approval as the brand product's original NDA.  Because the brand manufacturer already has approval to sell its brand drug, it does not need to file an ANDA, or obtain any additional approval, to market an identical generic version of its own brand drug.  ANDA filers have no patents on, and no right to be free from, an authorized generic version of the brand drug.

48.     For the brand company, an authorized generic launched during the first 180 days of generic marketing (or longer) provides a low cost, low risk means to regain some of the revenue lost from the termination of brand exclusivity.  For the generic manufacturer enjoying exclusivity as the first generic to be marketed, however, an authorized generic launch has a huge negative impact on its revenue.  A generic company generally earns about 80% of its total income from a given generic product during the period that it is the sole generic on the market.  An authorized generic, when launched during that time, is typically priced competitively as against the other generics, and will capture 50% or more of total generic sales during that

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

period.  A brand's promise not to launch an authorized generic during the initial period of generic marketing is thus a very valuable payment to the generic company that is the first-filer generic entrant.  It doubles the first-filer generic entrant's sales volume during that time, and, because it removes a source of price competition from the market, it more than doubles the first-filer generic entrant's revenues and profits.  Correspondingly, a brand's promise not to launch an authorized generic represents a substantial sacrifice of the revenues and profits that the authorized generic would otherwise have created for the brand.  Those revenues and profits are instead ceded, by way of the no-authorized-generic promise, to the generic company.

49.    In a report by the Federal Trade Commission ("FTC") issued at the request of Congress in 2011 entitled *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* ("*Authorized Generic Drugs*"), the FTC concluded that no-authorized-generic promises are being used as a payment by brands to generics for delayed generic entry.  The FTC analyzed documents and empirical data covering more than 100 companies and found that the presence of authorized generic competition reduces the first-filer generic's revenues by more than 50% during the first 180 days of generic marketing.  *Authorized Generic Drugs* at iii, vi, 41-48, 57-59, available at http://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf.

50.    The FTC found that a generic company makes significantly less money when it competes with an authorized generic because (1) the authorized generic takes a significant share of generic sales away from the first-filer (around 50%), and (2) wholesale and retail prices decrease when the first-filer faces an authorized generic due to competition between the two.  Both of these factors reduce the generic

- 16 -

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

company's sales and revenues.  With a no-authorized-generic promise, the generic company avoids this reduction in revenue.  The FTC noted that "there is strong evidence that agreements not to compete with an authorized generic have become a way for brand-name companies to compensate generic competitors for delaying entry.  These agreements can be part of 'pay-for-delay' patent settlements, which have long concerned the Commission."  *See id.* at vi.

51.    A 2006 study sponsored by the brand drug company trade association, PhRMA, similarly found that competition from an authorized generic results in lower generic prices.

52.    An agreement between a brand and generic drug company — horizontal competitors — that the brand company will withhold an authorized generic from the market in exchange for the generic company's agreement to delay market entry with its generic version of the brand drug, injures consumers twice over:  first, by prolonging the period during which only the high-priced brand is available, and second, by ensuring that, once delayed generic competition begins, generic prices are artificially inflated because of the absence of the authorized generic.

53.    For a first-filer generic like Watson, of a brand product like Lidoderm, the difference between (1) selling the only generic product and (2) selling a generic product while competing against an authorized generic, for the first months of generic marketing, constitutes a very large payment — reaching hundreds of millions of dollars.  These economic realities are well known in the pharmaceutical industry, and the FTC's authorized generic report cites numerous documents from industry participants confirming the financial impact of an authorized generic and, by necessary implication, its absence.

54.    No-authorized-generic promises like the one Endo and Teikoku made as payment in exchange for Watson's promise to delay introduction of generic Lidoderm

- 17 -

thus allow horizontal competitors to benefit from an agreement not to compete and deny purchasers the consumer surplus that should flow to them from increased competition.

## VII.   FACTUAL ALLEGATIONS

### A.   Background

#### 1.   Approval of Brand Lidoderm and its Purported Patent Protection

55.    Lidoderm is a prescription lidocaine-containing patch approved to treat pain associated with post-herpetic neuralgia.  The active ingredient in Lidoderm is 5% lidocaine.  While other drugs are available to treat the same or similar medical conditions, they are not AB-rated to Lidoderm, cannot be automatically substituted for Lidoderm by pharmacists, do not exhibit substantial cross-price elasticity of demand with respect to Lidoderm, and are not economic substitutes for, nor reasonably interchangeable with, Lidoderm.

##### a.   Initial Approval of Lidoderm

56.    On March 19, 1999, FDA approved NDA 200612, submitted by Hind Health Care, Inc. ("Hind"), which sought to market an adhesive patch containing 5% lidocaine under the brand name Lidoderm.  Lidoderm was awarded Orphan Drug Exclusivity by FDA, meaning that no generic competitor could get FDA approval to market a generic Lidoderm product until March 2006.

57.     In 1998, Hind granted to Endo the exclusive right to market and distribute Lidoderm in the United States.  Hind subsequently transferred full ownership of and responsibility for the Lidoderm NDA to Teikoku, effective June 1, 1999.  Teikoku then granted Endo the exclusive right to market and distribute the Lidoderm patch in the United States under Teikoku's NDA, and Endo launched Lidoderm in the United States in 1999.

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.      Endo and Teikoku's Acquisition of Lidoderm Patents

58.     Endo and Teikoku owned or obtained assignments of or licenses to a number of patents associated with Lidoderm.  Subsequently, Teikoku listed several patents in the Orange Book as covering Lidoderm.  As of January 2010 (after Watson had filed ANDA No. 200675, the first ANDA filed as to Lidoderm), Teikoku had three patents listed in the Orange Book.  By agreement with Teikoku, Endo had the sole and exclusive right to institute, prosecute, and control any lawsuits alleging infringement of any Orange Book-listed patents covering Lidoderm, and Teikoku was required to assign any such infringement claims to Endo.

59.     The first was U.S. Patent No. 5,411,738 (the "'738 patent"), which is a method of use patent for treating certain types of pain with lidocaine using a topical delivery mechanism and a gel formulation of lidocaine.  The second was U.S. Patent No. 5,601,838 ("the '838 patent"), which is a method of use patent for treating certain types of pain with lidocaine.  The '738 and '838 patents both were assigned to Hind, both expired on May 2, 2012, and are referred to collectively as the "Hind patents."

60.     The third patent that Teikoku listed in the Orange Book as covering Lidoderm was U.S. Patent No. 5,827,529 (the "'529 patent"), which is a formulation patent for a lidocaine patch.  This patent was assigned to Teikoku, and is set to expire on October 17, 2015.  Endo is the exclusive licensee of the '529 patent.

61.     The '529 patent, titled "External Preparation for Application to the Skin Containing Lidocaine," issued on October 27, 1998, from an application filed on June 10, 1994.  That application was a continuation of an application filed on March 30, 1992.

62.     The '529 patent claims foreign priority to Japanese Application No. 3-067353, filed March 30, 1991.

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

63.     The '529 patent contains six claims directed generally to a hydrogel transdermal patch containing the active ingredient lidocaine and inactive ingredients or excipients.

64.     Claim 1 of the '529 patent claims a patch comprising "a drug-retaining layer placed on a support," in which the drug-retaining layer comprises an "adhesive gel base and 1 to 10% by weight of lidocaine."  The claimed "adhesive gel base" consists of three components within specific percentage weight ranges:  (i) "0.5 to 50% by weight of a water-soluble high molecular weight substance"; (ii) "30 to 70% by weight of water"; and (iii) "1 to 70% by weight of a water-retaining agent."

### c.     Endo and Teikoku Seek to Bolster Lidoderm's Patent Coverage

65.     Endo subsequently obtained additional patents from LecTec Corporation ("LecTec") that it and Teikoku claim cover Lidoderm.  In July 2008, LecTec had filed patent infringement litigation against Endo and other manufacturers of medicinal patch products in the United States District Court for the Eastern District of Texas (the "LecTec Litigation") over U.S. Patent No. 5,536,263 (the "'263 patent"), and U.S. Patent No. 5,741,510 (the "'510 patent"), both of which are patents for a medicinal adhesive patch.  Each of these patents expired on March 30, 2014.

66.      Endo settled the litigation with LecTec in November 2009, paying LecTec $23 million in exchange for exclusive licenses to the '263 and the '510 patents for use in the field of prescription pain medications and treatment.

67.      Almost a year later, in or about October 2010, Endo granted Teikoku a sublicense under the '510 patent to make and sell prescription pain medications that contain 5% lidocaine in patch dosage form, including Lidoderm.

68.      In or about November 2010, Teikoku submitted the '510 patent to FDA for listing in the Orange Book with respect to Lidoderm.

- 20 -

69.     As of January 2011, Endo and Teikoku had four patents listed in the Orange Book related to Lidoderm:  the two Hind patents (which expired in May 2012), the '529 patent, and the '510 patent.

70.     In or about May 2011, in exchange for $2 million, Endo acquired from LecTec full title to the '263 patent, the '510 patent and three other patents.  The three other patents were U.S. Patent No. 6,096,333 (the "'333 patent"), (ii) U.S. Patent No. 6,096,334 (the "'334 patent"); and (iii) U.S. Patent No. 6,361,790 (the "'790 patent") (collectively with the '263 and the '510 patents, "the Rolf patents," named for one of the inventors).  These three patents all cover methods of formulating a medicinal adhesive patch and expired on March 30, 2014.  Other than the '510 patent, none of the Rolf patents was listed in the Orange Book with respect to Lidoderm.

## 2.     Watson's ANDA Threatens Endo and Teikoku's Weak Patents

71.     On November 13, 2009, Watson submitted ANDA No. 200675 to FDA, seeking to market a generic version of Lidoderm.  On or about January 14, 2010, Watson notified Teikoku of its November 13, 2009 ANDA filing.

72.     Watson's notice letter included a Paragraph IV certification that the commercial manufacture, use and/or sale of its generic Lidoderm product would not infringe any claim of the '529 patent, and/or that the '529 patent was invalid and/or unenforceable.  Watson was the first generic manufacturer to file an ANDA with a Paragraph IV certification with respect to Lidoderm, potentially entitling it to a six-month exclusivity period, free from competition from any other ANDA-filing generic company.  This exclusivity, however, would not have protected Watson from competition from an authorized generic version of Lidoderm.

73.     Watson did not submit Paragraph IV certifications as to the Hind patents, which were to expire on May 2, 2012.  As a result, FDA could not approve Watson's ANDA for generic Lidoderm until the Hind patents expired on May 2, 2012.

- 21 -

74.     Watson made no certification to any of the Rolf patents because the Rolf patents were not listed in the Orange Book until November 2010, a year after Watson filed its ANDA.

75.     FDA granted final approval to Watson's ANDA on August 23, 2012, but Watson did not launch its approved generic Lidoderm product until September 16, 2013, because of the unlawful Reverse Payment Agreement with Endo and Teikoku. No patents asserted, or capable of being asserted, by Endo and Teikoku would or could have prevented Watson from launching its approved generic Lidoderm product.

**3.      Endo and Teikoku Scramble to Protect Their Franchise**

76.     On February 19, 2010, Endo and Teikoku sued Watson in the United States District Court for the District of Delaware (*Endo Pharm. Inc., et al., v. Watson Labs., Inc.*, Civil Action No. 10-cv-00138-GMS), alleging that Watson's generic Lidoderm infringed the '529 patent (the "'529 Litigation").  As a result of the filing of the '529 Litigation, a 30-month Hatch-Waxman stay of FDA approval applied to Watson's ANDA, which precluded FDA from approving Watson's ANDA until (i) that stay expired in mid-July of 2012, or (ii) entry of a final judgment that the '529 patent was invalid, unenforceable, and/or not infringed.

77.     Watson raised numerous defenses, including that the '529 patent was invalid and/or unenforceable.

78.     As the '529 Litigation moved toward trial, Endo filed yet another suit against Watson, this time using the Rolf patents.  On or about June 29, 2011, Endo filed suit against Watson in the United States District Court for the District of Delaware (*Endo Pharm. Inc. v. Watson Labs., Inc.,* Civil Action No. 11-cv-00575-GMS) (the "Rolf Patent Litigation"), alleging that Watson's generic Lidoderm product would infringe three of the Rolf patents – the '333 patent, the '334 patent, and the '510 patent.  Only the '510 patent had been listed in the Orange Book.  Because the

- 22 -

Rolf patents had not been listed in the Orange Book when Watson filed its ANDA, the Rolf Patent litigation did not result in a 30-month Hatch-Waxman stay.

### a.   The '529 Litigation Exposed the Weakness of Endo and Teikoku's '529 Patent

79.   After the June 27, 2011 *Markman* hearing in the '529 Litigation, Judge Sleet rejected Endo's claim construction position, strengthening Watson's defense to Endo and Teikoku's infringement claims.  The '529 Litigation then proceeded to a bench trial in February 2012, in which Watson presented evidence of the invalidity of the '529 patent, as well as evidence that Watson's generic did not infringe the patent. The evidence at trial was overwhelmingly in favor of Watson, exposing the '529 patent to a determination that it was invalid or unenforceable and that the patent did not cover either the brand product or Watson's generic product.

### (1)   The '529 Patent Was Invalid

80.   The evidence developed during the '529 Litigation revealed that the same hydrogel transdermal patch technology claimed in the '529 patent had previously been disclosed in multiple pieces of prior art that were not disclosed to the patent examiner, but were well known to Endo and/or Teikoku (the "Teikoku Prior Art").  Each of the pieces of Teikoku Prior Art discloses a hydrogel transdermal patch formulation substantially similar to that claimed in the '529 patent.

81.   Each piece of the Teikoku Prior Art discloses an "adhesive gel base" consisting of (i) a water-soluble high molecular weight substance; (ii) water; and (iii) a water-retaining agent, all of which fall within the percentage ranges claimed in the '529 patent.  Each shares at least one inventor with the '529 patent, and also shares the same applicant, prosecuting attorneys, or assignee with the '529 patent.

82.   During the prosecution of the '529 patent, the PTO rejected the patent four times, noting that because lidocaine was conventionally used in transdermal patches, it would have been obvious to place lidocaine into available prior art patches.

- 23 -

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

The applicants consistently distinguished other prior art patches cited by the Examiner, arguing that the patch in the '529 patent was "unique."  The applicants never disclosed the Teikoku Prior Art to the PTO, or a prior art patent with the same elements as the '529 patent, which would have showed that the patch technology in the '529 patent was not unique, and in fact had been previously patented.  The PTO never cited the Teikoku Prior Art.

83.     Each of these prior art references is prior art to the '529 patent because each was publicly available and accessible more than one year before the March 30, 1991 priority date of the '529 patent.  Each of the prior art references predates the priority date of the '529 patent by over a year, and thus invalidates the '529 patent. The '529 patent was not capable of preventing Watson from launching its approved generic Lidoderm product.

### (2)     The '529 Patent Was Not Infringed

84.     In addition to being invalid, the '529 patent did not cover Lidoderm and was not infringed by Watson's generic equivalent.  The patch formulation disclosed in the '529 patent included a water-soluble high-molecular-weight substance, water, and a water-retaining agent.  The water-soluble high-molecular-weight substance and the water-retaining agent must be from the groups listed in the patent.  The groups listed in the '529 patent are known as Markush groups.  "A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form:  a member selected from the group consisting of A, B, and C."  *Endo Pharm. Inc., et al., v. Watson Labs., Inc.*, slip op. at 1 n.1, No. 10-138 (GMS) (D. Del. June 27, 2011) (*quoting Abbott Labs. v. Baxter Pharm. Prods.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003)).

85.     In the '529 patent, the first Markush group related to "a water-soluble high molecular weight substance selected from the group consisting of gelatin, starch, agar, mannan, alginic acid, polyacrylic acid, a salt of polyacrylic acid, dextrin,

- 24 -

methylcellulose, methylcellulose sodium, carboxymethylcellulose, carboxymethylcellulose sodium, polyvinyl alcohol, polyvinyl pyrrolidone, copolymer of methyl vinyl ether and maleic anhydride, gum arabic, tragacanth, karaya gum and locust bean gum."

86.    The second Markush group related to "a water-retaining agent selected from the group consisting of ethylene glycol, diethylene glycol, polyethylene glycol, glycerin, sorbitol, martitol, propylene glycol and 1,3-butylene glycol."

87.    As the District Court held in its *Markman* decision construing those two patent terms, Federal Circuit precedent from 2003 clearly established that both of the relevant Markush groups in the '529 patent were limited to one and only one of the listed alternatives.  *Endo Pharm. Inc., et al., v. Watson Lab., Inc.,* slip op. at 1 n.1-2. Under Federal Circuit precedent, the patent must be interpreted to cover a product which contains only *one* of the substances from each of the two Markush groups.

88.    Watson's generic Lidoderm product contained at least *four* water-soluble high-molecular-weight substances, and *three* water-retaining agents.  (So does Lidoderm.)  Thus, it did not infringe the '529 patent because it contained more than one substance from each Markush group.  As a result, Watson's generic Lidoderm product did not infringe the '529 patent.  The '529 patent was not capable of preventing Watson from launching its approved generic Lidoderm product.

### b.    The Rolf Patent Litigation

89.    The Rolf patents afforded Endo and Teikoku no basis to prevent Watson from launching its approved generic Lidoderm product, either.  Endo sued Watson only on some of the Rolf patents (the '510, '333, and '334 patents).  Watson had raised defenses and counterclaims alleging those patents were invalid and/or unenforceable and that its product did not infringe them.  Endo and Teikoku did not even bother to sue Watson on the '263 patent.  The Rolf Patent Litigation barely

- 25 -

proceeded past the pleading stage. The Rolf patents posed no reasonable risk to Watson of patent infringement liability.

90.     Of the Rolf patents, only the '510 patent had been asserted by its previous owner, LecTec, against Endo with respect to its Lidoderm product in the LecTec Litigation in 2008. As Endo and Teikoku learned from the LecTec Litigation, the '510 patent was subject to a strong invalidity challenge. The '510 patent was invalid as obvious in view of prior art references that were not submitted to the PTO during the prosecution of the '510 patent. Watson, too, was aware of the infirmities of the '510 patent from the publicly filed pleadings in the LecTec Litigation. The '510 patent was incapable of preventing Watson from launching its approved generic Lidoderm product.

91.     The '333 and '334 patents were also not infringed by Watson. Indeed, during the LecTec litigation, LecTec had not even sued Endo for infringement of the '333 and '334 patents with respect to Lidoderm. When Endo ultimately settled the LecTec Litigation in November 2009, it obtained licenses only to the '263 and '510 patents, further demonstrating that licenses to the '333 and '334 patents were irrelevant to the use, manufacture, or sale of Lidoderm. Watson's generic patch, a copy of the Endo patch, similarly would not infringe the '333 and '334 patents.

92.     Indeed, Endo did not bother to obtain the rights to the '333 and '334 patents until May 2011, when it bought the rights to all of the Rolf patents from LecTec for just $2 million, still further evidence that those patents were incapable of preventing Watson from launching its approved generic Lidoderm product. None of the Rolf patents was capable of preventing Watson from launching its approved generic Lidoderm product.

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

## B.     Endo and Teikoku Enter the Unlawful Reverse Payment Agreement with Watson

93.     On or about May 28, 2012 — after the February 2012 bench trial and as Endo,Teikoku and Watson were awaiting a decision from Judge Sleet — Endo and Teikoku entered into an agreement with Watson ending the patent litigation related to Lidoderm.  The Reverse Payment Agreement ended the '529 Litigation and the Rolf Patent Litigation, and obviated the need for Judge Sleet to render decisions on the validity, enforceability, and infringement of the patents Endo and Teikoku had asserted against Watson.

94.     Under the Agreement, Watson agreed to delay launching its generic Lidoderm product until a "Start Date" of September 15, 2013 unless before that date another generic product launched (a virtual impossibility) or Watson faced forfeiture of its 180-day exclusivity for failing to go to market (also a virtual impossibility).  The Agreement specifically provides:

> Subject to Section 2(d), Watson agrees, on behalf of itself and its Affiliates, that, prior to the Start Date, it and its Affiliates shall not directly or indirectly market, offer to sell, sell, have sold, import, manufacture or have manufactured in the Territory any of Watson's Generic Product.  Watson acknowledges and agrees that each of Endo and Teikoku would be irreparably harmed should Watson breach this Section 2(e). Nothing in this Agreement shall prohibit or preclude Watson from exercising its rights under 35 U.S.C. § 271(e)(1). [Settlement Agreement at Section 2(e).]
>
> ***
>
> "Start Date" means the earliest of: (i) September 15, 2013; (ii) the date of Launch of any Generic Product other than Watson's Generic Product; or (iii) the last day before Watson would forfeit its 180-day generic drug exclusivity with respect to Watson's Generic Product due to the operation of 21 U.S.C. 355(j)(5)(D)(ii) as a result of a forfeiture event under 21 U.S.C. 355(j)(5)(D)(i)(I). [*Id.* at Section 1(v).]

95.    As one *quid pro quo* for Watson's promise to delay entry of its generic Lidoderm product until September 15, 2013, Endo and Teikoku promised to share with Watson the monopoly profits Endo would reap (and share with Teikoku) from Lidoderm's extended market exclusivity by paying Watson at least $96 million (in the form of brand Lidoderm provided by Endo and/or Teikoku at no cost to Watson) at the rate of $12 million per month from January 1, 2013 through August 1, 2013.  Watson was free to sell the brand Lidoderm product and retain the full proceeds of those sales. This payment was no different than if Endo had made those sales itself and then Endo and Teikoku paid Watson their respective portions of the $96 million in cash.  The Agreement specifically provides:

> Endo/Teikoku shall provide, <u>at no cost</u>, to Watson's Wholesaler Affiliate Brand Product of value totaling <u>twelve million dollars ($12,000,000) per month</u>, as measured at the time of each delivery by the then-prevailing Wholesale Acquisition Cost as defined in the Red Book or, if the Red Book is not available, any other comparable U.S. price listing ("WAC"), on the first business day of each month beginning January 1, 2013 and ending August 1, 2013 <u>(for a total of eight (8) months)</u> for Watson's Wholesaler Affiliate's disposal as provided in Section 3(e). Endo shall provide to Watson's Wholesaler Affiliate an invoice with respect to such Brand Product, which invoice shall reflect the transfer of Brand Product to Watson's Wholesaler Affiliate at no cost. Notwithstanding the foregoing, Endo/Teikoku's obligations under this Section 3(b) shall terminate immediately upon the Launch of any Third Party Generic Product in the Territory. The Brand Product provided to Watson's Wholesaler Affiliate by Endo/Teikoku shall have the same NDC number as the Brand Product sold by Endo. In any month in which Endo/Teikoku has provided to Watson's Wholesaler Affiliate any Brand Product under this Section 3(b), and in which a Third Party has Launched a Generic Product in the Territory, Watson shall either (i) return to Endo a pro rata quantity of the Brand Product delivered by Endo/Teikoku during such month, or (ii) reimburse Endo in cash for the value of the Brand Product (based on the WAC measured at the time of delivery by Endo/Teikoku to Watson's Wholesaler Affiliate), in either case for the pro rata portion of the month on and after such Launch[.] * * * Such return or reimbursement shall be made by Watson to Endo within five (5) business days of the date of the Launch of a Generic Product in the Territory. [Settlement Agreement at Section 3(b) (emphasis added).]

> ***

> The Brand Product supplied by Endo/Teikoku to Watson's Wholesaler Affiliate under Sections 3(b) through (d) may be resold solely by Watson's Wholesaler Affiliate to Third Parties for use solely in the

- 28 -

Territory on pricing and other terms determined by Watson's Wholesaler Affiliate in its sole discretion, provided that neither Watson nor any of its Affiliates (including its Wholesaler Affiliate) shall sell, distribute or dispose of Branded Product in any manner that would constitute a Bundled Sale. Watson agrees that its Wholesaler Affiliate will honor all Endo price-related contracts as communicated to all Endo wholesalers from time to time in the ordinary course of business, provided that the price related contracts do not impose any requirements on Watson's Wholesaler Affiliate that would be inconsistent with requirements imposed upon other Lidoderm® wholesalers, and further provided that such price-related contracts shall not conflict with the terms of this Agreement. Watson shall comply with all Applicable Laws in connection with its resale of the Brand Product. [Settlement Agreement at Section 3(e).]

96.     Endo and Teikoku also agreed to make additional payments to Watson if Watson did not receive FDA approval for its generic Lidoderm product by January 1, 2014, as well as additional payments if Watson did not receive approval by January 1, 2015. Neither situation came to pass or was expected to come to pass: Watson received final FDA approval on August 23, 2012, within three (3) months of Defendants' execution of the Reverse Payment Agreement.

97.     As the Agreement expressly provided, this $96 million payment from Endo and/or Teikoku to Watson was expressly to induce Watson to quit its challenge to Endo and Teikoku's patents:

Endo/Teikoku and Watson agree that the Brand Product provided by Endo/Teikoku to Watson's Wholesaler Affiliate hereunder is a good-faith, bargained-for resolution of the claims at issue in the Litigation. The Brand Product provided hereunder is not contingent on any past or future purchase of any product from Endo or Teikoku by Watson or any of its Affiliates. [Agreement, Section 3(i).]

98.     Through the Agreement, Defendants ensured that Watson's sales of Lidoderm would not result in price competition, but rather that Watson would sell brand Lidoderm at the same supracompetitive prices at which Endo had been selling it. The Agreement provided that Watson would honor all of Endo's price-related contracts honored by Endo's wholesalers. In fact, Watson maintained the

- 29 -

supracompetitive prices for brand Lidoderm throughout the term of the Agreement, generating revenues and profits of close to $96 million from those sales.  Watson's sales of branded Lidoderm did not increase output, reduce price, or increase consumer choice; it merely substituted Watson for Endo as the seller of $96 million worth of branded Lidoderm, solely to pay Watson for delaying market entry of its less-expensive generic Lidoderm.

99.    As a second payment in exchange for Watson's promise to delay entry of its generic Lidoderm product until September 15, 2013, Endo promised to delay launching an authorized generic version of Lidoderm for 7½ months after Watson's belated launch of generic Lidoderm, unless another ANDA filer entered the market during that time (a virtual impossibility that, in fact, did not occur).

100.    Endo was otherwise ready, willing, and able to launch an authorized generic version of Lidoderm simultaneously with Watson's launch.  As early as April 2007, Endo and Teikoku had specifically agreed that Endo would be the exclusive licensee for authorized generic Lidoderm.  As shown below, this no-authorized-generic promise effectuated a payment from Endo and Teikoku to Watson of $170 million or more.

101.    Endo's agreement not to launch an authorized generic meant that Endo would cede those sales to Watson (and Teikoku would forego any proceeds from such ceded sales), and Watson would therefore be the sole generic on the market for 7½ months.  This would allow Watson to obtain 100% of generic Lidoderm sales for 7½ months (instead of just 50% if Endo had launched an authorized generic) and additionally permitted Watson to avoid the inter-generic price competition an authorized generic necessarily creates and thereby maintain an artificially-inflated supracompetitive generic price for those doubled generic sales.  These doubled revenues and profits were at the expense of Plaintiffs and the members of the Class,

- 30 -

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

consumers, and competition in general.  The Agreement (which refers to an authorized generic by the acronym "AG") provides:

> License. Subject to the terms and conditions of this Agreement, Endo/Teikoku hereby grant to Watson a non-exclusive (other than pursuant to Section 2(b)), royalty-bearing, non-transferable (other than pursuant to Section 21) and non-sublicensable (other than pursuant to Section 2(c)) license to the Licensed Patents to make, have made, import, use, sell, and offer for sale Watson's Generic product in the Territory solely during the License Term.  [Settlement Agreement at Section 2(a).]
>
> *****
>
> AG Product. The license granted pursuant to Section 2(a) shall be partially exclusive for a period of time in that Endo/Teikoku and their respective Affiliates shall not market or sell a Generic Product, or authorize or license a Third Party to market or sell and AG Product at any time before the earlier of (i) seven and a half (7.5) months from the Start Date, and (ii) the Launch of any Third Party Generic Product in the Territory. [Settlement Agreement at Section 2(b) (emphasis added).]

102.   Endo's agreement not to launch an authorized generic for 7½ months allowed Watson to double its generic sales *and* charge higher prices for its generic during that time (because it faced no competition from an authorized generic), and had a cash value to Watson of $170 million or more.  This no-authorized-generic promise is little different than if Endo actually did launch an authorized generic alongside Watson during the first 7½ months that Watson marketed generic Lidoderm, and then Endo and Teikoku simply handed their respective portions of the proceeds from those sales over to Watson in cash.  (Though Endo would have to give Watson additional monies on top of those revenues, to make up for the higher price Watson's generic Lidoderm would have been able to command because it was free from price competition from Endo's authorized generic).

103.   Absent the Reverse Payment Agreement, and Endo's promise not to launch an authorized generic contained therein, Endowould have launched an authorized generic simultaneously with Watson's entry, which would have resulted in lower prices to Plaintiffs and the Class, and cut Watson's revenues and profits from selling generic Lidoderm by half.

- 31 -

104.   In fact, at its first opportunity following the expiration of the no-authorized-generic promise, Endo immediately launched an authorized generic.

105.   The Reverse Payment Agreement contained a term whereby Watson agreed to pay back to Endo a small (25%) portion of Watson's increased profits resulting from Endo's agreement not to launch an authorized generic for 7½ months. That term provided:  "Beginning with the First Commercial Sale of Watson's Generic Product and until the date of the occurrence of the First Commercial Sale by a Third Party or Endo/Teikoku or their Affiliates of a Generic Product or AG Product in the Territory, Watson shall pay to Endo royalty payments equal to twenty-five percent (25%) of all Gross Profit of Watson's Generic Product."  Agreement, Section 3(a).

106.   This term providing for a 25% royalty back to Endo during the 7½ month period was window dressing for the parties' naked agreement not to compete during Watson's anticipated 180-day Hatch-Waxman exclusivity period.  The royalty was designed merely to give the appearance of a legitimate, non-collusive transaction.  In reality, Defendants simply agreed to lengthen the no-authorized-generic promise's duration by 1½ months (from 6 months to 7½ months) in order to mitigate the royalty Watson would be paying to Endo.

107.   Plaintiffs' estimate that the payment to Watson by the no-authorized-generic promise amounted to $170 million or more already accounts for an assumed 25% royalty paid by Watson back to Endo.

108.   Endo and Teikoku sacrificed substantial revenues and profits by their agreement not to launch an authorized generic for 7½ months.  Absent the Reverse Payment Agreement and the delay in generic Lidoderm competition it effectuated, it would have made economic sense for Endo to launch an authorized generic simultaneous with Watson's launch so that Endo could retain sales that Watson's less expensive generic otherwise would capture, rather than ceding those sales to Watson.

- 32 -

As alleged above, an authorized generic product typically captures approximately 50% of the generic sales during first 180 days of generic marketing.

109.   The no-authorized-generic promise was a very large payment to Watson. Using a conservative approach that relies upon the revenue numbers that Endo reported in its filings with the Securities and Exchange Commission as an input for the annual revenue from Lidoderm, and valued as of the time the Reverse Payment Agreement was entered, Plaintiffs estimate that the no-authorized-generic promise constituted a payment of $170 million or more from Endo and Teikoku to Watson. This figure is estimated by calculating the difference between Watson's revenues during the 7½ months free from competition from Endo's authorized generic and Watson's revenues during 7½ months facing competition from Endo's authorized generic.  Both of these amounts can be estimated using the known dynamics of the pharmaceutical industry and publicly-available information.

110.   The amount of revenue Watson would expect to earn from sales of generic Lidoderm during the first 7½ months of marketing free from competition from Endo's authorized generic can be estimated as follows:

   a. At the time Defendants entered the Agreement, Endo had reported that its annual revenue from sales of Lidoderm in the prior year, 2011, was $825 million.  Thus, at the time of the Agreement, 7½ months of branded Lidoderm sales would generate revenue to Endo of at least $515,625,000 (7.5/12 * 825,000,000).[1]

   b.  As is common in the pharmaceutical industry, the first generic is expected to take 80% (or more) of the brand's unit sales within six months.  Thus, approximately $412,500,000 worth of brand unit sales

_____

[1] That number is conservative, as it does not account for any increase in sales achieved by Endo in 2012 and 2013, during the period of delayed generic Lidoderm competition purchased by Endo and Teikoku's payments to Watson.  In fact, Endo's Lidoderm revenue rose from $825 million in 2011 to $947 million in 2012.

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

would be converted to Watson's generic during the first 7½ months Watson's generic Lidoderm was on the market (515,625,000 * .8).

c. As is also common, with only one generic on the market, the generic is typically priced at 90% of the brand's pre-generic price, which would result in generic sales revenues during the first 7½ months Watson was on the market of approximately $371,250,000 (412,500,000 * .9).  Thus, the sales revenues Watson would have obtained during the 7½ months that the no-authorized-generic promise was in effect were approximately $371,250,000.

d. Under the Agreement, Watson agreed to pay Endo a royalty of 25% on Watson's gross profits on sales of generic versions of Lidoderm during the 7½ month period that the no-authorized-generic promise was in effect.  Conservatively applying the royalty on $371,250,000 in sales (as opposed to the lower number that would reflect Watson's gross profits), and further assuming that royalties were actually paid, this would amount to approximately $92,812,500 (371,250,000 * .25). As a result, even when the amount of the royalty is netted out, Watson's anticipated revenue during 7½ months free from competition from Endo's authorized generic would be, conservatively, $278,437,500 (371,250,000 - 92,812,500).

111.   Watson's dramatically smaller revenues if Endo had not promised to refrain from launching an authorized generic for 7½ months following Watson's launch can be estimated as follows:

a. According to an FDA study of the dynamics of generic competition, the addition of a second generic (such as Endo's authorized generic)

- 34 -

drives the average generic price down to 52% of the brand price.[2]
Thus, while the generics would still take 80% of brand sales during
those first 7½ months, or $412,500,000 at the branded Lidoderm price,
the dollar value of those generic sales would drop to $214,500,000 in
the presence of an authorized generic (412,500,000 * .52).

b. Watson would not get 100% of those revenues, however. That is
because the unit sales of the generic during those first 7½ months
would be split evenly between Watson's generic Lidoderm and Endo's
authorized generic Lidoderm.[3]  (Moreover, there is reason to expect
that Endo may have enjoyed a marketing advantage as the incumbent
and garner more than 50% of unit sales.)

c. Thus, without Endo's no-authorized-generic promise, Watson's
revenues from sales of generic Lidoderm during the first 7½ months of
generic marketing would have been approximately $107,250,000
(214,500,000 * .5).

112.   The incremental revenue that Endo and Teikoku paid to Watson by the
no-authorized-generic promise is therefore $171,187,500 (278,437,500 -
107,250,000).  That amount is the payment that Endo and Teikoku made to Watson by
way of the no-authorized-generic promise contained in the Reverse Payment
Agreement.  This estimate assumes that, rather than Defendants' entering an

---

[2] Generic Competition and Drug Prices,
http://www.fda.gov/AboutFDA/CentersOffices/
OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm (last accessed June 3,
2014).

[3] *Id.* at vi (The Federal Trade Commission has concluded that, when free from
competition from an authorized generic, "the first-filer's revenue will approximately
double" during the first six months of generic competition, compared to what the first
filer would make if it faced authorized generic competition.). The Supreme Court has
recognized this as well.  *See FTC v. Actavis*, 133 S. Ct. 2223, 2229 (2013) (the "vast
majority of potential profits for a generic drug manufacturer materialize during" the
first six months of marketing).

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

agreement that allowed Watson to enter without Endo and Teikoku paying Watson to delay its entry, Watson would have entered the market "at risk" in the "but-for world" (*i.e.*, in a world absent the reverse payments challenged by this lawsuit).

113.   By contrast, had the parties instead entered an agreement without Endo and Teikoku paying Watson to delay entry of its generic Lidoderm, and the Agreement consequently bore an earlier agreed entry date, and assuming a term in that agreement requiring Watson to pay a royalty of 25% during the first 7½ months of Watson's generic marketing, the royalty on those sales would be $26,812,500 (107,250,000 * .25).  Thus, net of royalties, the revenue Watson would have realized during the first 7½ months of marketing from an earlier licensed entry with competition from Endo's authorized generic would be $80,437,500 (107,250,000 - 26,812,500).

114.   The incremental revenue that Endo and Teikoku paid to Watson by the no-authorized-generic promise is therefore approximately $198,000,000 (278,437,500 – 80,437,500).  That amount is the payment that Endo and Teikoku made to Watson by way of the no-authorized-generic promise contained in the Reverse Payment Agreement.  This second estimate assumes that, rather than Watson entering the market at risk, Defendants enter into an agreement that allowed Watson to enter without Endo and Teikoku paying Watson to delay its entry in the "but-for world" (*i.e.*, in a world absent the reverse payments challenged by this lawsuit).

115.   Thus, Endo's agreement not to launch an authorized generic version of Lidoderm for 7½ months was a payment to Watson of at least $170 million and possibly $198 million or more.  The value of this payment to Watson was no different than if Endo had made those sales itself (by launching an authorized generic) and then Endo and Teikoku handed their respective portions of the resulting $170-198 million or more to Watson in cash.  And, given that Lidoderm revenues increased significantly

- 36 -

to $947 million in 2012, the size of the payment almost certainly increased by the time Watson ultimately received it in September of 2013, when Watson belatedly launched without competition from Endo's authorized generic.

116.    The total payment flowing from Endo and Teikoku to Watson, including both the $96 million in free goods and Endo's promise to delay launching an authorized generic version of Lidoderm for 7½ months had a cash value in the hundreds of millions of dollars.  Although Plaintiffs do not assume the burdens of production or proof on Defendants' affirmative defenses by so doing, Plaintiffs nevertheless aver that Defendants can offer no cognizable, nonpretextual justification or explanation for the reverse payments.  The reverse payments are far greater than Endo and Teikoku's avoided litigation costs, and were not for services to be provided by Watson to Endo and/or Teikoku.  Rather, the reverse payments were made in order to induce Watson to stay out of the lidocaine patch 5% market until September of 2013 and to allow Defendants to share monopoly profits.

117.    These large, unjustified payments have no rational connection to, and far exceed, any approximation of the costs of continuing the patent litigation.  Moreover, Defendants are unable to establish that either payment was consideration for the fair value of any services provided by Watson to Endo and/or Teikoku.  Indeed, Watson was not required to perform any services in exchange for the unlawful payment according to the Reverse Payment Agreement.  Watson provided no value to Endo or Teikoku under the Agreement other than impermissible agreement to delay competition.  The Agreement was not a distribution agreement, and Endo had no need for any such services for Lidoderm in any event.

118.    Absent Endo and Teikoku's unlawful reverse payments to Watson, any agreement settling the patent litigation would have resulted in much less delay of Watson's generic entry than with the payments.  But for the reverse payments, Watson

- 37 -

would have launched much earlier than September 2013, either under an agreement without any reverse payments, or at risk after final approval.  And, in either circumstance, Watson's entry would have been immediately met with Endo's authorized generic.

119.   The evidence amassed during and prior to the patent litigations showed that the patents purportedly covering Lidoderm would not withstand scrutiny. Moreover, the millions of dollars that Endo and Teikoku paid to Watson as part of the unlawful Agreement "provide a workable surrogate for [the] patent[s'] weakness[es]." *FTC v. Actavis, Inc.*, 570 U.S. ___, 133 S. Ct. 2223, 2236-37 (2013).  "An unexplained reverse payment," like the payment at issue here, "itself would normally suggest that the patentee has serious doubts about the patent's survival."  *Id.* at 2236.

## C. Anticompetitive Purpose and Effect of Defendants' Conduct

120.   The unlawful Reverse Payment Agreement enabled Defendants to: (a) delay the entry of less expensive generic versions of Lidoderm products in the United States for up to 13 months; (b) delay the introduction of an authorized generic lidocaine patch 5% for 7½ months, which otherwise would have appeared on the market coincident with initial generic competition; (c) fix, raise, maintain or stabilize the price of lidocaine patch 5% products; (d) maintain a monopoly in the U.S. market for lidocaine patch 5% products; (e) allocate 100% of the United States market for lidocaine patch 5% to Endo for up to 13 months; and (f) allocate 100% of United States sales of generic lidocaine patch 5% to Watson for 7½ months.

121.   Paragraph deleted.[4]

---

[4] Plaintiffs have deleted this paragraph alleging *per se* illegality of the agreement to withhold an authorized generic in light of the Court's ruling (ECF No. 117, at 26-27, November 17, 2014).  Plaintiffs preserve their appellate rights with respect to the ruling dismissing Plaintiffs' count alleging that the agreement to withhold an authorized generic is *per se* unlawful.

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

122.   But for the unlawful Agreement: (a) Watson would have begun selling its generic version of Lidoderm when it received FDA approval on August 23, 2012 or shortly thereafter, either "at risk" or pursuant to an agreement with Endo and Teikoku that did not include a reverse payment; and (b) Endo would have launched an authorized generic lidocaine patch 5% simultaneously with Watson's earlier entry.

123.   Watson would have launched its generic product notwithstanding any patents that Endo and Teikoku may have claimed covered Lidoderm, prior to resolution of the '529 Litigation, and prior to resolution of the Rolf Patent Litigation. None of the patents other than the '529 patent was even listed in the Orange Book when Watson filed its ANDA.  Thus, Watson was not required to certify to any other patents under Hatch-Waxman, and any litigation filed over those other patents would not, and could not, result in a 30 month Hatch-Waxman stay of FDA approval of Watson's ANDA.  Given the obvious defects in the '529 patent and Rolf patents, Watson would have launched upon final FDA approval even in the absence of a court ruling on those patents.  Once Watson obtained FDA approval of its ANDA, it was free to launch, and but for the unlawful reverse payments, Watson would have launched its generic Lidoderm immediately, and Endo would have launched an authorized generic simultaneously.

124.   Watson told Wall Street analysts in late 2011 and early 2012 that it was pursuing its ANDA, that it was closely monitoring the progress of the ANDA and expected approval in 2012, that its efforts to increase capacity were well underway, and it expected to be "ready to go at the earliest possible time to launch the product."

125.   Alternatively, but for the unlawful reverse payments Endo, Teikoku and Watson would have entered into a procompetitive settlement agreement under which Endo and Teikoku would not have paid Watson for delay, Watson would have entered

- 39 -

the market much earlier than September of 2013, and Endo would have simultaneously launched an authorized generic lidocaine patch 5%.

126.   Defendants' unlawful actions have delayed the sale of generic Lidoderm in the United States, delayed the sale of an authorized generic Lidoderm in the United States, and unlawfully enabled Endo, and then Watson, to sell lidocaine patch 5% at artificially inflated, supracompetitive prices.  But for Defendants' illegal conduct, generic competition to Lidoderm would have begun prior to September 15, 2013, and would have included both Watson's generic Lidoderm product as well as Endo's authorized generic Lidoderm.

## VIII.  INTERSTATE COMMERCE

127.   At all material times, Teikoku manufactured and Endo  promoted, distributed, and sold substantial amounts of Lidoderm (and Watson manufactured, promoted, distributed, and sold substantial amounts of generic Lidoderm) in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States, including its territories, possessions and the Commonwealth of Puerto Rico.

128.   At all material times, Defendants transmitted funds as well as contracts, invoices and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Lidoderm and generic Lidoderm.

129.   In furtherance of their efforts to monopolize and restrain competition in the market for lidocaine patch 5%, Defendants employed the United States mail and interstate and international telephone lines, as well as means of interstate and international travel.  The activities of Defendants were within the flow of and have substantially affected interstate commerce.

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

## IX.   MONOPOLY POWER AND MARKET DEFINITION

130.   At all relevant times, Endo had market and/or monopoly power over lidocaine patch 5% because it had the power to maintain lidocaine patch 5% prices at supracompetitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Lidoderm, with the exception of AB-rated generic versions of Lidoderm.

131.   A small but significant, non-transitory price increase to Lidoderm by Endo would not have caused a significant loss of sales to drug products other than AB-rated generic versions of Lidoderm.

132.   Lidoderm does not exhibit significant, positive cross elasticity of demand with respect to price with any product other than AB-rated generic versions of Lidoderm.

133.   Because of, among other reasons, its approved indication, Lidoderm is differentiated from all products other than AB-rated generic versions of Lidoderm.

134.   Endo needed to control only Lidoderm and its AB-rated generic equivalents, and no other products, in order to maintain the price of Lidoderm profitably at supracompetitive prices.  Only the market entry of a competing, AB-rated generic version of Lidoderm would render Endo unable to profitably maintain its supracompetitive prices for Lidoderm without losing substantial sales.

135.   Endo sold Lidoderm at prices well in excess of marginal costs, and in excess of the competitive price, and enjoyed high profit margins.

136.   Endo has had, and exercised, the power to exclude and restrict competition to Lidoderm and its AB-rated generics.

137.   Endo and Teikoku's reverse payments to Watson demonstrate that Endo enjoyed market and/or monopoly power with respect to lidocaine patch 5%.

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

138.   Endo, at all relevant times, enjoyed high barriers to entry with respect to competition to the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

139.   To the extent that Plaintiffs may be legally required to prove market and/or monopoly power circumstantially by first defining a relevant product market, Plaintiffs allege that the relevant market is lidocaine patch 5% (*i.e.*, Lidoderm and its AB-rated generic equivalents).  During the period relevant to this case, Endo was able to profitably maintain the price of lidocaine patch 5% well above competitive levels.

140.   The relevant geographic market is the United States, including its territories, possessions and the Commonwealth of Puerto Rico.

141.   At all relevant times, Endo's market share in the relevant market was 100%, implying a substantial amount of market power.

## X.   EFFECTS ON COMPETITION AND DAMAGES

142.   Watson's ANDA was approved August 23, 2012.  Were it not for the unlawful reverse payments and Reverse Payment Agreement alleged herein, Watson would have entered the market on or shortly after that date.  One or more generic Lidoderm products would have entered the market well before the date provided in Defendants' unlawful Reverse Payment Agreement, September 15, 2013.

143.   But for the unlawful Reverse Payment Agreement, an authorized generic version of Lidoderm would have been available on the market simultaneously with the launch of Watson's generic.

144.   Defendants' unlawful reverse payments and Reverse Payment Agreement delayed generic Lidoderm competition and unlawfully enabled Endo to sell Lidoderm without generic competition.  But for Defendants' illegal conduct, one or more generic competitors would have begun marketing AB-rated generic versions of Lidoderm on

- 42 -

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

August 23, 2012 or shortly thereafter, and in any event, earlier than September 15, 2013.

145. Watson had extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs, marketing generic pharmaceutical products, and manufacturing commercial launch quantities adequate to meet market demand.

146. Defendants' unlawful Reverse Payment Agreement, which delayed introduction of generic versions of Lidoderm in the United States, has caused Plaintiffs and the Class to pay more than they would have paid for lidocaine patch 5%.

147. Typically, generic versions of brand drugs are initially priced significantly below the corresponding brand drug to which they are AB-rated. As a result, upon generic entry, some or all of the direct purchases of brand drugs are rapidly substituted with generic versions of the drug. As more generic manufacturers enter the market, prices for generic versions of a drug predictably plunge even further because of competition among the generic manufacturers, and, correspondingly, the brand drug continues to lose even more sales to the generics.

148. This price competition enables all direct purchasers of the drugs to: (a) purchase generic versions of a drug at a substantially lower price, and/or (b) purchase the brand drug at a reduced price. Consequently, brand drug manufacturers have a keen financial interest in delaying the onset of generic competition, and purchasers experience substantial cost inflation from that delay.

149. But for Defendants' unlawful Agreement, direct purchasers, such as Plaintiffs and members of the Class, would have paid less for lidocaine patch 5% by (a) substituting purchases of less-expensive AB-rated generic Lidoderm for their purchases of more-expensive brand Lidoderm, (b) receiving discounts on their

- 43 -

remaining brand Lidoderm purchases, and/or (c) purchasing generic Lidoderm at lower prices sooner.

150.   Thus, Defendants' unlawful conduct deprived Plaintiffs and the Class of the benefits of competition that the antitrust laws were designed to protect.

151.   During the relevant period, Plaintiffs and other members of the Class purchased substantial amounts of Lidoderm directly from Endo and purchased substantial amounts of generic Lidoderm directly from Watson.  As a result of Defendants' illegal conduct as alleged herein, Plaintiffs and other members of the Class were compelled to pay, and did pay, artificially inflated prices for their lidocaine patch 5% requirements.  Plaintiffs and the other Class members paid prices for lidocaine patch 5% that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (1) Class members were deprived of the opportunity to purchase lower-priced generic Lidoderm instead of more expensive brand Lidoderm; and (2) Class members paid artificially inflated prices for lidocaine patch 5%.

152.   As a consequence, Plaintiffs and other members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

## XI.   CLAIMS FOR RELIEF

### CLAIM I:  VIOLATION OF 15 U.S.C. § 1
### (AGREEMENT UNREASONABLY RESTRAINING TRADE)

153.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

154.   Defendants have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

155.   In or about May 2012 and at times prior to the formal execution thereof Defendants entered into the Reverse Payment Agreement, an illegal contract, combination and conspiracy in restraint of trade under which Endo and Teikoku agreed to make large reverse payments to Watson in exchange for Watson's agreement to delay bringing its generic version of Lidoderm to the market for up to 13 months, the purpose and effect of which were to: (a) allocate 100% of the market for lidocaine patch 5% in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Endo; (b) delay the availability of generic versions of Lidoderm in the United States,  including its territories, possessions and the Commonwealth of Puerto Rico, thereby protecting Lidoderm from any generic competition; (c) delay the entry of Endo's authorized generic until 7½ months after Watson's entry with a generic Lidoderm product, and allocate 100% of sales for generic lidocaine patch 5% in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Watson prior to that time; and (d) fix, at supracompetitive levels, the price at which direct purchasers would pay for lidocaine patch 5%.

156.   The Agreement harmed Plaintiffs and the Class as set forth above.

157.   Defendants are liable for the Agreement under a rule of reason standard.

158.   There is and was no legitimate, non-pretextual, procompetitive justification for the payment from Endo and Teikoku to Watson that outweighs its harmful effect.  Even if there were some conceivable such justification, the payment was not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

159.   As a direct and proximate result of Defendants' agreement in restraint of trade, as alleged herein, Plaintiffs and the Class were harmed and suffered overcharge damages as aforesaid.

- 45 -

**CLAIM II:  Deleted[5]**

160.    Paragraph deleted.

161.    Paragraph deleted.

162.    Paragraph deleted.

163.    Paragraph deleted.

164.    Paragraph deleted.

165.    Paragraph deleted.

166.    Paragraph deleted.

167.    Paragraph deleted.

**CLAIM III:  VIOLATION OF 15 U.S.C. § 2
(CONSPIRACY TO MONOPOLIZE)**

168.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

169.    At all relevant times, Endo possessed substantial market power (*i.e.*, monopoly power) in the relevant market.  Endo possessed the power to control prices in, prevent prices from falling in, and exclude competitors from, the relevant market.

170.    Through the Reverse Payment Agreement, Endo, Teikoku and Watson conspired to maintain Endo's monopoly power in the relevant market in order to block and delay market entry of generic Lidoderm.

171.    The Reverse Payment Agreement (a) allocated 100% of the market for lidocaine patch 5% in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Endo; (b) delayed the availability of generic versions of Lidoderm in the United States,  including its territories, possessions and

---

[5] Plaintiffs have deleted Count II alleging *per se* illegality of the agreement to withhold an authorized generic in light of the Court's ruling (ECF No. 117, at 26-27, November 17, 2014).  Plaintiffs preserve their appellate rights with respect to the ruling dismissing Plaintiffs' count alleging that the agreement to withhold an authorized generic is *per se* unlawful.

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

the Commonwealth of Puerto Rico, thereby protecting Lidoderm from any generic competition; (c) delayed the entry of Endo's authorized generic until 7½ months after Watson's entry with a generic Lidoderm product, and allocate 100% of sales for generic lidocaine patch 5% in the United States, including its territories, possessions and the Commonwealth of Puerto Rico, to Watson prior to that time; and (d) fixed, at supracompetitive levels, the price at which direct purchasers would pay for lidocaine patch 5%.

172.   The goal, purpose and/or effect of the Agreement was to maintain and extend Endo's monopoly power in the United States market, including its territories, possessions and the Commonwealth of Puerto Rico, in the market for lidocaine patch 5%, in violation of Sherman Act Section 2, 15 U.S.C. § 2.  The Agreement was intended to and did prevent and/or delay generic competition to Lidoderm and enabled Endo to continue charging supracompetitive prices for Lidoderm without a substantial loss of sales.

173.   Defendants knowingly and intentionally conspired to maintain and enhance Endo's monopoly power in the relevant market.

174.   Defendants specifically intended that their Agreement would maintain Endo's monopoly power in the relevant market, and injured Plaintiffs and the Class thereby.

175.   Defendants each committed at least one overt act in furtherance of the conspiracy.

176.   As a direct and proximate result of Defendants' concerted monopolistic conduct, as alleged herein, Plaintiffs and the Class were harmed as aforesaid.

### COUNT IV: VIOLATION OF 15 U.S.C. § 2
### (MONOPOLIZATION)

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO

177.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

178.   This claim is pled as to Endo only.

179.   At all relevant times, Endo possessed substantial market power (*i.e.*, monopoly power) in the relevant market.  Endo possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

180.   Through the anticompetitive conduct, as alleged extensively above, Endo willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiffs and the Class thereby.

181.   It was Endo's conscious object to further its dominance in the relevant market by and through the anticompetitive conduct alleged herein.

182.   Endo's anticompetitive conduct harmed competition as alleged herein.

183.   As a direct and proximate result of Endo's illegal and monopolistic conduct, as alleged herein, Plaintiffs and the Class were harmed as alleged herein.

## COUNT V: VIOLATION OF 15 U.S.C. § 2
## (ATTEMPTED MONOPOLIZATION)

184.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

185.   This claim is pled as to Endo only.

186.   Through the Reverse Payment Agreement, Endo specifically intended to maintain monopoly power in the relevant market.  It was Endo's conscious objective to control prices and/or to exclude competition in the relevant market.

187.   The natural and probable consequence of Endo's anticompetitive conduct, which was intended by Endo, and plainly foreseeable to Endo, was to control prices and exclude competition in the relevant market, to the extent it did not succeed.

- 48 -

188.   There was a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that Endo would succeed in and achieve its goal of maintaining monopoly power in the relevant market.

189.   As a direct and proximate result of Endos illegal and monopolistic conduct, Plaintiffs and the Class were harmed as alleged herein.

## XII.   DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that the Court:

A.     Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declare the Plaintiffs as the representatives of the Class;

B.     Enter joint and several judgments against Defendants and in favor of Plaintiffs and the Class;

C.     Award the Class damages (*i.e.*, three times overcharges) in an amount to be determined at trial; and

D.     Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law.

## XIII.  JURY DEMAND

Pursuant to Fed. Civ. P. 38, Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

- 49 -

Dated:  December 19, 2014                    Respectfully submitted,


                                             /s/ Peter R. Kohn
                                             Peter R. Kohn
                                             Joseph T. Lukens
                                             FARUQI & FARUQI, LLP
                                             101 Greenwood Avenue, Suite 600
                                             Jenkintown, PA 19046
                                             (215) 277-5770
                                             pkohn@faruqilaw.com
                                             jlukens@faruqilaw.com

Bruce E. Gerstein                            Thomas M. Sobol
Joseph Opper                                 David S. Nalven
Ephraim Gerstein                             Ed Notargiacomo
GARWIN GERSTEIN & FISHER LLP                 HAGENS BERMAN SOBOL
88 Pine Street 10th Floor                    SHAPIRO LLP
New York, NY 10005                           55 Cambridge Parkway, Suite 301
(212) 398-0055                               Cambridge, MA 02142
bgerstein@garwingerstein.com                 (617) 482-3700
jopper@garwingerstein.com                    tom@hbsslaw.com
egerstein@garwingerstein.com                 davidn@hbsslaw.com
                                             ed@hbsslaw.com

*Interim Co-Lead Counsel for Direct Purchaser Class Plaintiffs*

Jeff Friedman
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000
jefff@hbsslaw.com

*Interim Liaison Counsel for Direct Purchaser Class Plaintiffs*

- 50 -

DIRECT PURCHASER PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:14-MD-02521-WHO