UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LIDODERM ANTITRUST LITIGATION<br><br>This document relates to: [ALL ACTIONS] | Case No. 14-md-02521-WHO<br><br>**ORDER DENYING MOTION TO DISQUALIFY AND CROSS-MOTION CHALLENGING CLAW BACK**<br><br>Re: Dkt. No. 293 |

Defendant Teikoku moves to disqualify plaintiffs' counsel because they relied on and used an allegedly privileged email that Teikoku inadvertently produced and then clawed back. Plaintiffs argue that the email in question is not privileged or otherwise protected from disclosure and cross-move challenging the claw back. I heard argument on these motions on November 23, 2015. I conclude that the issue of privilege is a close one, but determine that the email in question is privileged and that Teikoku is allowed to claw it back. However, given the context of the discovery production in this case, the contents of the email at issue (which I reviewed in camera), and plaintiffs' other sources of evidence on the subject matters discussed in the email, disqualification of plaintiffs' counsel is not warranted.

## I. MOTION TO DISQUALIFY

Teikoku moves to disqualify plaintiffs' counsel - all twelve firms representing the direct purchasers, indirect purchasers, GEHA, Rite Aid, and Walgreen – because plaintiffs' counsel, in alleged contradiction of their professional responsibilities, reviewed and attempted to use an April 2012 email sent by Teikoku's outside counsel Noriyuki Shimoda to representatives of his client. To analyze this motion, one must understand the context in which the Shimoda email was written, its contents, and how it came to be produced and used.

### A. Background

Defendants Endo and Teikoku were plaintiffs in the underlying patent infringement case against Watson.[1] Pursuant to Endo and Teikoku's April 2007 agreement, in any patent infringement actions between Endo and a generic manufacturer regarding Lidoderm: (i) Endo had the "first sole and exclusive right . . . to institute, prosecute and control a patent infringement action" with Teikoku's prior written consent; (ii) Teikoku could have its patents removed from the suit (at an early stage, if it felt its patents were not being infringed); and (iii) Endo could not agree to a settlement or other voluntary disposition of the suit without Teikoku's agreement if the settlement affected the enforceability of Teikoku's patents, or otherwise impacted Teikoku's rights under the agreement with Endo. Declaration of Dena C. Sharp (Dkt. No. 301-6), Ex. 13. Endo would pay the costs for any suits, keep any damages awarded, and hold Teikoku harmless from any damages. *Id*. Teikoku had to cooperate with the institution and prosecution of the suit, and Endo was required to keep Teikoku reasonably informed as to the status of the suit. *Id*.

The bench trial in the Watson litigation concluded in February 2012, but a judgment had not been issued as of the date of the email in question. Endo and Watson were in settlement negotiations. On April 11, 2012 at 7:29 a.m., Teikoku counsel Noriyuki Shimoda sent an email to Teikoku executives reporting on the contents of a call he had with Endo's General Counsel Caroline Manogue.[2] The email was written in Japanese and titled "FW: Case of Reconciliation Consultation with Company W (Attorney – Clients Privilege)."[3] Its first line is "Attorney-Client Communication" and the second states "Confidential and Privilege." In the email Shimoda

---

[1] Endo is a Delaware corporation that markets and sells Lidoderm throughout the United States. Teikoku Seiyaku Co. is a Japanese company that manufactures Lidoderm for Endo pursuant to a Manufacturing and Supply Agreement. Teikoku Pharma USA is a California corporation that is wholly owned by Teikoku Seiyaku Co., and is the holder of the New Drug Application for Lidoderm. All three entities were plaintiffs in the Watson litigation in the District of Delaware. In this Order, I will refer to the Teikoku entities jointly as Teikoku.

[2] The Shimoda email was forwarded by one of its recipients at Teikoku (Mitsuhiro Matsumura) to Takahiro Aihara at 12:21 a.m. on April 11, 2012. The only content added by Matsumura in the forward to Aihara is "Attorney-client Communication – Confidential and Privileged Please confirm it. Mitsuhiro Matsumura." Teikoku contends that documents produced to plaintiffs demonstrate that each of the recipients of the Shimoda email was a Teikoku employee. Declaration of Rafael Langer-Osuna (Dkt. No. 293-4) ¶ 20.

[3] In the subject line in the original email "(Attorney-Clients Privilege)" was in English, although the rest of the subject line was in Japanese.

2

reported that following a conference with his client the day before, as agreed, Shimoda had a conversation with Manogue. Shimoda explained to his client that in the conversation with Manogue, Shimoda conveyed Teikoku's concerns and thoughts regarding the terms being negotiated by Endo with Watson to settle the litigation, as well as Teikoku's concerns and thoughts regarding the strength of the Watson litigation and regulatory actions. Shimoda also described in the email Endo's responses to Teikoku's concerns and thoughts as conveyed by Manogue, and Manogue's concerns and thoughts about finalizing the settlement terms.[4]

    As part of its protocol for the production of documents in this case, in July 2015 Teikoku reviewed documents marked "potentially privileged" by their contract review team to ensure the documents were appropriately withheld and included on Teikoku's privilege log. Status Conference Statement (Dkt. No. 214) at 2. As a result of that second-level review, on July 31, 2015, Teikoku produced 3,512 documents initially withheld from production as privileged. Sharp Decl. ¶ 14. The Shimoda email was included in that production and it was produced as TEI-AT0283567-572 and stamped by Teikoku as "HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY."[5] Even though the email was produced in an unredacted form, the Shimoda email was also listed on Teikoku's 1600 page privilege log (on page 1,598), under the same bates stamp number. Declaration of Rafael Langer-Osuna (Dkt. No. 293-4) ¶ 9; Sharp Decl. ¶ 5. A further 1,305 documents initially considered privileged were produced on September 29, 2015 along with a supplemental privilege log. Sharp Decl. ¶ 14. At that same time Teikoku "clawed back" 204 documents that it had inadvertently produced, and listed those documents on a "claw-back specific" privilege log. The Shimoda email was not included in that list. *Id*. ¶ 15.

---

[4] So as not to waive the privilege, Teikoku submitted an unredacted copy of the Shimoda email for in camera review. This description of the Shimoda email is consistent with what was described in unredacted portions of the parties' pleadings and discussed in open court. This limited and generalized characterization does not waive any privilege that otherwise attaches to the email.

[5] Teikoku's document review declarant believes that a software glitch in the document review system led to the unredacted production of the Shimoda email. Declaration of Robert Johnson (Dkt. No. 293-7) ¶ 7. While plaintiffs contend that this "glitch" is more systemic than Teikoku lets on, they do not really challenge the inadvertence of Teikoku's production. Opposition to Disqualification (Dkt. No. 301-4) at 8. I determine that the production of the Shimoda email was inadvertent.

1  Plaintiffs obtained a translation of the Shimoda email and on October 2, 2015, filed a
2  Motion for Production or Alternatively for Preclusion of Evidence at Summary Judgment and
3  Trial ("Election Motion").  The memorandum in support quoted four paragraphs from the
4  Shimoda email verbatim.  Dkt. No. 271-4.  When Teikoku read the motion, Teikoku immediately
5  notified plaintiffs' counsel that the email was privileged and was subject to claw back.  Langer-
6  Osuna Decl. ¶ 19.[6]  During a meet and confer regarding plaintiffs' use of the Shimoda email,
7  plaintiffs' counsel stated that they "read, reviewed, and assessed" the Shimoda email and
8  concluded that it was not privileged.  *Id*. ¶ 21.

### B. Is the Shimoda Email Privileged?

Plaintiffs argue that disqualification is not warranted in this action because the Shimoda email is not privileged.  I disagree and find that it is protected by the attorney-client privilege.[7]

In his declaration, Shimoda explains that he and his firm were hired by Teikoku to advise Teikoku in the prosecution, defense, and settlement of the Watson litigation.  Declaration of Noriyuki Shimoda (Dkt. No. 293-5) ¶¶ 4-7.  His role – as outside counsel who is licensed in Japan and speaks Japanese – was to provide legal advice to Teikoku in a way that makes sense to his Japanese client in light of the differences "in languages, cultures, and legal systems between the United States and Japan."  *Id*. ¶ 14.  Shimoda asserts that he crafted the email in question with that purpose in mind.  *Id*.

Although the issue is not as clear as contended by defendants, considering the email as a whole in the context of Shimoda's representation of Teikoku I find that Shimoda was engaged in providing legal advice to Teikoku in the email.  It notes that Shimoda's conversation with Manogue follows a conference call with Shimoda's client the prior day.  The email describes that

---

[6] Pursuant to the parties' subsequent agreement, plaintiffs' original Election Motion quoting the Shimoda email was withdrawn and a revised motion, which did not quote from or otherwise rely on the contents of the Shimoda email, was filed.

[7] "An eight-part test determines whether information is covered by the attorney-client privilege: '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.'" *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (quoting *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n. 2 (9th Cir.1992)).

4

Shimoda conveyed Teikoku's concerns and thoughts about the Watson settlement discussions and regulatory issues to Endo after having discussed those same issues with his client and at his client's direction the day before. He then reported to Teikoku Endo's responses *along with* his a few of his own comments and additional thoughts. The general contents of the email show that Teikoku was in the process of reviewing and presumably providing input to Endo on the proposed settlement with Watson, and that Endo wanted to have Teikoku on board with the settlement.

Plaintiffs contend that the Shimoda email is not protected by the attorney-client privilege because Shimoda was not conveying legal advice but merely transmitting non-confidential information from Endo about the Watson settlement negotiations. If portions of the email are viewed alone, without context, plaintiffs' argument that the email is simply a factual report has some surface appeal. But when considered as a whole and in context, I find the contents of the email are completely – except for the article attached – protected by the attorney-client privilege.

The email does not indicate – and the circumstances do not support – plaintiffs' argument that Shimoda was acting as a mere conduit in an attempt to cloak otherwise non-confidential information with the attorney-client privilege. *But see Acosta v. Target Corp*., 281 F.R.D. 314, 321 (N.D. Ill. 2012) ("funneling" non-legal "communications past an attorney will not make them privileged"); *In re Universal Serv. Fund Tel. Billing Practices Litig*., 232 F.R.D. 669, 675 (D. Kan. 2005) (where client "chose to channel the work through an attorney rather than perform the work with non-legal personnel does not provide the basis for a claim of privilege. Also, the privilege does not apply when an attorney is merely acting as a conduit for information."); *Byrnes v. Empire Blue Cross Blue Shield*, No. 98CIV.8520(BSJ)(MHD), 1999 WL 1006312, at *5 (S.D.N.Y. Nov. 4, 1999) (data "intended to assist the business decision-makers to assess the economic impact of possible alternatives" does not reflect the performance by counsel of legal services and cannot be protected even if funneled through counsel); *see also Lopes v. Vieira*, 688 F. Supp. 2d 1050, 1058-59 (E.D. Cal.) on reconsideration, 719 F. Supp. 2d 1199 (E.D. Cal. 2010) ("A client may not refuse to disclose a relevant fact simply because he incorporated it into his communication with counsel. . . . Opposing parties may question corporate employees and officers to ascertain facts relevant to the pending litigation even if the particular fact was disclosed

5

to counsel in a communication protected by the attorney-client privilege. But opposing parties may not simplify the discovery process by demanding copies of attorney-client communications in which the facts are included.").

Nor does the language in the email or the circumstances indicate that Shimoda was participating in the conversation between Endo and Teikoku to provide business advice. Instead, they support the assertion that Shimoda and his firm were separately hired to advise Teikoku on their independent legal interests related to the Watson litigation. *But see Georgia-Pac. LLC v. OfficeMax Inc*, No. C 12-02797 WHO (LB), 2014 WL 2942833, at *4 (N.D. Cal. June 30, 2014) (attorneys' suggestion on how to respond to misinformation about environmental remediation plan was not protected by the attorney-client privilege where it did not "reference to his knowledge and discretion in the law."); *see also United States v. Ackert*, 169 F.3d 136, 140 (2d Cir. 1999) (conversation between attorney and investment advisor not protected by attorney-client privilege because investment advisor not hired by attorney to translate or interpret information the client gave to the attorney); *Matter of Fischel*, 557 F.2d 209, 211-12 (9th Cir. 1977) (recognizing that a client's freedom of expression protected by the attorney-client privilege "does not to permit his attorney to conduct the client's business affairs in secret," and proponent or privilege had to demonstrate which portions of attorney compiled summaries of client's business transactions with third parties directly or indirectly reveal communications of a confidential nature by the client to the attorney); *TVT Records, Inc. v. Island Def Jam Music Grp*., No. 02 CIV. 6644 (VMDF), 2003 WL 749801, at *2 (S.D.N.Y. Mar. 5, 2003) (in context where attorneys providing both business advice and legal advice, only communications reflecting legal advice, but not those reflecting business strategy discussions "where, for example, an attorney is merely conveying to his client the substance of what a third party has conveyed," will be protected as attorney-client privilege); *ECDC Envtl. v. New York Marine & Gen. Ins. Co*., No. 96CIV.6033(BSJ)(HBP), 1998 WL 614478, at *9 (S.D.N.Y. June 4, 1998) (recognizing that an "attorney's communication to a client reporting facts learned by the attorney from a third party is not within the attorney-client privilege unless the information is included in legal analysis or advice communicated to the client," and the "critical inquiry is whether, viewing the lawyer's communication in its full content and context, it

6

was made in order to render legal advice or services to the client.").

The email supports Shimoda's contention that his role was to provide legal guidance and help translate legal concepts for his Japanese clients. *See, e.g., United States v. Mobil Corp.*, 149 F.R.D. 533, 539 (N.D. Tex. 1993) (document from tax counsel to officers of Mobil and members of Mobil's tax department detailing the state of settlement negotiations with the German tax authorities protected by attorney-client privilege and work product doctrine). The language of the email and the circumstances surrounding it indicate that Teikoku was weighing in on the Watson settlement negotiations and using Shimoda as their outside counsel to help them do so in his capacity as their attorney. The fact that there is little formal legal advice in the email at issue does not preclude protection under the attorney-client privilege. The email itself, the Shimoda declaration, and the circumstances indicate that this particular exchange of information was part of a larger conversation between Shimoda and his client, to allow Teikoku to formulate its response and position on the Watson settlement negotiations in light of Teikoku's analysis of the strength of Endo's litigation position in the Watson litigation and pending regulatory actions.

Plaintiffs also argue that because there is no common interest or joint defense privilege between Endo and Teikoku regarding the Watson litigation – an issue I address below – Shimoda's email conveys only unprivileged facts which cannot be shielded by the attorney-client privilege. Even if I assume that plaintiffs are correct and that there is no privilege for communications between Endo and Teikoku, there is a privilege for the communication between Shimoda and his own client. The attorney-client privilege protects communications between attorneys and their clients even when the facts being conveyed may themselves be unprivileged. *See, e.g., Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) ("A fact is one thing and a communication concerning that fact is an entirely different thing."); *see also Willnerd v. Sybase, Inc.*, 2010 U.S. Dist. LEXIS 135781, *8-9 (D. Idaho Dec. 22, 2010) (protecting email that "was drafted for the purpose of facilitating legal representation"); *Muro v. Target Corp.*, 250 F.R.D. 350, 363 n.21 (N.D. Ill. 2007) ("communications of facts are privileged even if the original facts

are not.").[8]

Because I find that the email at question is protected by the attorney-client privilege, I need not consider whether it is also protected attorney work-product or whether the common interest/joint defense privilege shields communications between Endo and Teikoku more generally. Plaintiffs' cross-motion challenging the claw back of the Shimoda email is DENIED.

**C. Is Disqualification Warranted?**

Teikoku argues that plaintiffs' counsel should have immediately recognized the privilege of the document, segregated it, and notified Teikoku. Instead, plaintiffs' counsel shared the document and then used it as part of their Election Motion against Endo. That conduct, Teikoku argues, requires disqualification of plaintiffs' counsel.

Under applicable California law, "[w]hen a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged. The parties may then proceed to resolve the situation by agreement or may resort to the court for

---

[8] The cases plaintiffs rely on are inapposite or unpersuasive. In *Regents of Univ. of California v. Micro Therapeutics, Inc.*, No. C 03-05669 JWRS, 2007 WL 2069946, at *2 (N.D. Cal. July 13, 2007), plaintiffs rely on an inapposite case quote. "When an attorney conveys to his client facts acquired from other persons or sources, those facts are not privileged" comes from a FOIA case where the court's concern was allowing government agencies to shield facts by passing them through agency attorneys. In *Briton v. Department of State*, 636 F.2d 600, 604 (Fed.Cir.1980). In *Hofman v. City & County of San Francisco*, 2013 U.S. Dist. LEXIS 118989, *2-3 (N.D. Cal. Aug. 20, 2013), the court concluded that San Francisco could not refuse to identify the reasons it adopted tools used to promote police officers because the reasons those tools were adopted were unprivileged "facts" not protected "communications," even if the tools were developed with the assistance of the City's attorneys. The *Hofman* quote relied on by plaintiffs comes from *Standard Chartered Bank PLC v. Ayala Int'l Holdings (U.S.), Inc.*, 111 F.R.D. 76, 80 (S.D.N.Y. 1986), which relied on a portion of *Hickman v. Taylor*, 329 U.S. 495, 508, (1947) discussing the early contours of the attorney-client privilege vis-à-vis the work-product doctrine ("the protective cloak of this privilege does not extend to information which an attorney secures from a witness while acting for his client in anticipation of litigation."). Finally, while the court in *S.E.C. v. Roberts*, 254 F.R.D. 371, 382 (N.D. Cal. 2008), noted in passing that it "is aware of no privilege that protects the factual information contained within" notes an attorney shared with a third-party, it held that the work product doctrine nevertheless prevented disclosure of the facts in those notes. *Id.* at 383.

8

guidance with the benefit of protective orders and other judicial intervention as may be justified." *State Comp. Ins. Fund v. WPS, Inc.*, 70 Cal. App. 4th 644, 656-57 (1999).

To determine whether an attorney violated the rules of professional conduct with respect to receipt of a privileged document, "courts must consider whether reasonably competent counsel, knowing the circumstances of the litigation, would have concluded the materials were privileged, how much review was reasonably necessary to draw that conclusion, and when counsel's examination should have ended." *Rico v. Mitsubishi Motors Corp.*, 42 Cal. 4th 807, 818 (2007). If the Court determines that a violation of professional conduct has occurred with respect to an inadvertently produced privileged document, the "next question" is whether disqualification is the proper remedy. *Id*. at 819. Mere exposure to a document may not merit disqualification, but "full use" of the materials may. *Id*. (use of defense counsel's privileged defense strategy notes placed defense experts and defendants at a great and irreversible disadvantage requiring disqualification).[9]

District courts have inherent authority to disqualify counsel. *United States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir. 1996). However, "[b]ecause of their susceptibility to tactical abuse, [m]otions to disqualify counsel are strongly disfavored" and "should be subjected to particularly strict judicial scrutiny." *Oracle Am., Inc. v. Innovative Tech. Distrib., LLC*, 11-CV-01043-LHK, 2011 WL 2940313, at *4 (N.D. Cal. July 20, 2011) (quotation marks omitted). Courts must also be cognizant of the "substantial hardship" and the "monetary and other costs of finding a replacement" on parties whose counsel is disqualified. *Gregori v. Bank of Am.*, 207 Cal. App. 3d 291, 300 (Ct. App. 1989). Finally, "the purpose of a disqualification must be prophylactic; an attorney may not be disqualified purely as a punitive or disciplinary measure." *Neal v. Health Net, Inc.*, 100 Cal. App. 4th 831, 844 (2002).

Plaintiffs argue that disqualification is not warranted in this case because they did not

---

[9] GEHA filed a separate opposition brief to argue that under Federal Rule of Evidence 501, the privilege laws of each of the 32 states under which GEHA brings state law claims must be applied to determine whether the Shimoda email was "obviously privileged" in light of the common interest privilege under *Rico v. Mitsubishi Motors Corp.*, 42 Cal. 4th 807. Dkt. No. 302. However, as I have concluded the email is protected by attorney-client privilege, I need not reach this issue to decide the disqualification motion.

breach any professional conduct standards. They assert that the Shimoda email was not "obviously" privileged and nor was it "reasonably apparent" to a competent attorney that the email was inadvertently produced given the circumstances of the litigation. Those circumstances include that this case *is about* the settlement of another lawsuit. Discovery is focused on documents regarding the Watson litigation and settlement and hundreds of those sorts of documents – many of which were sent to or from lawyers and have been marked in whole or in part as "attorney-client" – have been produced without redaction. Plaintiffs assert that it was also reasonable to rely on the fact that Teikoku had implemented extensive review protocols to conduct their privilege review (as discussed in the Case Management Conferences), which led to staggered production of documents that were initially withheld on privilege grounds but subsequently released after a second-round review. Sharp Decl. ¶¶ 3, 7.

Plaintiffs also note that: (i) Shimoda was listed as a sender or recipient on more than 1,500 documents produced in this litigation as to which Teikoku has not asserted a privilege; (ii) more than 500 documents Teikoku has produced have an "attorney-client" stamp yet are unredacted; and (iii) 100 of those "attorney-client" stamped documents are to or from Shimoda. *Id*., ¶¶ 33-34, 38. This context, plaintiffs contend, shows that when the April 11, 2012 Shimoda email was reviewed by counsel, it could not be obvious or readily apparent to them that the email was privileged.

Teikoku disputes the import of and the actual number of documents that have been produced stamped "attorney-client" and not redacted or clawed back, arguing the pool is much smaller and more discrete than plaintiffs assert. *See, e.g.*, Supplemental Declaration of Rafael Langer-Osuna (Dkt. No. 313-2). Teikoku argues that many of the unredacted documents marked at "attorney-client" are public records, discovery-related documents exchanged with opposing counsel, or standard disclaimers from email signature blocks. *Id*. ¶¶ 7-9. Teikoku also contends that because the Shimoda email was included on its privilege log, despite the fact that it was produced unredacted, plaintiffs should have been on notice of its privileged nature.

However, considering the context of this litigation – focusing as it does on the parties' beliefs as to the strength of the Watson litigation and regulatory proceedings – as well as the

colorable argument that the email is not privileged, I agree that the Shimoda email's privilege was not "readily apparent."[10] This conclusion is strengthened when considering the context of the production of the Shimoda email, occurring after a second-round privilege review had been conducted and where numerous (if not as numerous as plaintiffs contend) substantive documents marked as attorney-client were nonetheless produced without redactions.

Moreover, I find that denial of disqualification will not cause prejudice to Teikoku, Endo, or the judicial system. Courts have recognized that opposing counsel's access to otherwise privileged information can damage both the integrity of the judicial system and an opposing party in litigation because "the inevitable questions about the sources of [counsel's] knowledge (even if [counsel] in fact obtained such knowledge from legitimate sources) could undermine the public trust and confidence in the integrity of the adjudicatory process." *Clark v. Superior Court*, 196 Cal. App. 4th 37, 55 (2011); *see also Gregori v. Bank of Am.*, 207 Cal. App. 3d 291, 309 (1989) ("the significant question is whether there exists a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court"). But given the nature of the underlying questions in this antitrust suit – defendants' beliefs about the strength of Watson's non-infringement arguments and Endo's Citizen Petition – there has been and will continue to be significant discovery on these topics from Endo and Teikoku executives. Indeed, plaintiffs point to evidence that they have collected independent of and *prior to* the disclosure of the Shimoda email that cover most of the privileged topics discussed in the Shimoda email. Sharp Decl. ¶¶ 49-53. There is little evidence that Teikoku or Endo will suffer any real prejudice from the fact that plaintiffs' counsel had relatively fleeting access to the information in the Shimoda email.

Finally, although not necessary to my conclusion, I am cognizant of the severe impact

---

[10] On this point, plaintiffs rely on the declaration of Profession Richard Zitrin, opining as a proposed expert that given the factual background and discovery history in this case, plaintiffs' counsel had no duty to disclose to Teikoku or refrain from using the unredacted copy of the Shimoda email. Zitrin Decl. (Dkt. No. 303-8), ¶ 4. Teikoku objects to the Zitrin Declaration on multiple grounds. Reply (Dkt. No. 311-4) at 15; Reply to GEHA (Dkt No. 312) at 6-7. I do not rely on the Zitrin Declaration in reaching my conclusion, and therefore need not reach Teikoku's objections to the same.

disqualification would have on the progress of this litigation and the ability of plaintiffs to effectively move the case to conclusion without unnecessary costs. *See, e.g., FlatWorld Interactives LLC v. Apple Inc.*, No. 12-CV-01956-WHO, 2013 WL 4039799, at *5 (N.D. Cal. Aug. 7, 2013) ("Courts must be cognizant of the 'substantial hardship' and the 'monetary and other costs of finding a replacement' on parties whose counsel is disqualified.") (quoting *Gregori v. Bank of Am.*, 207 Cal.App.3d 291, 300 (Ct. App. 1989)).

Teikoku's motion to disqualify plaintiffs' counsel is DENIED.

## II. THE COMMON INTEREST/JOINT DEFENSE DOCTRINE

Raised in both Teikoku's motion to disqualify and plaintiffs' cross motion challenging the claw back is the issue of whether communication of otherwise privileged information between Endo and Teikoku waives the privilege or are those communications covered by the common interest/joint defense doctrine. The doctrine is "an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." *Pac. Pictures Corp. v. United States Dist. Court*, 679 F.3d 1121, 1129 (9th Cir. 2012). However, "a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception. Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement— whether written or unwritten." *Id.* (internal citation omitted). More generally, "the common interest privilege, frequently referred to as the joint defense privilege, applies where (1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived. *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003); *Fox v. Shinseki*, No. CV 11-04820 EDL, 2013 U.S. Dist. LEXIS 63067, *4 (N.D. Cal. May 2, 2013).

Counsel agree that a determination of the applicability of this doctrine to communications between Endo and Teikoku should not be made with broad strokes, but instead determined more narrowly, on a document-by-document analysis. I did not need to address its applicability to the Shimoda email. But I did entertain argument on the issue and will make this modest statement to hopefully assist the parties in their consideration of the issue.

12

There is a basis for asserting the common interest privilege in this case; the unresolved issue is its reach.  On the one hand, Teikoku agreed in 2007, and repeated in 2015, that it did not have control of the litigation.  On the other, Teikoku was clearly involved in aspects of discovery and, as the Shimoda email made clear, conversations concerning settlement.

Endo explained at the hearing that it was not applying the doctrine to block release of communications regarding "commercial" issues, but was where those communications involved "litigation."  Teikoku stated that it was not applying the doctrine to block release of communications containing "facts" but was to communications discussing "strategy."  These lines seem appropriate in general.  How they apply to any specific communication, or whether they should be disregarded for some reason, are questions left for later determination.

As to choice of law governing applicability of the doctrine – in light of GEHA's state law claims – I am inclined to apply federal common law as the federal claims in this case predominate. *See, e.g., Agster v. Maricopa Cty.*, 422 F.3d 836, 839 (9th Cir. 2005) ("Where there are federal question claims and pendent state law claims present, the federal law of privilege applies.").  The parties may brief this further if need be once a dispute arises.

## CONCLUSION

Defendants' motion to disqualify and plaintiffs' cross-motion challenging the claw back are both DENIED.

**IT IS SO ORDERED**.

Dated: November 25, 2015



WILLIAM H. ORRICK
United States District Judge

13