UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE LIDODERM ANTITRUST LITIGATION** | Case No.  14-md-02521-WHO |
| | **ORDER ON MOTIONS FOR PRODUCTION OR PRECLUSION AND PRODUCTION OF ATTORNEY NOTES** |
| | Re: Dkt. Nos. 462, 463, 472, 473, 476, 478, 490, 491 |

Attorney-client privilege issues lie at the heart of litigation over a settlement alleged to be anticompetitive when a party's lawyers are the principal negotiators and advisors regarding the agreement.  That party cannot testify to its subjective beliefs about the reasons for entering into the settlement and preclude its adversaries from discovering the content of the lawyers' advice by simply asserting that the attorney-client advice was irrelevant to those subjective beliefs.  Instead, when the record shows that attorney-client advice played a significant role in formulating a party's subjective beliefs on central issues in the case, the adversaries are entitled to disclosure of the otherwise privileged material to test the credibility of those subjective beliefs.  But if a party relies solely on objective evidence, or subjective beliefs derived exclusively from business judgment and experience, the attorney-client privilege should be protected.

Currently before me are two motions: (i) plaintiffs' renewed motion for production or preclusion, arguing that defendants have put "at issue" subjective beliefs requiring defendants to either waive attorney-client privilege for related information or be precluded from raising the beliefs on summary judgment or trial; and (ii) plaintiffs' motion to compel Endo to produce the notes of former General Counsel Caroline Manogue regarding the negotiations of the Watson settlement.  Each motion raises multiple issues of privilege.  On the record developed in discovery, I GRANT in part and DENY in part each motion.

United States District Court
Northern District of California

United States District Court
Northern District of California

# DISCUSSION

## I.  PLAINTIFFS' RENEWED MOTION FOR PRODUCTION OR PRECLUSION

Last fall, plaintiffs argued that defendant Endo put "at issue" attorney-client communications by relying on subjective beliefs informed by its counsel with respect to testimony Endo gave to the Federal Trade Commission.  At that juncture of the case, prior to the depositions of defendants and "in light of Endo's express disclaimer of any intent to rely on its subjective belief," I declined to find "that Endo has broadly placed at issue unidentified documents and communications that would normally be protected by the attorney-client or work product doctrines."  December 3, 2015 Order at 3.  I invited plaintiffs, as the case progressed, to "reassert the waiver issue with respect to specifically identified documents or communications so that I may rule on discrete waiver assertions." *Id*.

Disputes precipitated by the breadth of defendants' privilege assertions – unsurprising given the subject matter of this case – and the unsettled question of what exact subjective beliefs defendants intend to rely on to defend the Watson settlement have occurred since.[1]  In order to provide finality and clarity on the issue, following the April 5, 2016 Case Management Conference I ordered defendants to identify all subjective beliefs that they intend to introduce or rely on at trial on the following topics:

> (a) Endo's assessment of the strength of the relevant patents and its expectations concerning the outcome of the patent litigations;
>
> (b) Endo's reasons, explanations and intentions for the Payments, and its beliefs about the impact the Payments would have on competition;
>
> (c) Endo's beliefs about Watson's final ANDA approval and an at-risk launch by Watson;
>
> (d) Endo's reasons or incentives, if any, for agreeing to a generic entry date before September 2013;[2] and

---

[1] The basic provisions of the July 2012 Watson settlement included: (i) termination of the patent litigations; (ii) Endo providing brand-name Lidoderm patches to Watson for Watson to sell; (iii) Endo allowing Watson to sell its generic version of Lidoderm starting on a date certain (before Teikoku's patents expired); and (iv) Endo giving Watson a period of exclusivity to market Watson's generic version of Lidoderm patches without competition from Endo's generic patch.

[2] The defendants appropriately construed this topic as Endo's reasons or incentives for not

United States District Court
Northern District of California

1  (e) Endo's intention to launch an authorized generic version of
2  Lidoderm.

3  Defendants did so.[3]  Plaintiffs renewed their motion, arguing that defendants' reliance on the

4  identified subjective beliefs means they have placed "at issue" attorney-client privilege

5  information that in fairness must either be disclosed or defendants should be precluded from

6  relying on the particular subjective beliefs as this case goes forward.  Plaintiffs support their

7  motion by showing how, when defendants' major trial witnesses were deposed, those witnesses

8  relied on assertions of attorney-client privilege to refuse to answer questions regarding topics

9  disclosed under (a) through (e) above.  Plaintiffs also rely on the descriptions included in

10  defendants' privilege logs to demonstrate that numerous documents have been withheld under the

11  attorney-client privilege that expressly implicate the subjective beliefs defendants intend to rely

12  on.

13     As discussed in more detail below, given the evidence plaintiffs have presented showing

14  that defendants *actually relied* on attorney advice in reaching their subjective beliefs, I conclude

15  that defendants will be precluded from relying on specific subjective beliefs unless they choose to

16  waive the privilege as to communications and information regarding the same.  This does not

17  mean that defendants will be unable to rely on any evidence with respect to those topics or

18  defenses.  Defendants may rely on objective evidence from experts that does not cross into what

19  defendants believed or why defendants were motivated to agree to certain terms in the Watson

20  settlement.

21  **A. Legal Standard**

22     Plaintiffs argue that a topic becomes "at issue" and creates an implied waiver of the

23  attorney-client privilege when "in fairness" the privileged information should be disclosed so the

24  other side can refute a claim or defense.  Defendants counter that at issue waiver *only* occurs when

25  a party makes an affirmative choice to rely on attorney advice for a claim or defense.  Plaintiffs'

26  _____

27  agreeing to a date *before* September 15, 2013 (Endo, Teikoku), or reasons or incentives for
    agreeing to the date *of* September 15, 2013 (Watson).

28  [3] Teikoku and Watson appropriately rephrased some of the topics so that they disclosed *their* subjective beliefs as to the topics at issue. *See* Exs. B & C to Kohn Decl.

3

formulation is slightly overbroad and defendants' is too narrow.

"The privilege which protects attorney-client communications may not be used both as a sword and a shield.  Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (internal citation omitted); *see also Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1042 (9th Cir. 2009).  In *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003), the Ninth Circuit explained "[i]n practical terms, this means that parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials. The party asserting the claim is said to have implicitly waived the privilege." *Id.* at 719.  However, the "court imposing the waiver does not order disclosure of the materials categorically; rather, the court directs the party holding the privilege to produce the privileged materials if it wishes to go forward with its claims implicating them. The court thus gives the holder of the privilege a choice: If you want to litigate this claim, then you must waive your privilege to the extent necessary to give your opponent a fair opportunity to defend against it." *Id.* at 720.[4]

In the Ninth Circuit, the standard for determining when an implied waiver of the attorney-client privilege occurs is set out in *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975).  *See Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995).

> Under *Hearn*, an implied waiver of the attorney-client privilege occurs when (1) the party asserts the privilege as a result of some affirmative act, such as filing suit; (2) through this affirmative act, the asserting party puts the privileged information at issue; and (3) allowing the privilege would deny the opposing party access to information vital to its defense.

*Id.* at 1326.

Plaintiffs rely heavily on *United States v. Amlani*, 169 F.3d 1189 (9th Cir. 1999).  There, the district court found that defendant impliedly waived the attorney-client privilege with respect

---

[4] The *Bittaker* court noted that "three important implications flowed from this regime": first, the court must impose a waiver no broader than needed to ensure the fairness of the proceedings before it; second, the holder may preserve the confidentiality of the privileged communications by choosing to abandon the claim that gives rise to the waiver; and third, a court may impose contours and protections on the use of the privileged information.  *Id.* at 721.

to communications involving him, his wife, his current counsel, and his former counsel by asserting a claim of attorney disparagement in the appeal of his conviction and sentence.  Amlani's claim for disparagement was based on allegations that the government deprived him of his Sixth Amendment right to counsel when the prosecutor intentionally undermined his confidence in his chosen counsel by disparaging Amlani's counsel in front of him.  *Id*. at 1191.  The district court found that Amlani waived the privilege and allowed the government to investigate the claim by issuing subpoenas and seeking the testimony of defendant, his wife, and his counsel into the circumstances surrounding the substitution of new counsel.

The Ninth Circuit affirmed, applying the *Hearn* test.  It concluded that Amlani put the circumstances at issue by claiming disparagement and prejudice from having to substitute in new counsel as a result, and that the government "demonstrated a real need for the evidence, especially in deciding the question of whether the allegedly disparaging statements caused Amlani to seek new counsel."  *Id*. at 1195.  The court recognized that privileged communications "do not become discoverable simply because they are related to issues raised in the litigation" and that when the sought-after evidence is only one of several forms of indirect evidence about an issue, the privilege has not been waived.  *Id*.  But it explained that "fairness" required the disclosure because to defend against defendant's claim, "the government must have access to" the communications at issue.  *Id*.

As the court explained, other potential sources of evidence on the issue would be "of little, if any, value in evaluating whether the prosecutor's statements caused Amlani to retain other counsel.  If the government has no access to the subpoenaed documents and other communications because of the privilege, it would be forced to rely almost exclusively on Amlani's and Katz's characterization of events."  *Id*. at 1196.  Therefore, "[i]n fairness, to defend against these charges, the government must have access to Amlani's communications with counsel to determine whether in fact the disparaging comments caused the substitution of counsel."  *Id*.; *see also Apple Inc. v. Samsung Elecs. Co*., 306 F.R.D. 234, 243 (N.D. Cal. 2015) (when defendant attempted to defeat sanctions related to an inadvertent disclosure of confidential materials relying on and submitting for *in camera* review *its* own privileged documents, it went beyond "mere denials" and its "use

placed the privileged information at issue while improperly limiting Apple and Nokia's ability to assess or challenge these assertions. This waived privilege."); *Landmark Screens, LLC v. Morgan, Lewis & Bockius LLP*, No. C08-02581 JF (HRL), 2009 U.S. Dist. LEXIS 102579, at *7-8 (N.D. Cal. Oct. 21, 2009) (where plaintiff put at issue fact of when it became aware of the alleged fraud by alleging tolling of the statute of limitations, "[i]nformation that shows when Landmark discovered the alleged fraud would therefore be vital to MLB's defense, and the *Hearn* test is met."); *Rambus Inc. v. Samsung Elecs. Co*., No. C-05-02298 RMW, 2007 U.S. Dist. LEXIS 97619, at *13 (N.D. Cal. Nov. 13, 2007) (because defendant asserted tolling of statute of limitations to when it discovered former employee's fraud counterclaim, implied waiver was found as to relevant communications); *cf. Chevron Corp. v. Donziger*, 2013 U.S. Dist. LEXIS 168187, at *9, *11 (S.D.N.Y. Nov. 21, 2013) (following *Hearn* and considering whether it would "be unfair for a party asserting contentions to an adjudicating authority to then rely on its privileges to deprive its adversary of access to material that might disprove or undermine the party's contentions" and concluding "implied waiver may be found where a party puts a claim or defense at issue that in fairness requires disclosure of privileged material, whether or not the privileged material explicitly was relied upon in making the claim or defense.").

Contrary to defendants' position, the actual use of attorney client information in prosecuting or defending *this* case is not necessary to effect an implied waiver under *Hearn*. *Cf. Bowne, Inc. v. AmBase Corp*., 150 F.R.D. 465, 488 (S.D.N.Y. 1993) (concluding defendant waived privilege for communications by asserting it was not at fault for a missed proxy statement mailing; "[t]he implicit point was that even if a party does not attempt to make use of a privileged communication, he may waive the privilege if he asserts a factual claim the truth of which can only be assessed by examination of a privileged communication."); *but see DR Distributors, LLC v. 21 Century Smoking, Inc*., No. 12 CV 50324, 2015 WL 5123652, at *7 (N.D. Ill. Sept. 1, 2015) (following 7th Circuit's adoption of *Rhone-Poulenc Rorer, Inc. v. Home Indemnity Company*, 32 F.3d 851, 863 (3rd Cir.1994), and noting that "privilege is waived when the advice is affirmatively used to establish a claim or defense"); *Sorensen v. Black & Decker Corp*., No. 06CV1572BTM

United States District Court
Northern District of California

1   (CAB), 2007 WL 1976652, at *2 (S.D. Cal. Apr. 9, 2007) (following *Rhone-Poulenc Rorer*).[5]

2       That said, a simple showing of relevance to a case will not suffice.  The information sought

3   must be *directly* relevant and *necessary* to allow a party to fully challenge the claims or defenses

4   of the party asserting the privilege, and the information cannot be secured through other sources.

5   *See, e.g.*, *In re Geothermal Res. Int'l, Inc.*, 93 F.3d 648, 653 (9th Cir. 1996) (emphasizing that the

6   privilege is waived only when "the client tenders an issue touching directly upon the substance or

7   content of an attorney-client communication" and not when the testimony sought would be "only

8   one of several forms of indirect evidence" about an issue); *1st Sec. Bank of Washington v. Eriksen*,

9   No. CV06-1004RSL, 2007 WL 188881, at *3 (W.D. Wash. Jan. 22, 2007) (information otherwise

10  protected by privilege must be "vital" to party's claim; "[m]ere relevance to defendant's case is

11  not sufficient."); *see also Cervantes v. CEMEX, Inc.*, No. 1:12-CV-1932-LJO-JLT, 2014 WL

12  4104200, at *9 (E.D. Cal. Aug. 18, 2014) (if "mere showing" that privileged information would be

13  "helpful" to a party "was deemed sufficient, the privilege would be completely eviscerated and

14  clients would no longer be permitted to seek advice of counsel in confidence").

15      Relatedly, defendants cannot avoid waiver by offering to rely at summary judgment or trial

16  solely on non-legal justifications for certain subjective beliefs.  There is no doubt – given the

17  question at issue is whether anticompetitive goals motivated defendants' settlement – that business

18  advice and non-legal facts were considered by settlement decision-makers.  But if defendants

19  inject their subjective beliefs on specific topics as part of their defense of the Watson settlement –

20  like a subjective belief that patent litigation is inherently uncertain –where evidence *establishes*

21  that the subjective belief was also informed by attorney advice, it would be unfair to not allow

22  plaintiffs access to defendants' contemporaneous attorney-client information to test the veracity of

23  the defendants' justifications in this litigation even though that belief is based *in part* on business

24

25

26  _____

    [5] Many of defendants' cases are inapposite because they cite to or rely on the Third Circuit's
    analysis in *Rhone-Poulenc Rorer* which, contrary to *Hearn*, requires affirmative use of the
27  privileged information to find implied waiver.  *See, e.g., Sorensen v. Black & Decker Corp.*, No.
    06CV1572BTM(CAB), 2007 WL 1976652, at *2 (S.D. Cal. Apr. 9, 2007) (relying on *Rhone-
    Poulenc Rorer*); *Harter v. Univ. of Indianapolis*, 5 F. Supp. 2d 657, 664 (S.D. Ind. 1998)
28  (following *Rhone-Poulenc Rorer*).

judgment and executive experience.[6]

## B. Defendants' Subjective Beliefs

Endo has identified 29 subjective beliefs as to topics (b) – (e) on which it intends to rely at summary judgment and trial.  *See* Exhibit A to the Declaration of Peter Kohn, Dkt. No. 463-2.[7] Watson/Actavis has identified 28 subjective beliefs on topics (a) – (e).  Ex. B to the Kohn Declaration.  Teikoku has identified 11 subjective beliefs on topics (a) – (c) and (e).  Ex. C to the Kohn Declaration.

As described in more detail below, plaintiffs have demonstrated that many of the subjective statements identified by defendants rely in significant part on legal advice.  The depositions of defense fact witnesses and the assertions of privilege in those depositions demonstrate that legal advice was provided and considered.[8]  The privilege logs likewise show that legal advice was provided on these topics and considered by senior management, and confirm that defendants' settlement negotiators and often primary decision-makers were the attorneys.

Some of the subjective beliefs under each category plausibly implicate only business decisions and could have been theoretically reached without attorney-client input.  For example,

---

[6] Defendants rely on *1st Sec. Bank of Washington v. Eriksen*, No. CV06-1004RSL, 2007 WL 188881, at *3 (W.D. Wash. Jan. 22, 2007) for the proposition that because their subjective beliefs can be supported by non-privileged information, there is no waiver.  *See, e.g.*, Watson Oppo. at 2. In that case, however, the privileged information at issue was not relevant to the question at the heart of the case (defendant's malpractice liability), and was at most relevant to damages (the reasonableness of the subsequent settlement).  As the privileged information did not go to the central issue, there was no need to pierce the privilege and non-privileged facts sufficed for proof on the ancillary damages issue.

[7] Because Endo understood that in my December 2015 Order I determined that any subjective belief regarding topic (a) would result in a waiver of the attorney-client privilege and attorney work product doctrines, Endo has elected not to present evidence of its subjective beliefs regarding "Endo's assessment of the strength of the relevant patents and its expectations concerning the outcome of the patent litigations."  Plaintiffs nevertheless ask me to require Endo to produce privileged documents on this topic because: (i) Endo made false representations to the FTC and this Court about its beliefs on the patent litigation; and (ii) Endo has nonetheless put at issue this topic through its subjective beliefs about the September 2013 Watson entry date and its assessment of Watson launching at-risk.  Motion at 12, n.12.  I will not revisit the "FTC gamesmanship" argument rejected in my December Order.

[8] Indeed, the privilege disputes the parties have brought before me implicate many of these topics – for example Endo and Teikoku's discussion of the status of Watson's ANDA as well as the strategy for Endo's Citizen Petition – and demonstrate that attorneys were inherently involved in helping the companies formulate their beliefs and strategies.

United States District Court
Northern District of California

United States District Court
Northern District of California

under (b) – "Endo's Reasons, Explanations and Intentions for the Payments, and its Beliefs About the Impact the Payments Would Have on Competition" – Endo's Subjective Belief 1 is that: "All terms of the Agreement were part of a negotiated package that enabled the parties to resolve the patent litigation in a manner that permitted Watson to enter the market before the expiration of the patents Endo asserted against Watson."   On its face, some components of that belief could plausibly be based solely on business judgment.

*The problem* is that in order to test the veracity of that belief – including whether other factors were involved and how much weight each factor had in motivating the parties to  "resolve the patent litigation" and allow Watson "early" entry – other justifications that plaintiffs have shown relied on attorney-client advice are also directly implicated.  As to many of the subjective beliefs discussed below, defendants' position is essentially this: "Trust us.  The justifications we are putting forward here *are* why we settled."  But in order to test or rebut defendants' assertions, in fairness, plaintiffs should be given access to contemporaneous information regarding those topics that necessarily implicate attorney-client advice.  *Cf. Amlani*, 169 F.3d at 1196 ("If the government has no access to the subpoenaed documents . . . it would be forced to rely almost exclusively" on defendants' characterization of events).[9]

Given the importance of many of these beliefs to the merits of this case, *if* defendants choose to rely on a subjective belief identified below that the record shows directly implicate attorney-client advice, defendants will have effectuated an at-issue waiver for that belief and will be required to produce withheld privileged documents. At oral argument, defendants complained that requiring them to decide whether to waive attorney-client privilege or forego reliance on subjective beliefs to defend this case puts them in an untenable position and would "eviscerate"

---

[9] The Ninth Circuit in *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995) concluded that it was not an abuse of discretion to deny defendants access to plaintiff's attorney-client privileged information, because that information was not critical to defendants' defense.  Specifically, facts defendants admitted undermined their theory as to the relevance of the privileged documents.  *Id*. at 1326-27 (plaintiffs' actions and intent); *see also id*. at 1327 (reasonableness of insurer's settlement, an ancillary issue, established by facts regarding existing judgment).  The facts in *Home Indemnity* – the irrelevance of privileged documents to the central liability issue and that other admitted evidence fully established the ancillary damages issue – differentiate this case from that one.

United States District Court
Northern District of California

the attorney-client privilege.  Defendants' sky-is-falling protest ignores the unique circumstances of this case.  Defendants' position would put plaintiffs in a truly untenable posture – requiring them to challenge the subjective beliefs defendants assert to justify the Watson settlement post-hoc without access to the contemporaneous information and documents defendants *actually* relied on.  Moreover, as explained below, many of the "beliefs" defendants wish to rely on at summary judgment or trial can be presented through objective evidence by experts without touching on defendants' subjective beliefs.

**C.  Topic (a) – Defendants' Assessment of the Strength of the Relevant Patents and Expectations Concerning the Outcome of the Patent Litigations**

Endo, correctly understanding that I have already ruled that any attempt to rely on a subjective belief regarding the strength of the relevant patents and expectations concerning the outcome of the Watson patent litigation would create an at-issue waiver, has not identified any subjective beliefs under (a).[10]  Teikoku has identified one subjective belief:

> Teikoku may introduce or rely on at trial evidence that at the time it entered into the Settlement Agreement, Teikoku believed that the outcome of the Watson litigation was uncertain.

Watson has identified two subjective beliefs:

> 1. There are risks inherent in patent litigation, including that District Courts, and Judge Robinson of the District of Delaware specifically, and the Federal Circuit routinely find patents valid, enforceable, and infringed, and as a consequence, there was a risk that the district court and/or the Federal Circuit would find the '529, '510, '333, and/or '334 Patents valid, enforceable, and infringed by Actavis.

> 2. An appeal of the district court decision in the '529 patent litigation would last at least a year from the date of decision.

Given that the subject matter here *is the Watson patent litigation* and the justifications for resolving that litigation, these subjective beliefs necessarily involve attorney-client advice. *Xuedan Wang v. Hearst Corp.*, No. 12 CV 793 (HB), 2012 U.S. Dist. LEXIS 179609, at *8

---

[10] Endo did disclose – as Subjective Belief 26 – that the post-trial motions in patent cases take a few months to resolve and appeals in patent litigation take approximately a year to resolve.  Ex. A at 5.  While phrased in a general way, if this belief is introduced in evidence it would necessarily suggest a subjective belief as to the Watson patent litigation.  It is therefore treated, along with Watson's Subjective Belief 2, as an expectation concerning the outcome of the patent litigation. *See* Kohn Decl., Ex. D E22 (Endo attorney and Senior VP of Intellectual Property asserted privilege in response to questions about likelihood of success in Watson litigation).

(S.D.N.Y. Dec. 19, 2012) ("I find it difficult to imagine that a good faith defense . . . raised by a corporation as large and as sophisticated as Hearst would not involve the advice of its legal department.").

Teikoku and Watson's argument – that these specific subjective beliefs can be based on business judgment and the general knowledge of pharmaceutical executives – is accurate to a point.[11] But the privilege logs and deposition testimony demonstrate that the status of the *Watson patent litigation* and the risks involved to both sides were discussed between executives and counsel, which is to be expected. Kohn Decl., Ex. E, W1 – W3 (Watson CEO discussed strength of patents and status of patent litigation with counsel), W4-W7 (Watson in-house patent counsel invoked privilege as to discussions regarding Watson patent litigation), W8 (Watson in-house patent counsel knew what CEO's beliefs were as to merits of patent litigation, but could not reveal those beliefs because of attorney-client privilege), W14;[12] *see also* Kohn Ex. F T1 (Teikoku CEO could not disclose his opinion about patent litigation without disclosing privileged information because "[e]verything involves opinions from counsel."), T2-T3 (Teikoku's Director of Business Development and Manager of Corporate Development did not know anyone at Teikoku who had an opinion about the Watson litigation not based on legal advice), T5 (CEO asserting privilege and lack of knowledge about rulings in Watson litigation).[13] If business executives were allowed to testify concerning their subjective beliefs about the inherent uncertainties in patent litigation and

---

[11] Watson relies on extensive deposition citations to testimony by its former CEO Paul Bisaro that he and similarly situated people in his industry were familiar with Paragraph IV patent litigation and the inherent risks involved. *See, e.g.*, Hoffman Lent Decl. [Dkt. No. 477-1], Ex. B at W1-W8. However, Watson's own excerpts confirm that their executives' beliefs as to the outcome of the litigation *at issue* were informed by counsel. *Id.* at W4-W5.

[12] *See also* Dkt. No. 434 at 3 (asserting privilege over comments Watson's CFO Todd Joyce made characterizing "Watson's beliefs regarding the strength or weakness of its position in the patent litigations" because those beliefs were based on legal advice Joyce received from counsel). Watson counsel also created analyses of the patent litigation, but it was unclear whether these analyses were provided to executives or settlement decision-makers at Watson, other than General Counsel David Buchen. *See generally*, Kohn Decl. Ex. H (Watson privilege log excerpts).

[13] Documents listed on Teikoku's privilege log also confirm that communications with the "client" regarding the Watson patent litigation and trial outcome have also been withheld. Kohn Decl., Ex. I at 1-5.

United States District Court
Northern District of California

timeframes for trial court and appellate decisions generally, the direct and unmistakable

*implication* from that testimony is that those considerations weighed on the settlement of the

Watson litigation as to which defendants have asserted privilege.[14]

Relatedly, Watson argues that it should be allowed to rely on identified subjective beliefs

where they are backed up by "public statements" made by Watson during the relevant timeframe.

Watson Oppo. at 2-3; *see also* Hoffman Lent Decl., Ex. C W1-W7.  However, those public

statements do not disprove the evidence that attorney advice was provided on these subjective

beliefs.  Nor do the public statements show that attorney advice played no *direct* role in Watson's

formation of the subjective beliefs.  In essence, Watson is arguing that because it said something

publicly at that time, no other motivations could have been at play, despite evidence that extensive

attorney information about the patent litigation was provided to Watson executives.  *Cf. United*

*States v. Amlani*, 169 F.3d at 1196 ("If the government has no access to the subpoenaed

documents and other communications because of the privilege, it would be forced to rely almost

exclusively on Amlani's and Katz's characterization of events.").

At summary judgment or trial, defendants' experts will be allowed to testify on these

topics based on objective evidence (including the pleadings and transcripts from the Watson patent

litigation).  Those experts may also opine on the timing of the trial court decision, post-trial

motions, and resolution of appeals to the Federal Circuit.  Those experts, however, will not be

allowed to discuss or suggest what the defendants' *actual* subjective beliefs may have been on

these topics.

### D. Topic (b) – Defendants' Reasons, Explanations and Intentions for the Payments, and Beliefs about the Impact the Payments Would Have on Competition

On topic (b), Endo identifies the following subjective beliefs:

> 1. All terms of the Agreement were part of a negotiated package that enabled the parties to resolve the patent litigation in a manner that permitted Watson to enter the market before the expiration of the patents Endo asserted against Watson

---

[14] Therefore, Watson Subjective Belief 5 (asserting that given the timeframe for an appeal in the underlying patent litigation, Watson's early entry was procompetitive) puts at issue attorney-client information.

United States District Court
Northern District of California

2. The Agreement permitted Watson to enter the market before the expiration of the patents Endo asserted against Watson.

3. The Agreement eliminated or reduced uncertainty concerning the latest date that Watson would be able to launch a generic form of Lidoderm® if it obtained FDA approval.

4. The Agreement created a second seller of branded Lidoderm®, during a time when it was uncertain whether Watson would have a generic Lidoderm® available to market.

5. A generic Lidoderm® product would not have been introduced to the market earlier in the absence of the Agreement.

6. The Agreement reduced litigation expenses and the business distractions associated with litigation.

7. Endo was unwilling to agree to a Start Date, as that term is defined in the Agreement, earlier than September 15, 2013.

8. Endo agreed to the terms of the Agreement in order to resolve the costs, distractions, and uncertainties inherent in its patent litigation with Watson.

9. Endo agreed to the terms of the Agreement in order to obtain certainty as to the date of entry of generic competition and thereby permit it to make more informed and rational decisions about the allocations of its resources and to facilitate its access to capital to grow its business, all of which enhanced competition.

10. The provision of branded Lidoderm pursuant to Section 3(b)-3(k) of the Agreement addressed Watson's concern that it might not obtain FDA approval of its ANDA.

11. The provision of branded Lidoderm pursuant to Section 3(b)-3(k) of the Agreement was not intended to delay the Start Date and was not in exchange for a later Start Date, as that term is defined in the Agreement.

12. The Agreement does not limit or impede Watson's wholesaler affiliate, Anda, Inc., from offering branded Lidoderm provided pursuant to Section 3(b)-3(k) to its customers at a price lower than what Endo charged or what other wholesalers charged for Lidoderm.

13. Section 3(e) of the Agreement ensured that entities with contracts with Endo for branded Lidoderm would get the benefit of those contracts even if they purchased branded Lidoderm® from Anda, Inc.

14. Any cost associated with the provision of Branded Lidoderm pursuant to Section 3(b)-3(k) of the Agreement was counterbalanced by Watson's agreement to pay Endo a royalty on its generic Lidoderm.

15. The partially exclusive licensing provisions in the Agreement, including Section 2(b), were not intended to delay the Start Date and

were not in exchange for a later Start Date, as that term is defined in the Agreement.

16. There is no way to know whether the parties would have reached a settlement agreement had they been required to negotiate without all of the elements in the Agreement.

Teikoku identifies the following:

1. The branded Lidoderm provided pursuant to the Settlement Agreement would permit Watson (a) early entry to the market for prescription adhesive 5% lidocaine patches (the "market"), and (b) to compete against Endo on price.

2. The cost of Teikoku's contribution to the settlement – consisting of half-price discounts to Endo totaling $5 million – was small.

3. Teikoku believed that its contribution to the settlement would maintain good business relations with Endo and in turn benefit Teikoku in their ongoing business negotiations.

4. Teikoku believed that Endo had the contractual right to control the litigation and settlement with Watson pursuant to the Teikoku-Endo April 10, 2007 letter agreement.

5. Teikoku believed that resolution of the patent litigation against Watson would (a) help avoid the further costs, distractions and uncertainties inherent in such litigation, and (b) allow Watson to launch a generic version of Lidoderm before the expiration of the '529 patent.

6. Apart from maintaining good business relations and avoiding further costs, distractions and uncertainties, as set forth above, and without taking into consideration the potential outcomes of the litigation or regulatory proceedings in the FDA, Teikoku believed that the terms embodied in the May 28, 2012 Settlement and License Agreement would not necessarily benefit Teikoku.

Watson identifies the following:

3. All of the terms of the Agreement, including the partially-exclusive patent license, provision of branded Lidoderm product and royalty for generic sales, were part of a negotiated package that enabled the parties to reach a settlement that allowed Actavis to launch generic Lidoderm significantly in advance of the last patent expiration.

4. The terms of the Agreement were procompetitive, because they were part of a negotiated settlement that enabled Actavis to launch generic Lidoderm 25 months before the expiration of the last patent, which had 41 months remaining at the time of settlement.

5. Even if Actavis prevailed during the '529 patent trial, given the time an appeal would take regarding that litigation alone, the terms of the Agreement were procompetitive because they were part of a negotiated settlement that enabled Actavis to launch generic

14

Lidoderm before patent litigation proceedings would have ended.

6. The terms of the Agreement were procompetitive, because they were part of a settlement that precluded Endo/Teikoku from submitting a new Citizen Petition, amending the pending Citizen Petition, and/or bringing suit against the FDA, thereby removing potential barriers to Actavis receiving FDA approval for generic Lidoderm.

7. Endo's provision of brand Lidoderm was procompetitive, because it added a competing supplier of brand Lidoderm during a time period when Actavis did not or was unlikely to have had generic Lidoderm available to market, and facilitated sales at a price lower than what Endo charged and/or what other wholesalers charged for Lidoderm.

8. The Agreement was procompetitive because it reduced litigation expenses and the business distractions associated with litigation.

9. Actavis agreed to the terms of the Agreement in order to obtain certainty as to the date of entry of generic competition and thereby permit it to make more informed and rational decisions about the allocations of its resources, all of which enhanced competition.

10. The provision of branded Lidoderm pursuant to Section 3(b)-3(k) of the Agreement was not intended to and did not delay the Entry Date, as that date is defined in the Agreement.

11. The provision of the partially exclusive licensing provisions in the Agreement, including Section 2(b), was not intended to and did not delay the Entry Date, as that date is defined in the Agreement.

As an initial matter I recognize that the first part of this topic – the reasons, explanations, and intentions for the "payment" of free product to Watson – would appear to *necessarily* implicate attorney-client advice because that payment was a key, if not *the* central, term of the Watson settlement negotiated by defendants' counsel.[15] The second part of this topic – the "beliefs about the impact" on competition – by *its* nature falls more squarely into the provenance of business knowledge and industry experience (*except* where the testimony implicates whether and why Watson's generic entry was "early" or "uncertain," because those statements necessarily rely on defendants' attorney-client-informed beliefs about the strength of the Watson patent

---

[15] *See, e.g.,* Kohn Ex. D, E1 (Endo General Counsel discussed with Endo executives whether settlement would be possible without provision of free branded Lidoderm); Ex. E W23 (Watson counsel discussed provision of free product with CEO; refused to disclose contents of conversation based on privilege).

litigation and uncertainties regarding the FDA's actions).  With that foundation, I group the beliefs identified by defendants to resolve whether the particular subjective beliefs put at issue privileged information.

**1. Resolving Litigation to Allow Watson "Early Entry" Into Market on a Specific Date**

Defendants argue that the fact that the Settlement allowed Watson to enter the market and sell its generic Lidoderm *before* the expiration of the patents can be shown by the agreed-to date of entry provided in settlement (September 15, 2013) and the patent expiration dates (one year later for the '510 patent and two years later for the '529 patent).  That is true.  That fact can be established through testimony about the Settlement Agreement and evidence on the face of the patents themselves.  *See* Endo Subjective Belief 2, Watson Subjective Belief 4 (in part).  Allowing subjective testimony as to that *fact* would not create an at issue waiver.[16]

However, describing the entry as "early" and testimony concerning how or why Watson would seek early entry, why Endo/Teikoku would agree to early entry (the "reasons, explanations and intentions" for the payments), and why early entry was procompetitive, necessarily involves beliefs about the strength of the patents and the outcome of the patent litigation.  *See* Endo Subjective Beliefs 1,7; Teikoku Subjective Belief 1(a); Watson Subjective Beliefs 3 (in part) 4 (in part), 5.  In deposition, Endo's witnesses would not explain *why* the entry date was agreed to other than it was part of a negotiated package, and rested on assertions of attorney-client privilege. Declaration of Daniel Asimow (Dkt. No 475-1), Ex. 2 (Dep. Tr. of Levin) at 302 (Endo CFR would not "speculate" on earlier date but it would have been "challenging"), Ex. 4 (Levin FTC testimony) at 125; *see also* Kohn Decl., Ex. D E8, E44 (General Counsel discussed September 2013 start date with Endo executives); E9 (Endo patent attorney and VP of Intellectual Property instructed not to answer question regarding entry date on grounds of privilege); *see also* Ex. E W17 (Watson in-house counsel asserted privilege when questioned whether entry date reflected assessment of strength of patent litigation); W20 (asserting privilege over reasons for September

---

[16] Obviously, objective expert testimony could establish this fact as well, based on authenticated documents.

United States District Court
Northern District of California

2013 entry date); W44 (in-house counsel asserting privilege as to best launch date scenario); W49 (General Counsel discussed the reasons for the September 15, 2013 launch date with CEO, including reasons based on legal advice).[17]   Allowing subjective testimony on these issues would create an at issue waiver.

### 2.  Agreement was a Negotiated Package

Defendants' business executives[18] may testify that they accepted the terms of the settlement as a package, and would not have settled unless all elements of the agreement were present.  Endo Subjective Beliefs 1 and 16 (in part); Watson Subjective Belief 3 (in part).  Defendants cannot, however, offer testimony as to their negotiation strategy or attempt to explain why each component was necessary to the settlement "package."  Plaintiffs have shown that defendants in-house counsel (and in the case of Teikoku, outside counsel) were the main negotiators and in most cases the actual decision-makers on the Settlement.  *See, e.g.*, Kohn Decl., Ex D E3 (Endo CEO Holveck relied on advice of General Counsel who "had the details" on settlement negotiations and ultimate agreement); Kohn Reply Decl., Ex. J E69 (Endo General Counsel approved settlement of patent litigation).  Testimony about what was negotiated, when it was negotiated, and why provisions were required to settle would necessarily put at issue attorney-client information.

### 3.  Resolving "Uncertainty" of Date of Generic Launch

Beliefs about the date on which Watson would be able to launch their generic based *solely* on competitive intelligence (at Endo/Teikoku) or on business plans and status (at Watson) about Watson's capacity to launch (*e.g.*, Watson's access to ingredients, manufacturing capacity), do not necessarily involve attorney-client advice and do not create an at issue waiver.  Similarly, testimony about the business benefits of knowing exactly when a generic might enter the market

---

[17] As noted above, defendants' business executives cannot discuss their subjective beliefs about the uncertainties inherent in patent litigation and appeals (as to the merits or timeframe) because that would put at issue attorney-client information.  *See, e.g.*, Watson Subjective Belief 5.

[18] The use of the terms "business executives" or "business employees" in this Order is meant to distinguish between in-house counsel (including general counsel) and non-lawyer executives and employees.

from Endo (Endo Subjective Belief 9 (in part)) or Watson (Watson Subjective Belief 9 (in part))

can also be based purely on business and industry experience.

However, as discussed above, beliefs about resolving the "uncertainty" surrounding the

generic launch date and allowing Watson "early" entry, necessarily implicate beliefs as to the

outcome of patent litigation.  The same analysis applies to the approval of Watson's ANDA by the

FDA and resolution of the related Endo Citizen Petition.[19]  Subjective beliefs that necessarily rely

on what defendants have been told regarding the outcome of the patent litigation put attorney-

client information at issue.

With respect to the FDA's approval of Watson's ANDA, any beliefs that touch on that

subject will also put "at issue" attorney-client advice.  *See* Endo Subjective Belief 10.  Defendants

argue that business executives have beliefs and understandings about the FDA's approval of

ANDAs not informed by attorney-client information (given their experience in the industry) and

defendants' scientists likewise have beliefs not informed by attorney-client information about the

FDA's requirements and activities with respect to ANDAs generally and the Watson ANDA in

particular.  That is undoubtedly true.  But plaintiffs have established that each of the defendants'

actual understanding of the status of Watson's ANDA and the implications of the FDA's actions

on the ANDA were based in significant part on attorney-client advice.  Kohn Decl., Ex. D E28,

E29, E32 (Endo General Counsel advised client as to whether FDA might decide Watson ANDA

by a particular date in light of FDA's actions and Citizen Petition, and asserting privilege over

contents of communications); Ex. E W27 (Watson's CEO's view on ANDA approval informed by

counsel); W28 (Watson FDA 30(b)(6) witness instructed not to answer question regarding

whether FDA approved ANDA in part because of settlement);[20] Ex. F T23 (Teikoku outside

United States District Court
Northern District of California

---

[19] Endo Subjective Beliefs 3, 5, 9 (in part); Teikoku Subjective Belief 5(b); Watson Subjective Belief 9 (to extent relies on resolution of uncertainty).

[20] In Opposition, Watson submits deposition excepts from its regulatory 30(b)(6) witness containing non-attorney-client information that also weighed on Watson's understanding of the likelihood of ANDA approval.  Hoffman Lent Decl., Ex. 2 W16.  The fact that Watson relied in part on non-legal advice is accepted.  That does not, however, undermine that legal advice likewise played a significant role.  In fairness, therefore, if this topic is put at issue by Watson, plaintiffs should have access to the attorney-client information so they can determine the significance of the various factors (legal, regulatory, and others) that motivated Watson's beliefs

1    counsel recalled Endo General Counsel's opinion of likelihood of FDA approving ANDA, but

2    refused to describe because of privilege), T25 (Teikoku CEO opinion as to FDA approval of

3    ANDA based on information from attorneys).

4           This conclusion is supported by my prior Order affirming Watson's assertions of privilege

5    regarding the ANDA and the publicly filed briefing on the parties' privilege disputes.  *See, e.g.*,

6    Dkt. No. 434 at 3 (Watson claiming privilege over Robert Stewart's (President of Global

7    Operations) email disclosing his "take on the implications [of the ANDA] for the development and

8    manufacturing of generic Lidoderm," which Stewart provided to Watson General Counsel Buchen

9    in aid of Buchen's settlement negotiations); Dkt. No. 434-3 (Watson General Counsel Buchen's

10   role was to provide advice about the Watson litigation and settlement, and as settlement

11   discussions "intensified" in Spring 2012 Buchen required "updates of significance" on the status

12   of Watson's ANDA to inform his legal advice and settlement negotiations); *see also* Minute

13   Order, Dkt. No. 435.

14          The "uncertainty" regarding Watson's generic launch date also implicates the Citizen

15   Petition then-pending with the FDA.  *See* Watson Subjective Belief 6.  As with the ANDA,

16   plaintiffs have established that each of the defendants' actual understanding as to the purpose,

17   content, status, and chance of success of the Citizen Petition depended in part on attorney-client

18   advice.  Kohn Decl., Ex. D E38, E39 (Endo relied on outside counsel in formulating position and

19   advice on intertwined regulatory and legal issues with Citizen Petition); E40-41 (Endo CFO's

20   knowledge about Citizen Petition came exclusively from Endo's lawyers); Ex. E W31 (Watson

21   CEO had conversation with General Counsel about likely outcome of Citizen Petition; asserted

22   privilege in refusing to disclose contents of those conversations); W32, W54 (Watson General

23   Counsel provided legal advice to CEO and executive committee regarding likely outcome of

24   Citizen Petition); W34 (General Counsel and outside counsel studied impact of potential outcomes

25   with respect to Citizen Petition); Ex. F T20 (Teikoku CEO's opinion about likelihood of denial of

26

27   ─────────────────────────

     as to the strength and timing of the ANDA approval; a central question that goes directly to the
28   heart of this case.  *See also id*. W19 (non-attorney-client information about Watson's thoughts on
     Endo Citizen Petition).

United States District Court
Northern District of California

United States District Court
Northern District of California

Citizen Petition based on attorney-client advice), T24 (Teikoku outside counsel discussed status of Citizen Petition with Endo General Counsel).

The parties' privilege disputes confirm that defendants relied on attorney-client advice regarding the purpose, content, status, and chance of success of the Citizen Petition.  *See* Dkt. No. 449 (Watson asserted privilege over information regarding status and potential outcomes of Citizen Petition); Dkt. No. 434 at 4 (Watson asserted privilege over a discussion of in-house counsel's "plans regarding Watson's potential response to Endo's Citizen Petition"); Dkt. No. 434-3 (Watson General Counsel Buchen provided legal advice about status of Citizen Petition); Dkt. No. 413 at 14 (upholding Endo's assertion of privilege regarding advice on Citizen Petition, especially with respect to Manogue and other Endo counsels' discussions of the Citizen Petition and its amendments "in context of Watson litigation settlement discussions"); Dkt. No. 386-1 (Endo's General Counsel provided analysis to Endo and Teikoku as to the contents, strengths, and implications of the Citizen Petition and its 2012 amendments, including supervising the work of outside consultants on the Citizen Petition ); Dkt. Nos. 359, 367 (Teikoku asserted privilege over discussions of timing of Citizen Petition made in connection with settlement discussions with Watson); *cf.* Dkt. No. 413 (discussing broad assertions of privilege by Endo over a range of documents dealing with Citizen Petition and Amendments).

Defendants' views on these topics – the potential outcomes of the patent litigation, the FDA's actions with and potential resolution of the Watson ANDA, and the FDA's actions with and potential resolution of the Endo Citizen Petition – were formed with attorney-client input. Critically, they are central to the merits of this case.  As such, fairness dictates that defendants should not be able to offer subjective beliefs that necessarily hinge on the potential outcome of the patent litigation, the ANDA, or the Citizen Petition without allowing plaintiffs access to contemporaneous attorney-client documents regarding those topics.[21]

---

[21] Subjective beliefs about when non-Watson generics might enter the market is similarly permitted only to the extent it is based solely on competitive intelligence.   Otherwise, these beliefs implicate on attorney-client advice.  *See, e.g.,* Dkt No. 434 at 3-4 (Watson asserting privilege over in-house attorney's "fulsome patent litigation analysis" regarding non-Watson generic Lidoderm entry).

### 4.   ANDA Approval and Resolution of the Citizen Petition by the FDA

As discussed above, the record in this case demonstrates that the contents, strategy, status, and likelihood of success of both Watson's ANDA and Endo's Citizen Petition were the subject of attorney-client advice and these topics were not merely discussed in the settlement negotiations, but were central to those negotiations and, thus, the merits of this case.  Any attempt to rely on or introduce defendants' subjective beliefs about these topics will put attorney-client information at issue.

### 5.   Allowing Second Seller of Branded Lidoderm into Market

The fact that the Settlement Agreement allowed a second seller of branded Lidoderm into the market is obvious from the face of the Agreement and can be testified to by defendants' fact witnesses.  Teikoku Subjective Belief 1(b).

However, any assertion concerning the timing of this entry or its procompetitive significance (*e.g.,* because it allowed Watson to enter the market "early" or at a time when it was "uncertain" whether Watson would have a generic Lidoderm available to the market, *see* Endo Subjective Belief 4, Watson Subjective Belief 7) puts attorney-client information at issue.  *See also* Kohn Decl., Ex. D E13, E14 (Endo General Counsel discussed with client "what role" provision of branded Lidoderm would play in settlement).  Timing was uncertain because of uncertainty regarding the outcome of the patent litigation and the status of the ANDA and Citizen Petition – topics which put at issue attorney-client information.

### 6.   No Intention to "Delay" Watson's Entry

Endo and Watson want to rely on subjective beliefs that portions of the Agreement (provision of branded Lidoderm to Watson and partially exclusive licensing) were not intended to delay the start date for Watson's generic.  Endo Subjective Beliefs 11, 15; Watson Subjective Beliefs 10, 11.  However, Endo and Watson do not explain what these provisions *were* intended for, presumably because that would touch directly on attorney-client advice.  *See e.g.,* Kohn Decl., Ex. D E13, E14 (Endo General Counsel discussed with client "what role" provision of branded Lidoderm would play in settlement); E15 (Endo in-house patent counsel asserting privilege in response to question about reason free product was provided).  Endo and Watson cannot insert

these subjective beliefs at summary judgment or trial, absent a proffer of a justification devoid of attorney-client input.  Endo and Watson's actual justifications for these provisions in the Agreement, obviously, are central to the merits of this case.

### 7.   Reduced Litigation Expenses and Business Distractions

This topic does not necessarily rely on attorney-client advice.[22]  Testimony can be based (as defendants assert) on the experience of business executives who have been involved in Paragraph IV patent litigation or who tracked the expenses incurred from and any business distraction caused by the Watson litigation itself.  The Supreme Court in *Actavis* acknowledged that avoiding litigation expenses might constitute a "legitimate justification" for a reverse payment settlement.  *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2236 (2013) ("The reverse payment, for example, may amount to no more than a rough approximation of the litigation expenses saved through the settlement.").  Therefore, while testimony on this topic is central to the prosecution and defense of this case, because it can be shown exclusively through testimony of executives without implicating attorney-client privileged information, testimony on these subjective beliefs will not put at issue attorney-client advice.

### 8.   Agreement's Impact on Watson's/Anda's Ability to Offer Branded Lidoderm and Impact on Existing Endo Contracts

Endo's Subjective Beliefs 12 and 13 and Watson's Subjective Belief 7 (in part) – that the Agreement did not limit Watson or its wholesaler affiliate Anda from offering the branded Lidoderm at prices below what Endo or other wholesalers charged and that the Agreement protects Endo's existing contracts – are based on the face of the Agreement and do not necessarily implicate attorney-client information.  These beliefs do not put attorney-client information at issue.

### 9.   Costs Associated with Agreement and Control Over Settlement

Endo's Subjective Belief 14, about how the costs of Agreement would be offset by royalty

---

[22] Endo Subjective Beliefs 6 and 8 (in part; no subjective testimony about "uncertainties" in patent litigation allowed without placing topic at issue); Teikoku's Subjective Belief 5(a) & 6 (in part; no subjective testimony about "uncertainties" inherent in patent litigation); Watson Subjective Belief 8.

payments on Watson's generic, does not necessarily implicate attorney-client information, can be established from the face of Agreement, and can be testified to based solely on testimony from business witnesses.  This belief does not put attorney-client information at issue.[23]

Teikoku's Subjective Belief 2, that its contribution to the Agreement was small, similarly does not necessarily involve attorney-client information and can be established by testimony from business executives.  Teikoku's Subjective Belief 3, that its settlement contribution was to "maintain good business relations" with Endo, does not necessarily involve attorney-client information and can be established by business executives.  Teikoku's Subjective Belief 4, about the terms of its agreements with Endo regarding control over Paragraph IV patent litigation, do not necessarily implicate attorney-client information and can be testified to by business executives.[24]

Teikoku's Subjective Belief 6 includes a number of discrete assertions--that apart from the benefits of maintaining a good business relationship with Endo (OK), avoiding costs and distractions (OK), avoiding uncertainties (places attorney-client information at issue), and without taking into consideration the potential litigation and regulatory outcomes, the Terms in the Agreement "would not necessarily benefit Teikoku."  The problem with this belief is that Teikoku does not explain the reasoning behind it.  Therefore, I cannot determine whether it implicates attorney-client information.  Absent a proffer of a justification devoid of attorney-client input, Teikoku cannot insert this subjective belief at summary judgment or trial.

### E.  Topic (c) – Defendant's Beliefs About Watson's Final ANDA Approval and an At-Risk Launch by Watson

Endo's subjective beliefs:

> 17. Watson was unlikely to have launched a generic Lidoderm product "at risk" (i.e., before resolution of the patent litigation, including appeals) because (i) Watson did not have an economic incentive to launch at risk under the circumstances; (ii) Watson

---

[23] However, the testimony cannot extend to the role the royalty payment agreement played in the settlement, because that puts attorney-client information at issue.  Kohn Decl., Ex. D E18 (Endo General Counsel discussed with CEO and CFO role royalty provision played in settlement, but refused to disclose what she told them based on privilege).

[24] While Teikoku's CEO testified that the interpretation of the details of the agreements between Endo and Teikoku required assistance of counsel, he was able to testify as to his general understanding.  Kohn Decl., Ex. F T13.

United States District Court
Northern District of California

likely would have enjoyed the same statutory exclusivities with respect to other generic competition had it deferred its launch until after final resolution of the patent litigation, including appeals; (iii) Watson experienced manufacturing difficulties that would have delayed its ability to launch an FDAapproved generic Lidoderm product; (iv) Watson would not have risked incurring substantial damages in launching at risk; and (v) Watson did not have a history of launching at risk under similar circumstances.

18. Whether FDA would approve Watson's ANDA for a generic Lidoderm product was uncertain as of the date of the Agreement.

19. Whether FDA would grant Endo's citizen petition regarding the bioequivalence standards for generic Lidoderm, and if so whether it would apply new bioequivalence standards to Watson's generic product, was uncertain as of the date of the Agreement.

20. Statements by Watson's executives about the prospect of launching a generic Lidoderm product at risk were mere bluster and a negotiating tactic.

21. Statements by Watson's executives about the prospect of launching a generic Lidoderm product at risk became more conservative over time and appeared to be conditioning investors to be unsurprised if Watson did not launch at risk.

22. Watson's executives were concerned about whether and when FDA would grant approval for Watson to launch its generic Lidoderm product.

23. The scientific position set forth in Endo's citizen petition and amendments concerning Lidoderm was meritorious.

24. Endo's agreement to forego any appeal of FDA's decision on Endo's citizen petition and amendments thereto, and other provisions in Section 5(a) of the Agreement, may have emboldened FDA to deny Endo's citizen petition or caused it to decide on the petition sooner than it otherwise would have decided absent the Agreement.

Teikoku's subjective beliefs:

1. Teikoku believed Watson faced substantial technological and manufacturing hurdles in launching its generic prescription adhesive 5% lidocaine patch product within the 30-month stay period and for some time afterward.

2. Teikoku believed that whether FDA would adopt bioequivalency standards for topical patches, potentially precluding approval of Watson's ANDA, was uncertain.

3. Teikoku believed that whether FDA would approve Watson's ANDA was uncertain.

Watson's subjective beliefs:

24

12. Actavis faced significant uncertainty about whether and when the FDA would approve its ANDA for generic Lidoderm:

    a. Actavis was concerned that the FDA was engaging in a perpetual review due to the content and timing of certain deficiency letters it received for its ANDA;

    b. Actavis was unsure as to when the FDA would issue its ruling on Endo's Citizen Petition; under the operative regulatory rules at the time, the FDA did not have a deadline by which it was required to issue its decision and Actavis's ANDA could not be approved until the FDA ruled on the Citizen Petition.

13. Endo's Citizen Petition was not objectively baseless.

14. Actavis was concerned that the FDA may require Actavis to conduct clinical endpoint studies in order to demonstrate bioequivalence for generic Lidoderm ANDAs, which could cause Actavis to lose its 180-day exclusivity as the first filer for generic Lidoderm.

    a. If the FDA required clinical endpoint studies for generic Lidoderm, the approval of Actavis's ANDA could have been substantially delayed, or even entirely precluded.

15. Actavis was concerned that Endo would sue the FDA if the FDA ruled against the Citizen Petition and seek a temporary restraining order that would delay approval of Actavis's ANDA.

16. Actavis was concerned that it would lose its 180-day exclusivity period because it did not receive tentative approval by May 13, 2012.

17. Actavis could not launch from a regulatory perspective until it successfully completed process validation at the 1,000 gallon scale-up level, which required the production of three successful, successive process validation lots.

18. Section 5 of the Agreement, in which Endo/Teikoku agreed to not submit a new Citizen Petition, amend the pending Citizen Petition, or bring suit against the FDA, removed potential barriers to resolution of the Citizen Petition, and consequently, final approval for Actavis's Lidoderm ANDA.

19. Actavis would not have launched generic Lidoderm unless and until it had a sufficient amount of manufactured product available to sell such that it would (i) satisfy fully the market's demand for generic product, (ii) have an appropriate level of inventory on hand, and (iii) maximize the value of its 180-day exclusivity.

    a. Actavis would not have been in a position to launch at-risk upon termination of the 30-month stay because it would not have had requisite launch quantities of the product.

    b. Actavis would not have launched generic Lidoderm until it resolved significant problems and requirements concerning its commercial manufacturing process, including (1) fixing problems with its equipment; (2) optimizing the manufacturing process; (3) successfully completing process validation at the 1,000 gallon scale; (4) improving batch

yields and cycle times; and (5) manufacturing the requisite launch quantities commensurate with the forecasted demand.

c. The Agreement provided the opportunity for Actavis's Salt Lake City facility to fix the issues with its equipment and optimize its manufacturing process to increase batch yields and cycle times; absent these improvements, Actavis believes it may have needed up to 2 years to build the requisite launch quantities.

20. Actavis would not have launched generic Lidoderm in advance of a judgment of the district court in the trial regarding the '529 patent.

21. Any evaluation of an "at risk" launch of generic Lidoderm would have considered the size of the product market, the degree to which Actavis could maximize the value of its first-to-file exclusivity, the likelihood of additional generic competitors, the content of a trial court decision, and the risk of an injunction and/or significant damages.

As discussed above, all subjective beliefs about the FDA's actions with respect to Watson's ANDA, including its potential approval, put at issue attorney-client advice because the record in this case shows that defendants' attorneys were extensively involved in advising whether and when the ANDA might be approved. While it is true that defendants' scientists and employees working on regulatory matters could testify as to how the FDA handles ANDAs generally and the timeframe for regulatory action on ANDAs in general, the direct and unmistakable *implication* of testimony from defendants' employees is that those considerations weighed on decisions made with respect to the Watson ANDA and, therefore, the settlement of the Watson litigation. Endo Subjective Belief 18; Teikoku Subjective Belief 3; Watson Subjective Belief 12a., 12.b., 16. Defendants can present testimony about the Watson ANDA and the FDA's actions on it, not as subjective beliefs but by objective expert testimony.[25]

---

[25] Similarly, Watson Subjective Belief 15 (it was concerned Endo would sue the FDA if the FDA ruled against Endo's Citizen Petition) and Subjective Belief 18 (that the Agreement's provisions preventing Endo from submitting revisions or a new Citizen Petition or suing the FDA "removed potential barriers" to resolution of the Citizen Petition and helped lead to approval of the ANDA), by their nature implicate attorney-client advice, a conclusion supported by Watson's own admissions that counsel were intimately involved in advising Watson about the status of the ANDA and Citizen Petition, and counsel used that information in his settlement negotiations. These subjective beliefs, therefore, put that attorney-client information at issue. *See, e.g.,* Kohn Decl., Ex. E W22 (General Counsel advised Watson CEO about non-interference provisions of settlement); W28-30 (Watson FDA 30(b)(6) witness instructed not to answer question regarding whether FDA approved ANDA or denied Citizen Petition because of settlement). Watson's citation to its executives' non-attorney-client-based beliefs about the utility of the non-interference provisions does not prove that Watson did not also rely on legal advice about the same or

United States District Court
Northern District of California

1    The regulatory matters – the ANDA and the Citizen Petition – were expressly related (*i.e.*,

2    the Citizen Petition asked the FDA to require ANDAs like Watson's to meet specific

3    bioequivalence standards). The record demonstrates that defendants' counsel were intimately

4    involved in crafting the content for the Citizen Petition and its amendments, monitoring its status,

5    and advising their clients on the chance of success of the Citizen Petition.  As a result, any

6    subjective beliefs that discuss the content of, status of, or the FDA determination on Endo's

7    Citizen Petition and its amendments also put attorney-client information at issue.  *See* Endo

8    Subjective Belief 19, 23, 24; Teikoku Subjective Belief 2; Watson Subjective Belief 12b, 13, 14.

9    With respect to "at risk" launch, that term is defined as launching a generic drug on the

10   market before "a final court decision" in the underlying Paragraph IV patent litigation.  *See, e.g.,*

11   *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1330 (Fed. Cir. 2015).  By its very definition, the

12   concept requires reference to the status and strength of the patent litigation and necessarily

13   implicates legal advice.  *See also* Kohn Decl., Ex. D E20, E25 (Endo VP of Intellectual Property

14   (a patent attorney) discussed Watson at risk launch with client); E23 (Endo General Counsel

15   discussed likelihood of at risk launch with Endo executives); Ex. E W42, 48 (Watson CEO

16   discussed at risk launch with counsel); W46 (Watson CEO and General Counsel discussed risk of

17   treble damages); Ex. F T16 (Teikoku Director of Business Development testified that no one at

18   Teikoku had an opinion as to at risk launch not based on attorney-client advice), T18 (Teikoku

19   outside counsel recalls but rests on privilege to refuse to disclose opinion of Endo General

20   Counsel as to likelihood of at risk launch), T19 (Teikoku outside counsel advised his client on

21   likelihood of at risk launch).  Accordingly, any subjective beliefs about whether Watson would

22   launch (1) given Watson's economic incentives and risks, including treble damages (Endo

23   Subjective Belief 17(i),(iv)), (2) given the timeframe for final court decisions (Endo Subjective

24   Belief 17(ii)), Watson Subjective Belief 21 (in part)) (3) given the content of the trial court

25   decision (Watson Subjective Belief 21 (in part)), and (4) before a final trial court or appellate court

26   decision, would put attorney-client information as to the strength and status of the patent litigation

27

28   otherwise undermine the importance of the legal advice on this issue. *But see* Hoffman Lent
Decl., Ex. B W15.

United States District Court
Northern District of California

at issue.  Watson Subjective Belief 20.[26]

Defendants may present subjective testimony to show that Watson did not have capacity to launch before September 15, 2013, based on competitive intelligence (for Endo/Teikoku) or business hurdles (for Watson).[27]  When phrased without reference to being at risk but with reference to the date the Settlement Agreement allowed the launch, these subjective beliefs do not necessarily implicate attorney-client advice and logically were known to defendants' business executives and employees, independent of attorney advice.  Endo Subjective Belief 17(iii); Teikoku Subjective Belief 1; Watson Subjective Beliefs 17, 19.  Relatedly, if business executives formed a subjective belief as to Watson's history of launching when ongoing Paragraph IV litigation had not been resolved based solely on their experience in the industry or their view of Watson's public statements, they may testify as to those beliefs as well.  Endo Subjective Beliefs 17(v), 20, 21.[28]

**F.   Topic (d) Endo's Reasons or Incentives, if Any, For Agreeing to a Generic Entry Date Before September 2013**

Endo's subjective beliefs:

> 25.  Endo had a commercial interest in retaining as much of the relevant patent life as possible and believed Watson was unlikely to have launched at risk. Ultimately, September 15, 2013 was the only date on which the parties could agree in the context of an overall settlement.

> 26.  Subsequent to the entry of judgment, patent cases typically involve post-trial motions in the District Court taking a few months

---

[26] We know that counsel for Watson advised and weighed in on the risks of an at risk launch. Kohn Decl., Ex. E W46-48.  Therefore, while some of the factors in Watson Subjective Belief 21 ("evaluation of 'at risk' launch") might be based on business judgment, the weight given to these factors – including the "legal factors" which necessarily relied on attorney-client advice – is unknown and it would be unfair to allow Watson to testify as to some of these factors, while asserting privilege over contemporaneous information that would disclose exactly how the business and legal factors were actually weighed by Watson.

[27] *See, e.g.*, Hoffman Lent Decl., Ex. B W27-29.

[28] With respect to Endo Subjective Belief 22, regarding Watson executives' concerns about the FDA approval of the ANDA, if Endo's executives or employees formed this Subjective Belief solely based on comments Watson made publicly, then they can testify as to that Subjective Belief.  If, however, Endo learned about these concerns through the settlement negotiations themselves, the statements would necessarily implicate attorney-client information and put that information at issue.

to resolve, and usually result in appeals in the Court of Appeals that typically take approximately a year to resolve. Based on these typical steps, appeals in the '529 litigation would not have been resolved any earlier than September 15, 2013.

Watson's subjective beliefs:

22. The Agreement, which contemplated a launch of generic Lidoderm on September 15, 2013 (subject to FDA approval of Actavis's then-pending ANDA), resolved uncertainty created by the patent litigation as to when Actavis would have been able to commence sales of generic Lidoderm free of potential liability.

23. The Agreement brought two patent litigations to a conclusion and thereby avoided further and significant litigation costs and distraction of Actavis personnel.

24. The date of entry of generic Lidoderm, together with other provisions of the Agreement, represent a negotiated outcome that enabled Actavis to launch generic Lidoderm (subject to FDA approval of Actavis's then-pending ANDA) more than two years before the expiration of the relevant patents and to sell generic Lidoderm in competition with Endo for approximately two-thirds of the remaining period of exclusivity under the '529 patent.

1.      **Endo's Subjective Beliefs 25, 26.**

As to Endo's desire to retain as much commercial benefit for as long "as possible," that possibility is essentially the same as its belief as to the strength and outcome of the Paragraph IV litigation and necessarily puts at issue attorney-client information. As to at risk launch, that has been addressed above. The belief that September 15, 2013, was the "only date" the parties could agree to in settlement, as phrased, necessarily implicates attorney-client information on a key merits issue because it hinges on the settlement discussions (both between the parties and between defendants' executives and their own counsel). Kohn Decl., Ex. D E8. Rephrasing this belief to limit it to Endo's position that it refused to agree to an earlier date does not avoid the problem. As discussed above, without a proffer as to *why* Endo stuck to that date, it too likely puts at issue attorney-client information.

Finally, no subjective testimony concerning Endo's belief as to the Paragraph IV litigation timeframe (Endo Subjective Belief 26) is allowed. It can be provided by expert testimony based on objective evidence.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2.      Watson's Subjective Beliefs 22 – 24

As discussed above, no subjective beliefs about or based on litigation uncertainty and related at risk launch risks will be allowed without putting at issue attorney-client information. Watson Subjective Belief 22.  A subjective belief based on business executive testimony regarding costs and distractions of litigation (Watson Subjective Belief 23) is permissible without creating an at issue waiver.  As to the many parts of Watson Subjective Belief 24, business executives can testify only as to the fact that the settlement was a negotiated package.  Any subjective testimony regarding "early" entry of generic Lidoderm will put attorney-client information at issue.

### G.  Topic (e) Endo's Intention to Launch an Authorized Generic Version of Lidoderm

Endo's subjective beliefs:

> 27. At the time the Agreement was reached, Endo did not have a definite plan or an intention to launch an authorized generic when the first generic came to market.

> 28. A decision on whether to launch an authorized generic of Lidoderm would not have occurred until after observing the actual market reaction to the entry of a generic Lidoderm product and learning more about the potential launch of additional generic products.

> 29. In the event of a launch of a single generic Lidoderm product, Endo intended to employ strategies to compete against the generic on price with branded Lidoderm.

Teikoku's subjective beliefs:

> Teikoku may introduce or rely on at trial evidence that at the time it entered into the Settlement Agreement, Teikoku believed that Endo would possibly not launch an authorized generic form of Lidoderm if and when Watson's generic product were approved for sale in the U.S.

Watson's subjective beliefs:

> 25. Rational companies, such as Endo, consider a host of factors in determining whether and when to launch authorized generics, and that each decision is, ultimately, case-specific.

> 26. Rational companies, such as Endo, do not always launch authorized generics after the first ANDA generic launches.

> 27. Rational companies, such as Endo, can intend to launch an authorized generic without intending to launch that authorized generic during the 180-day exclusivity period of a first-filing ANDA generic.

28. There are additional strategies that rational companies can employ in lieu of an authorized generic to maintain product profitability following ANDA generic entry.

Compared to the subjective beliefs discussed previously, there is only thin evidence that defendants discussed any aspect of Endo's intent to launch an authorized generic version of Lidoderm with their counsel. Kohn Decl., Ex. D E48-49; Ex. E W50. The limited discussions were logically related to the settlement provision giving Watson a period of generic exclusivity. *See, e.g.,* Kohn Decl., Ex. D E1, E18, E48. Notwithstanding that the discussions occurred in the context of the Watson settlement negotiations, testimony about Endo's plans and ability to launch a generic Lidoderm does not necessarily or obviously implicate attorney-client advice but is more logically based on business judgment and experience. *See* Kohn Decl., Ex. D E26 (Endo President of Branded Pharmaceuticals testifying before FTC, without asserting privilege, about timing of Endo's authorized generic launch). Similarly, testimony regarding Endo's and other patent holders'/exclusive licensees' history of launching authorized generics is more logically based on business judgment and experience devoid of attorney-client advice. That conclusion is supported by the record here, showing that Endo's subjective beliefs on these topics were based wholly on market research and other economic justifications. *See* Asimow Decl., Exs. 8-10. Defendants will not effect an at-issue waiver if they rely on these subjective beliefs at summary judgment or trial.

## H. Endo's Selective Disclosure

Plaintiffs also argue that Endo effectuated a subject-matter waiver of privileged documents by selectively disclosing privileged information and allowing former General Counsel Manogue to testify as to communications regarding the likelihood of the FDA's approving Watson's ANDA and Endo's assessment of the merits of its Citizen Petition.

"[I]t has been widely held that voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject." *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981). As the Ninth Circuit explained, "'[w]hen (the privilege holder's) conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not.

He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or disclose, but after a certain point his election must remain final.'" *Id.* (quoting VIII J. Wigmore, Evidence § 2291, at 636 (McNaughton rev. 1961)).  As to the scope of the waiver, "[d]isclosing a privileged communication or raising a claim that requires disclosure of a protected communication results in waiver as to all other communications on the same subject." *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010); *see also* Fed. R. Evid. 502(a) (waiver of the privilege "extends to an undisclosed communication or information in a federal or state proceeding only if 1) the waiver is intentional; 2) the disclosed and undisclosed communications or information concern the same subject matter; and 3) they ought in fairness to be considered together.").

Plaintiffs argue that during her deposition Manogue disclosed portions of confidential communications that she had with officers of Endo, in particular, that she did not believe that the FDA would approve Watson's ANDA prior to September 15, 2013.  Kohn Decl., Ex. D E28 (Manogue Dep. at 205:14-206:18).  Manogue based that belief on Endo's "citizen petition and the trouble it appeared Watson had with their ANDA filing with the FDA." *Id.*

The parties dispute whether Manogue rested her disclosed belief on legal advice and analysis.  Plaintiffs contend Manogue's disclosed opinion necessarily was based on legal advice and analysis because in her testimony to the FTC, Manogue explained that all conversations with Endo's then CEO Holveck, CFO Levin, and President of Branded Pharmaceuticals Lortie about the Watson ANDA were "for the purpose of providing legal advice," thus preventing the FTC from inquiring further into Manogue's communications with any of those officers.  Ex. D W36 (FTC Tr. 247:12-23, 341:2-11).  Plaintiffs also argue that Levin similarly testified that, "we believed . . . that there was good science and good arguments that were pending with regulators that put meaningful risk" on the approval of Watson's ANDA.   Ex. D E42 (Levin Dep. at 174:12-175:20).  This disclosure, according to plaintiffs, necessarily disclosed attorney-client information because Levin further testified that everything he knew with respect to the Citizen Petition, he "learned from Endo's lawyers" or people working for Endo's lawyers.  *Id.* E40 (Dep. 204:8-22); *see also* E41 (Dep. 205:16-207:5 (Levin could not testify about what Endo believed regarding the

United States District Court
Northern District of California

1   Citizen Petition without revealing attorney-client communications)).

2          Endo counters that in her deposition in this case, Manogue explained that her opinions on

3   the status of the ANDA were business opinions, based on her years of experience and her

4   observations of the FDA's responses to the ANDA and the pendency of the Citizen Petition.  Ex.

5   D E28.  However, she admitted that when she gave her advice to Holveck and Levin regarding the

6   status of the ANDA, she was wearing her "general counsel" hat, although she based that opinion

7   on experience, not legal analysis.  *Id*. E30, E31.

8          Plaintiffs contend these "partial disclosures" by Manogue and Levin were for "tactical

9   advantage" to support Endo's Subjective Beliefs 18, 19 (discussed above) about the uncertainties

10   with respect to the FDA approval of the ANDA and status of the Citizen Petition.  As discussed

11   above, any attempt by Endo to rely on a subjective belief as to the likelihood of approval or timing

12   on the ANDA puts at issue attorney-client information.  That Manogue may have based her

13   opinions in part on her industry experience (which was as counsel, not as a business executive)

14   does not undermine the evidence that attorney-client advice on these topics played a direct and

15   significant role in formulating Endo's beliefs as to the ANDA's likelihood of success, the related

16   chance of success on Endo's Citizen Petition, and the FDA's timing on both.

17          In sum, I will not find that as of now Endo has made a subject matter waiver that entitles

18   plaintiffs to all of Endo's contemporaneous attorney-client discussions/information regarding the

19   Watson ANDA or Endo Citizen Petition.  But, consistent with the rulings previously discussed,

20   Endo cannot provide subjective testimony on these subject matters (contents, chances of success,

21   and timing) without putting all related attorney-client information on those matters at issue.

22   **II.  MOTION TO COMPEL PRODUCTION OF NOTES**

23          In the May 2, 2016 Case Management Conference, the parties discussed plaintiffs' request

24   for the production of notes taken by former Endo General Counsel Manogue regarding

25   "settlement-related conversations."   Dkt. No. 453 at 5; Dkt. No. 459 at 1.  The existence of these

26   notes – which were not clearly identified in Endo's privilege log as notes of Manogue regarding

27   the Watson settlement – came to light during Manogue's deposition.  Dkt. No. 453 at 5.

28   Following the parties' meet and confers on this issue, Endo identified privilege log entries by

United States District Court
Northern District of California

1    bates numbers said to contain the notes.  After further questions by plaintiffs, Endo re-reviewed

2    the withheld notes and re-characterized the privilege log entries to note Manogue as the custodian

3    and that the documents related to the Watson settlement.  *See* Ex. L to Plaintiffs' Motion for

4    Production (Dkt. No. 479-13).  Endo also identified additional log entries as containing relevant

5    Manogue notes.  *Id.*

6           Plaintiffs move to compel production of all or part of these notes, arguing that because

7    Manogue – who was the main Endo representative involved in the Watson settlement negotiations

8    and the ultimate decision-maker – could not recall much if anything of substance about those

9    negotiations at her deposition, any work product protection of the notes is overcome by plaintiffs'

10   need.  Plaintiffs also argue that because Endo's original and amended privilege log entries were

11   and are deficient, Endo has failed to meet its burden to show the documents at issue are protected

12   and the notes should be disclosed.

13          Pursuant to my Order, defendants submitted for *in camera* review twelve sets of notes,

14   annotated to show information they contend is protected work-product or attorney-client

15   privileged.[29]

16          **A.  Legal Standard**

17          Attorney notes are protected by the work product doctrine.  *SEC v. Roberts*, 254 F.R.D.

18   371, 375 (N.D. Cal. 2008) ("There is no dispute that the interview notes in question here are

19   classic attorney work product—they comprise handwritten notes that include the attorney's mental

20   impressions, conclusions and opinions.").  Typically, notes taken by an attorney are treated as

21   opinion, as opposed to fact, work product.  *See, e.g.*, *Tierno v. Rite Aid Corp.*, No. C 05-02520,

22   2008 U.S. Dist. LEXIS 112461, 2008 WL 2705089, at *4 (N.D. Cal. July 8, 2008) ("an attorney's

23   notes and memoranda of statements are protected as opinion work product because they reveal the

24   attorney's mental processes and show what facts the attorney deems legally significant.").[30]

25   _____

26   [29]  The parties have a side dispute on whether Endo should have: (i) produced for *in camera*
      review three sets of documents it previously identified as "notes" but on re-review determined

27   were not "notes" and, therefore, fell outside the scope of the response; (ii) redacted irrelevant
      information from four sets of notes produced for *in camera* review.  Dkt. Nos. 480, 485, 486.  I

28   find that Endo's redactions and its re-characterization of the notes were appropriate.
      [30]  Rule 26 distinguishes between opinion work product, which reveals "the mental impressions,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Opinion work product "receives greater protection than ordinary work product and is

2  discoverable only upon a showing of rare and exceptional circumstances." *Tennison v. City &*

3  *Cnty. of San Francisco*, 226 F.R.D. 615, 623 (N.D. Cal. 2005) (citation omitted); *see also*

4  *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992) ("A party seeking

5  opinion work product must make a showing beyond the substantial need/undue hardship test

6  required under Rule 26(b)(3) for non-opinion work product.").[31]  However, even where opinion

7  work product is concerned, if the facts being recorded by the attorney disclose "concerns a layman

8  would have as well as a lawyer in these particular circumstances, and in no way reveal anything

9  worthy of the description 'legal theory,'" disclosure may be warranted.  *In re John Doe Corp.*, 675

10 F.2d 482, 493 (2d Cir. 1982) (disclosing interviewing attorney notes); *see also FTC v. Boehringer*

11 *Ingelheim Pharms., Inc.*, 778 F.3d 142, 151 (D.C. Cir. 2015) (recognizing that "'not every item

12 which may reveal some inkling of a lawyer's mental impressions . . . is protected as opinion work

13 product.' . . . Opinion work product protection is warranted only if the selection or request reflects

14 the attorney's focus in a meaningful way.").

15    For example, in a reverse-payment agreement case, the D.C. Circuit recognized that "[a]

16 company may select an executive who is a lawyer to negotiate the business terms of a settlement;

17 this does not mean that the lawyer's thoughts relating to financial and business decisions are

18 opinion work product when she is simply parroting the thoughts of the business managers." *FTC*

19 *v. Boehringer Ingelheim Pharms., Inc.*, 414 U.S. App. D.C. 188, 199 (2015).  The court explained

20 that "[w]here it appears that the focus or framework provided by counsel" in requesting or

21 collecting information "is obvious or non-legal in nature, it is incumbent upon the party claiming

22 opinion work product protection to explain specifically how disclosure would reveal the attorney's

23 legal impressions and thought processes." *Id.*[32]

24 ────────────────────────────────

25 conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation," and fact work product, which does not.  Fed. R. Civ. P. 26(b)(3)(B).

26
27 [31] Under Fed. R. Civ. P. 26(b)(3), fact work product is discoverable if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means," so long as counsel's "impressions, conclusions, opinions, or legal theories" are not disclosed.

28 [32] The cases relied on by Endo for the proposition that courts have refused to produce attorney

### B. Plaintiffs' Justification for Production

The central factual question in this case is whether Endo, Teikoku, and Watson settled the patent litigation for anti-competitive purposes on anti-competitive terms or whether the settlement was justified by pro-competitive concerns. As such, the facts regarding the negotiation of the settlement with Watson go directly to the heart of plaintiffs' claims and defendants' defenses. I conclude that plaintiffs have shown a compelling need for disclosure of portions of Manogue's notes.

First, General Counsel Manogue was the main person at Endo engaged in negotiations regarding the settlement both with Teikoku (as to terms of settlement that would be mutually acceptable) and with Watson. Second, although Manogue met with counsel in preparation for her deposition in this case over the course of three days, when asked in her deposition about specifics regarding the settlement negotiations, she repeatedly responded that she "could not recall." For example:

> Q  Let me ask this question: You understand there was a point in time during the negotiations between Endo and Watson regarding Lidoderm that there was an agreement in principle reached?
>
> A (No response).
>
> Q Do you recall that?
>
> MR. READE: Objection, lack of foundation, but go ahead.
>
> THE WITNESS: I don't recall.
>
> BY MR. SOBOL:
>
> Q Okay. Do you remember there was a point in time where an understanding was reached, and that it needed to be memorialized into a settlement agreement?

---

notes of settlement discussions are inapposite. They either reject production of attorneys' notes of settlement discussions without analysis (*Tate & Lyle Americas, LLC, v. Glatt Air Techniques, Inc*., 2015 WL 4647561, at *4 (C.D. Ill. July 31, 2015)), decline to produce notes because they "might" reveal litigation strategy (*Wilson v. Dep't of Justice*, 1991 WL 111457, at *4 (D.D.C. June 13, 1991); *Am. Optical Corp. v. Medtronic, Inc*., 56 F.R.D. 426, 431 (D. Mass. 1972)), or reject production because *in camera* review of the notes actually disclosed attorney litigation strategy or opinion. *Cities Serv. Co. v. F.T.C*., 627 F. Supp. 827, 835 (D.D.C. 1984), aff'd, 778 F.2d 889 (D.C. Cir. 1985) ("they also reflect the attorney's own mental impression of what he believes to be significant to the Commission in its litigation/settlement strategy")).

1        A I don't recall.

2   Deposition of Caroline Manogue (478-6), Ex. A to Plaintiffs' Motion to Compel Production of

3   Notes at 21:13 – 22:2.  Regarding discussions with General Counsel David Buchen from Watson:

4            Q Okay, so on the 25th of January, you had a conversation with Mr.
             Buchen. At least, that's what's attributed to having occurred by this
5            chart, correct?

6            A That's what the chart says, yes.

7            Q  You don't have any memory about it at all, right?

8            A I do not.

9   *Id*. at 33:12-19.

10  With respect to a call the following day with Teikoku CEO Paul Mori:

11           Q Just it's fair to infer that what you were probably doing on that
             day was providing them information about what had been discussed
12           the previously day with Mr. Buchen in context?

13           A I don't know.

14  *Id.*. 34:7-11.  With respect to an in-person meeting with Buchen from Watson in January 2012,

15  Manogue could recall nothing of substance, other than an exchange of niceties.  *Id*. at 71:18 –

16  72:5.  Even after being shown emails following that meeting and describing some proposed terms

17  of settlement offered by Watson, Ms. Manogue's recollection was not refreshed and she could not

18  recall any details about conversations with Buchen during that time frame or in the subsequent

19  months.  *Id*., 72-81; 104-107.

20       When asked about various updates Manogue gave to Teikoku officers about the settlement

21  negotiations, Manogue similarly could not recall what information she provided about the status of

22  the Watson negotiations, even after plaintiffs attempted to refresh her recollection with

23  contemporaneous documents.  *Id*. at 33-34, 87-89, 91-93, 98-99.

24       Even general questions elicited no substantive response about the settlement negotiation

25  status or terms.

26           Q Do you recall that you actually did participate in negotiating the
             settlement of the Lidoderm case?
27
             A I did.
28

37

1        Q What do you remember?

2        A Not very much. I don't recall.

*Id.*, 101:13-18.

3

4        Q And as you sit here today, please describe to the jury everything you can remember about what you said to Watson and Watson said to you before the settlement agreement with respect to Lidoderm was entered into.

5

6        MR. READE: Objection to the form. Go ahead.

7        THE WITNESS: I don't recall.

8        BY MR. SOBOL:

9        Q Anything?

10        A I don't recall.

11  *Id.*, 102:19 – 103:4; *see also* 114 (could not recall starting positions); *see also* 133 (could not

12  recall anything about stage of negotiations in May 2012, at same time a press release about the

13  potential settlement was being drafted), 136 (could not recall details of "breakthrough" in

14  negotiations on May 9).

15        Apparently defense counsel made a strategic choice to not use Manogue's own notes –

16  which were in their possession and logged (albeit incorrectly) in the privilege log – to refresh her

17  recollection prior to her deposition.  It also appears that, despite the significance of the Watson

18  settlement to Endo, Manogue cannot recall any substantive details about the negotiations of that

19  settlement.  Contemporaneous information regarding this topic is central both to plaintiffs' burden

20  at trial and Endo's defenses.

21        Third, as to other sources of information regarding the negotiations with Watson, plaintiffs

22  show that there is little.  Watson's CEO testified that he avoided taking notes.  Deposition of Paul

23  Bisaro, (Ex. B to Pls. Mot.) at 111:19-112:6.  Watson's General Counsel testified that he discarded

24  his notes.  Deposition David Buchen, (Ex. C. to Pls. Mot) at 79:2-80:6.  David Holveck, Endo's

25  CEO, testified that the only thing he recalled from a settlement meeting he attended with Manogue

26  and Watson's CEO, CFO and General Counsel was that he introduced himself.  Deposition of

27  David Holveck (Ex. D to Pls. Mot.) at 123:1-124:13.  Plaintiffs assert that there were no written

28  documents exchanged between Watson and Endo reflecting the negotiation of the settlement's

United States District Court
Northern District of California

1    terms.  Pls. Mot. at n.1.

2         In Opposition, Endo does not dispute Manogue's central role in negotiating the Watson

3    settlement.  Nor do they argue that in her deposition Manogue provided sufficient testimony for

4    plaintiffs' purposes.  Instead, Endo argues – as supported by a declaration from Manogue – that

5    the notes are properly withheld as opinion work product because they were not "verbatim" and

6    that Manogue only wrote down the information she believed was of use or significant.   Endo also

7    asserts that documents produced by the parties and testimony of Manogue, Levin, Buchen, and

8    Bisaro "reflect the progression of settlement negotiations."

9         In the portions of the Manogue deposition Endo relies on, Manogue is asked about the

10   contents of two documents purporting to disclose some terms being negotiated, but those

11   documents did not refresh her recollection.  Manogue Dep. 78:5-79:2; 104:23.  Endo also relies on

12   nine lines of deposition testimony where Manogue discusses Watson wanting, at an unspecified

13   time, Endo and Teikoku to agree not to sue the FDA in connection with the approval of any

14   generic product and to withdraw their Citizen Petition.  *Id.* at 128:2-11.  Endo cites to the FTC

15   testimony of CFO Levin, regarding the potential agreement between Endo and Watson to

16   "collaborate" on a urology product (but that collaboration was not agreed to for reasons Levin

17   could not recall), as well as Levin's testimony about aspects of the final settlement agreement.

18   Levin FTC Testimony (Ex. 2 to Asimow Decl.), at 113:11-114:13, 135:4-141:24.  Endo points

19   also to Levin's deposition testimony where he speaks generally to a belief that each party had to

20   "take their own regulatory risk," but Levin does not disclose any specific terms that were

21   negotiated on or around that point.  Levin Dep. (Ex. 3 to Asimow Decl.) at 273:-277:24.

22        Endo cites to the deposition testimony of Watson General Counsel David Buchen, where

23   documents were used in a generally unsuccessful attempt to refresh *his* recollection as to various

24   negotiation points.   Buchen Dep. (Ex. 4 to Asimow Decl.) at 67:21-69:17, 121:22-124:2, 127:8-

25   135:8, 138:9-145:13, 173:2-176:8.  Endo also relies on Buchen's comments about theoretical

26   settlement strategies unrelated to the Endo discussions.  *Id.*, 103:13 – 105:19.  Buchen does testify

27   as to "general recollection" of Watson's desire to launch an authorized generic right away (that

28   was rejected) and Buchen testified regarding the final terms of the agreement.  *Id.*, 108:16-111:7,

United States District Court
Northern District of California

1  182:12-187:11.  Finally, Endo relies on the deposition testimony of Paul Bisaro about one in-

2  person settlement meeting where substantive settlement terms were not discussed.  Bisaro Dep.

3  (Ex. 5 to Asimow Decl.) at 176:7 – 178:13.  Based on this weak evidentiary record in response,

4  Endo asserts that plaintiffs have not made the extraordinarily rare showing of compelling need to

5  overcome opinion work product protection.  Endo also argues that some portions of the notes are

6  protected by the attorney-client privilege and likewise should not be produced.

7  Endo has not shown that any of the participants in the settlement negotiations can provide

8  – either through contemporaneous documents or through testimony – concrete information about

9  the exact terms that were exchanged, much less when those terms were proposed, debated, agreed

10  to, or rejected.  The terms of the Watson settlement – both those rejected and those agreed-to – are

11  key to plaintiffs' claims and defendants' defenses on the merits of this case.  As a result, there is a

12  compelling need to disclose Manogue's notes.

### C.  Review of the Notes Produced for In Camera Review

14  Endo "color coded" the Manogue notes for my *in camera* review.  Red are notes of

15  Manogue's conversations with Watson.  Blue are notes of Manogue's conversations with Teikoku.

16  Silver are notes of conversations between Manogue and Watson that touch upon antitrust liability

17  and, therefore, Endo asserts are covered by the common-interest privilege.  Green are notes of

18  internal Endo conversations or talking points to be raised or raised with Watson.[33]

19  It appears that many of the Watson notes (coded red) as well as the "internal discussions"

20  about the Watson negotiations (coded green) appear to be simply "verbatim" lists of terms

21  exchanged or proposed for exchange.  These notes also include references to phrases like "thanks

22  for that" and "we believe" indicating the notes were either a script for her conversations with

23  Watson's General Counsel Buchen or verbatim notes of what was actually said.  Given the context

24  of ongoing settlement discussions and the verbatim/script nature of at least these portions of the

---

[33] While Manogue had virtually no recall of the settlement discussions (and their progression) during her deposition, her recollection was apparently sufficiently refreshed by reviewing these notes, allowing her to perform the color coding.  I also note that Endo does not distinguish in its color coding between fact work product and opinion work product, as it contends that all of the notes are opinion work product.

40

United States District Court
Northern District of California

notes, the notes are more akin to fact work product than opinion work product. *See, e.g., FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d at 151. Plaintiffs have shown substantial need for the red notes and they should be produced. With respect to the green notes, the portions of those notes which reflect proposed or actual settlement terms exchanged with Watson, as well as any indication in the notes showing the date on which they were recorded, should be produced.[34] The remainder of the green notes – those portions which do not reflect proposed or actual settlement terms exchanged with Watson – are protected attorney-client information that absent being put at issue (as discussed above) may be withheld from production.

With respect to the blue notes – notes of Manogue's conversations with Teikoku – as with the green notes, Endo must produce the portions of those notes that reflect proposed or actual settlement terms exchanged with Watson (as well as any indications showing the time/date the notes were taken). Again, this information is key for plaintiffs' case and Endo has not shown that plaintiffs have access to this critical information through other documents or testimony. The remainder of the blue notes are protected attorney-client information that may be withheld, assuming the contents of those notes are covered by the joint privilege (as discussed in my prior Orders) and the subject matters addressed by the notes are not put at issue.

The one remaining issue is the few silver coded notes from April and May 2012 that Endo claims are covered by a common interest privilege with Watson because the material reflects the sharing of antitrust legal advice between Endo and Watson related to potential terms of the parties' settlement. Oppo. at 5. My prior common interest privilege analysis did not address attorney communications between Endo and Watson, and was limited to addressing communications between Endo and Teikoku. Within five days of the date of this Order, Endo shall file a two page brief providing legal authority for asserting a common interest privilege for these notes (dated April 16, 2012, May 7, 2012 and May 8, 2012). Five days after that brief is filed, plaintiffs may

---

[34] Even if the red notes and these portions of the green notes could be construed to be opinion work product (which I reject), they should still be produced. Based on the showing of materiality, Manogue's absolute lack of recall, the business executives' lack of recall, as well as plaintiffs' compelling and unique need (given the legal issues in this case focus on the terms of the settlement agreement) these notes should still be produced.

1   file a two page response.

2   **III. ADMINISTRATIVE MOTIONS TO SEAL**

3       <u>Plaintiffs' Motion to Seal Kohn Declaration Exhibits D – I and Portions of Renewed</u>

4   <u>Motion for Production or Preclusion</u>.  Dkt. No 462.  The information at issue has been designated

5   as confidential or highly confidential by defendants.  Endo files a declaration in support, moving

6   that identified portions of Ex. D remain sealed (E3, E26, E28, E30, E32, E38, E41, E43 and E49)

7   asserting good cause exists to seal this confidential and competitively-sensitive information.  Dkt.

8   No 464.  Endo also moves to seal Ex. G in full, as good cause exists to seal its privilege log.

9   Finally, Endo moves to seal discrete portions of the plaintiffs' brief which discuss these materials,

10  specifically: Page 8 footnote 7, Page 10 line 24, Page 11 lines 1-28, Page 12 lines 1-8, Page 12

11  lines 14-27, Page 13 lines 1-2, Page 16 lines 25-26, Page 17 lines 3-15, Page 23 lines 17-27, and

12  Page 24 lines 1-17. *Id*.

13      Teikoku submits a declaration, arguing good cause exists to seal potions of Exhibit F (T8 –

14  T12, T14, T19) and lines 6-20 on page 15 of plaintiffs' brief, because those disclose Teikoku's

15  thoughts on confidential settlement negotiations, confidential business discussions, and

16  confidential business strategies.  Dkt. No. 465.[35]

17      Plaintiffs' motion is GRANTED in part:  Endo and Teikoku have shown good cause for

18  continued sealing of the information identified above.  Within 10 days of the date of this Order,

19  plaintiffs shall e-file revised redacted versions of their motion and supporting exhibits consistent

20  with this Order.  The Clerk shall UNSEAL Ex. E (Dkt. No. 462-9), Ex. H (Dkt. No. 462-15), and

21  Ex. I (Dkt. No. 462-17).

22      <u>Endo's Motion to Seal Portions of its Opposition and Exhibits in Support</u>.  Dkt. No. 472.

23  Endo seeks to seal Exhibits 1, 6 and 10 in their entirety and Page 14, lines 3-4 of Endo's

24  Opposition, arguing good cause exists to seal this information regarding its competitive

25  intelligence strategies, confidential strategies regarding settlements, and confidential business

26

27  [35] Watson did not file a declaration in support of plaintiffs' motion regarding information Watson
    designated as confidential.  That is consistent with Watson's own administrative motion to seal
28  (Dkt. No. 476) discussed below, where Watson discusses testimony from the same witnesses
    discussed in plaintiffs' exhibit, but seeks to seal only testimony of two other employees.

United States District Court
Northern District of California

1    strategies for launching authorized generics.  Dkt. No. 472-2.  Endo's motion is GRANTED.

2          <u>Teikoku's Motion to Seal Portions of its Exhibits in Support of Opposition</u>.  Dkt. No. 473.

3    Teikoku seeks to seal portions of Exhibit A, T8-T12, T14 and T19, consistent with the request to

4    seal granted above (Dkt. No. 462).  Teikoku's motion to seal is GRANTED.

5          <u>Watson's Motion to Seal Portions of Exhibits in Support of Opposition</u>.  Dkt. No. 476.

6    Watson seeks to seal portions of Exhibit B, Rows 16, 27, 28, based on good cause because that

7    information discloses Watson's business strategy on launching new generic products and its

8    regulatory strategy with respect to the FDA.  Watson's motion to seal is GRANTED.

9          <u>Plaintiffs' Motion to Seal Portions of their Motion re Discoverability of Notes and Exhibits</u>

10   <u>in Support</u>.  Dkt. No 478.  The information at issue (Exhibits A-F and cites to that information in

11   their motion), has been designated as confidential or highly confidential by Endo or Watson.

12   Endo submits a declaration arguing good cause exists to seal the following: Ex. A, pages 97-99,

13   108-112, 166-167, 176-177, 179, 181-185, and 189-190, as those portions of Exhibit A disclose

14   Endo's confidential settlement approach and negotiation strategies, strategies concerning FDA

15   regulatory matters, and confidential accounting information; and Ex. F, excerpts from its privilege

16   log, in full.  Dkt. No. 481.

17         Watson filed a declaration arguing good cause exists to seal the following: lines 91:16, 20–

18   21, 92:1–6, 11–16, 106:16–18, 22, 25, and 107:4–5 of Exhibit A, because that information

19   discloses the terms of Actavis's licensing negotiations for a product that has not launched; and

20   lines 117:18–23; 118:1–14; and 119:9–14, 17–18 of Exhibit E, because that information reveals

21   proprietary formulation and composition details.  Dkt. No. 482.

22         Plaintiffs' motion is GRANTED in part:  Endo and Watson have shown good cause for

23   continued sealing of the information identified above.  Within 10 days of the date of this Order,

24   plaintiffs shall e-file revised redacted versions of their motion and supporting exhibits consistent

25   with this Order.  The Clerk shall UNSEAL Ex. B (Dkt. No. 478-8), Ex. C (Dkt. No. 478-10), and

26   Ex. D (Dkt. No. 478-12).

27         <u>Plaintiffs' Motion to Seal Portions of the Reply Brief and Exhibits in Support</u>.  Dkt. No.

28   490.  The information at issue (contained in Exhibits J-M and cited in portions of the reply brief)

United States District Court
Northern District of California

43

has been designated as confidential or highly confidential by defendants.  Teikoku files a declaration in support, contending that good cause exists to file under seal Exhibit M in full as well as the following pages from the Reply: Page 8, Line 21- Page 9, Line 2; Page 28, Lines 22-26; Page 29, Lines 17-20; Page 32, Lines 6-7; Page 32, Lines 21-24; Page 33, Lines 3-5.  The information at issue references highly confidential discussions designed to facilitate settlement negotiations.  Dkt. No. 493.

Endo filed a declaration in support, arguing good cause exists for sealing the following: Exhibit J, E61; the entirety of Exhibit M; and Page 8 Lines 21-27, Page 9 Lines 1-2, Page 12 Lines 23-27, and Page 13 Lines 1-4 because that information discloses confidential discussions between Endo and its business partner Teikoku regarding allocations of costs in connection with a potential settlement and would reveal Endo's internal decision making processes regarding patent litigation settlements.  Dkt. No. 495.  Watson did not file a declaration.

Plaintiffs' motion is GRANTED in part:  Endo and Teikoku have shown good cause for continued sealing of the information identified above.  Within 10 days of the date of this Order, plaintiffs shall e-file revised redacted versions of their reply and exhibit J consistent with this Order.  The Clerk shall UNSEAL Exhibits K (Dkt. No. 490-7) and L (Dkt. No. 490-8).

<u>Endo's Motion to Seal Exhibits in Support of its Opposition</u>.  Dkt. No. 491.  Endo seeks to file under seal Exhibits 3-5 submitted in support of its Opposition, but notes the materials in those exhibits were designated confidential by Teikoku or Watson.  Watson filed a declaration in support, arguing that good cause exists to seal pages and lines 127:19–21; 128:7, 11, 17, 18; and 129:3 of Exhibit 4 because that information discloses the terms of Actavis's licensing negotiations, including potential royalty rates, for a product Actavis has not yet launched.  Dkt. No. 496.  Teikoku did not file a declaration.

Endo's motion is GRANTED in part:  Watson has shown good cause for continued sealing of the information identified above.  Within 10 days of the date of this Order, Endo shall e-file a revised redacted version of Exhibit 4 consistent with this Order.  The Clerk shall UNSEAL Exhibits 3 (Dkt. No. 491-3) and 5 (Dkt. No. 491-5).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## CONCLUSION

In light of this Order, Endo shall produce the redacted red, green, and blue Manogue notes as required by this Order on or before August 16, 2016.  By that same date, defendants must file a final election on subjective beliefs disclosing whether they intend to rely on any subjective beliefs that, as identified in this Order, put at issue attorney-client information.   The parties shall then meet and confer regarding reopening any discovery foreclosed by defendants' assertions of privilege or otherwise necessitated by this Order.  The Case Management Conference set for August 9, 2016 is continued until August 30, 2016; any joint status report or dispute regarding discovery shall be filed by August 26, 2016.  The Case Management Conference set for September 6, 2016 is VACATED.  The normal Case Management Schedule will resume for the October 4, 2016 Conference.

**IT IS SO ORDERED**.

Dated: August 9, 2016



WILLIAM H. ORRICK
United States District Judge