UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1776 & PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND, et al., <br><br>Plaintiffs, <br><br>v. <br><br>TEIKOKU PHARMA USA, et al., <br><br>Defendants. | Case No.  14-md-02521-WHO <br><br>**ORDER RE ELECTIONS, PROFFER, AND COMMON INTEREST PRIVILEGE** |

On August 9, 2016, I entered an Order on plaintiffs' motions for production or preclusion and for production of attorney notes. I directed defendants to (i) file an election specifying whether they intended to rely on specific subjective beliefs (and thereby waive privilege as to those subjects) and (ii) provide additional proffers regarding identified subjective beliefs. Dkt. No. 536. I also directed the parties to submit briefing on whether the common interest privilege protects from disclosure notes reflecting the sharing of antitrust legal advice between Endo and Watson related to potential terms of the parties' settlement. *Id*. at 41. During the October 4 status conference, I requested additional declarations from Teikoku regarding any legal advice sought or received concerning Subjective Belief 6. Having now reviewed the material submitted, I have a sufficient record on which to rule.

**I.   ELECTIONS AND PROFFER**

   **A.  Endo Election**

Endo has elected not to rely on any subjective beliefs that I determined would otherwise put at issue attorney-client advice except for the following:

> The contemporaneous beliefs of Endo's officers and employees concerning (i) the merits of Endo's citizen petition submitted to the FDA, including amendments and supplements thereto (collectively,

the "Citizen Petition"), which addressed the standards for approval of generic versions of Lidoderm, (ii) the likelihood that the FDA would accept any or all of the positions taken and arguments made in the Citizen Petition, and (iii) the potential impact of the Citizen Petition on the timing and outcome of FDA's review of Watson's ANDA for its generic lidocaine 5% patch (*see* Endo Subjective Beliefs 18, 19, 23).[1]

Dkt. No. 543 at 1. Endo conditioned its election on an entry of an order:

(a) strictly limiting the scope of any implied privilege waiver to the specific subject matter identified above, and (b) limiting the effect of such implied waiver and the use and distribution of any information (including but not limited to documents and testimony) produced pursuant to such waiver as HIGHLY CONFIDENTIAL and OUTSIDE COUNSEL EYES ONLY as defined in the Stipulated Protective Order entered on May 8, 2014 (Docket No. 37) ("Protective Order"); and (d) absent modification of the proposed order, prohibiting any party from disclosing any information produced by Endo pursuant to such waiver to any person or party not contemplated by the Protective Order, notwithstanding Section 10.2 of the Protective Order.

*Id*. at 1-2.

Following the last Case Management Conference, plaintiffs asked to submit supplemental briefing on the scope and impact of Endo's limited waiver and to explain its objections to Endo's proposed order. I granted that request and allowed Endo to file a response to plaintiffs' supplemental briefing. Dkt. No. 560.

Plaintiffs argue that despite Endo's attempts to limit its waiver to subjective beliefs 18, 19 and 23 – regarding the chances of success of Endo's Citizen Petition ("CP") – to determine the scope of that limited waiver the court must consider Endo's "theory of relevance" of its assertion. In other words, the scope of the waiver is determined by the nature of the affirmative defense Endo is making under *Actavis*. According to plaintiffs, the theory of relevance is as follows: the CP was meritorious and would block or delay Watson's FDA approval through September 2013 and, therefore, Endo had no need or reason to pay Watson for delay. Dkt. No. 561. Plaintiffs

---

[1] Endo's Subjective Belief 18 is: "Whether FDA would approve Watson's ANDA for a generic Lidoderm product was uncertain as of the date of the Agreement." Subjective Belief 19 is: "Whether FDA would grant Endo's citizen petition regarding the bioequivalence standards for generic Lidoderm, and if so whether it would apply new bioequivalence standards to Watson's generic product, was uncertain as of the date of the Agreement." And Subjective Belief 23 is: "The scientific position set forth in Endo's citizen petition and amendments concerning Lidoderm was meritorious."

2

assert that this theory of relevance is (or more presumably could be, because plaintiffs do not really know) contradicted by privileged documents which, in fairness, should be included within the scope of the waiver. *Id.*

To avoid Endo's "disruption of trial by suggesting to the jury arguments and defenses relating to its beliefs about the CP for which plaintiffs have been denied fair discovery," plaintiffs request that language be added to Endo's proposed order requiring Endo to produce privileged materials relating to: (a) Watson's ANDA approval and launch and (b) the reasons or explanations for the free goods, not just those discussing the CP. *Id.*

Endo responds that plaintiffs' proposal is not "closely tailored" to matters "vital" to cross-examination on Endo's beliefs as to the potential for success on its CP. Endo does not dispute that evidence relating to the merits of the CP may be relevant to Endo's "alleged reason to pay Watson for delay," but Endo's subjective belief as to the chances of success on its CP is "also relevant" to other "potential issues that do not bear on the reasons for any particular term of the settlement." Dkt. No. 568 at 2-3. Those other reasons include: (i) rebutting plaintiffs' expected claims that the CP was a device to prevent generic competition and that Endo believed the CP was meritless, and (ii) Endo's belief that the issues raised in the CP provide an independent reason (unrelated to patent litigation) why Watson's generic might not have made it to market for a considerable amount of time.

Endo agrees that it will produce any documents that discuss the CP's impact on Watson's ANDA approval (because those topics are obviously connected), but objects to use of the language regarding Watson's "approval *and launch*" because that is an overbroad attempt to include documents regarding other factors that might have affected Watson's ability to launch, including Endo's analysis of the strength of the patent litigation. *Id.* at 4.

I agree that the scope of the waiver plaintiffs suggest is too broad. Endo's waiver is limited to documents regarding the CP (status, chances of success, strategies for amendments, etc.) as well as any documents bearing on the impact of the CP on the FDA's approval of Watson's ANDA. Endo's waiver does not extend more generally to documents concerning Watson's launch or more broadly to other reasons and explanations for the provision of free goods.

I recognize that the Federal Trade Commission has expressed concern about Endo's proposed limiting order. *See* Dkt. No. 579 (10/3/16 Letter from FTC). However, the election at issue is not a selective waiver, as that concept is typically understood and as suggested by the FTC. *See e.g., In re Pac. Pictures Corp.*, 679 F.3d 1121, 1130 (9th Cir. 2012) (discussing selective waiver in context of voluntary production of attorney-client privileged information to the government). Instead, the waiver here is as a result of a court order putting Endo to a choice about its source of proof. In these circumstances, Ninth Circuit case law directs district courts to adopt protective orders limiting the use of the disclosed attorney-client information to the case at hand. *See, e.g.*, *Lambright v. Ryan*, 698 F.3d 808, 820 (9th Cir. 2012) (following *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir.2003) and approving use of protective order to limit use of attorney-client materials covered by implied-waiver); *Oracle Am., Inc. v. Innovative Tech. Distributors, LLC*, No. 11-CV-01043-LHK, 2011 WL 2559825, at *2 (N.D. Cal. June 28, 2011) (imposing a "waiver strictly limiting the use of the documents to ITD's outside counsel's eyes only in the current proceedings before this Court."); *Rambus Inc. v. Samsung Elecs. C*o., No. C-05-00334 RMW, 2007 WL 3444376, at *7 (N.D. Cal. Nov. 13, 2007) (ordering that documents produced under an implied-waiver "should be produced under a protective order to otherwise preserve Samsung's attorney-client and work-product privileges").[2]

Therefore, I will adopt the proposed limiting order suggested by Endo. Dkt. No. 543-1.

**B. Teikoku Election and Proffer**

Teikoku has elected not to rely on any subjective belief at summary judgment or trial that I determined would put at issue and waive the attorney-client privilege for that subject matter. Dkt. No. 544. In the August 9th Order, I noted that Teikoku's "Subjective Belief 6" included a number of discrete assertions, some of which would place attorney-client information at issue and some of which would not.[3] August 9th Order at 23. I determined that Teikoku could not rely on a portion

---

[2] I am not addressing in any way the discovery to which the FTC is entitled in its action pending against Endo in the Eastern District of Pennsylvania. That is entirely up to the court in that case.

[3] Teikoku's Subjective Belief No. 6 is: "Apart from maintaining good business relations and avoiding further costs, distractions and uncertainties, as set forth above, and without taking into consideration the potential outcomes of the litigation or regulatory proceedings in the FDA,

4

of their Subjective Belief (that "the terms embodied in the May 28, 2012 Settlement and License Agreement would not necessarily benefit Teikoku") absent "a proffer of a justification devoid of attorney-client input." Id. Teikoku now provides that proffer, explaining it bases that belief on the following:

> At the time Teikoku entered into the Settlement Agreement, Teikoku did not believe it was capable of accurately evaluating the impact that loss of exclusivity would have on it profits – regardless of whether such loss of exclusivity occurred in Summer 2012 or when the '529 patent expired in October 2015 or any time in between. In particular, Teikoku witnesses would testify that Teikoku never before had one of its branded products lose exclusivity to a generic product. They would also testify that Teikoku executives had no experience analyzing the impact that loss of exclusivity would have on a brand product's profits. Accordingly, these witnesses would testify that when Teikoku entered into the Settlement Agreement in May 2012, Teikoku did not believe it could predict with any degree of certainty whether the Settlement Agreement would benefit Teikoku regardless of whether Teikoku won or lost the underlying patent infringement litigation.

Dkt. No. 544 at 2. Teikoku explains that its "belief evidence – i.e., that it lacked the experience, knowledge and ability to predict how a loss of exclusivity might affect its revenues as compared the commercial terms set forth in the Settlement Agreement – would be based solely on the business knowledge of Teikoku executives and witnesses" and assets that "Teikoku's belief was not the subject of any pre-settlement attorney-client communications and is not informed by advice received from counsel." Id. at 3.

The problem, as plaintiffs point out, is that in 2012 Teikoku created (and has produced in this litigation) forecasts of what would happen to Lidoderm's price and Teikoku's profit and royalties given different loss of exclusivity dates. Declaration of Lauren Ravkind (Dkt. No. 562-4), Ex. A. And when these scenarios were shown to Teikoku's outside counsel – who was cc'd on the forecasts sent to Teikoku's CEO – he was not allowed to testify as to his understanding of why he was included in that discussion. Ravkind Decl. Ex. B.[4]

---

Teikoku believed that the terms embodied in the May 28, 2012 Settlement and License Agreement would not necessarily benefit Teikoku." Id. at 14.

[4] Plaintiffs also rely on testimony from Teikoku CEO Paul Mori where he was prevented from answering a question about whether the settlement negotiations with Watson may have had a substantial impact on Teikoku's profits. Ravkind Decl., Ex. C. Teikoku says that the testimony plaintiffs rely on is irrelevant as Mori was actually discussing (or as being asked about) his

5

Teikoku responds that while the 2012 forecasts may have been discussed by counsel, the issue they want to present subjective evidence on is that in 2012 Teikoku lacked the ability to make accurate forecasts, a matter solely within the knowledge of business people. Teikoku also asserts that any forecasts that were made in 2012 were made *without* the input of attorneys and not at the direction of counsel.

Given the various representations of the parties, at the October 4, 2016 Case Management Conference I asked Teikoku to submit declarations from persons knowledgeable about this subject. On October 6, 2016, Teikoku submitted two declarations; one from outside counsel Noriyuki Shimoda and one from Manager of Corporate Development Michael Speitz. Dkt. Nos. 581-2. Those declarations confirm Teikoku's position that its belief evidence (regarding ability to forecast consequences of loss of exclusivity) was based solely on the business knowledge of Teikoku executives and witnesses, was not the subject of any pre-settlement attorney-client communications, and was not informed by advice received from counsel.

Therefore, Teikoku will be allowed to testify as to its subjective belief that the settlement with Watson was not necessarily in its best interest because it was not capable of accurately evaluating the impact the loss of exclusivity would have on it profits.[5]

## II.    COMMON INTEREST PRIVILEGE

As discussed in the August 9th Order, Endo asserted a common interest privilege over portions of the Manogue notes that reflected advice/information exchanged with counsel for Watson reflecting the sharing of antitrust legal advice between Endo and Watson related to potential terms of the parties' settlement. (Silver-coded notes). I ordered the parties to submit supplemental briefing on this narrow issue. Dkt. No. 536 at 41.

In its supplemental brief, Endo argues that it had an agreed-to common interest privilege

---

knowledge about projections made in 2015 for presentation to the FTC. Dkt. No. 569 at 2. Plaintiffs at the October 4, 2016 CMC also pointed to Entry 18 on Exhibit I to the Kohn Declaration in Support of Production of Preclusion (Dkt. No. 462-17) which shows that Teikoku withheld emails discussing "possible outcome of settlement and Lidoderm simulation."

[5] By request, Watson/Actavis was given until September 16, 2016 to make its election. Dkt. No. 547. On September 16, 2016, Watson explained that it would *not* elect to rely on any of its identified subjective beliefs and, therefore, avoid waiver. Dkt. No. 570.

with Watson (which was not in writing) that covered discussions between the two regarding antitrust advice over potential or actual terms of the parties' settlement. Dkt. No. 540. It relies on *In re: Androgel Antitrust Litig. (No. II),* No. 1:09-CV-955-TWT, 2015 WL 9581828 (N.D. Ga. Dec. 30, 2015), where, in a similarly postured reverse-settlement antitrust litigation, the district court concluded that the defendant patent holder and the defendant generic manufacturer could assert a common interest privilege over their discussion of potential antitrust liability because, "while the Defendants were adverse during the settlement negotiations, they shared a common legal interest in formulating a defense to any potential antitrust litigation." *Id*. at *2.

There are a number of issues with Endo's argument and its evidentiary showing. First, in the case Endo relies primarily on, *In re: Androgel Antitrust Litig*., the parties who had negotiated the underlying patent litigation settlement had entered into a written joint defense agreement to cover their discussion about potential antitrust liability for their settlement. *Id*., 2015 WL 9581828, at *2. While Endo is correct that a joint defense agreement or other agreement sufficient to create a common interest need not be in writing, there still must be some *evidence* of an actual agreement between the parties. *See, e.g., Avocent Redmond Corp. v. Rose Elecs., Inc*., 516 F. Supp. 2d 1199, 1203 (W.D. Wash. 2007) ("A written agreement is not required, but the parties must invoke the privilege: they must intend and agree to undertake a joint defense effort.").[6] There is no such evidence in this record. In her declaration, Manogue simply asserts: "In some instances, the Notes reflect my thoughts, mental impressions and opinions concerning antitrust

---

[6] Endo also argued at the August 30, 2016 Case Management Conference that the existence of the common interest privilege should be implied from Manogue's conduct (that she disclosed her antitrust concerns to Buchen). I recognize that cases have concluded that even absent an express agreement, the conduct of parties can imply the existence of a joint defense agreement. However, in those cases, the exchange of information occurred once a government investigation (or litigation) had commenced and the risks to the parties were established. Here it is more than a stretch to apply the concerns recognized in those cases – the need to facilitate prompt and confidential exchange of information useful to those parties' joint defense – to *this* situation where the parties were still negotiating settlement terms and no true prospect of antitrust litigation has arisen. Nor is this case analogous to *In re Regents of the Univ. of Cal*., 101 F.3d 1386, 1390 (Fed. Cir. 1996), where the licensee and patent holder were securing counsel from the same attorneys. Manogue was not advising Buchen how they should protect their joint interests or what their joint strategy should be. Instead, she expressed concerns about potential antitrust liability from provisions still being negotiated.

7

legal advice shared between myself and David Buchen, then the General Counsel for Watson, during Settlement Discussions. I understood at the time that Endo and Watson shared a common interest in ensuring that any settlement complied with the antitrust laws and in minimizing the possibility that the settlement would be challenged under the antitrust laws." Manogue Decl. (Dkt. No. 492-7) ¶ 6. Even Manogue does not provide facts showing that she and Buchen reached *an agreement* to protect the information Manogue shared with Buchen about her antitrust concerns. Manogue's "understanding" that because Endo and Watson could be at risk in potential, future litigation *as to a settlement that had not yet been finalized* is insufficient to establish a common interest privilege as to the information she shared with Watson.

Second, even if Manogue believed there was an agreement between Endo and Watson, there is no evidence that *Watson* had a similar understanding. Indeed, in his deposition in this case Watson's General Counsel David Buchen (whom Manogue was communicating with) testified that he did *not* have an understanding that an FTC investigation into the settlement *might occur*. Buchen Depo. (Dkt. No. 545-4) at 80:8-22. He destroyed his notes regarding the negotiation of the settlement terms with Manogue because "there was no reason to keep them after the settlement was entered into. There was no litigation. There was no investigation, so my regular practice was not to preserve my own handwritten notes, particularly after a matter had been resolved and I had moved on to something else." *Id*., at 79:7-15. On the record before me, I cannot find that Manogue's sharing of her antitrust "concerns" or "advice" with Buchen is covered by the common interest privilege. The silver-coded notes should be produced.

Finally, Endo seeks a "clarification" of the August 9th Order to allow Endo to withhold two very discrete notes taken by Manogue during her conversations with Buchen at Watson because those two notes are either Manogue's "mental impressions" and notes to herself about "legal matters," or because those two notes are likewise covered by the common interest privilege with Watson for the same reason as the silver-coded notes discussed above. Dkt. No. 540.

Plaintiffs oppose Endo's "ongoing attempt" to recode the notes, arguing Endo has had ample opportunity to appropriately code the notes (in the first instance, upon the parties' meet and confers, and upon submission to this Court for the *in camera* review that led to the August 9th

8

1  Order) and that Endo should not be allowed to keep changing its rationale for redaction. I have
2  reviewed the two discrete entries at issue. They are more clearly notes internal to Manogue's
3  thinking and not information she was disclosing to Buchen. They may be redacted from the
4  production.
5      **IT IS SO ORDERED**.
6  Dated: October 11, 2016



WILLIAM H. ORRICK
United States District Judge