[Submitting Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re LIDODERM ANTITRUST LITIGATION | Case No. 14-md-02521-WHO |
| THIS DOCUMENT RELATES TO:<br><br>DIRECT PURCHASER ACTIONS | **DIRECT PURCHASER PLAINTIFFS' MOTION FOR REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES**<br><br>**<u>ORAL ARGUMENT REQUESTED</u>**<br><br>Date:   September 12, 2018<br>Time:  2:00 p.m.<br>Courtroom 2, 17th Floor<br><br>The Honorable William H. Orrick |

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................... 1

II.     HISTORY OF THE LITIGATION ........................................................................... 3

III.    DPP COUNSEL'S LITIGATION EFFORTS ........................................................... 3

IV.     ARGUMENT ........................................................................................................... 4

        A.      The Percentage-of-the-Fund Method For Calculating Fees is Appropriate............... 4

        B.      DPPs Achieved an Exceptional Result for the Class ................................... 5

        C.      This Case was Extremely Risky and Complex ............................................ 8

        D.      DPPs's Performance Generated Benefits Beyond the Settlement Fund ................... 11

        E.      The Requested Fee is Consistent With Awards in Similar Representations ............ 12

        F.      DPPs Expended Significant Time and Effort in Litigating This Case..................... 14

        G.      DPPs Litigated This Case on a Wholly Contingent Basis ........................................ 16

        H.      No Class Members Have Objected to the Requested Fees ...................................... 17

V.      A LODESTAR CROSS-CHECK CONFIRMS THE REASONABLENESS OF THE
        REQUESTED FEE ................................................................................................. 18

VI.     THE ADVANCED EXPENSES ARE REASONABLE AND WERE
        NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED .................... 19

VII.    SERVICE AWARDS FOR THE CLASS REPRESENTATIVES ARE
        APPROPRIATE AND REASONABLE............................................................... 20

VIII.   CONCLUSION....................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Acosta v. Frito-Lay, Inc.*,
    2018 U.S. Dist. LEXIS 75998 (N.D. Cal. May 4, 2018) ..........................................................17

*In re Aggrenox Antitrust Litig.*,
    No. 14-md-2516 (D. Conn.).........................................................................................................12

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    2015 U.S. Dist. LEXIS 138479 (E.D.N.Y. Oct. 9, 2015) .............................................................9

*Am. Soc'y of Mech. Engineers v. Hydrolevel Corp.*,
    456 U.S. 556 (1982).....................................................................................................................17

*In re Animation Workers Antitrust Litig.*,
    2016 U.S. Dist. LEXIS 156720 (N.D. Cal. Nov. 11, 2016)..........................................................18

*Aros v. United Rentals, Inc.*,
    2012 U.S. Dist. LEXIS 104429 (D. Conn. July 26, 2012).............................................................15

*In re Asacol Antitrust Litig.*,
    No. 15-cv-12730-DJC, ECF No. 648 (D. Mass. Dec. 7, 2017) ..................................................21

*Beaver v. Tarsadia Hotels*,
    2017 U.S. Dist. LEXIS 160214 (S.D. Cal. Sept. 28, 2017) .......................................5, 11, 14, 16

*In re BioScrip, Inc. Sec. Litig.*,
    273 F. Supp. 3d 474 (S.D.N.Y. 2017).........................................................................................15

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980).......................................................................................................................4

*Bond v. Ferguson Enters.*,
    2011 U.S. Dist. LEXIS 70390 (E.D. Cal. June 30, 2011)............................................................18

*Boyd v. Bank of Am. Corp.*,
    2014 U.S. Dist. LEXIS 162880 (C.D. Cal. Nov. 18, 2014)..............................................6, 17, 18

*In re Buspirone Antitrust Litig.*,
    No. 01-CV-7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003) ............................14

*In re Capacitors Antitrust Litig.*,
    2017 U.S. Dist. LEXIS 99616 (N.D. Cal. June 27, 2017) .............................................................6

*In re Cardizem CD Antitrust Litig.*,
    MDL No. 1278 (E.D. Mich. Nov. 26, 2002) ..............................................................................14

- ii -

DIRECT PURCHASER PLS.' MOT. FOR REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES
*In re Lidoderm Antitrust Litig.*, No. 14-2521-WHO

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2016 U.S. Dist. LEXIS 24951 (N.D. Cal. Jan. 26, 2016) ........................................15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2016 U.S. Dist. LEXIS 5561 (N.D. Cal. Jan. 13, 2016) .........................................21

*Ching v. Siemens Indus.*,
   2014 U.S. Dist. LEXIS 89002 (N.D. Cal. June 27, 2014) ........................................16

*In re Credit Default Swaps Antitrust Litig.*,
   2016 U.S. Dist. LEXIS 54587 (S.D.N.Y. Apr. 25, 2016) ........................................17

*In re DDAVP Antitrust Litig.*,
   No. 05-2237 (S.D.N.Y. Nov. 28, 2011) ........................................13

*In re Doryx Antitrust Litig.*,
   No. 12-3824 (E.D. Pa. Sept. 15, 2014) ........................................13

*Edwards v. Nat'l Milk Producers Fed'n*,
   2017 U.S. Dist. LEXIS 145217 (N.D. Cal. June 26, 2017) ........................................8

*Fischel v. Equitable Life Assur. Soc'y of U.S.*,
   307 F.3d 997 (9th Cir. 2002) ........................................17

*In re Flonase Antitrust Litig.*,
   951 F. Supp. 2d 739 (E.D. Pa. 2013) ........................................9, 13

*Garcia v. Pancho Villa's of Huntington Vill., Inc.*,
   2012 U.S. Dist. LEXIS 144446 (E.D.N.Y. Oct. 4, 2012) ........................................15

*Goodwin v. Winn Mgmt. Grp. LLC*,
   2018 U.S. Dist. LEXIS 29684 (E.D. Cal. Feb. 22, 2018) ........................................5

*Gutierrez v. Wells Fargo Bank, N.A.*,
   2015 U.S. Dist. LEXIS 67298 (N.D. Cal. May 21, 2015) ........................................19

*Jones v. GN Netcom, Inc. (In re Bluetooth Headset Prods. Liab. Litig.)*,
   654 F.3d 935 (9th Cir. 2011) ........................................4

*Jones v. San Diego Metro. Transit Sys.*,
   2017 U.S. Dist. LEXIS 198284 (S.D. Cal. Nov. 30, 2017) ........................................4

*In re K-Dur Antitrust Litig.*,
   Civil Action No. 01-1652, ECF No. 1057 (D.N.J. Oct. 5, 2017) ........................................12, 21

*King Drug Co. of Florence v. Cephalon, Inc.*,
   No. 06-cv-0197 (E.D. Pa. 2015) ........................................12

- iii -

DIRECT PURCHASER PLS.' MOT. FOR REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES
*In re Lidoderm Antitrust Litig.*, No. 14-2521-WHO

*LecTec Corp., v. Chattem, Inc.*,
    E.D. Tex. No. 5:08-cv-00130 ......................................................................................10

*In re Lidoderm Antitrust Litig.*,
    2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ..............................................................3

*Mathein v. Pier 1 Imps. (U.S.), Inc.*,
    2018 U.S. Dist. LEXIS 71386 (E.D. Cal. Apr. 26, 2018)..........................................18

*Meijer, Inc. v. Abbott Labs.*,
    No. 07-5985 CW (N.D. Cal. Aug. 11, 2011) .............................................................13

*Moyle v. Liberty Mut. Ret. Ben. Plan*,
    2018 U.S. Dist. LEXIS 34730 (S.D. Cal. Mar. 2, 2018) ...........................5, 12, 17, 18

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) .................................................................................8

*In re NCAA Ath. Grant-in-Aid Cap Antitrust Litig.*,
    2017 U.S. Dist. LEXIS 201108 (N.D. Cal. Dec. 6, 2017) .................................. *passim*

*In re Neurontin Antitrust Litig.*,
    Civil Action No. 02-1830 (FSH), ECF No. 114 (D.N.J. Aug. 6, 2014) ...............13, 21

*In re Nifedipine Antitrust Litig.*,
    No. 03-mc-223-RJL (D.D.C. Jan. 31, 2011)..............................................................13

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1037 (N.D. Cal. 2008) .....................................................................19

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) .........................................................................4, 5, 20

*In re Oxycontin Antitrust Litig.*,
    No. 04-md-1603-SHS (S.D.N.Y. Jan. 25, 2011) .......................................................13

*Parkinson v. Hyundai Motor Am.*,
    796 F. Supp.2d 1160 (C.D. Cal. 2010) .....................................................................19

*In re Prograf Antitrust Litig.*,
    No. 11-md-2242 (D. Mass. May 20, 2015)................................................................13

*In re Provigil Antitrust Litig.*,
    No. 06-1797 (E.D. Pa. Oct. 15, 2015).................................................................12, 21

*In re Relafen Antitrust Litig.*,
    No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004)...................14

- iv -

DIRECT PURCHASER PLS.' MOT. FOR REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES
*In re Lidoderm Antitrust Litig.*, No. 14-2521-WHO

*In re Remeron Direct Purchaser Antitrust Litig.*,
  2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005)..................................................13

*Rochester Drug Co-Operative, Inc. v. Braintree Labs., Inc.*,
  No. 07-142 (D. Del. May 31, 2012)........................................................................13

*Rodriguez v. West Publ'g Corp.*,
  2007 U.S. Dist. LEXIS 74849 (C.D. Cal. Sept. 10, 2007)..........................................8

*Rodriguez v. West Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ...............................................................................20

*Shelby v. Two Jinns, Inc.*,
  2017 U.S. Dist. LEXIS 206930 (C.D. Cal. Aug. 2, 2017)...........................................16

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
  No. 12-cv-83 (E.D. Tenn. June 30, 2014)...............................................................13

*Skelton v. Gen. Motors Corp.*,
  860 F.2d 250 (7th Cir. 1988) .................................................................................4

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ............................................................................4, 20

*In re Superior Beverage/Glass Container Consol. Pretrial*,
  133 F.R.D. 119 (N.D. Ill. 1990)..............................................................................9

*In re Terazosin Hydrochloride Antitrust Litig.*,
  No. 99-MDL-1317, 2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005)..................14

*Thomas v. Magnachip Semiconductor Corp.*,
  2018 U.S. Dist. LEXIS 82801 (N.D. Cal. May 15, 2018) ...........................................5

*In re Tricor Direct Purchaser Antitrust Litig.*,
  No. 05-cv-340 (D. Del. April 23, 2009) ..................................................................13

*United Food and Com. Workers Loc. 1776 & Participating Employers Health and Welfare Fund v. Teikoku Pharma USA, Inc.*,
  74 F. Supp. 3d 1052 (N.D. Cal. 2014) .....................................................................3

*Van Vranken v. Atl. Richfield Co.*,
  901 F. Supp. 294 (N.D. Cal. 1995) ........................................................................19

*Velez v. Novartis Pharms. Corp.*,
  2010 U.S. Dist. LEXIS 125945 (S.D.N.Y. Nov. 30, 2010).........................................15

*Vincent v. Hughes Air W.*,
  557 F.2d 759 (9th Cir. 1977).................................................................................19

- v -

DIRECT PURCHASER PLS.' MOT. FOR REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES
*In re Lidoderm Antitrust Litig.*, No. 14-2521-WHO

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ...............................................................................4, 11, 18, 19

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
19 F.3d 1291 (9th Cir. 1994) .........................................................................................4

*In re Wellbutrin SR Antitrust Litig.*,
No. 04-5525 (E.D. Pa. Nov. 21, 2011) .......................................................................13

*In re Wellbutrin XL Antitrust Litig.*,
No. 08-cv-2431 (E.D. Pa. Nov. 7, 2012) ....................................................................13

**NOTICE OF MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that at 2:00 pm on September 12, 2018, Counsel for the Direct Purchaser Class Plaintiffs (hereinafter "DPPs") will and hereby do move before the Honorable William H. Orrick, United States District Judge, at the Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, Courtroom 2, 17th Floor, San Francisco, California, pursuant to Federal Rules of Civil Procedure 23(h) and 54(d) for the following:

An award of attorneys' fees in the amount of $45,000,070.46 (27.5% of the total $166 million settlement after the deduction of litigation expenses of 2,363,380.15);

Reimbursement of litigation expenses in the amount of $ 2,363,380.15; and

Service awards of $100,000 for each the three class representatives.

This Motion is made on the grounds that: the requested attorneys' fees are fair and reasonable in light of counsel for DPPs' efforts in litigating this case and creating a settlement fund for the benefit of all class members; the expenses for which reimbursement is sought were reasonably and necessarily incurred in connection with the prosecution of this action; and the requested service awards are warranted in light of the class representatives' efforts in bringing this litigation and their extensive time and involvement therein.

This Motion is based upon the accompanying Memorandum of Points and Authorities, the Declaration of Co-Lead Counsel Peter Kohn filed herewith ("Kohn Decl."), the individual declarations of DPPs filed herewith, the proposed Order submitted herewith, all pleadings and/or other papers filed in this action, and upon such argument as may be presented to the Court at the hearing on this Motion.

This Motion will be available today on the website established for this case, for review by class members: http://www.lidodermantitrustdppsettlement.com.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Following an investigation that began in 2011, counsel representing class representatives Droguería Betances, Inc. ("Betances"), Rochester Drug Co-Operative, Inc. ("RDC") and American

-1-

Sales Company, LLC ("ASC") and a proposed class of direct purchasers (collectively, "DPPs") filed this antitrust litigation in late 2013.  For more than four years, DPPs aggressively litigated a highly-complex, high-stakes and hotly-contested case against three sophisticated pharmaceutical companies represented by some of the most prominent defense firms in the country.  In the Fall of 2017, the parties were in the midst of intensive preparation for a trial to commence on February 23, 2018.  Contemporaneouly with preparing for trial, during three separate settlement conferences conducted under the supervision of Chief Magistrate Judge Joseph C. Spero, DPPs settled their claims against all three defendants.  Pursuant to Judge Spero's "mediator's proposals," DPPs, in exchange for dismissal of the litigation with prejudice and certain releases, reached cash settlements of $35 million with Teikoku, $71 million with Watson, and $60 million with Endo ($40 million immediately with the balance of $20 million to be paid in the first quarter of 2019), for a total of $166 million.  DPPs believe that the settlements represent an excellent result for DPPs.  Kohn Decl. ¶¶ 1, 102.

Undersigned counsel prosecuted DPPs' claims on a wholly contingent basis, without any guarantee of success or compensation for time spent, or for reimbursement of expenses.  Kohn Decl. ¶ 104.  At the outset, DPPs knew that they would incur millions of dollars in out-of-pocket expenses, face obstacles at every stage of the litigation, and potentially would have to obtain (and defend on appeal) a jury verdict in DPPs' favor.  From DPPs's investigation through February of 2018, counsel for DPPs expended 69,838.2 hours of uncompensated professional time.  As compensation for their efforts, DPPs seek an award of attorneys' fees in the amount of 45,000,070.50, *i.e.,* 27.5% of the total settlement after deduction of unreimbursed litigation costs.  As described more fully below and in the Kohn Declaration, the requested fee award is commensurate with the results achieved, the efforts of DPPs, the risk undertaken, and fees that have been awarded in this District and in other, similar cases that counsel for DPPs have participated in.

DPPs also seek $2,363,380.15 in unreimbursed out-of-pocket expenses, and service awards of $100,000 for each of the three Class representatives in recognition of their vital participation in this litigation.

## II.      HISTORY OF THE LITIGATION

DPPs are direct purchasers of Endo/Teikoku's brand-name prescription pharmaceutical product, Lidoderm.  The facts alleged by DPPs are the subject of numerous opinions.  *E.g.*, *United Food and Com. Workers Loc. 1776 & Participating Employers Health and Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1064 (N.D. Cal. 2014); *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *2 (N.D. Cal. Feb. 21, 2017).  In brief, DPPs alleged that Endo/Teikoku and Watson engaged in anticompetitive behavior in violation of the antitrust laws in connection with the settlement of patent litigation, causing DPPs to pay artificially inflated prices for Lidoderm and generic Lidoderm.  Kohn Decl. ¶ 9.  Defendants denied wrongdoing and asserted numerous defenses.  A detailed history of this litigation is fully set forth in the Part I of the Kohn Declaration, ¶¶ 5-103 .

## III.     DPP COUNSEL'S LITIGATION EFFORTS

Counsel for DPPs are from some of the leading antitrust law firms in the country working for plaintiffs.  DPPs have almost two decades of extensive experience prosecuting and trying Hatch-Waxman antitrust cases on behalf of the same core class of direct purchasers, and have been involved in most of the critical decisions in this evolving area of antitrust law, including the Supreme Court's landmark *Actavis* decision and subsequent decisions interpreting *Actavis*.  Litigating any Hatch-Waxman antitrust case requires expertise in many discrete and highly technical areas, including, among other things, patent law, antitrust law, economics, pharmaceutical regulation, drug manufacturing, and the particular therapeutic class of the relevant drug.  This is expertise that DPP counsel possessed.  Kohn Decl. ¶¶ 32, 40, 49, 51, 56.  Aside from the typical issues in Hatch-Waxman antitrust cases, this case involved two different patent litigations, up to seven patents (several of which ultimately were rendered essentially irrelevant based upon DPP counsel's efforts), a citizen petition, highly specific causation defenses associated with the unique pharmaceutical formulation and manufacturing process at issue, and an attack on all plaintiff counsel's continued prosecution of the case.  Kohn Decl. ¶¶ 6, 19, 27, 45, 48, 56.  DPPs took advantage of each firm's expertise to litigate this case in the most effective and efficient manner possible, without duplication of effort.  A detailed description of counsel for DPPs' efforts is fully

-3-

DIRECT PURCHASER PLS.' MOT. FOR REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES
*In re Lidoderm Antitrust Litig.*, No. 14-2521-WHO

set forth in the Kohn Declaration.

## IV.   ARGUMENT

### A.   The Percentage-of-the-Fund Method For Calculating Fees is Appropriate

Federal Rules of Civil Procedure 23(h) and 54(d) permit courts overseeing class actions to award reasonable attorneys' fees and costs. The Supreme Court has long recognized that a lawyer who recovers a "common fund" on behalf of a class is entitled to reasonable attorneys' fees and expenses from the fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Staton v. Boeing Co.,* 327 F.3d 938, 967 (9th Cir. 2003) (same). The rationale for the "common fund" doctrine is that "those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it." *In re Wash. Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1300 (9th Cir. 1994).

In the Ninth Circuit, there are two methods that courts may use in order to award attorneys' fees: (1) the "percentage-of-fund" method, which bases the fee on a percentage of the total amount of a common settlement fund; or (2) the "lodestar" method, which multiplies the amount of attorney hours reasonably expended by reasonably hourly rates. *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1047 (9th Cir. 2002); *In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 949 (9th Cir. 2015). "[C]ourts have discretion to choose which calculation method they use," but "their discretion must be exercised so as to achieve a reasonable result." *Jones v. GN Netcom, Inc. (In re Bluetooth Headset Prods. Liab. Litig.)*, 654 F.3d 935, 942 (9th Cir. 2011). "The lodestar method is preferred when calculating statutory attorney fees, whereas the percentage-of-recovery approach is preferred when fees will be drawn from a common fund." *Jones v. San Diego Metro. Transit Sys.*, 2017 U.S. Dist. LEXIS 198284, *10 (S.D. Cal. Nov. 30, 2017) (citation and internal quotation marks omitted).[1] The Ninth Circuit instructs that when the percentage-of-the-fund method is used for calculation of fees, a lodestar cross-check can "confirm that a percentage of [the] recovery amount does not award

---

[1] Statutory attorneys' fees are not available here under the Clayton Act.  Only if there is a judgment in favor of plaintiff are statutory shifted fees available. *E.g.*, *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 255 (7th Cir. 1988).

counsel an exorbitant hourly rate." *Online DVD*, 779 F.3d at 949 (citation and internal quotation marks omitted).

When the percentage-of-recovery approach is used to determine an appropriate fee award, courts take into account all of the facts and circumstances of the particular case. *Beaver v. Tarsadia Hotels*, 2017 U.S. Dist. LEXIS 160214, at *31 (S.D. Cal. Sept. 28, 2017).  When the requested percentage departs from the Ninth Circuit's 25% "benchmark," courts consider the following factors: "(1) the results achieved; (2) the risk undertaken by class counsel in pursuing the case; (3) whether the settlement generated benefits beyond a cash payment; (4) the market rate for similar representations; and (5) the nature of the representation, including whether it was executed on a contingency basis." *Id.* (internal citations and quotations omitted). *See also Goodwin v. Winn Mgmt. Grp. LLC*, 2018 U.S. Dist. LEXIS 29684, at *19 (E.D. Cal. Feb. 22, 2018) ("Reasons to vary the benchmark award may be found when counsel achieves exceptional results for the class, undertakes 'extremely risky' litigation, generates benefits for the class beyond simply the cash settlement fund, or handles the case on a contingency basis").

Here, DPPs's efforts have created a common fund of $166 million in cash for the benefit of the direct purchaser class.  As detailed herein, using a "percentage-of-the-fund" method with a lodestar cross-check, counsel for DPPs' requested fee award of 27.5% is a justified departure from the benchmark, after consideration of all of the relevant factors.

## B.   DPPs Achieved an Exceptional Result for the Class

"The 'most critical factor' in determining appropriate attorneys' fee awards 'is the degree of success obtained.'" *Thomas v. Magnachip Semiconductor Corp.*, 2018 U.S. Dist. LEXIS 82801, at *11 (N.D. Cal. May 15, 2018) (quoting *Ensley v. Eckerhart*, 461 U.S. 424, 436 (1983)); *Moyle v. Liberty Mut. Ret. Ben. Plan*, 2018 U.S. Dist. LEXIS 34730, *27-28 (S.D. Cal. Mar. 2, 2018) ("The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award") (internal quotation omitted).

Here, the amount of the proposed settlements — $166 million — is unquestionably substantial and will provide a significant guaranteed cash recovery to each member of the class.[2] This amount represents between 55% and 79% of DPPs' total aggregate damages.[3]  This is the third highest drug or device antitrust class action in terms of percentage recovery of total damages, therefore.  Kohn Decl. ¶ 1.  As one court in this District has observed, "[f]ar lesser results (with 20% of recovery of damages or less) have justified upward departures from the 25% benchmark."  *In re NCAA Ath. Grant-in-Aid Cap Antitrust Litig.*, 2017 U.S. Dist. LEXIS 201108, at *6 (N.D. Cal. Dec. 6, 2017).  *See also Boyd v. Bank of Am. Corp.,* 2014 U.S. Dist. LEXIS 162880, at *24 (C.D. Cal. Nov. 18, 2014) (deeming recovery of 36% of damages "impressive").  Moreover, if the proposed settlements are finally approved, each class member's share will be calculated on a *pro rata* basis based on that class member's actual purchases, and all that class members need do in order to receive their recovery is fill out a simple claim form that will be directly mailed to them by the claims administrator.  *See generally In re Capacitors Antitrust Litig.*, 2017 U.S. Dist. LEXIS 99616, at *28 (N.D. Cal. June 27, 2017) ("There is a real value to Class members of receiving a cash distribution from the Settlements in the near term").  This excellent recovery, which ensures that all class members are treated fairly and equally in that they are compensated directly in proportion to their actual purchases, and will receive their shares of the settlement fund promptly.

The exceptional result in this case is illustrated not just by the recovery or its rank among other cases, but also by the accomplishments of the DPPs throughout the litigation process, from initial investigation through trial preparation.  Counsel for the DPPs were the first to discover, investigate, and file this case, relative to the government.  Kohn Decl. ¶¶ 5-10.  Counsel for the DPPs successfully defeated defendants' motion to dismiss, overcoming defendants' proposal to

---

[2] The results obtained by DPPs stand in stark contrast to those obtained by the Federal Trade Commission, whose investigation started nearly contemporaneously with DPPs' filings, but which has to date obtained only consent judgments with Endo and Teikoku merely to enjoin each from entering into similar agreements in the future, and no monetary recovery.

[3] If the jury found that Watson would have entered the market with generic Lidoderm in mid-December 2012, DPPs' damages were $300 million.  If the jury found that Watson would have entered the market with generic Lidoderm in late March 2013, DPPs' damages were $211 million. Kohn Decl. ¶¶ 1 & n.1, 102.

depart from the shifting burdens of production and persuasion supplied by the structured rule of reason analysis, and obtaining a favorable interpretation of *Actavis*. *Id.* ¶¶ 12-15. Counsel for the DPPs also obtained an order requiring defendants to elect to waive the attorney-client privilege or be precluded from making multiple assertions at trial, one of the few successful such motions in any antitrust (or other) case. *Id.* ¶¶ 27-28. Counsel for DPPs obtained an order requiring Endo's general counsel to disclose her handwritten attorney notes of settlement discussions with Watson's counsel. *Id.* ¶ 24 (entry 21). Counsel for the DPPs also obtained partial affirmative summary judgment on the issue of the relevant antitrust product market, another rarity. *Id.* ¶¶ 60-61. And, together with other counsel, DPP counsel obtained a favorable standard for the jury to find that a patent would not have prevented generic competition in a reverse-payment settlement case. *Id.* ¶¶ 63-66. Plaintiffs resisted three (3) separate trips to the Ninth Circuit on *mandamus* and Rule 23(f) proceedings.

The execeptional result in this case can also be seen through the Court's periodic observations. The Court has repeatedly recognized the complexity of the issues in this case, the quality of the lawyering, the cooperation among counsel, and the work that counsel put into the case. This consistent recognition of the lawyering on both sides of the aisle underscores that the result that DPPs obtained was extraordinary. Defendants' counsel aggressively defended their clients' interests every step of the way. This necessarily required intense responsive efforts by plaintiffs' counsel to prepare their affirmative case and to fend off the intense defenses and other arguments that defense counsel pursued.

Specifically, in October of 2015, the Court observed, "I have been impressed by the way that you all have been working[.] This may be … completely opaque to my eyes, … but it seems to me that you're working very effectively and collaboratively over difficult issues in a way that is … at the higher level of professionalism and … I want to applaud you for that and encourage you to keep up that hard and good work. I know there is a ton that you are going through, and there are going to be places that will be hard, but … I appreciate the efforts that you're all making." ECF 290 at 10 (Oct. 6, 2015 Status Conference). The Court later acknowledged that discovery was extremely contentious, noting that "when you are not present and I am discussing this case, I usually complement the manner in which you are working through and pursuing the discovery on what is

often very contentious work, I know.  So I appreciate it, and keep up the good work."  ECF 374 at 25 (of Jan. 12, 2016 Status Conference).  In February 2016, the Court noted: "Well, you continue to do an enormous amount of work on this matter.  And I appreciate the quality of what gets presented to me. So, thank you for that, and I'll look forward to the timeliness, as well."  ECF 385, at 22 (Feb. 2, 2016 Status Conference).

In dealing with several discovery disputes, the Court noted, "as always, I am impressed by the amount of work that you're doing, even though I was also impressed by the number of discovery disputes that you gave me for this status conference."  ECF 416, at 45 (March 1, 2016 Status Conference).  In April, 2016, the Court noted: "I appreciate the work that you're doing.  And these issues are not simple to me, and I suspect they're not simple to you.  So thank you for your good work in trying to work through the issues as much as you can before you bring them to me."  ECF 440, at 44-45 (Apr. 5, 2016 Status Conference).

At the class certification hearing, the Court noted: "As has always been the case throughout this case, the arguments were excellent and I appreciate them[.]"  ECF 644, at 118 (Nov. 29, 2016 argument).  At summary judgment, the Court noted: "I am constantly impressed by the quality of the lawyering in this case and by the arguments of counsel."  ECF 882, at 98 (Sept. 15, 2017 argument).

These recognized efforts of all counsel is yet another illustration of the exceptional results obtained in the face of highly competent and able defense counsel, and strongly supports the requested fee.

### C.      This Case was Extremely Risky and Complex

As numerous courts have recognized, antitrust cases typically present very significant risk. *See, e.g., Edwards v. Nat'l Milk Producers Fed'n*, 2017 U.S. Dist. LEXIS 145217, *26 (N.D. Cal. June 26, 2017) ("[a]n antitrust class action is arguably the most complex action to prosecute. . . . The legal and factual issues involved are always numerous and uncertain in outcome.") (citing *In re Linerboard Antitrust Litig.,* 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004)).  "The history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or negligible damages, at trial or on appeal."  *Rodriguez v. West Publ'g Corp.,* 2007 U.S. Dist. LEXIS 74849, *43 (C.D. Cal. Sept. 10, 2007).  "Antitrust litigation in

general, and class action litigation in particular, is unpredictable." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998). "The 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages. None of these risks should be underestimated." *In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990). *See also In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013) ("Antitrust class actions are particularly complex to litigate and therefore quite expensive."); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2015 U.S. Dist. LEXIS 138479, at *148-49 (E.D.N.Y. Oct. 9, 2015) (price-fixing conspiracy required "complex expert analysis and review of mountains of documents").

This case exemplifies these observations about risk. The issues in this case were complex, and defendants asserted vigorous defenses to each and every aspect of DPPs' claims. At the time the litigation was filed in November 2013, the Supreme Court had just issued the *Actavis* decision, and district and appellate courts were tasked with its interpretation and implementation. In filing their motion to dismiss DPPs' complaint, defendants contended that the challenged settlement could not even be said to contain "reverse payments" under *Actavis* because Endo/Teikoku's provision of product and "no-AG" agreement were pro-competitive vehicles by which Watson could achieve early entry, rather than "payments for delay." At that point in time, two district courts had dismissed complaints alleging "no-AG" promises on the basis that a "no-AG" provision was not a cognizable reverse payment. Moreover, proving causation (*i.e.,* that Watson could and would have entered the market earlier with a less-expensive version of generic Lidoderm) also presented significant obstacles for DPPs because Watson contended that it could not and would have launched earlier than it had agreed to, in view of serious equipment, supply and FDA approval problems.

Another particularly complex aspect of the case concerned the underlying patent litigations. As the Court is well aware, a key patent at issue in this litigation was the '529 patent, which was the subject of a bench trial before Judge Sleet in the District of Delaware. The Court is also aware that the reverse payment agreement covered not just the '529 patent, but an additional 5 patents, referred to as the "Rolf" patents, which had previously been asserted by their former owner, LecTec, against Endo. The Rolf patents added a layer of complexity and effort to this case that likely is much less

apparent than the effort related to '529 patent, because defendants ultimately placed little reliance upon the Rolf patents in expert discovery, on summary judgment, and in the joint pretrial conference statement.  However, for the bulk of this litigation, Endo and Watson contended that those patents in fact blocked earlier entry by Watson, erecting a causation barrier that DPPs had to overcome to prevail.  As a result, DPPs' counsel expended significant effort analyzing and taking discovery on all five (5) of the Rolf patents.  This involved satellite litigation to obtain materials from an unrelated patent case, which involved numerous third parties, and ultimately motions practice in the Eastern District of Texas.  *See LecTec Corp., v. Chattem, Inc*., E.D. Tex. No. 5:08-cv-00130 (Robert W. Schroeder, U.S.D.J.).  Kohn Decl. ¶¶ 18-19.  While these difficult and often contentiously litigated issues were described to the Court in status reports (*see* ECF 272; ECF 306 at 4-5; ECF 352 at 4; ECF 365 at 5), DPP counsel were largely able to avoid burdening this Court with any disputes concerning the Rolf patents.  And, ultimately, after DPPs engaged in significant discovery and analysis of the Rolf patents and submitted extensive expert analysis of these patents through Professor Adelman and Dr. Shah, defendants' experts barely mentioned them in their reports and did not even raise them in their summary judgment motion.  Thus, while DPP counsel expended significant time on the five (5) Rolf patents throughout the course of this litigation, that effort, while appearing to have borne significant fruit in marginalizing those patents in this litigation, may not be readily apparent to the Court.

Defendants also vigorously challenged DPPs claims based on the pendency of a citizen petition Endo filed with the FDA in 2006.  Defendants argued that, without the challenged reverse payments, settlement would not have been reached and a generic launch would have been indefinitely delayed due to the pending petition.  In their motion to dismiss, defendants referenced the citizen petition no fewer than 25 times, and retained an expert to provide testimony at trial concerning its strength.

Finally, this case involved protracted disputes concerning monopoly power and relevant market.  And of course, absent the settlement, DPPs would have had to obtain a jury verdict in DPPs' favor (and defend that verdict on an inevitable appeal to the Ninth Circuit), which also

1   involved significant risk.  Counsel for DPPs have sometimes lost cases analogous to this one,

2   recovering nothing.

3   Accordingly, this factor strongly supports the requested fee.

4   **D.      DPPs's Performance Generated Benefits Beyond the Settlement Fund**

5   This factor examines whether counsel's performance generated some non-monetary or public

6   policy benefit beyond the creation of the settlement fund, such as by clarifying a point of law or

7   obtaining a ruling on a significant issue.  *See, e.g., Beaver*, 2017 U.S. Dist. LEXIS 160214 at *36-37

8   (class counsel clarified a statute of limitations issue and obtained a Ninth Circuit decision on other

9   significant issues); *Vizcaino*, 290 F. 3d at 1049 (litigation caused defendant to change its employee

10  benefit practices).

11  Here, counsel for DPPs unarguably evoked decisions by this Court that advanced the law in

12  several respects.  The Court's motion to dismiss opinion (ECF 117, reported at 74 F. Supp.3d 1052)

13  was one of the first post-*Actavis* decisions to set forth the pleading standards for an antitrust case

14  alleging a reverse payment, including by clarifying the allocation of the burdens of pleading,

15  production and persuasion on the issue of procompetitive justifications.  In the face of contrary

16  decisions that it deemed "not persuasive," the Court ruled that a no-AG promise was a cognizable

17  reverse payment.  It ruled that the free-goods promise was a cognizable reverse payment, even

18  though "Plaintiffs have not cited, and I have not found any case where brand product is used as

19  payment for the delay in a post-*Actavis* case."  ECF 117 at 16.  The opinion was not just

20  groundbreaking, but it was influential:  Westlaw says the Court's motion to dismiss opinion has been

21  cited by appellate and district courts 57 times thus far, and has been cited another 65 times in

22  secondary sources (including several times in ¶ 2046 of Areeda & Hovenkamp).

23  Further, the Court's several at-issue waiver opinions (ECF 350, 536, 795) show that this case

24  is one of the very few times any antitrust court has required defendants to elect to produce or be

25  precluded.  The Court's main opinion (ECF 536) clarified and advanced the law substantially, by

26  exploring the largely untrodden territory between the relatively "easy" case of a privilege holder's

27  explicitly asserting the substance of legal advice as a defense, and the far more complicated case of a

28  privilege holder's making assertions that, while not containing the legal advice itself, are either

necessarily or in fact the product of that legal advice.  In the course of its decision, the Court set forth limiting factors on the invasion of the privilege that will guide future courts faced with similar defense assertions.

Finally, the Court's summary judgment opinion (ECF 900, 978) made law in two respects: first, it is one of the few applying the summary judgment standard in a post-*Actavis* case, and blazed a trial as one of the first to decide how a jury should be instructed on the quantum of proof required to show relevant patents would not have prevented generic launch (the "some evidence" standard); second, it is one of few courts in the history of antitrust to rule in favor of plaintiff as a matter of law on the composition of the relevant antitrust product market.

Counsel for the DPPs were either principally (Kohn Decl. ¶¶ 14-15, 28, 60-61) or substantially (*id.* ¶¶ 63-64) responsible for the briefing that evoked these developments in the law. Accordingly, this factor strongly supports the requested fee.

### E.    The Requested Fee is Consistent With Awards in Similar Representations

This factor examines whether DPPs's requested fee is in line with awards for similar representations. *Moyle*, 2018 U.S. Dist. LEXIS at *26-27.  The most comparable representations are other, similar delayed entry cases that DPPs have litigated, in which DPPs have routinely been awarded fees of one-third, as demonstrated by the following chart:

| Case | Fee Award |
|------|-----------|
| *In re K-Dur Antitrust Litig.,* No. 01-1652 (D.N.J. Oct. 5, 2017) | 33⅓% of $60 million settlement |
| *In re Provigil Antitrust Litig.,* No. 06-1797 (E.D. Pa. Oct. 15, 2015) | 27.5% of $512 million settlement (partial settlement)[4] |

---

[4] Though $33^{1}/_{3}$% is a typical award granted in direct purchaser pharmaceutical antitrust cases, there are outliers.  In the *Provigil* case, for example, the court granted a fee award of 27.5% in 2015. That settlement involved a $512 million cash payment — the highest cash payment ever awarded in a pharmaceutical antitrust case — and generated a $140.8 million fee that represented a multiplier of 4.12 on the total lodestar.  *See King Drug Co. of Florence v. Cephalon, Inc.*, No. 06-cv-0197 (E.D. Pa. 2015), ECF No. 870.  The court in *Aggrenox* (2017) similarly departed from the norm, granting a 20% fee award.  But *Aggrenox*, settled for $146 million very early in the litigation, before any class certification or summary judgment briefing had been submitted and after only a few preliminary depositions had been taken.  *See generally In re Aggrenox Antitrust Litig.*, No. 14-md-2516 (D.

| Case | Fee Award |
|------|-----------|
| *In re Prograf Antitrust Litig.,* No. 11-md-2242 (D. Mass. May 20, 2015) | 33⅓% of $98 million settlement |
| *In re Doryx Antitrust Litig.,* No. 12-3824 (E.D. Pa. Sept. 15, 2014) | 33⅓% of $15 million settlement |
| *In re Neurontin Antitrust Litig.,* No. 02-1830 (D.N.J. Aug. 6, 2014) | 33⅓% of $191 million settlement |
| *In re Skelaxin (Metaxalone) Antitrust Litig.,* No. 12-cv-83 (E.D. Tenn. June 30, 2014) | 33⅓% of $73 million settlement |
| *In re Flonase Antitrust Litig.,* No. 08-cv-3149 (E.D. Pa. June 14, 2013) | 33⅓% of $150 million settlement |
| *In re Wellbutrin XL Antitrust Litig.,* No. 08-cv-2431 (E.D. Pa. Nov. 7, 2012) | 33⅓% of $37.5 million settlement |
| *Rochester Drug Co-Operative, Inc. v. Braintree Labs., Inc.,* No. 07-142 (D. Del. May 31, 2012) | 33⅓% of $17.25 million settlement |
| *In re DDAVP Antitrust Litig.,* No. 05-2237 (S.D.N.Y. Nov. 28, 2011) | 33⅓% of $20.25 million settlement |
| *In re Wellbutrin SR Antitrust Litig.,* No. 04-5525 (E.D. Pa. Nov. 21, 2011) | 33⅓% of $49 million settlement |
| *Meijer, Inc. v. Abbott Labs.,* No. 07-5985 CW (N.D. Cal. Aug. 11, 2011) | 33⅓% of $52 million settlement |
| *In re Nifedipine Antitrust Litig.,* No. 03-mc-223-RJL (D.D.C. Jan. 31, 2011) | 33⅓% of $35 million settlement |
| *In re Oxycontin Antitrust Litig.,* No. 04-md-1603-SHS (S.D.N.Y. Jan. 25, 2011) | 33⅓% of $16 million settlement |
| *In re Tricor Direct Purchaser Antitrust Litig.,* No. 05-cv-340 (D. Del. April 23, 2009) | 33⅓% of $250 million settlement |
| *In re Remeron Direct Purchaser Antitrust Litig.,* 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) | 33⅓% of $75 million settlement |

Conn.).  In contrast, the fee amount sought here is clearly proportionate to the recovery obtained in light of the late stage of the litigation.

-13-

DIRECT PURCHASER PLS.' MOT. FOR REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES
*In re Lidoderm Antitrust Litig.,* No. 14-2521-WHO

| Case | Fee Award |
|------|-----------|
| *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317, 2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) | 33⅓% of $74 million settlement |
| *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) | 33⅓% of $175 million settlement |
| *In re Buspirone Antitrust Litig.*, No. 01-CV-7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003) | 33⅓% of $220 million settlement |
| *In re Cardizem CD Antitrust Litig.,* MDL No. 1278 (E.D. Mich. Nov. 26, 2002) | 30% of $110 million settlement |

Further, "[d]istrict courts in [the Ninth] Circuit have routinely awarded fees of one-third of the common fund or higher after considering the particular facts and circumstances of each case." *Id.* (listing cases awarding one-third of a common fund and noting that "[i]n most common fund cases, the award exceeds [the] benchmark") (internal quotation omitted).  *Accord Beaver*, 2017 U.S. Dist. LEXIS 160214, at *31-32 (observing that "[t]he Ninth Circuit has [] upheld awards of one-third of a common fund").  And notably, an award of 27.5% here would not trigger any concerns of "windfall profits," because unlike some cases "in which mere disclosure of a government investigation all but guarantees the creation of a megafund, notwithstanding what counsel does or does not do," *In re NCAA*, 2017 U.S. Dist. LEXIS 201108, at *14-15, here the opposite is true:  the DPPs were years ahead of the FTC and state Attorneys General, and it is they who wanted to join our litigation.  Kohn Decl. ¶¶ 5-8, 22 n.4.  The settlements here were achieved directly because of DPPs's efforts in investigating, filing and litigating this case all the way to trial, as discussed herein.

Accordingly, this factor strongly supports the requested fee.

### F.    DPPs Expended Significant Time and Effort in Litigating This Case

DPPs expended almost 70,000 hours in investigating and prosecuting this case over the course of eight (8) years, starting from the initial investigation that began in 2011 up through February of 2018.  As detailed fully in the Kohn Declaration, counsel for DPPs, *inter alia*: (a) successfully defeated Defendants' motion to dismiss (Kohn Decl. ¶ 15); (b) reviewed and analyzed

-14-

DIRECT PURCHASER PLS.' MOT. FOR REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES
*In re Lidoderm Antitrust Litig.*, No. 14-2521-WHO

more than 3.6 million pages of documents produced by Defendants and third-parties (*id.* ¶ 31); (c)

served as lead questioner at 40 depositions of defendants' fact and expert witnesses (*id.* ¶¶ 38, 50);

(e) consulted with and retained seven (7) expert witnesses, and defended those experts at deposition

(*id.* ¶¶ 44, 50); (f) engaged in substantial motion practice on various issues (*id.* ¶¶ 24-30); (g)

obtained certification of a direct purchaser class (*id.* ¶¶ 55-57); (h) obtained partial summary

judgment on two issues (concerted action and market power) and defeated defendants' motions for

summary judgment (*id.* ¶¶ 59-66); (i) engaged in intensive trial preparation (*id.* ¶¶ 71-75); and (j)

prepared for and participated in multiple mediation sessions, during which DPPs engaged in hard-

fought settlement negotiations and ultimately agreed to the three proposed settlements with

defendants (*id.* ¶¶ 95-103).  Consequently, DPPs expended a significant amount of time and effort

over an eight (8) year period in litigating this case.  *See In re NCAA*, 2017 U.S. Dist. LEXIS 201108,

at *18 (where counsel expended over $11 million in professional time and over $3 million in

expenses, such represented a significant "commitment of time, personnel and money to the classes");

*In re BioScrip, Inc. Sec. Litig.,* 273 F. Supp. 3d 474, 498 (S.D.N.Y. 2017) (litigation was "a hard-

fought, complicated case, requiring extensive work on the part of Lead Counsel"); *Velez v. Novartis*

*Pharms. Corp.,* 2010 U.S. Dist. LEXIS 125945, at *54 (S.D.N.Y. Nov. 30, 2010) ("Class Counsel

devoted 36,996.77 hours from 68 attorneys and staff members to the successful prosecution of this

matter").

Moreover, DPPs will be expending a significant number of hours in connection with securing

approval of and administering the settlements without any compensation.  *See In re Cathode Ray*

*Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist. LEXIS 24951, *305 (N.D. Cal. Jan. 26, 2016)

(acknowledging that "Lead Counsel and a handful of other firms have and will invest many hundreds

of uncompensated hours . . . in obtaining approval of the settlement, administering the distribution of

funds, dealing with objectors, and other post-settlement tasks"); *Garcia v. Pancho Villa's of*

*Huntington Vill., Inc.,* 2012 U.S. Dist. LEXIS 144446, at *22-23 (E.D.N.Y. Oct. 4, 2012)

(acknowledging that class counsel would perform more work on behalf of the class after final

approval, including "assisting with the administration of the settlement, and answering Class Member

questions, which further supports their fee request"); *Aros v. United Rentals, Inc.,* 2012 U.S. Dist.

LEXIS 104429, at *17 (D. Conn. July 26, 2012) (acknowledging that class counsel would continue to perform work on behalf of the class during the settlement approval process and the disbursement phase).

Finally, DPPs have spent over $2.3 million of their own money in necessary out-of-pocket litigation costs, without any resort to third-party funding. This amount is composed of ureimmbursed disbursements from a litigation fund of over $2 million and law firm-incurred costs of over $300,000. Kohn Decl. ¶ 109. This significant financial burden has been made heavier by the fact that some of DPPs's resources have been diverted from other work while this action was litigated.

Accordingly, this factor strongly supports the requested fee.

**G.      DPPs Litigated This Case on a Wholly Contingent Basis**

"Courts have long recognized that the public interest is served by rewarding attorneys who assume representation on a contingent basis with an enhanced fee to compensate them for the risk that they might be paid nothing at all for their work." *Ching v. Siemens Indus.,* 2014 U.S. Dist. LEXIS 89002, at *25 (N.D. Cal. June 27, 2014). *See also Shelby v. Two Jinns, Inc.,* 2017 U.S. Dist. LEXIS 206930, *28-29 (C.D. Cal. Aug. 2, 2017) (noting "when cases are taken on a contingency basis and litigation is protracted, the risk of non-payment warrants a significant fee award.") (citing *In re Heritage Bond Litig.,* 2005 U.S. Dist. LEXIS 13555, at *70 (C.D. Cal. June 10, 2005)); *Beaver v. Tarsadia Hotels*, 2017 U.S. Dist. LEXIS 160214, *32 (S.D. Cal. Sept. 28, 2017) ("From the outset, Class Counsel litigated this case in the face of extraordinary risk of non-payment by taking the case on a pure contingency basis and risked receiving zero compensation for their years of work and out-of-pocket costs"). Because contingent representation enables a client to pay only for results achieved, the law recognizes "both sides of the bargain — a significant upside fee for successful contingent representations." *In re NCAA*, 2017 U.S Dist. LEXIS 201108, at *10.

Here, DPPs litigated this case purely on a contingency fee basis — with no up-front retainer fees or allowance for expenses, nor any resort to third-party funding. Consequently, DPPs faced the very real risk that they might ultimately receive nothing for their hard work and long hours, as well as the millions of dollars in cash outlays. *Id.* at *10-11 ("[C]ounsel for the classes have spent more than three years investigating and litigating this case, without receiving any compensation to do so.

Such burdens are significant, even for law firms of the stature of plaintiffs' counsel"). *See also Moyle*, 2018 U.S. Dist. LEXIS 34730, at *31 ("Thus far, Class Counsel have not received any compensation for more than seven years of work on this case").  DPP counsel have lost analogous cases.

Counsel for DPPs' willingness to pursue Hatch-Waxman pharmaceutical cases on a contingent basis in the face of such risk advances the important public policy goal of incentivizing private plaintiffs to enforce this nation's antitrust laws.  As the Supreme Court has held, "private suits are an important element of the Nation's antitrust enforcement effort." *Am. Soc'y of Mech. Engineers v. Hydrolevel Corp.,* 456 U.S. 556, 572 n.10 (1982).  As such, "it is important to encourage top-tier litigators to pursue challenging antitrust cases…[because] [o]ur antitrust laws address issues that go to the heart of our economy." *In re Credit Default Swaps Antitrust Litig.,* 2016 U.S. Dist. LEXIS 54587, at *55 (S.D.N.Y. Apr. 25, 2016).  Adequate compensation ensures that competent counsel are attracted to such work and not deterred by bearing the risk (and sometimes the reality) of loss.  *See Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002) (fee awards provide "the necessary incentive for attorneys to bring actions to protect individual rights and to enforce public policies") (internal citations and quotations omitted).

Accordingly, this factor strongly supports the requested fee.

### H.   No Class Members Have Objected to the Requested Fees

The existence, or absence, of objections to a requested fee is a factor in determining an appropriate fee award.  Although this brief is, by design, being filed and made available to Class members prior to the running of the deadline for objections, the Notice advised class members that DPP counsel would seek a fee of up to one-third of the settlement fund after the deduction of litigation expenses.  No objections to the requested fee have been received as of the date of this filing.  *See Acosta v. Frito-Lay, Inc.,* 2018 U.S. Dist. LEXIS 75998, at *35 (N.D. Cal. May 4, 2018) (lack of any objections supported fee request); *Boyd*, 2014 U.S. Dist. LEXIS 162880, at *25 ("The lack of any opposition, and the very high opt-in rate of 95%, weighs in favor of an upward modification of the benchmark rate").  If any objections are received, counsel for DPPs will report back to the Court in the brief in support of final settlement approval.

## V.     A LODESTAR CROSS-CHECK CONFIRMS THE REASONABLENESS OF THE REQUESTED FEE

In assessing the reasonableness of a fee award, a court utilizing the percentage-of-recovery method will typically conduct a lodestar cross-check, which measures counsel's actual time investment in the litigation.  *See Vizcaino*, 290 F.3d at 1050; *Bond v. Ferguson Enters.,* 2011 U.S. Dist. LEXIS 70390, *29 (E.D. Cal. June 30, 2011) (finding that "[c]alculation of the lodestar amount may be used as a cross-check to assess the reasonableness of the percentage award").

The lodestar is calculated by multiplying the number of hours counsel expended on the litigation by "a reasonable hourly rate for the region and for the experience of the lawyer."  *Boyd*, 2014 U.S. Dist. LEXIS 162880, at *29 (internal quotation omitted).  As a first step, a court determines whether counsel's hourly rates are reasonable considering their experience, skill and reputation.  *Id.* at *29-30.  As a second step, a court determines whether the number of hours worked on the case is reasonable.  *Id.* at *30.  In performing the cross-check, "a court need not exhaustively catalogue and review counsel's hours, but can instead focus on the general question of whether the fee award appropriately reflects the degree of time and effort expended by the attorneys."  *Moyle*, 2018 U.S. Dist. LEXIS 34730, at *32-33 (internal quotation omitted).

Here, DPPs's requested percentage-of-recovery fee award is reasonable when analyzed in light of a lodestar crosscheck.  *See* Kohn Decl. ¶¶ 105 (lodestar).  First, DPPs's rates are well within the range that have been approved as reasonable by courts in this judicial district.  DPPs' counsel's rates can be found in Appendix A to each declaration of the firms representing DPPs.  *See* Kohn Decl. ¶ 106; *id.* Exs. A-K.  *See, e.g., In re NCAA*, 2017 U.S. Dist. LEXIS 201108, at *20-21 (reputable survey of 2015 rates for California attorneys showed range of $200 to $1,080); *In re Animation Workers Antitrust Litig.,* 2016 U.S. Dist. LEXIS 156720, at *20 (N.D. Cal. Nov. 11, 2016) (hourly rates ranging from $275 to $1,200 were "fair, reasonable, and market-based, particularly for the 'relevant community' in which counsel work").  Counsel for DPPs all have nearly two decades of experience litigating complex drug antitrust cases; no other group of lawyers in the country shares the same level of expertise and experience in this highly specialized area.  Second, the number of hours DPP counsel worked on this case was reasonable.  As detailed in the Kohn Declaration, DPP counsel aggressively litigated this case through the eve of trial.  *See Mathein*

*v. Pier 1 Imps. (U.S.), Inc.,* 2018 U.S. Dist. LEXIS 71386, at *30 (E.D. Cal. Apr. 26, 2018)

("[C]ounsels' declarations are sufficient to establish the number of attorney hours worked in this

matter").  That the proposed settlements only occurred at this stage of the litigation, despite prior

unsuccessful attempts at settlement, demonstrates that it was the hard work and long hours put in by

DPPs that positioned the case for the excellent results obtained through settlement.

The requested fee award of 27.5% would equate to a lodestar multiplier of 1.05.  Such a

multiplier falls in the low range of lodestar multipliers routinely awarded by courts in this Circuit,

and thus could not be said to result in "windfall" profits to DPPs.  *See, e.g., Vizcaino*, 290 F.3d at

1051 n.6 (approving multiplier of 3.65); *In re NCAA*, 2017 U.S. Dist. LEXIS 201108 at *3

(approving multiplier of 3.66 and noting that "multiples ranging from one to four are frequently

awarded in common fund cases when the lodestar method is applied"); *id.* at *16 (noting that "a 3.66

multiplier was well within the range of multipliers awarded in similar cases"); *Parkinson v. Hyundai

Motor Am.,* 796 F. Supp.2d 1160, 1170 (C.D. Cal. 2010) ("Where appropriate, multipliers may range

from 1.2 to 4 or even higher."); *Van Vranken v. Atl. Richfield Co.,* 901 F. Supp. 294, 298-99 (N.D.

Cal. 1995) (holding that a multiplier of 3.6 was "well within the acceptable range for fee awards in

complicated class action litigation" and that "[m]ultipliers in the 3-4 range are common"); *Gutierrez

v. Wells Fargo Bank, N.A.*, 2015 U.S. Dist. LEXIS 67298, at *25 (N.D. Cal. May 21, 2015)

(awarding $18.5 million in fees, noting that "this order allows a multiplier of 5.5 mainly on account

of the fine results achieved on behalf of the class, the risk of non-payment they accepted, the

superior quality of their efforts, and the delay in payment").

Accordingly, the lodestar cross-check supports the requested fee.

## VI.   THE ADVANCED EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED

Counsel who have created a common fund for the benefit of a class are entitled to be

reimbursed for out-of-pocket expenses reasonably incurred in creating the fund.  *See Vincent v.

Hughes Air W.,* 557 F.2d 759, 769 (9th Cir. 1977); *In re Omnivision Techs., Inc.,* 559 F. Supp. 2d

1037, 1048 (N.D. Cal. 2008) ("Attorneys may recover their reasonable expenses that would typically

be billed to paying clients in non-contingent matters.").  As the Ninth Circuit has aptly recognized,

-19-

DIRECT PURCHASER PLS.' MOT. FOR REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES
*In re Lidoderm Antitrust Litig.*, No. 14-2521-WHO

1    in class actions litigated on a wholly contingent basis, "litigation expenses make the entire action

2    possible." *Online DVD*, 779 F.3d at 953.

3        Here, DPPs's unreimbursed expenses were reasonably incurred and necessary for the

4    litigation of the case. *See* Kohn Decl. ¶¶ 109-113. These expenses were advanced by DPPs (with no

5    recourse to third-party funding), interest free, and with no assurance that they would ever be

6    reimbursed. They are described in detail in the Kohn Declaration. Kohn Decl. ¶ 109. The largest

7    expenditure was for expert witnesses. Other notable expenses include the creation and maintenance

8    of a electronic document database, shared among the co-plaintiffs, which hosted the voluminous

9    discovery produced in this litigation (which amounted to more than 3.6 million pages), and trial-

10   related vendors.

11       Accordingly, DPPs respectfully request that the Court approve reimbursement of counsel for

12   DPPs' expenses in full, before calculating the percentage award.

13   **VII.  SERVICE AWARDS FOR THE CLASS REPRESENTATIVES ARE APPROPRIATE
            AND REASONABLE**

14       The purpose of service awards is to reimburse named plaintiffs, who "take on a variety of

15   risks and tasks when they commence representative actions[.]" *In re NCAA*, 2017 U.S. Dist. LEXIS

16   201108 at *25-26. "[Service] awards are fairly typical in class action cases" as they are intended "to

17   compensate class representatives for work done on behalf of the class, to make up for financial or

18   reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to

19   act as a private attorney general." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir.

20   2009). Service awards are determined based on "the actions the plaintiff has taken to protect the

21   interests of the class, the degree to which the class has benefited from those actions . . . [and] the

22   amount of time and effort the plaintiff extended in pursuing the litigation." *Staton*, 327 F.3d at 977.

23       Here, counsel for DPPs requests that the Court approve service awards to the three Class

24   representatives (Betances, RDC and ASC) in the amount of $100,000 each, in recognition of their

25   commitment to, and participation in, this litigation.[5] The Class representatives each actively pursued

26   the class's interests by filing suit as a named plaintiff on behalf of all direct purchasers and

27

28

---

[5] The total amount equals just 0.18% (0.0018) of the $166 million settlement fund.

undertaking the responsibilities attendant upon them as representative plaintiff.  In particular, the Class representatives undertook significant burden in this case in responding to Defendants' extensive discovery and data requests, which required the class representatives to perform repeated search and production and spend significant time preparing and sitting for depositions.  *See* Exs. 1-3 hereto (declarations of class representatives).  Moreover, courts have recognized the risks inherent in filing suit as a named plaintiff on behalf of a class against an entity with which the named plaintiffs transacts business.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.,* 2016 U.S. Dist. LEXIS 5561, *68 (N.D. Cal. Jan. 13, 2016) ("A Class Representative could reasonably have been concerned about a backlash from Defendants, reducing that Representative's business opportunities with respect to products manufactured, sold, or otherwise controlled by Defendants.").  Here, that risk is acute inasmuch as the class members are direct purchasers of defendants' products, and thus transact business with defendants on a regular basis.  Finally, the amount of the service awards requested here is in line with both service awards in this district, and awards made to named representatives in other Hatch-Waxman antitrust cases.  *See, e.g., In re Asacol Antitrust Litig.,* No. 15-cv-12730-DJC, ECF No. 648 at ¶ 13 (D. Mass. Dec. 7, 2017) (awarding $100,000 to each of four class representatives); *In re K-Dur Antitrust Litig.,* Civil Action No. 01-1652, ECF No. 1057 at ¶ 12 (D.N.J. Oct. 5, 2017) (awarding $100,000 to class representative); *In re Provigil Antitrust Litig.,* Civil Action No. 2:06-cv-01797 (MSG), ECF No. 870 at ¶ 30 (E.D. Pa. Oct. 15, 2015) (awarding $100,000 to each of four class representatives and $50,000 to each of two other class representatives); *In re Neurontin Antitrust Litig.,* Civil Action No. 02-1830 (FSH), ECF No. 114 at ¶ 31 (D.N.J. Aug. 6, 2014) (awarding $100,000 to each of two class representatives).

For all of the foregoing reasons, DPPs respectfully request that the Court approve these appropriate and reasonable service awards to the Class representatives.

## VIII.   CONCLUSION

For the foregoing reasons, DPPs respectfully request that this Court enter an Order awarding DPPs fees in the amount of $45,000,070.46, *i.e.,* 27.5% of $163,636,619.85, which represents the $166 million settlement less litigation expenses of $2,363,380.15.  DPPs also respectfully request reimbursement of those litigation expenses of $2,363,380.15.  DPPs also respectfully request that

1   this Court approve incentive awards of $100,000 for each of the class representatives for their efforts

2   on behalf of the Class in the prosecution of this action.  A proposed order to this effect will

3   accompany DPPs' motion for final settlement approval.

4   DATED:  June 11, 2018                          Respectfully submitted,

5

6

7                                                  Peter Kohn
                                                   Joseph T. Lukens
8                                                  **FARUQI & FARUQI LLP**
                                                   101 Greenwood Avenue, Suite 600
9                                                  Jenkintown, PA 19046
                                                   Telephone: (215) 277-5770
10                                                 Facsimile: (215) 277-5771
                                                   Email: pkohn@faruqilaw.com
11
                                                   */s/ Bruce E. Gerstein*
12                                                 Bruce E. Gerstein
                                                   Noah Silverman
13                                                 Ephraim R. Gerstein
                                                   **GARWIN GERSTEIN & FISHER LLP**
14                                                 88 Pine Street, 10th Floor
                                                   New York, NY 10005
15                                                 Telephone: (212) 398-0055
                                                   Facsimile: (212) 764-6620
16                                                 Email: bgerstein@garwingerstein.com
                                                   Email: nsilverman@garwingerstein.com
17                                                 Email: egerstein@garwingerstein.com

18                                                 */s/ Thomas M. Sobol*
19                                                 Thomas M. Sobol
                                                   David S. Nalven
20                                                 Gregory T. Arnold
                                                   **HAGENS BERMAN SOBOL SHAPIRO LLP**
21                                                 55 Cambridge Parkway, Suite 301
                                                   Cambridge, MA 02142
22                                                 Telephone: (617) 482-3700
                                                   Email: tom@hbsslaw.com
23                                                 Email: davidn@hbsslaw.com
                                                   Email: grega@hbsslaw.com
24
                                                   *Co-Lead Counsel for the*
25                                                 *Direct Purchaser Class*

26

27

28