1   [Submitting Counsel on Signature Page]

2

3

4

5

6

7

8

9

10                    **UNITED STATES DISTRICT COURT**
11                  **NORTHERN DISTRICT OF CALIFORNIA**

12   | In re LIDODERM ANTITRUST LITIGATION | Case No. 14-md-02521-WHO |
13   | | |

14   | | **DECLARATION OF CO-LEAD COUNSEL** |
15   | THIS DOCUMENT RELATES TO: | **PETER KOHN IN SUPPORT OF DIRECT** |
     | | **PURCHASER PLAINTIFFS' MOTION** |
16   | DIRECT PURCHASER ACTIONS | **FOR REIMBURSEMENT OF COSTS AND** |
     | | **ATTORNEYS' FEES** |
17   | | |
18   | | **ORAL ARGUMENT REQUESTED** |
19   | | Date:   September 12, 2018 |
20   | | Time:  2:00 p.m. |
     | | Courtroom 2, 17th Floor |
21   | | |
22   | | The Honorable William H. Orrick |

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    WORK PERFORMED IN THIS CASE BY THE DIRECT PURCHASER CLASS ............2

    A.    Case Investigation ...................................................................................................2

    B.    Initial Complaints....................................................................................................3

    C.    MDL Practice ..........................................................................................................3

    D.    Motion to Dismiss the Direct Purchaser Complaints...............................................4

    E.    Written Fact Discovery ...........................................................................................5

    F.    Motions to Compel Discovery .................................................................................7

    G.    Document Review and Analysis .............................................................................12

    H.    Depositions of Fact Witnesses ..............................................................................14

    I.    Expert Discovery ...................................................................................................16

    J.    Depositions of Expert Witnesses ...........................................................................19

    K.    Class certification..................................................................................................21

    L.    Summary Judgment Motions .................................................................................22

    M.    *Daubert* Motions ..................................................................................................24

    N.    Trial Preparation ..................................................................................................25

        1.    Motions *in limine* ...................................................................................26

        2.    Trial-structure briefing...........................................................................29

        3.    Disputed legal issues..............................................................................29

        4.    Fact witness examinations and deposition designations............................30

        5.    Documentary evidence............................................................................31

        6.    Expert witness examinations....................................................................31

        7.    Jury instructions, verdict form, voir dire, and other portions of the
           pretrial conference statement ..................................................................32

- i -

DIRECT PURCHASER PLS.' MOT. FOR REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES
*In re Lidoderm Antitrust Litig.*, No. 14-2521-WHO

O.      Settlement ...............................................................................................33

II.     SUMMARY OF DIRECT PURCHASER CLASS COUNSEL'S ATTORNEYS' FEES
        AND UNREIMBURSED EXPENSES.................................................................34

- ii -

DIRECT PURCHASER PLS.' MOT. FOR REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES
*In re Lidoderm Antitrust Litig.*, No. 14-2521-WHO

1    Peter Kohn, subject to the penalties of perjury provided by 18 U.S.C. § 1746, does

2    hereby declare as follows:

3    1.    I am a partner in the law firm Faruqi & Faruqi LLP, co-lead counsel for the Direct

4    Purchaser Class and attorney for Plaintiff Rochester Drug Co-Operative, Inc.  I submit this

5    declaration in support of Direct Purchaser Plaintiffs' Motion for Reimbursement of Costs and

6    Attorneys' Fees, to describe the work we performed that resulted, just a few days prior to trial, in

7    the $166 million cash settlement in this case, which represents between 55% and 79% of the Direct

8    Purchaser Class's total aggregate damages before trebling.[1]  This percentage places this case in the

9    top three (3) of drug and device antitrust class action recoveries in terms of percentage of total

10   damages recovered.[2]

11   2.    Several firms contributed to this result, and each had a substantial role in one or

12   more issues in the case.  I describe that work in the aggregate here.  Separate declarations by each

13   such firm are also submitted herewith.  As the Court will see, each lawyer has contemporaneously

14   recorded his or her time according to a billing code.  The billing codes are set forth in each separate

15   declaration and were set prior to the inception of this case for all direct purchaser lawyers to use.

16   They have been augmented to reflect the separate litigation tasks each comprises.

17   3.    Detailed daily time meeting the American Bar Association requirements and this

18   Court's stated requirements for contemporaneous time records are available for inspection if the

19   Court desires.

20   4.    This was no run-of-the-mill antitrust case.  Counsel for the direct purchaser class

21   were years ahead of the FTC in identifying and bringing suit challenging the reverse payments

---

[1] If the jury found that Watson would have earlier entered the market with generic Lidoderm in mid-December of 2012, the Direct Purchaser Class's damages were $300 million.  If the jury found that Watson would have earlier entered the market with generic Lidoderm at the end of March of 2013, the Direct Purchaser Class's damages were $211 million.

[2] This is based on my review of cases involving the drugs Cardizem, Buspar, Relafen, Platinol, Hytrin, Remeron, children's liquid ibuprofen, Ovcon, Tricor, endosurgical products, sharps containers, Oxycontin, Nifedipine, Norvir, Wellbutrin SR, Wellbutrin XL, DDAVP, Toprol, Miralax, hypodermic products, Neurontin, Doryx, Prandin, Nexium, Provigil, and Skelaxin.  Only in Cardizem and Buspar did plaintiffs obtain a greater percentage of total damages.

between Endo/Teikoku and Watson and in obtaining monetary relief for injured parties.  (The FTC thus far has only obtained injunctive relief.)  Prior to trial, counsel for the direct purchasers, faced with four aggressive defense firms, litigated this case efficiently and effectively, yielding several important and instructive decisions by this Court in an area of antitrust law that is still being developed, and gathering the documentary, expert, and deposition evidence necessary to prevail at trial where few percipient witnesses could be compelled to attend and testify.  This case broke ground in the areas of pleading sufficiency and summary judgment in a pay-for-delay case, privilege waivers, the quantum of evidence an antitrust plaintiff must adduce of patent weakness, and stands as one of the few cases where plaintiff prevailed as a matter of law on the composition of the relevant antitrust product market.  Plaintiffs' achievements in this case were made despite the tireless efforts of defense counsel to dismiss the case, disqualify plaintiffs, defeat class certification, shield damning evidence under claims of privilege, and prepare their fact and expert witnesses for days at a time prior to deposition.  The 69,935 hours counsel for the direct purchaser class spent on this case is a testament not just to their hard work, but to the unique challenges faced by plaintiffs in this case.

# I.      WORK PERFORMED IN THIS CASE BY THE DIRECT PURCHASER CLASS

## A.      Case Investigation

5.      The direct purchasers were several years ahead of both the Federal Trade Commission and state Attorneys General in investigating and bringing suit in this case.

6.      My firm, together with the firm of Taus Cebulash & Landau LLP, began investigating this case in August of 2011, during the course of Endo and Teikoku's lawsuit against Watson.  Based upon an analysis of the defenses and counterclaims asserted by Watson several months before the trial began in February 2012, the '529 patent in suit appeared weak.  It appeared particularly weak after the *Markman* decision rendered by Judge Sleet, as did the Rolf Patent litigation that Endo filed against Watson immediately after that *Markman* decision, and so our investigation initially centered on whether the patent litigation was so weak as to make it a "sham" under the Sherman Act § 2 standard established by the Supreme Court in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993).  We also investigated the

citizen petitions that Endo had filed with the FDA under the same sham petitioning theory.  We also investigated the status of Watson's ANDA.

7.     After the announcement of Endo and Teikoku's settlement with Watson in May of 2012, which was before the end of the 30-month stay of FDA approval of Watson's ANDA (mid-July of 2012), our investigation resumed.  We drafted a complaint on behalf of our client, class representative Rochester Drug Co-Operative, Inc., a direct purchaser of Lidoderm.

8.     Another group of firms, consisting of Garwin, Gerstein & Fisher LLP, Smith Segura and Raphael LLP, and Odom & Des Roches LLC had also been independently investigating the underlying patent litigation and settlement on behalf of their client, class representative Drougeria Betances, and were drafting a complaint.

**B.     Initial Complaints**

9.     Following the Supreme Court's decision in *FTC v. Actavis*, 133 S. Ct. 2223 (2013), in June of 2013, and following Watson's launch of generic Lidoderm in September of 2013 in accordance with the challenged settlement, Drougeria Betances filed the first direct purchaser complaint in this matter, on November 8, 2013 (No. 13-6542, U.S.D.C., E.D. Pa.).  Rochester Drug Co-Operative, Inc. filed its complaint thereafter, on December 11, 2013 (No. 13-7217, U.S.D.C., E.D. Pa.).  Both complaints alleged large reverse payments from Endo and Teikoku to Watson (the free goods and a no-AG promises), in exchange for Watson's delay of generic competition. American Sales Company then filed on January 3, 2014 (No. 14-0122, U.S.C.D., E.D. Tenn.).

10.     It was not until three months after the first direct purchaser complaints were filed (and almost three years after the direct purchaser investigation began) that the FTC issued Civil Investigative Demands to Endo, Teikoku and Watson (February of 2014).  The FTC action proceeded on an independent track, without any coordination with the private cases.

**C.     MDL Practice**

11.     The Endpayors filed the MDL petition in this case, seeking transfer and coordination before this Court.  The direct purchasers sought coordination in the Eastern District of Pennsylvania, where the first two complaints were filed, because of the geographic proximity of that court to Endo and Watson's headquarters in New Jersey (and therefore the availability of live

trial witnesses from those two defendants).  The Judicial Panel on Multidistrict Litigation ordered transfer of these cases to this Court. Following transfer, the direct purchasers filed a consolidated amended complaint.  ECF 70.

> **D.**     **Motion to Dismiss the Direct Purchaser Complaints**

12.     Defendants were represented in this case by five able and aggressive firms:  Arnold & Porter and Reed Smith and, later, Williams & Connolly (for Endo), Skadden (for Watson), and Squire Patton (for Teikoku).  It became obvious early on that in the background for Endo was also Dechert, an able antitrust defense firm who also served as patent counsel for Endo in the underlying patent litigations.  Skadden (for Watson) and Dechert (for Endo) had advised their clients in connection with the challenged settlement, and so were invested in defending against plaintiffs' challenge to it.  Beginning with their motion to dismiss (ECF 95), defendants put the direct purchaser plaintiffs through their paces, requiring plaintiffs to respond in kind.

13.     Defendants' motion to dismiss was filed when the *Actavis* decision was just a year old.  Several district courts had reached divergent results on post-*Actavis* motions to dismiss.  The Rule 12 motion asserted that the no-AG promise and the free goods promise that Endo and Teikoku made to Watson were not cognizable reverse payments; that the settlement agreement should be adjudged procompetitive as a matter of law; that causation could not plausibly be proven because Watson purportedly could not have entered the market earlier with generic Lidoderm; and that monopoly power could not be shown.  ECF No. 95.  Defendants had case law at their disposal dismissing direct purchaser complaints involving the drugs Lamictal (from the District of New Jersey) and Loestrin (from the District of Rhode Island), both of which involved no-AG promises.  Defendants also challenged direct purchasers' efforts to cast the no-AG provision of the challenged settlement as an unlawful market allocation or output restriction agreement, subject to the *per se* illegality standard.

14.     The direct purchasers took the laboring oar in responding to the federal antitrust issues posed by defendants' motion, and showed how the shifting burdens of production and persuasion under the rule of reason operated in the Ninth Circuit, and how defendants' motion, by essentially seeking to have procompetitive justifications adjudicated on a motion to dismiss,

deviated from that law.  The direct purchasers also showed how the no-AG and free goods promises were cognizable reverse payments whose value could be, and in the complaint was, quantified.  The direct purchasers argued that whether Watson would have entered earlier is a factual question, unsuited to a motion to dismiss, and how monopoly power was adequately pled.  The direct purchasers also argued that *per se* liability should apply to the no-AG provision, which (because Watson had no patent on authorized generic Lidoderm) was a naked agreement to restrict output.

15.     The direct purchasers orally argued the motion to dismiss, and the Court denied the motion (ECF 117) with two exceptions: the Court disagreed that the no-AG promise could cognizably be considered a *per se* illegal market allocation or output restriction agreement; and the Court wanted the direct purchaser plaintiffs to amend the complaint to allege that either Endo or Teikoku enjoyed market power, not both.  In this course of its decision, the Court articulated the pleading standards for an antitrust case alleging a reverse payment, including allocation of the burdens of pleading, production and proof of procompetitive justifications, and in the face of contrary decisions nevertheless ruled that a no-AG promise and a free goods promise were cognizable reverse payments.

16.     Accordingly, the direct purchasers filed a Second Consolidated Amended Complaint.  ECF 121.

**E.     Written Fact Discovery**

17.     Prior to the denial of the motion to dismiss, the direct purchasers and defendants agreed to a limited production of documents and data, including documents from the '529 patent litigation, which the direct purchasers immediately reviewed and catalogued.

18.     Following the denial of the motion to dismiss, fact discovery began in earnest.  Direct purchasers served seven (7) sets of interrogatories on defendants and jointly with the endpayors served nearly 100 document requests.[3]  Various other discovery devices were employed, as well, including Rule 36 requests, contention interrogatories and nineteen (19) document subpoenas to nonparties, including Endo and Watson's accounting and auditing firms, and other

---

[3] Counsel for the direct purchaser class and the endpayor class enjoyed an exceptionally cooperative relationship in this case that benefited both classes.

service providers to defendants.  A list of the subpoenas issued by the direct purchasers that yielded documents important to the case is as follows:

|  | Subpoena to | Role |
|---|---|---|
| 1 | Ernst & Young | Endo's auditor/accountant |
| 2 | Deloitte | Endo's auditor/accountant |
| 3 | Prince of Peace | Party to the *LecTec v. Endo* litigation (Rolf patents) |
| 4 | Chattem, Inc. | Party to the *LecTec v. Endo* litigation (Rolf patents) |
| 5 | J&J | Party to the *LecTec v. Endo* litigation (Rolf patents) |
| 6 | Mentholatum | Party to the *LecTec v. Endo* litigation (Rolf patents) |
| 7 | Axogen | Party to the *LecTec v. Endo* litigation (Rolf patents) |
| 8 | Hisamitsu | Party to the *LecTec v. Endo* litigation (Rolf patents) |
| 9 | Generics Bidco I, LLC | Seller of Endo's authorized generic Lidoderm |
| 10 | Apco Worldwide | Endo's public relations firm |
| 11 | Twi | Generic ANDA filer for Lidoderm |
| 12 | Noven | Generic ANDA filer for Lidoderm |
| 13 | Axogen | Generic ANDA filer for Lidoderm |
| 14 | Mylan, Inc. | Generic ANDA filer for Lidoderm |
| 15 | Auburn Pharm. Co. | Drug distributor |
| 16 | Genetco Inc. | Drug distributor |
| 17 | Masters Pharm. Inc. | Drug distributor |
| 18 | Quest Pharm. Inc. | Drug distributor |
| 19 | Top Rx Inc. | Drug distributor |

19.    Obtaining documents containing the designated information of nonparties (such as from the Rolf Patent litigation brought by nonparty LecTec, in which Endo was an alleged infringer) required the direct purchasers to move to intervene under Rule 24(b) and to modify the underlying protective order in *LecTec Corp., v. Chattem, Inc.*, E.D. Tex. No. 5:08-cv-00130 (Robert W. Schroeder, U.S.D.J.).  The direct purchasers did this, and were granted leave to permissively intervene and obtain documents filed under seal in that litigation.

20.    Early in the case, counsel for direct purchasers issued a FOIA request to FDA, seeking Watson's "approval package" (FDA's documentation of the review of Watson's ANDA and all FDA actions taken over the course of the application from submission to approval, redacted

only to shield trade secrets and information protected by the deliberative process privilege).  FDA's response, provided several years after the request (just in time for trial), was instrumental in rebutting defendants' claim that the settlement containing the challenged reverse payments accelerated FDA approval of Watson's ANDA.

21.     Jointly with the endpayors, the direct purchasers negotiated a protective order, an ESI protocol, and an expert discovery stipulation with defendants.

22.     The direct purchasers took the lead on negotiating with defendants their responses and objections to plaintiffs' Rule 34 requests, in collaboration with endpayor counsel.  This included negotiating search terms and custodians with defendants.  This effort comprised several lengthy meet-and-confer sessions and led to several disputes that had to be brought to the Court. Many of these disputes pertained to assertions of privilege. One was that defendants would agree to produce to plaintiffs only what they had produced to the FTC, whose civil investigative demands (issued in February of 2014) post-dated the direct purchasers' complaints.[4]

23.     The defendants served discovery of their own, comprising Rule 34 document requests and sets of Rule 33 interrogatories to the direct purchasers.  Several of those disputes had to be brought to the Court, as well.

**F.     Motions to Compel Discovery**

24.     The discovery disputes between plaintiffs and defendants that were brought to the Court were numerous and hard-fought.  In all, there were twenty-two (22) motions to compel brought to the Court by way of briefing and argument, putting aside the at-issue waiver motions (and appeals therefrom) and Teikoku's motion to disqualify plaintiffs' counsel (in which Endo joined).  These do not include the many other disputes that were resolved by the Court following framing via the parties' monthly status reports or after substantial written and oral negotiation by compromise.  A catalog of those twenty-two (22) motions to compel is as follows:

---

[4] Late in this case, the FTC and state attorneys general sought to slow this case down so that they could catch up and litigate alongside plaintiffs.  *See* ECF Nos. 656, 660, 662, 663, 665, 666, 667, and 668.  The Court rightly rejected this effort.  Ultimately, the FTC reached injunction-only settlements with Teikoku and then Endo.

| | ECF No. | Topic of motion |
|---|---|---|
| 1 | 247-248 | Downstream discovery |
| 2 | 269-270 | Discoverability of SEC letter drafts |
| 3 | 276 | Watson "launch date" redactions in forecasts and other documents |
| 4 | 331, 345 | Seeking to compel an Endo 30(b)(6) forecasting witness |
| 5 | 357 | Plaintiffs' proposal for defendants to have a deadline by which to claw back documents |
| 6 | 358-359 | February 2, 2012 email and Kato meeting minutes |
| 7 | 364 | Proposal for a procedure to challenge clawed-back documents |
| 8 | 366 | Endo's failure to produce sufficient transactional data |
| 9 | 375, 379, 389-390 | Defendants' motion to reconsider the Court's ruling on the February 2, 2012 email |
| 10 | 377, 386, 392 | Citizen petition-related clawbacks |
| 11 | 399 | Seeking to compel compliance with Alan Levin subpoena |
| 12 | 401 | Seeking to compel production of Bejar documents from Teikoku |
| 13 | 402 | Seeking to compel production of Boyle, Williams, and Singh documents from Endo |
| 14 | 418 | Relating to Teikoku's patent-related assertions |
| 15 | 421 | Pertaining to Endo's response to 4th set of interrogatories |
| 16 | 427, 434 | Seeking to compel production of 6 Watson privileged documents |
| 17 | 445 | Defendants' reconsideration of motion to compel 6 Watson documents |
| 18 | 450, 484 | Defendants' *mandamus* regarding the order compelling production of the February 2, 2012 email (9th Cir. No. 16-70965) |
| 19 | 451-452 | Seeking to compel production of April 10, 2012 Endo email |
| 20 | 455, 460 | Seeking production of certain Endo documents |
| 21 | 478-480, 485-496, 492, 540, 545, 548 | Seeking production of Manogue notes |
| 22 | 503 | Seeking a 30(b)(6) witness from Watson on the provenance of the Dos Santos memo |

25.     Each of these disputes had to be briefed, argued, and in some cases argued multiple times, including briefing to the Ninth Circuit on *mandamus*.

26.     In terms of their effect on this case, the value to the direct purchaser class of pursuing these motions cannot be underestimated.  It was though these motions that plaintiffs dislodged some of the most probative evidence in this case, including documents characterizing the accounting treatment of the reverse payments (and therefore the nature and purpose of the payments), the handwritten notes of Endo general counsel Carolyn Manogue, and documents characterizing the defendants' contemporaneous views of the strength of Endo and Teikoku's patents purportedly covering Lidoderm.

27.     Warranting separate mention are plaintiffs' at-issue waiver motion,[5] which was the subject of yet another *mandamus* petition (9th Cir. No. 16-72817), and the related motion to disqualify plaintiffs' counsel.[6]  The latter motion grew out of plaintiffs' first at-issue waiver motion, and plaintiffs' successful opposition (drafted jointly with the endpayors) featured written testimony by an ethics expert (Prof. Richard Zitrin), and was particularly hard-fought both in argument and on the papers.

28.     The at-issue waiver motion was not just one motion, but a series of several motions, and reflected direct purchaser class counsel's persistence in advocating for the direct purchaser class.  Anticipating defenses based on Endo's purportedly innocent motivations for the no-AG promise and free goods promise to Watson, the direct purchasers moved on behalf of all plaintiffs for an order requiring all defendants to elect whether to assert those subjective beliefs and produce related privileged documents, or in the alternative to be precluded from making those assertions going forward.  At first, the Court mostly denied plaintiffs' motion without prejudice (ECF 350), but as the role of defendants' subjective beliefs as affirmative defenses grew larger and clearer, and as plaintiffs repeatedly pointed this out to the Court, the Court ultimately granted plaintiffs'

---

[5] ECF Nos. 271-274, 276-278, 281, 299, 318, 350, 398, 459, 462-463, 474-477, 483, 490-491, 509, 510, 511, 512, 514, 517,  536, 537-538, 542, 543, 544, 547, 561, 562, 564, 567-570, 581, 583, 641-642, 653, 655, 679, 697, 717-718, 726-727, 728, 737, 738, 795.

[6] ECF Nos. 293, 301, 303, 304, 312-314, 322, 334, 338.

application to require defendants to disclose, once and for all, the subjective beliefs on which they would rely at trial.  Based on these disclosures, plaintiffs filed a renewed production/preclusion motion.  In drafting the motion, direct purchaser plaintiff counsel cataloged for the Court all then-existing deposition testimony and representative privilege log entries.  Plaintiffs successfully showed that the overwhelming majority of defendants' assertions were in fact premised on legal advice, resulting in a substantial victory (ECF 536) that forced defendants to elect to waive privilege on several topics central to the case or be precluded from making assertions regarding those topics going forward.  Additional skirmishing on the scope of defendants' elections and associated waiver productions, and the consequences of defendants' expert reports, kept this dispute alive for most of the case, and dramatically limited the fact and expert evidence that defendants could offer at trial.  Similar motions have been brought over the years in pay for delay and other generic drug competition cases; this one succeeded where several others had failed.

29.    Many discovery disputes that did not warrant separate discovery-letter briefing (or which required rapid resolution) were presented to the Court by way of joint status reports and status conference statements.  These disputes were generally briefed in short paragraphs, and were argued during monthly case management conferences held by the Court telephonically.  These disputes can be, in summary fashion, described as follows, and illustrate the intensity of discovery brawling in this case, the industry of counsel and the Court, and the efficiency of the monthly-conference procedure:

| Statement Date | ECF | Topics presented to the Court by way status conference statement |
|---|---|---|
| 5/2/14 | 27 | Critical legal issues |
| 12/18/14 | 120 | Discovery planning |
| 4/3/15 | 157 | Deposition limits |
| 5/1/15 | 175 | Discovery meet/confer status |
| 5/29/15 | 194 | Document production status |
| 7/2/15 | 214 | Document production status |
| 7/31/15 | 240 | Several pending discovery disputes |
| 8/28/15 | 261 | 5 discovery disputes |
| 10/2/15 | 272 | 7 discovery disputes |
| 10/5/15 | 279 | Privilege dispute |
| 10/6/15 | 280 | Privilege dispute |
| 10/30/15 | 306 | 4 discovery disputes and deposition scheduling |

| Statement Date | ECF | Topics presented to the Court by way status conference statement |
|---|---|---|
| 12/4/15 | 352 | 6 discovery disputes plus privilege dispute |
| 1/9/16 | 365 | Deposition disputes plus privilege disputes |
| 1/29/16 | 376 | Several discovery disputes |
| 2/26/16 | 403 | 3 discovery, 2 privilege, and 2 deposition disputes |
| 4/1/16 | 433 | Several discovery and privilege disputes |
| 4/29/16 | 453 | Various discovery disputes, including Manogue notes and FTC materials |
| 6/3/16 | 504 | 8 discovery disputes |
| 6/30/16 | 528 | 4 discovery disputes, including Watson batch records |
| 8/5/16 | 535 | 5 discovery disputes, including PWC subpoena |
| 8/26/16 | 549 | Several discovery disputes |
| 9/30/16 | 577 | At-issue waiver election productions and additional depositions |
| 11/3/16 | 595 | Upcoming class certification argument |
| 2/17/17 | 669 | Defendants' stay requests in light of new FTC and AG complaints |
| 3/24/17 | 688 | Dispute over subjective beliefs in expert reports |
| 4/28/17 | 730 | Additional depositions plus motion to compel |
| 6/2/17 | 743 | Manogue deposition plus motion to compel |
| 7/7/17 | 789 | Amendment of defense expert reports, Manogue deposition |
| 8/4/17 | 800 | Application of FRE 703 at trial |

30.     These disputes were argued during twenty-five (25) monthly case management conferences, an efficient case management procedure imposed by the Court that allowed the parties to present disputes to the Court and rapidly receive rulings orally followed by a notation in civil minutes if not an order.  Direct purchasers were represented at all of these conferences and argued many of the disputes.  (The endpayors argued many of the disputes as well, and Ms. Sharp was all plaintiffs' able spokesperson at virtually all of the conferences.)  The dates of these conferences and

the large number discovery rulings that resulted from the disputes argued during them are depicted in the following chart:

| Conference Date | ECF | Number of rulings by the Court |
|---|---|---|
| 5/9/14 | 40 | 3 rulings |
| 1/6/15 | 131 | 1 ruling |
| 5/5/15 | 180 | 1 ruling |
| 6/2/15 | 195 | 3 rulings |
| 7/7/15 | 218 | 0 rulings |
| 8/4/15 | 243 | 1 ruling |
| 9/1/15 | 262 | 1 ruling |
| 10/6/15 | 281 | 3 rulings |
| 11/9/15 | 319 | 3 rulings |
| 12/8/15 | 355 | 4 rulings |
| 1/12/16 | 367 | 5 rulings |
| 2/2/16 | 379 | 0 rulings |
| 3/1/16 | 406 | 5 rulings |
| 4/5/16 | 435 | 6 rulings |
| 5/2/16 | 459 | 2 rulings |
| 6/7/16 | 510 | 3 rulings |
| 8/30/16 | 560 | 3 rulings |
| 10/4/16 | 582 | 4 rulings |
| 11/8/16 | 611 | 0 rulings |
| 2/21/17 | 671 | 2 rulings |
| 3/28/17 | 694 | 4 rulings |
| 5/2/17 | 734 | 5 rulings |
| 6/6/17 | 746 | 1 ruling |
| 8/8/17 | 821 | 1 ruling |
| 11/13/17 | 912 | 4 rulings |

## G.    Document Review and Analysis

31.    Ultimately, Endo, Teikoku, Watson, and the various nonparty subpoena recipients produced a total of 509,487 documents, comprising 3,656,561 pages.  A substantial portion of the documents produced by Teikoku were in Japanese, requiring translation.

32.    To analyze these documents, counsel for direct purchasers divided up into teams, corresponding to each firm's expertise in particular issues that the case presented.  This ensured that duplicative effort was not expended and that lawyers with expertise in certain issues (patents and patent litigation, drug competition economics, drug manufacturing processes, generic ANDA

approval process, authorized generics, patent settlement agreement negotiations, etc.) were applying the expertise each had developed during years of related litigation.

33.     Each direct purchaser subject-matter team was tasked with performing the searches necessary to identify pertinent documents, and then to create a detailed memorandum detailing their findings based on the documents, their nominations for deponents, and their nominations for the particular documents to be used with each deponent.  Each team produced an initial memorandum during the summer of 2014 (based on the pre-answer productions by Endo, Teikoku, and Watson), an interim memorandum during the spring of 2015 (following substantial productions by defendants and nonparties), and a final memorandum in the summer of 2015.  In a further effort to avoid duplication and promote the development of expertise, and anticipating deposition preparation needs, the team tasked with evaluating the patent settlement agreement negotiations was further divided into an Endo subgroup, a Watson subgroup, and a Teikoku subgroup.

34.     These subject-matter teams were supervised closely by co-lead counsel, who required each team to submit for prior approval an outline showing the methodology and approach that each would take to finding pertinent documents, and describing the nature of the documents that would be deemed pertinent (and why each type of document was pertinent).  This ensured that there were no gaps and no unnecessary duplication in work, and that all lawyers were sensitized to case strategy and could articulate what they were looking for and why.

35.     The subject-matter teams did not work in isolation, however.  Telephone meetings, generally held once every other week for durations of around an hour, were conducted by co-lead counsel and attended by all of the subject-matter teams to discuss findings, seek and receive feedback, and, where necessary, to adjust approach.  Each subject-matter team had a spokesperson who was put "on the spot" during these calls, to give a short recitation of the team's interim findings and challenges.  This proved to be an excellent way to coordinate the teams, to ensure that they were working efficiently, to identify gaps in defendants' production of documents (including privilege issues and over-redaction), and to develop and fine-tune case strategy, as the story of defendants' challenged conduct began to come into clearer focus during document review.

36.     The work product memoranda of the subject-matter teams proved essential to selecting witnesses and exhibits for depositions, identifying gaps in proof that needed filling, assisting deposition takers with efficient preparation, and assembling in a coherent fashion the documentary evidence that would be used in communicating with the Court, with expert witnesses, and ultimately with a jury.

**H.     Depositions of Fact Witnesses**

37.     Using the output of direct purchaser counsel's subject-matter teams, the process of selecting deponents began.  This was done in close cooperation with the endpayors.  The deposition process was especially important in this case due to the transfer of this case to this Court, which lacked the power under Rule 45 to compel Endo (located in Chadds Ford, Pennsylvania) and Watson (located in Parsippany, New Jersey) witnesses to trial.  Videos of the depositions are what a jury would ultimately be viewing, not live testimony (unless the deposition testimony forced defendants to bring their witnesses to trial).

38.     Ultimately, plaintiffs noticed and took thirty-seven (37) depositions of thirty-two (32) fact witnesses.  Of those 37 depositions, counsel for the direct purchasers was the lead questioner in twenty-eight (28), or seventy-five percent (75%.)  Those depositions are catalogued as follows:

|   | Witness Name | Date | Lead Examiner | Direct Purchaser Examiner |
|---|---|---|---|---|
| 1 | James Williamson (Watson) | 10/29/2015 | Direct purchasers | David Raphael, Jr. |
| 2 | Andrew Gesek (Endo) | 12/9/2015 | Direct purchasers | Peter Kohn |
| 3 | Roberto Cuca (Endo) | 12/22/2015 | Endpayors | Gregory Arnold |
| 4 | John Spigiel (Watson) | 1/7/2016 | Direct purchasers | Andrew Kelly |
| 5 | Jason Reckner (Endo) | 1/21/2016 | Direct purchasers | Peter Kohn |
| 6 | Robert Stewart (Watson) | 1/27/2016 | Direct purchasers | Andrew Kelly |
| 7 | Michael Speitz (Teikoku) | 1/28/2016 | Direct purchasers | Caitlin Coslett |
| 8 | Michael Speitz (Teikoku) | 1/29/2016 | Direct purchasers and endpayors | Archana Tamoshunas |
| 9 | Andrew Boyer (Watson) | 2/11/2016 | Direct purchasers | Michael Kane |
| 10 | Paul Mori (Teikoku) | 2/25/2016 | Direct purchasers | David Nalven |
| 11 | Paul Mori (Teikoku) | 2/26/2016 | Endpayors | None |
| 12 | Janie Gwinn (Watson) | 3/3/2016 | Direct purchasers | Chris Letter |
| 13 | David Holveck (Endo) | 3/11/2016 | Direct purchasers | David Nalven |

|    | Witness Name | Date | Lead Examiner | Direct Purchaser Examiner |
|----|---|---|---|---|
| 14 | Steven Cooper (Endo) | 3/16/2016 | Direct purchasers | Peter Kohn |
| 15 | Francisco Bejar (Teikoku) | 3/23/2016 | Endpayors | David Nalven |
| 16 | Joseph DosSantos (Watson) | 4/8/2016 | Endpayors | David Nalven |
| 17 | Paul Bisaro (Watson) | 4/12/2016 | Direct purchasers | Tom Sobol |
| 18 | Guy Donatiello | 4/13/2016 | Direct purchasers | Russell Chorush |
| 19 | Guy Donatiello | 4/14/2016 | Direct purchasers | David Nalven |
| 20 | Brian Anderson (Watson) | 4/14/2016 | Direct purchasers | Miranda Jones |
| 21 | Matthew Riviello (Endo) | 4/19/2016 | Direct purchasers | David Raphael |
| 22 | Vince Orlando (Endo) | 4/20/2016 | Direct purchasers | Noah Silverman |
| 23 | David Buchen (Watson) | 4/21/2016 | Direct purchasers | Thomas Sobol |
| 24 | Caroline Manogue (Endo) | 4/22/2016 | Direct purchasers | Thomas Sobol |
| 25 | Robert Joyce (Watson) | 4/26/2016 | Direct purchasers | David Raphael |
| 26 | Michael Moes (Endo) | 4/26/2016 | Direct purchasers | Neill Clark |
| 27 | Lee Lamborn (Watson) | 4/27/2016 | Direct purchasers | Andrew Kelly |
| 28 | Brian Lortie (Endo) | 4/28/2016 | Direct purchasers | Peter Kohn |
| 29 | Arjan Singh (Endo) | 4/28/2016 | Endpayors | Noah Silverman |
| 30 | Noriyuki Shimoda (Teikoku) | 5/2/2016 | Endpayors | None |
| 31 | Alan Levin (Endo) | 5/3/2016 | Endpayors and direct purchasers | Noah Silverman |
| 32 | Daniel Rudio (Endo) | 5/11/2016 | Direct purchasers | Peter Kohn |
| 33 | Robert Stewart (Watson) | 5/25/2016 | Endpayors | None |
| 34 | Jutaro Shudo (Teikoku) | 4/28/2017 | Direct purchasers | David Nalven |
| 35 | Raj Patel (Watson) | 5/4/2017 | Endpayors | Andrew Kelly |
| 36 | Tate Edwards (Watson) | 5/5/2017 | Direct purchasers | Andrew Kelly |
| 37 | Caroline Manogue (Endo) | 9/29/2017 | Direct purchasers | Tom Sobol |

39.     Thorough preparation by plaintiffs, skill in questioning, and judicious use of

documents produced in discovery yielded transcripts and videos that, once edited, could be

understood by a jury, even if like most videotaped testimony they were not especially electrifying.

Despite being well-prepared for their testimony, several defense witnesses made concessions in

these depositions that advanced plaintiffs' claims and robbed defendants of certain defenses.[7]

40.     In addition to taking depositions of fact witnesses, counsel for the direct purchasers

had to defend three (3) depositions, one each of the Rule 30(b)(6) designee of each class

---

[7] While the direct purchasers generally had at most two (2) lawyers at a given deposition (and
often just one), defendants sometimes had as many as six (6).  After Williams & Connolly entered
the case on behalf of Endo, both Arnold & Porter and Williams & Connolly were generally present.
Endo frequently was also represented by Reed Smith and an in-house counsel for Endo.

representative.  Counsel for the direct purchasers also attended certain other depositions, to monitor the testimony and, when necessary, conduct cross or redirect examination.  These were chiefly depositions of co-plaintiffs, noticed by defendants.  Sometimes co-plaintiff witnesses were expected to be asked questions by defense counsel bearing on the issue of the relevant antitrust product market.  The role of on-deck examiner for the direct purchasers was filled by two lawyers with special expertise in relevant market issues, who alternated these assignments.  They only attended these depositions by telephone, and then only when they had good reason to believe that such market definition-related questions would be asked.

41.     In general, deposition assignments were made based on the fit between lawyer expertise and the subject area and complexity of the witness's knowledge.  Because these would almost entirely be trial depositions played to a jury and not mere discovery depositions, more senior lawyers were assigned to take depositions.  To ensure efficiency in deposition preparation, the subject-matter teams (*see* § G, *supra*) would send the deposing lawyer documents selected from the team's work-product memos, as well as proposed areas of questioning, and sometimes proposed questions.  In this way, deposition preparation did not entail an inefficient document review "do over" by the deposing lawyer or his or her subordinates, and instead utilized the knowledge gained by the subject-matter teams in document review.  The deposing lawyer would typically supplement this procedure by running a search string using the witness's name, to ensure that the subject-matter teams missed nothing important.

42.     Following each deposition, the deposing lawyer would circulate a summary by email or deliver a summary at the next weekly call among counsel.  This helped other deposing lawyers and those assisting in deposition preparation to strategize and react to developments in testimony.

**I.     Expert Discovery**

43.     During the course of fact discovery, counsel for the direct purchaser plaintiffs retained several consulting experts, virtually all of whom became testifying experts.  Each expert witness was assigned a direct purchaser liaison lawyer, who served as the primary and usually sole connection between the direct purchasers and the expert.  This was done for the sake of efficiency, economy, and good order.  The direct purchaser lawyer serving as a liaison was one on the subject-

matter team that fit with the expert's discipline (patents, reverse-payment economics, damages, generic and authorized generic drug development, etc.).

44.     Ultimately, counsel for the direct purchasers retained seven (7) testifying experts, who collectively issued sixteen (16) reports (opening reports and rebuttal reports), comprising thousands of pages of reports, exhibits, and backup.  They are identified as follows:

| Name | Area of Expertise | # of Reports |
| --- | --- | --- |
| Martin Adelman | Patent law | 1 |
| Einer Elhauge | Antitrust economics (reverse payments) | 2 |
| Jeffrey Leitzinger, Ph.D. | Antitrust economics (market power and damages) and class certification | 4 |
| Kenneth Miller, Ph.D. | Medicinal patch development | 3 |
| Luis Molina | Generic and authorized generic drug development and launch | 2 |
| David Read | FDA citizen petition procedures | 2 |
| Kishore Shah, Ph.D | Medicinal patch chemistry | 2 |

45.     The opinions of the direct purchasers' experts were wide-ranging, corresponding to the unique complexity of this case.  Professor Adelman's essential opinion was that Endo and Teikoku had a very small chance of prevailing in the '529 patent litigation and the Rolf patent litigation.  Professor Elhauge rendered an opinion on the harm to competition from the challenged reverse payments, the absence of procompetitive justifications, and the Watson entry date that a settlement among the defendants would bear, among other issues.  Dr. Leitzinger opined on Endo's market power, direct purchasers' damages, and the value of the no-AG promise and the free goods, as well as the number of Watson and AG patches required to meet demand.  Dr. Miller opined on Watson's ability to manufacture sufficient quantities of patches earlier and on issues of infringement.  Mr. Molina's report focused on whether Watson would have launched at risk and whether Endo was going to launch an AG.  Mr. Read discussed whether the settlement accelerated FDA's disposition of Endo's citizen petitions.  Dr. Shah opined on technical issues relating to infringement, invalidity, and patent enforceability.

46.     To promote efficiency and defray costs that would otherwise be borne solely by the direct purchaser class, counsel for the direct purchasers offered, and the endpayors accepted,

sharing of all of these experts for all purposes, including trial, with the exception of Dr. Leitzinger (whose primary focus was direct purchaser damages). Counsel for the direct purchasers continued to serve as liaison to these experts.

47. Defendants also retained thirteen (13) expert witnesses of their own to respond to the direct purchaser class's experts and to assert various defenses. In total, defendants' experts issued issued fifteen (15) lengthy reports, some on behalf of all defendants and some on behalf of just Endo or just Teikoku. These reports comprised thousands of pages. They are identified as follows:

| Name | Area of Expertise | # of Reports |
|---|---|---|
| Gregory Bell, Ph.D. | Antitrust economics | 1 |
| Dennis Carlton, Ph.D. | Antitrust economics | 1 |
| Benoit Cossart | Patch manufacturing | 2 |
| Nick Fleischer, Ph.D. | FDA practices and procedures | 2 |
| Robert Frank | Patent law | 1 |
| Chris Gilligan, M.D. | Medical use of Lidoderm | 1 |
| Majella Lane, Ph.D. | Medicinal patch chemistry | 1 |
| James Langenfeld Ph.D. | Antitrust economics | 1 |
| Gregory Leonard, Ph.D. | Antitrust economics (class certification) | 1 |
| Michael Moffit | Negotiations | 1 |
| Hasha Murthy | Generic drug development | 1 |
| Ulrike Schaede, Ph.D. | Japanese business practices | 1 |
| David Schwartz | Patent law | 1 |

48. Defendants' expert opinions were wide-ranging. Dr. Bell opined that Endo lacked market power and that damages were low or zero. Dr. Carlton argued that the no-AG provision and the free goods promise were not payments, were of a low or zero magnitude even if they were, and that at all events they did not delay generic competition. Mr. Cossart opined that Watson had manufacturing problems that would have precluded an earlier launch regardless. Dr. Fleischer opined that Endo's citizen petition was well taken, and that the settlement actually accelerated its disposition (and thus Watson's ANDA approval). Mr. Frank, hired just by Endo, opined that Endo and Teikoku would have won the '529 patent litigation. Dr. Gilligan argued that Lidoderm had several therapeutic substitutes. Dr. Lane's report focused on the validity of the '529 patent and sought to rebut invalidity arguments, just as she had done for Endo in the underlying patent case.

Dr. Langenfeld, hired only by Teikoku, quantified Teikoku's losses from the settlement.  Dr. Leonard was defendants' class certification expert, re-designated for trial, and rendered opinions on antitrust impact and damages.  Professor Moffit held the view that there was no way to predict whether defendants could have reached a settlement absent the reverse payments and Watson's delay.  Mr. Murthy opined that Watson was not going to launch at risk and was merely bluffing or signaling to Endo, and that Endo would not have launched an AG.  Dr. Schaede argued that Teikoku was not a co-conspirator, but was rather going along with the challenged conduct because of Japanese business cultural factors.  Professor Schwartz wrote about how the '529 patent litigation was strong in Endo and Teikoku's favor.

49.   Once the defense expert reports were served, counsel for the direct purchasers with the appropriate expertise in the issues covered by a given report was assigned to immediately begin to analyze defendants' expert reports in order to rebut the arguments contained in them.  Rebuttal reports were prepared and served by all but one of plaintiffs' experts.  The direct purchasers also immediately set about preparing to take the depositions of defendants' experts.

**J.   Depositions of Expert Witnesses**

50.   Counsel for the direct purchaser class took the leading role in preparing for and taking the depositions of all but three of defendants' experts, and in defending plaintiffs' experts at deposition.  This can be seen in the following chart:

| Expert witness name | Date | Lead examiner/ defender | Direct purchaser examiner/defender |
|---|---|---|---|
| Jeffrey Leitzinger, Ph.D. | 7/28/2016 | Direct purchasers | Peter Kohn |
| Gregory Leonard, Ph.D. | 10/13/2016 | Direct purchasers | Peter Kohn |
| Jeffrey Leitzinger, Ph.D. | 11/18/2016 | Direct purchasers | Peter Kohn |
| Kishore Shah, Ph.D. | 5/4/2017 | Direct purchasers | Miranda Jones |
| Ulrike Schaede, Ph.D. | 5/4/2017 | Endpayors | None |
| James Langenfeld, Ph.D. | 5/10/2017 | Direct purchasers | Peter Kohn |
| Luis Molina | 5/11/2017 | Direct purchasers | Neill Clark |
| Majella E. Lane, Ph.D. | 5/11/2017 | Direct purchasers | Douglas Wilson |
| Chris Gilligan, MD | 5/17/2017 | Direct purchasers | Caitlin Coslett |
| Martin Adelman | 5/17/2017 | Direct purchasers | Douglas Wilson |
| Harsha Murthy | 5/19/2017 | Endpayors | Neill Clark |
| Lawrence Schwartz | 5/23/2017 | Direct purchasers | Douglas Wilson |
| David T. Read | 5/24/2017 | Direct purchasers | Chris Letter |
| Robert S. Frank, Jr. | 5/25/2017 | Direct purchasers | Douglas Wilson |

| Expert witness name | Date | Lead examiner/ defender | Direct purchaser examiner/defender |
|---|---|---|---|
| Jeffrey Leitzinger, Ph.D. | 6/1/2017 | Direct purchasers | Peter Kohn |
| Einer Elhauge | 6/6/2017 | Direct purchasers | Noah Silverman |
| Gregory K. Bell, Ph.D. | 6/9/2017 | Direct purchasers | Caitlin Coslett |
| Kenneth Miller, Ph.D. | 6/14/2017 | Direct purchasers | Douglas Wilson |
| Michael Moffitt | 6/14/2017 | Direct purchasers | Peter Kohn |
| Dennis Carlton, Ph.D. | 6/16/2017 | Direct purchasers | Noah Silverman |
| Nicholas Fleischer, Ph.D. | 6/21/2017 | Direct purchasers | Chris Letter |
| Benoit Cossart | 7/7/2017 | Endpayors | None |

51.     Counsel for the direct purchasers generally assigned just one person from an appropriate subject-matter team to take (or defend) each expert deposition, so that there was no duplication of effort.  For instance, because Doug Wilson and Miranda Jones of Heim Payne & Chorush are patent lawyers, they were assigned to defend Mr. Adelman (Wilson), Dr. Shah (Jones) and Dr. Miller (Wilson), respectively, and to take the depositions of Dr. Lane, Professor Schwartz and Mr. Frank (all by Doug Wilson).  Noah Silverman of Garwin Gerstein & Fisher and I divided up the defense economists, and it was he who prepared and defended Professor Elhauge and took Professor Carlton's deposition (yielding many useful admissions relevant to the rule of reason analysis), while I focused on taking Dr. Langenfeld and Mr. Moffit (the "negotiations" expert) and defending Dr. Leitzinger.  In view of her excellent performance during the course of the litigation, a younger lawyer, Caitlin Coslett of Berger & Montague, was assigned to take Dr. Bell and Dr. Gilligan's depositions under my supervision, with an eye toward winning the market power dispute as a matter of law (which she ultimately did).  Another younger lawyer, Christopher Letter of Odom & Des Roches, who has well-known expertise in FDA regulatory matters, took Dr. Fleischer's deposition and defended Mr. Read on the issue of the citizen petition.

52.     Like their fact witnesses, defendants' experts were exceptionally well prepared by defense counsel.  By the time of expert discovery, Endo had retained Williams & Connolly to assist Endo.  Nevertheless, through preparation and skillful questioning, counsel for the direct purchasers made good headway with defendants' experts during depositions, obtaining a variety of concessions that would form the basis for *Daubert* motions and which undercut defendants' defenses and even assisted plaintiffs in advancing their own claims.  (Illustrating the latter point, following the

deposition of Teikoku's economic expert Dr. Langenfeld, plaintiffs placed him on plaintiffs' list of trial witnesses and sought to call him in plaintiffs' case in chief, leading to *in limine* motions practice and disavowal by Endo and Watson of Dr. Langenfeld.)

53.     Defense counsel likewise made headway with some of plaintiffs' experts despite the lengthy preparation each plaintiff expert received.  Mr. Asimow was an effective examiner of Professor Elhauge, Ms. Lent previewed what the cross examination at trial of Mr. Molina might look like, and Stan Fisher, a patent litigator at Williams & Connolly, was an effective examiner of Professor Adelman.

54.     Counsel for the direct purchasers also attended a few of the depositions of the experts retained by co-plaintiffs, when those depositions carried the possibility of inconsistent testimony among plaintiffs.  This was generally done by telephone, thereby avoiding the cost of travel.  Caitlin Coslett listened in at one of the depositions of endpayor economist of Hal J. Singer, Ph.D., the deposition of defense class certification economist James Hughes, Ph.D., and the deposition of retailer economist Keith Leffler, Ph.D. for this purpose, and Barry Taus listened in at the deposition of retailer plaintiff litigation-cost expert Peter Hardigan because the direct purchasers had agreed to share Mr. Hardigan.

### K.     Class certification

55.     Counsel for the direct purchasers successfully moved for class certification in this case.  A limited number of lawyers from three firms was principally involved in that effort:  me, Caitlin Coslett from Berger & Montauge, and Archana Tamoshunas from Taus, Cebulash & Landau.  Coming on the heels of the decertification on numerosity grounds of a similar class in the Third Circuit, class certification was hotly contested in this case and so occupied a substantial amount of time and effort.

56.     Led by Skadden, defendants raised all manner of arguments opposing certification of the direct purchaser class in this case, focusing principally on numerosity and a novel "rationing" argument that was premised on the idea that if Watson launched at risk without sufficient quantities, only some direct purchasers would be able to substitute their brand purchases with generic purchases.  The head of the subject-matter team devoted to Watson's generic launch (Andrew Kelly

at Odom & Des Roches, who has recognized expertise in generic drug manufacturing and launch issues) was incorporated into class certification practice to assist with that issue.

57.    As is typical, class certification was heavily expert-discovery dependent, and as reflected in Sections I and J above, the expert economist battle was between Dr. Leitzinger for the direct purchaser plaintiffs and Dr. Leonard for defendants.  Following briefing and oral argument, the Court ultimately certified a class of 55 direct purchasers (ECF 670), and Rule 23(g) proceedings ensued in the Ninth Circuit (No. 17-80034), which denied defendants' petition for interlocutory review.

58.    Notice was sent to all direct purchasers via first-class mail.  No opt outs were received, save for the opt outs of the units assigned by certain members of the direct purchaser class to the retailer plaintiffs.  The validity of those partial assignments was the subject of some dispute between the retailer plaintiffs and defendants, but defendants did not press that dispute.

**L.    Summary Judgment Motions**

59.    Following expert discovery, cross motions for summary judgment and partial summary judgment and *Daubert* motions were filed.  Defendants moved for judgment as a matter of law on all claims, on the basis that no reasonable jury could find that the challenged reverse payments delayed Watson's entry into the market.  According to defendants, there were two basic reasons why no reasonable jury could find a causal link between defendants' reverse payments and Watson's delay: (1) the '529 patent case was strong, and would have prevented Watson's at-risk launch; and (2) it was too speculative that Endo/Teikoku and Watson would have reached an agreement with an earlier entry date.  Defendants also separately moved for partial judgment as a matter of law, arguing that Watson could not have entered the market before December 17, 2012.  Defendants also sought to disqualify direct purchasers Drougeria Betances and American Sales from serving as class representatives on standing grounds.

60.    Plaintiffs filed a motion for partial summary judgment of their own.  Based on the factual and expert record bearing on the composition of the relevant antitrust product market, plaintiffs moved for an order requiring the jury to find that the relevant market was limited to 5% lidocaine patches.  No such motion had ever been granted previously (though several similar

motions had been filed in similar cases in the past), but the record in this case was particularly suited to such an outcome.  Plaintiffs' offensive motion also sought an order establishing for trial that defendants had conspired, which defendants ultimately chose not to contest.

61.     Counsel for the direct purchasers was principally responsible for the successful partial offensive summary judgment motion on composition of the relevant antitrust product market.  A single lawyer, Caitlin Coslett of Berger & Montague (who was responsible for much of the expert testimony on the subject), was tasked with drafting the motion under my supervision.  This ensured an efficient use of resources.

62.     Counsel for the direct purchasers was also responsible for responding to defendants' motion for partial summary judgment on when Watson could have earlier entered the market.  A single lawyer, Andrew Kelly of Odom & Des Roches (who was responsible for issues regarding Watson's manufacturing of generic Lidoderm for the direct purchasers and therefore the most familiar with the fact and expert evidence on this topic) performed this task.  This, too, ensured an efficient use of resources.

63.     Counsel for the direct purchasers was also largely responsible for designing, and drafting many portions of, the response to defendants' motion for summary judgment on all claims.  I drafted an outline of the opposition, and then made nine (9) assignments for the drafting of inserts, assignments which were taken by various lawyers for the direct purchasers, the endpayors, and the retailers.  The patent law insert was drafted by counsel for the direct purchasers, as were other portions.  Counsel for the endpayors did substantial drafting and editing.

64.     Summary judgment was ably argued by both sides.  Williams & Connolly argued for defendants.  I argued the successful partial summary judgment motion on the relevant antitrust product market.  Ms. Sharp, co-lead counsel for the endpayors, ably argued the successful opposition to defendants' summary judgment motion.  Ms. Steiner, co-lead counsel for the endpayors, ably argued the response to defendants' partial summary judgment motion pertaining to Watson's earlier entry into the market.

65.     Plaintiffs were victorious on summary judgment.  *See* ECF No. 900.  The uncontested grant of partial judgment as a matter of law in plaintiffs' favor on the element of

conspiracy and the grant of judgment on the composition of the relevant market promised to simplify and shorten the presentation of evidence at trial and avoid jury distraction and confusion on those issues.

66.     Defendants moved for reconsideration of summary judgment (ECF 948), in particular on the issue of the quantum of proof that would allow the jury to find that the relevant patents would not have prevented Watson's launch (the "some evidence" standard), but the Court denied defendants' motion (ECF 978) following truncated briefing (ECF 948 and 949) and oral argument, leaving the standard intact.

**M.     *Daubert* Motions**

67.     Plaintiffs and defendants filed *Daubert* motions directed to most experts. Defendants filed motions to exclude in their entirety the testimony of the following direct purchaser class experts, the oppositions to which direct purchaser class counsel drafted:   (1) Professor Adelman (patents), (2) Dr. Shah (patents), (3) Dr. Miller (patents and patch development), (4) Professor Elhauge (reverse payment antitrust economics), (5) Mr. Molina (generics and authorized generics), and (6) Mr. Read (FDA practices and procedures).  Counsel for the direct purchaser class drafted and filed motions to exclude portions of the testimony of the following defense experts:  (1) Bell (regarding relevant market), (2) Carlton (antitrust economics), and (3) Moffitt (negotiations). Plaintiffs also filed motions to exclude the testimony of the following defense experts, which direct purchaser class counsel helped to write and edit:  (4) Murthy (regarding generic launches), and (5) Schaede (Japanese business practices).

68.     Besides requiring a great deal of work in addition to the large amount of summary judgment work, these *Daubert* motions were important to the trial of this expert-intensive case. Without professor Adelman and Dr. Shah to discuss the invalidity and unenforceability of the '529 patent, plaintiffs' patent evidence would have been hobbled.  Without Professor's Elhauge's testimony concerning an alternative settlement, one of plaintiffs' but-for world scenarios potentially would have been excluded in its entirety, as would much of the evidence regarding anticompetitive effects and the absence of procompetitive justifications.  If Mr. Molina's opinions were excluded, plaintiffs would have lacked an expert on the issues of whether Watson would have launched at risk

and whether Endo would have launched an authorized generic version of Lidoderm.  Excluding Dr. Miller's opinions would have left plaintiffs without an expert to discuss Watson's earlier readiness to launch sufficient quantities of patches.  Without Mr. Read's opinions about FDA procedures, plaintiffs would have been unable to rebut defendants' argument that the settlement's "noninterference" provision accelerated the denial of Endo's citizen petition and approval of Watson's ANDA.

69.     Counsel for the direct purchasers, in collaboration with counsel for the endpayors and retailers, drafted the oppositions to the motions against plaintiffs' experts.  Several were argued by counsel for the direct purchasers during the summary judgment hearing; specifically, defendants nominated those pertaining to Professor Elhauge and Dr. Miller (and, during the "lightning round," Professor Moffitt) for argument and argued by counsel for the direct purchasers.

70.     When the Court ruled on the *Daubert* motions (ECF 900), none of plaintiffs' experts was precluded or limited in any meaningful respect, and some of defendants' experts were excluded (Schaede) or significantly limited (Bell, Moffit).

**N.     Trial Preparation**

71.     Jury selection was scheduled for February 23, and openings were to begin on February 26, 2018.  Direct purchaser plaintiffs' counsel was fully prepared for trial.  This case would have been only the third reverse-payment case tried before a jury.

72.     Even before summary judgment had been denied, plaintiffs were in the process of preparing for trial.  This included (a) trial vendor selection for trial technology (two were selected and a total of four (4) personnel were relocated to San Francisco just prior to trial), (b) a first round of deposition designations for witnesses outside of the subpoena power of the Court (which was most fact witnesses), (c) preliminary trial exhibit selection, (d) preliminary jury instruction drafting, and (e) motion *in limine* identification.  After the summary judgment hearing, plaintiffs accelerated their efforts, focusing on nothing but trial preparation.

73.     To facilitate efficient trial preparation, counsel for the direct purchaser plaintiffs and the endpayor plaintiffs, and counsel for the retailer plaintiffs, divided into five (5) subject-matter teams.  Each team was staffed with a small number of lawyers from the direct purchasers, the

endpayors, and then the retailers.  The teams roughly corresponded to the subject-matter teams that the direct purchasers had created for conducting the document review at the beginning of discovery.

74.     Each subject-matter trial team was tasked with identifying the proofs within its purview that were required for trial, and the fact witness testimony, documents, and expert testimony that would constitute the evidence to be adduced for each such proof.  Each team was also tasked with identifying and resolving any admissibility issues that could be raised by defendants for any given testimony or document,[8] and with identifying the evidence that defendants may seek to offer at trial and any applicable motions *in limine*.

75.     An in-courtroom trial team was established, consisting of a small number of lawyers for the direct purchaser class and a small number of lawyers for the endpayor class.  A seven-member paralegal team was created, and relocated to San Francisco the week prior to trial, occupying "war room" space that had been rented.  The trial team met in person and by phone frequently and regularly to discuss strategic issues of case presentation and to divide up fact and expert witnesses for examination, opening and closing statements to the jury, and jury selection. Demonstratives were mocked up for opening statements.

### 1.     Motions *in limine*

76.     Plaintiffs filed thirty-five (35) targeted motions *in limine* relevant to the claims of the direct purchaser class (ECF 904).  They are as follows:

| | Motion *in limine* to… | | Motion *in limine* to… |
|---|---|---|---|
| 1 | Require defendants to supply witnesses at trial | 19 | Exclude argument that an authorized generic might "cannibalize" Lidoderm branded sales |
| 2 | Exclude evidence of the parties' financial conditions or sizes | 20 | Exclude argument that the price of Lidoderm increased in response to generic entry |
| 3 | Exclude mention of treble damages | 21 | Exclude argument that a "No-AG" promise is an exclusive patent license |
| 4 | Exclude mention of generic "bypass" | 22 | Exclude argument that Teikoku lost money, or was a "minor" participant |

---

[8] Later, a standalone "evidence team" was established to work through various evidentiary issues.  That team was staffed by two direct purchaser lawyers (Peter Kohn and Kimberly Hennings) and two retailer plaintiff lawyers.

| | Motion *in limine* to… | | Motion *in limine* to… |
|---|---|---|---|
| 5 | Exclude mention of downstream effects | 23 | Exclude Judge Sleet's comments from the bench about witness credibility |
| 6 | Exclude mention of direct purchaser recoveries | 24 | Exclude expert testimony from Hasha Murthy implying that Paul Bisaro was "signaling" or "bluffing" |
| 7 | Exclude characterization of at-risk launch as "theft" or "illegal" | 25 | Allow Plaintiffs to call defense expert James Langenfeld in their case-in-chief |
| 8 | Exclude self-serving portions of FTC investigational hearing transcripts | 26 | Exclude defense expert Dr. Gilligan and issue a binding jury instruction on monopoly/market power |
| 9 | Exclude cumulative patent expert testimony | 27 | Exclude defense expert David Schwartz's testimony about the relevance of the prosecution history to obviousness and inequitable conduct |
| 10 | Exclude evidence that *Actavis* changed the law | 28 | Exclude defense expert Nicholas Fleischer's opinion that FDA wrongly denied Endo's Citizen Petition |
| 11 | Exclude procompetitive justification that the "noninterference provision" accelerated Watson's ANDA approval | 29 | Exclude defense expert David Schwartz's testimony that Watson was required to notify the FDA of a Federal Circuit reversal or injunction |
| 12 | Exclude the procompetitive justification that the free goods protected against Watson's delayed ANDA approval or manufacturing issues | 30 | Exclude any argument that Judge Sleet approved the Patent Litigation settlement |
| 13 | Exclude the procompetitive justification that the free goods lowered prices or increased output | 31 | Exclude any argument or suggestion that the Federal Circuit would have affirmed fact findings without consideration of the merits based on a deferential standard of review |
| 14 | Exclude other purported procompetitive justifications that did not increase competition and/or for which reverse payments and associated delay were not the least restrictive means of achievement (e.g., for settlement) | 32 | Exclude any argument that the Takeda reference is not enabled |
| 15 | Exclude the procompetitive justification that Endo and Teikoku were "risk averse" | 33 | Exclude expert opinions relying on case law decided after a final, non-appealable judgment would have occurred in the patent litigation |
| 16 | Exclude argument that entry prior to patent expiration was "early" and a procompetitive justification | 34 | Exclude defense expert Majella Lane's contralegal opinions that the '529 claims were nonobvious because of unpredictability in the art |

| | Motion *in limine* to… | | | Motion *in limine* to… |
|---|---|---|---|---|
| 17 | Exclude argument that the reverse payments were not "large" compared to Endo/Teikoku profits | | 35 | Exclude defense expert Majella Lane's opinions based on an interpretation of the claims that requires invalidity of other claim |
| 18 | Exclude any lay or expert evidence about the "Rolf" patents | | | |

77. Counsel for the direct purchaser class drafted the majority of these motions. Most were decided in plaintiffs' favor (granted, either wholly, partially, or denied as uncontested or moot), namely those bearing the following numbers above: 1-8, 10-11, 14-17, 21-22, 24-28, 30. *See* ECF No. 978. These rulings were important, as they substantially limited arguments and evidence that defendants could introduce at trial, including on certain purported procompetitive justifications, and excluded prior testimony by defense witnesses that the FTC had perpetuated in non-adversarial investigatory hearings.

78. Defendants filed thirteen (13) motions *in limine* of their own, all of which required opposition briefing by plaintiffs. Counsel for the direct purchasers principally drafted oppositions to defendants' motions. Defendants' motions were as follows:

| | Motion *in limine* to… | | | Motion *in limine* to… |
|---|---|---|---|---|
| 1 | Preclude reference to privilege invocations | | 8 | Preclude references to "Teva" or "Allergan" |
| 2 | Exclude defendants' submissions to FTC | | 9 | Exclude evidence of other lawsuits |
| 3 | Preclude use of inflammatory terms like payoff | | 10 | Restrict scope of Dr. Miller's testimony |
| 4 | Exclude evidence that generic products are cheaper | | 11 | Exclude "Dos Santos" memo |
| 5 | Exclude evidence of employee compensation | | 12 | Exclude Teikoku email by Mr. Bejar |
| 6 | Preclude "missing witness" commentary | | 13 | Preclude criticism of need for interpreters |
| 7 | Exclude "confidential" stamps | | | |

79. Some of defendants' motions, if granted, would have excluded important evidence from the jury, including two contemporaneously-drafted documents from Watson and Teikoku characterizing the reverse-payment settlement just as plaintiffs had contended, and privilege log entries showing that immediately prior to drafting a particular Endo document stating the likelihood that Endo would lose the patent case against Watson, its author had consulted with Endo's in-house

patent lawyer.  Following argument, the Court did not grant any of defendants' motions *in limine* that restricted plaintiffs in any meaningful way (ECF 978).

### 2.      Trial-structure briefing

80.      Plaintiffs and defendants filed competing motions advocating what the structure of the trial should be.  *See* ECF Nos. 888, 889.  Plaintiffs advocating for a joint liability trial and separate damages trials.  Defendants sought a single joint trial.  The Court ultimately ruled in favor of a single joint trial with breaks before damages evidence.

### 3.      Disputed legal issues

81.      In addition to motions *in limine*, the parties, by way of the joint pretrial statement, presented to the Court thirteen (13) disputed legal issues that were central to the trial of this case, and whose disposition would dictate how the jury would be instructed.  Those issues were as follows:

|   | Disputed legal issue |
|---|---|
| 1 | Whether overcharges from delayed generic drug competition, if proven, are a harm that the antitrust laws were intended to prevent |
| 2 | Whether Plaintiffs must prove that the anticompetitive harms outweigh the procompetitive benefits that flow from the Settlement Agreement generally or the reverse payments specifically |
| 3 | Whether it is Plaintiffs' initial burden to prove by the preponderance of the evidence that the Settlement Agreement included payments from Endo and Teikoku to Watson that were both (1) "large" and (2) "unexplained" |
| 4 | Whether Plaintiffs must prove that Watson's launch would have been "lawful" |
| 5 | Whether Defendants can present evidence that certain Plaintiffs passed on overcharges upon resale of Lidoderm |
| 6 | The appropriateness of class certification and issues concerning class membership |
| 7 | Whether Plaintiffs can recover, given that the '529 Patent and/or Rolf patents are infringed, valid, and enforceable |
| 8 | The extent to which Plaintiffs can recover under a theory other than their Sherman Act Section 1 claim |
| 9 | The extent to which Plaintiffs can recover (treble damages or otherwise) for conduct that occurred prior to the Supreme Court's decision in *FTC v. Actavis*, 133 S. Ct. 2223 (2013) |
| 11 | Whether Plaintiffs are allowed duplicative recovery |

KOHN DECL. ISO MOTION FOR REIMBURSEMENT OF COSTS AND ATTORNEYS' FEES
*In re Lidoderm Antitrust Litig.*, No. 14-2521-WHO

| 12 | Whether Teikoku can assert a defense based on the fact that its contribution to the Settlement Agreement with Watson was small (i.e., $5.1 million) and/or whether such contributions are explained by "traditional settlement considerations." |
|----|---|
| 13 | Whether imposition of essentially duplicative treble damages for federal and state claims against Teikoku violates the Due Process clause of the 5th and 14th Amendments to the United States Constitution given the fact that Teikoku had a contractual obligation to permit Endo to settle the litigation with Endo, given that Teikoku entered into the Settlement Agreement on the request of Endo to preserve its business relationship with Endo and given the relatively small size of Teikoku's contribution to the Settlement Agreement |

82.     These issues, briefed by the parties for thirty (30) pages in the joint pretrial statement (ECF 929), were argued alongside motions *in limine*.  Many of these issues were decided in plaintiffs' favor (those numbered 1, 3, 4, 5, 6, 7, 9, and 11 above) or were mooted (Nos. 12 and 13). *See* ECF No. 978.

### 4.     Fact witness examinations and deposition designations

83.     Plaintiffs' trial team prepared witness examinations (for live witnesses) and selected deposition and former patent trial and FTC investigatory hearing testimony (for unavailable witnesses).  In this process, for unavailable witnesses, nearly fifty (50) transcripts of testimony were analyzed, and excerpts of testimony were selected and timely served on defendants in compliance with the Court's pretrial orders.

84.     Defendants selected testimony from all of these same transcripts plus several others, for a total of fifty-six (56) transcripts.  Plaintiffs' trial team analyzed those transcripts to designate additional testimony under Rule 106 and in the nature of counter-designations, and to lodge appropriate objections.

85.     The trial team's 4-person evidence team (consisting of me, Kimberly Hennings of the Garwin Gerstein & Fisher, and two retailer plaintiff lawyers) then undertook to analyze all of defendants' proposed designations to ensure that all appropriate objections were asserted and not waived.  This required analysis of all of defendants' designated transcripts of testimony for purposes of asserting objections to defendants' initial designations.  Later, those same transcripts were analyzed and objections lodged to defendants' counter-designations.

86.     For witnesses within the subpoena power of the Court (named plaintiffs and witnesses affiliated with Teikoku), plaintiffs served trial subpoenas prepared live witness examinations.  Counsel for the direct purchaser plaintiffs prepared an examination of Francisco Bejar (Teikoku), and their client Joseph Brennan of Rochester Drug Co-Operative, Inc., and assisted in the preparation of examinations of Mr. Shimoda (Teikoku) and Mr. Speitz (Teikoku). For those fact witnesses that defendants later disclosed would be brought to trial live in defendants' case in chief (Lortie, Rudio, Levin, Moes and Singh for Endo; Bisaro, Buchen, Clark, Edwards, Gwinn, Spiegel, and Stewart for Watson), plaintiffs drafted rough cross examinations.

### 5.     Documentary evidence

87.     From the work performed by the subject-matter teams to select testimony from deposition transcripts for unavailable witnesses, and to create direct and cross examinations for witnesses who would appear live, plaintiffs constructed their exhibit list.  Plaintiffs' exhibit list had approximately 1,000 items, comprising documents, data sets, and other forms of evidence, some of which were to be used in examinations of fact witnesses and much of which was Rule 703 material placed on the exhibit list in abundant caution.  Defendants asserted multiple objections to most of plaintiffs' proposed exhibits, requiring plaintiffs' evidence team to evaluate those objections and recommend action for any that were curable (for instance, by obtaining Rule 902(11) declarations or certifications for public records).

88.     Plaintiffs' evidence team also undertook to analyze all of defendants' proposed exhibits to ensure that all appropriate objections were asserted and not waived.  This required plaintiffs' evidence team to analyze over 500 proposed defense exhibits.

### 6.     Expert witness examinations

89.     For each expert witness that plaintiffs planned to call, plaintiffs prepared a direct examination. This was typically done by the lawyer serving as the liaison to that expert.  Counsel for the direct purchaser plaintiffs prepared direct examinations of Professor Adelman (patent law), Dr. Leitzinger (reverse payment size, anticompetitive effects, and procompetitive justifications), Professor Elhauge (reverse payment economics, size, effects, and absence of procompetitive

justifications), Mr. Molina (generic launches and authorized generic launches), and Dr. Shah (patent invalidity and uneforceability).

90.     Although defendants' case in chief would not begin for several weeks, for each defense expert witness, plaintiffs began or completed a cross examination.  This was typically done by a lawyer on the appropriate subject-matter team.

7.     **Jury instructions, verdict form, voir dire, and other portions of the pretrial conference statement**

91.     Plaintiffs prepared a comprehensive set of jury instructions (both preliminary and final) covering all legal issues in the case, annotated with all existing authority from cases involving reverse payment patent settlement agreements.  Ultimately, the joint jury instructions (with defense objections and counterproposals, and plaintiff objections to defendants' counterproposals) comprised sixty-two (62) instructions spanning nearly two-hundred (200) pages, containing extensive competing legal discussion for use at the charging conference.  *See* ECF No. 933-1.  This is exclusive of the additional bench briefing the parties included to supplement the legal discussion.

92.     The jury instruction team benefitted from concentrated attention by one lawyer for the direct purchaser class and one lawyer from the endpayor class, and received editorial assistance from counsel for the retailer plaintiffs.  The lawyers comprising the patent law subject-matter team were heavily involved on issues of invalidity, infringement, and unenforceability.  Proposed jury instructions went through several iterations, to incorporate the Court's rulings at summary judgment (and reconsideration thereof), on motions *in limine*, and on rulings on the disputed legal issues presented by the joint pretrial statement.  The endpayor lawyer (Scott Grzenczyk) who kept the jury instructions current relative to the Court's rulings kept up with impressive speed and skill.

93.     Defendants initially proposed jury instructions of their own, comprising thirteen (13) preliminary instructions spanning seventeen (17) pages, thirty-three (33) final instructions spanning forty-two (42) pages, and thirteen (13) damages instructions spanning fourteen (14) pages (a total of fifty-nine (59) instructions spanning seventy-three (73) pages), to which counsel for plaintiffs asserted comprehensive objections supported by pertinent authority.  Counsel for Teikoku proposed

some separate instructions that it wanted read to the jury in lieu of Endo and Teikoku's proposed instructions, which plaintiffs opposed as well.

94.     Plaintiffs and defendants also drafted competing versions of a verdict form (to which Teikoku added its own proposed form) containing objections and responses thereto (ECF 933-4, 933-5, 933-6, and 933-7), voir dire questions for jury selection, and other portions of the joint pretrial conference statement (including a statement of the case, disputed and undisputed facts, disputed legal issues (discussed above), and witness lists.  Counsel for plaintiffs and counsel for defendants met and conferred frequently concerning the proposed jury instructions and all of these contested submissions to the Court, resulting in a modest set of stipulated facts.  The endpayor lawyer (Scott Grzenczyk) who served as the point person with defendants for that process was industrious and efficient.  After the endpayors settled, counsel for DPPs took over that function.

**O.     Settlement**

95.     This case settled just a few days prior to trial.  Counsel for the direct purchaser class had attempted to engage defendants several times over the course of this case.  Prior attempts to resolve the case in 2015, 2016, and 2017 were not successful.

96.     In September of 2017, following oral argument on summary judgment, this Court made a referral to Chief Magistrate Judge Joseph C. Spero for a settlement conference.  *See* ECF 881.

97.     Judge Spero conducted three (3) settlement conferences among the defendants and counsel for the direct purchaser class.  The first was held on November 14, 2017, and lasted an entire day.  In advance of that first conference, the parties were directed to, and did, prepare extensive settlement conference memoranda for Judge Spero, including a confidential letter detailing prior settlement efforts.

98.     Following that first conference, Judge Spero ordered the parties to hold three additional dates in January for further conferences.  The second settlement conference for the direct purchaser class was held with Watson alone on January 17, 2018.

99.     Following that second conference, Judge Spero ordered a third settlement conference for the direct purchaser class and Endo alone, on February 13, 2018.

100.     Following each of the three settlement conferences involving the direct purchaser class, the parties reached impasse.  Judge Spero made a "mediator's recommendation" following a declaration of impasse.  Judge Spero's successive recommendations were that Teikoku pay the direct purchaser class $35 million, that Watson pay the direct purchaser class $71 million, and that Endo pay the direct purchaser class $60 million in three installments out to the year 2020.

101.     After consultation with their clients and absent members of the direct purchaser class, counsel for the direct purchaser class and each defendant ultimately accepted Judge Spero's successive mediator's recommendations.

102.     I and my co-lead counsel believe the settlement in this case is excellent.  Totaling $166 million, the settlement represents between 55% and 79% of the Direct Purchaser Class's total aggregate damages before trebling.  (Which percentage applies depends on the date the jury ultimately found Watson would have entered the market absent the reverse payments.)

103.     As of today, following the Court's preliminary approval order (ECF 1018), the settlement funds have been placed in an escrow account by Endo, Teikoku and Watson.  (Endo's final $20 million installment is not due until March 29, 2019.)  Notice has been sent to the direct purchaser class.

## II.  SUMMARY OF DIRECT PURCHASER CLASS COUNSEL'S ATTORNEYS' FEES AND UNREIMBURSED EXPENSES

104.     This complicated and challenging case was litigated for over five (5) years and investigated prior thereto for over two (2) years.  Counsel have been paid nothing for their efforts thus far, have assumed the representation of their clients and the direct purchaser class on a purely contingent basis, have advanced all expenses on behalf of the direct purchaser class, and have borne all of the risk that defendants would prevail.

105.     By firm, the total lodestar reported by counsel from inception through February 28, 2018 is as follows:

| Firm Name | Lodestar | Hours |
|---|---|---|
| Faruqi & Faruqi | $13,669,425.50 | 20,446.7 |
| Garwin Gerstein & Fisher | 5,017,979.50 | 7,632.9 |
| Hagens Berman Sobol Shapiro | 6,243,634.80 | 11,122.3 |

| Firm Name | Lodestar | Hours |
|---|---|---|
| Berger & Montague | 3,774,457.00 | 8,012.9 |
| Odom & Des Roches | 3,722,956.25 | 5,783.6 |
| Taus, Cebulash & Landau | 2,932,370.00 | 4,248.4 |
| Smith Segura & Raphael | 2,593,554.00 | 4,830.7 |
| Heim, Payne & Chorush | 2,380,516.00 | 3,897.8 |
| Radice Law Firm | 1,477,507.50 | 2,724.0 |
| Nussbaum Law Group | 636,742.50 | 791 |
| Grant & Eisenhofer | 222,730.50 | 347.9 |
| TOTAL | $42,671,873.55 | 69,838.2 |

106.    I have attached as Exhibits "A" through "K" the declarations of each of the firms representing the direct purchaser class.  Each firm appends to its declaration an Appendix "A," detailing by task and lawyer the lodestar each has reported in this case, and the rates of each lawyer and paralegal.  The firms are:

| Exhibit | Firm Declaration |
|---|---|
| A | Faruqi & Faruqi |
| B | Garwin Gerstein & Fisher |
| C | Hagens Berman Sobol Shapiro |
| D | Berger & Montague |
| E | Odom & Des Roches |
| F | Taus Cebulash & Landau |
| G | Smith Segura & Raphael |
| H | Heim Payne & Chorush |
| I | Radice Law Firm |
| J | Nussbaum Law Group |
| K | Grant & Eisenhofer |
| L | All firms combined |

107.    As indicated above, I have attached as Exhibit "L" a summary version of the Appendix A, showing all of the firms' lodestar, by task, in case the Court would like that perspective.

108.    We will provide the Court with daily time records if the Court requests.  At the inception of this case, co-lead counsel drafted time and expense reporting guidelines and issued them to all firms participating in this case for the direct purchaser class.  Counsel adhered to those guidelines.  A copy of the guidelines is attached as Exhibit "M."

109.   Counsel for direct purchaser plaintiffs also advanced substantial expenses in the prosecution of this action that have not been reimbursed.  Some of those expenses were paid from a litigation fund into which most of the firms representing the direct purchaser class contributed.[9] Some of the those expenses were paid by the individual firms not through the litigation fund (which are reflected in the declarations attached as Exhibits "A" through "K").  In summary, the expenditures of counsel for the direct purchaser class for which reimbursement is sought are as follows:

| LITIGATION FUND DISBURSEMENTS | |
|---|---|
| **Expense Category** | **Amount** |
| Bank service charges for litigation fund itself | $197.71 |
| Deposition transcripts | 42,110.51 |
| Drug sales data from IMS Health | 11,624.00 |
| Expert witnesses | 2,655,284.19 |
| Japanese translation for witnesses at depositions | 8,577.00 |
| Litigation support document database | 93,804.29 |
| Patent-related research services (prior art, etc.) | 3,600.00 |
| Private mediation services | 9,375.00 |
| Subpoena service | 1,257.66 |
| Transcripts of in-court hearings | 589.13 |
| Trial technology vendors | 69,754.86 |
| Trial workspace rental | 7,979.44 |
| Reimbursements received from co-plaintiffs | (853,416.59) |
| TOTAL | $2,050,737.20 |

| FIRM DISBURSEMENTS FOR LITIGATION EXPENSES | |
|---|---|
| **Expense Category** | **Amount** |
| Consulting experts | $2,488.05 |
| Court reporter | 4,151.35 |
| Document database vendor | 26,316.97 |
| FDA and other document fees | 882.30 |
| Filing fees/court costs | 5,401.22 |
| Process server and subpoena expenses | 1,965.15 |
| Reproduction costs (outside vendor) | 1,311.98 |
| Scientific literature fees | 485.09 |
| Travel/hotel/meals | 267,026.71 |

---

[9] There is a balance in the litigation fund for this case in the amount of $334,262.81, which will be returned to the contributing law firms based on their payments into the fund.  The balance results from the receipt of trailing payments from co-plaintiffs into the litigation fund for their portion of the shared expert witnesses, fees which were advanced by counsel for the direct purchasers.

| FIRM DISBURSEMENTS FOR LITIGATION EXPENSES | |
|---|---|
| **Expense Category** | **Amount** |
| Trial expenses (furniture and equipment) | 2,614.14 |
| TOTAL | $312,642.96 |

110.   By firm, the advanced litigation expenses are as follows (*see* Exs. A-K hereto):

| Firm Name | Total Expenses Advanced (Litigation Fund contributions and otherwise) |
|---|---|
| Faruqi & Faruqi | $373,170.63 |
| Garwin Gerstein & Fisher | 384,815.98 |
| Hagens Berman Sobol Shapiro | 395,403.81 |
| Berger & Montague | 271,548.58 |
| Odom & Des Roches | 268,069.11 |
| Taus, Cebulash & Landau | 237,380.63 |
| Smith Segura & Raphael | 256,987.73 |
| Heim, Payne & Chorush | 276,638.31 |
| Radice Law Firm | 230,000.00 |
| Nussbaum Law Group | 3,628.18 |
| Grant & Eisenhofer | 0 |
| TOTAL | $2,697,642.96 |

111.   In light of the balance in the litigation fund, the total advanced expenses for which reimbursement is sought is therefore $2,363,380.15

112.   Litigation support vendors (online document review, court reporter, trial support vendors) were all subjected to a bid proposal process, and the lowest responsible bidder was selected.  Cost sharing among plaintiff groups helped spread and defray expenses to each group of plaintiffs, including the direct purchaser plaintiffs.

113.   No expenses have been included for legal research (Lexis/Westlaw), in-house copying, telephone, facsimile, or the like, as previously instructed by the Court.  No first-class travel of any kind has been incurred.  Hotel expenses in San Francisco were minimized wherever possible, and BART was used for transportation to and from SFO whenever possible.  Every effort was made to conserve costs in this case.  The Court's conducting monthly case management conferences via telephone was a valuable source of those savings, one of many things for which we thank the Court.

114.   Pursuant to 28 U.S.C. § 1746, I declare under the penalties of perjury that the foregoing, is true and correct.

Executed this 11th day of June, 2018.

_____
PETER KOHN
*Co-Lead Counsel for the Direct Purchaser Class*