[Submitting Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LIDODERM ANTITRUST LITIGATION | MDL Docket No. 14-md-02521-WHO |
| THIS DOCUMENT RELATES TO:<br><br>END-PAYOR ACTIONS | **JOINT DECLARATION OF END-PAYOR CO-LEAD COUNSEL IN SUPPORT OF MOTIONS FOR FINAL APPROVAL AND FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS** |

Dena C. Sharp, Renae D. Steiner, and Sharon K. Robertson jointly declare:

1.      We serve as Co-Lead Counsel for the End-Payor Class in this matter. This declaration is submitted in support of End-Payor Plaintiffs' Motion for Final Approval and End-Payor Class Counsel's Motion for Attorneys' Fees, Expenses, and Service Awards. We have personal knowledge of the facts below and, if called upon to do so, could and would testify competently thereto.

## I.   THE SETTLEMENT IS FAIR AND REASONABLE

2.      Co-Lead Counsel Girard Gibbs LLP, Heins Mills & Olson, P.L.C., and Cohen Milstein Sellers & Toll PLLC are highly experienced in prosecuting end-payor pharmaceutical antitrust cases, and each firm has a track record of successfully litigating antitrust and other complex MDLs of all types.

3.      Co-Lead Counsel are qualified to evaluate the benefits of settling this case as opposed to proceeding to trial. Co-Lead Counsel have litigated this case for over four years. Counsel have also served in leadership positions and prosecuted other pharmaceutical-related end-payor actions through various pretrial stages and trial. Through their experience in this matter, in similar pharmaceutical "pay-for-delay" litigation, in other antitrust actions, and in class actions generally, counsel are thoroughly familiar with the relative risks and rewards of settlement in relation to trial.

4.      Co-Lead Counsel believe the settlements are fair, reasonable, and adequate. The settlements represent the largest recovery by end-payors in a federal generic suppression case in at least the past decade. The settlements also provide the End-Payor Class 46% of the damages End-Payor Plaintiffs (EPPs) would have sought at trial (using a "forecasting" model), and represent a 67% recovery of the damages EPPs calculated using a more traditional "backcasting" model. And while end-payors typically recover less than one-half of what direct purchasers recover, here EPPs recovered approximately 63% of what the Direct Purchaser Plaintiffs recovered.

5.      The chart below compares recoveries in generic suppression cases brought in federal court since 2005:

JOINT DECLARATION OF END-PAYOR CO-LEAD COUNSEL IN SUPPORT OF MOTIONS FOR FINAL APPROVAL AND FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
MDL DOCKET NO. 14-md-02521-WHO

| CASE (District and Settlement Year) | DPP (~MM) | EPP (~MM) | EPP % of DPP Total |
|---|---|---|---|
| *Lidoderm (N.D. Cal. 2018)* | *$166* | *$104.75* | *63%* |
| | | | |
| *Aggrenox* (D. Conn. 2018) | $146 | $54 | 37% |
| *Solodyn* (D. Mass. 2018) | $77 | $45 | 58% |
| *Skelaxin* (E.D. Tenn. 2015) | $73 | $9 | 12% |
| *DDAVP* (S.D.N.Y 2013) | $20 | $5 | 25% |
| *Flonase* (E.D. Pa. 2013) | $150 | $35 | 23% |
| *Toprol XL* (D. Del. 2012) | $20 | $11 | 55% |
| *Wellbutrin SR* (E.D. Pa 2011) | $50 | $22 | 44% |
| *Tricor* (D. Del. 2009) | $250 | $66 | 26% |
| *Ovcon* (D.D.C. 2009) | $22 | $13 | 59% |
| *Terazosin* (S.D. Fla. 2005) | $75 | $31[1] | 41% |
| *Relafen* (D. Mass. 2005) | $175 | $75[2] | 43% |
| *Remeron* (D.N.J. 2005) | $75 | $36 | 48% |
| *Paxil* (E.D. Pa. 2005) | $150[3] | $65 | 43% |
| **Pre-Lidoderm Average (unweighted)** | | | **39%** |

6.      Aside from providing substantial relief to the End-Payor Class, the settlements also allowed the End-Payor Class to avoid the substantial risks that proceeding through trial to verdict would have posed. In addition to establishing that Defendants entered into a pay-for-delay agreement, EPPs would have had to convince the jury that Defendants' settlement of their patent litigation significantly harmed competition and that such harm substantially outweighed any procompetitive justifications that Defendants were poised to offer. Defendants were also prepared to argue to the jury that the End-Payor Class's damages were minimal, and that any overcharges paid by EPPs were "passed on." Even if EPPs won at trial, Defendants were poised to appeal numerous pivotal decisions, including the certification of the End-Payor Class and the denial of Defendants' summary judgment motion.

7.      Given the size of the recovery and potential for an unfavorable trial or a reversal on appeal, Co-Lead Counsel respectfully submit that the settlements are more than reasonable; they represent a win for the Class.

---

[1] Of this amount, $2 million was set aside to pay for the fees, costs, and claims of the state plaintiffs.

[2] This amount includes an $8 million payment to a large non-class group of third-party purchasers.

[3] After accounting for opt-outs, the final settlement amount was $100 million.

## II.        WORK PERFORMED BY CLASS COUNSEL

8.        From inception through the eve of trial four years later, class counsel actively litigated this case against several leading defense firms. Over the course of the case, class counsel obtained rulings denying Defendants' motions to dismiss, pursued discovery of Defendants, responded to Defendants' discovery of the EPP class representatives, reviewed over 3.3 million pages of documents produced by Defendants, deposed Defendants' fact and expert witnesses, prevailed on key discovery disputes and appeals, prevailed on class certification, obtained favorable rulings on Defendants' motion for summary judgment and *Daubert* motions, largely prevailed on key pretrial matters, completed preparation for trial, and appeared at multiple mediation sessions, including several mediation appearances before Chief Magistrate Judge Joseph C. Spero. While the result speaks for itself, the Court, through its close supervision of the litigation and rulings on key issues, is ultimately best qualified to assess both the fairness of the result achieved and the degree of risk confronting the End-Payor Class on several highly disputed points of law and fact.

9.        As explained in further detail below, each phase of the litigation required the expertise and expenditure of substantial time and resources by class counsel.

### A.        Investigation and Complaint Filing

10.        The first end-payor complaint in this multidistrict litigation was filed on November 12, 2013. *See United Food and Commercial Workers Local 1776 v. Teikoku Pharma USA, Inc., et al.*, 5:13-cv-05247 (N.D. Cal.) ("UFCW"). EPPs filed additional complaints in this and other districts across the country. Prior to filing, EPPs researched and investigated the factual and legal issues in the litigation. In particular, counsel reviewed Defendants' patent litigation history, Watson's ANDA and its approval history, the terms of the reverse payment settlement, their own purchase history, publicly available filings and other information to quantify the size and impact of the reverse payments.

11.        While the UFCW complaint was filed after the direct purchasers had filed their first complaint, class counsel had been investigating potential litigation concerning Defendants' pay-for-delay agreement for many months. The UFCW complaint also preceded the Federal Trade Commission's issuance of Civil Investigate Demands by several months.

12.     The Judicial Panel on Multidistrict Litigation centralized all pending Lidoderm actions before this Court. ECF 1. On May 23, 2014, the Court appointed Girard Gibbs, Heins Mills, and Cohen Milstein as Interim Co-Lead Counsel. The Court also appointed the Joseph Saveri Law Firm, Inc. as Interim Liaison Counsel, and Hilliard & Shadowen LLP, Miller Law LLC, Motley Rice LLC, Robbins Geller Rudman & Dowd LLP, and The Dugan Law Firm, APLC as members of the Executive Committee. ECF 63.

13.     Following transfer of all pending Lidoderm actions to this Court, the Court separately consolidated the end-payor actions and the direct purchaser actions. EPPs filed a consolidated amended complaint ("CAC") on June 13, 2014. ECF 72. Before filing the CAC, class counsel further investigated their claims, including each of the state laws claims asserted by the plaintiffs named in the CAC.

### B.     Motions to Dismiss

14.     On July 27, 2014, Defendants moved to dismiss the CAC, and the amended complaints of the direct purchaser plaintiffs and the Government Employees Health Association. ECF 95. Defendants argued that their settlement was not a reverse payment under the Supreme Court's decision in *F.T.C. v. Actavis*, and that the settlement was reasonable as a matter of law. Defendants also asserted that Plaintiffs had failed to allege that, but for their reverse payment agreement, Watson would have obtained FDA approval and entered the market before September 2013.

15.     This case was the first—and remains the only—federal pay-for-delay case litigated in the Ninth Circuit after *Actavis*. As such, the issues raised by Defendants' motion were matters of first impression in this Circuit. In the year since *Actavis* had been decided in June 2013, several district courts had analyzed the Supreme Court's holding and come to divergent conclusions. In several of those decisions, courts had dismissed end-payor complaints based on the same arguments that Defendants here had offered. EPPs worked with counsel for the DPPs and GEHA to oppose Defendants' arguments.

16.     In addition, Defendants devoted well over half of their substantive argument to EPPs' state law claims. Defendants argued that EPPs lacked standing to bring their claims in certain states, that the laws of five states prohibit indirect purchaser actions, and that EPPs' unjust enrichment claims

4

JOINT DECLARATION OF END-PAYOR CO-LEAD COUNSEL IN SUPPORT OF MOTIONS FOR FINAL APPROVAL
AND FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
MDL DOCKET NO. 14-md-02521-WHO

should be dismissed. EPPs thoroughly researched the laws of numerous states to fully respond to each of Defendants' arguments, and argued the motion on November 5, 2014.

17.     The Court issued a November 17, 2014 order largely denying Defendants' motion to dismiss and upholding EPPs' claims under the laws of seventeen states. ECF 117. EPPs filed a second amended complaint on December 19, 2014. ECF 122. On January 30, 2015, Defendants filed a second motion to dismiss seeking dismissal of EPPs' claims under Massachusetts and Utah law. EPPs filed their opposition on March 2, 2015 (ECF 143), and argued the motion at an April 23, 2015 hearing. With respect to their Massachusetts claim, the Court directed EPPs to serve a demand letter on Defendants. ECF 179. EPPs did so and filed their operative corrected third amended complaint on June 18, 2015. ECF 208.

C.      **Case Management**

18.     The parties began discovery while Defendants' motion to dismiss was pending. Early in the case, Defendants produced pleadings and expert reports from the patent litigation, drafts of Defendants' settlement agreement, sales and marketing information related to branded and generic Lidoderm, communications between Actavis and Endo regarding the settlement, and supply and manufacturing agreements between Endo and Teikoku. Plaintiffs reviewed, indexed, and analyzed these initial productions.

19.     When the Court denied Defendants' first motion to dismiss, it directed the parties to conduct a Rule 26 conference and submit an updated case management order and proposed schedule. EPP Co-Lead Counsel coordinated with counsel for the DPPs, and together they met and conferred with Defendants and negotiated a prioritized production of documents from Defendants consisting of documents Defendants had previously produced to the FTC. ECF 120. EPPs and DPPs also worked with Defendants to prepare a comprehensive case management statement that addressed, among other things, the parties' priority document productions, modifications to the default discovery limits, potential advice of counsel defenses, and the proposed case schedule.

20.     EPPs also worked with DPPs to negotiate stipulated orders concerning electronically stored information (ECF 125), deposition limits (ECF 162), and expert discovery (ECF 244).

21.     Throughout the litigation, the Court held more than twenty monthly status conferences. At the conferences the parties discussed the overall conduct of the litigation, the progress of discovery, the case schedule, and any pending disputes. Before each conference, the parties jointly submitted case management conferences statements. EPPs frequently took the lead in preparing, finalizing, and filing the statements.

**D.     Discovery of Defendants**

22.     In addition to the negotiated priority document requests, EPPs and DPPs collectively served seven sets of interrogatories on Defendants and nearly one hundred requests for production. EPPs also took the lead on requests for admission relating to earlier generic launches.

23.     Plaintiffs jointly negotiated with Defendants concerning Defendants' responses to Plaintiffs' discovery requests. In particular, EPPs worked closely with DPPs to negotiate search terms and custodians. Negotiations with each Defendant were extensive. A key issue was the extent to which each Defendant would search for and produce documents beyond what they had produced to the FTC. Plaintiffs closely analyzed the FTC's civil investigative demands and the scope of Defendants' productions of FTC materials to identify deficiencies and prepare the additional discovery needed for the private litigation. Those findings guided the parties' meet and confer efforts.

24.     EPPs took the lead negotiating the scope of Teikoku's document production, including the review and analysis of several iterations of "hit reports" produced by Teikoku that showed the number of documents captured by different search term proposals. The parties ultimately negotiated a predictive coding system that allowed Teikoku to efficiently identify and produce responsive documents. As part of that process, EPPs created a "seed set" of documents for the predictive coding system to use as a baseline and then reviewed a sample set of documents identified by the system to ensure that it was operating as intended. EPPs, along with DPPs, also negotiated a streamlined privilege log protocol with Teikoku.

25.     The negotiations with Watson regarding its document production were likewise labor-intensive. Watson took the position that their FTC production and custodians were sufficient to discharge its production obligations in this case. EPPs reviewed Watson's production to FTC and conducted their own independent investigation, and then collaborated with DPPs to develop a list of

6

1    custodians and search terms. Through multiple meet and confers, the parties came to agreement on the

2    search terms and initial custodians.

3           26.     Negotiations with Endo regarding search terms and custodians were also contentious.

4    Endo argued that its production should likewise be limited given the size and scope of its production to

5    the FTC. EPPs worked closely with the DPPs to identify and negotiate the production of documents

6    from additional custodians and to review and analyze hit reports that identified the number of

7    documents that would be captured by using different search parameters. Following a series of meet and

8    confers and exchange of a number of hit reports, the parties ultimately agreed on additional custodians

9    and search terms for the purpose of identifying relevant and responsive documents.

10          27.     Plaintiffs also served Rule 30(b)(1) and 30(b)(6) deposition notices on Defendants and

11   their corporate officers. Plaintiffs ultimately deposed 32 fact witnesses, including current and former

12   employees of Defendants. EPPs and DPPs collaborated to prepare the outline and documents to be used

13   during the depositions, and EPPs served as the lead questioners in the fact depositions of Francisco

14   Bejar, Roberto Cuca, Joseph DosSantos, Alan Levin, Raj Patel, Noriyuki Shimoda, Arjan Singh, and

15   Robert Stewart (twice). Two other witnesses—Paul Mori and Michael Speitz—were deposed over two

16   days, with EPPs and DPPs dividing the questioning. In instances where DPPs led the deposition

17   examination, EPPs were also present to assist the questioner, ask follow-up questions (in for example,

18   the depositions of Andrew Gesek, David Holveck, Brian Lortie, Matthew Riviello, and Danie Rudio),

19   and ensure that all critical issues were covered. EPPs assigned lawyers to deponents based on the

20   lawyer's experience and familiarity with the issues the witness was expected to testify about. The vast

21   majority of the depositions taken by the EPPs were taken by Co-Lead Counsel (Ms. Steiner, Ms. Sharp,

22   and Ms. Robertson), because EPP counsel anticipated that the deposition video was likely to be used at

23   trial in lieu of live testimony for most witnesses, and EPP Co-Lead Counsel intended to serve as lead

24   trial counsel for the End-Payor Class. As a result of Plaintiffs' preparation, the depositions yielded

25   statements and admission that would have played a significant role in Plaintiffs' case-in-chief in trial.

26         **E.**     **Document Review**

27          28.     Defendants ultimately produced over 3.3 million pages of documents, with non-parties

28   producing thousands of additional pages of documents and data. EPPs assembled a team of attorneys to

7

JOINT DECLARATION OF END-PAYOR CO-LEAD COUNSEL IN SUPPORT OF MOTIONS FOR FINAL APPROVAL
AND FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
MDL DOCKET NO. 14-md-02521-WHO

review the documents. As Defendants' document productions rolled in, Scott Grzenczyk (the senior EPP associate on the case) took a "quick look" at the productions to evaluate their contents, and then allocated the review among the document review team. Teresa Jones from Heins Mills served as an additional senior associate point of contact for the document review team, devising or assisting on search terms and assessment of batches and bringing issues to the attention of Co-Lead Counsel for their consideration and determination.

29.     Reviewers synthesized their findings into short weekly memos. The important points from the weekly memos were then consolidated into a "meta" memorandum that EPPs used throughout the litigation as a guide to the key issues and documents in the case. As the document review progressed, reviewers were assigned substantive areas on which to focus their review. Two reviewers, for example, focused on patent issues. Others focused on Defendants' financial forecasts or correspondence concerning the negotiating history of the reverse payment agreement. Document reviewers also identified key individuals and provided background on their involvement. This information informed Co-Lead Counsel's selection of fact witnesses to depose. Once deponents were identified, reviewers assembled "deposition kits" that provided background on each person, their involvement in the case, and key documents. Co-Lead Counsel worked directly with the reviewers to refine the kits and prepare for depositions.

30.     Co-Lead Counsel closely monitored the document review, tracking the progress of each reviewer to ensure that the time billed by the reviewers was commensurate with the number and type of documents being reviewed. We also scheduled weekly calls with the review team to ensure that the review was proceeding efficiently, to discuss strategy and potential adjustments to the review protocol, to obtain feedback from the reviewers, and to answer any questions the reviewers might have. On the weekly calls, the team discussed when certain areas of review began to produce diminishing returns and, in those instances, adjusted the review strategy or search terms being used. As the review progressed, the pre-scheduled weekly calls were cancelled if there were no open issues to discuss.

31.     A substantial portion of the documents produced by Teikoku, a Japanese company, were in Japanese. EPPs were responsible for the review of the Japanese-language documents. Girard Gibbs attorney Emily Jenks, who is fluent in Japanese, reviewed the Japanese language documents. If a

document was designated for use in substantive briefing, depositions, or trial, EPPs obtained certified translations through a specialized firm. All Plaintiffs were given access to, and benefitted from, the Japanese language review conducted by EPPs and the certified translations EPPs obtained.

32.    As described in certain firms' individual declarations, some firms' document reviewers in this case were contract attorneys. Those firms have identified those reviewers and capped their rates as such. All document review work in this case (for both offensive and defensive discovery) has been capped at $350 per hour, with the exception of Ms. Jenks, whose hourly rate is capped at $400 per hour, given her unique language abilities.

### F.    Discovery and Privilege Disputes

33.    At the center of this litigation was Defendants' agreement to settle litigation involving patents covering Lidoderm. A considerable portion of Plaintiffs' discovery efforts were focused on Defendants' assessments of their chances of winning the patent litigation and their reasons for entering into the settlement agreement. Unsurprisingly, discovery spawned a large number of complex privilege disputes.

34.    The parties filed more than twenty motions to compel, usually through joint discovery letter briefs.[4] Plaintiffs' motions included challenges to Defendants' assertions of attorney-client privilege concerning drafts of letters prepared for Endo's outside accountant, in response to requests for production of notes of Endo's in-house counsel, and Teikoku's attempts to claw-back documents on privilege grounds. EPPs took the lead in drafting and arguing many of these motions on behalf of Plaintiffs.

35.    One of the parties' chief disputes centered on the production of a February 2, 2012 email between Teikoku personnel relaying a conversation with Endo's in-house counsel. ECF 359. Teikoku initially produced the document before attempting to claw it back. Plaintiffs filed a clawback challenge. ECF 359. The Court ruled that certain portions of the email were not subject to the common interest privilege and must be produced. ECF 367. Endo filed a motion for reconsideration, which the Court denied. ECFs 375, 413. Endo then sought mandamus relief from the Ninth Circuit and also filed a

---

[4] ECFs 227, 247, 269, 276, 331, 345, 357, 359, 364, 366, 375, 377, 398, 399, 401, 402, 418, 421, 427, 445, 450, 451, 455, 478, and 503.

JOINT DECLARATION OF END-PAYOR CO-LEAD COUNSEL IN SUPPORT OF MOTIONS FOR FINAL APPROVAL AND FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
MDL DOCKET NO. 14-md-02521-WHO

1   motion to stay the Court's directive that Teikoku produce the document in question. The Ninth Circuit

2   first denied Defendants' stay motion and, after the parties fully briefed Endo's petition, denied the

3   petition as well. ECF 484. EPPs took the lead in all aspects of this dispute, including drafting and

4   arguing the original motion to compel, and drafting Plaintiffs' responses to Defendants' stay motion

5   and mandamus petition.

6        36.    Plaintiffs also filed an at-issue waiver motion requesting that Defendants either forego

7   certain defenses at trial or produce allegedly privileged documents bearing upon those defenses.

8   Plaintiffs filed their original motion in October 2015. The Court denied Plaintiffs' original motion

9   without prejudice. ECF 350. Plaintiffs then developed the record necessary to more clearly demonstrate

10  the ways in which Defendants were relying on attorney-client communications to support their

11  defenses. In April 2016, Plaintiffs filed a renewed motion. ECF 463. The Court granted the motion and

12  directed Defendants to elect whether to waive certain defenses and maintain their privilege assertions or

13  to waive the privilege and produce documents related to those defenses. ECF 536. Over the ensuing

14  months, the parties litigated the scope of Defendants' elections and productions. On August 24, 2016,

15  Defendants sought mandamus relief from the Ninth Circuit and on December 12, 2016, the appellate

16  court directed Plaintiffs to file a response. Plaintiffs filed their answer on January 3, 2017, and the

17  Ninth Circuit denied Defendants' petition on March 14, 2017. ECF 679. While DPPs took the lead in

18  the briefing before this Court, EPPs were heavily involved as well and drafted Plaintiffs' response to

19  Defendants' mandamus petition. This Court's at-issue waiver opinion was in many ways precedent-

20  setting in the pay-for-delay arena, and at least one other Court overseeing a generic suppression case

21  has adopted the Court's standard for resolving at-issue waiver disputes. *In re Namenda Direct*

22  *Purchaser Antitrust Litig.*, 2017 WL 3314233, at *2-3 (S.D.N.Y. Aug. 2, 2017).

23       37.    In connection with the filing of Plaintiffs' initial at-issue waiver motion in October

24  2015, Teikoku moved to disqualify Plaintiffs' counsel. Given the complexity and expense of the

25  litigation, and the progress EPP class counsel had already made in advancing the claims of the End-

26  Payor Class, the disqualification of EPP counsel could have been fatal to the EPPs' chances of

27  obtaining any recovery for their overcharges. EPPs were the primary authors of Plaintiffs' opposition

28  to the motion to disqualify, and Plaintiffs jointly retained a legal ethics expert. Plaintiffs also carefully

1  analyzed the documents produced by Teikoku to demonstrate that the document at the center of the

2  parties' dispute was not unique, and that Teikoku had produced troves of similar emails sent or

3  received by its attorneys. On November 25, 2015, the Court denied Defendants' motion. ECF 338.

4       38.     In their monthly status conference statements, the parties provided the Court with

5  updates on the status of discovery and any open issues, which the parties discussed with the Court at

6  nearly every status conference. In some instances, discovery-related disputes were presented solely

7  through the status conference statements instead of separate briefing. EPPs presented nearly all of the

8  case updates to the Court in the context of the monthly status conferences, and EPPs also argued most

9  of the privilege disputes raised at the monthly status conferences. The statements also previewed

10  discovery disputes that had not yet become ripe, giving the Court a chance to provide guidance to allow

11  the parties to resolve the issue without motion practice.

12       **G.     Discovery of End-Payor Plaintiffs**

13       39.     EPPs served their initial disclosures on January 9, 2015. On January 13, 2015,

14  Defendants served over 100 document requests and several interrogatories on EPPs. Defendants later

15  served multiple sets of additional interrogatories and document requests. Co-Lead Counsel researched

16  the Ninth Circuit law applicable to a number of issues, including the production of retention agreements

17  and documents related to drugs other than Lidoderm that Defendants claimed were in the same relevant

18  market as Lidoderm. Class counsel conferred with their clients regarding Defendants' requests and

19  EPPs served their responses and objections to Defendants' interrogatories on March 2 and Defendants'

20  requests for production on March 16, 2015.

21       40.     Defendants sent a 12-page letter about EPPs' responses on April 22, 2015. Another

22  letter addressing EPPs' responses to the interrogatories followed on May 11, 2015. The parties then met

23  and conferred extensively regarding EPPs' responses, including the exchange of numerous letters

24  addressing the substantive bases for EPPs' objections, issues related to the search terms and custodians

25  that EPPs would use to collect responsive documents, and the production of transactional data. After

26  EPPs produced documents in response to Defendants' discovery requests, Defendants sent additional

27  letters addressing purported deficiencies in the productions. Class counsel also followed up with the

28  class representatives (and their respective counsel) to address issues raised in Defendants' letters.

41.     While the parties were able to resolve most of their disputes by meeting and conferring over the course of nearly fifteen months, Defendants moved to compel the production of documents related to premiums and EPPs' financial condition. After the parties submitted joint discovery dispute letters, the Court denied Defendants' motion. ECF 435.

42.     In November 2015 Defendants served Rule 30(b)(6) deposition notices on each of the eleven class representatives. The notices included twenty-three broad topics on which EPPs were to be prepared to testify. Co-Lead Counsel prepared materials for class counsel to use in preparing their clients. Depositions of the EPPs took place between January and March of 2016. With the assistance of Co-Lead Counsel, class counsel prepared and defended the depositions of each of the class representatives, except Plaintiff Letizia Gallotto (who was not deposed).

43.     In lieu of a deposition, Defendants served over 40 interrogatories on named Plaintiff Gallotto. Co-Lead Counsel prepared responses to those interrogatories and served them on June 3, 2016.

44.     Defendants also served lengthy contention interrogatories. EPP Co-Lead Counsel marshalled the most compelling evidence—including testimony from Defendants' fact witness—to include in their responses. On April 25, 2016, EPPs served a thirty-page response.

**H.      Class Certification and Related Proceedings**

**1.      EPPs' Class Certification Motion**

45.     On October 17, 2016, EPPs moved for entry of an order certifying the End-Payor Class. EPPs faced an uphill battle: a series of district court decisions had recently denied certification of end-payor classes in pay-for-delay cases. Direct purchasers in antitrust class cases can rely on Defendants' sales data to demonstrate classwide injury and damages. But EPPs (who are by definition *indirect* purchasers) cannot. Instead, to establish classwide injury, EPPs analyzed data from Defendants, EPPs, non-parties, and IMS Health (a leading provider of healthcare-related data). In addition, the End-Payor Class includes consumers and a variety of third-party payors, and EPPs had to demonstrate that Defendants' conduct caused injury to each segment of the class.

46.     In support of their motion, EPPs retained and worked with two experts. Leading antitrust economist Dr. Hal Singer, whom EPPs engaged to build a model showing that EPPs suffered injury and

1   were damaged on a classwide basis. Dr. Singer's report relied primarily on a "forecasting" approach,

2   under which Defendants internal forecasting and planning documents are used to determine the prices

3   at which brand and generic Lidoderm would have been sold absent Defendants pay-for-delay

4   agreement. To prepare the forecasting model, Dr. Singer and Co-Lead Counsel (primarily Ms. Steiner)

5   carefully reviewed and incorporated Defendants' forecasts and other documents discussing the

6   economic impact of generic entry.

7       47.     Defendants moved to exclude Dr. Singer's opinion, arguing, among other things, that the

8   use of a "forecasting" model was inappropriate, and that a more traditional "backcasting" model— in

9   which real world generic prices are used as the but-for entry price—is preferable. EPPs opposed

10  Defendants' *Daubert* motion, and worked with Dr. Singer to prepare a rebuttal report and a sur-reply

11  declaration after Defendants submitted an unauthorized reply report from their economic expert.

12      48.     EPPs also submitted a report by Paul DeBree, an expert on the pharmaceutical

13  distribution chain and on the relationship between pharmacy benefit managers (PBMs) and end-payors.

14  Mr. DeBree opined that end-payors can be readily identified from PBM records. He also explained that

15  PBMs do not pay for prescriptions drugs and instead serve as intermediaries for end-payors' purchases.

16  Defendants also moved to exclude Mr. DeBree's opinions, which EPPs opposed.

17      49.     EPPs served subpoenas on several of the country's largest pharmacy benefit managers

18  (PBMs). PBMs process prescription drugs claims on behalf of third-party payors. In other cases, such

19  as *In re Skelaxin*, courts denied class certification based on defendants' arguments that PBMs—not

20  end-payors—may have borne the risk for supracompetitive drug prices in some instances and that end-

21  payors classes were unascertainable. In this case, EPPs (primarily Ms. Robertson and class counsel

22  Wexler Wallace) obtained declarations, documents, and data from PBMs showing that the PBMs did

23  not, in fact, bear pricing risk and that PBMs instead maintained detailed records of prescription drug

24  transactions that could be used to identify members of the End-Payor Class (and carve out individuals

25  excluded from the class). *See* ECFs 524-3, 524-4, and 524-5 (PBM declarations). The declarations

26  proved critical in overcoming the same arguments that had been fatal to end-payors' class certification

27  efforts in other cases and now serve as a model for similar third-party discovery in other

28  pharmaceutical antitrust cases.

50.     Defendants opposed EPPs' motion, arguing that EPPs' class certification motion failed to account for (1) several types of allegedly uninjured class members, (2) damages absorbed by PBMs, and (3) reimbursements received from Medicare Part D for certain types of class members. Defendants also challenged EPPs' ability to meet Rule 23's implied ascertainability requirement. They submitted reports from their own economist and two professed experts on the pharmaceutical distribution chain (Mr. John Fritz and Mr. Roberto Navarro) to counter the opinions of Mr. DeBree. EPPs deposed all three experts and moved to exclude Mr. Fritz's opinions as to his contention that EPPs pass their overcharges onto their insureds through premiums.

51.     On October 24, 2016, EPPs filed their reply and rebuttal expert reports. The court held oral argument on November 26, 2016.

52.     On February 21, 2017, the Court issued an order granting EPPs' motion and denying Defendants' *Daubert* challenges to EPPs' experts. ECF 670. Defendants filed a petition with the Ninth Circuit seeking interlocutory review under Federal Rule of Civil Procedure 23(f), which EPPs opposed and the Ninth Circuit denied. ECF 756. The Court's opinion has already been cited by courts in other end-payor pharmaceutical antitrust cases. *E.g.*, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2017 WL 462177 (D. Mass. Oct. 16, 2017).

53.     Shortly after the Court certified the End-Payor Class, Co-Lead Counsel sent Requests for Proposals to eight class action administration support firms seeking proposals for dissemination of notice and estimates on pricing and timing. Co-Lead Counsel reviewed the firms' respective submissions and made follow-up inquiries. Co-Lead Counsel selected Kurtzman Carson Consultants ("KCC") as the notice administrator. EPPs worked with KCC to develop a comprehensive notice plan that used a combination of direct and publication notice to reach virtually all third-party payor class members and approximately 80% of consumer class members. *See* ECF 872 (KCC declaration). The Court approved EPPs' notice plan on June 13, 2017 (ECF 751), and KCC subsequently distributed notice in accordance with the notice plan approved by the Court.

### 2.     Proceedings Related to Opt-Outs

54.     Several large insurers (sometimes referred to as "Separately Represented End-Payors" or "SREPs") opted out of the End-Payor Class. No consumers opted out of the End-Payor Class.

55.     In addition to their own opt-out requests, the SREPs also attempted to opt out self-funded health and welfare plans for whom the insurers provide administrative services. EPPs met and conferred with the opt-outs, and ultimately filed a motion asking the Court to reject the insurers' attempt to opt out their self-funded plan clients, arguing that the attempted mass opt-outs raised significant due process and practical concerns. ECF 893. The Court granted EPPs' motion to preclude the insurers from opting out their self-funded plans. ECF 946. The Court's order has been cited in the *Solodyn* and *Aggrenox* matters, where counsel there faced the same issue and both courts reached the same conclusion.

56.     With respect to the insurers themselves, EPPs moved for a "set aside" order, which provides that a portion of any recovery obtained by the insurers (or any other opt out) would be sequestered and subject to a motion for payment to class counsel in recognition of the work performed by class counsel for all end-payors, including any opt-outs. ECF 742. EPPs briefed and argued the motion, which again presented a matter of first impression for courts in this Circuit. Before this Court granted EPPs' motion, a set-aside order had been entered in only one other antitrust case. ECF 828.

I.      **Merits Experts**

57.     The trial in this case was initially scheduled for December 2017 and later set to begin on February 23, 2018. In preparation for trial, the parties exchanged more than 20 merits expert reports on a range of topics including damages, patent issues, when generic entry would have been expected to occur absent the settlement, and Watson's manufacturing capabilities.

58.     Plaintiffs jointly retained six experts: Martin Adelman (patent law), Einer Elhauge (economics and projected entry dates), Kenneth Miller, Ph.D. (patch development and Watson's manufacturing capabilities), Luis Molina (drug development and launch), David Read (FDA citizen petitions and ANDA approval), and Kishore Shah, Ph.D. (patch development and patent issues). Mr. Adelman authored one expert report, Dr. Miller authorized three, and the other four experts issued two reports each. Professor Elhauge developed a first-of-its-kind model to determine the range of possible settlements dates that would have been economically rationale for Defendants and to evaluate the harm to competition caused by the reverse payments.

59.     EPPs worked closely with DPPs to support the work of the experts (and also shared costs with DPPs). EPPs, for example, assisted DPP counsel Andrew Kelly and Neill Clark with their work with Mr. Molina on his at-risk and authorized generic launch opinions, particularly regarding Watson's public statements and internal financial documents consistent with at-risk launch and with the overlabeling calculations related to authorized generic launch capabilities. In addition, EPPs worked with DPP counsel Peter Kohn and Andrew Kelly in focusing Dr. Miller on key at-risk launch and manufacturing capability evidence to address in his reports.

60.     In addition to his work on EPPs' class certification motion, Dr. Singer also authored opening and rebuttal merits reports addressing EPPs' damages and the definition of the relevant market. Dr. Singer calculated the maximum single damages for the End-Payor Class as $229 million (ECF 776-25 (Singer Reply Rpt.) at 40). As discussed above, Dr. Singer's damages estimate was based on a "forecasting" model. Had EPPs used the same "backcasting" type model that the DPPs used here and is commonly used in antitrust cases, the EPPs' damages estimate would have been $156 million, and their $104.75 settlement would have represented a 67% recovery of backcasted damages. In other words, EPPs' settlement here recovers 67% of the class damages based on the damages model typically employed in these cases. There was also a substantial risk that Defendants would persuade the jury that Watson could not have launched a generic until March 31, 2013, in which case EPPs' maximum damages would have been lower and the settlement would represent 88% of backcasted damages.

61.     In addition, as noted in the declaration of DPP class counsel Peter Kohn (ECF 1024 at 1), the DPPs' recovery of between 55% and 79% of their backcasted damages places the DPPs' recovery among the top three of drug and device antitrust class action recoveries in terms of percentage of total damages recovered by direct purchaser class plaintiffs. Here, as far as class counsel knows, the EPP class' recoveries as a percentage of total damages are superior to recoveries in any other federal EPP pay-for-delay litigation in at least a decade, and are likewise greater than DPPs' percentage-of-damages recoveries in all but two cases.

62.     Defendants' expert, Dr. Gregory Bell, calculated the maximum damages for the End-Payor Class as $5.6 million, assuming plaintiffs proved that the patents would not prevent generic entry. (ECF 778-5 (Bell Rpt.) at 69). In addition to responding to Dr. Bell, Dr. Singer also addressed issues

1    raised in the reports of Defendants' experts Dennis Carlton and James Langenfeld. Dr. Singer's analysis

2    proved critical in Plaintiffs' successful motion for summary judgment concerning the definition of the

3    relevant market. *See In re Lidoderm Antitrust Litig.*, 2017 WL 5068533, at *20-21 (N.D. Cal. Nov. 3,

4    2017).

5          63.     Defendants also offered reports from twelve experts (two of whom prepared multiple

6    reports) in response to Plaintiffs' experts and to support Defendants' positions. Two of Defendants'

7    experts—Dr. Bell and Dr. Dennis Carlton—offered opinions concerning antitrust economics, with Dr.

8    Bell focusing on market power and damages, and Dr. Carlton focusing on the economic impacts of the

9    reverse payments. Teikoku also retained Dr. James Langenfeld to opine on whether the no-AG

10   agreement and free goods were large reverse payments form Teikoku's perspective. Dr. Chris Gilligan's

11   report focused on the uses of Lidoderm and its purported interchangeability, which Defendants used to

12   support their relevant market arguments.

13         64.     With respect to patent issues, Defendants retained Dr. Majella Lane to opine on issues

14   related to patent validity and David Schwartz and Robert Frank (retained solely by Endo) to opine that,

15   absent the settlement agreement, Endo and Teikoku would have prevailed in the underlying patent

16   litigation. Benoit Coasart and Hasha Murthy authored reports concerning patch manufacturing and

17   development, which were offered in support of Defendants' argument that Watson could not have

18   brought generic Lidoderm to the market any earlier that it did under the terms of the settlement

19   agreement. Dr. Nick Fleischer opined on the FDA's practices and procedures as they relate to citizen

20   petition reviews and ANDA approvals. Michael Moffitt evaluated the parties' settlement negotiations

21   and Dr. Ulrike Schaede (retained solely by Teikoku) argued that Teikoku's decision to enter in the

22   settlement agreement was the result of Japanese business norms, and not an intention to delay generic

23   competition.

24         65.     EPPs evaluated the experts' reports and their impact on the litigation, and worked with

25   DPPs and Plaintiffs' experts on the preparation of rebuttal reports. Co-Lead Counsel shared

26   responsibility for separate experts based on their respective areas of expertise and the issues they had

27   worked on throughout the litigation. EPPs also worked with DPPs to depose Defendants' experts and

28   defend Plaintiffs' joint experts at their depositions. EPPs were primarily responsible for deposing Dr.

1    Schaede, Mr. Murthy, and Mr. Cossart. For some experts, such as Dr. Bell, counsel for DPPs and EPPs

2    both conducted the deposition, with each counsel focusing on separate aspects of the expert's opinion.

3    Regardless of whether EPPs or DPPs took or defended the deposition, both sides participated in

4    preparing Plaintiffs' experts and preparing the lines of questioning for Defendants' experts. Counsel for

5    EPPs also appeared by phone for a portion of the deposition of GEHA's expert.

6        66.    Plaintiffs filed two early motions related to Defendants' expert reports. First, after

7    Defendants submitted an expert report from Dr. Cossart that relied on new declarations alleging certain

8    manufacturing facts, EPPs took the lead on drafting a motion to strike two post-discovery period

9    declarations submitted by Watson employees in support of Dr. Cossart's report. ECF 681. That motion

10   was jointly drafted by DPP counsel and Ms. Steiner, and Ms. Steiner argued the motion. After the Court

11   allowed additional discovery and depositions of these two declarants (ECF 694), EPPs and DPPs met

12   and conferred with Watson's counsel and oversaw the review of the newly-produced documents (some

13   of which were very favorable to Plaintiffs' manufacturing theory and were subsequently relied on by our

14   experts). EPPs conducted one of the depositions of these two declarants, while DPPs conducted the

15   other deposition, all in a very compressed time frame. EPPs and DPPs jointly assisted Dr. Miller in his

16   assessment of the new materials for his rebuttal report.

17       67.    Second, in the wake of the Court's at-issue waiver orders, Plaintiffs argued that certain

18   expert reports had put "at issue" Defendants' subjective beliefs, and that documents related to those

19   beliefs should be produced. ECF 697. The resulting Court order clarified that experts could testify about

20   what a reasonable company would do, but not what the Defendants themselves would do. ECF 795.

21   Certain of Defendants' expert reports were amended as a result. The Court also rejected Defendants'

22   argument that Plaintiffs' experts had "opened the door" to subjective beliefs and that Defendants should

23   therefore be able to present their beliefs without producing supporting documents related to that belief.

24   Both of the Court's holdings provided important clarifications as the parties prepared for trial.

25       **J.    Summary Judgment**

26       68.    In June 2017, after expert depositions had concluded, the parties filed motions for

27   summary judgment and also filed *Daubert* motions to exclude various experts from testifying at trial.

28   Defendants sought summary judgment on all Plaintiffs' claims on the issue of causation, and separately

1   on the issue of whether early generic entry could have occurred from a manufacturing standpoint. ECFs

2   786, 794. Plaintiffs sought partial summary judgment on the relevant market, and separately on the

3   "contract, combination, or conspiracy" prong of their antitrust claims. ECFs 775. While DPPs primarily

4   drafted Plaintiffs' affirmative summary judgment motions, EPPs worked with DPPs to develop and

5   refine the parties' arguments.

6          69.     EPPs took the lead in drafting Plaintiffs' opposition to Defendants' causation summary

7   judgment motion. Defendants relied on three post-*Actavis* cases to argue that to adequately establish

8   causation, Plaintiffs must prove that Watson *would have* prevailed in the underlying patent litigation

9   absent the settlement agreement. Plaintiffs instead argued that they needed only show at trial that there

10  was *some evidence* that Watson could have prevailed. Like many others in the litigation, this issue was

11  one of first impression in the Ninth Circuit. In support of Plaintiffs' opposition, EPPs researched and

12  analyzed every case to address these issues. EPPs also scoured the factual record and the parties' expert

13  reports to provide the Court with a robust record showing that Watson not only *could* have won the

14  patent litigation, but was in fact likely to do so (meaning that Plaintiffs would have prevailed even

15  under Defendants' proposed legal standard). Because Defendants' arguments cut across multiple

16  subject matters—the patent litigation merits, the economics of earlier generic entry, and the viability of

17  an alternative, no-payment settlement—EPPs were required to synthesize the expert opinions regarding

18  each of these topics. Plaintiffs' opposition brief directly addressed each of Defendants' positions, but

19  after Plaintiffs had filed their opposition (and before Defendants filed their reply), the Third Circuit

20  affirmed one of the district court decisions in *Wellbutrin* that Defendants had relied on in their motion.

21         70.     EPPs were also primarily responsible for drafting *Daubert* motions concerning

22  Defendants' experts Mr. Moffitt, Mr. Murthy, Dr. Schaede, and Mr. Fritz. EPPs were also the primary

23  drafters of Plaintiffs' opposition to Defendants' *Daubert* motions to exclude the opinions of Dr. Miller

24  and Professor Elhauge, each of which was critical to Plaintiffs' summary judgment and trial strategies.

25         71.     At the September 15, 2017 hearing, EPPs argued both of Defendants' summary

26  judgment motions (as to causation and Watson's manufacturing capabilities). On November 3, 2017,

27  the Court denied Defendants' causation motion, granted the unopposed portion of Defendants' motion

28  concerning Watson's entry date, granted Plaintiffs' motion, and granted in part and denied in part the

parties' *Daubert* motions. ECF 900. In particular, the Court agreed with Plaintiffs that they did not need to prove that Watson *would have* won at trial, granted Plaintiffs' *Daubert* motion to exclude Dr. Schaede's testimony (a motion prepared and argued by EPPs), and granted in part Plaintiffs' *Daubert* motion as to Professor Moffitt (another motion primarily drafted by EPPs). Defendants later moved for reconsideration of the ruling concerning the causation standard that would apply at trial. EPPs took the lead on preparing Plaintiffs' opposition, and the Court denied Defendants' motion. ECF 978.

72.     EPPs' efforts to overcome Defendants' summary judgment and reconsideration motions not only benefited the EPP and DPP classes in this litigation, but also plaintiffs in other pay-for-delay cases. *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018 WL 563144, at *14, *21 (D. Mass Jan. 25, 2018) (relying on the Court's holdings on the standard of proof and viability of an alternative settlement theory).

**K.     Pretrial Submissions and Briefing**

73.     During fall 2017, after summary judgment and *Daubert* briefing was complete, the parties turned their full attention to preparing for trial.

74.     The parties exchanged their initial proposed pretrial materials—including exhibit lists, witness lists, jury instructions, deposition designations, and verdict forms—on November 6, 2017. Nearly a month of negotiations followed until the parties filed their agreed-upon and disputed pretrial submissions in early December. ECFs 929 and 933

75.     Plaintiffs timely submitted their proposed jury instructions, which EPPs took the lead drafting (with DPPs preparing specific portions). The instructions addressed all of the substantive issues in the case, including damages issues specific to both EPPs and DPPs. Each instruction was supported by authority from reverse payment and other antitrust cases. The instructions were revised several times to incorporate the Court's summary judgment decision and other rulings. EPPs also reviewed Defendants' proposed instructions (including several separate instructions proffered by Teikoku) and prepared detailed responses and objections to the vast majority of the instructions. EPPs led the meet and confer efforts with Defendants to combine the parties' proposals (and reach agreement where possible) and prepare a consolidated set of joint instructions. The final set of proposed instructions submitted to the Court included sixty-two instructions spanning over two hundred pages.

76.     EPPs also took the lead in drafting Plaintiffs' portions of the Joint Pretrial Statement. Among other things, the statement identified disputed legal issues touching on nearly all of the parties' major legal disputes. EPPs researched and prepared Plaintiffs' arguments for each issue. In its February 7, 2018 order, the Court largely found in Plaintiffs' favor on the disputed legal issues. ECF 978. EPPs also coordinated the preparation of Plaintiffs' other submissions, including exhibit lists, witness lists, deposition designations, and verdict forms. EPPs led the Plaintiffs' meet and confer efforts on each of these items on behalf of all Plaintiffs and prepared the final documents for submission to the Court. ECFs 929 and 933.

77.     The parties also filed motions *in limine* (MILs) addressing a wide range of issues likely to arise at trial. Plaintiffs jointly prepared thirty-five MILs and responded to thirteen MILs filed by Defendants. The Court issued rulings on each side's MILs. ECF 978.

78.     In advance of trial, Plaintiffs and Defendants also each submitted briefs concerning the appropriate structure for trial. ECFs 888, 889. EPPs primarily drafted the Plaintiffs' brief, which sought separate trials (and juries) for the liability and damages phases. The brief also addressed other issues, including the sequencing of the parties' presentation of videotaped deposition testimony during trial. EPPs were also primarily responsible for drafting Plaintiffs' response to Defendants' submission.

**L.     Trial Preparations**

79.     In the months leading up to the February 23, 2018 jury selection (and well before the Court had denied Defendants' motion for summary judgment), EPP Co-Lead Counsel dedicated themselves to preparing for trial.

80.     Plaintiffs worked cooperatively to develop a draft outline of their case-in-chief, which was largely broken into several key subject matters that would be at issue at trial. Attorneys were assigned to each subject area based the work they had done in the litigation to date. Within each team, counsel designated portions of fact witness depositions for use at trial and identified documents to be used as exhibits. Counsel also identified potential admissibility issues associated with Plaintiffs' selected testimony and documents, and developed strategies to overcome those challenges.

81.     Each of the EPP Co-Lead Counsel was a member of Plaintiffs' joint trial team. Members of the core trial team and other attorneys responsible for trial preparation participated in numerous in-

21

JOINT DECLARATION OF END-PAYOR CO-LEAD COUNSEL IN SUPPORT OF MOTIONS FOR FINAL APPROVAL AND FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
MDL DOCKET NO. 14-md-02521-WHO

1   person and telephonic strategy sessions during which Plaintiffs' counsel decided how to allocate the

2   time available for their case-in-chief, which attorneys would be responsible for questioning fact and

3   expert witnesses, which fact witness deposition testimony would be designated and played for the jury,

4   and what testimony and exhibits to include (and exclude), among other things.

5        82.   As trial approached, Plaintiffs worked with Defendants to create a combined witness list,

6   further refine the parties' joint jury instructions, and resolve other pretrial logistics (such as shared

7   courtroom technology). EPPs took the lead in Plaintiffs' discussions with Defendants on these issues.

8        83.   EPPs retained a highly-respected jury consultant with significant experience preparing

9   counsel for trials in the Northern District and in pay-for-delay cases. EPP Co-Lead Counsel worked

10   with the consultant to develop a strategy for carrying out *voir dire* and jury selection, and conducted

11   jury theme testing with focus groups comprised of likely members of the jury pool. Upon an invitation

12   from EPP Co-Lead Counsel, counsel for DPPs joined the theme testing with two focus groups.

13        **M.   Settlement**

14        84.   EPPs participated in mediation with Endo and Teikoku before the Hon. Layn Phillips in

15   May 2017 but made only limited progress. Thereafter settlement negotiations took place under the

16   auspices of Chief Magistrate Judge Joseph C. Spero. EPPs prepared settlement conference statements

17   outlining the strengths and weaknesses of EPPs' claims and potential damages. EPPs reached an

18   agreement in principle with Teikoku following an initial settlement conference in December 2017, with

19   Watson following a January 2018 settlement conference, and finally with Endo following a February

20   settlement conference, one week before jury selection. Chief Judge Spero's assistance was critical at

21   the mediations, and without his advice the parties might not have succeeded in overcoming their

22   differences.

23        85.   EPPs prepared the settlement papers for each of the Endo, Teikoku, and Watson

24   settlements, working with both counsel for Defendants and counsel for the SREPs represented by the

25   Lowey Dannenberg firm. After lengthy negotiations, the parties agreed on final settlement terms and

26   EPPs submitted the agreements for preliminary approval on March 20, 2018.

27        86.   As of today's date, both Teikoku and Watson have deposited the full amounts of their

28   settlement contributions into an escrow account, and Endo has deposited its first payment (the other

payments are not due until February 2019 and February 2020). KCC has informed class counsel that as of July 27, 2018, 18,921 consumer class members and 159 third-party payor class members have submitted claims and no objections have been received.

87.     On April 3, 2018, Defendants provided Co-Lead Counsel with a copy of the March 30, 2018, notice they served on federal and state officials as required by the Class Action Fairness Act (CAFA), 28 U.S.C. § 1715(b). A copy of the notice is attached as Exhibit A.

## III.     CLASS COUNSEL'S LODESTAR

88.     Class counsel have prosecuted this litigation solely on a contingent-fee basis and have at all times been at risk that they would not receive any compensation for prosecuting claims against the Defendants. While class counsel devoted their time and resources to this matter, they have foregone the option of other opportunities for which they may have been compensated.

89.     Class counsel spent 51,668.35 hours prosecuting this case on behalf of the End-Payor Class, with a resulting lodestar of $25,560,049.50. Of the total hours spent, more than 80% was spent by Co-Lead Counsel and Liaison Counsel, with the remaining 18.5% of hours billed by Executive Committee and other class counsel firms. Co-Lead Counsel divided tasks among themselves to avoid duplication. Ms. Sharp (and her colleague Mr. Grzenczyk), for example, took the lead in much of the legal briefing; Ms. Steiner was in charge of working with EPPs' economic expert, Dr. Hal Singer, and many of plaintiffs' joint experts; and Ms. Robertson oversaw plaintiff and non-party discovery critical to EPPs' class certification motion and related expert work, as well as EPPs' responses to Defendants' discovery requests. Ms. Sharp, Ms. Steiner, and Ms. Robertson collaborated on overall case strategy to draw on their collective experience. In accordance with the Court's direction at the May 9, 2015 Initial Case Management Conference, Co-Lead Counsel generally limited attendance on internal strategy calls or at court hearings to one attorney per firm (Ms. Sharp, Ms. Steiner, and Ms. Robertson), and otherwise staffed meetings and hearings as leanly as possible but in accordance with the needs of the case and skill set of available attorneys. Liaison Counsel supported Co-Lead Counsel on key projects including research in support of EPPs' amended complaint, class certification and *Daubert* briefing and oral argument, legal and factual research in support of Plaintiffs' privilege challenges, pretrial preparations, and oversight of class counsel's time and expense submissions.

90.    Below is a summary of number of hours worked by each firm and the firm's total lodestar.

| Firm | Hours | Lodestar |
|---|---|---|
| Cohen Milstein Sellers & Toll PLLC (Co-Lead Counsel) | 13,594.00 | $6,772,990.00 |
| Girard Gibbs LLP (Co-Lead Counsel) | 12,146.2 | $6,237,297.00 |
| Heins Mills & Olson, P.L.C. (Co-Lead Counsel) | 12,270.7 | $6,367,266.00 |
| Joseph Saveri Law Firm, Inc. (Liaison Counsel) | 4091.0 | $1,994,244.50 |
| Hilliard & Shadowen LLP (Executive Committee) | 882.8 | $362,700.00 |
| Miller Law LLC (Executive Committee) | 1,111.0 | $423,476.50 |
| Motley Rice LLC (Executive Committee) | 18,13.8 | $795,609.50 |
| Robbins Geller Rudman & Dowd LLP (Executive Committee) | 1,043.9 | $429,844.50 |
| Cohen, Placitella & Roth, P.C. | 72.1 | $49,012.50 |
| Freed Kenner London & Millen LLC | 667.5 | $235,117.00 |
| Glancy Prongay & Murry LLP | 31.0 | $22,317.50 |
| Hach Rose Schirripa & Cheverie LLP | 1,592.0 | $605,232.50 |
| Kohn, Swift & Graf, P.C. | 23.4 | $14,868.00 |
| Krause, Kalfayan, Benink & Slavens, LLP | 170.35 | $ 71,697.50 |
| Labaton Sucharow LLP | 519.3 | $313,413.00 |
| Law Offices of Robert W. Sink | 45.1 | $31,268.00 |
| Lockridge Grindal Nauen P.L.L.P. | 406.7 | $251,043.50 |
| Meredith & Narine | 6.0 | $3,900.00 |
| Pomerantz LLP | 481.35 | $249,141.50 |
| Shepherd, Finkelman, Miller & Shah, LLP | 461.3 | $220,631.00 |
| Spector Roseman & Kodroff, P.C. | 57.75 | $31,015.00 |
| Weinstein Kitchenoff & Asher LLC | 20.0 | $9,035.00 |
| Wexler Wallace LLP | 161.1 | $68,929.50 |

91.    Declarations submitted by each firm (1) identify the attorneys and staff members who worked on the case and the tasks they performed, (2) describe the amount of time spent by each of the firm's attorneys and staff members, and the hourly rates for each of them, and (3) provide an itemization of the expenses incurred by the firm.

92.    The firm declarations also break down the amount billed by each attorney or staff member for specific tasks. The total per-task breakdown of class counsel's hours appears below:

| Category | Hours |
|---|---|
| Litigation Strategy and Case Management (including attorney meetings) | 2,168.60 |
| Client Updates | 188.55 |
| Court Appearances and Preparation | 1414.40 |
| Initial Complaint | 432.95 |

| Category | Hours |
|---|---|
| Amended Complaints | 348.80 |
| Motions to Dismiss | 414.90 |
| Depositions of Defendants (including preparation) | 3,203.70 |
| Discovery of Defendants: Written Discovery | 1,490.60 |
| Discovery of End-Payor Plaintiffs | 3841.70 |
| Discovery of Non-Parties | 305.30 |
| Discovery - Other (ESI, privilege protocol, expert discovery stipulation) | 1,732.00 |
| Document Review (including preparation of deposition kits) | 15,563.90 |
| Privilege Motion Practice (including Defendants' Disqualification Motion) | 2,966.50 |
| Appeals (other than Rule 23(f) Petition) | 139.60 |
| Class Certification (including Rule 23(f) Petition), Related Expert Work, and Distribution of Class Notice | 3,175.90 |
| Motion Practice (Miscellaneous) | 758.50 |
| Merits Expert Reports | 1,683.80 |
| Summary Judgment and *Dauberts* | 2,012.70 |
| Trial Preparation | 4,472.70 |
| Settlement | 1,558.60 |
| Specific Tasks Assigned by Co-Lead Counsel (including substantial work related to class certification) | 2,485.20 |
| Miscellaneous (including review and analysis of time and expense submissions) | 1,291.95 |

93.     The firms other than Co-Lead Counsel and Liaison Counsel worked on only a limited set of tasks at Co-Lead Counsel's direction. In total, class counsel other than Co-Lead and Liaison Counsel billed 84% of their time to document review, responding to discovery requests served on their client(s), and defending their client(s) at deposition. Non-lead firms also assisted with other discrete tasks at direction of Co-Lead Counsel, such as assisting with non-party discovery and expert discovery. These firms do not seek compensation for any significant amount of time spent on litigation strategy, participating on conference calls, or unnecessary "read and review" time.

94.     Class counsel also took steps to ensure that the time submitted reflected only work reasonably performed for the benefit of the End-Payor Class. *First*, each firm kept contemporaneous records of their time and has reviewed their daily time records to eliminate inefficiencies. Co-Lead Counsel and Liaison Counsel also reviewed the time records. Work that did not benefit the End-Payor Class—such as intra-firm conferences or "read and review" time beyond what is necessary to provide status updates to clients—is not included in class counsel's lodestar. Class counsel are prepared to submit their detailed time records for *in camera* review if requested by the Court. *Second*, time related to

25

JOINT DECLARATION OF END-PAYOR CO-LEAD COUNSEL IN SUPPORT OF MOTIONS FOR FINAL APPROVAL AND FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
MDL DOCKET NO. 14-md-02521-WHO

1  the JPML transfer motion or the appointment of interim lead counsel was excluded entirely from each

2  firm's lodestar. *Third*, each firm's lodestar includes only a maximum of twenty hours for drafting their

3  client's initial complaint; any additional complaint-related time was excluded.

4      95.    Two additional issues with regard to class counsel's lodestar and fee request bear

5  mention. First, several firms have written client referral agreements with other (non-class counsel)

6  firms. Class counsel's requested fees are based entirely on hours worked by class counsel. Any fees

7  owed to non-class counsel as a result of a client referral agreement will be allocated to referring counsel

8  by the class counsel firm bound by the agreement, and will in no way affect the amount recovered by

9  the End-Payor Class.

10     96.    Second, as noted in the EPPs' motion for preliminary approval, in connection with the

11 settlements now before the Court, certain large insurers represented by Lowey Dannenberg Cohen &

12 Hart, P.C (the "SREPs") that had originally opted out of the End-Payor Class withdrew their opt-out

13 requests and opted back into the End-Payor Class. Securing the SREPs' agreement to opt back into the

14 End-Payor Class increased EPPs' negotiating leverage with Defendants, thereby maximizing the

15 recovery for the Class. ECF No. 1005 at 4-5, citing *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 310

16 (3d Cir. 2011) ("achieving global peace is a valid, and valuable, incentive to class action

17 settlements"). As part of the negotiation to encourage the SREPs to rejoin the End-Payor Class and

18 recognizing that the SREP's counsel would be foregoing fees they would be entitled to under their fee

19 arrangements with the SREPs if they settled the SREPs claims outside the class, class counsel agreed to

20 pay Lowey Dannenberg a portion of the total fees ultimately awarded by this Court to EPP class

21 counsel. Lowey Dannenberg represents that it has incurred in excess of $4 million in attorneys' fees

22 during this litigation, but neither EPPs nor Lowey Dannenberg is requesting separate payment of

23 Lowey Dannenberg's attorneys' fees out of the settlements. Instead, the amount paid to Lowey

24 Dannenberg will come exclusively from attorneys' fees allocated to class counsel. Class counsel stand

25 ready to provide copies of any written agreements or other information the Court may request relating

26 to their fee arrangements and the agreement to share a portion of class counsel's fee with Lowey

27 Dannenberg.

28

## IV.    LITIGATION EXPENSES

97.    Class counsel also seeks the reimbursement of out-of-pocket expenses. EPPs' expenses fall into two categories: litigation fund payments and firm-specific costs.

### A.    Litigation Fund Payments

98.    Co-Lead Counsel, Liaison Counsel, firms on the Executive Committee, and other counsel contributed $2,485,000 to a litigation fund that was used to pay costs common to the class.[5] In total, EPPs spent $2,470,935.01 from the litigation fund and seek reimbursement of that amount.[6]

99.    The expenses paid from the litigation fund are summarized below:

| Category | Amount Incurred |
| --- | --- |
| Consultants and pretrial preparations | $12,031.03 |
| Document hosting services | $128,548.28 |
| Experts: EPPs' class and damages expert, Dr. Hal Singer | $1,831,005.83 |
| Experts: EPPs' premium and pharmaceutical marketplace expert, Paul DeBree | $68,320.00 |
| Experts: Plaintiffs' shared experts | $397,985.13 |
| Lidoderm sales data from IMS Health | $17,707.00 |
| Mediation | $9,375.00 |
| Transcripts | $18,905.44 |
| Translation services | $10,794.72 |
| Wire transfer fees | $99 |

100.    The largest costs were payments to EPPs' economic expert, Dr. Hal Singer. Over the course of the litigation, Dr. Singer prepared two opening reports (one class, one merits), two rebuttal

---

[5] Class counsel's individual declarations set forth their respective litigation fund contributions. EPP counsel The Dugan Law Firm also contributed $10,000 to the litigation fund but did not do additional work in the case and therefore did not submit an individual declaration. The Dugan Law Firm's litigation fund contribution is included in the $2,485,000 figure for litigation fund contributions.

[6] In total, payments made from the litigation fund totaled $2,494,771.43. For some of the costs paid with the litigation fund, however, counsel for plaintiffs other than EPPs provided partial reimbursements. The $2,470,935.01 in litigation fund expenses for which EPPs seek reimbursement are for unreimbursed payments made from the litigation fund.

1  reports, and a supplemental class certification declaration. He was deposed on three separate occasions

2  by very capable defense counsel, meaning that Dr. Singer needed to be exceptionally well-prepared for

3  his depositions. Dr. Singer also developed the economic analysis that underpins EPPs' plan of

4  allocation, which is based on, among other things, the relative proportion of classwide damages

5  attributable to consumers and third-party payors.

6       101.    Economic expert opinions for end-payors in pharmaceutical cases are particularly

7  complex. An expert cannot simply look to the defendants' sales data or retail pricing data. Instead, the

8  economist must consider the relationship between the defendants' list prices and retail prices and

9  evaluate the damages suffered by numerous segments of the End-Payor Class (insured consumers, third

10  part-payors, Medicare Part D, and cash paying consumers) in particular states. Dr. Singer also had to

11  evaluate the impact of a number of alleged offsets to EPPs' damages, such as rebates and subsidies

12  provided by Medicare Part D. And this case posed even more challenges than a typical end-payor case

13  because Endo entered into individual contracts with certain large insurers, each of which had to be

14  evaluated independently. In addition, because Dr. Singer relied on a forecasting model instead of a

15  backcasting model, he also needed to be familiar with Defendants' internal documents, as well as the

16  sales data obtained from Defendants and non-parties.

17       102.    Dr. Singer's merits reports addressed EPPs damages, and also addressed cross-elasticity

18  of demand arguments that proved central to Plaintiffs' successful motion for summary judgment as to

19  the relevant market. Dr. Singer was preparing to testify at trial concerning the regulatory framework of

20  the pharmaceutical industry and damages and impact as to EPPs.

21       103.    The vast majority of the remaining litigation fund payments went to paying Plaintiffs'

22  shared experts, and EPPs' premium and pharmaceutical marketplace expert. The consultation and

23  pretrial costs were primarily for Plaintiffs' jointly-retained jury consultant and payments for trial

24  vendors (many of whom required non-refundable down payments that EPPs made before the case

25  settled).

26      **B.**    **Firm Expenses**

27       104.    Class counsel also incurred $434,313.80 in out-of-pocket costs that the firms themselves

28  advanced, as opposed to being paid out of the litigation fund. Co-Lead Counsel has reviewed class

28

JOINT DECLARATION OF END-PAYOR CO-LEAD COUNSEL IN SUPPORT OF MOTIONS FOR FINAL APPROVAL
AND FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
MDL DOCKET NO. 14-md-02521-WHO

counsel's expense submissions to ensure that the costs were incurred for the benefit of the End-Payor Class.

105.   A breakdown of these expenses is below:

| Category | Amount Incurred |
|---|---|
| Consultants | $17,350.00 |
| Courts Fees (filing, etc.) | $13,988.11 |
| Computer Research (Lexis, Westlaw, PACER, etc.) | $148,033.63 |
| Research (reference materials) | $295.78 |
| Document Production | $1,011.42 |
| Photocopies – In-House | $71,721.41 |
| Photocopies – Outside | $10,170.69 |
| Postage, Courier, Messenger (including providing chambers copies to the Court) | $12,538.82 |
| Service of Process (including service of third-party and trial subpoenas) | $5,369.79 |
| Telephone / Facsimile | $5,701.78 |
| Transcripts (hearings, depositions, etc.) | $3,317.97 |
| Translation of Complaint for Service of Process | $3,566.50 |
| Travel (airfare, ground transportation) | $75,660.90 |
| Travel (meals and lodging) | $65,304.26 |
| Trial Exhibits | $281.99 |

106.   Of the above amounts, 84% were incurred by Co-Lead Counsel and Liaison Counsel.

107.   The largest expense categories are computerized research, service of process, and travel. The computerized research category includes all Lexis, Westlaw, and PACER costs incurred in connection with research issues raised in this litigation. Class counsel have only requested the reimbursement of their case-specific research costs—class counsel's request does not include research overhead not attributable to this litigation, nor does class counsel's request reflect any markup on the costs incurred conducting legal research. Service of process includes the costs incurred by firms serving their complaints on Defendants and service of subpoenas on third-parties and trial witnesses. Service of process also reflects the costs for providing the Court with chambers copies of filings in accordance

29

with the Court's rules and practices. The travel-related expenses were for class counsel to attend the depositions of their clients; travel by Co-Lead Counsel to hearings, status conferences, and settlement conferences where an in-person appearance was necessary; travel by Co-Lead Counsel to conduct and defend fact and expert witness depositions; and other necessary travel, such as attending trial preparation meetings or jury theme testing.

108.    While EPPs' fee request does not include any attorneys' fees for the Lowey Dannenberg firm, it does include $356,792.62 in out-of-pocket expenses incurred by Lowey Dannenberg. Co-Lead Counsel has reviewed the detailed expense report provided by Lowey Dannenberg and, subject to the Court's approval, believes the expenses identified below contributed to the result achieved on behalf of the End-Payor Class.

| Category | Amount Incurred |
|---|---|
| Computer Research (Lexis, Westlaw, PACER, etc.) in support of motions filed on behalf of all Plaintiffs. | $1,137.54 |
| Contributions to the costs of Plaintiffs' joint experts | $343,891.16 |
| Travel (airfare, ground transportation, meals, and lodging) to depositions, mediations, and a motion hearing | $11,763.92 |

Lowey Dannenberg may move separately for reimbursement of additional expenses as to which Co-Lead Counsel and Lowey Dannenberg have not reached agreement. Should Lowey Dannenberg move for reimbursement of additional expenses, Co-Lead Counsel will continue to negotiate with Lowey Dannenberg to narrow the range of items in dispute.

**C.    Class Certification Notice Expenses**

109.    The cost for distributing notice of class certification—including setting up a case-specific website and responding to class member inquiries—was $385,000 (which was below KCC's estimated cost). KCC has agreed to carry this amount, but the invoice will become payable upon final approval.

**V.    SETTLEMENT ADMINSTRATION COSTS**

110.    KCC has estimated that distributing notice of the settlements to the End-Payor Class, administering the claims submission process, and making the first distribution of settlement funds to

eligible claimants in March 2019 will cost $601,062. Most of that amount—over $415,000—is attributable to giving notice to class members. Another $100,000 of that amount is for processing claims and allocating the settlement proceeds among eligible claimants. The remaining costs include providing support for and contact with class members, preparing and distributing checks to claimants, and handling the various tax reporting obligations required by law. KCC estimates that it will cost approximately $83,956 to make the second distribution of settlement funds in March 2020. Both of these estimates are subject to change depending primarily on the volume and complexity of the claims received. Under each of the settlement agreements, costs of notice and administration are properly deductible from the Settlement Fund. A copy of the invoice from KCC is attached as Exhibit B.

The undersigned declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 31st day of July 2018.

*/s/ Dena C. Sharp*
Dena C. Sharp

*/s/ Renae D. Steiner*
Renae D. Steiner

*/s/ Sharon K. Robertson*
Sharon K. Robertson

JOINT DECLARATION OF END-PAYOR CO-LEAD COUNSEL IN SUPPORT OF MOTIONS FOR FINAL APPROVAL AND FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
MDL DOCKET NO. 14-md-02521-WHO

1

## **ATTESTATION**

2

I, Dena C. Sharp, am the ECF User whose identification and password are being used to file this

3

Joint Declaration of End-Payor Co-Lead Counsel in Support of Motions for Final Approval and for

4

Attorneys' Fees, Expenses, and Service Awards. Pursuant to Civil L.R. 5-1(i)(3), I attest under penalty

5

of perjury that concurrence in this filing has been obtained from all counsel.

6

7

DATED:  July 31, 2018                                   /s/ *Dena C. Sharp*

8                                                                       Dena C. Sharp

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT DECLARATION OF END-PAYOR CO-LEAD COUNSEL IN SUPPORT OF MOTIONS FOR FINAL APPROVAL
AND FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
MDL DOCKET NO. 14-md-02521-WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2018, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system.

/s/ *Dena C. Sharp*

JOINT DECLARATION OF END-PAYOR CO-LEAD COUNSEL IN SUPPORT OF MOTIONS FOR FINAL APPROVAL
AND FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
MDL DOCKET NO. 14-md-02521-WHO

EXHIBIT A

March 30, 2018

<u>VIA PRIORITY MAIL</u>

The Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

The State Attorneys General and other
"appropriate state officials" as defined by 28 U.S.C. § 1715(a)(2)
(identified on the attached Distribution List)

***In re Lidoderm Antitrust Litigation*, Case No. 3:14-md-02521-WHO (N.D. Cal.)**

Dear Sir/Madam:

We write on behalf of Actavis, Inc. (f/k/a Watson Pharmaceuticals, Inc.), Watson Laboratories, Inc., and Actavis plc (together, "Watson"), Endo Pharmaceuticals Inc. ("Endo"), and Teikoku Pharma USA, Inc. and Teikoku Seiyaku Co., Ltd. (together, "Teikoku" together with Watson and Endo, "Defendants") in relation to the above-referenced action currently pending in the United States District Court for the District of Northern California before the Honorable William H. Orrick (the "Case").  In connection with the Class Action Fairness Act of 2005, 28 U.S.C. § 1715 ("CAFA"), Defendants hereby provide notice that motions for preliminary approval of settlements between Defendants and two certified classes, Direct Purchaser Plaintiffs ("DPPs") and End Payor Plaintiffs ("EPPs"), were filed on March 20, 2018.

The classes are defined as follows:

The Direct Purchaser Class ("DPP Class") consists of:

> All persons or entities in the United States, including its territories, possessions, and the Commonwealth of Puerto Rico, who purchased brand or generic Lidoderm directly from any of the Defendants at any time during the period August 23, 2012 through May 1, 2014.  Excluded from the DPP Class are Teikoku, Endo, Watson, and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental agencies.

> Also excluded from the DPP Class for purposes of this settlement are the following entities that have opted out of the DPP Class and pursued claims in consolidated *Lidoderm Actions* separately from the DPP class:

March 30, 2018

>Walgreen Co., The Kroger Co., Safeway Inc., HEB Grocery Company LP, Albertson's LLC, Rite Aid Corporation, Rite Aid Hdqtrs. Corp., and CVS Pharmacy, Inc.

The End Payor Class ("EPP Class") consists of:

>All persons and entities in the United States and its territories who, in Arizona, California, Florida, Kansas, Maine, Massachusetts, Minnesota, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, or Wisconsin ("Class States") for consumption by themselves or their family member, or by their insureds, plan participants or beneficiaries, paid and/or provided reimbursements for some or all of the purchase price of:

>>i.   Branded Lidoderm for the time period August 23, 2012 through September 14, 2013; and/or

>>ii.  AB-rated generic Lidoderm for the time period September 15, 2013 through August 1, 2014;

>>-and-

>Third-party payors Cigna, MedImpact Healthcare Systems, Inc., Comprehensive Health Management, Inc. Part D, and Express Scripts Senior Care to the extent they provided, under their Medicare Part D plans, reimbursements for some or all of the price of branded Lidoderm purchased in Class States for the time period September 15, 2013 through August 1, 2014.

>The following persons or entities are excluded from the EPP Class:

>>(a)  Defendants and their officers, directors, management, employees, subsidiaries, and affiliates;

>>(b)  Those who, after September 15, 2013, paid and/or provided reimbursements for branded Lidoderm and did not purchase or reimburse for generic Lidoderm, except third-party payors Cigna, MedImpact Healthcare Systems, Inc., Comprehensive Health Management, Inc. Part D, or Express Scripts Senior Care for their Part D insurance;

>>(c)  Government entities, other than government-funded employee benefit plans;

2

March 30, 2018

     (d) Fully insured health plans (*i.e.*, plans that purchased insurance that covered 100 percent of the plan's reimbursement obligations to all of its members);

     (e) "Single flat co-pay" consumers who purchased Lidoderm or generic Lidoderm only via a fixed dollar co-payment that does not vary on the basis of the purchased drug's status as branded or generic (*e.g.*, $20 for both branded and generic drugs);

     (f) "Flat generic co-pay" consumers who, after September 15, 2013, purchased generic Lidoderm via a fixed dollar copayment (*e.g.*, $10 for generic drugs) regardless of the co-payment applicable to branded drugs;

     (g) Consumers who purchased or received Lidoderm or its AB-rated generic equivalent through a Medicaid program only;

     (h) Pharmacy benefit managers;

     (i) The judges in this case and members of their immediate families; and

     (j) The following entities that previously excluded themselves from the EPP Class and have not requested to opt back in: Carter Bank & Trust; CVS Health Corporation; Darby Dental Supply, LLC; Powell's City of Books; Rite Aid Corporation; The Western Union Co.; Wisconsin Evangelical Lutheran Synod; and Wood Group Management Services, Inc.

Per their obligations under 28 U.S.C. § 1715(b), Defendants provide the enclosed CD which includes copies of the documents identified below:

1. <u>28 U.S.C. § 1715(b)(1): Complaints and Amended Complaints</u>

    a. **DPP Complaints** (<u>Attachment 1</u>)

       i. Complaint, *Drogueria Betances, Inc. v. Endo Pharmaceuticals, Inc. et al*, Civ. A. No. 2:13-cv-06542 (E.D. Pa.), dated November 8, 2013 (Dkt. No. 1) (<u>Attachment 1-A</u>)

      ii. Complaint, *Rochester Drug Co-Operative, Inc. v. Endo Pharmaceuticals, Inc. et al*, Civ. A. No. 2:13-cv-07217 (E.D. Pa.), dated December 11, 2013 (Dkt. No. 1) (<u>Attachment 1-B</u>)

      iii. Complaint, *American Sales Company, LLC v. Endo Pharmaceuticals, Inc. et al*, Civ. A. No. 3:14-cv-00022 (M.D. Tenn.), dated January 7, 2014 (Dkt. No. 1) (<u>Attachment 1-C</u>)

3

March 30, 2018

    iv.  Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint, *In re Lidoderm Antitrust Litigation*, MDL No. 3:14-md-02521-WHO (N.D. Cal.), dated June 13, 2014 (Dkt. No. 70) (<u>Attachment 1-D</u>)

    v.  Direct Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint, *In re Lidoderm Antitrust Litigation*, MDL No. 3:14-md-02521-WHO (N.D. Cal.), dated December 19, 2014 (Dkt. No. 121) (<u>Attachment 1-E</u>)

  b.  **EPP Complaints** (<u>Attachment 2</u>)

    i.  Complaint, *United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc., et al*, Civ. A. No. 3:13-cv-05257 (N.D. Cal.), dated November 12, 2013 (Dkt. No. 1) (<u>Attachment 2-A</u>)

    ii.  Complaint, *Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund v. Teikoku Pharma USA, Inc. et al*, Civ. A. No. 3:13-cv-05280 (N.D. Cal.), dated November 13, 2013 (Dkt. No. 1) (<u>Attachment 2-B</u>)

    iii.  Complaint, *City of Providence v. Endo Pharmaceuticals, Inc. et al*, Civ. A. No. 1:13-cv-007710 (D. R.I.), dated December 10, 2013 (Dkt. No. 1) (<u>Attachment 2-C</u>)

    iv.  Complaint, *Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund v. Teikoku Pharma USA, Inc. et al*, Civ. A. No. 3:13-cv-05938 (N.D. Cal.), dated December 23, 2013 (Dkt. No. 1) (<u>Attachment 2-D</u>)

    v.  Complaint, *Philadelphia Federation of Teachers Health and Welfare Fund v. Endo Pharmaceuticals, Inc., et al*, Civ. A. No. 2:14-cv-00057 (E.D. Pa.), dated January 7, 2014 (Dkt. No. 1) (<u>Attachment 2-E</u>)

    vi.  Complaint, *International Association of Fire Fighters Local 22 Health and Welfare Fund v. Endo Pharmaceuticals, Inc., et al*, Civ. A. No. 2:14-cv-00092 (E.D. Pa.), dated January 8, 2014 (Dkt. No. 1) (<u>Attachment 2-F</u>)

    vii.  Complaint, *Painters District Council No. 30 Health & Welfare Fund v. Teikoku Pharma USA, Inc. et al*, Civ. A. No. 2:14-cv-00289 (C.D. Cal.), dated January 13, 2014 (Dkt. No. 1) (<u>Attachment 2-G</u>)

    viii.  Complaint, *Local 17 Hospitality Benefit Fund v. Endo Pharmaceuticals, Inc. et al*, Civ. A. No. 3:14-cv-00503 (N.D. Cal.), dated February 3, 2014 (Dkt. No. 1) (<u>Attachment 2-H</u>)

    ix.  Complaint, *Teamsters Union Local 115 Health and Welfare Fund v. Endo Pharmaceuticals, Inc. et al*, Civ. A. No. 2:14-cv-00772 (E.D. Pa.), dated February 4, 2014 (Dkt. No. 1) (<u>Attachment 2-I</u>)

March 30, 2018

    x.    Complaint, *Steven Roller v. Endo Pharmaceuticals, Inc., et al*, Civ. A. No. 3:14-cv-00792 (N.D. Cal.), dated February 21, 2014 (Dkt. No. 1) (Attachment 2-J)

    xi.    Complaint*, Welfare Plan of the International Union of Operation Engineers Local 137, 137A, 137B, 137C, 137R  v. Endo Pharmaceuticals Inc. et al,* Civ. A. No. 3:14-cv-00591 (M. D. Tenn.), dated February 28, 2014 (Dkt. No. 1) (Attachment 2-K)

    xii.    Complaint, *NECA-IBEW Welfare Trust Fund v. Endo Health Solutions, Inc., et al*, Civ. A. No. 3:14-cv-01141 (N.D. Cal.), dated March 11, 2014 (Dkt. No. 1) (Attachment 2-L)

    xiii.    Complaint, *Allied Services Division Welfare Fund v. Endo Pharmaceuticals Inc. et al*, Civ. A. No. 2:14-cv-01548 (E.D. Pa.), dated March 14, 2014 (Dkt No. 1) (Attachment 2-M)

    xiv.    Complaint, *Greater Metropolitan Hotel Employers-Employees Health and Welfare Fund et al  v. Endo Pharmaceuticals, Inc., et al*, Civ. A. No. 2:14-cv-01584 (E.D. Pa.), dated March 17, 2014 (Dkt. No. 1) (Attachment 2-N)

    xv.    Complaint, *Twin City Iron Workers Health and Welfare Fund v. Teikoku Pharma USA, Inc. et al*, Civ. A. No. 2:14-cv-01920 (E.D. Pa.), dated April 1, 2014 (Dkt No. 1) (Attachment 2-O)

    xvi.    Complaint, *International Union of Operating Engineers Local 49 Health & Welfare Fund v. Endo Pharmaceuticals Inc. et al*, Civ. A. No. 14-01643 (D. Minn.), dated May 23, 2014 (Dkt. No. 1) (Attachment 2-P)

    xvii.    Complaint, *Iron Workers District Council of New England Welfare Fund v. Endo Pharmaceuticals Inc. et al*, Civ. A. No. 3:14-02480 (N.D. Cal.), dated May 29, 2014 (Dkt. No. 1) (Attachment 2-Q)

    xviii.    First Amended Complaint, *GEHA v. Endo Pharmaceuticals Inc. et al*, MDL No. 3:14-md-02521-WHO, dated June 13, 2014 (Dkt. No. 71) (Attachment 2-R)

    xix.    Second Amended Complaint, *GEHA v. Endo Pharmaceuticals Inc. et al*, MDL No. 3:14-md-02521-WHO, dated December 19, 2014 (Dkt. No. 123) (Attachment 2-S)

    xx.    End-Payor Plaintiffs' Consolidated Amended Complaint, *In re Lidoderm Antitrust Litigation*, MDL No. 3:14-md-02521-WHO, dated June 13, 2014 (Dkt. No. 72) (Attachment 2-T)

    xxi.    End-Payor Plaintiffs' Second Consolidated Amended Complaint, *In re Lidoderm Antitrust Litigation*, MDL No. 3:14-md-02521-WHO, dated December 19, 2014 (Dkt. No. 122) (Attachment 2-U)

March 30, 2018

    xxii.  End-Payor Plaintiffs' Third Consolidated Amended Complaint, *In re Lidoderm Antitrust Litigation*, MDL No. 3:14-md-02521-WHO, dated June 9, 2015 (Dkt. No. 206) (Attachment 2-V)

    xxiii.  End-Payor Plaintiffs' Corrected Third Consolidated Amended Complaint, *In re Lidoderm Antitrust Litigation*, MDL No. 3:14-md-02521-WHO, dated June 18, 2015 (Dkt. No. 208) (Attachment 2-W)

2. 28 U.S.C. § 1715(b)(3): Proposed Notifications to Class Members

    a.  **Notification Proposed By DPPs**

      i.  Exhibit 6 to the Declaration of David S. Nalven in Support of Direct Purchaser Class Plaintiffs' Motion for (1) Preliminary Approval of Settlement with All Defendants, (2) Approval of Form of Notice, and (3) a Schedule Leading to a Final Approval Hearing ("Nalven Declaration") filed on March 20, 2018 (Dkts. 1004.1, 1004.7) (Attachments 3A, 3B), which includes the proposed notice to inform class members of the proposed settlement, the right to object to the proposed settlement, and the proposed plan of distribution. The Court has neither approved nor disapproved this proposed notice, and it is therefore subject to change.

      ii.  The Court previously had certified the DPP Class, and notice was sent to the Class informing them of the action and providing a right to opt-out. (Attachment 4).

    b.  **Notification Proposed By EPPs**

      i.  Exhibit 3 to the Declaration of Dena C. Sharp in Support of End-Payor Class Plaintiffs' Unopposed Motion for Preliminary Approval of Settlements, Preliminary Approval of Plan of Allocation, and Approval of Notice and Claims Plan ("Sharp Declaration"), filed on March 20, 2018 (Dkt. 1005.1, 1005.4) (Attachments 5A, 5B), which includes proposed "long-form" and "short-form" notices to inform class members of the proposed settlement, the right to object to the proposed settlement, and the proposed plan of distribution. The Court has neither approved nor disapproved this proposed notice, and it is therefore subject to change.

      ii.  The Court previously had certified the EPP Class, and notice was sent to the Class informing them of the action and providing a right to opt-out. (Attachment 6).

March 30, 2018

    3.  <u>28 U.S.C. § 1715(b)(4): Proposed Settlement</u>

        a.  **Proposed DPP Settlements**

            i.  A copy of the Watson Settlement Agreement, filed March 20, 2018 (Dkt. 1004.3) is attached (<u>Attachment 7</u>).[1]

           ii.  A copy of the Endo Settlement Agreement, filed March 20, 2018 (Dkt. 1004.4) is attached (<u>Attachment 12</u>).[2]

          iii.  A copy of the Teikoku Settlement Agreement, filed March 20, 2018 (Dkt. 1004.2) is attached (<u>Attachment 14</u>).

        b.  **Proposed EPP Settlements**

            i.  A copy of the Watson Settlement Agreement, filed March 20, 2018 (Dkt. 1005.4), is attached (<u>Attachment 5B</u>).[3]

           ii.  A copy of the Endo Settlement Agreement, filed March 20, 2018 (Dkt. 1005.2), is attached (<u>Attachment 15</u>).[4]

          iii.  A copy of the Teikoku Settlement Agreement, filed March 20, 2018 (Dkt. 1005.3), is attached (<u>Attachment 17</u>).[5]

    4.  <u>28 U.S.C. § 1715(b)(6): Dismissal of Certain Federal and State Law Claims</u>

        a.  **Dismissals of DPP Claims**

            i.  In an Order dated November 17, 2014 (Dkt. No. 117) (<u>Attachment 11</u>), DPPs' claims in the First Amended Consolidated Class Action Complaint and Jury Demand (Attachment 1-D) alleging a *per se* violation under Sherman Act Section 1 were dismissed with prejudice.

        b.  **Dismissals of EPP Claims**

            i.  In an Order dated November 17, 2014 (Dkt. No. 117) (<u>Attachment 11</u>), EPPs' state law antitrust claims under the laws of Florida, Illinois, Massachusetts, Puerto Rico, and Rhode Island, alleged in the End-Payor

---

[1]    Please note that Attachment A to the Watson DPP Settlement Agreement is not a public document.  It has been filed under seal with the district court because it contains confidential information. An unredacted copy of Attachment A is enclosed as <u>Attachment 8</u> and the parties respectfully request that Attachment A not be disclosed outside your office.

[2]    Please note that Attachment A to the Endo DPP Settlement Agreement is not a public document.  It has been filed under seal with the district court because it contains confidential information. An unredacted copy of Attachment A is enclosed as <u>Attachment 13</u> and the parties respectfully request that Attachment A not be disclosed outside your office.

[3]    Please note that Appendix A to the Watson EPP Settlement Agreement is not a public document.  It has been filed under seal with the district court because it contains confidential information. An unredacted copy of Appendix A is enclosed as <u>Attachment 9</u> and the parties respectfully request that Appendix A not be disclosed outside your office.

[4]    Please note that Appendix A to the Endo EPP Settlement Agreement is not a public document.  It has been filed under seal with the district court because it contains confidential information. An unredacted copy of Appendix A is enclosed as <u>Attachment 16</u> and the parties respectfully request that Appendix A not be disclosed outside your office.

[5]    Please note that Appendix A to the Teikoku EPP Settlement Agreement is not a public document.  It has been filed under seal with the district court because it contains confidential information.  An unredacted copy of Appendix A is enclosed as <u>Attachment 18</u> and the parties respectfully request that Appendix A not be disclosed outside your office.

March 30, 2018

> Plaintiffs' Consolidated Amended Complaint (Attachment 2-U), were dismissed with prejudice. EPPs' claims of unjust enrichment arising under the laws of Alaska, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Montana, New Jersey, Oklahoma, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Texas, Virginia, Washington, and Wyoming were dismissed with prejudice in the same Order.

Defendants also provide the following information:

1. 28 U.S.C. § 1715(b)(2): Notice of Hearing

   a. A hearing as to the DPP and EPP settlements with the Defendants is currently scheduled for April 24, 2018 at 9 a.m. in Courtroom 2 before Judge William H. Orrick.

2. 28 U.S.C. § 1715(b)(5): Other Contemporaneous Agreements

   a. **Contemporaneous DPP Agreements**

      i. Watson and DPPs have contemporaneously entered into an Escrow Agreement. A copy of the Escrow Agreement, filed on March 20, 2018 (Dkt. 1004.9) is attached. (Attachment 10).

      ii. Watson and DPPs have not contemporaneously entered into any other settlements or agreements.

      iii. Endo and DPPs have contemporaneously entered into an Escrow Agreement. A copy of the Escrow Agreement, filed on March 20, 2018 (Dkt. 1004.10) is attached. (Attachment 19).

      iv. Endo and DPPs have not contemporaneously entered into any other settlements or agreements.

      v. Teikoku and DPPs have contemporaneously entered into an Escrow Agreement. A copy of the Escrow Agreement, filed on March 20, 2018 (Dkt. 1004.8) is attached. (Attachment 20).

      vi. Teikoku and DPPs have not contemporaneously entered into any other settlements or agreements.

   b. **Contemporaneous EPP Agreements**

      i. Defendants and EPPs have contemporaneously entered into an Escrow Agreement. A copy of the Escrow Agreement, filed on March 20, 2018 (Dkt. 1005.4) is attached. (Attachment 5B).

      ii. Defendants and EPPs have not contemporaneously entered into any other settlements or agreements.

3. 28 U.S.C. § 1715(b)(7): Class Members and Proportionate Share

   a. **DPP Class Members and Proportionate Share**

8

March 30, 2018

    **i.** The Direct Purchaser Settlement Class is comprised of 54 members.  The breakdown of the class members' states of residence is as follows:

        Arkansas:  1 class member
        California:  2 class members
        Connecticut:  1 class member
        Florida:  2 class members
        Georgia: 1 class member
        Illinois:  2 class members
        Kentucky: 2 class members
        Louisiana:  2 class members
        Maryland:  1 class member
        Michigan:  3 class members
        Minnesota: 2 class members
        Missouri:  3 class members
        New Jersey:  2 class members
        New York:  6 class members
        North Carolina:  1 class member
        North Dakota: 1 class member
        Pennsylvania:  6 class members
        Puerto Rico:  5 class members
        Ohio:  8 class members
        South Carolina: 1 class member
        Vermont:  1 class member
        Wisconsin: 1 class member

    Defendants provide in Appendix B the estimated proportionate share of DPP Class members' claims to the entire settlement by state. The Settlement Fund will be allocated among and distributed to the DPP Class in a manner authorized by the Court.

  **b.** **EPP Class Members and Proportionate Share**

    i. Defendants provide in Appendix A the estimated proportionate share of EPP Class members' claims to the entire settlement for each state included in the class.  The data for the proportionate shares of claims is based on data relied upon by Plaintiffs' expert.

4. 28 U.S.C. § 1715(b)(8): Judicial Opinions

  a. There is no written judicial opinion issued in this action relating to the materials described in 28 U.S.C. §§ 1715(b)(3)-(6) with respect to the claims against Defendants other than the above-mentioned November 17, 2014 Order.

Please let us know if you have any questions regarding this notice.

March 30, 2018

Sincerely,

/s/ *Karen Hoffman Lent*
Karen Hoffman Lent
**SKADDEN, ARPS, SLATE, MEAGHER &**
**FLOM**
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (917) 777-3000
Karen.Lent@skadden.com

Steven C. Sunshine
Sean M. Tepe
1440 New York Ave. NW
Washington DC, 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
Steve.Sunshine@skadden.com
Sean.Tepe@skadden.com

*Counsel for Defendants Actavis, Inc. (f/k/a Watson*
*Pharmaceuticals, Inc.), Watson Laboratories, Inc.,*
*and Actavis plc*

/s/ *George G. Gordon*
George G. Gordon
**DECHERT LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-2382
Facsimile: (215) 655-2382
George.Gordon@dechert.com

*Counsel for Defendant Endo*
*Pharmaceuticals Inc.*

/s/ *Joseph A. Meckes*
David S. Elkins
Joseph A. Meckes
**SQUIRE PATTON BOGGS (US) LLP**
1801 Page Mill Drive, Suite 110
Palo Alto, CA 94304
Telephone: (650) 856-6500
Facsimile: (650) 843-8777
Email: david.elkins@squirepb.com
Email: joseph.meckes@squirepb.com

*Counsel for Defendants Teikoku Pharma*
*USA, Inc. and Teikoku Seiyaku Co., Ltd.*

Enclosure

10

Appendices contain information designated as confidential by Defendants and are not included, but are available at the Court's request.

EXHIBIT B



3301 Kerner Boulevard   415.798.5900   PHONE
San Rafael, CA 94901   415.892.7354   FAX
kccllc.com

June 7, 2018

Scott M. Grzenczyk, Esq.
Girard Gibbs LLP
601 California Street Suite 1400
San Francisco, CA 94108

Re:   *In re Lidoderm Antitrust Litigation Settlement Administration*
      Class Action Settlement Administration Services Estimate

Dear Scott,

We appreciate the opportunity to submit this revised proposal and cost estimate for class action administration services pertaining to the *In re Lidoderm Antitrust Litigation Settlement Administration*.

For the purposes of this proposal, we applied the following assumptions with respect to KCC's duties:

- Email the Summary Notice to approximately 1,000 entities included in KCC's Third Party Payor database;
- Print and mail an 8-page Notice to approximately 47,714 entities included in KCC's Third Party Payor database, which, generally speaking, includes life insurance and health insurance companies, fully insured health and welfare groups, fully and partially self-funded health and welfare groups (such as several of the named plaintiffs in this litigation), as well as third party administration companies;
- Conduct address searches for any Notices returned as undeliverable and re-mail to any new found address;
- KCC Legal Notification Services will implement a media plan designed to reach 80% of the consumer class;
- The Third Party Payor direct notice effort will be supplemented with notice placements in a set of relevant trade journals;
- Establish and maintain a case website that will contain relevant case documents, important dates, frequently asked questions and allow class members to file claims online;
- Process opt-outs and provide a Declaration of Notice Procedures to the parties indicating our compliance with the noticing efforts;
- Provide automated telephone support with the option to punch-through to a live operator to handle any class member inquiries and fulfill notice packet requests; and
- Process all claims received and issue checks to class members who submit an approved claim, as appropriate.

In addition, we have included unit rates for an optional second disbursement of checks, and KCC Legal Notification Services has provided several media campaign options, as described below and in the attached *Notice Plan Highlights*.

With experience administering more than 6,000 settlements, KCC provides high-quality and cost-effective class action settlement administration services including pre-settlement consulting, settlement funds escrow, class member data management, legal notification, call center support, claims administration as well as disbursement and tax reporting services. We are a knowledgeable partner who proactively works with you throughout the settlement administration process and are well-positioned to handle your matter immediately.

Our domestic infrastructure, the largest in the industry, includes a 1,200-seat call center and document production capabilities that handle hundreds of millions of documents annually. Last year, our disbursement services team distributed $500 billion to payees in the form of 29 million checks and 11 million electronic transfers.

**KCC**

Please contact me with any questions regarding the enclosed case assumptions and cost estimate. We will hold this proposal and estimate open for ninety days from the date of this letter. Thank you for your time and consideration.

Sincerely,                                                Sincerely,

Robert P. DeWitte                                   Jenny Trang
Senior Director, Class Action Services     Director, Class Action Services
KCC LLC                                                KCC LLC
Tel: (312) 768-5499                                Tel: (212) 805-7306
Cell: (773) 791-4510                               Cell: (718) 753-1314
Email: rdewitte@kccllc.com                   Email: jtrang@kccllc.com

## COST SUMMARY & SCOPE OF SERVICES

| Description | Estimated Cost |
|---|---|
| Class Member Data Management | $3,000 |
| Legal Notification | $417,138 |
| Telephone Support | $10,691 |
| Claims Administration | $106,955 |
| Disbursement & Tax Reporting | $43,956 |
| **Sub-Total Administration Costs** | **$581,740** |
| Plus Estimated Postage | $59,322 |
| **Total Estimated Cost** | **$641,062** |
| **Less Escrow Discount** | **($40,000)** |
| **Total Estimated Cost, with Discount** | **$601,062** |
| **Class Certification Notice Costs Incurred** | **$385,000** |

The final cost of the administration depends primarily on, among other variables, the total number of claims processed and the manner by which they are filed, as well as whether documentation must be reviewed. If so, that review will be performed at standard hourly rates.

The escrow discount is contingent on KCC being both Escrow Agent and Settlement Administrator.

## OPTIONAL SERVICES

Second Disbursement – TBD, expected to be similar to initial distribution. Costs could vary based on postage changes and counsel's instructions.

Media Campaign Options – TBD

## CLASS MEMBER DATA MANAGEMENT

**Data and Forms Management**
We will utilize the data developed and updated in the class certification notice campaign throughout the administration process. Prior to mailing, the addresses will be updated using the National Change of Address System ("NCOA") to increase mail deliverability and accuracy. Our estimate assumes that the class member data will be delivered in one electronic file in a complete and accurate form.

We will format all relevant documents and will send all document proofs to you for approval prior to printing.

**Third Party Payor Database**
Third Party Payors will be reached by direct mail to entities included in the same TPP database used for class certification notice.

This effort will be supplemented by notice placements in trade journals targeting Third Party Payors, as described in additional detail below.

## LEGAL NOTIFICATION

**Email Notice (Recommended Addition to Class Certification Notice Strategies)**
We will deliver the Summary Notice to approximately 1,000 entities in KCC's Third Party Payor database. The email will be the Summary Notice in the body of the email rather than an attachment, as attaching the notice will cause a significant number of emails to be blocked by service providers. The email will contain a link to the settlement website.

**Print and Mail Notice**

The TPP notice will be sent in a #10 envelope and will include an 8-page Notice.

The notice will be mailed to TPP class members via First Class U.S. mail. All notices that are returned by the postal service with a forwarding address will be re-mailed to the new address and the class member list will be updated accordingly.

**Address Searches and Re-mails**

We will track all returned undeliverable mail and conduct address searches using credit bureau information for all returned mail that does not have a forwarding address. We will re-mail to the class members for whom we locate updated address information.

**Media Campaign – 80% Reach**

KCC's Legal Notification Services will produce and place the Summary Notice in the following:

Consumer Media

- *People*; 1/3-page ad
- *Good Housekeeping*; 1/3-page ad
- Internet banner ads using Google Display Network, Yahoo! and Facebook – 157,500,000 impressions

TPP Media

- *HR Magazine*; 1/2-page ad
- Internet banners on LifeHealthPro.com / Life Health Channel on ThinkAdvisor (60,000 impressions) and SHRM.org (approximately 66,845 impressions)
- E-newsletters via LifeHealth Pro Daily E-newsletter (1 week / 5 days) and HR Daily E-newsletter (1 day)

**Website Set-up and Maintenance**

We will establish and maintain a case-specific website incorporating important court documents, dates, FAQs, forms and other pertinent case information.

The option to file claims online will be provided, and KCC will provide a template to guide TPP claimants in particular in completing their claim forms and submitting the required substantiating documentation. KCC will work with the parties to ensure that the required information is provided in order for a class member to file a claim online.

**Opt-Out Processing & Declaration of Notice Procedures**

We will process any Requests for Exclusion, and provide copies to counsel and the Court. We will prepare a Declaration of Notice Procedures to report our compliance with all class notification requirements.

**TELEPHONE SUPPORT**

**Automated Call Support**

We will set up a toll-free automated Interactive Voice Response (IVR) system through which class members can access settlement information (via menu-driven Q&A's) and facilitate Notice Packet requests.

The option for callers to "punch-through" to a live operator will be provided. Our 1,200-seat call center is staffed by trained specialists who will be available from 9 a.m. Eastern Time to 8 p.m. Eastern Time, although they can be available 24 hours, 7 days a week at an additional cost. Our specialists will utilize a case-specific script in order to answer frequently asked questions and assist with Notice Packet requests. When legal concerns arise, we will forward them to Counsel or designated party.



Our estimate assumes that 10% of callers will punch through to a live operator. The punch-through rate will depend on, primarily, the accessibility of the punch-through option.

## CLAIMS ADMINISTRATION

We will ensure that all settlement agreement requirements have been satisfied and approve or deny individual class claims. After processing, we will provide the appropriate parties with the approved claimants list, including the distribution calculations for each claim. Claimants with rejected claims will be sent a Notice of Rejected Claim.

Per the Client's request, we have estimated a consumer claims filing rate of 2% and that 800 TTP claims will be filed, of which 90% will be filed online and 10% will be filed by postal mail. Of the claims filed by mail, we have assumed that 5% will be deficient.

## DISBURSEMENT AND TAX REPORTING

### Disbursement
We will obtain a Taxpayer ID number for the settlement fund and open the settlement fund bank account. We will make distributions to the claimants, attorneys and named plaintiffs, as applicable, in accordance with the terms of the settlement agreement. Our disbursement services include:
- An 8 ½" x 11" sheet with the check printed on safety paper on the bottom one-third and a transmittal letter printed on the top two-thirds;
- Through the Positive Pay system, we will regularly monitor the account for potential fraud;
- Daily updates of the check register to respond to claimant requests for misplaced checks and daily account reconciliation; and
- Processing stop payment/re-issue requests, tracking and re-mailing undeliverable checks.

### Tax Reporting
All required taxes will be paid from the settlement fund, and we will work with a CPA firm to file all necessary tax returns.

## OPTIONAL SERVICES

### Second Disbursement
We will issue a second distribution of checks to class members, as required.

## MEDIA CAMPAIGN OPTIONS

KCC Legal Notification Services has provided the following media campaign options, as described further in the attached *Notice Plan Highlights*.

| Description | Estimated Cost |
|---|---|
| Half-Page Consumer Magazines (Incremental Cost) | $55,015 |
| Third Party Poster Notice | TBD |
| Subpoena Information Mailing / Emailing | TBD |
| *ThinkAdvisor Life/Health* Co-Branded Email – Based on 80k Recipients | $9,912 |
| A/B or Split Testing | $2,500 |
| Targeted Internet – 10% Shift of Impressions (Incremental Cost) | $40,532 |
| Retargeted Internet (Based on Conversion Tracking with Initial Internet Campaign) | $5,883 |
| Paid Search – Google.com | $5,253 |
| Native Advertising – 6.25M Impressions Over 30 Days | $29,612 |
| Social Media Monitoring | $5,000 |
| Press Releases (Based on 400 Words, 3 Insertions) | $2,877 |

**KCC**

## PROPOSED TIMELINE

The notice schedule contemplates notice commencing approximately 30 days after preliminary approval.

| Day | Event |
| --- | --- |
| Day 1 | Preliminary Approval Granted |
| Days 30-45 | Direct Notice Issued to TPPs via Mail and Email |
| Days 31-61 | 157.5 Million Internet Banner Impressions Targeted Nationally to A45+ are Distributed Over Google Display Network, Yahoo! ad network and Facebook (30-day duration) |
| Days 31-61 (approx.) | 60,000 Internet Banner Impressions Run on ThinkAdvisor.com/Life-Health Channel (30-day duration) |
| Days 31-61 (approx.) | 66,845 Internet Banner Impressions Run on SHRM.org (30-day duration) |
| Days 35-60 (approx.) | *HR Magazine* On Sale |
| Day 45 (approx.) | *People* On Sale |
| Day 45 (approx.) | *HR Daily* E-Newsletter Issued |
| Days 45-50 (approx.) | *ThinkAdvisor Life/Health Daily* E-Newsletter Issued (5 days) |
| Day 90 (approx.) | *Good Housekeeping* On Sale |
| Day 120 (or later) | Exclusion & Objection Deadline |
| Day 120 (or later) | Claims Deadline |
| Day 120 (or later) | Final Approval Hearing |



**Administration Services Estimate**
*In re Lidoderm Antitrust Litigation Settlement Administration*
June 7, 2018
Robert P. DeWitte; RDeWitte@kccllc.com; 773.791.4510

| Key Assumptions Used in Estimate Preparation | |
|---|---|
| Estimated Size of Class: | 4,000,000 |
| Count in TPP Database with Postal Address: | 47,714 |
| Count in TPP Database with Email Address: | 1,000 |
| | |
| Case Duration: | 24 months |
| # of Electronic, Finalized Data Files Provided (Excel, Access, etc.): | 1 file(s) |
| | |
| CAFA Notice Required? | No |
| | |
| Claims Processing: | Yes |
| Address Searches: | Yes |
| % of returned notices to be forwarded: | 1% |
| % of returned undeliverable notices: | 10% |
| % of successful address searches: | 60% |
| Media Campaign Required: | Yes |
| Expert Media Services: | No |
| Translations Required: | No |
| # of Email Campaigns: | 1 |
| Reminder Mailing: | No |
| | |
| Duration of Claims Filing Period: | 8 weeks |
| Business Reply Mail ("BRM" or 'pre-paid' postage): | No |
| Documentation required to file a claim: | No (Pricing Separated) |
| # of claims to be filed from TPP: | 800 claims |
| % of consumers to file a claim: | 2% |
| % of claims filed online: | 90% |
| % of claims filed by postal mail: | 10% |
| % of deficient claims filed by postal mail: | 5% |
| | |
| Type of Telephone Support: | IVR w/ Punchthrough |
| # of calls estimated: | 2,500 calls |
| % of callers that will punch through to a Live Operator: | 10% |
| % of callers that will request a Notice Packet: | 5% |
| Duration of Telephone Support: | 24 months |
| | |
| Type of Website Support: | Dynamic |
| Online Claims Filing: | Yes |
| Duration of Website Support: | 24 months |

| SUMMARY OF COSTS | |
|---|---|
| Estimated # of Claims Filed: | 80,800 |
| Notice Procedures | **$420,138** |
| Telephone Support | **$10,691** |
| Claims Administration | **$106,955** |
| Disbursements & Tax Reporting | **$43,956** |
| Sub-Total Administration Costs | **$581,740** |
| Plus Estimated Postage* | **$59,322** |
| Total Estimated Cost** | **$641,062** |
| LESS ESCROW DISCOUNT**** | (**$40,000**) |
| Total Est. Cost, with Discount** | **$601,062** |
| | |
| Class Certification | **$385,000** |
| | |
| Additional Services | |
| 2nd Disbursement | TBD |
| *See Below for Additional Media Considerations* | |

| BLENDED HOURLY RATE | RATE PER UNIT |
|---|---|
| **KCC Blended Hourly Rate** | **$100.00 /hour** |

For purposes of this estimate, KCC has applied and will bill at a blended hourly rate of $100 per hour to all hours estimated pursuant to the scope of work outlined above. For any work outside of this defined scope, we will apply and bill our Standard Hourly Rates, which are specified below.

| NOTICE PROCEDURES | RESPONSE RATE | QUANTITY | RATE PER UNIT | ESTIMATED COST | TOTAL |
|---|---|---|---|---|---|
| **Third Party Payor Database** | | | | | |
| - Database Development | | 47,714 units | | *(waived)* | |
| Sub-total of Third Party Payor Database | | | | | *(waived)* |
| | | | | | |
| **Data and Forms Set-up** | | | | | |
| - Set up Case Management System | | 5 hrs | $100.00 | $500 | |
| - Data Work and Updates to Third Party Payor Database | | 10 hrs | $100.00 | $1,000 | |
| - Format Document(s) | | 15 hrs | $100.00 | $1,500 | |
| Sub-total of Data and Forms Set-up | | | | | $3,000 |
| | | | | | |
| **Email Campaign - TPP Database** | | | | | |
| - Email Service | | 1,000 units | | $1,000 | |
| - Email Campaign Management | | 10 hrs | $100.00 | $1,000 | |
| Sub-total of Email Campaign - TPP Database | | | | | $2,000 |
| | | | | | |
| **Print/Mail Notice Packet - TPP Database** | | | | | |
| - NCOA Updates | | 47,714 units | | $250 | |
| - 8-page Notice, #10 Outer Envelope | | 47,714 units | $0.40 | $19,086 | |
| - Print Production Management | | 10 hrs | $100.00 | $1,000 | |
| - Forwarding of Returned Mail with USPS Forwarding Addresses | 1% | 477 units | $1.15 | $549 | |
| - Data Entry for Re-mails to New Addresses | | 477 units | $0.50 | $239 | |
| - Returned Undeliverable Mail | 10% | 4,771 units | $0.10 | $477 | |
| Sub-total of Print/Mail Notice Packet - TPP Database | | | | | $21,600 |



**Administration Services Estimate**
*In re Lidoderm Antitrust Litigation Settlement Administration*
June 7, 2018
Robert P. DeWitte; RDeWitte@kccllc.com; 773.791.4510

| | | | | | |
|---|---|---|---|---|---|
| **Address Searches/Re-mails** | | | | | |
| - Number of Address Searches Performed | | 4,771 units | $0.50 | $2,386 | |
| - Number of New Addresses Found | 60% | 2,863 units | | | |
| - Re-mails to Found Addresses | | 2,863 units | $1.15 | $3,292 | |
| - Staff Time for Address Searches/Re-mails | | 5 hrs | $100.00 | $500 | |
| Sub-total of Address Searches/Re-mails | | | | | **$6,178** |
| | | | | | |
| **Media Campaign****** | | | | | |
| Media Campaign - Estimated 80% Reach | | | | $365,085 | |
| - Please see attached *Highlights of Settlement Notice Program Recommendation* for details | | | | | |
| Sub-total of Media Campaign**** | | | | | **$365,085** |
| | | | | | |
| **Website Set-up & Maintenance** | | | | | |
| - Design & Set up Dynamic Website | | 50 hrs | $100.00 | $5,000 | |
| - Domain Registration (5 yrs/Privacy Registration) | | | | $175 | |
| - Maintenance | | 24 hrs | $100.00 | $2,400 | |
| - Server Space rental | | 24 mos | $50.00 | $1,200 | |
| Sub-total of Website Set-up & Maintenance | | | | | **$8,775** |
| | | | | | |
| **Case Management, Opt Out Processing, and Declaration of Notice Procedures** | | | | | |
| - Case Management | | 100 hrs | $100.00 | $10,000 | |
| - Case Processing: Opt-Out / Objection / Correspondence | | 250 units | | | |
| - Staff Hours - Case Processing | | 25 hrs | $100.00 | $2,500 | |
| - Declaration of Notice Procedures | | 10 hrs | $100.00 | $1,000 | |
| Sub-total of Case Management, Opt Out Processing, and Declaration of Notice Procedures | | | | | **$13,500** |
| | | | | | |
| SUB-TOTAL OF NOTICE PROCEDURES | | | | | **$420,138** |

| TELEPHONE SUPPORT | RESPONSE RATE | QUANTITY | RATE PER UNIT | ESTIMATED COST | TOTAL |
|---|---|---|---|---|---|
| **Automated Call Support** | | | | | |
| - Toll Free Phone Line & System Set-up Cost | | | | $3,750 | |
| - Script Drafting and Management | | 15 hrs | $100.00 | $1,500 | |
| - Monthly Maintenance Fees | | 24 mos | $50.00 | $1,200 | |
| - Estimated # of Calls | | 2,500 calls | | | |
| - Average Call Duration (minutes) | | 3 mins | | | |
| - IVR Line Charges | | 7,500 mins | $0.18 /min | $1,350 | |
| - Projected # of Punchthroughs to Live Operator (% of Calls) | 10% | 250 calls | | | |
| - Average Call Duration (minutes) | | 3 mins | | | |
| - IVR Transfer Line Charges | | 750 mins | $0.18 /min | $135 | |
| - Live Operator Line Charges | | 750 mins | $1.25 /min | $938 | |
| - Long-Form Notice Packet Requests | 5% | 125 units | | | |
| - Fulfill Notice Packet Requests | | 125 units | $1.15 | $144 | |
| - Print Production Management | | 4 hrs | $100.00 | $400 | |
| - Transcriptions | | 125 units | $0.60 | $75 | |
| - Staff Time Downloading Transcribed Data (30 min/month x 24 months) | | 12 hrs | $100.00 | $1,200 | |
| | | | | | |
| SUB-TOTAL OF TELEPHONE SUPPORT | | | | | **$10,691** |

| CLAIMS ADMINISTRATION | RESPONSE RATE | QUANTITY | RATE PER UNIT | ESTIMATED COST | TOTAL |
|---|---|---|---|---|---|
| - Estimated # of TPP Claims | | 800 claims | | | |
| - Estimated # of Consumer Claims | 2% | 80,000 claims | | | |
| **Estimated # of Claims** | | **80,800 claims** | | | |
| **Process Claims Filed Online** | 90% | 72,720 claims | $0.50 | $36,360 | |
| **Process Claims Filed by Postal Mail** | 10% | 8,080 claims | | | |
| - Staff Hours Processing Claims | | 270 hrs | $100.00 | $27,000 | |
| - Data Entry & Claim Scoring Set-up | | | | $895 | |
| - Open/Image/Data Enter Forms | | 8,080 claims | $1.85 | $14,948 | |
| **Third Party Payor - File Loading** | | 800 claims | | | |
| - Staff Hours Loading & Reviewing Third Party Payor Claims | | 200 hrs | $100.00 | $20,000 | |
| **Documentation Review (If Requested)** | | | | | |
| - Staff Hours Reviewing Documentation | | TBD hrs | $100.00 | TBD | |
| **Deficient Claims filed by Postal Mail** | 5% | 404 claims | | | |
| - Print/Mail Deficiency Letters | | 404 units | $1.25 | $505 | |
| - Staff Hours Processing Deficiencies | | 55 hrs | $100.00 | $5,500 | |
| - Open/Image/Data Enter Forms | | 404 units | $1.85 | $747 | |
| **Status Reports** | | 10 hrs | $100.00 | $1,000 | |
| | | | | | |
| SUB-TOTAL OF CLAIMS ADMINISTRATION | | | | | **$106,955** |



**Administration Services Estimate**
*In re Lidoderm Antitrust Litigation Settlement Administration*
June 7, 2018
Robert P. DeWitte; RDeWitte@kccllc.com; 773.791.4510

| DISBURSEMENTS & TAX REPORTING | RESPONSE RATE | QUANTITY | RATE PER UNIT | ESTIMATED COST | TOTAL |
|---|---|---|---|---|---|
| Funds Management, Obtain Tax ID | | 10 hrs | $100.00 | $1,000 | |
| Distribution Calculations & Prep | | 15 hrs | $100.00 | $1,500 | |
| Print/Mail Checks | | 80,800 cks | $0.40 | $32,320 | |
| Distribution Management | | 10 hrs | $100.00 | $1,000 | |
| Returned Undeliverable Checks | 1% | 808 units | | | |
| - Handling of Returned Undeliverable Mail | | 10 hrs | $100.00 | $1,000 | |
| Reissue Checks | 1% | 808 cks | $4.50 | $3,636 | |
| Post-Distribution Follow-up & Reports | | 15 hrs | $100.00 | $1,500 | |
| Settlement Fund Tax Returns (annual) | | 2 yrs | $1,000.00 | $2,000 | |
| | | | | | |
| SUB-TOTAL OF DISBURSEMENTS & TAX REPORTING | | | | | $43,956 |
| | | | | | |
| SUB-TOTAL ADMINISTRATION COSTS | | | | | $581,740 |
| Plus Estimated Postage* | | | | | $59,322 |
| TOTAL ESTIMATED COST** | | | | | $641,062 |
| | | | | | |
| LESS ESCROW DISCOUNT**** | | | | | ($40,000) |
| TOTAL ESTIMATED COST, WITH DISCOUNT | | | | | $601,062 |

| CLASS CERTIFICATION | RESPONSE RATE | QUANTITY | RATE PER UNIT | ESTIMATED COST | TOTAL |
|---|---|---|---|---|---|
| Pre-Settlement Class Certification Work | | | | | |
| - Estimated Costs Incurred from Class Certification Work | | | | $385,000 | |
| Sub-total of Pre-Settlement Class Certification Work | | | | | $385,000 |
| | | | | | |
| SUB-TOTAL OF CLASS CERTIFICATION | | | | | $385,000 |

| OPTIONAL 2ND DISBURSEMENT | RESPONSE RATE | QUANTITY | RATE PER UNIT | ESTIMATED COST | TOTAL |
|---|---|---|---|---|---|
| Funds Management | | TBD hrs | $100.00 | TBD | |
| Distribution Calculations & Prep | | TBD hrs | $100.00 | TBD | |
| Print/Mail Checks | | TBD cks | $0.40 | TBD | |
| Distribution Management | | TBD hrs | $100.00 | TBD | |
| | | | | | |
| SUB-TOTAL OF OPTIONAL 2ND DISBURSEMENT | | | | | TBD |

| MEDIA CAMPAIGN OPTIONS | RESPONSE RATE | QUANTITY | RATE PER UNIT | ESTIMATED COST | TOTAL |
|---|---|---|---|---|---|
| Media Campaign Considerations | | | | | |
| - Half Page Consumer Magazines (Incremental Cost) | | | | $55,015 | |
| - Third Party Poster Notice | | | | TBD | |
| - Subpoena Information Mailing / Emailing | | | | TBD | |
| - *ThinkAdvisorLife/Health Co*-Branded Email - based on 80k recipients | | | | $9,912 | |
| - A/B or Split Testing | | | | $2,500 | |
| - Targeted Internet - 10% shift of impressions (Incremental Cost) | | | | $40,532 | |
| - Retargeted Internet (based on conversion tracking with initial internet | | | | $5,883 | |
| - Paid Search - Google.com | | | | $5,253 | |
| - Native Advertising - 6.25 million impressions over 30 days | | | | $29,612 | |
| - Social Media Monitoring | | | | $5,000 | |
| - Press Releases - based on 400 words | | 3 times | | $2,877 | |
| Sub-total of Media Campaign Considerations | | | | | TBD |

| STANDARD HOURLY RATES | | | | RATE PER UNIT | |
|---|---|---|---|---|---|
| KCC Standard Hourly Rates | | | | | |
| - Principal | | | | $290.00 /hour | |
| - Director | | | | $235.00 /hour | |
| - Sr. Manager | | | | $185.00 /hour | |
| - Manager | | | | $160.00 /hour | |
| - Supervisor | | | | $120.00 /hour | |
| - Staff | | | | $60.00 - $85.00 /hour | |



**Administration Services Estimate**
*In re Lidoderm Antitrust Litigation Settlement Administration*
June 7, 2018
Robert P. DeWitte; RDeWitte@kccllc.com; 773.791.4510

| OTHER SERVICES AND OUT-OF-POCKET EXPENSES | RATE PER UNIT |
|---|---|
| Other Services and Ad Hoc Reporting, as needed or requested | (standard hourly rates) |
| Other Charges and Out-of-Pocket Costs*** | (actual) |

\* Estimated Postage and Handling. Postal Rates are scheduled to increase in January 2018.
\*\* Does not include applicable taxes or escheatment services.
\*\*\* Includes, but is not limited to long distance calls, overnight shipping, photocopies, storage, PO Box rentals, broker fees, etc.
\*\*\*\* Escrow Discount is to be applied only if KCC is selected as both Escrow Agent and Settlement Administrator.

This Class Action Administration Services Estimate and the attached Cost Summary & Scope of Services (together, the "Proposal") are valid for ninety days from 6/7/2018.  After such period, KCC reserves the right to amend the Proposal (including, without limitation, by increasing fees and costs) or to withdraw the Proposal in its sole discretion.

All services to be provided to the undersigned (the "Client") and all fees and costs set forth in the Proposal are subject to the terms, specifications, assumptions and conditions set forth in the Proposal and the attached Terms and Conditions (the "Terms of Service"). The estimated fees and charges in the Proposal are based on certain information provided to KCC as well as significant assumptions. Accordingly, this estimate is not intended to limit KCC's actual fees and charges, which may be less or more than estimated due to the scope of actual services or changes to the underlying facts or assumptions.

KCC Class Actions Services, LLC

BY: _____        DATE: _____

TITLE: _____


Girard Gibbs LLP

BY: _____        DATE: _____

TITLE: _____



**Legal Notification Services**

_____

*In re Lidoderm Antitrust Litigation*
No. 14-md-2521-WHO (N.D. Cal.)

# Highlights of Settlement Notice Program Recommendation

**Prepared: March 12, 2018**

© 2018 KCC LLC
Proprietary and Confidential

# Table of Contents

Page

About KCC ............................................................................................................. 3

Expert Services ..................................................................................................... 4

Case Overview ...................................................................................................... 5

TPP and EPP Entity Notice Plan ........................................................................... 8

Consumer Notice Plan ......................................................................................... 11

Response Mechanisms ........................................................................................ 17

Optional Notice Plan Considerations ................................................................... 18

Notice Schedule ................................................................................................... 21

Conclusion ........................................................................................................... 22

## About KCC

**KCC Legal Notification Services**

KCC designs and implements defensible media campaigns and employs notice methods that satisfy due process requirements as well as applicable federal and state laws. KCC has been involved with some of the largest and most complex legal notification programs in the United States, Canada, and across the globe, including several significant antitrust cases.

Consistent with the judicial standards set forth by *Daubert* and *Kumho* and as illustrated in the Federal Judicial Center's (FJC) *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, KCC utilizes the same practices and statistical analyses that are relied upon in the advertising industry when designing and measuring the effectiveness of the notice programs they develop.

## Expert Services

**Expert Services**

Our Legal Notification Services include:

**Pre-Settlement Consulting**
- Review and advise clients of any potential obstacles relative to class definition or legal notification processes
- Develop a noticing plan strategy
- Provide judicial decisions that are relevant to the case or terms of the settlement

**Demographic Analysis**
- Define the target audience through research and analysis of class demographics
- Identify the geographic location of potential class members giving specific consideration to the class period
- Research class member media usage to define the communication channels that will be most effective

**Notice Programs**
- Create custom notice programs that incorporate media such as newspapers, magazines, trade journals, radio, television, social media and the internet to meet due process requirements
- Develop press releases, social media enhancements, and broadcast public service announcements (PSAs) as needed
- Track media activity to verify the adequacy of placements

**Plain Language Communication**
- Consider audience's level of understanding and devise communications strategy accordingly
- Design, draft and distribute plain-language notices that capture attention and are easily understood by class members
- Incorporate response mechanisms, such as a toll-free number, case website address, and/or QR code into notice documents

**Expert Testimony**
- Provide defensible opinions and testimony to verify the effectiveness of notice programs
- Supply proof of performance for each notice served, as required by the courts
- Provide evidence and judicial decisions to overcome objections

## Case Overview

### Case Analysis

This Notice Plan is submitted by KCC's Legal Notification Services in connection with *In re Lidoderm Antitrust Litigation*, No. 14-md-2521 in the United States District Court for the Northern District of California. This Notice Plan describes KCC's proposed efforts to provide notice of settlement to potential class members, including end purchaser payors (EPPs) and third-party payors (TPPs). In the pages that follow, KCC has also provided supplemental notice program options. The following known factors were considered when designing our recommendations:

1. The exact number of class members is unknown; however, the class consists of approximately 4,400,000 class members, in addition to TPPs.
2. While the class is limited to persons and entities that paid and/or provided reimbursement for Lidoderm purchases made in Arizona, California, Florida, Kansas, Maine, Massachusetts, Minnesota, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, or Wisconsin (the "Class States"), class members may have since relocated outside of the Class States, or may have only purchased the product from locations in the Class States during the class periods. Therefore, class members are likely located throughout U.S. and its territories, including large cities and rural areas.
3. Patient privacy issues may preclude the compilation and use of unsolicited mailings to individual medical patients without their authorization; therefore, individual class members must likely be reached through a consumer media campaign.
4. Comprehensive mailing lists of relevant entities are available, and do not implicate similar privacy concerns.
5. Effective reach and notice content is vital to convey the importance of the information affecting Class members' rights, as well as to withstand challenge and collateral review.

### Objective

To design a notice program that will effectively reach Class members and capture their attention with notice communicated in clear, concise, plain language. The FJC's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* considers 70-95% reach among class members reasonable.

### Class Details

EPPs consist of employee health and welfare benefit plans, municipal corporations, employee unions (EPP Entities) and individuals (consumers) who purchased brand or generic Lidoderm from third parties, not from defendants directly. This case seeks to certify the following EPP and TPP class:

(a) All persons and entities in the United States and its territories who, in Arizona, California, Florida, Kansas, Maine, Massachusetts, Minnesota, Nevada, New Hampshire, New Mexico, New York,

© 2018 KCC LLC
Proprietary and Confidential

North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, or Wisconsin ("Class States") for consumption by themselves or their family member, or by their insureds, plan participants, or beneficiaries, paid and/or provided reimbursements for some or all of the purchase price of:

      i.   Branded Lidoderm for the time period August 23, 2012 through September 14, 2013; and/or

     ii.   AB-rated generic Lidoderm for the time period September 15, 2013 through August 1, 2014;

– and –

(b) TPPs CVS Caremark, Cigna, Envision Pharmaceutical Services, MedImpact Healthcare Systems, Inc., Comprehensive Health Management, Inc. Part D, and Express Scripts Senior Care to the extent they provided, under their Medicare Part D plans, reimbursements for some or all of the price of branded Lidoderm purchased in Class States for the time period September 15, 2013 through August , 2014.

Excluded from the Class are:

(a) Defendants and their officers, directors, management, employees, subsidiaries, and affiliates;

(b) Those who, after September 15, 2013, paid and/or provided reimbursements for branded Lidoderm and did not purchase or reimburse for generic Lidoderm, except third-party payors CVS Caremark, Cigna, Envision Pharmaceutical Services, MedImpact Healthcare Systems, Inc., Comprehensive Health Management, Inc. Part D, or Express Scripts Senior Care for their Part D insurance;

(c) Government entities, other than government-funded employee benefit plans;

(d) Fully insured health plans (*i.e.*, plans that purchased insurance that covered 100 percent of the plan's reimbursement obligations to all of its members);

(e) "Single flat co-pay" consumers who purchased Lidoderm or generic Lidoderm only via a fixed dollar co-payment that does not vary on the basis of the purchased drug's status as branded or generic (*e.g.*, $20 for both branded and generic drugs);

(f) "Flat generic co-pay" consumers who, after September 15, 2013, purchased generic Lidoderm via a fixed dollar co-payment (*e.g.*, $10 for generic drugs) regardless of the co-payment applicable to branded drugs;

(g) Consumers who purchased or received Lidoderm or its AB-rated generic equivalent through a Medicaid program only;

(h) Pharmacy benefit managers; and

(i) The judges in this case and members of their immediate families.

## Summary of Proposed Settlement Notice Strategies

The strategies for reaching the class are set forth below:

1. **Direct Notice to TPPs and EPP Entities**: TPPs and EPP entities will be reached via direct mail to a database compiled by KCC inclusive of pharmacies and script services, life and health insurance companies, fully insured health and welfare groups, and fully and partially self-funded health and welfare groups, as well as third-party administration companies. The database is

compiled by researching and accessing updated records from various databases identified as containing TPP and EPP entity mailing information and updated each time it is used for notice purposes.

2. **Paid Media to EPP Entities**: The direct mail effort will be supplemented by notice placements in trade media targeting EPP Entities, as described below.

3. **Paid Media Notice to EPP Consumers**: EPP Consumers will be reached via summary notice placements in well-read consumer magazines and internet banner ads placed on a variety of websites, including the social media site Facebook. To maximize the options available to counsel, supplemental notice plan recommendations have been suggested.

## Plan Delivery

The recommended settlement Notice Plan will reach virtually all TPP and EPP Entity class members.

To reach consumer class members, a media plan has been developed to reach at least 80% of likely consumer class members on average 2.5 times each.

## TPP and EPP Entity Notice Plan

**Proposed Notice Tactics to Reach TPPs and EPP Entities**

The following notice tactics are recommended to best reach TPPs and EPP Entities:

1. **Direct Notice:** Notice will be sent to all entities contained in KCC's proprietary database of pharmacies and script services, life and health insurance companies, fully insured health and welfare groups, and fully and partially self-funded health and welfare groups, as well as third-party administration companies.

   ➤ *Email Addresses*
   To supplement the TPP notice effort, an Email Notice containing a summary of the litigation in the body of the email as well as a link to the case website can also be sent to all available email addresses in the database. It is our understanding that email addresses are available for approximately 1,000 TPP/EPP Entity class members.

   ➤ *Postal Addresses*
   A Postcard Notice will be mailed to all available postal addresses in KCC's database.

   Prior to mailing, the names and addresses will be:
   - Checked against the United States Postal Service (USPS) National Change of Address (NCOA)[1] database;
   - Certified via the Coding Accuracy Support System (CASS);[2] and
   - Verified through Delivery Point Validation (DPV).[3]

   Notices returned as undeliverable will be re-mailed to any address available through postal service information. For example, to the address provided by the USPS on returned pieces for which the automatic forwarding order has expired, but is still within the period that the USPS returns the piece with the new address indicated. Any returned mailing that does not contain an expired forwarding order with a new address indicated may be researched through a third-party look-up service, if applicable.

2. **Trade Journals:** To extend reach among EPP Entities, we recommend placing a half-page summary notice in *HR Magazine*.[4]

---

[1] The NCOA database contains records of all permanent change of address submissions received by the USPS for the last four years. The USPS makes this data available to mailing firms and lists submitted to it are automatically updated with any reported move based on a comparison with the person's name and last known address.

[2] Coding Accuracy Support System is a certification system used by the USPS to ensure the quality of ZIP+4 coding systems.

[3] Records that are ZIP + 4 coded are then sent through Delivery Point Validation to verify the address and identify Commercial Mail Receiving Agencies. DPV verifies the accuracy of addresses, and reports exactly what is wrong with incorrect addresses.

[4] *HR Magazine* does not offer a third-page ad unit.



- Official publication of the Society for Human Resource Management
- Offers the largest total qualified circulation of all HR-related publications
- Total Circulation: 286,078 (includes print and digital)
  - Executive-level, paid subscribers: 108,924
  - Manager-level, paid subscribers: 88,352
  - Administrative-level, paid subscribers: 25,877
  - Other paid subscribers: 53,797

3. **Trade Websites:** Coverage may be further extended through the use of advertising on trade websites.

| Trade Website | Duration | Notice Size | Impressions |
|---|---|---|---|
| *ThinkAdvisor.com/Life-Health* | One Month | 300x250 728x90 | 60,000 |
| *SHRM.org* | One Month | 300x600 | 66,845 |
| **TOTAL** | | | **126,845** |



- ThinkAdvisor's Life/Health channel provides insurance agents and investment advisors with comprehensive coverage of the products and services necessary to guide clients in making life, health, and wealth decisions.
- The Life/Health Channel audience includes 145,000 monthly unique visitors and over 415,000 page views per month
- Trusted source for breaking news, investigative features, opinions, analysis, and research
- Notice will appear across all ThinkAdvisor content related to the Life/Health channel on ThinkAdvisor.com (Run of Channel)

![SHRM logo - SOCIETY FOR HUMAN RESOURCE MANAGEMENT]

- Official website of the Society for Human Resource Management

- Audience includes over 1.6 million monthly unique visitors and over 6.3 million page views per month
- Content updated throughout the day
- Notice will appear across the entire SHRM.org website (Run of Site)

4. **Trade E-Newsletters:** Coverage to may be further extended through the use of advertising on digital newsletters, also called e-newsletters.

| Trade E-Newsletter | Duration | Notice Size | Opt-In Subscribers |
|---|---|---|---|
| *ThinkAdvisor Life/Health Daily* | One Week (Five Days) | 468x60 logo<br>Three (3) 300x250 ad units<br>"About Us" placement | 83,000 |
| *HR Daily* | One Day | 580x110 | 291,000 |
| **TOTAL** | | | **374,000** |



- Official daily e-newsletter of ThinkAdvisor's Life/Health channel
- Provides up-to-the-minute news coverage, analysis, and trends
- Each sponsorship opportunity is exclusive – no other advertiser appears during the selected week
- Notice includes a top-banner logo, three (3) 300x250 banners between content, and an "About Us" placement that includes a 100-character headline, 500-character body text, and 75x75 image

![SHRM Society for Human Resource Management logo]

- *HR Daily* is the official daily e-newsletter of the Society for Human Resource Management
- Reaches more than 291,000 SHRM members each weekday and an average audience of 423,000
- Notice includes one weekday insertion

© 2018 KCC LLC
Proprietary and Confidential

## Consumer Notice Plan

Mailings to the consumer class may not be possible due to legal and privacy issues. As a result, KCC recommends the use of paid media to reach this portion of the EPP Consumer class.

According to the Centers for Disease Control and Prevention (CDC), shingles, also known as zoster or herpes zoster, affects almost 1 in 3 persons in the United States in their lifetime, with about half of all cases occurring in men and women 60 years of age or older.[5] The CDC also indicates that post-herpetic neuralgia (PHN), the most common complication of shingles, rarely occurs among people under 40 years of age, but can occur in up to a third of untreated people who are 60 years of age and older.[6]

It is our understanding that Lidoderm is the brand name for lidocaine 5% patches, which are used to relieve the pain of PHN. PHN is also known as "after-shingles" pain and is characterized by severe pain in areas where affected persons had the shingles rash, even after the rash clears up. The pain may resolve in a few weeks or months in most patients, but may last for many years for others. Older persons are more likely to develop PHN, and the pain is more likely to be intense.[7]

A CDC recommendation on the prevention of herpes zoster indicates that virtually all studies on zoster have identified an association between age and increasing zoster (and therefore PHN) incidence.[8] One study showed zoster incidence increased by age (from 0.74 incidents per 1000 person years in children younger than 10 years of age, to 10.1 per 1000 person years in adults aged 80-89 years), with much of the increase in incidence beginning at age 50-60 years.[9] The table below indicates the rate* of risk for experiencing two or more months of pain from PHN† increasing 27.4 times among patients aged 50 years of age or older, compared with those younger than 50; approximately 80%-85% of PHN occurs in zoster patients 50 years of age or older.[10]

[5] Centers for Disease Control and Prevention. (2016). Shingles (Herpes Zoster) Overview. Retrieved from https://www.cdc.gov/shingles/about/overview.html

[6] Centers for Disease Control and Prevention. (2016). Shingles (Herpes Zoster) About. https://www.cdc.gov/shingles/about/complications.html

[7] Id.

[8] Centers for Disease Control and Prevention, National Center for Immunization and Respiratory Diseases, Division of Viral Diseases (2008). Preventions of Herpes Zoster Recommendation of the Advisory Committee on Immunization Practices (ACIP). Retrieved from https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5705a1.htm

[9] Id.

[10] Id.



*Per 1,000 person-years.
†Defined as ≥30 days of pain.

Based on this information, GfK MediaMark Research & Intelligence, LLC (MRI)[11] data was studied among adults 45 years of age or older who have used a branded or generic prescription remedy personally in the last twelve months for chronic/severe pain ("A45+ Prescription Pain Remedy Consumers"), because this broad, over inclusive target group indicates and best represents the consumer class. MRI data was also studied among adults 65 years of age or older who have used a branded or generic prescription remedy personally in the last twelve months for chronic/severe pain ("A65+ Prescription Pain Remedy Consumers").

Knowing the characteristics, interests, and habits of a target group aids in the media selection process. Below is a summary of that information relevant to this matter.

- Demographic highlights of A45+ Prescription Pain Remedy Consumers include the following:
  - 97.6% speak English most often;
  - 90.8% live in a household consisting of one to four people and 66.2% live in a household consisting of one or two people;
  - 86.1% are white;
  - 83.3% have graduated from high school and 50.6% have attended or graduated from college or beyond;
  - 73.7% live in a Metropolitan CBSA;[12]

---

[11] GfK MRI is a nationally accredited research firm that provides consumer demographics, product and brand usage, and audience/exposure in all forms of advertising media. Established in 1979, MRI measures the usage of nearly 6,000 product and service brands across 550 categories, along with readership of hundreds of magazines and newspapers, internet usage, television viewership, national and local radio listening, yellow page usage, and out-of-home exposure. Based on a yearly face-to-face interview of 26,000 consumers in their homes, MRI's Survey of the American Consumer™ is the primary source of audience data for the U.S. consumer magazine industry and the most comprehensive and reliable source of multi-media audience data available.

[12] Core Based Statistical Areas (CBSAs) consist of the county or counties or equivalent entities associated with at least one core (urbanized area or urban cluster) of at least 10,000 population, plus adjacent counties having a high degree of social and economic integration with the core as measured through commuting ties with the counties associated with the core. The general concept of a CBSA is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of

© 2018 KCC LLC
Proprietary and Confidential

- o 70.2% are **not** employed;
- o 69.2% have lived at their current address for five years or more;
- o 67.0% are women;
- o 65.2% own a home;
- o 62.4% have a household income of $30,000 or more, 56.5% have a household income of $35,000 or more, and 51.4% have a household income of $40,000 or more;
- o 61.6% live in County Size A or B, with 32.4% living in County Size B;[13]
- o 60.4% own a home valued less than $500,000; and
- o 54.8% are married.

- On average, A45+ Prescription Pain Remedy Consumers:[14]
  - o are 60 years of age;
  - o have a household income of $60,825; and
  - o own a home valued at $211,988.

- Also important is the fact that, compared to the adult population 45 years of age or older, A45+ Prescription Pain Remedy Consumers are:
  - o 2.1 times more likely to have a household income between $10,000-$19,999, 66.3% more likely to have a household income under $10,000, and 20.8% more likely to have a household income between $30,000-$39,999;
  - o 66.1% more likely to live in a Micropolitan CBSA;
  - o 56.2% more likely to live in County Size D and 9.0% more likely to live in County Size B;
  - o 54.0% more likely to rent their home;
  - o 49.8% more likely to own a home valued less than $100,000;
  - o 37.3% more likely to **not** be employed;
  - o 26.5% more likely to be women;
  - o 24.9% more likely to have **not** graduated from high school, 15.1% more likely to have attended college, and 5.4% more likely to have graduated from high school as the highest degree received;
  - o 23.9% more likely to live alone;
  - o 22.9% more likely to have lived at their current address for one to four years and 8.8% more likely to have lived at their current address for less than one year;

---

economic and social integration with that core. CBSAs are defined by the U.S. Office of Management and Budget to provide a nationally consistent set of geographic entities for the United States and Puerto Rico for use in tabulating and presenting statistical data. Metropolitan Statistical Areas are CBSAs associated with at least one urbanized area that has a population of at least 50,000. The metropolitan statistical area comprises the central county or counties or equivalent entities containing the core, plus adjacent outlying counties having a high degree of social and economic integration with the central county or counties as measured through commuting. Micropolitan Statistical Areas are CBSAs associated with at least one urban cluster that has a population of at least 10,000 but less than 50,000. The micropolitan statistical area comprises the central county or counties or equivalent entities containing the core, plus adjacent outlying counties having a high degree of social and economic integration with the central county or counties as measured through commuting.

[13] Nielsen County Size classifications are based on Census household counts and metropolitan proximity. There are four county size classes, "A," "B," "C," and "D." "A" counties are highly urbanized areas and belong to the 21 largest Metropolitan Statistical Areas. The combined counties contain 40% of United States households. "B" counties are counties not defined as A counties that have more than 85,000 households. The combined counties contain 30% of United States households. "C" counties are counties not defined as A or B counties that have more than 20,000 households or are in Consolidated Metropolitan Areas or Metropolitan Statistical Areas with more than 20,000 households. The combined counties contain 15% of United States households. "D" counties are all counties not classified as A, B, or C counties. They are considered very rural. The combined counties contain 15% of United States households.

[14] The average age for U.S. adults is 47, the average household income is $81,761, and the average home value is $268,528.

© 2018 KCC LLC
Proprietary and Confidential

- o   17.2% more likely to live in the South Census Region and 14.4% more likely to live in the Midwest Census Region;
- o   7.5% more likely to be white; and
- o   6.1% more likely to have never married.

*Source: 2017 MRI Doublebase Study*

Based on our analysis, we prepared a media plan to reach the consumer class—the following details a consumer media plan with 80% reach goal.

## Proposed Notice Tactics to Reach Consumer Class Members

➤ ***Consumer Media Plan – 80% Reach Goal***

1. **Consumer Publications:** We recommend placing a summary notice in the following leading consumer publications among A45+ Prescription Pain Remedy Consumers.

| Publication | Issuance | Notice Size[15] | # of Insertions |
|---|---|---|---|
| *People* | Weekly | Third Page | 1 |
| *Good Housekeeping* | Monthly | Third Page | 1 |
| **TOTAL** | | | **2** |



- • Circulation: 3,411,860
- • Adult Audience: 41,353,000
- • Weekly entertainment magazine featuring celebrity news, biographies and gossip
- • Reaches 21.1% of A45+ Prescription Pain Remedy Consumers
- • A45+ Prescription Pain Remedy Consumers are 24.3% more likely to be readers of *People*, as compared to the adult population 45 years of age or older
- • Provides a large number of pass along readers



- • Circulation: 4,315,905

---

[15] Given the older class demographics, if necessary, to allow for an adequate font size, we recommend that the notice size be increased to half page units.

- Adult Audience: 19,671,000
- Monthly women's magazine featuring articles on women's interest, product testing, recipes, health and more
- Reaches 16.7% of A45+ Prescription Pain Remedy Consumers
- A45+ Prescription Pain Remedy Consumers are 2.1 times more likely to be readers of *Good Housekeeping*, as compared to the adult population 45 years of age or older
- Extends reach among middle-aged females and homemakers

2. **Internet Banners**: According to MRI data, 78.9% of A45+ Prescription Pain Remedy Consumers have access to the internet at home using a computer and 74.5% have looked at or used the internet in the last 30 days. Compared to the adult population 45 years of age or older, A45+ Prescription Pain Remedy Consumers are 5.1% *less* likely to have access to the internet from home using a computer. Among the core target, A65+ Prescription Pain Remedy Consumers use internet media even less: 65.0% of A65+ Prescription Pain Remedy Consumers have access to the internet at home using a computer and 53.5% have looked at or used the internet in the last 30 days. Compared to the adult population 65 years of age or older, A65+ Prescription Pain Remedy Consumers are 10.2% *less* likely to have access to the internet at home using a computer, and 8.6% *less* likely to have looked at or used the internet in the last 30 days.

Additionally, 64.2% of A45+ Prescription Pain Remedy Consumers consume an average amount *or less* of internet media in an average week than the adult population 45 years of age or older; however, they are 63.9% more likely to be considered *heavy* internet users, as compared to the adult population 45 years of age or older.

Despite low internet usage, comScore[16] research among adults who have purchased an over-the-counter remedy or prescription for shingles, who have searched for information or treatment from a branded drug site or online, or who have shingles as a condition themselves (Shingles Internet Users) suggests that paid internet notice will likely extend reach among A45+ Prescription Pain Remedy Consumers. The data suggests Shingles Internet Users likely fall within our target of A45+ Prescription Pain Remedy Consumers, as 50.5% of Shingles Internet Users are 45 years of age or older.

Therefore, we have used comScore to determine the number of internet impressions necessary to effectively extend reach among likely Class members. Based on our analysis, we recommend purchasing 157.5 million internet impressions to be distributed over leading networks such as the Google Display Network and the Yahoo! ad network, as well as the social media site Facebook over a period of 30 days. The impressions will appear on both desktop and mobile devices, including smartphones and tablets. The online ads will be targeted to adults 45 years of age or older (Adults 45+) and will include an embedded link to the case website. Conversion tracking will

---

[16] comScore is a leading cross-platform measurement and analytics company that precisely measures audiences, brands and consumer behavior everywhere, capturing 1.9 trillion global interactions monthly. comScore's proprietary digital audience measurement methodology allows marketers to calculate audience reach in a manner not affected by variables such as cookie deletion and cookie blocking/rejection, allowing these audiences to be reached more effectively. comScore operates in more than 75 countries, serving over 3,200 clients worldwide.

be used to monitor online behavior, as well as track likely Class members who file a claim online or who leave the case website before filing a claim.



© 2018 KCC LLC
Proprietary and Confidential

## Response Mechanisms

### Response Mechanisms

KCC advocates the utilization of a website and toll-free number to allow the class opportunities to solicit information and communicate about the case.

1. **Case Website:** The informational case website (www.lidodermantitrustlitigation.com) will be updated to allow class members the ability to obtain additional information and documents about the settlement, as well as file a claim online. The website address will be accessible through an embedded link in the email notice and the internet banner notices, as well as e-newsletter advertising.

2. **Toll-Free Number:** The toll-free number will be updated, to allow class members to learn more about the settlement in the form of frequently asked questions and answers and to request to have more information and a claim form mailed directly to them.

© 2018 KCC LLC
Proprietary and Confidential

# Optional Notice Plan Considerations

We recommend augmenting the Notice Plan presented above with additional efforts to effectively reach the Consumer Class and to maximize participation in the settlement. One or more of the below media plan options may be selected to supplement the Notice Plan.

## Larger Ad Units

If necessary to accommodate an adequate font size or to increase noticeability, the publication ad units may be increased to the sizes indicated below or larger:

| Publication | Notice Size |
|---|---|
| *People* | Half Page |
| *Good Housekeeping* | Half Page |

## Third-Party Poster Notice

We recommend mailing a letter, along with Notices and Tear-Away claim forms, to major pharmacy and supermarket chains requesting their assistance in placing the Notice Posters at prescription counters to reach potential consumer class members. KCC would provide draft letters used in similar circumstances.

## *ThinkAdvisor Life/Health* Co-Branded Email Blast

ThinkAdvisor can send a co-branded email to a specific audience of Life/Health email recipients. The sponsored email builds value by bringing the settlement Notice in front of a known audience from a trusted content source. The email blast may be sent to as many as 80,000 of ThinkAdvisor's Life/Health contacts.

## A/B or Split Testing

This is the process of running two or more sets of creative or targets and monitoring key performance indicators (KPIs) to identify stronger performing campaigns, ad units, or creatives. KPIs are generally clear, measurable goals, like click-throughs or conversions. Analysis of split-test campaigns is generally reserved for longer duration campaigns (4+ weeks). Common A/B test elements include: target group or keyword set; changing a call to action (e.g., "File a Claim" vs. "Learn More"); altering colors, images, backgrounds; and value proposition – slight changes to ad copy or benefit statements. KCC's digital specialists will use split testing to allocate efforts to creatives with better-performing KPIs. Campaigns may be monitored on a weekly or more frequent basis to optimize toward the best-performing initiatives. A/B testing may be added on to the existing Google Display or Facebook efforts as designated to the Notice Plan, and/or to select supplemental media considerations in this section.

## Targeted Internet

Targeted internet campaigns may display to specific audiences based on a user's interests or web-browsing behavior. Data that may be collected when an individual visits a website (for example, the pages they visit, the amount of time they view each page, the links they click on, the searches they make, or the things they interact with) helps composite a user profile for a particular demographic or web-browsing behavior. Ad servers then use this data to create defined audience segments based on individuals with similar profiles. In turn, advertisers may use these segments to position ads in front of those individuals who exhibit a greater level of interest and intent for a product or service being offered.

If desired, some internet impressions may be shifted to a more specific target of Adults 45+ whose online purchase behavior indicates an interest in pain relief. In addition, impressions may be shifted to appear on pages with content related to skin conditions and/or pharmacy, as well as pain management or drugs & medication, and to Adults 45+ who are in-market for skin care products.

## Retargeted Internet

Conversion tracking will be used to monitor the behavior of likely Class members as they navigate the case website. KCC may then retarget internet banner notices to those likely Class members who left the case website prior to filing a claim online. The retargeting effort may commence as early as four weeks after the start of the initial internet banner notice effort.

## Internet Paid Search Effort

Web browsers often open to a search engine page like Google, Bing, or Yahoo! As a result, search engines are frequently used to navigate to a specific website as opposed to typing in the desired URL. We suggest purchasing keywords related to the case. The paid search effort will consist of an ad with a hyperlink to the case website that may appear on the Google search engine results page(s) when purchased keywords are searched. Efforts would be monitored and optimized so that ads appear above or below organic search results for keywords generating the most click-throughs to the case website.





Search Google or type URL

## Native Advertising

Native advertising campaigns are paid advertising campaigns designed to follow the natural form and function of a user's website experience. Native ads appear blended within content or alongside organic stories or recommendations, rather than in designated ad space on a website's page. Consumers look at native ads 53% more frequently than traditional display banner ads. Native ads can appear on desktop, tablet, and mobile devices and generally consist of a headline, image, and descriptive text. The ad

© 2018 KCC LLC
Proprietary and Confidential

automatically configures to fit the form of the digital space on which the ad appears and links directly to the case website.

Ads may be purchased programmatically to target specific audiences. In this case, we recommend targeting native ads to Adults 45+ who have aches and pains, who purchase over-the-counter analgesics, who have demonstrated an interested in pain relief or pain relief brands over a period of 30 days.

## Social Media Monitoring/Listening

Social Media Listening is the active monitoring of a variety of social media channels for information. KCC will monitor blogs, news sites, micro-blogs such as Twitter, social networking sites, video/photo sharing websites, forums, message boards and other user-generated content to determine the volume and sentiment of online conversation about the settlement. If someone posts an inquiry or comment on online, KCC will respond uses an approved script or escalate the issue to counsel as needed.

## National Press Release

An informational press release may be issued nationwide. The release will include the toll-free number and website address so that Class members may easily obtain more information about the settlement. Although we are not able to speculate on the number of press outlets that will report the story, or be able to apply reach percentage or circulation statistics for them, the press release will provide a valuable role in distributing information in a cost-effective manner.

In this case we recommend issuing three press releases. The first press release would be issued at the launch of the notice campaign. It would provide an overview of the settlement and alert potential class about their rights and options. The second press release would be issued mid-way or toward the end of the notice campaign. It would remind class members to act on their rights, including their right to file a claim form. The third and final press release would be issued 15-30 days prior to the claims filing deadline. This press release would focus solely on reminding class members to file a claim form before the claims deadline.

## Expert Services

If desired, KCC's notice experts can provide an opinion regarding the effectiveness of the notice program. KCC Expert Services would include plain language notice design/drafting/review, preparation of a notice plan for court submission, and the preparation of opinionated declarations in conjunction with the motion for preliminary approval as well as for final approval.

## Notice Design & Drafting

The Notices may be designed and drafted by KCC's plain language notice expert to provide a clear, concise, plain language statement of class members' legal rights and options. The toll-free number and case website would be included in all printed notice documents and the case website would be accessible through an embedded link in the email notice and internet banner notices.

# Notice Schedule

The notice schedule contemplates notice commencing approximately 30 days from preliminary approval.

| Day | Event |
|---|---|
| Day 1 | Preliminary Approval Granted |
| Days 30-45 | Direct Notice Issued to TPPs via Mail and Email |
| Days 31-61 | 157.5 Million Internet Banner Impressions Targeted Nationally to A45+ are Distributed Over Google Display Network, Yahoo! ad network, and Facebook (30 day duration) |
| Days 31-61 (approx.) | 60,000 Internet Banner Impressions Run on ThinkAdvisor.com/life-health Channel (30 day duration) |
| Days 31-61 (approx.) | 66,845 Internet Banner Impressions Run on SHRM.org (30 day duration) |
| Day 35-60 (approx.) | *HR Magazine* On Sale |
| Day 45 (approx.) | *People* On Sale |
| Day 45 (approx.) | *HR Daily* E-Newsletter Issued |
| Days 45-50 (approx.) | *ThinkAdvisor Life/Health Daily* E-Newsletter Issued (5 days) |
| Day 90 (approx.) | *Good Housekeeping* On Sale |
| Day 120 (or later) | Exclusion & Objection Deadline |
| Day 120 (or later) | Claims Deadline |
| Day 120 (or later) | Final Approval Hearing |

## Conclusion

**Conclusion**

The proposed notice plan options provide the same reach and frequency evidence that courts have approved and is recommended by the FJC.

The notice plan options meet due process requirements and are consistent with the "desire to actually inform" due process communications standard of *Mullane*. All Notice Plan options would provide the same FJC-recommended reach and frequency evidence which have been approved by Courts, and withstood appellate scrutiny, other expert critiques, and collateral review.



# TERMS AND CONDITIONS

All services to be provided by KCC Class Action Services, LLC (together with its affiliates, "KCC"), including services provided to Client as set forth in the attached Proposal, are subject to the following Terms and Conditions:

**1.   SERVICES**. KCC agrees to provide the services set forth in the Proposal attached hereto (the "Services"). Capitalized terms not otherwise defined herein have the meanings given to such terms in the Proposal. KCC will often take direction from Client's representatives, employees, agents and/or professionals (collectively, the "Client Parties") with respect to the Services. The parties agree that KCC may rely upon, and Client agrees to be bound by, any direction, advice or information provided by the Client Parties to the same extent as if provided by Client. Client agrees and understands that KCC shall not provide Client or any other party with any legal advice.

**2.   PRICES, CHARGES AND PAYMENT**. KCC agrees to charge and Client agrees to pay, subject to the terms herein, KCC for its fees and charges as set forth in the Proposal. Client acknowledges that any estimate in the Proposal is based on information provided by Client to KCC and actual fees and charges may vary depending on the circumstances and length of the case. Notwithstanding the foregoing, where total charges are expected to exceed $10,000 in any single month, KCC may require advance payment from Client due and payable upon demand and prior to the performance of services. KCC's prices are inclusive of commission and other charges and are generally adjusted periodically to reflect changes in the business and economic environment. KCC reserves the right to reasonably increase its prices, charges and rates annually. If any such increase exceeds 10%, KCC will give thirty (30) days written notice to Client. Client agrees to pay the reasonable out of pocket expenses incurred by KCC in connection with Services, including, but not limited to, transportation, lodging, and meals.

KCC agrees to submit its invoices to Client and Client agrees that the amount invoiced is due and payable upon receipt. If any amount is unpaid as of thirty (30) days from the receipt of the invoice, the Client further agrees to pay a late charge (the "Finance Charge"), calculated as one and one-half percent (1-1/2%) of the total amount unpaid every thirty (30) days. In the case of a dispute in the invoice amount, Client shall give written notice to KCC within twenty (20) days of receipt of the invoice by Client. Client agrees the Finance Charge is applicable to instances where KCC agreed to provide certain pre-settlement work while deferring the billing of said work until the settlement phase.

**3.   FURTHER ASSURANCES**. Client agrees that it will use its best efforts to include provisions reasonably acceptable to KCC in any relevant court order, settlement agreement or similar document that provide for the payment of KCC's fees and expenses hereunder.  No agreement to which KCC is not a party shall reduce or limit the full and prompt payment of KCC's fees and expenses as set forth herein and in the Proposal.

**4.   RIGHTS OF OWNERSHIP**. The parties understand that the software programs and other materials furnished by KCC to Client and/or developed during the course of the performance of Services are the sole property of KCC. The term "program" shall include, without limitation, data processing programs, specifications, applications, routines, and documentation. Client agrees not to copy or permit others to copy the source code from the support software or any other programs or materials furnished to Client. Fees and expenses paid by Client do not vest in Client any rights in such property, it being understood that such property is only being made available for Client's use during and in connection with the Services provided by KCC.

5.   **CONFIDENTIALITY**. Each of KCC and Client, on behalf of themselves and their respective employees, agents, professionals and representatives, agrees to keep confidential all non-public records, systems, procedures, software and other information received from the other party in connection with the Services; provided, however, that if either party reasonably believes that it is required to produce any such information by order of any governmental agency or other regulatory body it may, upon not less than five (5) business days' written notice to the other party, release the required information. These provisions shall survive termination of Services. KCC will not accept, and Client agrees not to send, any information that may be deemed protected health information under state or federal law without the consent of the data subjects or pursuant to the terms of an agreed qualified protective order entered by a court of competent jurisdiction.

**6.   BANK ACCOUNTS**. At Client's request, KCC shall be authorized to establish accounts with financial institutions as agent for Client or as otherwise agreed by the parties. All Client accounts established by KCC shall be deposit accounts of commercial banks with capital exceeding $1 billion and an FIR rating of "A-" or higher (each, an "Approved Bank"). In some cases, KCC may derive financial benefits from financial institutions resulting from settlement funds and other moneys on deposit or invested with them including, for example, discounts provided on certain banking services and service fees.  The amounts held pursuant to these Terms and Conditions ("Amounts Held") are at the sole risk of Client and, without limiting the generality of the foregoing, KCC shall have no responsibility or liability for any diminution of the fund that may result from any deposit made with an Approved Bank including any losses resulting from a default by the Approved Bank or other credit losses.  It is acknowledged and agreed that KCC will have acted prudently in depositing the fund at any Approved Bank, and KCC is not required to make any further inquiries in respect of any such bank.

**7.   TERMINATION**. The Services may be terminated by either party (i) upon thirty (30) days' written notice to the other party or (ii) immediately upon written notice for Cause (defined herein). As used herein, the term "Cause" means (i) gross negligence or willful misconduct of KCC that causes serious and material harm to Client, (ii) the failure of Client to pay KCC invoices for more than sixty (60) days from the date of invoice, or (iii) the accrual of invoices or unpaid services where KCC reasonably believes it will not be paid. Termination of Services shall not relieve Client of its obligations to pay all fees and expenses incurred prior to such termination.

In the event that the Services are terminated, regardless of the reason for such termination, KCC shall reasonably coordinate with Client to maintain an orderly transfer of data, programs, storage media or other materials furnished by Client to KCC or received by KCC in connection with the Services. Client agrees to pay for such services in accordance with KCC's then existing prices for such services.

**8.   LIMITATIONS OF LIABILITY AND INDEMNIFICATION**. Client shall indemnify and hold KCC, its affiliates, members, directors, officers, employees, consultants, subcontractors and agents (collectively, the "Indemnified Parties") harmless, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, judgments, liabilities and expenses (including reasonable counsel fees and expenses) (collectively, "Losses") resulting from, arising out of or related to KCC's performance of Services. Such indemnification shall exclude Losses resulting from KCC's gross negligence or willful misconduct. Without limiting the generality of the foregoing, Losses include any liabilities resulting from claims by any third-parties against any Indemnified Party. Client shall notify KCC in writing promptly upon the assertion, threat or commencement of any claim, action, investigation or proceeding that Client becomes aware of with respect to the Services provided by KCC.

Except as provided herein, KCC's liability to Client or any person making a claim through or under Client or in connection with Services for any Losses of any kind, even if KCC has been advised of the possibility of such Losses, whether direct or indirect and unless due to gross negligence or willful misconduct of KCC, shall be limited to the total amount billed or billable for the portion of the particular work which gave rise to the alleged Loss. In no event shall KCC's liability for any Losses, whether direct or indirect, arising out of the Services exceed the greater of (i) the total amount billed and paid by or through Client for the Services and (ii) solely in the event of any loss of the Amount Held caused by KCC's gross negligence or willful misconduct, the total Amount Held under Section 6. . In no event shall KCC be liable for any indirect, special or consequential damages such as loss of anticipated profits or other economic loss in connection with or arising out of the Services. Except as expressly set forth herein, KCC makes no representations or warranties, express or implied, including, but not limited to, any implied or express warranty of merchantability, fitness or adequacy for a particular purpose or use, quality, productiveness or capacity. The provisions of this Section 8 shall survive termination of Services.

**9.   FORCE MAJEURE**. Whenever performance hereunder is materially prevented or impacted by reason of any act of God, strike, lock-out or other industrial or transportation disturbance, fire, lack of materials, law, regulation or ordinance, war or war condition, or by reason of any other matter beyond the performing party's reasonable control, then such performance shall be excused and shall be deemed suspended during the continuation of such prevention and for a reasonable time thereafter.

**10. INDEPENDENT CONTRACTORS**. KCC is and shall be an independent contractor of Client and no agency, partnership, joint venture or employment relationship shall arise, directly or indirectly, as a result of the Services or these Terms and Conditions.

**11. NOTICES**. All notices and requests hereunder shall be given or made upon the respective parties in writing and shall be deemed as given as of the third day following the day it is deposited in the U.S. Mail, postage pre-paid or on the day it is given if sent by facsimile or on the day after the day it is sent if sent by overnight courier to the appropriate address set forth in the Proposal or to such other address as the party to receive the notice or request so designates by written notice to the other.

**12. APPLICABLE LAW**. These Terms and Conditions will be governed by and construed in accordance with the laws of the State of California, without giving effect to any choice of law principles.

**13. ENTIRE AGREEMENT; MODIFICATIONS; SEVERABILITY; BINDING EFFECT**. These Terms and Conditions, together with the Proposal delivered pursuant hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersede all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof. If any provision herein shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby. These Terms and Conditions may be modified only by a written instrument duly executed by the parties. All of the terms, agreements, covenants, representations, warranties and conditions of these Terms and Conditions are binding upon, and inure to the benefit of and are enforceable by, the parties and their respective successors and permitted assigns.

IN RE LIDODERM ANTITRUST LITIGATION SETTLEMENT ADMINISTRATION