UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK, JUDGE

<u>IN RE LIDODERM ANTITRUST LITIGATION</u> )  No. 14-MDL-02521-WHO

San Francisco, California
Wednesday, September 12, 2018

## <u>TRANSCRIPT OF PROCEEDINGS</u>

<u>**APPEARANCES**</u>:

For End-Payor Plaintiffs:
GIRARD GIBBS, LLP
601 California Street
14th Floor
San Francisco, California  94108
BY: **DENA CONNOLLY SHARP, ESQ.**
**SCOTT M. GRZENCZYK, ESQ.**

HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, Minnesota  55403
BY: **RENAE D. STEINER, ESQ.**

For Direct-Purchaser Plaintiffs:
FARUQI & FARUQI, LLP
101 Greenwood Avenue
Jenkintown, Pennsylvania  19046
BY: **PETER KOHN, ESQ.**

GARWIN GERSTEIN & FISHER, LLP
10th Floor
New York, New York  10005
BY: **JOSEPH OPPER, ESQ.**

HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway
Suite 301
Cambridge, Massachusetts  02142
BY: **DAVID C. NALVEN, ESQ.**

Reported By: **BELLE BALL, CSR 8785, CRR, RDR**
Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**

For Plaintiff Government Employees Health Association, Inc.:
                         LOWEY DANNENBERG, P.C.
                         FOUR TOWER BRIDGE
                         200 Barr Harbor Drive
                         Suite 400
                         West Conshohocken, Pennsylvania
               **BY:  GERALD LAWRENCE, ESQ.**

For Defendant Endo Pharmaceuticals, Inc.:
                         WILLIAMS AND CONNOLLY, LLP
                         725 Twelfth Street, N.W.
                         Washington, D.C.  20005
               **BY:  HEIDI K. HUBBARD, ESQ.**

                         ARNOLD & PORTER KAYE SCHOLER, LLP
                         Three Embarcadero Center
                         10th Floor
                         San Francisco, California  94111-4024
               **BY:  DANIEL B. ASIMOW, ESQ.**


For Teikoku Defendants:
                         SQUIRE PATTON BOGGS (US) LLP
                         275 Battery Street
                         Suite 2600
                         San Francisco, California  94111
               **BY:  JOSEPH A. MECKES, ESQ.**

For Watson Defendants:
                         SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
                         1440 New York Avenue N.W.
                         Washington, D.C.  20005
               **BY:  SEAN M. TEPE, ESQ.**

|  |  |
|---|---|
| 1 | **Wednesday - September 12, 2018**          **2:03 p.m.** |

2                             **P R O C E E D I N G S**

3         **THE CLERK:** Calling Civil Matter 14-2521, In Re:

4 Lidoderm Antitrust.

5       Counsel, please come forward and state your appearances.

6         **MS. SHARP:** Good afternoon, Your Honor. Dena Sharp,

7 Girard Gibbs, for the end-payor plaintiffs.

8         **THE COURT:** Good afternoon.

9         **MS. STEINER:** Renae Steiner, Heins, Mills & Olson, for

10 end-payor plaintiffs.

11         **MR. KOHN:** Good afternoon, Your Honor. Peter Kohn

12 from Faruqi & Faruqi, for the direct purchaser plaintiffs.

13       With me today are Joe Opper from the Garwin Gerstein firm,

14 co-lead counsel for the directs, and David Nalven of Hagens

15 Berman, also for the directs.

16         **THE COURT:** Welcome, all.

17         **MR. LAWRENCE:** Good afternoon, Your Honor. Gerald

18 Lawrence on behalf of GEHA and the 17 independent plans that

19 opted back into the class.

20         **THE COURT:** All right. Good afternoon.

21         **MS. HUBBARD:** Good afternoon, Your Honor. Heidi

22 Hubbard from Williams & Connolly, on behalf of Endo.

23         **MR. ASIMOW:** And good afternoon, Your Honor. Daniel

24 Asimow, Arnold & Porter, also on behalf of Endo.

25         **MR. MECKES:** Good afternoon, Your Honor. Joe Meckes

1 from Squire Patton Boggs, for the Teikoku defendants.

2 **MR. TEPE:** Good afternoon, Your Honor. Sean Tepe,

3 Skadden Arps, on behalf of the Watson defendants.

4 **THE COURT:** Well, welcome everybody. Glad to see you

5 all again.

6 Is there anybody here in the audience who is here to speak

7 to the fairness of the settlement of In Re: Lidoderm Antitrust

8 Litigation?

9 (No response)

10 **THE COURT:** Hearing no one. Ms. Sweeney is not here.

11 So I think I will grant the order with respect to her

12 discovery, I'll sign off on that.

13 So Mr. Kohn, I would like to start with you. I have just

14 a couple of questions for you.

15 Just, in the way that your comprehensive declaration was

16 organized, there are some things that I thought it would be

17 helpful if we just got clearly on the record.

18 **MR. KOHN:** Yes, Your Honor.

19 **THE COURT:** And the first one is: Can you describe

20 for me the steps that you took to ensure that this class action

21 was handled in an efficient manner, given all of the people who

22 were working on it?

23 **MR. KOHN:** Yes, Your Honor. There were several ways.

24 The first thing we did was that we made sure that

25 everybody understood that work that was not authorized by

1  co-lead counsel could not be performed.  And we did that

2  immediately following our appointment as co-lead counsel.

3      The second thing we did was we had weekly meetings.  And

4  the weekly meetings were attended, they were presided by --

5  upon by co-lead counsel.  They were attended by all of the

6  document reviewers.  And the documents reviewers were divided

7  up into teams.  And the teams did not have any overlap with one

8  another.

9      And attorneys were placed on a team, whether the team was

10  the patent litigation team or the causation team, or the

11  economics team, or the agreements team, for instance, based on

12  the experience of those attorneys.  So that there was really

13  nobody who was climbing up a learning curve, and learning in

14  the course of the Lidoderm antitrust litigation.

15      Each of these teams was directed to take the 3.6 million

16  pages of documents that the defendants produced, to formulate

17  search strategies in order to get the documents that were

18  relevant to that particular team's particular issues, and

19  assemble a white paper in order to assist the deposition-takers

20  in later taking depositions and in understanding the case.

21      Before any of the teams could do those searches, they had

22  to send the proposed searches to co-lead counsel.  And we,

23  instead of having people, through trial and error, just do

24  things, and then it was a mistake, and do it again, we signed

25  off on their searches.  So we made sure that we were all in

agreement that the document searching would be done once, and it would be done right, and it would be done in a non-duplicative manner.

After that, we would continue to have calls. And I often presided over these calls. And I would put the members of each of the teams on the spot to talk about where they were in the course of their review, and what things were looking like. And we put some very tough questions to people.

These calls lasted about an hour. And they -- and somebody was put on the spot from each team during each of the calls and they were held weekly.

After that was done, and after each of the teams had assembled the documents that they thought they needed for a particular issue, they were to put together what was called a white paper. And this was to be an annotated compendium of the documents, their significance, and their proposed use for the issues in the case.

The white papers were not freeform. Just like the searches were signed off on by co-lead counsel, the structure of these white papers were, at first, outlines. And each team had an outline. And co-lead counsel signed off on each outline before it was populated with the documents, so it could be done once in a non-duplicative manner.

Those white papers went through three revisions. Not because of duplication, but because of continued production by

1    the defendants.

2         There was a pre-production in the case that preceded the

3    Court's decision on the motion to dismiss.  That was the first

4    thing the teams went through.  And then there were at least two

5    productions thereafter, before the end of fact discovery.

6         Those white papers were very efficient because they formed

7    the basis for the deposition-takers to decide what documents

8    they would be using in order to take the depositions.

9         I have been in many cases where document reviewers review

10   documents, write white papers, and then deposition-takers do it

11   all over again, and completely re-prepare the case, doing

12   document review, having their own team to do the document

13   review, in preparation for a deposition.  That's highly

14   inefficient.  And it was something that I determined would not

15   occur in this case.

16        And so the deposition-takers, who were not people who were

17   not learned in the particular area that the fact witness was to

18   cover, but who, instead, were people who were up the learning

19   curve on that subject matter, would take the white papers for

20   that particular subject, would extract the documents.  And any

21   supplemental searching was very limited.  And this made for

22   deposition preparation that was extremely efficient.

23        The directs were not the only ones that were involved in

24   the process just before depositions were taken.  In the

25   beginning we were -- you know, we kind of ran, ran the show.

But midway through, the end-payors were assigned to the various teams, as well.  And they assisted us.  And in that way, there was an added layer of efficiency.

So for instance, Ms. Sharp was on the agreements team.  And the agreements team divided up even further, for efficiency purposes, to an Endo team, a Watson team, and a Teikoku team.  And Ms. Sharp was part of the Teikoku team, along with Mr. Nalven.

And in this way, they gained expertise.  And so they weren't having to relearn the cases to Endo or the cases to Watson, trial preparation aside.  But during discovery, they didn't have to learn those other parts of the cases.  They were specializing.  That added efficiency.  And it wasn't just efficiency with the directs; it was efficiency among all of the counsel who were preparing the case.

The same general thing happened in expert discovery.  If there was a lawyer who had a particular expertise, he or she would end up handling our particular expert on that subject matter.

Well, instead of having somebody completely different deal with the 15 experts the defendants found to oppose our experts, we had those same people handling the defense experts who handled the plaintiff experts.  So they defended the plaintiff expert depositions, and they took the defense expert depositions.

So I think the basic theme that Your Honor is probably hearing from me is that we had specialization within the direct purchasers.  And we utilized that specialization to ensure that people were not duplicating everybody else's work.

THE COURT:  Two other things struck me.

In comparing the expenses of the EPPs as opposed to the DPPs, the expenses -- travel, meals, hotel -- were almost twice the amount for the DPPs as the EPPs.

MR. KOHN:  Uh-huh.

THE COURT:  And so, if you could explain that.

MR. KOHN:  I think -- and this is a hypothesis, Your Honor, because I haven't made a study of what it is that you just asked.

But my hypothesis would be that because the DPPss took the bulk of the expert depositions and the fact depositions -- which is not to say that the EPPs did not contribute.  Please, don't get me wrong.  But because of just the sheer numbers, I think there was probably more travel involved.

I would have to make a study, though, of what Your Honor is talking about in terms of travel expenses.

Speaking for myself, I found -- I only took BART.  I still have my BART card here (Indicating).  And I know that from SFO to Montgomery is $9.65.

And, and I made it a game to find hotels in San Francisco under $200 a night.  And it was a challenging game, but I

almost --

      **THE COURT:**  That's a good game.

      **MR. KOHN:**  I almost always won.

  And -- but if the Court would like, I will take a harder look at the travel expenses, and see what I can see.

      **THE COURT:**  Well, my supposition was that you ended up taking closer to two-thirds of the depositions.

      **MR. KOHN:**  (Nods head)

      **THE COURT:**  And to me, that probably is the explanation.  But I just -- I wanted to see what you thought.

  What about -- the rate of contract attorneys was also different between the two groups.  Yours was between 490 to 590 an hour, and the EPPs were 350 an hour.

  What explains that, if you know?

      **MR. KOHN:**  I don't know.  I personally don't use contract attorneys.  And so it's not my preferred way of reviewing documents.

  And frankly, I didn't even know there were contract attorneys, I will confess here at the bar of the Court.  And I will look into that, if the Court would like.

      **THE COURT:**  Let me ask you another question.

  Do you know the amount that RG2 has charged to date, and what the ultimate charges are likely to be?

      **MR. KOHN:**  It's not going to be high.  I think it's -- it's -- I don't actually know what it is.

The Court should know that during the notice phase, the claims administrator charged maybe $5,000. During the entirety of the claims administration phase, I would be shocked if the number ended up much above $20,000.

**THE COURT:** All right. Well, so those were my questions.

The settlement amount that you achieved is an excellent amount. And is certainly approvable as being fair, reasonable and adequate to the class.

With respect to the attorneys' fees, you undertook serious risk in this case. As I said throughout the litigation, the lawyering on both sides -- but now I'm just talking to you because it's your money on the line -- was excellent. And very much appreciated.

This case involved complicated discovery and complicated and novel legal issues. And so the multiplier that you seek of your fees is modest, at 1.05. And the incentives you seek are not modest for each of the three representatives, but I think they fall within the reasonable range of 100,000.

So, I am -- I'm going to grant the -- both the motion and the request for fees.

I would be interested in answers to the questions that I raised. But neither of them would -- all I would end up doing with the expenses, if the expenses seemed overcharged, would be to funnel them back into the attorneys' fees, given what I've

just said about the work that was done.

So, congratulations.

**MR. KOHN:**  Thank you, Your Honor.  It's been a
pleasure.

**THE COURT:**  Ms. Sharp.

**MS. SHARP:**  Thank you, Your Honor.  Dena Sharp.

**THE COURT:**  So I don't have the same questions for
you, because I could figure out more readily from your
declarations how the efficiencies were achieved with the EPPs.

And so I guess my question for you:  Right now, how many
consumer claims have been made?

And what's the expectation?

**MS. SHARP:**  Sure.  So let me update the Court a bit on
that.

The Court has before it the declaration of Carla Peak from
KCC.  And that is at ECF No. 1036-2.  That provided the numbers
that we had as of September 4th.  We have a few updates to
that.

**THE COURT:**  Okay.

**MS. SHARP:**  We now have well over 25,000 claims from
consumers.  More like 28,000.  Which is nothing to sneeze at,
we would say.

The website has experienced more than 140,000 hits.  And
so we can surmise from that, that the notice has been
effective.  And of course, the reach there is expected to be

1   80 percent of the consumer class, so that's a pretty

2   substantial number of folks.

3        With regard to the third-party payors, the claims rate

4   there is not yet as robust as we would expect.  But as set

5   forth in Ms. Peak's declaration, third-party payors tend to do

6   what so many of us do, I guess, and wait until close to the

7   deadline.  And that has been borne out by experience by most of

8   our colleagues here (Indicating).

9        For example, GEHA and the separately-represented end

10  payors have not yet submitted claims.

11       My office has also spoken to several third-party payors

12  with whom we've been in touch throughout the litigation.

13  And -- just to check in, make sure everything's okay.  And

14  without fail, every one of them confirms:  Yeah, we're working

15  through it; we've been working with the claims administrator;

16  we're going to submit those claims as soon as we can.

17       So everything appears to be on track.  We don't have any

18  reason to believe we're going to have problems paying out the

19  fund.

20       And of course, the plan of allocation sets forth how that

21  would happen, in the event that we do get, you know,

22  substantial claims from the consumers, and can pay them out

23  fully, and then spill over to the third-party payor pool if it

24  comes to that.

25            **THE COURT:**  All right.  So, again, I -- you know, I

should let -- I should have probably let the -- see whether any

of the defendants wanted to say anything with respect to the

settlement before I continue on granting what I intend to

grant.

Does anybody want to chime in at this point?

**MS. HUBBARD:**  Your Honor, this is one of the rare

times when I'm going to sit here and not talk in court.

**THE COURT:**  All right.

Well, so, again, the settlement that the end payors

achieved was excellent, and is certainly approvable as being

fair, reasonable and adequate.  And I will approve it.

And if there was ever a case for a multiplier, I think

this is that case.  Because of the very high risk, the

expensive nature of this, the high-quality lawyering, and the

result.  So I'm going to approve the fee request, as stated.

The incentives are -- awards are also fine, at 10,000.

So, I am -- I'm ready to go.

But, I guess Ms. Steiner doesn't want me to approve it,

so...

**MS. STEINER:**  I hate to look a gift horse in the

mouth, Your Honor.

But we did realize we had failed to submit one expense

which was some of the trial work, deposition of Cutting, we

didn't get the bill until after we submitted.  So it's another

$3,642.50.

**THE COURT:** Forget it. So, say it again. It's three-thousand --

**MS. STEINER:** It's $3,642.50. And we can submit an order with that number in, or we can hand you this Post-It note (Indicating), which is how we did it today. Either way.

**THE COURT:** I think the order might work better. So if you would do that, that would be fine.

**MS. STEINER:** Okay, thank you.

**THE COURT:** So then we have the issue with respect to, I guess, GEHA and the expenses.

**MR. LAWRENCE:** Yes, Your Honor. Gerald Lawrence, Your Honor, on behalf of GEHA and the 17 separately represented large health plans.

**THE COURT:** So explain why the expenses for document hosting and Dr. Melnick were not duplicative.

**MR. LAWRENCE:** Absolutely, Your Honor. If I could say three things, sort of set some context of who we are, who we represent.

Secondly, a brief bit of legal argument about why they were not.

And then, I could also address the specifics of them as well, if you'd like.

**THE COURT:** Okay.

**MR. LAWRENCE:** Our clients, in addition to GEHA who actively litigated the case -- and, as you know, we

participated in deposition, we questioned witnesses.
Mr. St. Phillip was here in front of Your Honor many times.

We also represented 17 large health plans, including
Aetna, Cigna, Humana, Anthem.  We had three to five of the
largest health plans in the country who, themselves, have
almost a 40 percent market share of covered lives.
Collectively, that group is in the neighborhood of two-thirds
of the collective -- covered lives with insurance, private
insurance, in the United States.

The standard -- which is not easy to find because it's not
often that you have these independently-represented plans that
would incur expenses, and then opt back into part of the class.
But the standard in the *Hughes Aircraft* case says that if you
create, increase, or preserve a fund, you are entitled to
recover your costs.  And that's a Ninth Circuit case, 557 F.2d,
that's on Page 769.

Applying that standard, if you look at this, did we bring
value to this fund?

And I think that, without question, we did.

**THE COURT:**  But -- and you've been compensated in --
for at least some of those expenses.  It's just these two
categories that I'm interested in hearing about.

**MR. LAWRENCE:**  Absolutely correct, Your Honor.

And first of all, I want to say I respect counsel's right
(Indicating) to say that they did not feel comfortable in

submitting those to the Court.

You know, I'm a former member of the Disciplinary Board in Pennsylvania, I'm on the Board of Law Examiners.  I deal a lot with attorney ethics issues.  And I very much respect them for saying to the Court that this is a close call.  It is.  I'll readily admit that.  Put it before Your Honor, and we're going to trust Your Honor's judgment on this.

They're not duplicative, because for us to bring that value, for us to increase the leverage to drive the settlement to the level that it was, which, Your Honor acknowledged it's an outstanding settlement, and for us to bring that increased recovery to the class, we had to engage in the litigation of the case.

And in order to engage in the litigation of the case, we had to have our clients' documents, which weren't part of their server.

And then we also had on that server the defendant's documents for our attorneys in our office that were working independently, but in a supportive role, that were participating in this litigation, to be able to review those documents.

Similarly with Dr. Melnick's report.  For Dr. Melnick to do that report, we needed those documents.  That report was necessary for us to understand the theories of the case.  It was ultimately put before the Court as part of the -- as an

exhibit, and cited in the motion for summary judgment.
Submitted by the plaintiffs.

It was one of three reports that was cited there, that all
led to the same conclusion that we are hopeful are influential
on the Court to make the decisions that it did, which all
contributed to the ultimate issue:  Increasing the end payor's
leverage, and increasing the value of the recovery of the end
payors.

That's why we think they're necessary.

**THE COURT:**  So did you not have access to the
documents that the end payors had collected?

**MR. LAWRENCE:**  That's correct, Your Honor.  We did not
have access to their electronic system.  We had to maintain our
own database to work with those documents.

**THE COURT:**  Okay.  And is that the document hosting
and review system that Ms. Sharp has identified?

**MR. LAWRENCE:**  In the papers, right.  We had our own
system.  And it was at a cost of 184,934.13, as described in
the papers.

**THE COURT:**  And at trial, if we had gone to trial,
would Dr. Melnick have testified on behalf of GEHA?

**MR. LAWRENCE:**  Absolutely, Your Honor.

**THE COURT:**  Okay.

Ms. Sharp, do you have anything you wanted to add with
respect to that?

1        **MS. SHARP:** I think not, Your Honor. We've set forth

2  our position in the papers.

3      As the Court noted, we agreed, subject, of course, to this

4  Court's approval, that more than $350,000 worth of the expenses

5  that Lowey Dannenberg claimed were -- fell appropriately within

6  the ambit of class expenses.

7      And we otherwise commit to the sound discretion of this

8  Court the resolution on these two categories.

9        **THE COURT:** And is it correct, as -- as I was just

10  told, that GEHA didn't have access to the documents that you

11  had gathered?

12        **MS. SHARP:** That's right, Your Honor.

13      We -- we had a document review database. I would be

14  digging into my memory to even remember whether there was ever

15  a discussion about coordination on that.

16      I -- I don't think that we ever had that discussion. And

17  I don't think GEHA ever came to us and said: Hey, do you guys

18  want to share a database?

19      Obviously, we would have had that discussion in that

20  context. We were, frankly, very focused on coordinating to the

21  extent possible with the direct purchasers because we thought

22  that was the most important thing at the time.

23      But it is true, yeah.

24        **THE COURT:** So I will allow the expenses that GEHA is

25  speaking.

1      I would certainly have benefited, or the jury would have,

2 from Dr. Melnick, one way or the other.  And if you didn't have

3 a way of necessarily accessing those documents, then I think

4 you needed to.

5      So --

6           **MR. LAWRENCE:**  Thank Your Honor.

7           **THE COURT:**  All right.

8      The one final thing is that there are motions to seal that

9 are outstanding.  Is there any reason now not to deny the

10 motions to seal?

11           **MS. SHARP:**  From our perspective, no.

12           **MR. KOHN:**  What she said.

13           **MS. HUBBARD:**  So Your Honor --

14      (Reporter interruption)

15           **MS. HUBBARD:**  Sure.  Heidi Hubbard.

16      So, Your Honor, we were not prepared for this issue today.

17 I understand that there may still be some confidential

18 propriety -- proprietary information of the company, but I'm

19 not prepared to say, one way or the other.

20      I know this had been an issue a number of months ago, and

21 I apologize.  I think we didn't realize it was going to be an

22 issue today.

23      Would it be all right if we submitted something in the

24 very near term that answered Your Honor's question?

25           **THE COURT:**  Yeah, in the very near term.  I would

1   really like to get these off the books.

2       These motions to seal are the bane of my existence, and

3   others that I care about.

4           **MS. HUBBARD:** Understood, Your Honor.

5           **THE COURT:** And it is not obvious to me why -- it's

6   not obvious to me what's there, and what would still be

7   proprietary.

8       So, would you look very carefully at that, with the idea

9   of getting something to me in a week?

10          **MS. HUBBARD:** Yes.

11          **THE COURT:** And tell me if there's anything that's

12  really important, and why.

13          **MS. HUBBARD:** Absolutely, Your Honor.

14      And, I apologize. This was not an issue in which I had

15  been involved, as we were getting ready for trial. And we will

16  get on it, and get you an answer within a week.

17          **THE COURT:** Okay. Excellent.

18          **MS. HUBBARD:** Thank you.

19          **THE COURT:** Okay. Well, so, is there anything else

20  that we need to do to resolve the matters pending before this

21  Court?

22          **MS. SHARP:** Not from my perspective, Your Honor.

23      And we will submit a revised fee order, as Ms. Steiner

24  offered, forthwith.

25          **THE COURT:** Excellent.

1   **MS. SHARP:**  Thank you.

2   **MR. KOHN:**  (Shakes head)

3   **THE COURT:**  Well, it has been pleasure to have read

4   what you write, and listen to what you say.  For me this was a

5   very -- it was a fascinating case.  And it was very well

6   litigated by all.

7       So, thank you all.

8   **MS. SHARP:**  Thank you.

9   **MR. KOHN:**  Thank Your Honor.

10  **MS. STEINER:**  Thank Your Honor.

11      (Proceedings concluded)

**<u>CERTIFICATE OF REPORTER</u>**

I, BELLE BALL, Official Reporter for the United States
Court, Northern District of California, hereby certify that the
foregoing is a correct transcript from the record of
proceedings in the above-entitled matter.


*Belle Ball*

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Thursday, September 13, 2018